Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133, 08-75161 & 08-75165

_____

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT
_____

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *et al.,*

    Petitioners,

    v.

BONNEVILLE POWER ADMINISTRATION,

    Respondent.
_____

PETITIONER'S BRIEF
_____

ON PETITION FOR REVIEW UNDER THE
NORTHWEST POWER ACT

JOHN R. KROGER
Attorney General
JEROME LIDZ
Solicitor General
STEPHANIE ANDRUS
Senior Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-6322

Attorneys for Petitioner
Public Utility Commission of Oregon

_____

_____

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION .......................................................................1

ISSUES PRESENTED .........................................................................................2

STATEMENT OF THE CASE ..............................................................................4

STATEMENT OF RELEVANT FACTS ...............................................................5

SUMMARY OF ARGUMENT ...........................................................................10

ARGUMENT ......................................................................................................12

    I.     BPA does not have authority for the Lookback Proposal because it is a retroactive rule requiring express congressional authority BPA does not have. ..................................12

          A.    Whether BPA engaged in retroactive rulemaking and whether BPA has authority to engage in retroactive rulemaking are questions of law the Court reviews *de novo*. ................................................................................... 12

          B.    The Lookback Proposal is a rule under the Administrative Procedures Act because it is a statement of general applicability designed to implement the NW Power Act. ........................................... 13

          C.    The Lookback Proposal increases the cost of power exchanged by investor-owned utilities from 2002 to 2007 and decreases the cost of power purchased by preference customers during that period and thus, has a retroactive effect under the test articulated by the United States Supreme Court in *Landgraf v. USI Film Products, et al.* ..................................................................... 15

          D.    An agency may engage in retroactive rulemaking only if authorized to do so by Congress "in express terms."...... 17

          E.    BPA concedes that it does not have "explicit authority for retroactively providing refunds" and thus, under the Supreme Court's opinion in *Bowen v. Georgetown University*, BPA's Lookback Proposal is unlawful ............ 19

i

F.      If this court reviews pertinent statutes to determine whether BPA has implicit authority for the Lookback Proposal, the court should find that BPA has none. ........... 20

II.     BPA does not have equitable authority to engage in curative retroactive rulemaking. .............................................................22

A.      BPA does not have authority under *United Gas Improvement, et al. v. Callery* to cure the past overcharges in preference customer rates with a billing credit because *Callery* addresses an agency's adjudicatory authority and preference rates and the billing credit are products of BPA's rulemaking authority. ........................................................................... 23

B.      BPA's reliance on this Court's opinion in *Newman v. Apfel* for the proposition that the general prohibition against retroactive rulemaking without congressional authority does not apply when discharging a judicial order on remand is misplaced. ............................................. 29

III.    BPA is precluded from exercising its "common law" right of setoff to recover REP benefits paid to investor-owned utilities under 2000 REP Settlement Agreements because under the express terms of 2000 REP Settlement Agreements, investor-owned utilities do not owe BPA a debt and in any event, there is no mutuality. ........................................34

A.      The provision in the 2000 REP Settlement Agreements that investor-owned utilities would retain benefits paid under the Agreement in the event the Ninth Circuit Court determined the Agreement was unlawful, void, or unenforceable is not a part of a regulation, and thus, this Court reviews BPA's interpretation of that provision *de novo*............................. 34

B.      Investor-owned utilities are entitled to retain benefits received under the 2000 REP Settlement Agreements........ 35

C.      Even if BPA was not precluded by the 2000 Settlement Agreements from invoking the common-law doctrine of setoff, the doctrine is not applicable in this case because there is no mutuality of debts. ................ 37

ii

IV. Even if the Lookback Proposal is within BPA's statutory authority, it is arbitrary and capricious because BPA did not analyze whether it is in the public interest. ...................................38

V. The Lookback Proposal is not supported by the circumstances and is arbitrary and capricious. .............................40

VI. BPA's decision to exclude applicable 7(g) costs from both the program and 7(b)(2) cases for purposes of the 7(b)(2) rate test is arbitrary and capricious. ...............................................42

  A. This Court reviews BPA's interpretation of the NW Power Act to determine whether it is arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law............................................................ 42

  B. The NW Power Act specifies that certain applicable 7(g) costs should be omitted from the "Program Case," but not the 7(b)(2) Case for purposes of the 7(b)(2) Rate Test and BPA erred in concluding otherwise. ............................................................. 42

VII. Conclusion................................................................................48

Addendum
 Statutes Cited in Brief         Add.-1

## TABLE OF AUTHORITIES

### Cases Cited

*Aluminum Company of America, et al. v. Central Lincoln People's Utility District, et al.,*
 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984) ..............................5

*Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway* Co.,
 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932) ............................ 26, 27

*Bowen v. Georgetown University,*
 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) .. 10, 16, 17, 18, 19, 20, 22, 24, 25, 28, 31, 32, 33

*Brimstone R. Co. v. United States*,
 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928) ...................................19

*Central Electric Power Cooperative, Inc. v. Southeastern Power*
*Administration,*
338 F.3d 333 (4th Cir. 2003) .................................................. 20, 21, 22, 34

*Citizens Bank of Md. v. Strump*,
516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (2005) .............................37

*Consumer Federation of America v. Federal Power Commission*,
515 F.2d 347 (D.C. Cir. 1975) ................................................................39

*Covey v. Hollydale Mobilehome Estates*,
116 F.3d 830 (9th Cir. 1997) ...................................................................15

*Friends of Southeast's Future v. Morrison*,
153 F.3d 1059 (9th Cir. 1998) ......................................................... 18, 19

*Golden NW Aluminum, Inc. v. Bonneville Power Administration*,
501 F.3d 1009 (9th Cir. 2007) ... 8, 9, 11, 23, 28, 32, 35, 36, 38, 39, 41, 48

*INS v. Cardoza-Fonseca*,
480 U.S. 421, 107 S. Ct. 1207, 94 L.Ed.2d 434 (1987) ..........................12

*Landgraf v. USI Film Products, et al.*,
511 U.S. 244, 114 S.Ct. 1483, 28 L.Ed.2d 229 (1994) .............. 15, 16, 17

*Livermore v. Heckler,*
743 F.2d 1396 (9th Cir. 1984) .................................................................31

*Motion Picture Association of America, Inc. v. Oman*,
969 F.2d 1154 (D.C. Cir. 1992) ..............................................................26

*Nat'l Mining Assoc. v. Dep't of Labor*,
292 F.3d 849 (D.C.Cir.2002) ..................................................................13

*Newberry Corp. v. Fireman's Fund Ins. Co.*,
95 F.3d 1392 (9th Cir. 1996) ...................................................................37

*Newman v. Apfel,*
223 F.3d 937 (9th Cir. 2000) ..................................................... 23, 29, 31

*Nw. Envtl. Def. Ctr. v. BPA*,
117 F.3d 1520 (1997) ...............................................................................42

*Portland General Electric Co. v. Bonneville Power Administration*,
501 F.3d 1009 (9th Cir. 2007) ............................... 6, 7, 9, 10, 35, 36, 39, 41

*Pub. Power Council, Inc. v. BPA*,
442 F.3d 1204 (9th Cir. 2006) .................................................................12

*Scamihorn v. General Truck Drivers*,
282 F.3d 1078 (9th Cir. 2002) .................................................................18

iv

*Securities and Exchange Commission v. Chenery Corporation ("SEC v. Chenery),*
   332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ............. 24, 25, 38, 39

*Securities and Exchange Commission v. Chenery Corporation,*
   318 U.S. 80, 63 S.Ct. 454, 87 L.Ed 626 (1943) ......................................38

*United Gas Improvement Co., et al. v. Callery Properties, Inc.*,
   382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965) ......................... 23, 25

*Utility Reform Project v. Bonneville Power* Administration,
   869 F.2d 437 (9th Cir. 1989) .......................................................................12

*Verizon Telephone Companies, et al. v. FCC,*
   269 F.2d 1098 (D.C. Cir. 2001) ....................................................... 26, 27

## Constitutional & Statutory Provisions

16 U.S.C. § 839c(c) ........................................................................................6

16 U.S.C. § 839c(c)(3) ....................................................................................7

16 U.S.C. § 839e ...........................................................................................43

16 U.S.C. § 839f .............................................................................................5

16 U.S.C. § 839f(e) .........................................................................................1

16 U.S.C. § 839f(e)(2) ...................................................................................12

16 U.S.C. § 839f(e)(5) .....................................................................................2

5 U.S.C. § 551(4) .................................................................................... 13, 15

5 U.S.C. § 706................................................................................................12

5 U.S.C. § 706(2) ..........................................................................................42

5 U.S.C. § 706(2)(a).......................................................................................12

Or. Rev. Stat. § 756.040..................................................................................5

## Other Authorities

Restatement (Second) of Contracts  (1981)...................................................... 37

**PETITIONER'S BRIEF**
_____

**STATEMENT OF JURISDICTION**

The Public Utility Commission of Oregon ("OPUC") petitions this court to review final actions by the Bonneville Power Administration ("BPA"). This court possesses jurisdiction of this matter under Section 9(e)(5) of the Pacific Northwest Electric Power Planning and Conservation Act ("the Northwest Power Act"), which grants this court original jurisdiction to review BPA's final actions.[1]

The final actions at issue are BPA's determination and implementation of its "Lookback Proposal" and BPA's adoption of a new "Section 7(b)(2) of the Pacific Northwest Electric Power Planning and Conservation Act Legal Interpretation" and "Section 7(b)(2) of the Pacific Northwest Electric Power Planning and Conservation Act Implementation Methodology." These actions were taken at the same time BPA issued final wholesale rates in its WP-07 Supplemental Rate Adjustment Proceeding ("WP-07S Rate Proceeding") on September 22, 2008. While BPA's decisions regarding the wholesale rates are not final until approved by the Federal Energy Regulatory Commission ("FERC"), the actions at issue in this matter are not subject to FERC approval

_____

[1]     16 U.S.C. § 839f(e).

and were final at the time BPA issued the WP-07S Rate Proceeding Final Record of Decision ("WP-07S Final ROD").

The Public Utility Commission of Oregon ("OPUC") timely filed its petition for review of the WP-07S Final ROD on December 22, 2008, within 90 days of the issuance of the WP-07S Final ROD.[2]

## ISSUES PRESENTED

(1) Agencies may not adopt retroactive rules unless so authorized by Congress. BPA's Lookback Proposal, a construct for determining what amount of benefits previously paid to customers of investor-owned utilities should be reallocated to BPA's preference customers, and how the benefits will be reallocated, was adopted by BPA in a rulemaking proceeding and is a statement of general applicability that fits within the definition of a rule under the Administrative Procedures Act. The Lookback Proposal is retroactive because it (a) changes the rate at which investor-owned utilities "exchanged" power with BPA during a previous period, and concomitantly, the level of benefits owed to customers of investor-owned utilities for the prior exchanges; and (b) changes the rate at which preference customers purchased power during a previous period and concomitantly, the amount owed by preference customers

---

[2]    *See* 16 U.S.C. § 839f(e)(5) (prescribing 90 days to petition for judicial review).

for power purchased in that period.   BPA does not have congressional authority to adopt a retroactive rule to reallocate previously recovered costs.  These circumstances present the following legal issue:  Did BPA act unlawfully when it adopted a retroactive rule to reallocate to investor-owned utilities costs recovered from preference customers in a previous period without congressional authority?

(2)  Congress has imposed a ceiling on the amount of costs associated with the NW Power Act's Residential Exchange Program ("REP") that may be allocated to BPA's preference customers. Congress has prescribed a comparison that BPA must use to ensure preference rates are no higher than that ceiling – the "7(b)(2) Rate Test."   BPA compares two "cases" in the 7(b)(2) Rate Test – the Program Case and 7(b)(2) Case.  Congress directs BPA to omit from the calculation of costs making up the Program Case "amounts charged [preference] customers under subsection [7(g)] for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events," but does not include such a directive for the costs making up the 7(b)(2) Case.  Nonetheless, BPA concluded that it is required to omit the 7(g) costs ("the applicable 7(g) costs") from both the Program and 7(b)(2) Cases prior to the 7(b)(2) Rate Test comparison.  These circumstances present the following legal issues:   Is BPA's conclusion that it is required to omit

4

applicable 7(g) costs from both the Program and 7(b)(2) Cases for purposes of the 7(b)(2) Rate Test contrary to law?

## STATEMENT OF THE CASE

This is a petition for review of BPA's final actions in a rulemaking proceeding, the WP-07S Rate Adjustment Proceeding ("WP-07S Rate Proceeding"), opened to address the Court's 2007 remand in *Golden NW Aluminum v. Bonneville Power Administration* ("*Golden NW*").[3] In *Golden NW*, the Court addressed wholesale power rates set by BPA in the early 2000's in the WP-02 Rate Proceeding. The Court held that BPA erred by including in preference customers' wholesale power rates certain costs associated with benefits paid to customers of investor-owned utilities under the Residential Exchange Program "REP." The Court also held that BPA erred in disregarding certain information related to fish and environmental costs and that BPA's decision regarding the appropriate cost recovery for fish and environmental costs was not supported by substantial evidence.

In the WP-07S Rate Proceeding, BPA decided to make a retroactive downward adjustment to the benefits due investor-owned utilities under the REP for the period the WP-02 rates were effective and investor-owned utilities

---

[3] OPUC. E.R. Vol. I, 23 (R.A.R. 062333).

received REP benefits under the 2000 REP Settlement Agreements (2002-2007), exact return of benefits paid to the investor-owned utilities that exceeded the adjusted amount, and pay the returned benefits to preference customers that paid the illegal charges under the WP-02 rates.

The OPUC is charged by statute with protecting the customers of investor-owned utilities from unjust and unreasonable practices and filed the petition for review in this matter to fulfill this statutory directive.[4]

## STATEMENT OF RELEVANT FACTS

BPA is federal power marketing agency.[5] BPA's customers include publicly-owned utilities, cooperatives and federal agencies, ("preference customers"), investor-owned utilities, and direct-service industries.[6] BPA determines the wholesale rates it will charge these customers by rule.[7]

---

[4]     Oregon Revised Statute § 756.040.

[5]     *See e.g. Aluminum Company of America, et al. v. Central Lincoln People's Utility District, et al.,* 467 U.S. 380, 382-83, 104 S.Ct. 2472, 2475-6, 81 L.Ed.2d 301 (1984).

[6]     *Id.,* 467 at 384, 104 S. Ct. at 2476.

[7]     16 U.S.C. § 839f(e)(2) (noting that administrative record in "7(i) proceeding" used to establish rates is rulemaking record).

6

BPA's authority as a power marketing agency derives primarily from four organic statutes.[8] The statute germane to most of the issues presented in this petition is the Northwest Power Act adopted in 1980.

Congress adopted the NW Power Act to address a regional dispute amongst various customer groups regarding the appropriate allocation of the relatively low-cost power marketed by BPA. Congress devised the REP for the purpose of granting customers of investor-owned utilities access to the relatively cheap power marketed by BPA.[9]

The REP provides that whenever a Pacific Northwest utility offers to sell to BPA electricity intended for residential customers at the utility's average system cost ("ASC") for producing such power, BPA shall purchase that power and offer, in exchange, to sell an equivalent amount of power to the utility for resale to its residential customers.[10] This Court has noted that the REP "essentially acts as a cash rebate to the IOUs where the IOUs' power costs exceed those of BPA."[11] The benefits of the REP are not for the investor-

---

[8]     *See e.g. Portland General Electric Co. v. Bonneville Power Administration*, 501 F.3d 1009, 1014 (9th Cir. 2007) ("*PGE*") (noting BPA's authority to market power is derived from four separate acts).

[9]     16 U.S.C. § 839c(c).

[10]     *Id.*

[11]     *PGE, supra,* 501 F.3d at 1015.

owned utilities themselves, but must be passed along, in their entirety, to the utilities' residential and small-farm customers.[12]

In 2000, BPA entered into individual settlement agreements with six northwest investor-owned utilities under which the investor-owned utilities and BPA stipulated to a method by which to establish the level of REP benefits for a ten-year period ("REP Settlement Agreements"). [13] BPA incorporated certain costs of the REP Settlement Agreements into the wholesale rates for its preference customers established in BPA's WP-02 Wholesale Power Rate Proceeding and supplemental proceedings. Various parties petitioned for review of BPA's final record of decision approving the 2000 REP Settlement Agreements and BPA's WP-02 rates.

In *Portland General Electric Co. v. Bonneville Power Administration* ("*PGE*"), the Ninth Circuit Court of Appeals addressed petitions for review of the Final Record of Decision approving the 2000 Settlement Agreements. The Court concluded that BPA acted outside of its authority when it determined the level of REP benefits owed to investor-owned utilities differently from the method prescribed by Section 5 of the NW Power Act.[14]

---

[12]    16 U.S.C. § 839c(c)(3).

[13]    *See PGE, supra,* 501 F.3d at 1023.

[14]    *Id.*, at 1036-37.

8

In *Golden NW Aluminum, Inc. v. Bonneville Power Administration* ("*Golden* NW"), the Court addressed rates set in BPA's WP-02 Rate Proceeding. The court concluded that BPA violated the NW Power Act by including certain costs of the REP (costs of the 2000 Settlement Agreements) in the calculation of preference rates.[15] The court also concluded in *Golden NW* that BPA acted contrary to the NW Power Act by declining to consider certain information in determining its estimates for fish and environmental costs and that the cost estimates underlying the WP-02 rates, and by extension the rates themselves, were not supported by substantial evidence.[16] The Court "remand[ed] to BPA to set rates in accordance with [the Court's] opinion.[17]

The Court remanded *Golden NW* to BPA while rates set in BPA's WP-07 Wholesale Rate Proceeding were pending review by FERC. BPA asked FERC to stay Commission action regarding the WP-07 rates while BPA considered the Court's remand. BPA then opened a new rulemaking docket under section 7(i) of the NW Power Act, the WP-07 Supplemental Wholesale Power Rate Adjustment Proceeding, to address the *Golden NW* remand.[18]

---

[15]    501 F.3d 1037, 1048 (9th Cir. 2007).

[16]    *Id.*, at 1052.

[17]    *Id.*, at 1053.

[18]    OPUC E.R. Vol. I, 23 (R.A.R. 062333).

9

In the WP-07S Final ROD, BPA concluded that under the Court's opinions in *PGE* and *Golden NW*, "some sort of retrospective relief * * * is mandated" for BPA's inclusion of certain REP exchange costs in WP-02 rates.[19] BPA explained that to provide this retrospective relief to preference customers BPA would:

(1)     Revisit the WP-02 rates charged during the FY 2002-2006 period and remove the REP Settlement Agreement costs from the rates;

(2)     return the resulting overcharges as "credits" to the preference customers for past overpayments; and

(3)     offset future REP benefits for the IOUs that were overpaid REP benefits under the REP Settlement Agreements.[20]

BPA adopted the "Lookback Proposal" to accomplish these objectives. The Lookback Proposal is a methodology that determines the amount of REP benefits it (BPA) believes it overpaid investor-owned utilities from 2002 to 2007 ("the Lookback Period") and how these overpayments will be deducted from future REP benefits and credited to preference customers in future bills.[21]

---

[19]     OPUC E.R. Vol. I, 38 (R.A.R. 062348).

[20]      OPUC E.R. Vol. I, 31 (R.A.R. 062341).

[21]     OPUC E.R. Vol. I, 32, (R.A.R. 062342).

## SUMMARY OF ARGUMENT

(1)     In response to the court's invalidation of wholesale power rates set in BPA's WP-02 Rate Proceeding and remand, BPA opened a rulemaking proceeding to determine how to provide retrospective relief for the effect of the invalidated rates.  BPA adopted a rule—the Lookback Proposal—that specifies how BPA will calculate the amount of excess benefits provided to customers of investor-owned utilities under the provisions of REP Settlement Agreements found to be unlawful by the court in *PGE* and how BPA will recover these excess amounts from customers of investor-owned utilities and redistribute them to preference customers.

The Lookback Proposal is a retroactive rule because it changes the cost of power exchanged by investor-owned utilities in a prior period and changes the cost of power purchased by preference customers during that same prior period.  BPA does not have explicit Congressional authority to adopt a retroactive rule like the Lookback Proposal and accordingly, it is unlawful under the United States Supreme Court opinion in *Bowen v. Georgetown University Hospital.*

Even if this court were to review pertinent statutes to determine whether BPA has implicit authority for the Lookback Proposal, it will find BPA has none.

BPA does not have equitable authority to adopt and implement the Lookback Proposal because the rates invalidated in *Golden NW* were adopted under BPA's rulemaking authority, and an agency has equitable authority to cure mistakes identified on judicial review only when the agency is exercising its adjudicatory function.

(2)     The NW Power Act protects BPA's preference customers from certain costs of the REP and requires that BPA conduct a test ("the 7(b)(2) Rate Test") to ensure that protection is provided.  The NW Power Act expressly requires BPA to omit certain costs from amounts to be charged to preference customers ("the Program Case) for purposes of conducting the 7(b)(2) Rate Test, but does not expressly require that such costs be omitted from the comparison case ("the 7(b)(2) Case").  BPA's conclusion that it is required to omit the costs from both the Program and 7(b)(2) Cases for purposes of the 7(b)(2) Rate Test is contrary to this court's methodology for statutory construction, which is to discern Congress's intent from the plain language of the pertinent statute.

12

## ARGUMENT

**I.** **BPA does not have authority for the Lookback Proposal because it is a retroactive rule requiring express congressional authority BPA does not have.**

**A.** **Whether BPA engaged in retroactive rulemaking and whether BPA has authority to engage in retroactive rulemaking are questions of law the Court reviews *de novo*.**

This Court's review of BPA's actions is governed by the Administrative Procedures Act, 5 U.S.C. § 706 ("APA").[22]  Under the APA, BPA's decisions may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[23]

Whether Congress explicitly granted BPA the authority to adopt retroactive rules is a question of law.  Questions of law that can be answered with traditional tools of statutory construction are within the special expertise of courts, not agencies, and are therefore reviewed by the court *de novo*.[24]  Similarly, whether the Lookback Proposal is a rule and whether it has a

---

[22]     *See* 16 U.S.C. § 839f(e)(2) (NW Power Act incorporating scope of review provisions of the APA).

[23]     5 U.S.C. § 706(2)(a).  *See Pub. Power Council, Inc. v. BPA*, 442 F.3d 1204, 1209 (9th Cir. 2006).

[24]     *INS v. Cardoza-Fonseca,* 480 U.S. 421, 446, 107 S. Ct. 1207, 1221, 94 L.Ed.2d 434 (1987).  *See also Utility Reform Project v. Bonneville Power* Administration, 869 F.2d 437, 442-43 (9th Cir. 1989).

13

retroactive effect are questions of law on which BPA is not entitled to

deference.[25]

**B.    The Lookback Proposal is a rule under the Administrative Procedures Act because it is a statement of general applicability designed to implement the NW Power Act.**

The Lookback Proposal falls under the definition of a rule found in the

Administrative Procedures Act ("APA"), which is as follows:

> "Rule" means the whole or a part of an agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefore or of the valuations, costs, or accounting, or practices bearing on any of the foregoing[.][26]

The Lookback Proposal is a construct that prescribes how to (1) calculate

the amount of excess REP benefits paid to investor-owned utilities from 2002-

2007 and deduct such amounts from future REP benefits; and (2) calculate the

amount to credit against future charges to preference customers for past

overcharges from 2002-2007 and credit such amounts to preference customers

---

[25]    *See e.g., Nat'l Mining Assoc. v. Dep't of Labor*, 292 F.3d 849 (D.C.Cir.2002) (not deferring to Department of Labor (DOL) in determining whether the DOL's rules promulgated under the Black Lung Benefits Act have an impermissible retroactive effect).

[26]    5 U.S.C. § 551(4).

14

in future billings.[27]  In other words, the Lookback Proposal is a statement of general applicability to prescribe how to calculate future credits and REP benefit offsets for the purpose of implementing the NW Power Act, and fits squarely within the APA's definition of "rule" set forth above.

The rate credit for preference customers implemented by the Lookback Proposal is also a rule.  BPA's Lookback Proposal initially included BPA staff's proposal to refund preference customers for WP-02 rate overcharges through reductions in future rates. The Administrator ultimately chose a different refund method – a billing credit – believing this method would obtain a better match between refunds provided and overcharges under the WP-02 Rates.[28]  Rate credits on preference customers' bills, based on the preference customers' percentage share of total WP-02 revenues paid during the FY 2002-2007 period, fall within the APA's definition of a rule: an agency's statement of general or particular applicability, of future effect, and including "the approval or prescription for the future of rates * * * prices, * * * services or allowances

---

[27]     OPUC E.R. Vol. I, 181 (R.A.R. 062491) and Vol.I, 269 (R.A.R. 062579).

[28]     OPUC E.R. Vol. I, 297-98 (R.A.R. 062607-08).

15

therefore or for the valuations, costs, or accounting, or practices on any of the foregoing[.]"[29]

**C. The Lookback Proposal increases the cost of power exchanged by investor-owned utilities from 2002 to 2007 and decreases the cost of power purchased by preference customers during that period and thus, has a retroactive effect under the test articulated by the United States Supreme Court in *Landgraf v. USI Film Products, et al.***

In *Landgraf v. USI Film Products,* the United States Supreme Court explained that it would determine whether legislation had a retroactive effect by determining whether "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." [30] The Ninth Circuit has also applied this test.[31]

Under the Lookback Proposal, BPA will retroactively increase the rates at which investor-owned utilities exchanged power with BPA during the

---

[29] 5 U.S.C. § 551(4).

[30] *Landgraf v. USI Film Products, et al.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994).

[31] *See e.g. Southwest Center for Biological Diversity v. United States Department of Agriculture*, 314 F.3d 1060, 1062 (9th Cir. 2002) (The court determines whether a statute has retroactive effect by determining, "whether it would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."); and *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 835 (9th Cir. 1997) (same).

16

Lookback Period and will exact payment for this increased rate by decreasing future REP benefits. In other words, BPA will impose additional charges in the future for power exchanged in a previous period. Similarly, BPA will retroactively decrease the rate at which preference customers purchased power during the Lookback Period and will provide to preference customers the benefit of this decreased rate through credits on future bills. In other words, BPA will retroactively decrease the cost of power purchased by consumer-owned utilities in a previous period and provide the benefit of this decrease to consumer-owned utilities in the future.

BPA's retroactive modification to the rates under which investor-owned utilities exchanged power from 2002-2007 is similar to the Agency's retroactive modification to cost limit rules in *Bowen v. Georgetown University.*[32] In *Bowen v. Georgetown University,* the agency sought to recoup funds that had been paid to hospitals in a previous period by adopting cost limit regulations and applying them to the previous payments.[33] In *Landgraf v. USI Film*

---

[32] 488 U.S. 204, 206-208, 109 S.Ct. 468, 470-72, 102 LEd.2d 493 (1988).

[33] 488 U.S. at 206-208, 109 S.Ct. 468 at 470-72.

17

*Products,* the United States Supreme Court described this retroactive surcharge a "paradigmatic case of retroactivity."[34]

### D. An agency may engage in retroactive rulemaking only if authorized to do so by Congress "in express terms."

In *Bowen v. Georgetown University*, the United States Supreme Court held that "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."[35] The Court further noted that a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless the power is conveyed by Congress *in express terms*:

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result* * * . By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless the power is conveyed by Congress in express terms* * * . Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.[36]

---

[34] *Landgraf v. USI Film Products, supra,* 511 U.S. at 272, 114 S. Ct. at 1500.

[35] 488 U.S. at 208, 109 S.Ct. at 471-72.

[36] *Id.* (citations omitted).

The Ninth Circuit Court of Appeals has applied the holding in *Bowen v. Georgetown University.* In *Friends of Southeast's Future v. Morrison*, the U.S. Forest Service argued that it had authority under the National Forest Management Act (NFMA) to retroactively apply changes to the Tongass Land Management Plan to a timber sale.[37] The court disagreed stating, "[i]n *Bowen v. Georgetown University* * * * the Supreme Court held that agency authority to change the legal consequences of completed acts only exists if Congress conveys such authority in an '*express* statutory grant.'"[38] Similarly, in *Scamihorn v. General Truck Drivers*, the Court relied on *Bowen v. Georgetown University* for its holding that "[r]egulations cannot be applied retroactively unless Congress has so authorized the administrative agency[.]"[39]

----

[37]  *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1070 (9th Cir. 1998).

[38]  *Id.* 53 F.3d at 1070 (citations omitted; emphasis in *Friends v. Southeast's Future v. Morrison*).

[39]  *Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1083 (9th Cir. 2002) (holding Court was bound to follow Department of Labor regulations in place at time of employee leave to determine whether employee qualified for protection under Family Medical Leave Act).

**E.  BPA concedes that it does not have "explicit authority for retroactively providing refunds" and thus, under the Supreme Court's opinion in *Bowen v. Georgetown University*, BPA's Lookback Proposal is unlawful**

BPA admits that Congress did not give BPA explicit authority to retroactively provide refunds to preference customers.[40]  Accordingly, this Court's analysis of whether BPA has authority to adopt the Lookback Proposal, which is designed for the purpose of providing preference customers rate credits, need go no farther.  Under *Bowen v. Georgetown University*, the authority to engage in retroactive rulemaking must be conveyed in "express terms."[41]  In absence of explicit authority to make adjustments to future REP benefits for investor-owned utilities and to issue bill credits to preference customers for the purpose of retroactively re-allocating to investor-owned utilities costs previously charged to preference customers, the court should conclude BPA has none.[42]

---

[40]  OPUC E.R.  Vol. I, 46 (R.A.R. 062356) (stating "the Northwest Power Act * * * does not provide explicit statutory for retroactively providing refunds[.]").

[41]  *Bowen v. Georgetown University, supra*, 488 U.S. at 208, 109 S.Ct. at 472; *See also Friends of Southeast's Future v. Morrison*, *supra*, 153 F.3d at 1070.

[42]  *See e.g., Brimstone R. Co. v. United States*, 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1928) ("The power to require readjustments for the past is drastic.  It * * * ought not to be extended so as to permit unreasonably harsh action without very plain words.").

20

**F.** **If this court reviews pertinent statutes to determine whether BPA has implicit authority for the Lookback Proposal, the court should find that BPA has none.**

In *Bowen v. Georgetown University,* the Supreme Court noted that "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant."[43]  Authority to impose a surcharge on investor-owned utilities to re-allocate to them costs previously charged to preference customers is implicit in the NW Power Act only if this court concludes that Congress' instructions to BPA on how to administer the REP carry with them permission to re-allocate costs between customer groups years after the costs are collected in order to conform with the Act.  However, if the court finds such authority implicit in the NW Power Act, virtually every grant of rulemaking authority made by Congress carries with it the authority to engage in retroactive corrective rulemaking if initial rules adopted by the agency do not properly fulfill Congress' intent.  Such a conclusion is not supported by the cautionary language found in *Bowen v. Georgetown University*.

BPA relies on the Fourth Circuit Court of Appeals opinion in *Central Electric Power Cooperative, Inc. v. Southeastern Power Administration*

---

[43]    *Bowen v. Georgetown University, supra*, 488 U.S. at 208-09, 109 S.Ct. at 472.

(*Central Electric*) [44] for the proposition that it has implicit authority to re-allocate previously collected costs between customer classes. [45] Because that case addresses a power marketing agency's authority to recover its costs and protect the public fisc, not re-allocate previously recovered costs, BPA's reliance is misplaced.

The Court's opinion in *Central Electric* addresses a FERC order concluding that the Flood Control Act of 1944 "expressly allows costs not recouped in one time period to be recovered in another, later time period so as to ensure recovery of both costs of producing power and the federal investment." [46] The Fourth Circuit agreed with FERC that the surcharge was permissible. The Court concluded that under the Flood Control Act, the power marketing agency was required to protect the public fisc by ensuring that federal hydro-electric programs recover their own costs and do not require subsidies from the federal treasury and thus, required to address the revenue shortfall. [47]

---

[44]  338 F.3d 333 (4th Cir. 2003).

[45]  OPUC E.R. Vol. I, 24-25 (R.A.R. 062350-51).

[46]  *Southeastern Power Admin.*, 55 F.E.R.C. ¶¶ 61,016, 61,045.

[47]  338 F.3d at 337.

The circumstances presented in this case are different from those in *Central Electric*. The costs at issue are not revenue shortfalls. BPA did not engage in retroactive rulemaking in order to recover revenue shortfalls associated with producing power and repay federal investment that were not recovered in a previous rate period. Instead, BPA adopted retroactive rules for the purpose of reallocating costs between customers. While BPA may have authority under the Flood Control Act to issue a surcharge to make up for past revenue shortfalls in order to recover its costs and protect the public fisc, it does not have a authority under the Flood Control Act, nor the NW Power Act, to retroactively reallocate between customers costs that have already been recovered.

## II.     BPA does not have equitable authority to engage in curative retroactive rulemaking.

BPA acknowledges the prohibition against retroactive rulemaking in *Bowen v. Georgetown University,* but, relying on the Supreme Court's opinion in *United States v. Callery*, D.C. Circuit Court opinions in *Natural Gas Clearinghouse v. FERC* and *Pub. Utilities Comm'n of State of Calif. v. FERC,* and the Ninth Circuit Court opinion in *Newman v. Apfel,* concludes the prohibition is not applicable because BPA has equitable authority to undo its

mistakes upon judicial remand.[48]  BPA's reliance on the Supreme Court opinion and D.C. Circuit Court opinions is misplaced because they concern agencies' adjudicative authority, not their rulemaking authority.  The mistake identified in *Golden NW,* the case remanded by the Ninth Circuit, was a mistake in rulemaking – the inclusion of prohibited costs in preference rates.  BPA does not have equitable adjudicative authority to correct the effects of a rulemaking mistake in the rulemaking proceeding BPA initiated after the Court's remand.  BPA's reliance on the Ninth Circuit Court's opinion in *Newman v. Apfel* is misplaced because that opinion addresses the authority of the court, not the agency.

> **A.**    **BPA does not have authority under *United Gas Improvement, et al. v. Callery* to cure the past overcharges in preference customer rates with a billing credit because *Callery* addresses an agency's adjudicatory authority and preference rates and the billing credit are products of BPA's rulemaking authority.**

In *Callery,* the Court held that although the Federal Power Commission (FPC) has no statutory authority to order a refund for a previous overcharge "it is not so restricted where its order, which never became final, has been overturned by a reviewing court."[49]  In reaching this conclusion, the Court

---

[48]    OPUC E.R. Vol. I, 39-40 (R.A.R. 062364-65).

[49]    *United Gas Improvement Co., et al. v. Callery Properties, Inc.*, 382 U.S. 223, 229, 86 S.Ct. 360, 364,15 L.Ed.2d 284 (1965).

relied on its previous opinion in *Securities and Exchange Commission v. Chenery* ("*SEC v. Chenery*"),[50] in which the Court concluded that an agency has authority in "ad hoc" litigation to retroactively apply a new principle.[51]

More specifically, in *SEC v. Chenery*, the Court explained that an agency must be free to act by rule or by individual order, and that an agency has the ability to "make new law prospectively through the exercise of its rulemaking powers," and may announce principles through ad hoc litigation.[52] The Court further explained that it is permissible for an agency to retroactively apply a new principle after ad hoc litigation, if the retroactive application is not contrary to statutory design or to legal and equitable principles.[53]

In *Bowen v. Georgetown University,* the Agency attempted to argue that under *SEC v. Chenery,* it had equitable authority to undo its past rulemaking mistake and engage in corrective, retroactive rulemaking. The majority court did not adopt this argument. Justice Scalia, in a concurring opinion, expressly rejected it, stating that that the Secretary's reliance on *SEC v. Chenery* for his retroactive application of new rules was misplaced because *SEC v. Chenery*

---

[50]    332 U.S. 194, 200-201, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

[51]    *Id.*

[52]    332 U.S. at 202, 67 S.Ct. at 1580-81.

[53]    *Id.*

involved adjudication rather than rulemaking.[54]  He noted that while it was true

that in *Chenery* the Court's opinion permitted the Secretary, after his correction

of the procedural error that caused an initial reversal, to reach the same

substantive result with retroactive effect, "*the utterly crucial distinction*" is that

*Chenery* involved that form of administrative action where retroactivity is not

only permissible but standard.[55]

BPA's reliance on *National Gas Clearinghouse v. FERC* and *Public

Utility Comm'n of Calif. v. FERC*, is similarly unavailing.  In both cases, the

D.C. Circuit Court expressly relies on the Supreme Court's opinion in *United

Gas Improvement v. Callery*, for the proposition that the agency has authority

on remand to correct errors identified on judicial review.  Furthermore, neither

*National Gas Clearinghouse* nor *Public Utility Comm'n of Calif. v. FERC*

addresses the agency's rulemaking authority.  Instead, the court addresses

whether actions taken by FERC violated the "filed rate doctrine" and "rule

against retroactive ratemaking."

In other words, the D.C. Circuit Court's position on an agency's

retroactive application of rules is found not in the cases cited by BPA.  It is

---

[54]   *Bowen v. Georgetown University*, *supra*, 488 U.S. at 220-21 (Scalia, J., concurring).

[55]   *Id.*

however, found in other cases.  In *Motion Picture Association v. Oman,* the D.C. Circuit Court noted the distinction between an agency's adjudicative and rulemaking function when it concluded the Copyright Office did not have authority to engage in retroactive rulemaking, absent express statutory authority:

> In adjudication, retroactivity is the norm; in legislation it is the exception. In rulemaking, the administrative analogue to legislation, exceptions are fewer still.  Agency power is derived from statutes.  If Congress has not conferred retroactive rulemaking power on an agency, the agency has none to exercise.[56]

In *Verizon Telephone Companies, et al. v. FCC*, the D.C. Circuit Court discussed the difference between an agency's authority to retroactively change rules stemming from a quasi-judicial proceeding and its authority to retroactively change rules stemming from a proceeding that is quasi-legislative.[57]  Specifically, the court considered whether the Federal Communications Commission (FCC) was prohibited under the Supreme Court's decision in *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway* Co.,[58] from awarding certain payphone providers damages for charges

---

[56]    *Motion Picture Association of America, Inc. v. Oman*, 969 F.2d 1154, 1155 (D.C. Cir. 1992).

[57]    269 F.2d 1098, 1106-09 (D.C. Cir. 2001).

[58]    284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932).

made by Local Exchange Carriers (LECs) the FCC initially concluded were

lawful, but then concluded were unlawful in a subsequent adjudication.  The

D.C. Circuit Court noted that in *Arizona Grocery* the Supreme Court held that

the Interstate Commerce Commission (ICC) did not have authority to order

railroads to pay reparations for charging a rate within limits set by the agency in

a quasi-legislative proceeding when the agency concluded, in a subsequent

quasi-judicial proceeding, that the rates were excessive.[59]

> [I]t is not surprising that the Court in *Arizona Grocery*
> observed that the ICC had prescribed a legal rate in its "quasi-
> legislative capacity." * * * The Court recognized that ratemaking
> "fixing rates or rate limits for the future" – is a legislative function,
> and held that once the Commission has exercised such a power it
> could only undo the results prospectively* * * . In other words,
> *Arizona Grocery*, by its own terms, does not apply where an
> adjudication agency alters, even with retroactive effect, a policy
> established in a quasi-judicial action.  Nor has it ever been so
> applied.  The lines between these categories of cases are not
> always clear – indeed in *Arizona Grocery* itself the quasi-
> legislative rates were established in an adjudicatory proceeding[.]
> * * * **Nevertheless, the Court in *Arizona Grocery* made clear
> that there is an important distinction between rules resulting
> from quasi-adjudication and rules resulting from quasi-
> legislation.**[60]

The D.C. Circuit Court concluded that *Arizona Grocery* did not prohibit

the damages at issue in *Verizon* because the damages stemmed from an error the

---

[59]    269 F.3d at 1106-07.

[60]    269 F.3d at 1107-08 (citations omitted; emphasis added).

FCC made during an adjudicatory proceeding as opposed to a legislative proceeding:

> [w]e are constrained to conclude that the FCC's actions in this case are not governed by the rule established in *Arizona Grocery*. The *Access Charge Reconsideration,* a rulemaking designed to establish how the LECs were to recover end-user costs in the future, was undoubtedly *legislative* in character. But this rulemaking was not "revised" by the *Liability Order* that the LECs now challenge. Rather, the *Liability Order* merely corrected the *EUCL Decisions,* agency adjudications that had erroneously interpreted the original *Access Charge Reconsideration* by holding that particular instances of challenged conduct on the part of the LECs did not violate the regulations arising from that rulemaking. In those decisions, the FCC did not purport to substitute a new legislative rule for an old one.[61]

The WP-02 Rate Adjustment Proceeding was a rulemaking proceeding. Under *Bowen v. Georgetown University,* BPA cannot retroactively change rules (aka rates) established in that proceeding, even on judicial remand. However, this is what BPA has done. It established a different charge for the power that preference customers purchased during the Lookback Period under the WP-02 rates in the rate adjustment proceeding opened in response to the Court's remand in *Golden NW*.

---

[61] *Id.* at 1108.

29

**B.** **BPA's reliance on this Court's opinion in *Newman v. Apfel* for the proposition that the general prohibition against retroactive rulemaking without congressional authority does not apply when discharging a judicial order on remand is misplaced.**

As noted above, BPA relies on the Court's opinion in *Newman v. Apfel*,[62] for its assertion that the general prohibition on retroactive rulemaking without congressional authority does not apply because BPA is discharging a judicial order on remand.[63] As noted above, *Newman v. Apfel* addresses the authority of the court, as opposed to an agency. Accordingly, BPA's reliance is misplaced.

In *Newman v. Apfel*, the plaintiff filed a class action suit seeking declaratory and injunctive relief against the Commissioner of Social Security from the Commissioner's failure to promulgate a regulation that would describe "reliable" and "currently available" information upon which the Commissioner could make a current-month adjustment to Supplemental Security Income (SSI), and to make current-month adjustments to benefits using the new regulation.[64] On appeal, the Ninth Circuit concluded the Commission was required to promulgate the regulation in question but declined to address

---

[62] 223 F.3d 937 (9th Cir. 2000).

[63] OPUC E.R. Vol. I, 55 (R.A.R. 062365).

[64] 223 F.3d at 940.

whether such a regulation would apply retroactively, indicating that the issue should be addressed only after the issue was final.[65]

On remand, the Commissioner adopted a rule defining the terms "reliable" and "currently available" and determined that because no such information existed, the Commissioner would not perform current-month adjustments.[66]  Newman filed another class action suit for declaratory and injunctive relief, this one challenging the regulation as contrary to law and seeking review of the Commissioner's refusal to reimburse her.  The district court granted the Commissioner's motion for summary judgment on the ground the regulation was a reasonable interpretation of the statute, and Newman appealed.[67]

On appeal, the Commissioner challenged the Ninth Circuit's jurisdiction, arguing that Newman did not have standing to sue because, among other things, she did not have a redressable injury because the Commissioner could not retroactively apply a newly adopted regulation defining "reliable" and "currently available."  The Court concluded that Newman did have a redressable injury, noting that "the capacity of the *courts* to order retroactive

---

[65]     *Id.*

[66]     *Id.*

[67]     *Id.,* at 941.

relief has never been questioned."[68]  In reaching this conclusion, the Court

relied on its previous opinion in *Livermore v. Heckler*,[69] in which the Court

affirmed the *district court's use of injunctive powers* to order the Secretary to

provide retroactive relief for benefits that had been erroneously calculated and

prospective implementation of the correct formula.[70]  In other words, the Court

in *Newman* rejected the respondent's claim that the plaintiff did not have a

redressable injury on the ground that **the Court itself could give the plaintiff**

**relief.**

The circumstances in this case are almost identical to those presented in

*Bowen v. Georgetown University*, as opposed to *Livermore v. Heckler*, or

*Newman v. Apfel*.  In *Bowen v. Georgetown University,* a United States District

Court concluded that rules adopted by the Secretary of Health and Human

Services were invalid because they were adopted in violation of the APA.

Here, the Court invalidated rates on direct judicial review and remanded the

matter to BPA to set new rates, aka rules:

---

[68]     *Id.* at 942 (emphasis added).

[69]     743 F.2d 1396 (9th Cir. 1984).

[70]     *Newman v. Apfel, supra*, 223 F.3d at 942, *citing Livermore v. Heckler,* 743 F.2d at 1405.

> We agree with petitioners * * * that BPA unlawfully shifted onto its preference customers the costs of its settlement with the IOUs. Their petitions are granted. * * * We therefore remand to BPA to set rates in accordance with this opinion.[71]

The Court's opinion in *Bowen v. Georgetown University* makes clear that a court opinion invalidating rules promulgated by an agency does not authorize an agency to engage in curative retroactive rulemaking.

Implicit in BPA's position that it does have authority to engage in curative retroactive rulemaking is the conclusion that while an agency may not have such authority when a court merely concludes rules are unlawful or invalid, an agency does have such authority when the court reaches such a conclusion and remands to the agency to promulgate lawful rules. It is illogical to conclude that the Supreme Court intended such an interpretation of its opinion in *Bowen v. Georgetown University.* Put another way, under BPA's interpretation of the remand in *Golden NW,* the Supreme Court in *Bowen v. Georgetown University* would have reached the opposite result had the district court remanded the invalidated rules to the Secretary with an order to promulgate new cost-limit rules consistent with the court's decision.

BPA's conclusion regarding the ease with which the judiciary may confer on agencies authority to adopt retroactive rules is contrary to the United States

---

[71]     *Golden NW, supra,* 501 F.3d at 1053.

33

Supreme Court's admonition that courts should be reluctant to find rules apply

retroactively.[72] In *Bowen v. Georgetown University,* Justice Scalia notes in his

concurring opinion:

> It is entirely unsurprising, therefore, that even though Congress wields such a power [to enact retroactive legislation] itself, it has been unwilling to confer it upon the agencies. Given the traditional attitude toward retroactive legislation, the regime established by the APA is an entirely reasonable one: Where quasi-legislative action is required, an agency cannot act with retroactive effect without some special congressional authorization. This is what the APA says, and there is no reason to think Congress did not mean it.[73]

It is inconceivable that while Congress itself has sparingly provided

agencies authority to adopt retroactive rules, Congress used the APA to

authorize the federal judiciary to give agencies this authority on an ad-hoc basis

by simply adding the word "remand" to judicial opinions invalidating rules on

direct review.

---

[72] *See e.g., Bowen v. Georgetown University*, 488 U.S. at 208-09, 109 S.Ct. at 472 ("Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.").

[73] 488 U.S. at 223-224, 109 S.Ct at 479 (Scalia, J., concurring).

34

**III.    BPA is precluded from exercising its "common law" right of setoff to recover REP benefits paid to investor-owned utilities under 2000 REP Settlement Agreements because under the express terms of 2000 REP Settlement Agreements, investor-owned utilities do not owe BPA a debt and in any event, there is no mutuality.**

**A.    The provision in the 2000 REP Settlement Agreements that investor-owned utilities would retain benefits paid under the Agreement in the event the Ninth Circuit Court determined the Agreement was unlawful, void, or unenforceable is not a part of a regulation, and thus, this Court reviews BPA's interpretation of that provision *de novo*.**

The 2000 REP Settlement Agreements between the investor-owned utilities and BPA include a provision that governs the parties' rights in the event that either the settlement agreements or payments under the settlement agreements are declared "unlawful, void, or unenforceable."[74]  The provision is not a regulatory provision, but one the parties negotiated free of any statutory or regulatory mandate.  Accordingly, this Court addresses the proper interpretation of that provision in the context of contract law.  In this context, BPA's interpretation of the provision is not entitled to deference.[75]

---

[74]    *See e.g.,* OPUC E.R. Vol. IV, 985-86 (R.A.R. 114154).

[75]    *See e.g. Central Electric Cooperative, Inc. v. BPA*, 835 F.2d 199, 203 (9th Cir. 1987)(noting that when contract provision is a part of a regulation it is evaluated in the context of administrative law and when it is a "bare contractual term" it is analyzed against the "backdrop of contractual law).

**B.    Investor-owned utilities are entitled to retain benefits received under the 2000 REP Settlement Agreements.**

In each of the 2000 REP Settlement Agreements BPA entered into with the investor-owned utilities, BPA expressly waived any right to seek recovery of past REP benefits paid to eligible residential and small farm customers under the Agreements.  Under the express terms of the provisions, they are severable and survive even if other parts of the agreements are unlawful or void.  For example, the waiver provision in the REP Settlement Agreement between PGE and BPA provides:

> In the event the United States Court of Appeals for the Ninth Circuit finally determines, after all appeals or requests for reconsideration, that this Agreement (or Section 4(a), section 4(c), or section 5 of this Agreement) is unlawful, void, or unenforceable, then the provisions of section 3(a) above shall be of no further force and effect, and the Parties intend and agree that:  (1) the cash payments pursuant to section 3(d), the Firm Power, and Monetary Benefits provided prior to such final determination shall be retained by PGE; and (2) the satisfaction of BPA's obligations to PGE under section 5(c) of the Northwest Power Act prior to such final determination shall be preserved, to the maximum extent permitted by law.  This section 3(b) shall survive notwithstanding any determination that any other provision of this Agreement (or the exhibits) is unlawful, void, or unenforceable.[76]

BPA has concluded that the Court invalidated the waiver provisions in *PGE* and *Golden NW*, and accordingly, that they do not bar BPA's decision that

---

[76]    OPUC E.R.  Vol. IV, 985-86 (R.A.R. 114154-114155).

investor-owned utilities must refund REP benefits received under the 2000 REP

Settlement Agreements:

> [B]ecause the Court held that BPA acted beyond the scope of its authority when it executed the 2000 REP Settlement Agreements and the Court did not carve out an exception with respect to the invalidity clause or any other clause, BPA believes the 2000 REP Settlement Agreements are invalid in their entirety. As a result, the invalidity clause is also invalid and cannot be used a shield to prohibit BPA from recovering 2000 REP Settlement Agreement benefits from the IOUs through the Lookback Proposal."[77]

BPA's interpretation of the Court's opinions in *PGE* and *Golden NW* is

incorrect. The Court did not conclude, as BPA suggests, that BPA has no

authority to settle issues related to the REP. In fact, the Court noted that BPA

has broad authority to settle claims under the Northwest Power Act.[78]

To interpret a contract, this Court attempts to discern the intent of the

contracting parties. The express language of the waiver provisions in each of

the six 2000 Settlement Agreements reflects that the parties intended the

provisions to survive even if the Court invalidated other terms of the 2000 REP

Settlement Agreements.

Under federal common law, a contractual provision is severable if it is

supported by valid consideration on both sides and capable of separation from

---

[77]     OPUC E.R. Vol. I, 194 (R.A.R. 062504).

[78]     *PGE, supra*, 501 F.3d at 1018.

37

any part of the contract that is contrary to public policy.[79]  The waiver

provisions in the 2000 Settlement Agreements meet these criteria.  Because it is

unequivocal that the contracting parties intended that the waiver provisions

survive even if other parts of the contract are invalidated by the Ninth Circuit

Court of Appeals, they are binding on BPA and preclude BPA from asserting

any right of set-off against the investor-owned utilities.

> **C.    Even if BPA was not precluded by the 2000 Settlement Agreements from invoking the common-law doctrine of setoff, the doctrine is not applicable in this case because there is no mutuality of debts.**

The doctrine of set off allows entities that owe each other money to apply

their mutual debts against each other.[80]  For mutuality to exist, the debts "must

be in the same right and between the same parties, standing in the same

capacity."[81]  In this case, no mutuality exists because BPA will withhold REP

benefits from customers that did not receive the overcharges under the 2000

REP Settlement Agreements.

---

[79]    *See Restatement (Second) of Contracts* § 183 (1981).

[80]    *Citizens Bank of Md. v. Strump*, 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (2005).

[81]    *Newberry Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398-99 (9th Cir. 1996)(internal quotation marks and citations omitted)).

38

**IV. Even if the Lookback Proposal is within BPA's statutory authority, it is arbitrary and capricious because BPA did not analyze whether it is in the public interest.**

In any event, assuming *arguendo* that BPA has authority upon the

Court's remand of *Golden NW* to correct the mistake identified in that opinion,

BPA's decision to debit future REP benefits and credit future preference

customer billings to make up for past transactions is arbitrary and capricious

because the agency did not analyze whether the retroactive correction is

required or permitted by the public interest.  In *SEC v. Chenery,* the United

States Supreme Court reversed an order of the Securities Exchange

Commission ("SEC") holding the order could not be sustained on the grounds

on which the agency had acted.[82]  On remand, the SEC "reexamined the

problem" and reached the same result but relied on a new standard of conduct

announced during the reexamination and applied retroactively.  The Supreme

Court reviewed the SEC's decision to determine whether the SEC's retroactive

application of a new rule announced in the course of an adjudicatory decision

was permissible.[83]  The Court concluded that it was, but noted that

---

[82]     *Securities and Exchange Commission v. Chenery Corporation*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed 626 (1943).

[83]     *SEC v. Chenery, supra,* 332 U.S. at 198-99, 67 S.Ct. at 1579-80.

"retroactivity must be balanced against the mischief of producing a result which is contrary to statutory design or to legal and equitable principles."[84]

Under the Supreme Court's opinions in *SEC v. Chenery,* it was incumbent on BPA to determine whether it is appropriate, in view of all the circumstances, to order the reparations contemplated by the Lookback Analysis.[85] However, BPA conducted no analysis to determine whether a retroactive correction was equitable or warranted by the circumstances. Instead, BPA simply assumed that it was obligated by the Ninth Circuit Court remand in *Golden NW,*[86] to refund to preference customers a portion of the rates they paid 2002-2007. The lack of analysis renders BPA's decision arbitrary and capricious.[87]

---

[84]    332 U.S. at 203, 67 S. Ct. 995

[85]    *See e.g. Consumer Federation of America v. Federal Power Commission*, 515 F.2d 347, 359 (D.C. Cir. 1975) ("[N]ot every decision invalidating an agency order is given full retroactive effect.  We express no opinion on the refund issue, beyond saying that, in our view, it involves complex and difficult questions which must be presented to and addressed by the [agency] in the first instance.  In matters of prospective and retroactive effect, there are large questions of equity and public interest—both for agencies and for courts.").

[86]    *PGE, supra,* 501 F.3d at 1037.

[87]    *See e.g. SEC v. Chenery, supra.*

40

**V.  The Lookback Proposal is not supported by the circumstances and is arbitrary and capricious.**

Because BPA's Lookback Proposal is contrary to legal and equitable principles, the Lookback Proposal is an abuse of any discretion BPA may have to order reparations for the remanded order.  Specifically, the Lookback Proposal violates equitable principles for several reasons.  First, neither investor-owned utilities nor their customers had notice that they may have to pay back amounts received under the 2000 REP Settlement Agreements because these agreements specified investor-owned utilities would retain benefits received under the Agreements, even if they were found to be unlawful by the Ninth Circuit Court of Appeals.  Second, the "parties" adversely affected by the Lookback Proposal are the residential and small-farm customers of the investor-owned utilities.  These customers relied fully and to their detriment on the benefits provided to them under the REP Settlement Agreements.

Third, the customers that have to repay the Lookback Amounts may be "vastly different" than the customers that received REP benefits in 2002-2007 because customers that are now in the investor-owned utilities' service territory may not have been during the Lookback Period.  Fourth, the burden of the Lookback Proposal on residential and small-farm customers of investor-owned utilities will be significant in that their future rates will be affected by the diminishment in REP benefits provided to NW investor-owned utilities.

41

Fifth, there is little statutory interest in applying the Lookback Proposal. The Lookback Proposal is not necessary to clarify the court's rulings in *PGE or Golden NW* or to clarify the NW Power Act. BPA's interpretation of the court's rulings and the NW Power Act will be accomplished by the prospective piece of the WP-07 Supplemental Rate proceeding and the 2008 Average System Cost Methodology Review.

Sixth, the consumer-owned utilities had no reasonable expectation to a rate other than the rates approved by FERC after the WP-02 proceeding. The consumer-owned utilities and their customers have conducted their business based on the rates that were in place from 2001-2007.

Finally, there has been no finding that the rates paid by consumer-owned utilities were unreasonably high, only a finding that the rates included costs that should not have been included. The retail rates for most northwest consumer-owned utilities are already lower than those of northwest investor-owned utilities. There is no equitable reason to increase this disparity through the Lookback Proposal. This is particularly true in light of the fact that one of the purposes of the NW Power Act is to achieve wholesale rate parity.

42

**VI.** **BPA's decision to exclude applicable 7(g) costs from both the program and 7(b)(2) cases for purposes of the 7(b)(2) rate test is arbitrary and capricious.**

    **A.** **This Court reviews BPA's interpretation of the NW Power Act to determine whether it is arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law.**

As noted above, this Court's review of BPA's actions is governed by the APA. This Court reviews BPA's interpretation of the NW Power Act to determine whether it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[88]

This Court defers to BPA's reasonable interpretations of statutes governing BPA.[89]

    **B.** **The NW Power Act specifies that certain applicable 7(g) costs should be omitted from the "Program Case," but not the 7(b)(2) Case for purposes of the 7(b)(2) Rate Test and BPA erred in concluding otherwise.**

The NW Power Act provides preference customers with rate protection from the REP by limiting the effect that costs of the REP can have on preference customers' rates. This protection is found in section 7(b)(2) of the Northwest Power Act and requires that BPA conduct a test – the 7(b)(2) Rate

---

[88]    5 U.S.C. § 706(2).

[89]    *See e.g. Nw. Envtl. Def. Ctr. v. BPA*, 117 F.3d 1520, 1530 (1997).

Test – to ensure that preference customers receive the protection to which they are entitled.[90]

In connection with the underlying proceeding, BPA revisited previous policy decisions it had made regarding the 7(b)(2) Rate Test – the 1984 7(b)(2) Legal Interpretation and 7(b) Implementation Methodology – and issued an updated Legal Interpretation and Methodology.[91]

The OPUC does not take issue in this proceeding with the decisions made in the revised Legal Interpretation and Implementation Methodology, with one exception. The OPUC seeks review of BPA's treatment of "applicable 7(g) costs."

To conduct the 7(b)(2) Rate Test, BPA projects two test cases, the Program Case and 7(b)(2) Case and compares them. BPA decided in the underlying proceeding that the NW Power Act requires BPA to subtract these costs from both the Program Case and 7(b)(2) Case prior to comparing the two cases. This interpretation of the Act is incorrect.

In 1984, BPA determined that section 7(b)(2) required BPA to require certain costs ("applicable 7(g) costs") from the Program Case prior to the

---

[90]     16 U.S.C. § 839e.

[91]     OPUC Vol. IV, 883-936, R.A.R. 063193-063228).

44

comparison, but not the 7(b)(2) Case.[92]  The Administrator's 1984 Section

7(b)(2) Implementation Methodology Record of Decision and his 1984 Legal

Interpretation of Section 7(b)(2) of the Pacific Northwest Electric Power

Planning and Conservation Act reflect that BPA previously concluded that

applicable 7(g) costs should only be subtracted from the Program Case.  For

instance, the following statements are included in the Legal Interpretation:

> Section 7(b)(2) is explicit in excluding the applicable 7(g) costs from the program case before comparison is made with the 7(b)(2) case.

> Since section 7(g) costs are specifically excluded from the program case, but not excluded from the 7(b)(2) case, it would be inappropriate to subtract 7(g) costs from the 7(b)(2) case for the purpose of comparison with the program case.[93]

Similarly, the Administrator stated in the 1984 Implementation Methodology
ROD:

> * * * "The projected amounts to be charged" means the program case.  "Exclusive of amounts charged * * * under section 7(g)" means that the enumerated section 7(g) costs are to be subtracted from the program case.  There is no parallel command in the statute to subtract from the 7(b)(2) case the costs corresponding to those allocated under section 7(g) in the program case* * * .

> * * * * *

---

[92]    OPUC E.R. Vol. IV, 940-43 (R.A.R. 002322-002325).

[93]    OPUC E.R. Vol. IV, 928-29 (R.A.R. 002310-002311).

* * *  [I]t follows that the 7(b)(2) customers may be charged up to the 7(b)(2) case amount plus the enumerated 7(g) costs. Otherwise, there would be no reason for the section 7(g) costs being mentioned in the statute.[94]

A significant flaw in what appears to be BPA's about-face with respect to the treatment of applicable 7(g) costs in the 7(b)(2) rate test is BPA's failure to acknowledge, let alone reconcile, the Administrator's 1984 Legal Interpretation in which the Administrator determined that applicable 7(g) costs should be excluded from the Program Case, but not the 7(b)(2) Case.  The primary underpinning of the Administrator's 1984 decision on this issue was his observation that the Act explicitly excludes the applicable 7(g) costs from the Program Case, but does not explicitly exclude such costs from the 7(b)(2) case, and his conclusion that "[i]f Congress intended power costs in the 7(b)(2) case to be exclusive of conservation costs and other section 7(g) costs, language to that effect would have been included in the provisions."[95]

BPA does not attempt to reconcile its 1984 Legal Interpretation with its proposed treatment of applicable 7(g) costs.  Instead, BPA asserts that its new interpretation is supported by (1) certain text in the Act; (2) the practical effect of its interpretation, which is to ensure that the five assumptions of the 7(b)(2)

---

[94]    OPUC E.R. Vol. IV, 941-42 (R.A.R. 002323-002324).

[95]    OPUC E.R. Vol. IV, 929 (R.A.R. 002311).

test are the only distinction between the Program and 7(b)(2) Cases in the 7(b)(2) rate test; and (3) the fact the new interpretation prevents double-counting of certain costs in the 7(b)(2) case.[96]  None of BPA's arguments in support of its new treatment of applicable 7(g) costs in the 7(b)(2) rate test is well taken.

BPA's first argument regarding the text of section 7(b)(2) ignores the observation made by the Administrator in 1984.  While Congress specifically directed that the "projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and Federal agency customers" used for the 7(b)(2) rate test would be "exclusive of amounts charged such customers" for applicable 7(g) costs, Congress did not specify such an exclusion for "the power costs" included in the 7(b)(2) Case. Furthermore, BPA's assertion that the "power costs" for the 7(b)(2) Case are the same as the "projected amounts to be charged for firm power for the combined general requirements" used earlier in the section, and that these power costs must therefore also exclude the applicable 7(g) costs inserts text into the statute that Congress itself did not insert.  If Congress intended that the

---

[96]     OPUC E.R. Vol. IV, 891-94 (R.A.R. 063201-063204).

"power costs" for the 7(b)(2) Case should exclude applicable 7(g) costs, it knew how to say so. It did not. BPA cannot now insert that language into the statute.

BPA's second argument, that its interpretation of 7(b)(2) with respect to applicable 7(g) costs is supported by the conclusion that Congress intended that only the five assumptions would demarcate the Program Case and 7(b)(2) Case, is belied by the fact that Congress made a specific provision for applicable 7(g) costs in section 7(b)(2). This court should recognize that Congress intended its statements regarding applicable 7(g) costs to have some meaning.

BPA's third argument, that its legal interpretation ensures that certain 7(g) costs will not be double-counted is not a persuasive one. Under the logical interpretation of the text of the Act, such as that found in the Administrator's 1984 Legal interpretation, it is possible to double-count certain applicable 7(g) costs. Nothing in the language of the Act suggests that this is an eventuality that Congress intended to avoid. Accordingly, BPA's assertion that its treatment of applicable 7(g) costs because it avoids double-counting certain applicable 7(g) costs is meaningless.

The practical effect of BPA's change in treatment of applicable 7(g) costs in the 7(b)(2) Case for purposes of the 7(b)(2) rate test is to disadvantage the Program Case and thereby potential residential exchange benefits. Even though it may seem at first glance that subtracting applicable 7(g) costs from both the

Program and 7(b)(2) Cases simply neutralizes the costs, subtracting the costs from both cases causes the average rate for the 7(b)(2) Case to decrease more than the average rate for the Program Case. This occurs because the 7(b)(2) loads are smaller than the Program Case loads.

## VII. Conclusion

This court should conclude that the Lookback Proposal is unlawful and that BPA does not have authority to engage in corrective retroactive rulemaking to address the court's remand in *Golden NW.* The court should also conclude that BPA's decision to subtract applicable 7(g) costs from the Program Case and 7(b)(2) Case for purpose of the 7(b)(2) Rate Test is contrary to law.

Respectfully submitted,

JOHN R. KROGER
Attorney General
JEROME LIDZ
Solicitor General

/s/ Stephanie Andrus

STEPHANIE ANDRUS #925123
Senior Assistant Attorney General

Attorneys for Petitioner
Oregon Public Utility Commission

SSA:slc/1565009-V1

# ADDENDUM

**Add. - 1**

## STATUTES CITED IN BRIEF

**5 U.S.C. § 706     Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be—

    (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B)     contrary to constitutional right, power, privilege, or immunity;

    (C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D)     without observance of procedure required by law;

    (E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**16 U.S.C. § 839c   Sale of power**

(a)     Preferences and priorities.  All power sales under this chapter shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 (16 U.S.C. § 832 and following) and, in particular, sections 4 and 5 thereof [16 U.S.C. §§ 832c and 832d].  Such sales shall be at rates established pursuant to section 839e of this title.

**Add. - 2**

(b)     Sales to public bodies, cooperatives, and Federal agency customers.

(1)     Whenever requested, the Administrator shall offer to sell to each requesting public body and cooperative entitled to preference and priority under the Bonneville Project Act of 1937 [16 U.S.C. § 832 *et seq*.] and to each requesting investor-owned utility electric power to meet the firm power load of such public body, cooperative or investor-owned utility in the Region to the extent that such firm power load exceeds—

(A)     the capability of such entity's firm peaking and energy resources used in the year prior to December 5, 1980, to serve its firm load in the region, and

(B)     such other resources as such entity determines, pursuant to contracts under this chapter, will be used to serve its firm load in the region.

In determining the resources which are used to serve a firm load, for purposes of subparagraphs (A) and (B), any resources used to serve a firm load under such subparagraphs shall be treated as continuing to be so used, unless such use is discontinued with the consent of the Administrator, or unless such use is discontinued because of obsolescence, retirement, loss of resource, or loss of contract rights.

(2)     Contracts with investor-owned utilities shall provide that the Administrator may reduce his obligations under such contracts in accordance with section 5(a) of the Bonneville Project Act of 1937 [16 U.S.C. § 832d(a)].

(3)     In addition to his authorities to sell electric power under paragraph (1), the Administrator is also authorized to sell electric power to Federal agencies in the region.

(4)     Sales under this subsection shall be made only if the public body, cooperative, Federal agency or investor-owned utility complies with the Administrator's standards for service in effect on December 5, 1980, or as subsequently revised.

(5)     The Administrator shall include in contracts executed in accordance with this subsection provisions that enable the Administrator to restrict his contractual obligations to meet the loads referred to in this

**Add. - 3**

subsection in the future if the Administrator determines, after a reasonable period of experience under this chapter, that the Administrator cannot be assured on a planning basis of acquiring sufficient resources to meet such loads during a specified period of insufficiency. Any such contract with a public body, cooperative, or Federal agency shall specify a reasonable minimum period between a notice of restriction and the earliest date such restriction may be imposed.

(6)    Contracts executed in accordance with this subsection with public body, cooperative, and Federal agency customers shall—

(A)    provide that the restriction referred to in paragraph (5) shall not be applicable to any such customers until the operating year in which the total of such customers' firm loads to be served by the Administrator equals or exceeds the firm capability of the Federal base system resources;

(B)    not permit restrictions which would reduce the total contractual entitlement of such customers to an amount less than the firm capability of the Federal base system resources; and

(C)    contain a formula for determining annually, on a uniform basis, each such customer's contractual entitlement to firm power during such a period of restriction, which formula shall not consider customer resources other than those the customer has determined, as of December 5, 1980, to be used to serve its own firm loads.

The formula referred to in subparagraph (C) shall obligate the Administrator to provide on an annual basis only firm power needed to serve the portion of such customer's firm load in excess of the capability of such customer's own firm resources determined by such customer under paragraph (1) of this subsection to be used to serve its firm load.

(7)    Required sale.

(A)    Definition of a joint operating entity. In this section, the term "joint operating entity" means an entity that is lawfully organized under State law as a public body or cooperative prior to September 22, 2000, and is formed by and whose members

**Add. - 4**

or participants are two or more public bodies or cooperatives, each of which was a customer of the Bonneville Power Administration on or before January 1, 1999.

(B)     Sale.  Pursuant to paragraph (1), the Administrator shall sell, at wholesale to a joint operating entity, electric power solely for the purpose of meeting the regional firm power consumer loads of regional public bodies and cooperatives that are members of or participants in the joint operating entity.

(C)     No resale.  A public body or cooperative to which a joint operating entity sells electric power under subparagraph (B) shall not resell that power except to retail customers of the public body or cooperative or to another regional member or participant of the same joint operating entity, or except as otherwise permitted by law.

(c)     Purchase and exchange sales

(1)     Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.

(2)     The purchase and exchange sale referred to in paragraph (1) of this subsection with any electric utility shall be limited to an amount not in excess of 50 per centum of such utility's Regional residential load in the year beginning July 1, 1980, such 50 per centum limit increasing in equal annual increments to 100 per centum of such load in the year beginning July 1, 1985, and each year thereafter.

(3)     The cost benefits, as specified in contracts with the Administrator, of any purchase and exchange sale referred to in paragraph (1) of this subsection which are attributable to any electric utility's residential load within a State shall be passed through directly to such utility's residential loads within such State, except that a State which lies partially within and partially without the region may require that such cost benefits be distributed among all of the utility's residential loads in that State.

**Add. - 5**

(4)    An electric utility may terminate, upon reasonable terms and conditions agreed to by the Administrator and such utility prior to such termination, its purchase and sale under this subsection if the supplemental rate charge provided for in section 839e(b) (3) of this title is applied and the cost of electric power sold to such utility under this subsection exceeds, after application of such rate charge, the average system cost of power sold by such utility to the Administrator under this subsection.

(5)    Subject to the provisions of sections 839b and 839d of this title, in lieu of purchasing any amount of electric power offered by a utility under paragraph (1) of this subsection, the Administrator may acquire an equivalent amount of electric power from other sources to replace power sold to such utility as part of an exchange sale if the cost of such acquisition is less than the cost of purchasing the electric power offered by such utility.

(6)    Exchange sales to a utility pursuant to this subsection shall not be restricted below the amounts of electric power acquired by the Administrator from, or on behalf of, such utility pursuant to this subsection.

(7)    The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the Council, the Administrator's customers, and appropriate State regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission. Such average system cost shall not include—

(A)    the cost of additional resources in an amount sufficient to serve any new large single load of the utility;

(B)    the cost of additional resources in an amount sufficient to meet any additional load outside the region occurring after December 5, 1980; and

(C)    any costs of any generating facility which is terminated prior to initial commercial operation.

(d)    Sales to existing direct service industrial customers.

**Add. - 6**

(1)   (A)   The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers.  Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region.

      (B)   After December 5, 1980, the Administrator shall offer in accordance with subsection (g) of this section to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 providing for the sale of "industrial firm power."

(2)   The Administrator shall not sell electric power, including reserves, directly to new direct service industrial customers.

(3)   The Administrator shall not sell amounts of electric power, including reserves, to existing direct service industrial customers in excess of the amount permitted under paragraph (1) unless the Administrator determines, after a plan has been adopted pursuant to section 839b of this title, that such proposed sale is consistent with the plan and that—

      (A)   additional power system reserves are required for the region's firm loads,

      (B)   the proposed sale would provide a cost-effective method of supplying such reserves,

      (C)   such loads or loads of similar character cannot provide equivalent operating or planning benefits to the region if served by an electric utility under contractual arrangements providing reserves, and

      (D)   the Administrator has or can acquire sufficient electric power to serve such loads, and unless the Council has determined such sale is consistent with the plan.  After such determination by the Administrator and by the Council, the Administrator is authorized to offer to existing direct service industrial customers power in such amounts in excess of the amount permitted under paragraph (1) of this subsection as the Administrator determines to be necessary to provide additional power system reserves to meet the region's firm loads.

**Add. - 7**

(4)   (A)   As used in this section, the term "existing direct service industrial customer" means any direct service industrial customer of the Administrator which has a contract for the purchase of electric power from the Administrator on December 5, 1980.

(B)   The term "new direct service industrial customer" means any industrial entity other than an existing direct service industrial customer.

(C)      (i)   Where a new contract is offered in accordance with subsection (g) of this section to any existing direct service industrial customer which has not received electric power prior to December 5, 1980, from the Administrator pursuant to a contract with the Administrator existing on December 5, 1980, electric power delivered under such new contract shall be conditioned on the Administrator reasonably acquiring, in accordance with this chapter and within such estimated period of time (as specified in the contract) as he deems reasonable, sufficient resources to meet, on a planning basis, the load requirement of such customer. Such contract shall also provide that the obligation of the Administrator to acquire such resources to meet such load requirement shall, except as provided in clause (ii) of this subparagraph, apply only to such customer and shall not be sold or exchanged by such customer to any other person.

(ii)   Rights under a contract described in clause (i) of this subparagraph may be transferred by an existing direct service industrial customer referred to in clause (i) to a successor in interest in connection with a reorganization or other transfer of all major assets of such customer. Following such a transfer, such successor in interest (or any other subsequent successor in interest) may also transfer rights under such a contract only in connection with a reorganization or other transfer of all assets of such successor in interest.

**Add. - 8**

       (iii)    The limitations of clause (i) of this subparagraph shall not apply to any customer referred to in clause (i) whenever the Administrator determines that such customer is receiving electric power pursuant to a contract referred to in such clause (ii).

(e)    Contractual entitlements to firm power.

    (1)    The contractual entitlement to firm power of any customer from whom, or on whose behalf, the Administrator has acquired electric power pursuant to section 839d of this title may not be restricted below the amount of electric power so acquired from, or on behalf of, such customer. If in any year such customer's requirements are less than such entitlement, any excess of such entitlement shall be first made available to increase the entitlement of other customers of the same class before being available for the entitlement of other customers. For purposes of this paragraph, the following entities shall each constitute a class:

        (A)   public bodies and cooperatives;

        (B)   Federal agencies;

        (C)   direct service industrial; and

        (D)   investor owned utilities.

    (2)    Any contractual entitlement to firm power which is based on electric power acquired from, or on behalf of, a customer pursuant to section 839d of this title shall be in addition to any other contractual entitlement to firm power not subject to restriction that such customer may have under this section. For the purposes of this subsection, references to amounts of power acquired by the Administrator pursuant to section 839d of this title shall be deemed to mean the amounts specified in the resource acquisition contracts exclusive of any amounts recognized in such contracts as replacement for Federal base system resources.

    (3)    The Administrator shall, consistent with the provisions of this chapter, insure that any restrictions upon any particular customer class made pursuant to this subsection and subsection (b) of this section are distributed equitably throughout the region.

**Add. - 9**

(f)     Surplus power

The Administrator is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to his obligations incurred pursuant to subsections (b), (c), and (d) of this section in accordance with this and other Acts applicable to the Administrator, including the Bonneville Project Act of 1937 (16 U.S.C. § 832 and following), the Federal Columbia River Transmission System Act (16 U.S.C. § 838 and following), and the Act of August 31, 1964 (16 U.S.C. §§ 837-837h).

(g)     Long-term contracts

(1)     As soon as practicable within nine months after December 5, 1980, the Administrator shall commence necessary negotiations for, and offer, initial long-term contracts (within the limitations of the third sentence of section 5(a) of the Bonneville Project Act [16 U.S.C. § 832d(a)]) simultaneously to—

(A)     existing public body and cooperative customers and investor-owned utility customers under subsection (b) of this section;

(B)     Federal agency customers under subsection (b) of this section;

(C)     electric utility customers under subsection (c) of this section; and

(D)     direct service industrial customers under subsection (d) (1) of this section.

(2)     Each customer offered a contract pursuant to this subsection shall have one year from the date of such offer to accept such contract. Such contract shall be effective as provided in this subsection.

(3)     An initial contract with a public body, cooperative or investor-owned electric utility customer or a Federal agency customer pursuant to subsection (b) of this section shall be effective on the date executed by such customer, unless another effective date is otherwise agreed to by the Administrator and the customer.

(4)     An initial contract with an electric utility customer pursuant to subsection (c) of this section shall be effective on the date executed by

**Add. - 10**

such customer, but no earlier than the first day of the tenth month after December 5, 1980.

(5)     An initial contract with a direct service industrial customer pursuant to subsection (d) (1) of this section, shall be effective on the date agreed upon by the Administrator and such customer, but no later than the first day of the tenth month after December 5, 1980.  When such contract is executed, it may for rate purposes be given retroactive effect to such first day.

(6)     Initial contracts offered public body, cooperative and Federal agency customers in accordance with this subsection shall provide that during a period of insufficiency declared in accordance with subsection (b) of this section each customer's contractual entitlement shall, to the extent of its requirements on the Administrator, be no less than the amount of firm power received from the Administrator in the year immediately preceding the period of insufficiency.

(7)     The Administrator shall be deemed to have sufficient resources for the purpose of entering into the initial contracts specified in paragraph (1) (A) through (D).

## 16 U.S.C. § 839e   Rates

(a)     Establishment; periodic review and revision; confirmation and approval by Federal Energy Regulatory Commission

(1)     The Administrator shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power.  Such rates shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law.  Such rates shall be established in accordance with sections 9 and 10 of the Federal Columbia River Transmission System Act (16 U.S.C. § 838) [16 U.S.C. §§ 838g and 838h], section 5 of the Flood Control Act of 1944 [16 U.S.C. § 825s], and the provisions of this chapter.

**Add. - 11**

(2)    Rates established under this section shall become effective only, except in the case of interim rules as provided in subsection (i) (6) of this section, upon confirmation and approval by the Federal Energy Regulatory Commission upon a finding by the Commission, that such rates—

    (A)    are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,

    (B)    are based upon the Administrator's total system costs, and

    (C)    insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.

(b)    General application of rates to meet general requirements

(1)    The Administrator shall establish a rate or rates of general application for electric power sold to meet the general requirements of public body, cooperative, and Federal agency customers within the Pacific Northwest, and loads of electric utilities under section 839c(c) of this title. Such rate or rates shall recover the costs of that portion of the Federal base system resources needed to supply such loads until such sales exceed the Federal base system resources. Thereafter, such rate or rates shall recover the cost of additional electric power as needed to supply such loads, first from the electric power acquired by the Administrator under section 839c(c) of this title and then from other resources.

(2)    After July 1, 1985, the projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and Federal agency customers, exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events, may not exceed in total, as determined by the Administrator, during any year after July 1, 1985, plus the ensuing four years, an amount equal to the power costs for general requirements of such customers if, the Administrator assumes that—

**Add. - 12**

(A) the public body and cooperative customers' general requirements had included during such five-year period the direct service industrial customer loads which are—

    (i) served by the Administrator, and

    (ii) located within or adjacent to the geographic service boundaries of such public bodies and cooperatives;

(B) public body, cooperative, and Federal agency customers were served, during such five-year period, with Federal base system resources not obligated to other entities under contracts existing as of December 5, 1980, (during the remaining term of such contracts) excluding obligations to direct service industrial customer loads included in subparagraph (A) of this paragraph;

(C) no purchases or sales by the Administrator as provided in section 839c(c) of this title were made during such five-year period;

(D) all resources that would have been required, during such five-year period, to meet remaining general requirements of the public body, cooperative and Federal agency customers (other than requirements met by the available Federal base system resources determined under subparagraph (B) of this paragraph) were—

    (i) purchased from such customers by the Administrator pursuant to section 839d of this title, or

    (ii) not committed to load pursuant to section 839c(b) of this title, and were the least expensive resources owned or purchased by public bodies or cooperatives; and any additional needed resources were obtained at the average cost of all other new resources acquired by the Administrator; and

(E) the quantifiable monetary savings, during such five-year period, to public body, cooperative and Federal agency customers resulting from—

**Add. - 13**

> > (i) reduced public body and cooperative financing costs as applied to the total amount of resources, other than Federal base system resources, identified under subparagraph (D) of this paragraph, and
>
> > (ii) reserve benefits as a result of the Administrator's actions under this chapter were not achieved.

> (3) Any amounts not charged to public body, cooperative, and Federal agency customers by reason of paragraph (2) of this subsection shall be recovered through supplemental rate charges for all other power sold by the Administrator to all customers. Rates charged public body, cooperative, or Federal agency customers pursuant to this subsection shall not include any costs or benefits of a net revenue surplus or deficiency occurring for the period ending June 30, 1985, to the extent such surplus or deficiency is caused by—

> > (A) a difference between actual power deliveries and power deliveries projected for the purpose of establishing rates to direct service industrial customers under subsection (c) (1) of this subsection, and

> > (B) an overrecovery or underrecovery of the net costs incurred by the Administrator under section 839c(c) of this title as a result of such difference.

> Any such revenue surplus or deficiency incurred shall be recovered from, or repaid to, customers over a reasonable period of time after July 1, 1985, through a supplemental rate charge or credit applied proportionately for all other power sold by the Administrator at rates established under other subsections of this section prior to July 1, 1985.

> (4) The term "general requirements" as used in this section means the public body, cooperative or Federal agency customer's electric power purchased from the Administrator under section 839c(b) of this title, exclusive of any new large single load.

(c) Rates applicable to direct service industrial customers

> (1) The rate or rates applicable to direct service industrial customers shall be established—

**Add. - 14**

    (A)    for the period prior to July 1, 1985, at a level which the Administrator estimates will be sufficient to recover the cost of resources the Administrator determines are required to serve such customers' load and the net costs incurred by the Administrator pursuant to section 839c(c) of this title, based upon the Administrator's projected ability to make power available to such customers pursuant to their contracts, to the extent that such costs are not recovered through rates applicable to other customers; and

    (B)    for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.

(2)    The determination under paragraph (1) (B) of this subsection shall be based upon the Administrator's applicable wholesale rates to such public body and cooperative customers and the typical margins included by such public body and cooperative customers in their retail industrial rates but shall take into account—

    (A)    the comparative size and character of the loads served,

    (B)    the relative costs of electric capacity, energy, transmission, and related delivery facilities provided and other service provisions, and

    (C)    direct and indirect overhead costs,

all as related to the delivery of power to industrial customers, except that the Administrator's rates during such period shall in no event be less than the rates in effect for the contract year ending on June 30, 1985.

(3)    The Administrator shall adjust such rates to take into account the value of power system reserves made available to the Administrator through his rights to interrupt or curtail service to such direct service industrial customers.

(d)    Discount rates; special rates

**Add. - 15**

> (1)    In order to avoid adverse impacts on retail rates of the Administrator's customers with low system densities, the Administrator shall, to the extent appropriate, apply discounts to the rate or rates for such customers.
>
> (2)    In order to avoid adverse impacts of increased rates pursuant to this chapter on any direct service industrial customer using raw minerals indigenous to the region as its primary resource, the Administrator, upon request of such customer showing such impacts and after considering the effect of such request on his other obligations under this chapter, is authorized, if the Administrator determines that such impacts will be significant, to establish a special rate applicable to such customer if all power sold to such customer may be interrupted, curtailed, or withdrawn to meet firm loads in the region. Such rate shall be established in accordance with this section and shall include such terms and conditions as the Administrator deems appropriate.

(e)    Uniform rates; rates for sale of peaking capacity; time-of-day, seasonal, and other rates

Nothing in this chapter prohibits the Administrator from establishing, in rate schedules of general application, a uniform rate or rates for sale of peaking capacity or from establishing time-of-day, seasonal rates, or other rate forms.

(f)    Basis for rates

Rates for all other firm power sold by the Administrator for use in the Pacific Northwest shall be based upon the cost of the portions of Federal base system resources, purchases of power under section 839c(c) of this title and additional resources which, in the determination of the Administrator, are applicable to such sales.

(g)    Allocation of costs and benefits

Except to the extent that the allocation of costs and benefits is governed by provisions of law in effect on December 5, 1980, or by other provisions of this section, the Administrator shall equitably allocate to power rates, in accordance with generally accepted ratemaking principles and the provisions of this chapter, all costs and benefits not otherwise allocated under this section, including, but not limited to, conservation, fish and wildlife measures, uncontrollable events, reserves, the excess costs of experimental resources acquired under section 839d of

**Add. - 16**

this title, the cost of credits granted pursuant to section 839d of this title, operating services, and the sale of or inability to sell excess electric power.

(h)    Surcharges

Notwithstanding any other provision of this section (except the provisions of subsection (a) of this section), the Administrator shall adjust power rates to include any surcharges arising under section 839b(f) of this title, and shall allocate any revenues from such charges in such manner as the Administrator determines will help achieve the purposes of section 839b(f) of this title.

(i)    Procedures

In establishing rates under this section, the Administrator shall use the following procedures:

(1)    Notice of the proposed rates shall be published in the Federal Register with a statement of the justification and reasons supporting such rates. Such notice shall include a date for a hearing in accordance with paragraph (2) of this subsection.

(2)    One or more hearings shall be conducted as expeditiously as practicable by a hearing officer to develop a full and complete record and to receive public comment in the form of written and oral presentation of views, data, questions, and argument related to such proposed rates. In any such hearing—

(A)    any person shall be provided an adequate opportunity by the hearing officer to offer refutation or rebuttal of any material submitted by any other person or the Administrator, and

(B)    the hearing officer, in his discretion, shall allow a reasonable opportunity for cross examination, which, as determined by the hearing officer, is not dilatory, in order to develop information and material relevant to any such proposed rate.

(3)    In addition to the opportunity to submit oral and written material at the hearings, any written views, data, questions, and arguments submitted by persons prior to, or before the close of, hearings shall be made a part of the administrative record.

(4)    After such a hearing, the Administrator may propose revised rates, publish such proposed rates in the Federal Register, and conduct additional hearings in accordance with this subsection.

(5)    The Administrator shall make a final decision establishing a rate or rates based on the record which shall include the hearing transcript, together with exhibits, and such other materials and information as may have been submitted to, or developed by, the Administrator. The decision shall include a full and complete justification of the final rates pursuant to this section.

(6)    The final decision of the Administrator shall become effective on confirmation and approval of such rates by the Federal Energy Regulatory Commission pursuant to subsection (a) (2) of this section. The Commission shall have the authority, in accordance with such procedures, if any, as the Commission shall promptly establish and make effective within one year after December 5, 1980, to approve the final rate submitted by the Administrator on an interim basis, pending the Commission's final decision in accordance with such subsection. Pending the establishment of such procedures by the Commission, if such procedures are required, the Secretary is authorized to approve such interim rates during such one-year period in accordance with the applicable procedures followed by the Secretary prior to December 5, 1980. Such interim rates, at the discretion of the Secretary, shall continue in effect until July 1, 1982.

(j)    Cost figures to be indicated on rate schedules and power billings

All rate schedules adopted, and all power billings rendered, by the Administrator pursuant to this section shall indicate—

(1)    the approximate cost contribution of different resource categories to the Administrator's rates for the sale of energy and capacity, and

(2)    the cost of resources acquired to meet load growth within the region and the relation of such cost to the average cost of resources available to the Administrator.

(k)    Statutory basis for procedures used in establishing rates or rate schedules

Notwithstanding any other provision of this chapter, all rates or rate schedules for the sale of nonfirm electric power within the United States, but

**Add. - 18**

outside the region, shall be established after December 5, 1980, by the Administrator in accordance with the procedures of subsection (i) of this section (other than the first sentence of paragraph (6) thereof) and in accordance with the Bonneville Project Act [16 U.S.C. §§ 832 et seq.], the Flood Control Act of 1944, and the Federal Columbia River Transmission System Act [16 U.S.C. §§ 838 et seq.]. Notwithstanding section 201(f) of the Federal Power Act [16 U.S.C. § 824(f)], such rates or rate schedules shall become effective after review by the Federal Energy Regulatory Commission for conformance with the requirements of such Acts and after approval thereof by the Commission. Such review shall be based on the record of proceedings established under subsection (i) of this section. The parties to such proceedings under subsection (i) of this section shall be afforded an opportunity by the Commission for an additional hearing in accordance with the procedures established for rate-making by the Commission pursuant to the Federal Power Act [16 U.S.C. §§ 791a et seq.].

(l)     Rates for sales outside United States; negotiations

In order to further the purposes of this chapter and to protect the consumers of the region, the Administrator may negotiate, or establish, rates for electric power sold by the Administrator to any entity not located in the United States which shall be equitable in relation to rates for all electric power which is, or may be, purchased by the Administrator or the Administrator's customers from entities outside the United States. In establishing rates other than by negotiation, the provisions of subsection (i) of this section shall apply. In the case of any negotiation with an entity not located in the United States, the Administrator shall provide public notice of any proposal to negotiate such rates. Such negotiated rates shall be not less than the rates established under this chapter for nonfirm power sold within the United States but outside the region. The Administrator shall also afford notice of any rates negotiated pursuant to this subsection.

(m)    Impact aid payments; formula

(1)     Beginning the first fiscal year after the plan and program required by section 839b(d) and (h) of this title are finally adopted, the Administrator may, subject to the provisions of this section, make annual impact aid payments to the appropriate local governments within the region with respect to major transmission facilities of the Administrator, as defined in section 3(c) of the Federal Columbia River Transmission Act [16 U.S.C. § 838a(c)]—

(A)    which are located within the jurisdictional boundaries of such governments,

**Add. - 19**

> (B)  which are determined by the Administrator to have a substantial impact on such governments, and
>
> (C)  where the construction of such facilities, or any modification thereof, is completed after December 5, 1980, and, in the case of a modification of an existing facility, such modification substantially increases the capacity of such existing transmission facility.

(2)  Payments made under this subsection for any fiscal year shall be determined by the Administrator pursuant to a regionwide, uniform formula to be established by rule in accordance with the procedures set forth in subsection (i) of this section. Such rule shall become effective on its approval, after considering its effect on rates established pursuant to this section, by the Federal Energy Regulatory Commission. In developing such formula, the Administrator shall identify, and take into account, the local governmental services provided to the Administrator concerning such facilities and the associated costs to such governments as the result of such facilities.

(3)  Payments made pursuant to this subsection shall be made solely from the fund established by section 11 of the Federal Columbia River Transmission System Act [16 U.S.C. § 838i]. The provisions of section 13 of such Act [16 U.S.C. § 838k], and any appropriations provided to the Administrator under any law, shall not be available for such payments. The authorization of payments under this subsection shall not be construed as an obligation of the United States.

(4)  No payment may be made under this subsection with respect to any land or interests in land owned by the United States within the region and administered by any Federal agency (other than the Administrator), without regard to how the United States obtained ownership thereof, including lands or interests therein acquired or withdrawn by a Federal agency for purposes of such agency and subsequently made available to the Administrator for such facilities.

(n)  Limiting the inclusion of costs of protection of, mitigation of damage to, and enhancement of fish and wildlife, within rates charged by the Bonneville Power Administration, to the rate period in which the costs are incurred

Notwithstanding any other provision of this section, rates established by the Administrator, under this section shall recover costs for protection, mitigation and

**Add. - 20**

enhancement of fish and wildlife, whether under this chapter or any other Act, not to exceed such amounts the Administrator forecasts will be expended during the fiscal year 2002-2006 rate period, while preserving the Administrator's ability to establish appropriate reserves and maintain a high Treasury payment probability for the subsequent rate period.

### 16 U.S.C. § 839f   Administrative provisions

(a)    Contract authority

Subject to the provisions of this chapter, the Administrator is authorized to contract in accordance with section 2(f) of the Bonneville Project Act of 1937 (16 U.S.C. § 832a(f)). Other provisions of law applicable to such contracts on December 5, 1980, shall continue to be applicable.

(b)    Executive and administrative functions of Administrator of Bonneville Power Administration; sound and businesslike implementation of chapter

The Administrator shall discharge the executive and administrative functions of his office in accordance with the policy established by the Bonneville Project Act of 1937 (16 U.S.C. § 832 and following), section 7152(a) (2) and (3) of Title 42, and this chapter. The Secretary of Energy, the Council, and the Administrator shall take such steps as are necessary to assure the timely implementation of this chapter in a sound and businesslike manner. Nothing in this chapter shall be construed by the Secretary, the Administrator, or any other official of the Department of Energy to modify, alter, or otherwise affect the requirements and directives expressed by the Congress in section 7152(a) (2) and (3) of Title 42 or the operations of such officials as they existed prior to December 5, 1980.

(c)    Limitations and conditions on contracts for sale or exchange of electric power for use outside Pacific Northwest

Any contract of the Administrator for the sale or exchange of electric power for use outside the Pacific Northwest shall be subject to limitations and conditions corresponding to those provided in sections 2 and 3 of the Act of August 31, 1964 (16 U.S.C. §§ 837a and 837b) for any contract for the sale, delivery, or exchange of hydroelectric energy or peaking capacity generated within the Pacific Northwest for use outside the Pacific Northwest. In applying such sections for the purposes of this subsection, the term "surplus energy" shall mean electric energy for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy, and the term "surplus peaking capacity" shall mean electric peaking capacity for which there is no demand in the Pacific Northwest at

**Add. - 21**

the rate established for the disposition of such capacity. The authority granted, and duties imposed upon, the Secretary by sections 5 and 7 of such Act (16 U.S.C. §§ 837e and 837f) [16 U.S.C. §§ 837d and 837f] shall also apply to the Administrator in connection with resources acquired by the Administrator pursuant to this chapter. The Administrator shall, in making any determination, under any contract executed pursuant to section 839c of this title, of the electric power requirements of any Pacific Northwest customer, which is a non-Federal entity having its own generation, exclude, in addition to hydroelectric generated energy excluded from such requirements pursuant to section 3(d) of such Act (16 U.S.C. § 837b(d)), any amount of energy included in the resources of such customer for service to firm loads in the region if (1) such amount was disposed of by such customer outside the region, and (2) as a result of such disposition, the firm energy requirements of such customer or other customers of the Administrator are increased. Such amount of energy shall not be excluded, if the Administrator determines that through reasonable measures such amount of energy could not be conserved or otherwise retained for service to regional loads. The Administrator may sell as replacement for any amount of energy so excluded only energy that would otherwise be surplus.

(d)     Disposition of power which does not increase amount of firm power Administrator is obligated to provide to any customer

No restrictions contained in subsection (c) of this section shall limit or interfere with the sale, exchange or other disposition of any power by any utility or group thereof from any existing or new non-Federal resource if such sale, exchange or disposition does not increase the amount of firm power the Administrator would be obligated to provide to any customer. In addition to the directives contained in subsections (i) (1) (B) and (i) (3) of this section and subject to:

      (1)     any contractual obligations of the Administrator,

      (2)     any other obligations under existing law, and

      (3)     the availability of capacity in the Federal transmission system,

the Administrator shall provide transmission access, load factoring, storage and other services normally attendant thereto to such utilities and shall not discriminate against any utility or group thereof on the basis of independent development of such resource in providing such services.

**Add. - 22**

(e)   Judicial review; suits

    (1)   For purposes of sections 701 through 706 of Title 5, the following actions shall be final actions subject to judicial review—

        (A)   adoption of the plan or amendments thereto by the Council under section 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b(h) of this title;

        (B)   sales, exchanges, and purchases of electric power under section 839c of this title;

        (C)   the Administrator's acquisition of resources under section 839d of this title;

        (D)   implementation of conservation measures under section 839d of this title;

        (E)   execution of contracts for assistance to sponsors under section 839d(f) of this title;

        (F)   granting of credits under section 839d(h) of this title;

        (G)   final rate determinations under section 839e of this title; and

        (H)   any rule prescribed by the Administrator under section 839e(m)(2) of this title.

    (2)   The record upon review of such final actions shall be limited to the administrative record compiled in accordance with this chapter. The scope of review of such actions without a hearing or after a hearing shall be governed by section 706 of Title 5, except that final determinations regarding rates under section 839e of this title shall be supported by substantial evidence in the rulemaking record required by section 839e(i) of this title considered as a whole. The scope of review of an action under section 839d(c) of this title shall be governed by section 706 of Title 5. Nothing in this section shall be construed to require a hearing pursuant to section 554, 556, or 557 of Title 5.

**Add. - 23**

(3) Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator.

(4)    For purposes of this subsection—

    (A)    major resources shall be deemed to be acquired upon publication in the Federal Register pursuant to section 839d(c) (4) (B) of this title;

    (B)    resources, other than major resources, shall be deemed to be acquired upon execution of the contract therefor;

    (C)    conservation measures shall be deemed to be implemented upon execution of the contract or grant therefor; and

    (D)    rate determinations pursuant to section 839e of this title shall be deemed final upon confirmation and approval by the Federal Energy Regulatory Commission.

(5)    Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. §§ 832 et seq.], the Act of August 31, 1964 (16 U.S.C. §§ 837-837h), or the Federal Columbia River Transmission System Act (16 U.S.C. §§ 838 and following), shall be filed in the United States court of appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred. In the case of a challenge of the plan or programs or amendments thereto, such suit shall be filed within sixty days after publication of a notice of such final action in the Federal Register. Such court shall have jurisdiction to hear and determine any suit brought as provided in this section. The plan and program, as finally adopted or portions thereof, or amendments thereto, shall not thereafter be reviewable as a part of any other action under this chapter or any other law. Suits challenging any other actions under this chapter shall be filed in the appropriate court.

(f)    Tax treatment of interest on governmental obligations

**Add. - 24**

For purposes of enabling the Administrator to acquire resources necessary to meet the firm load of public bodies, cooperatives, and Federal agencies from a governmental unit at a cost no greater than the cost which would be applicable in the absence of such acquisition, the exemption from gross income of interest on certain governmental obligations provided in section 103(a) (1) of Title 26 shall not be affected by the Administrator's acquisition of such resources if—

(1)     the Administrator, prior to contracting for such acquisition, certifies to his reasonable belief, that the persons for whom the Administrator is acquiring such resources for sale pursuant to section 839c of this title are public bodies, cooperatives, and Federal agencies, unless the Administrator also certifies that he is unable to acquire such resources without selling a portion thereof to persons who are not exempt persons (as defined in section 103(b) of Title 26), and

(2)     based upon such certification, the Secretary of the Treasury determines in accordance with applicable regulations that less than a major portion of the resource is to be furnished to persons who are not exempt persons (as defined in section 103(b) of Title 26).

The certification under paragraph (1) shall be made in accordance with this subsection and a procedure and methodology approved by the Secretary of the Treasury. For purposes of this subsection, the term "major portion" shall have the meaning provided by regulations issued by the Secretary of the Treasury.

(g)     Review of rates for sale of power to Administrator by investor-owned utility customers

When reviewing rates for the sale of power to the Administrator by an investor-owned utility customer under section 839c(c) or 839d of this title, the Federal Energy Regulatory Commission shall, in accordance with section 824h of this title—

(1)     convene a joint State board, and

(2)     invest such board with such duties and authority as will assist the Commission in its review of such rates.

(h)     Companies which own or operate facilities for the generation of electricity primarily for sale to Administrator

**Add. - 25**

(1) No "company" (as defined in section 79b(a) (2) of Title 15), which owns or operates facilities for the generation of electricity (together with associated transmission and other facilities) primarily for sale to the Administrator under section 839d of this title shall be deemed an "electric utility company" (as defined in section 79b(a) (3) of Title 15), within the meaning of any provision or provisions of chapter 2C of Title 15, if at least 90 per centum of the electricity generated by such company is sold to the Administrator under section 839d of this title, and if—

    (A) the organization of such company is consistent with the policies of section 79a(b) and (c) of Title 15, as determined by the Securities and Exchange Commission, with the concurrence of the Administrator, at the time of such organization; and

    (B) participation in any facilities of such "company" has been offered to public bodies and cooperatives in the region pursuant to section 839d(m) of this title.

(2) The Administrator shall include in any contract for the acquisition of a major resource from such "company" provisions limiting the amount of equity investment, if any, in such "company" to that which the Administrator determines will be consistent with achieving the lowest attainable power costs attributable to such major resource.

(3) In the case of any "company" which meets the requirements of paragraph (1), the Administrator, with the concurrence of such Commission, shall approve all significant contracts entered into by, and between, such "company" and any sponsor company or any subsidiary of such sponsor company which are determined to be consistent with the policies of section 79a(b) and (c) of Title 15 at the time such contracts are entered into. The Administrator and the Securities and Exchange Commission shall exercise such approval authority within sixty days after receipt of such contracts. Such contracts shall not be effective without such approval.

(4) Paragraph (1) of this subsection shall continue to apply to any such "company" unless the Administrator or the Securities and Exchange Commission, or both, through periodic review, (A) determine at any time that the "company" no longer operates in a manner consistent with the policies of section 79a(b) and (c) of Title 15 and in accordance with this subsection, and (B) notify the "company" in

**Add. - 26**

writing of such preliminary determination. This subsection shall cease to apply to such "company" thirty days after receipt of notification of a final determination thereof. A final determination shall be made only after public notice of the preliminary determination and after a hearing completed not later than sixty days from the date of publication of such notice. Such final determination shall be made within thirty days after the date of completion of such hearing.

(i)     Electric power acquisition or disposition

(1)     At the request and expense of any customer or group of customers of the Administrator within the Pacific Northwest, the Administrator shall, to the extent practicable—

(A)     acquire any electric power required by (i) any customer or group of customers to enable them to replace resources determined to serve firm load under section 839c(b) of this title, or (ii) direct service industrial customers to replace electric power that is or may be curtailed or interrupted by the Administrator (other than power the Administrator is obligated to replace), with the cost of such replacement power to be distributed among the direct service industrial customers requesting such power; and

(B)     dispose of, or assist in the disposal of, any electric power that a customer or group of customers proposes to sell within or without the region at rates and upon terms specified by such customer or group of customers, if such disposition is not in conflict with the Administrator's other marketing obligations and the policies of this chapter and other applicable laws.

(2)     In implementing the provisions of subparagraphs (A) and (B) of paragraph (1), the Administrator may prescribe policies and conditions for the independent acquisition or disposition of electric power by any direct service industrial customer or group of such customers for the purpose of assuring each direct service industrial customer an opportunity to participate in such acquisition or disposition.

(3)     The Administrator shall furnish services including transmission, storage, and load factoring unless he determines such services cannot be furnished without substantial interference with his power

**Add. - 27**

marketing program, applicable operating limitations or existing contractual obligations. The Administrator shall, to the extent practicable, give priority in making such services available for the marketing, within and without the Pacific Northwest, of capability from projects under construction on December 5, 1980, if such capability has been offered for sale at cost, including a reasonable rate of return, to the Administrator pursuant to this chapter and such offer is not accepted within one year.

(j)   Retail rate designs which encourage conservation and efficient use of electric energy, installation of consumer-owned renewable resources, and rate research and development

    (1)   The Council, as soon as practicable after December 5, 1980, shall prepare, in consultation with the Administrator, the customers, appropriate State regulatory bodies, and the public, a report and shall make recommendations with respect to the various retail rate designs which will encourage conservation and efficient use of electric energy and the installation of consumer-owned renewable resources on a cost-effective basis, as well as areas for research and development for possible application to retail utility rates within the region. Studies undertaken pursuant to this subsection shall not affect the responsibilities of any customer or the Administrator which may exist under the Public Utility Regulatory Policies Act of 1978.

    (2)   Upon request, and solely on behalf of customers so requesting, the Administrator is authorized to (A) provide assistance in analyzing and developing retail rate structures that will encourage cost-effective conservation and the installation of cost-effective consumer-owned renewable resources; (B) provide estimates of the probable power savings and the probable amount of billing credits under section 839d(h) of this title that might be realized by such customers as a result of adopting and implementing such retail rate structures; and (C) solicit additional information and analytical assistance from appropriate State regulatory bodies and the Administrator's other customers.

(k)   Executive position for conservation and renewable resources

There is hereby established within the administration an executive position for conservation and renewable resources. Such executive shall be appointed by the Administrator and shall be assigned responsibility for conservation and direct-

**Add. - 28**

application renewable resource programs (including the administration of financial assistance for such programs). Such position is hereby established in the senior executive service in addition to the number of such positions heretofore established in accordance with other provisions of law applicable to such positions.

**Oregon Revised Statute § 756.040  General Powers**

(1) In addition to the powers and duties now or hereafter transferred to or vested in the Public Utility Commission, the commission shall represent the customers of any public utility or telecommunications utility and the public generally in all controversies respecting rates, valuations, service and all matters of which the commission has jurisdiction.  In respect thereof the commission shall make use of the jurisdiction and powers of the office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates.  The commission shall balance the interests of the utility investor and the consumer in establishing fair and reasonable rates.  Rates are fair and reasonable for the purposes of this subsection if the rates provide adequate revenue both for operating expenses of the public utility or telecommunications utility and for capital costs of the utility, with a return to the equity holder that is:

(a)  Commensurate with the return on investments in other enterprises having corresponding risks; and

(b)  Sufficient to ensure confidence in the financial integrity of the utility, allowing the utility to maintain its credit and attract capital.

(2)  The Commission is vested with power and jurisdiction to supervise and regulate every public utility and telecommunications utility in this state, and to do all things necessary and convenient in the exercise of such power and jurisdiction.

(3)  The commission may participate in any proceeding before any public officer, commission or body of the United States or any state for the purpose of representing the public generally and the customers of any public utility or telecommunications utility operating or providing service to or within the state.

(4)  The commission may make joint investigations, hold joint hearings within or without this state and issue concurrent orders in conjunction or concurrence with any official, board, commission, or agency of any state or of the United States.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify

that the Appellee's Brief is proportionately spaced, has a typeface of 14 points

or more and contains 9,987 words.

DATED:  August 19, 2009

/s/  Stephanie Andrus

STEPHANIE ANDRUS
Assistant Attorney General

Attorneys for Petitioner
Oregon Public Utility Commission

LCA:slc/1565009-v1

# CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2009, I directed the Petitioner's Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

David Hill
DEPARTMENT OF ENERGY
1000 Independence Avenue, S.W.
Washington, DC 20585

/s/ Stephanie Andrus
STEPHANIE ANDRUS
Senior Assistant Attorney General

Attorneys for Petitioner
Oregon Public Utility Commission

SSA:slc/1565009-v1

JOHN R. KROGER
Attorney General of Oregon
JEROME LIDZ
Solicitor General
STEPHANIE ANDRUS
Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-6632

Counsel for Petitioner
Oregon Public Utility Commission

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *et al.,* | U.S.C.A. Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133, 08-75161 & 08-75165 |
|---|---|
| Petitioners, | |
| v. | |
| BONNEVILLE POWER ADMINISTRATION, | STATEMENT OF RELATED CASES |
| Respondent. | |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of Appeals for the Ninth Circuit, the undersigned, counsel of record for petitioner, certifies that there are seven related cases pending in this court. They have been consolidated for a companion appeal pursuant to Ninth Circuit Court Rule 15-3.2(b). The name of the consolidated cases is *Idaho Public Utilities Commission, et al. v. Bonneville Power Administration,* Docket Nos. 08-74927, 08-74928, 08-74929, 08-74932, 08-74933, 08-74942, and 08-74-957 ("*Idaho PUC"*). The consolidated case in *Idaho PUC* raise related issues concerning

BPA's determination of the mandatory terms of residential purchase and sale agreements offered to utilities eligible to participate in the NW Power Act Residential Exchange Program in BPA's Record of Decision on the "Short-Term Bridge Residential Purchase and Sale Agreement for the Period Fiscal Years 2009-2011 and Regional Dialogue Long-Term Residential Purchase and Sale Agreement for the Period Fiscal Years 2012-2028 ("the RPSA ROD"). BPA issued the RPSA ROD on September 4, 2008. By Order of the Court dated June 4, 2009, the consolidated cases in the companion appeal (*Idaho PUC*) use the same Record on Appeal as the present consolidated cases.

Respectfully submitted,

JOHN R. KROGER
Attorney General
JEROME LIDZ
Solicitor General

/s/  Stephanie Andrus
STEPHANIE ANDRUS
Senior Assistant Attorney General

Attorneys for Petitioner
Oregon Public Utility Commission