Docket Nos. 08-74725, 08-74811, 08-74900, 08-75008,
08-75091, 08-75098, 08-75099, 08-75112, 08-75113
08-75130, 08-75132, 08-75133, 08-75161, 08-75165 (Consolidated)

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, et al.,
Petitioner,
v.
BONNEVILLE POWER ADMINISTRATION,
Respondent.

ON PETITION FOR REVIEW
UNDER THE NORTHWEST POWER ACT

INITIAL BRIEF OF THE
IDAHO PUBLIC UTILITIES COMMISSION
AS PETITIONER IN DOCKET NO. 08-75113

LAWRENCE G. WASDEN
ATTORNEY GENERAL

DONALD L. HOWELL, II (ISB #3366)
D. NEIL PRICE (ISB #6864)
Deputy Attorneys General
PO Box 83720
Boise, ID 83720-0074
Telephone: (208) 334-0312
E-mail: don.howell@puc.idaho.gov
neil.price@puc.idaho.gov

Attorneys for Petitioner
Idaho Public Utilities Commission

## TABLE OF CONTENTS

I.  STATEMENT OF JURISDICTION ...................................................................1

    A.    Agency Subject Matter Jurisdiction ..................................................1

    B.    Final Agency Action and Statutory Basis for the Court's Jurisdiction.........1

    C.    Timing of Appeal and Statutory Basis ...........................................2

II. STATEMENT OF THE ISSUES PRESENTED FOR REVIEW........................2

III. STATEMENT OF THE CASE.....................................................................4

    A.    Introduction ....................................................................................4

    B.    Remand to BPA...............................................................................5

IV. STATEMENT OF RELEVANT FACTS.........................................................7

    A.    The Residential Exchange Program ...............................................7

    B.    "Deemer" Accounts.........................................................................10

    C.    Average System Cost ("ASC") Methodology...............................12

    D.    The 2000 REP Settlement Agreements.........................................14

    E.    BPA's WP-07 ROD.........................................................................16

V. SUMMARY OF ARGUMENT ...................................................................17

VI. ARGUMENT .............................................................................................18

    A.    Standard of Review .......................................................................18

B. BPA's Lookback Methodology Exceeded the Scope of the Court's Remand Order and Constitutes a Direct Violation of the General Rule Against Retroactive Ratemaking ...............................................................................20

1. The Rule Against Retroactive-Ratemaking Can Only be Abrogated in Extraordinary Circumstances and with Express Congressional Authorization ................................................................................................21

2. The Northwest Power Act Does Not Authorize BPA to Engage in Retroactive Ratemaking ........................................................................25

3. The Flood Control Act Does Not Permit BPA to Institute an Approach That Willfully Violates the Rule Against Retroactive Ratemaking.........26

C. The Prevailing Parties in *PGE* and *Golden Northwest* Failed to Exercise Measures that Would Have Protected Their Interests .................................31

VII. ADOPTION OF OTHER ISSUES AND ARGUMENTS ..............................35

VIII. RELIEF REQUESTED ................................................................................36

STATEMENT OF RELATED CASES ...................................................................38

# TABLE OF AUTHORITIES

## CASES

*Aluminum Company of America ("ALCOA") v. Central Lincoln Elec.*, 467 U.S. 380, 399 (1984)......................................................................................8

*Amalgamated Sugar Co. v. Vilsack ("Amalgamated")*, 563 F.3d 822, 834 (9th Cir. 2009) ..............................................................................................19

*Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988)............................................................. 22, 25

*Brimstone R. Co. v. United States*, 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1928)...........................................................................................22

*Central Electric Power Cooperative, Inc. v. Southeastern Power Administration*, 338 F.3d 333 (4th Cir. 2003) .............................................. 27, 28, 29, 31

*Central Lincoln Elec. v. BPA,* 835 F.2d 199, 200-01 (9th Cir. 1987) ......................9

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984)..................................................................................................19

*Combine Metals Reduction Co. v. Gemmill*, 557 F.2d 179, 190 (9th Cir. 1977) .....33

*Georgetown University Hospital v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987)...25

*Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.* ("*Golden Northwest*"), 501 F.3d 1037 (9th Cir. 2007), *cert. denied sub nom. Portland General Electric Co. v. Public Power Council*, ___ U.S. ___, 128 S.Ct. 2902 (2008)........................................................... 5, 10, 11, 17, 18, 20, 24, 31, 31, 33

*Holloway v. United States*, 789 F.2d 1372, 1374 (9th Cir. 1986) ............................33

*Humane Soc. of U.S. v. Gutierrez*, 527 F.3d 788, 789 (9th Cir. 2008)....................34

*K-Mart Corp. v. Cartier,* 486 U.S. 281, 294 (1988)...............................................19

*Livermore v. Heckler*, 743 F.2d 1396 (9th Cir. 1984) ...........................................24

*Matter of Combined Metals Reduction Co.*, 557 F.2d 179, 188 (9th Cir. 1977)......33

*M-S-R Pub. Power Agency v. BPA,* 297 F.3d 833, 844-45 (9th Cir. 2002) ............20

*Newman v. Apfel*, 223 F.3d 937, 942 (9th Cir. 2000) ......................................... 23, 24

*PacifiCorp. v. FERC*, 795 F.2d 816, 819 (9th Cir. 1986)................................ 12, 13

*Portland General Electric Co. v. Bonneville Power Admin.* ("*PGE*"), 501 F.3d
  1009 (9th Cir. 2007), *cert. denied*, ___U.S. ___, 128 S.Ct. 2902 (2008) .................
  ........................................................................ 4, 10, 11, 15, 18, 19, 21, 31, 31, 33

*Public Utilities Comm'n of Cal. v. FERC*, 456 F.3d 1025, 1061 (9th Cir. 2000)
  *citing Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578, 101 S.Ct. 2925,
  2930-31, 69 L.Ed.2d 856 (1981) .............................................................21

*Regulatory Com'n of Alaska v. Tesoro Alaska Co.*, 178 P.3d 1159, 1171 (Alaska
  2008)...................................................................................................21

*Southeastern Power Admin.*, 23 F.E.R.C. ¶ 61,403 (1983) ....................................30

*Southeastern Power Admin.*, 49 F.E.R.C. ¶ 62,109 (1989) ...................................30

*Southeastern Power Admin.*, 55 F.E.R.C. ¶ 61,016 (1981) .............................. 28, 30

*Southern Cal. Edison Co. v. Public Utilities Com'n*, 20 Cal.3d 813, 816, 576 P.2d
  945, 945 (Cal. 1978)..............................................................................21

*Southwestern Power Admin.*, 18 F.E.R.C. ¶ 61,052 (1982) ................................... 30

*United States Dept. of Energy – Bonneville Power Administration*, 128 F.E.R.C. ¶
  61,058 (2009).........................................................................................2

*United States v. Peterson*, 19 F.3d 1442, 1444 (9th Cir. 1994) (unpublished
  disposition) ..........................................................................................33

*Utah Power & Light Co. v. Idaho Public Utilities Commission*, 685 P.2d 276, 285
  (Idaho 1984) ........................................................................................22

*Washington Utilities & Transp. Comm'n v. FERC*, 26 F.3d 935, 936-37 (9th Cir.
  1994)...................................................................................................10

**STATUTES**

16 U.S.C. § 825s ...................................................................... 26, 29

16 U.S.C. § 839b(a)(1) ..................................................................9

16 U.S.C. § 839c(c) ...................................................................1, 7
16 U.S.C. § 839c(c)(1) .....................................................................8
16 U.S.C. § 839c(c)(3) .....................................................................8
16 U.S.C. § 839c(c)(7) ........................................................... 9, 12, 20

16 U.S.C. § 839e(a)(1) .............................................................. 20, 21, 29
16 U.S.C. § 839e(a)(2) ....................................................................20
16 U.S.C. §§ 839e(b)(2) and (3) ....................................................4, 5

16 U.S.C. § 839f (e)(4)(D) ...............................................................2
16 U.S.C. § 839f(e)(2) ...................................................................18
16 U.S.C. § 839f(e)(5) .....................................................................2
16 U.S.C. §§ 839f(e)(1)(B) ...............................................................2

16 U.S.C. §§ 839-839h ....................................................................4

5 U.S.C. §§ 551, 553. ...................................................................25

5 U.S.C. § 705 ...................................................................... 31, 32

5 U.S.C. § 706(2) ........................................................................20
5 U.S.C. § 706(2)(A) .......................................................... 19, 26, 35

5 U.S.C. §§ 701-706 .....................................................................18

Idaho Code § 61-502 ......................................................................9
Or. Rev. Stat. 756.040 ....................................................................9
Wash. Rev. Code 80.01.040(3) .............................................................9

**OTHER AUTHORITIES**

H.R. Report No. 96-976 (Part II) at 34-35, 1980 U.S.C.C.A.N. 6023, 6032-33 .......8
H.R. Report No. 96-976(Part I) at 60, 1980 U.S.C.C.A.N. 5989, ____, 1980 WL
    12944 (Leg.Hist.) at 37 ...............................................................8

**RULES AND REGULATIONS**

F.R.A.P. 18(a)(1)..................................................................................32
F.R.A.P. 18(a)(2)..................................................................................32
18 C.F.R. § 300.21(G) .........................................................................31
73 Fed.Reg. 7270 (Feb. 8, 2008) ..........................................................5

## I.  STATEMENT OF JURISDICTION

**A.      Agency Subject Matter Jurisdiction**

Section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act") authorizes the Bonneville Power Administration ("BPA") to enter into power exchange agreements with Pacific Northwest electric utilities.  16 U.S.C. § 839c(c).

**B.      Final Agency Action and Statutory Basis for the Court's Jurisdiction**

On September 22, 2008, BPA issued its final Record of Decision in the "2007 Supplement Wholesale Power Rate Case" (the "WP-07 ROD").  The WP-07 ROD makes final decisions on how BPA determined the amount of over-payments made to investor-owned utilities' ("IOUs") customers under the 2000 Residential Exchange Settlement Agreements ("2000 REP Settlement Agreements") and how to return these over-payments to BPA's public preference customers.  I.E.R. Vol. I 31-32[1] (R.A.R. 062341-42).

The petitions in this docket are limited to the "non-rate" issues of the WP-07 ROD because at the time the petitions were filed, the Federal Energy Regulatory Commission ("FERC") had not yet approved the rates as final.  16 U.S.C. § 839f

---

[1] Excerpt of Record in the Brief of the Idaho Public Utilities Commission are referred to herein as Idaho Excerpt of Record ("I.E.R.").

(e)(4)(D) (rate determination final upon confirmation and approval by FERC).[2] The Court has original subject matter jurisdiction over petitions challenging final actions or the implementation of final actions by BPA. 16 U.S.C. §§ 839f(e)(1)(B) and 839f(e)(5).

## C. Timing of Appeal and Statutory Basis

BPA issued its WP-07 ROD on September 22, 2008. I.E.R. Vol. III 725 (R.A.R. 063035). The Idaho Public Utilities Commission ("Idaho PUC") filed its Petition for Review in Docket No. 08-75113 on December 19, 2008. The Petition for Review is timely because it was filed within 90 days of September 22, 2008. All challenges to BPA's final actions must be filed within 90 days of the final action. 16 U.S.C. § 839f(e)(5).

## II. STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. The "Lookback" mechanism adopted in BPA's final WP-07 ROD is arbitrary, capricious and not in conformance with the law because it constitutes retroactive ratemaking and withholds residential exchange benefits authorized by Section 5(c) of the Northwest Power Act from current and future residential and small farm utility customers.

2. BPA's use of the "deemer" mechanism is not authorized by Section 5(c) of the Northwest Power Act and is arbitrary and capricious in its application to set-off Residential Exchange benefits to residential and small farm customers of Idaho Power Company and Avista Corporation.

---

[2] On July 16, 2009, FERC approved BPA's WP-07 rates on a final basis. *United States Dept. of Energy – Bonneville Power Administration*, 128 F.E.R.C. ¶ 61,058 (2009). By stipulation of the parties and Court Order issued June 4, 2009, rate-related issues from BPA's WP-07 ROD are deferred. ("Issues shall be limited as described in the parties' stipulation.") Dkt Entry 6945924.

3. BPA breached the Section 3(b) "no-refund" provision in its 2000 REP Settlement Agreements and Load Reduction Agreements waiving any rights to recover past settlement payments and arbitrarily discarded the no-refund provision that resulted in the reduction of residential exchange benefits to current and future residential and small farm customers of the IOUs.

4. Even if BPA did not breach its contracts with the IOUs by seeking to recover past settlement payments, BPA acted arbitrarily, capriciously, and contrary to law in asserting a common law right of recoupment or set-off as a basis for withholding statutory REP benefits from current and future residential and small farm customers.

For issues 2 through 4 above, the Idaho PUC adopts by reference the issues and arguments contained in the following petitioners' briefs:

A. "Joint Brief of the Pacific Northwest Investor-Owned Utilities (Avista Corporation, Idaho Power Company, PacifiCorp, Portland General Electric Company, and Puget Sound Energy, Inc.), as Petitioners in Nos. 08-75098, 08-75099, 08-75112, 08-75130, and 08-75161" filed in this consolidated case.

B. "Joint Brief of Petitioners, Avista Corporation, PacifiCorp, Portland General Electric Company, and Puget Sound Energy" filed in the companion case, *Idaho Public Utilities Commission, et al. v. Bonneville Power Administration*" (Docket Nos. 08-74928, 08-74929, 08-74932, and 08-74957).

C. "Joint Initial Brief of Idaho Public Utilities Commission and Idaho Power Company" in the companion case, *Idaho Public Utilities Commission, et al. v. Bonneville Power Administration*" in related Docket Nos. 08-74927 and 08-74933.

### III. STATEMENT OF THE CASE

**A.     Introduction**

Petitions for review in this consolidated docket and the related petitions (discussed at the end of this Brief) are generally from two separate Bonneville Power Administration ("BPA") proceedings in 2008 in response to ruling from this Court.  In *Portland General Electric Co. v. Bonneville Power Admin.* ("*PGE*"), 501 F.3d 1009 (9th Cir. 2007), *cert. denied*, ___U.S. ___, 128 S.Ct. 2902 (2008), this Court held that BPA's 2000 Residential Exchange Program Settlement Agreements ("2000 REP Settlement Agreements") with the six regional investor-owned utilities ("IOUs") were contrary to the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act"), 16 U.S.C. §§ 839-839h.  In particular, the Court held that BPA improperly allocated 2000 REP Settlement Agreement costs to the rates paid by all customers including the preference customers in violation of Section 7(b)(2) and (3) of Northwest Power Act, 16 U.S.C. § 839e(b)(2) and (3). *PGE*, 501 F.3d at 1028, 1036.  The Court did not remand to BPA or direct BPA to take any particular action in response to its holding.

On the same day, the same panel issued its decision in the companion case involving BPA's WP-02 rates.  *Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.* ("*Golden Northwest*"), 501 F.3d 1037 (9th Cir. 2007), *cert. denied sub nom. Portland General Electric Co. v. Public Power Council*, ___ U.S. ___, 128 S.Ct.

2902 (2008). In *Golden Northwest* the Court declared that the holding in *PGE* was dispositive: BPA improperly included certain costs of the 2000 REP Settlement Agreements in the PF preference rate paid by preference customers contrary to Sections 7(b)(2) and 7(b)(3) of the Northwest Power Act, 16 U.S.C. §§ 839e(b)(2) and (3). *Id*. at 1048. Consequently, the PF preference rate was too high. The Court also ruled that the WP-02 preference rate was too low for BPA to meet its fish and wildlife obligations. *Id*. at 1052-53. The Court "therefore *remand[ed] to BPA to set rates in accordance with this opinion*." *Id*. at 1053 (emphasis added). Although remanded, the Court again did not direct any particular remedy.

## B.    Remand to BPA

On remand BPA suspended the REP payments it was making to the IOUs under the 2000 REP Settlement Agreements. BPA also instituted two, concurrent administrative proceedings in 2008.[3] First, in 2007 Supplemental Wholesale Power Rate Case (the subject of petitions in this consolidated docket), BPA proposed to reset its WP-07 rates for fiscal year ("FY") 2009 and also refund the REP over-payments to the public preference customers. I.E.R. Vol. I 31 (R.A.R. 062341). The recovery of the REP over-payments was commonly referred to as the "Lookback" analysis. I.E.R. Vol. I 32 (R.A.R. 062342). BPA utilized the Lookback mechanism to determine the

---

[3] A third BPA administrative proceeding was the proposed revision of the average system cost methodology ("ASC methodology") for utilities that participate in the REP. 73 Fed.Reg. 7270 (Feb. 8, 2008).

amount of over-payment for each IOU and the amounts of refund to be credited to the preferred customers. *Id.*

BPA's Lookback analysis had four parts.

1. First, BPA calculated the "total payments received" by each IOU for FY 2002-2008. Total payments included financial benefits, load reduction payments and power purchase benefits. I.E.R. Vol. I 25 (R.A.R. 062335).

2. Next, BPA calculated "reconstructed REP benefits," i.e., the amount of REP benefits that each IOU would have received absent the various REP Settlement Agreements for FY 2002-2008. *Id.*

3. BPA then calculated the "Lookback Amount" for each IOU by subtracting the reconstructed benefits that should have been allowed in step 2, from the benefits that were actually paid in step 1. *Id.*

4. Finally, BPA decided to recover the Lookback Amounts over time by reducing future REP payments made to eligible IOUs. The recovered Lookback Amounts would then be returned to preference customers on a proportional basis.[4]

In the WP-07 rate case, BPA calculated the Lookback Amounts to be recovered from the IOUs totaled $766.552 million. I.E.R. Vol. III 730 (R.A.R. 087516). For FY 2008 and 2009, BPA determined that it would withhold Lookback Amounts from the IOUs' residential and small farm customers totaling $158.308 million ($87.539 million for FY 2008 and $70.769 million in FY 2009). I.E.R. Vol. III 731-33 (R.A.R. 087518, 087520, 087523).

---

[4] BPA also subtracted "deemer" balances from the eligible REP benefits. I.E.R. Vol. III 726-28 (R.A.R. 087509-12).

In the second 2008 administrative proceeding (the subject of petitions in the related dockets), BPA conducted an informal notice-and-comment proceeding. BPA determined the mandatory terms and conditions for the standard residential purchase and sale agreements ("RPSAs") under which BPA provides future REP benefits to eligible IOUs pursuant to Section 5(c) of the Northwest Power Act. 16 U.S.C. 839c(c). The RPSAs are to be effective during two time periods. BPA proposed that the "short-term" or "bridge" RPSAs are to be in effect during FY 2009-2011, and the long-term RPSAs were proposed to be in effect until from FY 2012 through FY 2028. I.E.R. Vol. III 745 (R.A.R. 098589). The short-term RPSAs are intended to "bridge" the period between October 1, 2008 and the effective date of the long-term RPSA in FY 2012 (i.e., October 1, 2012). Section 20 of both the bridge and long-term RPSAs contain terms that allow BPA to reduce or offset REP payments for the purpose of recovering the Lookback amounts. I.E.R. Vol. III 734-35 (R.A.R. 098216-17).

## IV. STATEMENT OF RELEVANT FACTS

### A.    The Residential Exchange Program

The purpose of the Residential Exchange Program is to share the benefits of the federal hydropower system in the Pacific Northwest in the form of rate relief for the more than 1.6 million residential and small farm customers served by the regional IOUs. I.E.R. Vol. III 752, 754 (R.A.R. 064129, 074904). Congress

intended that the REP exchanges would provide the IOUs with access to low-cost federal power marketed by BPA. The power exchanges "should equalize the wholesale costs of the electric power with a resulting benefit to investor-owned utilities' customers." H.R. Report No. 96-976(Part I) at 60, 1980 U.S.C.C.A.N. 5989, ____, 1980 WL 12944 (Leg.Hist.) at 37; *see also* H.R. Report No. 96-976 (Part II) at 34-35, 1980 U.S.C.C.A.N. 6023, 6032-33.

Under the Residential Exchange Program ("REP") embodied in Section 5(c) of the Northwest Power Act, investor-owned utilities ("IOUs") may exchange their high-priced power for low-cost federal power provided by BPA. The REP provision of the Northwest Power Act provides:

> *Whenever* a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources *in each year*, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.

16 U.S.C. § 839c(c)(1) (emphasis added). The benefits of this low-cost power are to be "passed through directly" to the residential and small farm customers of the participating utilities. *See* 16 U.S.C. § 839c(c)(3); *Aluminum Company of America ("ALCOA") v. Central Lincoln Elec.*, 467 U.S. 380, 399 (1984). However, rather than actually exchange power with the IOUs, BPA simply pays the differential (referred to herein as "net benefits") between the utility's average system cost and

the BPA Priority Firm exchange rate. *See, e.g., Central Lincoln Elec. v. BPA,* 835 F.2d 199, 200-01 (9th Cir. 1987).

The REP is open to all utilities in the Pacific Northwest, but as a practical matter the REP has been primarily used by the IOUs for the benefit of their residential and small farm customers. The regional IOUs are: Avista Corporation ("Avista"), Idaho Power, NorthWestern Energy, PacifiCorp, Portland General Electric Company, and Puget Sound Energy. With the exception of NorthWestern, the remaining IOUs are regulated by the respective regulatory commissions in Idaho, Oregon, and Washington. The respective state commissions set the retail rates of the IOUs operating in Idaho, Oregon and Washington. *Idaho Code* § 61-502; Or. Rev. Stat. 756.040; Wash. Rev. Code 80.01.040(3).

There are three components to the REP mechanism.

1. The calculation of each utility's average system cost ("ASC") using the approved ASC methodology.[5]

2. The establishment of BPA's priority firm ("PF") power rate.

---

[5] Section 5(c)(7) of the Northwest Power Act provides in part: "the 'average system cost' for electric power sold to [BPA] under this subsection shall be determined by [BPA] on the basis of a methodology developed for this purpose in consultation with the [Pacific Northwest Electric Power and Conservation Planning] Council, [BPA's] customers, and appropriate state regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission." 16 U.S.C. § 839c(c)(7); *see also* 16 U.S.C. § 839b(a)(1).

3. The RPSAs that provide the contractual terms under which the IOUs receive REP benefits for eligible residential and small farm customers.

I.E.R. Vol. III 736-39 (R.A.R. 098541-44).

This Court has often explained how the REP mechanism operates. When a utility's ASC is *greater than* BPA's PF rate, BPA pays the net difference to the utility. In *PGE*, the Court explained that "Section 5(c) permits IOUs to exchange power they have purchased or generated *for lower-cost power generated by BPA*." *PGE,* 501 F.3d at 1015 (emphasis added); *Golden Northwest*, 501 F.3d at 1047; *Washington Utilities & Transp. Comm'n v. FERC*, 26 F.3d 935, 936-37 (9th Cir. 1994). "The REP essentially acts as a cash rebate to the *IOUs where the IOU's power costs exceed those of BPA*." *PGE*, 501 F.3d at 1015 (emphasis added). When BPA's PF rate is less than the utility's ASC, the difference is multiplied by the utility's residential and small farm load to arrive at the monetary REP benefits for participating utilities. I.E.R. Vol. III 737, 745-46, 750 (R.A.R. 098542, 098589, 098595, 098612).

**B.** **"Deemer" Accounts**

In addition to the three REP factors mentioned *supra*, page 9, there is another factor which determines whether an IOU may to receive benefits under the REP – whether the exchanging utility has a "deemer" balance. The "deemer" accounting mechanism is a remnant from the original residential purchase and sale

- 10 -

agreements (1981 RPSAs) between BPA and each of the IOUs. The deemer mechanism is based on the extra-statutory notion that REP benefits – intended to provide monetary benefits to IOUs' residential and small farm customers – could flow in the opposite direction to benefit BPA. I.E.R. Vol. I 233, 234-35 (R.A.R. 062543, 062544-45).

> BPA explained the operation of the deemer mechanism in its WP-07 ROD:

> when a utility's ASC is less than the PF Exchange rate, the utility could elect to "deem" its ASC equal to the PF Exchange rate. By doing so, it avoided making actual monetary payments to BPA. The amount that the utility would otherwise have paid BPA was tracked in a "deemer account." At such time as the utility's ASC became higher than BPA's PF Exchange rate, benefits that would otherwise have been paid to the utility would be first credited against the negative "deemer balance." Only after positive REP benefits had completely offset the "negative balance," or the "negative balance" had been brought down by the deeming utility, would the utility again receive actual monetary REP payments. The 1981 RPSAs provided that "[u]pon termination of this Agreement, any debit balance in such separate account shall not be a cash obligation of the Utility, but shall be carried forward to apply to any subsequent exchange by the Utility for the Jurisdiction under any new or succeeding agreement."

I.E.R. Vol. I 234-35 (R.A.R. 062543-44) (internal citations omitted). The "deemer" account mechanism from the 1981 RPSAs was continued by BPA in the new bridge and long-term RPSAs. I.E.R. Vol. III 742-44, 747-49 (R.A.R. 098553-56, 098601-03).

Although the deemer balances were not mentioned in either *PGE* or *Golden Northwest*, BPA determined that the deemer balances for both Avista and Idaho

- 11 -

Power must be recovered from current and future REP benefits. *See e.g.*, I.E.R. Vol. III 731-32 (R.A.R. 087518, 087520). In the WP-07 Supplemental case, BPA calculated the deemer balance for Avista and Idaho Power as of October 2007 to be $99.32 million and $245.36 million, respectively. I.E.R. Vol. III 756 (R.A.R. 074912).

## C.    Average System Cost ("ASC") Methodology

Simultaneous with the offering of the 1981 RPSA, BPA also adopted in 1981 the ASC methodology[6] that governed the calculation of a utility's ASC. *See generally PacifiCorp. v. FERC*, 795 F.2d 816, 819 (9th Cir. 1986). However, barely two years later, in 1983, BPA initiated a process to revise the ASC methodology. *Id.* The revisions to the ASC methodology were proposed by BPA to respond to a wrongful inclusion of certain costs in its average system cost by the Portland General Electric Company. *Id.* at 823. Revisions to the ASC methodology were approved by the Federal Energy Regulatory Commission (*hereinafter* "FERC") on a final basis in 1984, with clarifications in 1985. *Id.*

The changes to the ASC methodology applied to the calculation of the average system costs of all the IOUs. In particular, the changes had the effect of reducing IOUs' ASCs. As a result of the significant changes to the ASC

---

[6]  The average system cost for electric power sold to the BPA under the REP is determined by BPA on the basis of a methodology developed in consultation with other parties, subject to review and approval by the Federal Energy Regulatory Commission. 16 U.S.C. § 839c(c)(7).

methodology, the ASCs for Avista, Idaho Power and NorthWestern Energy dropped below the BPA PF Exchange rate. These utilities then began to accrue large deemer balances under their 1981 RPSAs. I.E.R. Vol. III 755-56 (R.A.R. 074905, 074912). The IOUs and state regulatory commissions filed petitions with this Court to review BPA's changes to the ASC methodology. In its decision, this Court stated that it did "not sanction any permanent implementation of the revisions." *PacifiCorp*, 795 F.2d at 823. However, the Court sustained BPA's revisions to the ASC methodology for, among other reasons, "the need to avoid abuse." *Id.*

The effects of the changed ASC methodology upon Avista and Idaho Power were particularly onerous. By way of example, their deemer balances at the end of 1984 were relatively minor at $6.8 million for Avista and $1.9 million for Idaho Power.[7] Subsequently, those companies ceased receiving REP benefits and commenced incurring significant deemer account balances. *See e.g.* I.E.R. Vol. III 757-58 (R.A.R. 074977-78). Their present deemer account balances (including interest) dwarf the actual residential exchange benefits that they received and distributed to their customers before the average system cost methodology was changed. Testimony submitted on behalf of the Idaho PUC stated:

---

[7] BPA does not object to the Court taking judicial notice of these figures. *See* Joint Motion of Idaho Public Utilities Commission and Idaho Power Company for Judicial Notice at 2, Dkt Entry 702568, Case 08-74927 (August 12, 2009).

The REP benefits from FY 1982 to FY 1994 demonstrate the unreasonableness of the deemer mechanism. As indicated in a summary table prepared by BPA (WP-07-E-ID-AT16), Avista and Idaho Power received REP benefits totaling $6,550,000 and $42,342,000, respectively. In comparison, BPA calculates that Avista's deemer balance is $99.32 million as of October 2007 and Idaho Power's deemer balance is $245.36 million as of October 2007. Clearly, the benefits are over-shadowed by the negative balances in the deemer accounts.

I.E.R. Vol. III 759 (R.A.R. 074982).

In 1987 and 1988, BPA executed agreements suspending the 1981 RPSA with Avista and Idaho Power respectively. *See e.g.* I.E.R. Vol. I (R.A.R. 062546) (WP-07S ROD at 220). Later, Avista and Idaho Power terminated their 1981 RPSAs in 1993. *Id.* In summary, Avista's deemer balance grew from $6.8 million in 1984 to $99.32 million as of October 2007. During the same period Idaho Power's deemer balance grew from $1.9 million to $245.36 million.

## D. The 2000 REP Settlement Agreements

In 2000 BPA developed a new REP agreement, the 2000 REP Settlement Agreement which BPA expected the IOUs to sign. I.E.R. Vol. III (R.A.R. 098543). BPA did not seek to enforce deemer account balances from the 1981 RPSAs in the 2000 REP Settlement Agreement, but merely reserved its right, if any, to enforce the deemer account balance in a future RPSA. *See e.g.* I.E.R. Vol. III 779 (R.A.R.114000).

Although there was "broad customer support" for the 2000 REP Settlement Agreements, a number of customers petitioned to this court to review BPA's decision to offer the 2000 REP Settlement Agreements. I.E.R. Vol. III 738 (R.A.R. 098543). As mentioned above, the resulting decision of this Court held that certain aspects of the 2000 REP Settlement Agreements were inconsistent with the Northwest Power Act. *PGE,* 501 F.3d at 1037. Significantly, in *PGE*, no party challenged BPA's determination to forego enforcement of the deemer account balances in the 2000 REP Settlement Agreements.

The 2000 REP Settlement Agreements contemplated that the Agreements might be challenged in court. Consequently, BPA and the IOUs included a provision commonly referred to as the "risk allocation" or "no-refund" clause. By its terms, the clause governed the parties' remedies in the event that the 2000 REP Settlement Agreements or payments under those Agreements were declared "unlawful, void or enforceable." Section 3(b) of the Settlement Agreement provided:

3. SATISFACTION OF SECTION 5(c) OBLIGATION

. . .

(b) Invalidity

In the event the United States Court of Appeals for the Ninth Circuit finally determines, after all appeals or requests for reconsideration, that this Agreement (or section 4(a), section 4(c), or section 5 of this Agreement) is unlawful, void, or unenforceable, then the provisions of

- 15 -

Section 3(a) above shall be of no further force or effect *and the Parties intend and agree that: (1) Firm Power and Monetary Benefits provided prior to such final determination shall be retained by [the IOU]*; and (2) the satisfaction of BPA's obligations to [IOU] under Section 5(c) of the Northwest Power Act prior to such final determination shall be preserved, to the maximum extent permitted by law. *This Section 3(b) shall survive notwithstanding any determination that any other provision of this Agreement (or the exhibits) is unlawful, void, or unenforceable*.

I.E.R. Vol. III 762-63 (R.A.R. 075374-75 (emphasis added)). As set out above, BPA expressly waived any right to recover the monetary benefits it provided to the IOUs. Section 3(b) was also severable[8] and expressly was intended to survive other parts of the 2000 REP Settlement Agreements that might be unenforceable or void. *Id.*; *see also* I.E.R. Vol. III 760-78 (R.A.R. 075372-90).

## E.    BPA's WP-07 ROD

In its WP-07 ROD, BPA rejected the Idaho PUC's testimony and legal arguments that the Lookback mechanism violates the general rule against retroactive ratemaking. I.E.R. Vol. I 38-46 (R.A.R. 062348-56). BPA also rejected comments by the Idaho and Washington Commissions, and the IOUs opposing BPA's proposed treatment of the deemer balances in the Lookback mechanism. I.E.R. Vol. I 234-38, 241 (R.A.R. 062544-48, 062551). BPA also

---

[8] The severability clause in Section 13(g) of the 2000 REP Settlement Agreement provided "All other provisions and exhibits of this Agreement are independent of Exhibit A (Firm Block Power Sales Agreement) attached hereto and shall remain in effect even if any or all of such Exhibit A is unlawful, void, or unenforceable." I.E.R. Vol. III 777 (R.A.R. 075389).

rejected the IOUs' objection that BPA's Lookback analysis violated the "no-refund" provisions of the various REP Settlement Agreements. I.E.R. Vol. I 193-96 (R.A.R. 062503-06). Given BPA's determinations regarding the Lookback, deemer, and other non-rate issues, various parties filed Petitions for Review in this consolidated case.

## V. SUMMARY OF ARGUMENT

In *Golden Northwest*, this Court granted the petitions of various preference customers and ordered BPA to "set rates in accordance with this opinion." The Court did not vacate the WP-02 rates at issue in that case, nor did it offer any specific instructions as to how BPA should set its rates. In response to the remand order, BPA voluntarily developed a Lookback approach during its WP-07 Supplemental rate proceeding that recalculated the level of REP benefits residential and small farm customers served by IOUs would receive pursuant to Section 5(c) of the Northwest Power Act.

Thus, the Lookback approach presents the Court with a case of first impression in this Circuit when BPA has retroactively adjusted its power rates and removed statutorily-mandated REP benefits from one set of customers and awarded them to another. This is in direct contravention of what this Court has referred to in the past as "one of the fundamental tenets in FERC jurisprudence" – the rule against retroactive ratemaking. BPA's Lookback mechanism resets the

rates for the 2002-2008 time period and divests residential and small farm customers of future REP benefits for which they are lawfully entitled under the clear and express language of the Northwest Power Act. BPA acknowledges that the approach it adopted is retroactive in nature and that it provides "rough justice" in favor of the preference customers. BPA should have responded to the remand order by adhering to the rule against retroactive ratemaking and prospectively set rates in compliance with the Court's opinions in *PGE* and *Golden Northwest*.

The prevailing parties in the *PGE* and *Golden Northwest* cases failed to take the appropriate steps in order to preserve their remedy. The parties failed to seek a Motion for Stay Pending Appeal to BPA, FERC or this Court. Besides preserving their remedy while the 2000 REP Settlement Agreements were being reviewed by the Court, such a Motion would have served as notice to the IOU customers and the various state commissions that the benefits provided under the 2000 REP Settlement Agreement were subject to refund. This is all the more critical given that BPA and the IOUs had contracted that there would be no refunds of benefits.

## VI. ARGUMENT

### A. Standard of Review

Section 9(e)(2) of the Northwest Power Act, 16 U.S.C. § 839f(e)(2), provides that the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA") governs the scope of judicial review of BPA's actions. Under the APA, BPA's

actions are upheld unless they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). BPA cannot adopt a regulation that violates the requirements of the Northwest Power Act. *K-Mart Corp. v. Cartier,* 486 U.S. 281, 294 (1988); *PGE,* 501 F.3d 1009, 1035. Where an agency interprets or administers a statute in a way that furthers its own administrative or financial interests, the agency interpretation must be subject to greater scrutiny to ensure that it is consistent with Congressional intent and the underlying purpose of the statute. *Amalgamated Sugar Co. v. Vilsack ("Amalgamated"),* 563 F.3d 822, 834 (9th Cir. 2009).

In reviewing an agency's construction of a statute, the Court must reject those constructions that are contrary to clear congressional intent or frustrate the policy that Congress sought to implement. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984). *Chevron* deference may be inappropriate where, as here, (1) the agency has a self-serving or pecuniary interest in advancing a particular interpretation of a statute, *and* (2) the construction advanced by the agency is arguably inconsistent with Congressional intent. *Amalgamated,* 563 F.3d at 824. BPA's actions and statutory interpretations regarding the Lookback and deemer mechanisms are not entitled to deference and must be rejected if they violate Congress's directives and produce "a result manifestly at odds with Bonneville's obligation under law." *M-S-R Pub. Power*

- 19 -

*Agency v. BPA,* 297 F.3d 833, 844-45 (9th Cir. 2002).  The Court will not defer to

BPA's interpretation when it violates a "well-established principle of statutory

construction" or "clashes with the statute's legislative history."  *Id.* at 845.

**B.      BPA's Lookback Methodology Exceeded the Scope of the Court's Remand Order and Constitutes a Direct Violation of the General Rule Against Retroactive Ratemaking**

The Court's admonitions in the *PGE* and *Golden Northwest* cases neither

require or authorize BPA to provide retroactive relief.  *See Golden Northwest*, 501

F.3d at 1053.  In *Golden Northwest*, the Court "remand[ed] to BPA to set rates in

accordance with this opinion."  *Id.*  In neither case did the Court vacate the BPA's

WP-02 or the WP-07 rates.  Indeed, pursuant to the Court's findings in *Golden*

*Northwest* that the rates were both too high and too low, the Court remanded the

matter back to BPA "to set rates in accordance with this opinion."  *Id.*  This is

consistent with the well-established rule that Courts do not set rates – they are

merely empowered to set aside agency action.  5 U.S.C. § 706(2).  It is BPA that is

vested with the authority to "establish, and periodically review and revise, rates for

the sale and disposition of electric energy and capacity . . . . ."  Section 7(a)(1), 16

U.S.C. § 839e(a)(1).  Moreover, it is for BPA to first establish rates and then

submit those rates for "confirmation and approval by" FERC.  Section 7(a)(2), 16

U.S.C. § 839e(a)(2).

**1.** **The Rule Against Retroactive-Ratemaking Can Only be Abrogated in Extraordinary Circumstances and with Express Congressional Authorization**

This Court has previously declared that "[o]ne of the fundamental tenets in FERC jurisprudence is the rule against retroactive ratemaking." *Public Utilities Comm'n of Cal. v. FERC*, 456 F.3d 1025, 1061 (9th Cir. 2000) *citing Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578, 101 S.Ct. 2925, 2930-31, 69 L.Ed.2d 856 (1981).[9]  While BPA is not FERC and does not operate under the Federal Power Act, it is a regulatory body that sets power rates for "the sale and disposition of electric energy and capacity and for the transmission of non-Federal power." 16 U.S.C. § 839e(a)(1). *See also PGE*, 501 F.3d at 1030 and n.18 (the NWPA "added new, more typically governmental responsibilities which 'donned BPA with more of the usual trappings of a federal regulatory agency.'").  BPA readily concedes that its Lookback approach (e.g., recalculating and reapportioning past REP benefits in response to the Court decisions) is retroactive in nature. I.E.R. Vol. I 31 (R.A.R. 062341) ("revisit new WP-02 rates charged during the FY 2002-2006 period").

---

[9] *See also Regulatory Com'n of Alaska v. Tesoro Alaska Co.*, 178 P.3d 1159, 1171 (Alaska 2008) ("'A fundamental rule of ratemaking is that rates are prospective in nature.'"); *Southern Cal. Edison Co. v. Public Utilities Com'n*, 20 Cal.3d 813, 816, 576 P.2d 945, 945 (Cal. 1978) (Reaffirmed a previous holding that the California Commission is vested with the "power to fix rates prospectively only.")

Nearly identical to the general prohibition against retroactive ratemaking is the judicial restraint against retroactive rulemaking. *See Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). In *Bowen*, the United States Supreme Court declared that "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." 488 U.S. at 208, 109 S.Ct. at 471. Indeed, because it is not a sound business practice to retroactively increase rates, the Court requires that Congress expressly permit such a practice in no uncertain terms. *Bowen*, 488 U.S. at 208, 109 S.Ct. at 472. "The power to require re-adjustments for the past is drastic. It . . . ought not to be extended so as to permit unreasonably harsh action without very plain words." *Id., quoting Brimstone R. Co. v. United States*, 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1928). The power to retroactively adjust rates is especially problematic given that IOU customers are not a fungible mass where future customers may be substituted for past customers to make up for past rate deficiencies. *Utah Power & Light Co. v. Idaho Public Utilities Commission*, 685 P.2d 276, 285 (Idaho 1984).

Here, BPA recalculated rates five years in arrears (FY 2002-2006) and reduced future REP payments and provided the Lookback amounts to the preference customers. I.E.R. Vol. I 31 (R.A.R. 062341). In other words, BPA

determined it must recover $766.552 million in future REP payments to residential and small farm customers and distribute this retroactive amount to preference customers. I.E.R. Vol. III 730 (R.A.R. 087516).

BPA cites to *Newman v. Apfel*, 223 F.3d 937, 942 (9th Cir. 2000) to support its retroactive Lookback approach. I.E.R. Vol. I 55 (R.A.R. 062365.) However, the *Newman* decision is not dispositive of the specific issue of whether an administrative agency like BPA is authorized to devise retroactive rates *sua sponte*. *Id.*

The *Newman* Court ruled in favor of an administrative agency's authority to promulgate retroactive regulations but it did so only in the context of whether the petitioner met the demands of "redressability" as it relates to the issue of standing. *Id.* On the substantive issue of whether the Social Security Commissioner's challenged regulation which "does not alter the amount of an SSI recipient's benefits in response to a change in the recipient's income until two months after that change has occurred . . . embodies a permissible interpretation" of its enabling statute, this Court affirmed the District Court for the Central District of California's granting of summary judgment in favor of the Commissioner. *Id.* at 939, 947.

In *Newman*, the Social Security plaintiffs challenged a regulation that addressed how their monthly social security payments are calculated. 223 F.3d at

938. *Newman* is distinguishable because the plaintiffs sued for "invalidation of the Commissioner's regulation and recalculation of [their] past benefits . . ." *Id.* at 939. They did not seek to reduce the social security payments to others- thereby increasing their own monthly payments.

The majority in *Newman* also referenced its prior decision in *Livermore v. Heckler*, 743 F.2d 1396 (9th Cir. 1984) wherein it affirmed a lower court's decision to order the Secretary of Health and Human Services to undertake a "recalculation of benefits erroneously calculated as well as prospective implementation of the correct formula." *Id.* at 1405. However, contrary to the specific mandate delivered to the Secretary of Health and Human Services in *Livermore*, BPA's Administrator was not compelled by "judicial order to make [the prevailing parties in *Golden Northwest* and *PGE* cases] whole. . . ." *Id.*; *see Golden Northwest*, 501 F.3d at 1041 (holding that BPA acted contrary to law when it imputed some of the costs of the IOU Settlement Agreements to the preference customers.) The fact remains that BPA could have honored the Court's remand order and ordered prospective relief only to the prevailing parties. Instead, BPA rejected this approach in favor of a misguided effort to reconstruct past rates so as to provide the preference customers with a retroactive remedy. I.E.R. Vol. I 76 (R.A.R. 062386.)

**2.**     **The Northwest Power Act Does Not Authorize BPA to Engage in Retroactive Ratemaking**

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen*, 488 U.S. at 208. "A statutory grant of rulemaking authority" is not enough − a federal agency must have express statutory authority before it can engage in retroactive rulemaking or provide a retroactive remedy such as reparations or refunds. *Id.*

In *Bowen*, the Secretary of Health and Human Services promulgated a rule that had a retroactive application. On appeal, the District of Columbia Court held as a general matter that the APA, 5 U.S.C. §§ 551, 553 *et seq.*, forbids retroactive rulemaking. *Georgetown University Hospital v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987) (the APA is clear and "equitable considerations are irrelevant to the determination of whether the Secretary's rule may be applied retroactively.").

The Supreme Court affirmed the D.C. Circuit Court's adherence to the general prohibition against an administrative agency's retroactive application of its rulemaking authority. *Bowen*, 488 U.S. at 208, 109 S.Ct. at 471. A unanimous Supreme Court held that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen*, 488 U.S. at 208, 109 S.Ct. at 472. "Even where some substantial

- 25 -

justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." *Id.* at 209, 109 S.Ct. at 472.

BPA admits that the Northwest Power Act "does not explicitly provide statutory authority for retroactively providing refunds. . . ." I.E.R. Vol. I 46 (R.A.R. 062356). Undaunted, BPA embarked on a course that would "impose uncertainty and risk on BPA" and put the Agency in direct conflict with a fundamental precept of ratemaking. I.E.R. Vol. III 753 (R.A.R. 074899). BPA's disregard for the rule prohibiting retroactive ratemaking is arbitrary, capricious and not in accordance with law. 5 U.S.C. § 706(2)(A) and (C).

### 3. The Flood Control Act Does Not Permit BPA to Institute an Approach That Willfully Violates the Rule Against Retroactive Ratemaking

The Flood Control Act of 1944 commands BPA to "transmit and dispose of . . . power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles. . . ." 16 U.S.C. § 825s. Further, BPA's "rate schedules should be drawn having regard to the recovery of the cost of producing and transmitting electric energy, including the amortization of the Federal investment over a reasonable number of years." *Id.*; I.E.R. Vol. I 19-20 (R.A.R. 062329-30).

Relying upon the aforementioned 'cost-recovery' provision, BPA has boldly declared that it is absolutely exempt from the well-settled restrictions of the filed-

rate doctrine and the rule against retroactive ratemaking/rulemaking. I.E.R. Vol. I 73 (R.A.R. 062383). BPA cites several cases, including *Central Electric Power Cooperative, Inc. v. Southeastern Power Administration*, 338 F.3d 333 (4th Cir. 2003), where courts have allowed federal Power Marketing Administrations (PMAs) to "recover revenue shortages incurred during prior rate periods." *Id.* at 335. A cursory review of these cases demonstrates that BPA's extravagant legal interpretations lack merit.

In *Central Electric*, the Fourth Circuit Court ruled that Southeastern Power Administration ("SEPA") did not act in an arbitrary and capricious manner when it asked its preference customers to either amend their "fixed-rates" contracts with SEPA or pay a "surcharge" in the next rate period in order to recover "unexpected revenue shortfalls." *Id.* at 337-38. SEPA was able to secure the assent of 168 out of 174 of its preference customers to modify their contracts with the federal agency and immediately pay an increased "short-term" rate to recover their portion of the revenue shortfall. *Id.* at 336. SEPA then added a surcharge in the next rate filing to those preference customers who previously declined to modify their contracts to recover the portion of the revenue shortage attributable to them. *Id.* The non-agreeing preference customers protested and asserted, *inter alia*, that the surcharge was discriminatory and constituted retroactive ratemaking. *Id.*

Ultimately, SEPA was permitted to deviate from the rate schedule designated in its power supply contracts because a "severe drought" created river conditions that "forced SEPA to make separate power purchases in order to honor its power supply contracts." *Central Electric*, 338 F.3d at 335.[10] "These extra power purchases in turn caused SEPA to incur costs exceeding those contemplated by [SEPA's 1985-1990] rate schedule." *Id.*

Unlike SEPA's actions in *Central Electric*, the Lookback approach adopted by BPA does not coincide with any demonstrated need by BPA "to ensure recovery of both costs of producing power and [recovering] the Federal investment." *Southeastern Power Admin.*, 55 F.E.R.C. ¶¶ 61,016, 61,045 (1991). BPA did not labor, as SEPA did, under a revenue shortage when it decided upon the Lookback approach.[11] BPA has not suddenly been presented with

---

[10] Similarly, in *Southeastern Power Admin.*, 55 F.E.R.C. ¶¶ 61,016, 61,045 (1991), SEPA was permitted to modify its rates retroactively in order to "meet its cost of providing service" and rectify its "revenue shortfall" which occurred as the result of a prolonged drought that affected its ability to deliver hydroelectric power to its customers. *Id.* at 61,042. SEPA approached its customers with a proposal to raise its rates prospectively, even though "Southeastern's contracts with its customers limited its ability to adjust rates until the end of the then-existing five year rate approval period." *Id.* at 61,043 (emphasis added). The factual record shows that 167 out of 173 of SEPA's customers consented and allowed SEPA to breach this provision of the contract. *Id.* SEPA then proceeded to increase its rates yearly to recover its costs of providing service. *Id.*

[11] The term "revenue shortages" appears in the WP-07 ROD on pages 24-25 and 48-49, and only in the context of the cases cited by BPA. I.E.R. Vol. I 40-41, 64-65 (R.A.R. 062350-51, 062374-75).

unanticipated or additional costs associated with the 2000 REP Settlement Agreements for which BPA must recover or risk not being able to make its Treasury Payment on time.

In summary, *Central Electric* stands for the proposition that a federal PMA should only be permitted to avail itself of this exception to the general rule against retroactive ratemaking under certain very circumscribed circumstances. The PMA must be proposing to implement rates that are the "lowest possible rates to consumers consistent with sound business principles . . ." and will generate sufficient revenues to pay the cost of producing the power and repay the Federal investment "over a reasonable period of years." 96 F.E.R.C. at ¶ 61,767; 16 U.S.C. § 825s. BPA's predicament (i.e., the proper allocation of the 2000 REP Settlement Agreement costs) is of its own making and did not require that it collect additional revenues in order to meet its operating costs and Treasury payments. 16 U.S.C. § 839e(a)(1).

The Flood Control Act does not represent an absolute shield against the application of the rule against retroactive rulemaking/ratemaking. BPA's bold assertion that the duty "to protect the public fisc," explained in *Central Electric*, 338 F.3d at 333, will always trump the general rule against retroactive ratemaking is not founded in law. I.E.R. Vol. I 61 (R.A.R. 062371).

Adhering to the general rule will not cause BPA to "ignore" its fiscal responsibility to the public treasury. *Id.* To the contrary, complying with the rule against retroactive ratemaking will not only protect the public treasury from needless exploitation but it will also permit Bonneville to craft an effective response to the Court's Remand Order that actually avoids the great "havoc" and "rough justice" that BPA admits has accompanied its decision to implement the Lookback approach. I.E.R. Vol. I 271 (R.A.R. 062581); Vol. III 758 (R.A.R. 074978).

In its WP-07 ROD, BPA failed to address the fact that the exemptions contained in the collective *SEPA* decisions[12] have all been premised upon the presence of unanticipated additional costs leading to revenue shortages. Unlike SEPA's actions in the aforementioned 4th Circuit case, BPA's Lookback approach does not seek to impose a "surcharge" in order to recover certain unanticipated costs. Rather, it is a deliberate and coordinated scheme to recalculate the amount of REP benefits already awarded and "passed through" to the residential and small farm customers of the IOUs during the 2002-2006 rate periods. I.E.R. Vol. I 46 (R.A.R. 062356). The Lookback mechanism adopted by BPA in response to the

---

[12] *See also Southeastern Power Admin.*, 49 F.E.R.C. ¶ 62,109 (1989); *Southeastern Power Admin.*, 55 F.E.R.C. ¶ 61,016 (1981); *Southwestern Power Admin.*, 18 F.E.R.C. ¶ 61,052 (1982); *Southeastern Power Admin.*, 23 F.E.R.C. ¶ 61,403 (1983).

Court's *PGE* and *Golden Northwest* decisions[13] is unrelated to its duty under the Flood Control Act of "recovering revenue shortages." *Central Electric*, 338 F.3d at 337. Instead of recovering revenue shortfalls, BPA's actions are concerned solely with extracting past REP benefit amounts already awarded to its IOU customers and reapportioning them amongst its preference customers. I.E.R. Vol. I 46 (R.A.R. 062356).

**C.** **The Prevailing Parties in *PGE* and *Golden Northwest* Failed to Exercise Measures that would have Protected Their Interests**

Even though BPA has no power to grant a retroactive remedy,[14] the prevailing parties in *PGE* and *Golden Northwest* could have preserved the fruits of their appeal by obtaining a stay pending their appeal of BPA's WP-02 Final ROD and the 2000 REP Settlement Agreements. Judicial review of final BPA actions under the APA expressly provides for such a procedure. 5 U.S.C. § 705 (an agency "may postpone the effective date of action taken by it, pending judicial review.").[15]

---

[13] *PGE*, 501 F.3d at 1009; *Golden Northwest*, 501 F.3d at 1037.

[14] As noted previously, BPA must issue refunds if the final FERC-approved rates are less than the interim rates. 18 C.F.R. § 300.21(g).

[15] Section 705 further provides: "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for a certiorari or other writ to a reviewing court, may issue all necessary and appropriate process

Likewise, Rule 18 of the Federal Rules of Appellate Practice provides for a stay pending appellate review. Under Rule 18, a petitioner must ordinarily first move BPA for a stay pending review of its decision or final order. F.R.A.P. 18(a)(1). In addition, this rule provides that a motion for stay may be made to the Ninth Circuit or one of its judges. F.R.A.P. 18(a)(2).

The Petitioners in the *PGE* and *Golden Northwest* cases did not seek a stay from BPA, FERC or this Court of the 2000 REP Settlement Agreements or the rates established in the WP-02 general rate proceeding. I.E.R. Vol. I 53 (R.A.R. 062363). They have argued, in their various legal briefs filed during the WP-07 Supplemental rate proceeding, that a motion for stay in order to preserve their legal remedy was "neither required or feasible." I.E.R. Vol. III 751 (R.A.R. 063718) (JP25 Brief). However, such an approach was entirely "feasible," so much so that BPA did itself seek, and was ultimately granted, a stay from FERC of the interim WP-07 rates. I.E.R. Vol. I 17 (R.A.R. 062327).

Because BPA's WP-02 rates were not stayed, they remain lawful and valid through the judicial review process consistent with "the well-established rule that an appeal will not affect the validity of a judgment or order during the pendency of

---

to postpone the effective date of an agency action or preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

an appeal, absence a stay or supersedeas." *Combine Metals Reduction Co. v. Gemmill*, 557 F.2d 179, 190 (9th Cir. 1977).

By failing to stay the effects of the 2000 REP Settlement Agreements or WP-02 rates, the prevailing parties in *PGE* and *Golden NW* put themselves at risk of losing the fruits of their appeal. "[Thus,] <u>a party who chooses to appeal but fails to obtain a stay</u> or injunction pending appeal risks losing its ability to realize the benefits of a successful appeal." *Holloway v. United States*, 789 F.2d 1372, 1374 (9th Cir. 1986) (emphasis added and citations omitted), *quoting Matter of Combined Metals Reduction Co.*, 557 F.2d 179, 188 (9th Cir. 1977); *United States v. Peterson*, 19 F.3d 1442, 1444 (9th Cir. 1994) (unpublished disposition).

In *Holloway,* the Court dismissed the case as moot and upheld the IRS' seizure and sale of the Holloway's property. 789 F.2d at 1374. The Court declared that the Holloways were left without a remedy because they failed to take advantage of their "opportunity to prevent the sale of their property through a stay of the order denying their petition for a writ of prohibition. . . ." *Id.* at 1373-74.

Likewise, the BPA preference customers in the *PGE* and *Golden Northwest* cases should have availed themselves of their opportunity to stay or enjoin the effectiveness of the 2000 Settlement Agreements. The effect of a motion for stay pending appeal would have been significant. As previously mentioned, and explained more fully in the Joint Brief of the Pacific Northwest Investor-Owned

Utilities, the IOUs and BPA, in Section 3(b) of the 2000 REP Settlement Agreements, had mutually agreed that there would be no refunds. Having contracted that there would be no refunds if a Court later overturned the Settlement Agreements, the IOUs had no reasonable expectation or notice that BPA would retroactively set rates and decrease future REP payments.

A stay pending appeal would have alerted the IOU residential and small farm customers that their REP benefits were subject to modification and/or rescission because the preference customers would have been required to make a "strong showing that [they are] likely to succeed on the merits . . ." of their claims and demonstrate ". . . where the public interest lies." *Humane Soc. of U.S. v. Gutierrez*, 527 F.3d 788, 789 (9th Cir. 2008).

A motion for stay pending appeal would also have alerted the Idaho, Oregon, and Washington Commissions that the REP benefits provided to the IOUs and ultimately passed through to their residential and small farm customers were subject to change. These state regulatory bodies could have then taken appropriate precautions in order to protect their respective IOU ratepayers against the prospect that their benefits would later evaporate. The state commissions would likely have been compelled to order the regulated IOUs to withhold in escrow all or a portion of the REP benefits being challenged by the preference customers.

In conclusion, BPA could have adhered to the rule against retroactive ratemaking, as well as the closely related filed-rate doctrine, and still complied with the Court's remand order. The two mandates are not mutually exclusive. Ironically, strict compliance with the rule against retroactive ratemaking would have helped BPA avoid the very same "utopian construct" that it so desperately sought to avoid but has nonetheless managed to create through the recalculation and redistribution of future REP benefits to satisfy past rate changes. I.E.R. Vol. I 271 (R.A.R. 062581). While the rule does not create "an expectation of perfect parity," it does avoid the substantial injustice of requiring "future consumers" of the IOUs to pay for REP settlement benefits they never received. I.E.R. Vol. I 276 (R.A.R. 062586). BPA's application of the Lookback mechanism is arbitrary and capricious and contrary to law. 5 U.S.C. § 706(2)(A).

## VII. ADOPTION OF OTHER ISSUES AND ARGUMENTS

In the interest of brevity and the Court's June 4, 2009 Order (Dkt Entry 6945924), the Idaho PUC adopts by reference the arguments about the deemer issues contained in the Joint Initial Brief of the Idaho PUC and Idaho Power Company in the companion (related) case, *Idaho PUC, et al. v. Bonneville Power Administration*, Docket Nos. 08-74927 and 08-74933.

The Idaho PUC also adopts by reference the arguments of the IOUs concerning breach of the Section 3(b) ("no-refund" provision) and other Lookback non-rate issues:

1. "Joint Brief of the Pacific Northwest Investor-Owned Utilities (Avista Corporation, Idaho Power Company, PacifiCorp, Portland General Electric Company, and Puget Sound Energy, Inc.)" filed in this consolidated case, Docket Nos. 08-75098, 08-75099, 08-75112, 08-75130, and 08-75161.

2. **"**Joint Brief of Petitioners, Avista Corporation, PacifiCorp, Portland General Electric Company, and Puget Sound Energy" filed in the companion case, *Idaho PUC, et al. v. Bonneville Power Administration*, Docket Nos. 08-74928, 08-74929, 08-74932, and 08-74957.

## VIII. RELIEF REQUESTED

For the foregoing reasons, BPA's final determinations regarding the Lookback and deemer mechanisms contained in the WP-07 ROD should be declared to be arbitrary, capricious, an abuse of discretion and not in conformance with law. The Court should remand this matter to BPA with instructions to revise its WP-07 ROD in conformance with the opinion of the Court.

DATED this   19th   day of August 2009.


By:   */s/ D. Neil Price*
D. Neil Price (ISB# 6864)
Donald L. Howell, II  (ISB# 3366)
Deputy Attorneys General

Idaho Public Utilities Commission
472 W. Washington Street
Boise, ID  83702-5918
neil.price@puc.idaho.gov
don.howell@puc.idaho.gov
Telephone: (208) 334-0314
             (208) 334-0312
Facsimile:   (208) 334-3762

## STATEMENT OF RELATED CASES

There are seven related cases pending in this Court which have been consolidated in a companion docket pursuant to Circuit Rule 15-3.2(b). The name of the consolidated cases is the *Idaho Public Utilities Commission* (*"Idaho PUC"),* *et al. v. Bonneville Power Administration*, Docket Nos. 08-74927, 08-74928, 08-74929, 08-74932, 08-74933, 08-74942 and 08-74957. These consolidated dockets in *Idaho PUC* raised the same or closely related "non-rate" issues involved in the review of BPA's "2007 Supplemental Wholesale Power Rate Case, Administrator's Final Record of Decision ("WP-07 ROD") issued on September 22, 2008. By Order of the Court dated June 4, 2009, the consolidated cases in the companion appeal (*Idaho PUC v. BPA)* use the same Record on Appeal as the present consolidated dockets (*APAC, et al. v. BPA*). The two separate cases are calendared before the same panel. *Id.*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed.R.App. P.32(a)(7)(C) and Ninth Circuit Rules 32-1, the attached opening brief is proportionately spaced, has a typeface of 14 points or more, and contains 8,082 words.


Date:   August 19, 2009

By:   */s/ D. Neil Price*
D. Neil Price (ISB# 6864)
Donald L. Howell, II  (ISB# 3366)
Deputy Attorneys General

Idaho Public Utilities Commission
472 W. Washington Street
Boise, ID  83702-5918
neil.price@puc.idaho.gov
don.howell@puc.idaho.gov
Telephone: (208) 334-0314
        (208) 334-0312
Facsimile:  (208) 334-3762

## CERTIFICATE OF SERVICE
When Not All Case Participants are Registered for
the Appellate CM/ECF System

U.S. Court of Appeals Docket Nos. 08-74725, 08-74811, 08-74900,
08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113
08-75130, 08-75132, 08-75133, 08-75161, 08-75165 (Consolidated)

I hereby certify that I electronically filed the foregoing **Initial Brief of the Idaho Public Utilities Commission, Petitioner, Docket No. 08-75113**, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 19, 2009.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

David Hill
Department of Energy
1000 Independence Avenue SW
Washington DC 20585

Anne L. Spangler
Public Utility District No. 1 of
 Snohomish County, Washington
2320 California Street
Everett, WA 98201


Signature        *s/ D. Neil Price*
                   Deputy Attorney General
                   Idaho Public Utilities Commission