Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133, 08-75161 & 08-75165

_____

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, et al.,

*Petitioners,*

v.

BONNEVILLE POWER ADMINISTRATION,

*Respondent.*

_____

*On Petition for Review of the Administrator's Final Record of Decision in the Bonneville Power Administration's 2007 Supplemental Wholesale Power Rate Case, WP-07-A-05 (Sept. 22, 2008)*

---

## JOINT BRIEF OF THE PACIFIC NORTHWEST INVESTOR-OWNED UTILITIES (AVISTA CORPORATION, IDAHO POWER COMPANY, PACIFICORP, PORTLAND GENERAL ELECTRIC COMPANY, AND PUGET SOUND ENERGY, INC.) AS PETITIONERS IN NOS. 08-75098, 08-75099, 08-75112, 08-75130, AND 08-75161

---

Dan L. Bagatell
PERKINS COIE BROWN & BAIN P.A.
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012

DBagatell@perkinscoie.com
(602) 351-8000

Donald G. Kari
Jason T. Kuzma
PERKINS COIE LLP
10885 N.E. Fourth Street, Suite 700
Bellevue, Washington 98004
DKari@perkinscoie.com
JKuzma@perkinscoie.com
(425) 635-1400

Counsel for Puget Sound Energy, Inc.

*[continued on inside cover]*

Michael G. Andrea
AVISTA CORPORATION
1411 East Mission Avenue – MSC-23
Spokane, Washington  99202
Michael.Andrea@avistacorp.com
(509) 495-2564

Counsel for Avista Corporation


Jay T. Waldron
Sara Kobak
SCHWABE WILLIAMSON & WYATT PC
1211 SW 5th Avenue, Suites 1500-2000
Portland, Oregon  97204
JWaldron@schwabe.com
SKobak@schwabe.com
(503) 222-9981

R. Blair Strong
PAINE HAMBLEN LLP
717 West Sprague Avenue, Suite 1200
Spokane, Washington  99201
r.blair.strong@painehamblen.com
(509) 455-6000

Counsel for Idaho Power Company


Lara L. Skidmore
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C.  20004
Lara.Skidmore@troutmansanders.com
(503) 590-2979

Ryan L. Flynn
PACIFICORP
825 NE Multnomah Street, Suite 1800
Portland, Oregon  97232
Ryan.Flynn@PacifiCorp.com
(503) 813-5854

Counsel for PacifiCorp


Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, Oregon  97204
scott.seidman@painehamblen.com
(503) 802-2021

Counsel for Portland General Electric Company

August 19, 2009

**Corporate Disclosure Statements**

Avista Corporation has no parent companies, and no publicly held company owns 10% or more of its stock.

Idaho Power Company is a wholly-owned subsidiary of IDACORP, a publicly traded company.

PacifiCorp is a wholly owned subsidiary of PPW Holdings, LLC, an Oregon limited liability company, which is a wholly owned subsidiary of MidAmerican Energy Holdings Company. No publicly held company owns 10% or more of PacifiCorp's stock.

Portland General Electric Company has no parent corporations, and no publicly held company owns 10% or more of its stock.

Puget Sound Energy, Inc. is a subsidiary of Puget Energy, Inc., a Washington corporation, and is indirectly a subsidiary of Puget Equico LLC, a Washington limited liability company, Puget Intermediate Holdings Inc., a Washington corporation, and Puget Holdings LLC, a Delaware limited liability company. No publicly held corporation owns 10% or more of the stock of Puget Sound Energy, Inc.

## Table of Contents

Corporate Disclosure Statements .............................................................................i

Table of Authorities.................................................................................................iv

Table of Abbreviations ...........................................................................................vii

Jurisdiction ............................................................................................................... 1

Questions Presented..................................................................................................2

Statement of the Case ...............................................................................................3

Statement of Facts ....................................................................................................5

       A.     BPA and the Residential Exchange Program ............................5

       B.     The 2000 REP Settlements ........................................................9

       C.     BPA's Independent Decision to Sell 1,000 aMW of
             Power at a Rate Equivalent to the PF Preference Rate ............ 13

       D.     The Energy Crisis, BPA's Load Reduction Program, and
             the 2001 Load Reduction and Settlement Agreements............ 15

       E.     This Court's 2007 Decisions.................................................... 19

       F.     BPA's "Lookback" Response to This Court's Decisions ........ 24

Summary of Argument .............................................................................................27

Argument .................................................................................................................32

    I.     BPA Has Improperly Required Refunds of Settlement
          Payments Contrary to the No-Refund Provisions of the 2000
          and 2001 Settlement Agreements ......................................................32

    II.    Any Lookback Analysis Should Have Excluded BPA's
          Section 5(b) Power Sales at the RL Rate and Its Load
          Reduction Payments in Lieu of Those Sales Because They Did
          Not Result in Any Overcharge to Preference Customers ..................37

A.     All Section 5(b) Power Sales and Payments in Lieu of Power Delivery Should Have Been Excluded from the Lookback Analysis .................................................................. 38

1.     Portland General's RL Power Purchases Did Not Cause Any Overcharge to Preference Customers .......... 40

2.     BPA's Load Reduction Payments to Avista, Idaho Power, and Portland General Did Not Cause Any Overcharges to Preference Customers .......................... 44

3.     BPA "Protected" Only a Portion of Its Load Reduction Payments to PacifiCorp and PSE Even Though Its Own ROD Purported to Provide Full Protection ............................................................................... 46

B.     The Proper Result Is a Limited Remand .................................. 48

III.     All Benefits Paid Under BPA's 2001 Agreements with PacifiCorp and PSE Should Have Been Excluded from the Lookback Analysis Because No One Timely Challenged Those Agreements ................................................................................. 49

Conclusion and Relief Requested ......................................................................... 51

Statement of Related Cases..................................................................................... 53

Certificate of Compliance....................................................................................... 54

Statutory Appendix.......................................................................................... SA-1

Certificate of Service

## Table of Authorities

**Cases** **Pages**

*Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*,
  467 U.S. 380 (1984) ................................................................6

*Am. Fed'n of Labor v. Chertoff*,
  552 F. Supp. 2d 999 (N.D. Cal. 2007) ........................................42

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ............................................. 6, 34

*Bell v. Bonneville Power Admin.*,
  340 F.3d 945 (9th Cir. 2003) .............................................15, 16

*Central Lincoln Peoples' Util. Dist. v. Johnson*,
  735 F.2d 1101 (9th Cir. 1984) ................................................43

*Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.*,
  501 F.3d 1037 (9th Cir. 2007) ..........................................3, *passim*

*Lucas v. NLRB*,
  333 F.3d 927 (9th Cir. 2003) .................................................44

*Marré v. United States*,
  117 F.3d 297 303 (5th Cir. 1997) ............................................35

*Nw. Env'tl Defense Ctr. v. Bonneville Power Admin.*,
  477 F.3d 668 (9th Cir. 2007) ..........................................42, 45, 48

*Pac. Nw. Generating Coop. v. Dep't of Energy*,
  550 F.3d 846 (2008), *amended*,
  ___ F.3d ___, 2009 WL 2386294 (9th Cir. Aug. 5, 2009) ............................ 1

*Pfaff v. United States Dep't of Housing & Urban Dev.*,
  88 F.3d 739 (9th Cir. 1996) ..................................................42

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
  501 F.3d 1009 (9th Cir. 2007) ..........................................3, *passim*

*Pub. Power Council, Inc. v. Bonneville Power Admin.*,
  442 F.3d 1204 (9th Cir. 2006) ................................................32

**Cases**                                                    **Pages**

*Pub. Util. Dist. No. 1 of Grays Harbor County, Wash. v. Dep't of Energy*,
250 Fed. Appx. 820 (9th Cir. 2007) ................................................24

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power
Admin.*, 506 F.3d 1145 (9th Cir. 2007) ...............................3, *passim*

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. United States*,
250 Fed. Appx. 817 (9th Cir. 2007) ................................................23

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power
Admin.*, 250 Fed. Appx. 821 (9th Cir. 2007) ..................................24

*Sierra Club v. EPA*,
346 F.3d 955, *amended*, 352 F.3d 1187 (9th Cir. 2003) ...........42, 45

*In re Sinking Fund Cases*,
99 U.S. 700 (1878) ........................................................................34

*Util. Reform Project v. Bonneville Power Admin.*,
869 F.2d 437 (9th Cir. 1989) .........................................................35

*United States Dep't of Energy—Bonneville Power Admin.*,
28 F.E.R.C. ¶ 61,058 (2009) ...........................................................2

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) .......................................................................34

**Statutes**

5 U.S.C. § 706(2)(A) ..........................................................................32

16 U.S.C. § 839 *et seq.* ....................................................................1, 6

16 U.S.C. § 839c(b) ...............................................................9, *passim*

16 U.S.C. § 839c(c) ...............................................................2, *passim*

16 U.S.C. § 839e ...................................................................................8

16 U.S.C. § 839e(b) ...............................................................3, *passim*

16 U.S.C. § 839e(f) .....................................................................14, 43, 44

**Statutes**                                                              **Pages**

16 U.S.C. § 839e(g) ...................................................................................... 8

16 U.S.C. § 839f(e) .................................................................................. 1, 49


**Other Authorities**

17A Am. Jur. 2d *Contracts* § 322 (2004) ............................................... 35

H.R. Rep. No. 96-976, 96th Cong., 2d Sess., pt. II, at 35 (1980),
    *reprinted in* 1980 U.S.C.C.A.N. 5989, 6033 ..................................... 6

*Restatement (Second) of Contracts* § 197 (1981) ................................... 35

**Table of Abbreviations**

| | |
|---|---|
| aMW | average megawatt |
| ASC | average system cost |
| BPA | Bonneville Power Administration |
| FERC | Federal Energy Regulatory Commission |
| FY | fiscal year or years |
| IOU | investor-owned utility |
| IOUER | investor-owned utilities' excerpts of record |
| Lookback | BPA's determinations of the amounts by which preference customers were overcharged for REP costs, including an assessment of "excess" REP payments that BPA had made to various IOUs pursuant to settlement agreements |
| LRA | load reduction agreement |
| NWPA | the Northwest Power Act, a shorthand name for the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839 *et seq.* |
| PF Exchange rate | priority firm power rate charged by BPA for REP exchanges under section 5(c) of the NWPA |
| PF Preference rate | priority firm power rate charged by BPA for some categories of sales to preference customers under section 5(b) of the NWPA |
| preference customers | BPA power customers that are publicly owned utilities or cooperatives (sometimes called "publics," consumer-owned utilities, or COUs) |
| Portland General | Portland General Electric Company |
| PSE | Puget Sound Energy, Inc. |

| | |
|---|---|
| PSE's 2001 REP Settlement Agreement | Amended Settlement Agreement dated June 7, 2001, between BPA and PSE settling BPA's obligations under the REP and calling for load reduction payments |
| R.A.R. | revised administrative record prepared by BPA |
| REP | Residential Exchange Program |
| RL rate | residential load rate (RL-02) charged by BPA for power sales under section 5(b) of the NWPA |
| ROD | Record of Decision |
| RPSA | Residential Purchase and Sale Agreement between BPA and a utility, pursuant to the REP |
| 2000 REP Settlement Agreements | agreements in 2000 between BPA and IOUs settling BPA's obligations under the REP for periods beginning FY2002 |

**Jurisdiction**

Avista Corporation, Idaho Power Company, PacifiCorp, Portland General Electric Company ("Portland General"), and Puget Sound Energy, Inc. ("PSE") have petitioned for review of the "Administrator's Final Record of Decision in the 2007 Supplemental Wholesale Power Rate Case" conducted by the Bonneville Power Administration ("BPA") under the Pacific Northwest Electric Power Planning and Conservation Act (the "Northwest Power Act" or "NWPA"), 16 U.S.C. §§ 839 *et seq*. That Record of Decision ("ROD") was a final action subject to judicial review under 16 U.S.C. § 839f(e). This Court has jurisdiction because the ROD was dated September 22, 2008, and the petitions were timely filed between December 17 and 22, 2008. *See* 16 U.S.C. § 839f(e)(5).

BPA's ROD included both prospective determinations of rates for fiscal year ("FY") 2009, which BPA submitted to the Federal Energy Regulatory Commission ("FERC") for approval, and retrospective ("Lookback") determinations of overcharges and refunds for previous years, which BPA contended did not need FERC approval. Because FERC had not confirmed BPA's FY2009 rates when the current petitions were filed, these petitions are limited to the "non-rate" aspects of the ROD. *Compare Pac. Nw. Generating Coop. v. Dep't of Energy*, 550 F.3d 846, 859 (2008), *amended on other grounds*, ___ F.3d ___, 2009 WL 2386294 (9th Cir. 2009) (issues ripe for review where BPA did not seek FERC approval), *with*

16 U.S.C. § 839f(e)(4)(D) (rate determinations final upon confirmation and approval by FERC).[1]

### Questions Presented

In 2007, this Court issued several decisions addressing agreements between BPA and various investor-owned utilities ("IOUs") that settled BPA's obligations to pay benefits under the Residential Exchange Program of section 5(c) of the Northwest Power Act, 16 U.S.C. § 839c(c). These consolidated cases involve BPA's response to those decisions. This brief raises the following issues:

1.     Whether BPA improperly required refunds of benefits that BPA had already paid under its settlement agreements with the IOUs.

2.     Whether BPA improperly included power sales to the IOUs (and load reduction payments in lieu of delivering that power) in its analysis of overcharges paid by BPA's preference customers as a result of the settlement agreements.

3.     Whether BPA's remedial analysis improperly included payments that it made under its 2001 load reduction agreement with PacifiCorp and its 2001 settlement and load reduction agreement with PSE.

---

[1] On July 16, 2009, FERC confirmed BPA's FY2009 rates on a final basis, *United States Dep't of Energy—Bonneville Power Admin.*, 128 F.E.R.C. ¶ 61,058 (2009), and petitions challenging those rates are expected. FERC's approval came too late, however, to include the rate-related issues in the current round of briefing. By Court order and stipulation of the parties, certain aspects of BPA's ROD have been deemed rate-related and will be deferred until the briefing on those petitions.

## Statement of the Case

Section 5(c) of the NWPA establishes a Residential Exchange Program ("REP") requiring BPA to pay benefits that reduce the cost of power to residential and small-farm customers of participating utilities. 16 U.S.C. § 839c(c). BPA makes payments to the utilities, but the utilities must pass all the benefits directly through to residential and small-farm consumers. *Id.* § 839c(c)(3).

In 2007, this Court ruled on a series of petitions for review challenging agreements that had settled BPA's obligations to pay REP benefits for certain periods. Among other things, the Court held that (1) BPA's methodology in calculating the benefits owed under the settlements was inconsistent with section 5(c) of the NWPA, 16 U.S.C. § 839c(c), and BPA's related regulations; and (2) BPA acted contrary to section 7(b) of the NWPA, 16 U.S.C. § 839e(b), in allocating certain costs of the settlements to the "PF Preference" rate paid by publicly owned utilities and cooperatives ("preference customers"). *Portland Gen. Elec. Co. v. BPA*, 501 F.3d 1009 (9th Cir. 2007); *Golden Nw. Aluminum, Inc. v. BPA*, 501 F.3d 1037 (9th Cir. 2007); *see also Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. BPA*, 506 F.3d 1145 (9th Cir. 2007) (addressing 2004 amendments to earlier settlements).

In response to these decisions, BPA suspended REP benefit payments under the settlements and opened a supplemental proceeding to "establish the amount by

– 3 –

which preference customers were overcharged and provide appropriate repayments to preference customers through lower rates or billing credits in the future." IOUER 29 (R.A.R. 062342). In that proceeding, BPA engaged in an analysis— dubbed the "Lookback"—comparing the amounts that BPA actually paid or would have paid each IOU under the settlements with the amount of REP benefits that BPA concluded would have been owed under the traditional REP. BPA treated the differences ("Lookback Amounts") as excess payments. BPA decided to credit each preference customer for its pro rata share of the total Lookback Amounts and to recover each IOU's Lookback Amount by reducing the REP benefits due in the future. The net effect is to require current and future residential and small-farm customers of the IOUs to pay for supposed excess benefits received by other residential and small-farm customers in the past.

Preference customers, IOUs, and state utility commissions representing the interests of retail consumers have all filed petitions for review. This brief, filed by five IOUs in the Pacific Northwest, raises three objections:

> (1)     BPA has improperly withheld REP benefits for current and future IOU customers in an attempt to recoup past overpayments to past customers. Among other things, BPA (a) misread this Court's decisions as declaring the settlement agreements void in their entirety, (b) wrongfully repudiated valid and binding contractual provisions in

which BPA agreed that all benefits paid before any finding of invalidity were non-refundable, and (c) erroneously invoked equitable doctrines of setoff and recoupment that do not apply.

(2)     Even if the Lookback approach were permissible, BPA's agreements to sell the IOUs power under section 5(b) of the NWPA, 16 U.S.C. § 839c(b), and later to pay cash rather than delivering that power, were valid and should have been excluded from the analysis because the preference customers were not overcharged as a result.

(3)     Even if BPA could properly recover payments under its original *2000* settlements with the IOUs, BPA was not entitled to recover payments under its *2001* agreements with PacifiCorp and PSE.  No preference customer (or any other party) timely challenged the 2001 agreements, and this Court's 2007 opinions did not invalidate them.

Each of these three arguments is independent, and each affects the power costs paid by residential and small-farm consumers by hundreds of millions of dollars.

**Statement of Facts**

**A.     BPA and the Residential Exchange Program**

BPA is a federal agency that Congress created in 1937 to market low-cost electric power from federal dams along the Columbia River.  BPA sells power to

– 5 –

various classes of customers including preference customers, IOUs, and direct-service industrial customers. *See generally Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380 (1984); *Ass'n of Pub. Agency Customers, Inc. v. BPA*, 126 F.3d 1158 (9th Cir. 1997).

Although several statutes govern BPA's programs, the statute critical to this case is the NWPA, enacted in 1980. 16 U.S.C. §§ 839 *et seq.* Among other things, the NWPA addressed concerns that BPA could not provide enough low-cost power to serve all the demand in the Pacific Northwest and that BPA's allocation of the benefits of this low-cost power had unfairly favored preference customers over residential and small-farm consumers served by IOUs. The Residential Exchange Program of section 5(c) of the NWPA, 16 U.S.C. § 839c(c), was designed to "allow the residential and small farm consumers of the region's IOUs to share in the economic benefits of the lower-cost Federal resources marketed by BPA and [to] provide these consumers wholesale rate parity with residential consumers of preference utilities in the region." H.R. Rep. No. 96-976, 96th Cong., 2d Sess., pt. II, at 35 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5989, 6033.

Under the REP, utilities may offer to sell BPA power for their residential and small-farm loads at their average system cost ("ASC"), and BPA must then sell them back an equivalent amount of power at BPA's PF Exchange rate, which is usually lower. 16 U.S.C. § 839c(c)(1). In practice, the exchange normally

occurs on paper, and the program results in an award of benefits equal to the utility's residential and small-farm load times the difference between its ASC and the applicable PF Exchange rate. IOUER 336 (R.A.R. 062655). Participating utilities must pass these benefits directly through to their residential and small-farm customers. *See* 16 U.S.C. § 839c(c)(3).

Although the NWPA allows both IOUs and preference customers to participate in the REP, the main beneficiaries of the program have been residential and small-farm ratepayers served by IOUs, who receive credits reducing their monthly electricity bills. Historically, most preference customers have not participated because their ASCs have been below the PF Exchange rate.

The NWPA directs BPA to determine the ASCs used in REP exchanges according to a methodology that BPA sets and FERC approves. 16 U.S.C. § 839c(c)(7). BPA developed its original ASC methodology in 1981 and revised it in 1984. In the years that followed, BPA and participants in the REP often disputed how to calculate their ASCs for particular years. BPA updated its ASC methodology in 2008, but the new ASC methodology is not at issue here because BPA applied its 1984 methodology to the matters now before this Court. BPA did apply the new ASC methodology for rates beginning in FY2009, and the Court may be asked to review the propriety of the new methodology in a later case.

BPA determines the other primary factor in the REP calculation (the PF Exchange rate) during periodic rate cases under section 7 of the NWPA, 16 U.S.C. § 839e. The PF Exchange rate is equal to the PF Preference rate that BPA charges its preference customers for firm power, except as adjusted under section 7(b)(2) and 7(b)(3) of the NWPA, 16 U.S.C. § 839e(b)(2), (3). Section 7(b)(2) provides that BPA's projected costs of serving its preference customers (excluding certain charges under section 7(g)) may not exceed its projected costs of serving those customers under five hypothetical assumptions. *Id.* One of those hypothetical assumptions is that no REP exchanges under section 5(c) occur. *Id.* § 839e(b)(2)(C). If BPA's projected "real-world" costs of serving preference customers loads (excluding section 7(g) charges) exceed its projected costs of serving those loads under the five hypothetical assumptions, BPA must reduce the PF Preference rate and recover the revenue shortfall caused by that reduction from rates other than the PF Preference rate. *Id.* § 839e(b)(3). If the projected "real-world" costs are less than the projected costs under the hypothetical assumptions, the section 7(b)(2) rate test does not "trigger" and the PF Preference rate and the PF Exchange rate are equal. If the section 7(b)(2) rate test "triggers," the PF Exchange rate is subject to a surcharge and is higher than the PF Preference rate. As a practical matter, a higher PF Exchange rate translates into lower REP benefits. *See* IOUER 1285 (R.A.R. 107337).

Section 7(b)(2) is extremely complex and effectively requires BPA to conduct a hypothetical rate case parallel to, yet interactive with, its actual rate case. BPA first construed and issued a Legal Interpretation and Implementation Methodology for section 7(b)(2) in 1984. As with the ASC methodology, BPA's implementation of section 7(b)(2) led to many disputes among BPA and its customers. And as with the ASC methodology, BPA revisited section 7(b)(2) in 2008 and issued a revised Legal Interpretation and Implementation Methodology. Again, however, the matters now before the Court were decided under BPA's 1984 approach. The Court will review the revised section 7(b)(2) Legal Interpretation and Implementation Methodology when it reviews BPA's rates for FY2009.

As discussed above, section 5(c) exchanges normally involve no actual exchange of power, just the distribution of monetary benefits to the participating utility for its residential and small-farm customers. Apart from section 5*(c)* and the REP, however, section 5*(b)* of the NWPA provides that BPA can—and sometimes must—actually sell and deliver power to IOUs and other customers. 16 U.S.C. § 839c(b). Section 5(b) sales to IOUs are *not* part of the REP, but are instead independent, cost-based sales separately authorized by the NWPA.

**B.     The 2000 REP Settlements**

In implementing the REP, BPA has required participating utilities to enter into multi-year agreements called Residential Purchase and Sale Agreements

("RPSAs").  During the 1980s and 1990s, BPA and customers participating in the REP frequently clashed over how to calculate the REP benefits payable under those agreements.  The disputes were hard-fought and involved large sums:  tens or even hundreds of millions of dollars per year.

In late 1990s, BPA resolved to end the disputes and stabilize its future REP obligations by entering into settlements.  *See* IOUER 786-88 (R.A.R. 097034-36) (*Power Subscription Strategy* (Dec. 21, 1998)); IOUER 822-61 (R.A.R. 097085-124) (*Power Subscription Strategy ROD* (Dec. 21, 1998)).  In October 2000, following many months of discussions, BPA issued two RODs offering IOUs a choice:  (1) they could enter into traditional RPSAs and receive traditional REP benefits under the 1984 methodologies; or (2) they could enter into settlement agreements resolving their existing and threatened claims and settling future REP obligations for a period of years.  *See* IOUER 1107-204 (R.A.R. 097669-766) (2000 RPSA ROD (Oct. 4, 2000)); IOUER 1205-404 (R.A.R. 107257-456) (2000 REP Settlement ROD (Oct. 4, 2000)).

In late 2000, six IOUs (the five filing this brief plus NorthWestern Energy) agreed to settle and enter into what the parties have called the 2000 REP Settlement Agreements.  Instead of having BPA pay REP benefits under section 5(c), the agreements called for BPA to make cash payments at specified levels and to sell and deliver nearly 1,000 aMW of power pursuant to section 5(b)

at BPA's "RL" (residential load) rate.  *See, e.g.,* IOUER 1428-508 (R.A.R. 114180-263) (PSE 2000 agreement).[2]  The power sale aspects were set forth in independent agreements, Exhibit A to each settlement agreement.  *See, e.g.,* IOUER 1444-511 (R.A.R. 114196-260) (PSE 2000 agreement).  Consistent with section 5(c)(3) of the NWPA, 16 U.S.C. § 839c(c)(3), the IOUs were required to pass all the benefits through to their residential and small-farm consumers.  *See, e.g.,* IOUER 1438 (R.A.R. 114190) (PSE 2000 agreement).

The 2000 REP Settlement Agreements recognized that the settlements might be challenged in this Court and specifically allocated the risk of that contingency. The parties understood that the IOUs were merely a conduit passing the benefits through to their residential and small-farm customers and that it would be impractical to recover those benefits from millions of ultimate recipients, some of whom would have relocated in the interim.  *See* IOUER 1342-44 (R.A.R. 107394-96) (BPA ROD recognizes difficulty of reclaiming benefits previously passed through to retail consumers and probable litigation over the amount of appropriate REP benefits); *see also* IOUER 1546-47, 1617-18 (R.A.R. 098660-61, 098702-03) (BPA identifies "potential economic harm to consumers" as another reason for

---

[2] Technically, NorthWestern Energy agreed to purchase 13 aMW under section 5(c)(5), IOUER 1063-85 (R.A.R. 114068-90), but BPA agreed to sell the remaining 987 aMW to the IOUs under section 5(b).  BPA's reason for selling 1,000 aMW of power rather than simply providing monetary benefits is discussed in the next section.

limiting remedies).  Section 3(b) of each agreement thus contained a no-refund

provision barring BPA from recovering any cash payments and power that BPA

had provided before the date of any invalidity finding (to the maximum extent

permitted by law).  In return, BPA would remain absolved of any REP obligations

through the date of the invalidity finding (again, to the maximum extent permitted

by law).  For example, Section 3(b) of Avista's agreement provided as follows:

> **(b)** **Invalidity**
> In the event the United States Court of Appeals for the
> Ninth Circuit finally determines, after all appeals or
> requests for reconsideration, that this Agreement (or
> section 4(a), section 4(c), or section 5 of this Agreement)
> is unlawful, void, or unenforceable, then the provisions
> of section 3(a) above shall be of no further force or
> effect, and the Parties intend and agree that:  (1) the Firm
> Power and Monetary Benefits provided prior to such
> final determination shall be retained by Avista; and
> (2) the satisfaction of BPA's obligations to Avista under
> section 5(c) of the Northwest Power Act prior to such
> final determination shall be preserved, to the maximum
> extent permitted by law.  This section 3(b) shall survive
> notwithstanding any determination that any other
> provision of this Agreement (or the exhibits) is unlawful,
> void, or unenforceable.

IOUER 967-68 (R.A.R. 113956-57).[3]

---

[3] For the parallel provisions in the other IOUs' agreements, see IOUER 989-90 (R.A.R. 113988-89) (Idaho Power); IOUER 1047-48 (R.A.R. 114052-53) (NorthWestern Energy); IOUER 1408 (R.A.R. 114105) (PacifiCorp); IOUER 1088-89 (R.A.R. 114154-55) (Portland General); IOUER 1431 (R.A.R. 114183) (PSE).

As a shorthand, this brief will refer to the remedy limitation of section 3(b) as

Apart from the no-refund provision, another section of each 2000 REP Settlement Agreement, section 13(g), made clear that the settlement and power sale agreements were independent:

> **(g)    Severability**
>
> All other provisions and exhibits to this Agreement are independent of Exhibit A (Firm Block Power Sales Agreement) attached hereto, and shall remain in effect even if any or all of such Exhibit A is unlawful, void, or unenforceable.

*See, e.g.,* IOUER 982 (R.A.R. 113971) (Avista agreement).

Although there was initially "broad customer support" for the 2000 REP Settlement Agreements, IOUER 1709 (R.A.R. 098543), various parties petitioned this Court for review. The petitions were not resolved until 2007, however, and no party challenging the settlements sought a preliminary injunction or other order staying payments and power deliveries in the interim. BPA thus continued to deliver the benefits required under the settlements, and the IOUs continued to pass through 100% of those benefits to residential and small-farm consumers.

## C.    BPA's Independent Decision to Sell 1,000 aMW of Power at a Rate Equivalent to the PF Preference Rate

As discussed above, the 2000 REP Settlement Agreements called for actual power sales to the IOUs under section 5(b) of the NWPA as well as monetary

---

the "no-refund" provision. BPA's ROD referred to it as the "invalidity" clause, and it has also been called a "risk allocation" provision because it allocated the risk of an invalidity finding. All three terms refer to the same clause.

payments. BPA expected to have ample power supplies and had determined that it could sell 1,000 aMW of power to regional customers at a rate close to the PF Preference rate charged to preference customers without having to increase the PF Preference rate:

> BPA has determined that it can provide 1,000 aMW of additional power to its customers and not increase the PF Preference rate. ... This is what BPA proposed to do. ... Because BPA has not determined the precise manner in which it would provide this additional Federal power to its regional customers, BPA has assumed that it would make sales of power under the FPS rate schedule to meet regional loads. ... BPA has assumed an FPS rate equal to the 1996 PF Preference rate as a reasonable price for such sales.

IOUER 900 (R.A.R. 001141) (citations omitted). BPA assumed that the sales would be made either to the region's IOUs at its RL rate, if the proposed REP settlements went through, or to other regional customers at another rate, if the IOUs chose not to settle. IOUER 905 (R.A.R. 001146). In either case, the price would be the same: equivalent to the PF Preference rate.

The RL rate was a cost-based rate, as required by section 7(f) of the NWPA, 16 U.S.C. § 839e(f). In its WP-02 rate case, which began in 2000, BPA projected no significant cost underrecovery from the RL rate sales to the IOUs. *See* IOUER 955 (R.A.R. 016497) (Final Rate Development Study Documentation Total Costs). As BPA stated in its ROD in the WP-02 rate case (issued in late 2000), it had determined that "it could sell an additional 1,000 aMW to regional

customers at a price equivalent to the PF-96 rate [the then-current PF Preference rate] and still provide rate stability for BPA's preference customers."  IOUER 905 (R.A.R. 001146).  BPA also confirmed that it would still "make the 1,000 aMW sale to regional customers in the Rate Design Step environment where IOUs forego the proposed settlements."  *Id*.

### D.     The Energy Crisis, BPA's Load Reduction Program, and the 2001 Load Reduction and Settlement Agreements

Unfortunately, BPA's prediction of ample power supplies did not come to pass.  By 2001, BPA and the entire Pacific Northwest had become mired in an energy crisis.  As BPA later described the events,

> [b]y the spring of 2001, the Pacific Northwest experienced its second worst drought since recordkeeping began in 1928. By April 2001, the Administrator announced that due to the power crisis, BPA was facing a rate increase of "250% or more."

IOUER 178 (R.A.R. 062494) (citation omitted).  BPA's situation was exacerbated by "the unanticipated return of over 1,000 aMW of public agency loads after such loads had previously left BPA service during a period of low market prices." IOUER 81 (R.A.R. 062394).  BPA was thus confronted with the dilemma of a power deficit in a wholesale power market where prices had "skyrocketed." *See Bell v. BPA*, 340 F.3d 945, 948 (9th Cir. 2003).  In reviewing the events, this Court aptly described BPA's position as "a financial disaster:  a contractual obligation to buy high and sell low."  *Id.*

In response to the crisis, BPA developed a Load Reduction Program that, in addition to conservation by consumers, depended critically on reductions in power demand by its utility customers. BPA pleaded for regional cooperation and voluntary load reductions to stabilize its position. Ultimately, BPA negotiated 71 load reduction agreements ("LRAs") with preference customers, direct-service industrial customers, and IOUs, enabling it to reduce its projected rate increase from 250% to just 46%. IOUER 178 (R.A.R. 062494). This Court later noted that the Load Reduction Program was "an astounding success." *Bell*, 340 F.3d at 948.

At BPA's behest, five of the six IOUs gave up all their rights to delivery of firm power at the RL rate during FY2002-2006 in exchange for cash payments, and the sixth (Portland General) accepted reduced deliveries in FY2002. Collectively, these agreements reduced BPA's load by 768 aMW in FY2002 and 742 aMW in the next four years—enough to serve much of the returned demand from preference customers. BPA elected to pay cash to Avista, Idaho Power, and NorthWestern Energy in accordance with options in their 2000 REP Settlement Agreements. PacifiCorp and PSE, in contrast, entered into separate load reduction agreements that sold their RL power rights back to BPA (at prices favorable to BPA). *See* IOUER 178 (R.A.R. 062494).

PSE's load reduction agreement was dated June 7, 2001, and was entitled "Amended Settlement Agreement," although this brief will sometimes refer to it as

"PSE's 2001 REP Settlement Agreement" for clarity.  IOUER 1631-59

(R.A.R. 114264-92).  The contract not only included PSE's agreement to reduce its

load and accept money rather than delivery of power at the RL rate, but also

superseded and replaced PSE's 2000 REP Settlement Agreement in its entirety:

> **(a)** **Existing Settlement Agreement**
> This Agreement replaces and supersedes in its entirety
> the Settlement Agreement including the Firm Power
> Block Sales Agreement executed by BPA and Puget (RL
> only), Contract No. 12168, attached as Exhibit A to the
> Settlement Agreement (Existing Agreements).

IOUER 1634 (R.A.R. 114267).  Because PSE's 2001 REP Settlement Agreement

fully replaced and superseded PSE's 2000 settlement agreement, it reiterated some

of the key provisions of that agreement.  In particular, Section 3(c) of PSE's 2001

REP Settlement contained a no-refunds-upon-invalidity clause that was

substantially similar to section 3(b) of the 2000 agreement:

> **(c)** **Invalidity**
> In the event the United States Court of Appeals for the
> Ninth Circuit finally determines, after all appeals or
> requests for reconsideration, that this Agreement (or
> section 4(a), section 4(b)(1), section 4(c), or section 5 of
> this Agreement) is unlawful, void, or unenforceable, then
> the provisions of section 3(b) above shall be of no further
> force or effect, and the Parties intend and agree that: (1)
> the cash payments pursuant to section 3(e), section
> 4(b)(1) or section 5; the Firm Power; and Monetary
> Benefits provided prior to such final determination shall
> be retained by Puget; and (2) the satisfaction of BPA's
> obligations to Puget under section 5(c) of the Northwest
> Power Act prior to such final determination shall be
> preserved, to the maximum extent permitted by law. The

– 17 –

> Parties specifically acknowledge and agree that, in the event of such final determination, the provisions of section 3(b) above shall not be effective for any period if and to the extent the cash payments, Firm Power and Monetary Benefits with respect to such period are not retained by Puget. This section 3(c) shall survive notwithstanding any determination that any other provision of this Agreement (or the exhibits) is unlawful, void, or unenforceable.

IOUER 1634-35 (R.A.R. 114267-68). Section 13(g) of PSE's 2001 REP Settlement Agreement also contained a severability provision identical to section 13(g) of the 2000 REP Settlement Agreements. IOUER 1653 (R.A.R. 114286).

PacifiCorp's 2001 load reduction was structured somewhat differently and was reflected in two instruments. The first was a letter amending PacifiCorp's 2000 REP Settlement Agreement and removing provisions for delivery of power at the RL rate. IOUER 1556-60 (R.A.R. 114125-29). The second was a separate Financial Settlement Agreement providing for payments in lieu of power delivery (in addition to the cash payments specified in PacifiCorp's 2000 REP Settlement Agreement, which remained under that agreement). IOUER 1561-78 (R.A.R. 114130-47). The amendment letter modified the no-refund clause of the 2000 REP Settlement Agreement to ensure that it also covered the new Financial Settlement Agreement. IOUER 1557-58 (R.A.R. 114126-27). The Financial Settlement Agreement contained an invalidity clause with parallel language.

– 18 –

IOUER 1563-64 (R.A.R. 114132-33).

Although BPA's preference customers had challenged the 2000 REP Settlement Agreements, no preference customer (or any other party) filed a timely petition for review challenging the legality or enforceability of any of the load reduction agreements, including PSE's 2001 REP Settlement Agreement and PacifiCorp's 2001 agreements. That tactical decision by the preference customers made sense because those customers benefited greatly from the 2001 agreements: BPA would have had to raise their rates much more if the IOUs had not entered into load reduction agreements.[4]

### E. This Court's 2007 Decisions

This Court resolved the petitions challenging the 2000 REP Settlement Agreements in May 2007. Although the Court sustained some of the objections by preference customers, it did not declare the 2000 agreements entirely void, and it did not direct any particular remedy. Moreover, the Court did not undermine the legality and validity of section 5(b) power sales at the RL rate.

In *Portland General Electric Co. v. BPA*, 501 F.3d 1009 (9th Cir. 2007) ("*PGE*"), the Court held that BPA had acted contrary to its governing statutes and

---

[4] As discussed below, certain preference customers did challenge 2004 amendments to the 2001 agreements, but not until several years later. Those petitioners also challenged post-2001 actions by BPA related to a "Reduction of Risk Discount" that appeared in the 2001 agreements. None of those petitions, however, presented a timely challenge to the 2001 agreements themselves.

– 19 –

regulations in determining the amounts to be paid under the 2000 REP Settlement Agreements. In particular, while the Court recognized BPA's broad and flexible authority to enter into settlement agreements, it ruled that the certain aspects of the 2000 settlements were inconsistent with the requirements of sections 5(c) and 7(b) of the NWPA and BPA's regulations implementing those provisions. *Id.* at 1037; *see also id.* at 1032 n.20 ("We simply hold that BPA cannot bypass the requirements of §§ 5(c) and 7(b) altogether when it settles out of purchase and exchange sale obligations."). The Court did not remand to BPA or direct BPA to take any particular action in response to its holdings.

On the same day that it issued *PGE*, the same panel issued its decision in the companion case involving BPA's WP-02 rates, *Golden Northwest Aluminum, Inc. v. BPA*, 501 F.3d 1037 (9th Cir. 2007) (*"Golden Northwest"*). There the Court held, among other things, that BPA had improperly allocated certain costs of the 2000 REP Settlement Agreements to the PF Preference rate charged to preference customers, contrary to sections 7(b)(2) and 7(b)(3) of the NWPA. The Court's opinion "remand[ed] to BPA to set rates in accordance with this opinion," but again did not direct any particular remedial procedure. *Id.* at 1053.

*PGE* and *Golden Northwest* only briefly mentioned BPA's section 5(b) power sales. *See PGE*, 501 F.3d at 1022 (factual background noting that the power sales to the IOUs were at the RL or PF Preference rate rather than the potentially

higher PF Exchange Rate); *Golden Northwest*, 501 F.3d at 1047 (similar).

Moreover, neither opinion discussed BPA's 2001 agreements with PacifiCorp and

PSE, which were not before the Court.  The May 2007 opinions also did not

address a subsequent round of amendments to the settlement agreements in 2004.

In October 2007, however, the panel ruled on four other petitions filed years later

that did address the 2001 agreements and the 2004 amendments.

   *Public Utility District No. 1 of Snohomish County, Washington v. BPA*,

506 F.3d 1145 (9th Cir. 2007) ("*Snohomish*"), primarily concerned the 2004

amendments.  The Court held that "[the] continued validity of the 2004

Amendments depends on how BPA treats the underlying 2000 Settlement

Agreement[s] in light of our opinion in *PGE*."  *Id.* at 1154.  The Court made clear

that it had not invalidated the entire 2000 REP Settlement Agreements in *PGE*.

The Court saw "at least two options":

> First, ...  BPA may conclude that our decisions undermined the
> basis for the 2000 REP Settlement Agreements and treat these
> 2004 agreements as null and void.  This would, consequently,
> render the provisions of the 2004 Amendments that amend the
> 2000 REP Settlement Agreements void *ab initio*.  Second, BPA
> might conclude that at least some of the contract provisions
> continue to be valid and enforceable subject to modifications to
> make them conform to our prior opinions and the requirements
> of the NWPA.

*Id.* (footnoted omitted).  From the record, the Court "c[ould ]not determine BPA's

likely course of action" and therefore "remand[ed] the 2004 Amendments

– 21 –

modifying the 2000 REP Settlement Agreements to BPA to permit it to determine, in the first instance, their continued validity in light of [its] recent opinions." *Id.* The Court "d[id] so without offering any opinion as to the validity of either course of action and without prejudice to other options available to BPA." *Id.*

Later in *Snohomish*, the Court addressed challenges to an aspect of the 2004 amendments that modified "Reduction of Risk Discounts" in BPA's 2001 agreements with PacifiCorp and PSE. Those provisions, which their opponents derided as "litigation penalties," provided that BPA's obligations to those two utilities would be reduced if BPA succeeded in settling its ongoing disputes with preference customers, including the litigation over the 2000 REP Settlement Agreements. The Court held that the so-called "penalties" were not an integral part of the 2001 settlement agreements with PacifiCorp and PSE because they related to the litigation over the 2000 REP Settlement Agreements and did not reflect an "independent benefit or program." 506 F.3d at 1154-55. The Court thus ruled that BPA was required to revisit the "penalty" provisions in light of its earlier decisions. Again, however, this Court merely noted some of the various options that BPA could consider on remand and declined to express any view on the propriety of those options or the validity of the "penalties" themselves:

> Because the "litigation penalty" provisions of the LRAs, as amended by the 2004 Amendments, are sufficiently related to the 2000 REP Settlement Agreements, they must be revisited in light of our decision in *PGE*. As with the other 2004

– 22 –

> Amendments, we cannot determine how BPA will treat these provisions. First, for example, it could determine that our prior opinions undermined the entire 2001 LRAs and, consequently, the 2004 Amendments modifying the LRAs are also void. Alternatively, BPA could determine that our decisions invalidated the "litigation penalty" provisions of the LRAs, but that those provisions are tangential to the main agreement and severable. Finally, BPA might decide to honor the "litigation penalty" provision as amended by the 2004 Amendments, but decline to charge its preference customers the cost of paying the penalty. Because we cannot determine from the record what BPA intends to do—and BPA may have other options—we remand for further proceedings. Again, we express no judgment on the merits of BPA's options or on the legality of the "litigation penalty" itself.

*Id.* at 1155 (footnote omitted).[5]

On the same day, the same panel dismissed three other petitions for review filed by preference customers. Most relevant here, in *Public Utility District No. 1 of Snohomish County, Washington v. United States*, 250 Fed. Appx. 817 (9th Cir. 2007), the Court dismissed a challenge to a 2003 BPA ROD proposing a settlement to the litigation over the 2000 REP Settlement Agreements. In addition to noting that the 2003 ROD was not a final action because that settlement never materialized, the Court recognized that the petitioner was improperly "attempting to challenge the original 2001 Load Reduction Agreement itself under the guise of [challenging] the failed 2003 ROD." *Id*. at 819-20. A companion ruling similarly

---

[5] The Court did not mention and apparently did not consider the effect of the remedy limitations in the 2000 and 2001 agreements.

– 23 –

dismissed a petition that nominally challenged a BPA press release, but in reality belatedly challenged "the 2001 LRA itself." *Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. BPA*, 250 Fed. Appx. 821 (9th Cir. 2007). Finally, the Court dismissed as moot a third petition that directly challenged the Reduction of Risk Discount provisions of the PacifiCorp and PSE 2001 agreements. *Pub. Util. Dist. No. 1 of Grays Harbor County, Wash. v. Dep't of Energy*, 250 Fed. Appx. 820 (9th Cir. 2007). Although the petitioner did not file a petition for review until years later, it contended that its petition was still timely because BPA had not published a ROD relating to those agreements in the Federal Register. The Court deemed the petition moot because it had already addressed the "litigation penalty" as part of its review of the 2004 amendments.

### F.    BPA's "Lookback" Response to This Court's Decisions

Just weeks after the *PGE* and *Golden Northwest* decisions issued, BPA cut off further payments under both the 2000 and 2001 REP settlement agreements, causing a large and immediate increase in the electricity bills of the IOUs' residential and small-farm customers. IOUER 1686-87 (R.A.R. 114878-79). BPA also conducted informal discussions about how to respond to the Court's decisions.

Ultimately, BPA decided to open a new "WP-07 Supplemental" rate proceeding that would not only reset its rates for FY2009, but also conduct a "Lookback" to "establish the amount by which preference customers were

overcharged and provide appropriate repayments to preference customers through lower rates or billing credits in the future." IOUER 29 (R.A.R. 062342). As a general proposition, BPA's Lookback treated the 2000 REP Settlement Agreements with the IOUs as void *ab initio*, and purported to put the parties in the positions they would have been in if no settlements had occurred.

BPA's Lookback proceeded in four steps:

(1) BPA calculated "Total Payments Received": the financial benefits, load reduction payments, and RL power purchase benefits that the IOUs had received or would have received for FY2002-2008. IOUER 22 (R.A.R. 062335).

(2) BPA calculated "Reconstructed REP Benefits": the amounts of benefits the IOUs would have received under the REP absent any settlements for the same period. *Id*. This step required BPA to determine how various issues would have been resolved if the settlement agreements had not mooted them at the time.

(3) BPA calculated "Lookback Amounts" by subtracting the reconstructed benefits that should have been paid (determined in the second step) from the benefits that were actually paid (determined in the first step). *Id*. As to PacifiCorp and PSE, BPA purported to adjust this calculation to reflect its view that its 2001 agreements with those

utilities were valid to the extent they required payments in exchange for reducing load, but invalid to the extent they carried forward payment obligations already owed under the 2000 REP Settlement Agreements. IOUER 185-87, 745, 759 (R.A.R. 062501-03, 087515, 087529).[6]

(4)     BPA declared that it would reduce future REP payments to the IOUs by their Lookback Amounts over time, and that it would credit the sum of the Lookback Amounts to preference customers on a proportional basis. *See* IOUER 292 (R.A.R. 062608).

In imposing this remedy, BPA recovered portions of the settlement payments that it had made to the IOUs for the benefit of their residential and small-farm customers under their 2000 and 2001 settlement agreements. BPA rejected the IOUs' objection that BPA's "Lookback" approach violated the no-refund provisions of the settlement agreements. IOUER 187-90 (R.A.R. 062503-06). BPA also rejected the IOUs' contention that the power sales components of the REP settlements should have been excluded from the Lookback analysis because those sales were legitimate sales under section 5(b) of the NWPA and occurred at an RL rate that had not been challenged in this Court's decisions. IOUER 206-08

---

[6] As discussed below, BPA's actual calculations gave PacifiCorp and PSE only *partial* credit for their load reduction payments.

(R.A.R. 062522-24). BPA further rejected arguments by PacifiCorp and PSE that payments under their 2001 agreements should have been excluded from the Lookback analysis because no one had timely challenged those agreements. IOUER 185-87, 745, 759 (R.A.R. 062501-03, 087515, 087529).

These petitions for review followed.

### Summary of Argument

BPA's Lookback remedy was fundamentally flawed in three independent respects. Unless this Court reverses those errors, residential and small-farm consumers served by the IOUs will be deprived of hundreds of millions of dollars in REP benefits under section 5(c) of the NWPA.

1. As explained in the IOUs' brief in the companion case challenging BPA's use of RPSAs to implement its reduction of future REP benefits, *Idaho Pub. Utils. Comm'n v. BPA*, Nos. 08-74927 et al., BPA has wrongfully repudiated the no-refund provisions of the 2000 REP Settlement Agreements and its 2001 agreements with PacifiCorp and PSE. BPA unambiguously agreed not to seek refunds of any settlement benefits that it paid before a judicial declaration of invalidity, and that remedy limitation was valid and enforceable as a matter of law.

Contrary to BPA's suggestion, this Court did *not* declare the entire 2000 REP Settlement Agreements void *ab initio*. It merely found that BPA's calculation of the benefits owed conflicted with section 5(c) of the NWPA and BPA

regulations, and that BPA violated section 7(b)(2) of the NWPA by allocating settlement costs to the rate paid by preference customers.

In reality, BPA has unilaterally repudiated the no-refund provisions in the very situation where they were designed to take effect. BPA is bound by its agreements because there was nothing illegal or improper about the no-refund provisions themselves. Such provisions are common, and they made sense here, where the IOUs were merely passing the benefits through to a disparate and changing array of consumers. The remedy limitations were bilateral, and no public policy precludes their enforcement. The traditional common-law rule leaves the parties as they stand when a contract is found unenforceable, rather than trying to restore them to positions as if no contract had existed. There are exceptions to that rule, but the parties could certainly agree to be bound by that common-law rule. The government may have a common-law right to recover sums wrongly paid, but it is also free to forgo that right in a no-refund provision and accept the risk of any overpayments. BPA did that here.

BPA also erred in invoking the equitable doctrine of setoff. The IOUs were parties to the settlement agreements, but there is nothing to recoup from them because they dutifully passed the benefits through to their residential and small-farm customers. In reality, BPA is reducing the REP benefits of current and future customers of the IOUs, not recovering payments from past beneficiaries.

Finally, BPA is wrong in suggesting that enforcing the no-refund provisions would deprive preference customers of a remedy. BPA presumably had other sources of funding for refunds in mind (e.g., reserves and proceeds from surplus sales) when it agreed to no-refund provisions in the first place. The Court should therefore hold that BPA may not reduce future REP benefits or otherwise recover past overpayments of benefits.

2.      Even if BPA were justified in demanding refunds of Lookback Amounts, BPA improperly included in the Lookback analysis its section 5(b) power sales to the IOUs and the load reduction payments it agreed to make in lieu of those sales. According to BPA itself, the Lookback was supposed to provide refunds to preference customers *to the extent those customers were overcharged* through higher PF Preference rates. At the time of the section 5(b) power sales, BPA determined that those sales would *not* increase the PF Preference rate, and BPA abused its discretion and acted arbitrarily and capriciously and contrary to law in retrospectively contending otherwise.

The historical record is clear. In 2000, BPA had announced plans to sell 1,000 aMW of power at a rate equivalent to the PF Preference Rate *regardless* of whether the 2000 REP Settlement Agreements went through. BPA had also concluded that such sales would cover its costs and would *not* increase the PF Preference rate. No one challenged the RL rate in *Golden Northwest.*

In retrospect, BPA contended that the PF Preference rate "arguably" would have been lower without the RL loads because selling an additional 1,000 aMW of power would have resulted in additional "system augmentation" costs. But that conclusion was flawed as a matter of both fact and law. On the facts, BPA presented no basis for flatly contradicting its own contemporaneous announcement that it was going to sell the 1,000 aMW of power (and incur any related system augmentation costs) whether or not the settlements were consummated and for reversing its own contemporaneous finding that such sales would *not* increase the PF Preference rate. In any event, even assuming some effect on the PF Preference rate, *Golden Northwest* itself held that preference customers are *not* illegally overcharged simply because a power sale to another customer class at a statutorily authorized rate results in a higher PF Preference rate. As this Court recognized, preference customers are not automatically entitled to the cheapest power possible. BPA has argued that the entire 2000 REP Settlement Agreements were void *ab initio*, but even if that were the case (and it is not), the power sales agreements were expressly independent of the settlement agreements.

The same analysis applies to the cash payments that BPA later made in lieu of delivering power. Indeed, if anything, those payments *helped* the preference customers because they substantially reduced BPA's load and limited the rate increases that BPA had to impose during the energy crisis. Nevertheless, BPA

included all of its load reduction payments to Avista, Idaho Power, and Portland General in the Lookback Analysis, and it gave only partial credit to PacifiCorp and PSE. BPA acknowledged in its ROD that its load reduction payments under its 2001 agreements with PacifiCorp and PSE involved an unchallenged "independent benefit or program" from the original 2000 REP Settlement Agreements, and it stated that it would exclude those payments from the Lookback analysis. Yet in its actual financial study, BPA "protected" only a fraction of those payments. BPA offered no justification for abandoning the conclusion in its own ROD.

The proper result is a limited remand to BPA. BPA need not redo the entire Lookback, just modify it to exclude the section 5(b) power sales and load reduction payments.

3.     Even if the Court upholds the Lookback construct, BPA's payments under its 2001 agreements with PacifiCorp and PSE should have been excluded. No party timely challenged those agreements in *PGE*, and that decision was necessarily limited to the legality of the *2000* REP Settlement Agreements. Payments under the 2001 agreements were not properly at issue in the WP-07 Supplemental rate proceeding, which responded to the errors and illegalities found by this Court. BPA purported to treat the 2001 agreements as invalid on the same theory that this Court in *PGE* adopted as to the 2000 agreements, but BPA was not entitled to order retroactive disgorgement of past payments no longer subject to

– 31 –

judicial review.  In any event, BPA itself has acknowledged that the 2001 agreements were not entirely void:  at least the load reduction aspects were valid. BPA has undeniably breached the no-refund provisions of those settlement agreements as well.  Again, the proper result is a limited remand.

## Argument

Under the Administrative Procedure Act, this Court reviews BPA's actions to determine if they were "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Pub. Power Council, Inc. v. BPA*, 442 F.3d 1204, 1209 (9th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)).  As shown below, BPA's Lookback remedy was arbitrary and capricious, an abuse of discretion, and contrary to law in three key respects.

## I.     BPA HAS IMPROPERLY REQUIRED REFUNDS OF SETTLEMENT PAYMENTS CONTRARY TO THE NO-REFUND PROVISIONS OF THE 2000 AND 2001 SETTLEMENT AGREEMENTS

The IOUs' brief in the companion case challenging BPA's use of RPSAs to implement its reduction of future REP benefits explains in detail how BPA abused its discretion and acted arbitrarily and capriciously and contrary to law by demanding recovery of settlement benefits that it paid before this Court issued its May 2007 decisions.  Consistent with this Court's order of June 4, 2009, the IOUs hereby adopt all the arguments they make in that brief.  For the Court's

convenience, this brief merely recapitulates the main points in that brief.[7]

BPA has wrongfully repudiated section 3(b) of the 2000 REP Settlement Agreements and the parallel provisions in BPA's 2001 agreements with PacifiCorp and PSE. There is no dispute over why those provisions were adopted: they were designed to allocate the risk of an invalidity ruling by this Court and to limit the parties' remedies in that event. There is also no dispute over what the provisions say and mean: BPA unambiguously waived any right to demand refunds of benefits it paid before a judicial declaration that its payment obligations were unlawful, void, or unenforceable. The only argument is whether the no-refund provisions are enforceable. And as a matter of law they are.

BPA's primary basis for claiming that the no-refund provisions are unenforceable is that this Court held in *PGE* that the entire 2000 REP Settlement Agreements were void *ab initio*. But this Court did no such thing. It invalidated two particular aspects of the agreements, holding that (1) BPA did not hew closely enough to section 5(c) and existing regulations in calculating the amount of REP benefits owed, and (2) BPA violated section 7(b)(2) in allocating some of the settlement costs to the rate paid by preference customers. *See* 501 F.3d at 1032-37. The Court nowhere declared the entire agreements void, and it did not address the

---

[7] Idaho Power, joined by the Idaho Public Utilities Commission, has filed its own brief in the companion cases. Idaho Power adopts in these cases all the arguments it has made in its joint brief with the Idaho Public Utilities Commission.

no-refund provisions specifically because those provisions were not at issue. BPA also ignored *Snohomish*, in which the Court noted that at least some of the provisions in the 2000 agreements and later amendments may continue to be valid and enforceable. 506 F.3d at 1154.

BPA had no basis for unilaterally repudiating the no-refund provisions in the precise circumstance where they were designed to take effect. To begin with, federal government agencies are bound by their contracts just like private parties are. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839 (1996); *In re Sinking Fund Cases*, 99 U.S. 700, 719 (1878). That is especially true for BPA, which routinely enters into commercial contracts and settlement agreements.

Furthermore, there was nothing inherently illegal or improper about the no-refund provisions. Similar provisions are common, and they made eminent sense here because the IOUs were passing along all the benefits to an ever-changing pool of millions of residential and small-farm consumers. The provisions were also bilateral and fair: BPA could not demand refunds of past payments, but BPA also could not be required to pay out more REP benefits for the same period. As this Court has repeatedly recognized, BPA has unusually broad contracting and settlement authority, and the no-refund provisions were a classic example of BPA exercising reasonable business judgment in allocating risks and limiting remedies. *See, e.g., Ass'n of Pub. Agency Customers v. BPA*, 126 F.3d 1158, 1170-71 (9th

Cir. 1997); *Util. Reform Project v. BPA*, 869 F.2d 437, 441-43 (9th Cir. 1989). Indeed, under contract law, the *normal* rule is to leave parties as they were at the time an illegality is determined, not to restore them to the position they would have been in if the contract never existed. *See, e.g.,* 17A Am. Jur. 2d *Contracts* § 322, at 308 (2004); *Restatement (Second) of Contracts* § 197 (1981).

BPA has contended that it would be "incongruous" to allow IOUs' residential and small-farm customers to retain benefits of the settlement agreements when this Court found the consideration excessive, but that is exactly what the parties contemplated when agreeing to the no-refund provision. Nothing was improper about that bargain. The government may have a common-law right to recover sums erroneously or illegally paid, but the government is also free to forgo that right and allocate invalidity risks contractually. The no-refund provisions here reflected the parties' recognition that it was most efficient for BPA to bear the risk of any adverse court ruling, and nothing was illegal about that agreement. BPA is bound by its contract.

BPA's reliance on the equitable doctrine of setoff is also misplaced. To begin with, the no-refund provisions waived any right to setoff. In any event, the doctrine does not apply here because it requires mutuality of debt. *See, e.g., Marré v. United States*, 117 F.3d 297, 303 (5th Cir. 1997). Although the IOUs were the official parties to the settlement agreements, they were merely a conduit of the

settlement benefits: the actual beneficiaries of BPA's payments were millions of residential and small-farm consumers (a varying array, as the benefits were paid out over nearly seven years). In reality, BPA is reducing the current and future REP benefits of an ever-evolving mass of residential and small-farm customers, not recovering overpayments from recipients of past benefits. That is not equitable—and it is especially unfair when the preference customers sought no immediate injunction or stay of the settlement agreements, but instead sat back and allowed them to be performed for many years.

Finally, BPA has contended that enforcing the no-refund provisions would deprive preference customers of a remedy, but that is not so either. Preference customers may be entitled to refunds of any past overcharges, but BPA has other sources for making those payments, including reserves and proceeds from sales of surplus power. BPA presumably intended to tap those sources (if need be) when it agreed to the no-refund provisions in the first place. It should do so now.

The Court should hold that BPA may not reduce future REP benefits or otherwise attempt to recover any past overpayments of benefits under the settlement agreements. BPA should be directed to draw on other sources of funds for any reimbursement of preference customers for any past overcharges.

**II.** **ANY LOOKBACK ANALYSIS SHOULD HAVE EXCLUDED BPA'S SECTION 5(b) POWER SALES AT THE RL RATE AND ITS LOAD REDUCTION PAYMENTS IN LIEU OF THOSE SALES BECAUSE THEY DID NOT RESULT IN ANY OVERCHARGE TO PREFERENCE CUSTOMERS**

BPA's Lookback analysis was intended to provide refunds to preference customers to the extent that the REP settlements had improperly increased the PF Exchange rate and resulted in overcharges. *See* IOUER 43 (R.A.R. 062356) ("Preference customers who have overpaid because of an unlawful rate determination should be entitled to relief for injuries caused by the defective rates."). But BPA's analysis did not carry out BPA's intent. BPA simply assumed that each dollar of "excess REP benefits" paid to the IOUs increased the PF Preference rate and thereby resulted in overcharges that injured preference customers. The section 5(b) power sales (and payments in lieu of delivery) should have been excluded from the Lookback because they did *not* result in overcharges.

In calculating excess REP benefits, BPA included the value of the power it delivered to the IOUs pursuant to section 5(b) of the NWPA and Exhibits A to the 2000 REP Settlement Agreements as well as the cash payments it later made in lieu of delivering power pursuant to the 2001 Load Reduction Program. As shown below, however, BPA had planned to sell the same amount of power at essentially the same rate *regardless* of whether the REP settlements went through, and the RL rate at which the section 5(b) power sales were priced fully recovered BPA's costs. In its WP-07 Supplemental ROD, BPA assumed that the section 5(b) power sales

may have increased the PF Preference rate paid by preference customers, but that assumption contradicted BPA's contemporaneous statements and findings.

The Court should therefore order BPA to exclude the section 5(b) power sales (and cash benefits resulting from BPA's 2001 requests that the IOUs monetize those sales) from the remedial Lookback analysis. BPA would need to determine the precise financial effects on remand, but there can be no doubt that including the section 5(b) power sales and payments in lieu of those sales in the Lookback calculation at least doubled the amount of REP benefits that BPA intends to withhold from the IOUs for their residential and small-farm customers.[8]

## A. All Section 5(b) Power Sales and Payments in Lieu of Power Delivery Should Have Been Excluded from the Lookback Analysis

In the Lookback, BPA first calculated each IOU's "Total Payments Received" as the sum of (a) the "Settlement Benefits" received, (b) the "Settlement Benefits" that would have been received had BPA not halted payment in 2007, and (c) load reduction payments to PacifiCorp and PSE under their 2001 agreements. Portland General's "Settlement Benefits" included a market valuation of the power it purchased at the RL rate in FY2002-2006. IOUER 203-06 (R.A.R. 062519-22).

---

[8] As discussed in Section I, the IOUs contend that BPA cannot properly recover *any* past REP payments or withhold *any* future REP benefits. This section is based on an independent argument and assumes without conceding that the overall Lookback construct was proper.

BPA then determined the Lookback Amount for each IOU for each year. For PacifiCorp and PSE, the Lookback Amount equaled the difference for each year between the utility's "Total Payments Received" and the greater of its load reduction payment or its "Reconstructed REP Benefit." IOUER 185-87, 745, 759 (R.A.R. 062501-03, 087515, 087529). For the other IOUs, the Lookback Amount equaled the difference for each year between the utility's "Total Payments Received" and its "Reconstructed REP Benefit."[9]

As shown below, BPA's approach was erroneous in three respects:

(1) It treated the difference between a market value of power and the cost-based RL rate paid by Portland General for power during FY2002-2006 as an overcharge to the preference customers.

(2) It treated the load reduction payments it made to Avista, Idaho Power, and Portland General to forgo power purchases at the RL rate during FY2002-2006 as overcharges to the preference customers.

(3) It gave PacifiCorp and PSE credit for load reduction payments only to the extent those payments exceeded "Reconstructed REP Benefits," even though BPA itself had concluded that the load

_____

[9] BPA made several additional adjustments in deriving Lookback Amounts, but those adjustments are not germane to the analysis presented in this brief.

reduction aspects of its agreements with the two companies were valid and that all load reduction payments to them should be excluded from the Lookback Amounts.

### 1. Portland General's RL Power Purchases Did Not Cause Any Overcharge to Preference Customers

BPA's Lookback included as "Settlement Benefits" the amount by which the market value for power exceeded the cost-based RL rate paid by Portland General during FY2002-2006. The effect of doing so increased Portland General's Total Lookback Amount by approximately $139.6 million. IOUER 769 (R.A.R. 088707). Although the IOUs had contended that power sales under the 2000 REP Settlement Agreements should be excluded from the calculation of "Settlement Benefits" (and thus from the Lookback analysis as a whole), BPA disagreed. BPA's logic was that "because the RL load existed in WP-02, more system augmentation was needed and all rates served with [Federal Base System] resources, mainly the PF Preference rate, were higher." IOUER 208 (R.A.R. 062524). BPA concluded that "[b]ecause the PF Preference rate in WP-02 would have arguably been lower without the RL loads, it is appropriate to include the cost of serving the RL loads in the Lookback analysis." *Id.*

BPA's conclusion was wrong, both factually and legally.

Factually, even assuming that BPA's sale of 1,000 aMW of power to non-preference customers required some "system augmentation," and even assuming

that PF preference rate bore some of the costs of augmentation, it does not follow that the section 5(b) power sales to the IOUs injured the preference customers. If BPA had not sold the power to Portland General and the other IOUs, it would have sold the same amount of power to others and incurred the same system augmentation costs. BPA's own contemporaneous statements confirm that BPA was going to sell that 1,000 aMW of power within the region *regardless* of whether the 2000 REP Settlements went through. IOUER 905 (R.A.R. 001146).

Moreover, BPA specifically determined in 2000 that "it could sell an additional 1,000 aMW to regional customers at a *price equivalent to the PF-96 rate* [the then-current PF Preference rate] and still provide rate stability for BPA's preference customers." IOUER 905 (R.A.R. 001146) (emphasis added; citations omitted). BPA specifically found that such sales would "*not increase the PF Preference rate.*" IOUER 900 (R.A.R. 001141) (emphasis added). The RL rate and the PF Preference rate were essentially equal. IOUER 943 (R.A.R. 001270). BPA thus concluded that selling 1,000 aMW of power at rates equivalent to the PF Preference rate, such as the RL rate, would *not* affect the rates that BPA charged to its preference customers.

In the WP-07 Supplemental ROD, BPA made an about-face and concluded that the RL sales *did* affect the PF Preference rate, but it presented no plausible basis for changing its mind. That alone compels the conclusion that BPA acted

– 41 –

arbitrarily and capriciously and abused its discretion. *See Nw. Env'tl Defense Ctr. v. BPA*, 477 F.3d 668, 687-88 (9th Cir. 2007) (BPA acted arbitrarily and capriciously when it failed to supply a reasoned analysis for changing course and transferring functions of Fish Passage Center to two other entities); *Sierra Club v. EPA*, 346 F.3d 955, 961-63, *amended*, 352 F.3d 1187 (9th Cir. 2003) (EPA acted arbitrarily and capriciously and abused its discretion when it concluded without evidence that California would have met Clean Air Act ambient air standards but for emissions from Mexico); *Pfaff v. United States Dep't of Housing & Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996) (radical departure from prior agency interpretation does not command usual deference to agency action); *Am. Fed'n of Labor v. Chertoff*, 552 F. Supp. 2d 999, 1006 (N.D. Cal. 2007) (Department of Homeland Security's implementation of new "no-match" rule was arbitrary and capricious because agency failed to supply reasoned analysis for about-face that would have made a no-match letter sufficient by itself to put an employer on notice of employee's unauthorized status).

BPA's logic was also contrary to law. Even if BPA's newfound view were correct and the PF Preference rate did increase, it does not follow that preference customers were illegally overcharged. Section 5(b) of the NWPA expressly authorizes power sales to IOUs, and preference customers are not illegally overcharged simply because additional power sales to other customers result in a

higher PF Preference rate.  Indeed, the Court so held in *Golden Northwest* itself, where it rejected preference customers' contention that "BPA violated the Northwest Power Act by supplying low-cost power to its [direct-service industrial] customers at the expense of its preference customers."  501 F.3d at 1043. Although BPA's sales to direct-service industrial customers resulted in system augmentation costs and raised the PF Preference rate, BPA could lawfully "charge its preference customers a rate that reflect[ed] the costs of acquiring additional power to serve" the direct-service industrial customers.  *Id.* at 1045.  In so holding, the Court once again "rejected the premise that preference customers were entitled 'to purchase not just available power, but the cheapest available power.'" *Id.* at 1046 (quoting *Central Lincoln Peoples' Utility District v. Johnson*, 735 F.2d 1101, 1125 (9th Cir. 1984)).[10]

Nor can BPA or the preference customers contend that the section 5(b) power sales belonged in the Lookback analysis because they were inherently illegal.  Again, section 5(b) expressly authorizes power sales to IOUs, and BPA set a lawful RL rate for those sales pursuant to section 7(f).  Notably, no one challenged BPA's authority to sell power to the IOUs pursuant to NWPA section

---

[10] The rate trigger of section 7(b)(2) of the NWPA does not change the analysis.  One of the five hypothetical assumptions under section 7(b)(2) is that "no purchases or sales by the Administrator as provided in [section 5(c)] were made."  16 U.S.C. § 839e(b)(2).  But section 7(b)(2) contains no parallel provision assuming no sales were made to IOUs under section 5(b).

5(b), and no one challenged BPA's determination that the RL rate it set was consistent with section 7(f) and sufficient to cover BPA's costs. The power sales agreements were attached to the 2000 REP Settlement Agreements, but that alone did not render them beyond BPA's authority. Indeed, section 13(g) of the power sales agreements expressly provided that they stood on independent footing from the settlement agreements. *See, e.g.,* IOUER 1102 (R.A.R. 114168) (Portland General Exhibit A).

Because the section 5(b) sales at the RL rate did not overcharge preference customers or otherwise deprive them of statutory rights, BPA misinterpreted the law, abused its discretion, and acted arbitrarily and capriciously in including those sales in the Lookback. *See, e.g., Lucas v. NLRB*, 333 F.3d 927, 931 (9th Cir. 2003) (agency entitled to no deference when decision rests on misapplication of law).

### 2. BPA's Load Reduction Payments to Avista, Idaho Power, and Portland General Did Not Cause Any Overcharges to Preference Customers

The same analysis applies where IOUs, responding to BPA's call for load reductions, agreed to accept cash rather than delivery of actual power.

As discussed above, Avista and Idaho Power gave up all their rights to power in FY2002-2006, while Portland General reduced its power purchase in FY2002. In its Lookback analysis, BPA treated all of its load reduction payments to these utilities as "Settlement Benefits" and "protected" none of them. Doing so

increased the Total Lookback Amounts for Avista, Idaho Power, and Portland General by $26.3 million, $33.3 million, and $4.6 million, respectively. IOUER 765 (R.A.R. 088703) (Avista); IOUER 766 (R.A.R. 088704) (Idaho Power); IOUER 769 (R.A.R. 088707) (Portland General).

That treatment was improper. As discussed above, BPA's actual sale of power at the RL rate did not injure preference customers, as a matter of fact and as a matter of law. If anything, BPA's election to pay cash rather than delivering actual power *undermines* the preference customers' claims of injury because that monetization enabled BPA to reduce its load, buy less power on the open market, and limit increases to the PF Preference rate and other rates.

Again, BPA and the preference customers cannot contend that the power sales contracts and their monetization provisions were inherently illegal. BPA planned to sell the power in any event, the contractual price for the power was appropriately cost-based, and section 13(g) of each 2000 REP Settlement Agreement provided that the settlement agreements and the power sales agreements stood on independent footing. BPA's payments in consideration of forgoing power delivery were entirely proper, and it was both arbitrary and capricious and an abuse of discretion to include them in the remedial Lookback analysis. *See, e.g., Nw. Env'tl Defense Ctr. v. BPA*, 477 F.3d at 687; *Sierra Club v. EPA*, 346 F.3d at 961.

### 3. BPA "Protected" Only a Portion of Its Load Reduction Payments to PacifiCorp and PSE Even Though Its Own ROD Purported to Provide Full Protection

Like the other IOUs, PacifiCorp and PSE agreed at BPA's behest to forgo purchasing power at the RL rate. Unlike the other IOUs, however, PacifiCorp and PSE entered into new agreements calling for load reductions. In particular, PacifiCorp entered into a Financial Settlement Agreement in 2001, and PSE entered into its 2001 REP Settlement Agreement. BPA recognized that payments for load reductions under the 2001 PacifiCorp and PSE agreements involved an "independent benefit or program" from the original 2000 REP Settlement Agreements. IOUER 183 (R.A.R. 062499). BPA further noted that no party had filed a timely challenge to the validity of the 2001 PacifiCorp and PSE agreements. IOUER 180 (R.A.R. 062496). BPA thus decided to treat the load reduction payment aspects of the 2001 PacifiCorp and PSE agreements as legally valid. On the other hand, it treated those agreements as *in*valid to the extent they carried forward BPA's existing financial obligations under the 2000 REP Settlement Agreements. IOUER 187 (R.A.R. 062503).[11]

In its WP-07 Supplemental ROD, BPA stated that it would "protect" the load reduction payments to PacifiCorp and PGE and exclude them from its

---

[11] BPA also treated the so-called "litigation penalty" clauses of the 2001 agreements as invalid. Those clauses are no longer at issue.

calculation of the REP overpayments to those utilities and the supposed overcharges to preference customers. IOUER 200 (R.A.R. 062516) ("BPA will exclude costs of the LRAs from the Lookback Amounts and not reverse the allocation of the costs of the LRAs to preference customers' rates."). In its detailed financial Lookback Study, however, BPA gave PacifiCorp and PSE only *partial* credit for their load reduction payments. Without any justification, BPA determined Lookback Amounts for each year by subtracting from the Total Benefits Received (which included the load reduction payments) either the utility's load reduction payments *or* its Reconstructed REP Benefits, whichever was greater in that year. IOUER 185-87, 745, 759 (R.A.R. 062501-03, 087515, 087529). In actuality, PacifiCorp and PSE's load reduction payments were "protected" only to the extent that those payments exceeded Reconstructed REP Benefits in each year. The effect was to increase the total Lookback Amounts for PacifiCorp and PSE by $407.6 million and $600.5 million, respectively. IOUER 768 (R.A.R. 088706) (PacifiCorp); IOUER 770 (R.A.R. 088708) (PSE).

BPA's actions were arbitrary and capricious and an abuse of discretion. As discussed above, BPA was going to make the section 5(b) power sales in any event, the RL rate at which they were priced did not increase the PF Preference rate, and any effect on the PF Preference rate would have been consistent with the NWPA even if it occurred. As with Avista, Idaho Power, and Portland General,

– 47 –

BPA's election to reduce load and convert its power delivery obligations into financial obligations should not change the result. As with the other IOUs, PacifiCorp's and PSE's settlement agreements made clear that those agreements and the power sales agreements were independent. BPA had no legitimate basis to include in the Lookback *any* payments it made in lieu of the section 5(b) sales.

Indeed, BPA's actions were doubly arbitrary and capricious and a clear abuse of discretion. BPA stated in its own ROD that it would "protect" all the load reduction payments it made to PacifiCorp and PSE. Yet BPA in fact "protected" only a portion of those payments: the fraction exceeding their "Reconstructed REP Benefits." BPA offered no justification for abandoning the logic of its own ROD. *See, e.g., Nw. Env'tl Defense Ctr. v. BPA*, 477 F.3d at 687.

### B. The Proper Result Is a Limited Remand

If this Court concurs that the section 5(b) power sales and the load reduction payments made in consideration of reducing or eliminating such sales did not overcharge or deprive preference customers of statutory rights, the proper result is a limited remand to BPA. BPA would not need to redo its entire Lookback, but instead would modify it to exclude the section 5(b) power sales and load reduction payments. In particular, rather than including the value of power sales and load reduction payments, "Total Payments Received" would be limited to the monetary benefits originally owed under the IOUs' 2000 REP Settlement Agreements. The

practical effect would be a significant reduction of the Lookback Amounts that BPA is seeking to recover.

### III. ALL BENEFITS PAID UNDER BPA'S 2001 AGREEMENTS WITH PACIFICORP AND PSE SHOULD HAVE BEEN EXCLUDED FROM THE LOOKBACK ANALYSIS BECAUSE NO ONE TIMELY CHALLENGED THOSE AGREEMENTS

Even if the Court upholds BPA's Lookback construct, the Court should require BPA to exclude all payments under the 2001 agreements with PacifiCorp and PSE because the legality of those agreements was unchallenged.

BPA recognized that the PSE 2001 REP Settlement Agreement replaced and superseded PSE's 2000 REP Settlement Agreement. IOUER 186 (R.A.R. 062502). BPA also recognized that no one filed a timely petition for review to challenge the 2001 agreements with PacifiCorp and PSE. IOUER 180 (R.A.R. 062496). Nevertheless, BPA proceeded to include all payments under those agreements in the Lookback. IOUER 185-87, 745, 759 (R.A.R. 062501-03, 087515, 087529).

That was error.

The NWPA has an unusually short statute of limitations: any challenges to a final action by BPA must be brought within 90 days of that action, "or be barred." 16 U.S.C. § 839f(e)(5). The limitations period is short so that the parties and the agency can move along with their business with the assurance that any unchallenged arrangements are valid and will be respected.

– 49 –

The preference customers made a tactical choice not to petition for review to challenge the 2001 agreements. They presumably held back because they benefited from the load reduction aspects of those agreements, which enabled BPA to limit increases in the PF preference rate. In any event, because no one filed a petition for review, the 2001 agreements were not before this Court in *PGE*; that decision was necessarily limited to the legality of particular aspects of the *2000* REP Settlement Agreements. *See* 501 F.3d at 1013 ("Petitioners ... challenge the actions taken by [BPA] in reaching settlement agreements in 2000 with six investor-owned utilities ...."). Because this Court could not and did not declare the 2001 agreements contrary to law, payments pursuant to those agreements were not properly at issue in BPA's WP-07 Supplemental rate proceeding, which was a proceeding designed to respond to the errors and illegalities found by this Court. *See* IOUER 1689 (R.A.R. 087192) (Federal Register notice dated Feb. 8, 2008).[12]

---

[12] As discussed above, the Court in *Snohomish* held that the Reduction of Risk Discounts were not central to the 2001 agreements with PacifiCorp and PSE because they related to the litigation over the 2000 REP Settlement Agreements and did not reflect an "independent benefit or program." 506 F.3d at 1155. The Court thus ruled that BPA was required to revisit the "penalty" provisions in light of its earlier decisions. *Snohomish* also addressed 2004 amendments to the settlement agreements, including the 2001 agreements. Even there, however, the only aspect of the 2001 agreements addressed by the Court was the supposed "litigation penalty." That issue is now moot and in any event cannot justify reopening matters involving unchallenged provisions of the 2001 agreements.

BPA has contended that it could unilaterally treat aspects of the 2001 agreements as invalid on the same theory that this Court adopted as to the 2000 REP Settlement Agreements. But BPA had no authority to order retrospective disgorgement of past contractual payments no longer subject to judicial review. In any event, even assuming that this Court's decisions implicitly voided the portions of the 2001 agreements that carried over financial benefit payment obligations from the 2000 REP Settlement Agreements, BPA itself has acknowledged that the 2001 agreements were not void in their entirety: at least the load reduction aspects were valid. And if the 2001 agreements remain standing in part, BPA cannot deny that it has breached the provisions of those agreements that expressly precluded BPA from claiming refunds if the agreements or portions thereof were found invalid. *See* IOUER 1557-58, 1563-64 (R.A.R. 114126-27, 114132-33) (PacifiCorp agreements); IOUER 1634-35 (R.A.R. 114267-68) (PSE agreement).

BPA acted arbitrarily and capriciously, abused its discretion, and acted contrary to law. At a minimum, this Court should hold that BPA must exclude any payments under the 2001 agreements from any Lookback analysis and remand for BPA to do so.

## Conclusion and Relief Requested

The petitions for review of the IOUs filing this brief should be granted, and the Court should remand to BPA to correct the errors identified above.

Respectfully submitted,

/s/ Michael G. Andrea

Michael G. Andrea
AVISTA CORPORATION
1411 East Mission Avenue – MSC-23
Spokane, Washington 99202

Counsel for Avista Corporation

/s/ R. Blair Strong

R. Blair Strong
PAINE HAMBLEN LLP
717 West Sprague Avenue, Suite 1200
Spokane, Washington 99201

Counsel for Idaho Power Company

/s/ Donald G. Kari

Donald G. Kari
Jason T. Kuzma
PERKINS COIE LLP
10885 N.E. Fourth Street, Suite 700
Bellevue, Washington 98004

Dan L. Bagatell
PERKINS COIE BROWN & BAIN P.A.
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012

Counsel for Puget Sound Energy, Inc.

/s/ Jay T. Waldron

Jay T. Waldron
Sara Kobak
SCHWABE WILLIAMSON & WYATT PC
1211 SW 5th Avenue, Suites 1500-2000
Portland, Oregon 97204

Lara L. Skidmore
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
Lara.Skidmore@troutmansanders.com

Ryan L. Flynn
PACIFICORP
825 NE Multnomah Street, Suite 1800
Portland, Oregon 97232

Counsel for PacifiCorp

/s/ Scott G. Seidman

Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, Oregon 97204

Counsel for Portland General
  Electric Company

– 52 –

**Statement of Related Cases**

The following cases pending in this Court are related to the consolidated

cases at issue here because they involve BPA's efforts to enforce determinations

that BPA made in the Record of Decision at issue here through provisions in

Residential Purchase and Sale Agreements:

*Idaho Pub. Utils. Comm'n v. BPA*, Nos. 08-74927, 08-74928,

08-74929, 08-74932, 08-74933, 08-74942, 0847957

     /s/ Donald G. Kari

Donald G. Kari

## Certificate of Compliance

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit

Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of

14 points or more, and contains 12,151 words.

_____/s/ Dan L. Bagatell_____

Dan L. Bagatell

## Statutory Appendix

**5 U.S.C. § 706     Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be—

   (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   (B)     contrary to constitutional right, power, privilege, or immunity;

   (C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

   (D)     without observance of procedure required by law;

   (E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

   (F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**16 U.S.C. § 839c   Sale of power**

(a)   Preferences and priorities.  All power sales under this chapter shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 (16 U.S.C. § 832 and following) and, in particular, sections 4 and 5 thereof [16 U.S.C. §§ 832c and 832d].  Such sales shall be at rates established pursuant to section 839e of this title.

(b)   Sales to public bodies, cooperatives, and Federal agency customers.

   (1)   Whenever requested, the Administrator shall offer to sell to each requesting public body and cooperative entitled to preference and priority under the Bonneville Project Act of 1937 [16 U.S.C. § 832 *et seq*.] and to each requesting investor-owned utility electric power to meet the firm power load of such public body, cooperative or investor-owned utility in the Region to the extent that such firm power load exceeds—

      (A)   the capability of such entity's firm peaking and energy resources used in the year prior to December 5, 1980, to serve its firm load in the region, and

      (B)   such other resources as such entity determines, pursuant to contracts under this chapter, will be used to serve its firm load in the region.

      In determining the resources which are used to serve a firm load, for purposes of subparagraphs (A) and (B), any resources used to serve a firm load under such subparagraphs shall be treated as continuing to be so used, unless such use is discontinued with the consent of the Administrator, or unless such use is discontinued because of obsolescence, retirement, loss of resource, or loss of contract rights.

   (2)   Contracts with investor-owned utilities shall provide that the Administrator may reduce his obligations under such contracts in accordance with section 5(a) of the Bonneville Project Act of 1937 [16 U.S.C. § 832d(a)].

   (3)   In addition to his authorities to sell electric power under paragraph (1), the Administrator is also authorized to sell electric power to Federal agencies in the region.

(4)    Sales under this subsection shall be made only if the public body, cooperative, Federal agency or investor-owned utility complies with the Administrator's standards for service in effect on December 5, 1980, or as subsequently revised.

(5)    The Administrator shall include in contracts executed in accordance with this subsection provisions that enable the Administrator to restrict his contractual obligations to meet the loads referred to in this subsection in the future if the Administrator determines, after a reasonable period of experience under this chapter, that the Administrator cannot be assured on a planning basis of acquiring sufficient resources to meet such loads during a specified period of insufficiency.  Any such contract with a public body, cooperative, or Federal agency shall specify a reasonable minimum period between a notice of restriction and the earliest date such restriction may be imposed.

(6)    Contracts executed in accordance with this subsection with public body, cooperative, and Federal agency customers shall—

    (A)    provide that the restriction referred to in paragraph (5) shall not be applicable to any such customers until the operating year in which the total of such customers' firm loads to be served by the Administrator equals or exceeds the firm capability of the Federal base system resources;

    (B)    not permit restrictions which would reduce the total contractual entitlement of such customers to an amount less than the firm capability of the Federal base system resources; and

    (C)    contain a formula for determining annually, on a uniform basis, each such customer's contractual entitlement to firm power during such a period of restriction, which formula shall not consider customer resources other than those the customer has determined, as of December 5, 1980, to be used to serve its own firm loads.

The formula referred to in subparagraph (C) shall obligate the Administrator to provide on an annual basis only firm power needed to serve the portion of such customer's firm load in excess of the capability of such customer's own firm resources determined by such

customer under paragraph (1) of this subsection to be used to serve its firm load.

(7) Required sale.

    (A) Definition of a joint operating entity. In this section, the term "joint operating entity" means an entity that is lawfully organized under State law as a public body or cooperative prior to September 22, 2000, and is formed by and whose members or participants are two or more public bodies or cooperatives, each of which was a customer of the Bonneville Power Administration on or before January 1, 1999.

    (B) Sale. Pursuant to paragraph (1), the Administrator shall sell, at wholesale to a joint operating entity, electric power solely for the purpose of meeting the regional firm power consumer loads of regional public bodies and cooperatives that are members of or participants in the joint operating entity.

    (C) No resale. A public body or cooperative to which a joint operating entity sells electric power under subparagraph (B) shall not resell that power except to retail customers of the public body or cooperative or to another regional member or participant of the same joint operating entity, or except as otherwise permitted by law.

(c) Purchase and exchange sales

(1) Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.

(2) The purchase and exchange sale referred to in paragraph (1) of this subsection with any electric utility shall be limited to an amount not in excess of 50 per centum of such utility's Regional residential load in the year beginning July 1, 1980, such 50 per centum limit increasing in equal annual increments to 100 per centum of such load in the year beginning July 1, 1985, and each year thereafter.

(3)     The cost benefits, as specified in contracts with the Administrator, of any purchase and exchange sale referred to in paragraph (1) of this subsection which are attributable to any electric utility's residential load within a State shall be passed through directly to such utility's residential loads within such State, except that a State which lies partially within and partially without the region may require that such cost benefits be distributed among all of the utility's residential loads in that State.

(4)     An electric utility may terminate, upon reasonable terms and conditions agreed to by the Administrator and such utility prior to such termination, its purchase and sale under this subsection if the supplemental rate charge provided for in section 839e(b) (3) of this title is applied and the cost of electric power sold to such utility under this subsection exceeds, after application of such rate charge, the average system cost of power sold by such utility to the Administrator under this subsection.

(5)     Subject to the provisions of sections 839b and 839d of this title, in lieu of purchasing any amount of electric power offered by a utility under paragraph (1) of this subsection, the Administrator may acquire an equivalent amount of electric power from other sources to replace power sold to such utility as part of an exchange sale if the cost of such acquisition is less than the cost of purchasing the electric power offered by such utility.

(6)     Exchange sales to a utility pursuant to this subsection shall not be restricted below the amounts of electric power acquired by the Administrator from, or on behalf of, such utility pursuant to this subsection.

(7)     The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the Council, the Administrator's customers, and appropriate State regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission. Such average system cost shall not include—

      (A)   the cost of additional resources in an amount sufficient to serve any new large single load of the utility;

      (B)   the cost of additional resources in an amount sufficient to meet any additional load outside the region occurring after December 5, 1980; and

      (C)   any costs of any generating facility which is terminated prior to initial commercial operation.

(d)   Sales to existing direct service industrial customers.

   (1)   (A)   The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers.  Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region.

          (B)   After December 5, 1980, the Administrator shall offer in accordance with subsection (g) of this section to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 providing for the sale of "industrial firm power."

   (2)   The Administrator shall not sell electric power, including reserves, directly to new direct service industrial customers.

   (3)   The Administrator shall not sell amounts of electric power, including reserves, to existing direct service industrial customers in excess of the amount permitted under paragraph (1) unless the Administrator determines, after a plan has been adopted pursuant to section 839b of this title, that such proposed sale is consistent with the plan and that—

      (A)   additional power system reserves are required for the region's firm loads,

      (B)   the proposed sale would provide a cost-effective method of supplying such reserves,

      (C)   such loads or loads of similar character cannot provide

equivalent operating or planning benefits to the region if served by an electric utility under contractual arrangements providing reserves, and

(D)    the Administrator has or can acquire sufficient electric power to serve such loads, and

unless the Council has determined such sale is consistent with the plan.  After such determination by the Administrator and by the Council, the Administrator is authorized to offer to existing direct service industrial customers power in such amounts in excess of the amount permitted under paragraph (1) of this subsection as the Administrator determines to be necessary to provide additional power system reserves to meet the region's firm loads.

(4)    (A)    As used in this section, the term "existing direct service industrial customer" means any direct service industrial customer of the Administrator which has a contract for the purchase of electric power from the Administrator on December 5, 1980.

    (B)    The term "new direct service industrial customer" means any industrial entity other than an existing direct service industrial customer.

    (C)    (i)    Where a new contract is offered in accordance with subsection (g) of this section to any existing direct service industrial customer which has not received electric power prior to December 5, 1980, from the Administrator pursuant to a contract with the Administrator existing on December 5, 1980, electric power delivered under such new contract shall be conditioned on the Administrator reasonably acquiring, in accordance with this chapter and within such estimated period of time (as specified in the contract) as he deems reasonable, sufficient resources to meet, on a planning basis, the load requirement of such customer.  Such contract shall also provide that the obligation of the Administrator to acquire such resources to meet such load requirement shall, except as provided in clause (ii)

of this subparagraph, apply only to such customer and shall not be sold or exchanged by such customer to any other person.

(ii) Rights under a contract described in clause (i) of this subparagraph may be transferred by an existing direct service industrial customer referred to in clause (i) to a successor in interest in connection with a reorganization or other transfer of all major assets of such customer. Following such a transfer, such successor in interest (or any other subsequent successor in interest) may also transfer rights under such a contract only in connection with a reorganization or other transfer of all assets of such successor in interest.

(iii) The limitations of clause (i) of this subparagraph shall not apply to any customer referred to in clause (i) whenever the Administrator determines that such customer is receiving electric power pursuant to a contract referred to in such clause (ii).

(e) Contractual entitlements to firm power.

(1) The contractual entitlement to firm power of any customer from whom, or on whose behalf, the Administrator has acquired electric power pursuant to section 839d of this title may not be restricted below the amount of electric power so acquired from, or on behalf of, such customer. If in any year such customer's requirements are less than such entitlement, any excess of such entitlement shall be first made available to increase the entitlement of other customers of the same class before being available for the entitlement of other customers. For purposes of this paragraph, the following entities shall each constitute a class:

(A) public bodies and cooperatives;

(B) Federal agencies;

(C) direct service industrial; and

(D) investor owned utilities.

(2)    Any contractual entitlement to firm power which is based on electric power acquired from, or on behalf of, a customer pursuant to section 839d of this title shall be in addition to any other contractual entitlement to firm power not subject to restriction that such customer may have under this section. For the purposes of this subsection, references to amounts of power acquired by the Administrator pursuant to section 839d of this title shall be deemed to mean the amounts specified in the resource acquisition contracts exclusive of any amounts recognized in such contracts as replacement for Federal base system resources.

(3)    The Administrator shall, consistent with the provisions of this chapter, insure that any restrictions upon any particular customer class made pursuant to this subsection and subsection (b) of this section are distributed equitably throughout the region.

(f)    Surplus power

The Administrator is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to his obligations incurred pursuant to subsections (b), (c), and (d) of this section in accordance with this and other Acts applicable to the Administrator, including the Bonneville Project Act of 1937 (16 U.S.C. § 832 and following), the Federal Columbia River Transmission System Act (16 U.S.C. § 838 and following), and the Act of August 31, 1964 (16 U.S.C. §§ 837-837h).

(g)    Long-term contracts

(1)    As soon as practicable within nine months after December 5, 1980, the Administrator shall commence necessary negotiations for, and offer, initial long-term contracts (within the limitations of the third sentence of section 5(a) of the Bonneville Project Act [16 U.S.C. § 832d(a)]) simultaneously to—

(A)    existing public body and cooperative customers and investor-owned utility customers under subsection (b) of this section;

(B)    Federal agency customers under subsection (b) of this section;

(C)    electric utility customers under subsection (c) of this section; and

– SA-9 –

(D)    direct service industrial customers under subsection (d) (1) of this section.

(2)    Each customer offered a contract pursuant to this subsection shall have one year from the date of such offer to accept such contract. Such contract shall be effective as provided in this subsection.

(3)    An initial contract with a public body, cooperative or investor-owned electric utility customer or a Federal agency customer pursuant to subsection (b) of this section shall be effective on the date executed by such customer, unless another effective date is otherwise agreed to by the Administrator and the customer.

(4)    An initial contract with an electric utility customer pursuant to subsection (c) of this section shall be effective on the date executed by such customer, but no earlier than the first day of the tenth month after December 5, 1980.

(5)    An initial contract with a direct service industrial customer pursuant to subsection (d) (1) of this section, shall be effective on the date agreed upon by the Administrator and such customer, but no later than the first day of the tenth month after December 5, 1980.  When such contract is executed, it may for rate purposes be given retroactive effect to such first day.

(6)    Initial contracts offered public body, cooperative and Federal agency customers in accordance with this subsection shall provide that during a period of insufficiency declared in accordance with subsection (b) of this section each customer's contractual entitlement shall, to the extent of its requirements on the Administrator, be no less than the amount of firm power received from the Administrator in the year immediately preceding the period of insufficiency.

(7)    The Administrator shall be deemed to have sufficient resources for the purpose of entering into the initial contracts specified in paragraph (1) (A) through (D).

**16 U.S.C. § 839e   Rates**

(a)   Establishment; periodic review and revision; confirmation and approval by Federal Energy Regulatory Commission

  (1)   The Administrator shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power.  Such rates shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law.  Such rates shall be established in accordance with sections 9 and 10 of the Federal Columbia River Transmission System Act (16 U.S.C. § 838) [16 U.S.C. §§ 838g and 838h], section 5 of the Flood Control Act of 1944 [16 U.S.C. § 825s], and the provisions of this chapter.

  (2)   Rates established under this section shall become effective only, except in the case of interim rules as provided in subsection (i) (6) of this section, upon confirmation and approval by the Federal Energy Regulatory Commission upon a finding by the Commission, that such rates—

    (A)   are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,

    (B)   are based upon the Administrator's total system costs, and

    (C)   insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.

(b)   General application of rates to meet general requirements

  (1)   The Administrator shall establish a rate or rates of general application

– SA-11 –

for electric power sold to meet the general requirements of public body, cooperative, and Federal agency customers within the Pacific Northwest, and loads of electric utilities under section 839c(c) of this title. Such rate or rates shall recover the costs of that portion of the Federal base system resources needed to supply such loads until such sales exceed the Federal base system resources. Thereafter, such rate or rates shall recover the cost of additional electric power as needed to supply such loads, first from the electric power acquired by the Administrator under section 839c(c) of this title and then from other resources.

(2)  After July 1, 1985, the projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and Federal agency customers, exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events, may not exceed in total, as determined by the Administrator, during any year after July 1, 1985, plus the ensuing four years, an amount equal to the power costs for general requirements of such customers if, the Administrator assumes that—

(A)  the public body and cooperative customers' general requirements had included during such five-year period the direct service industrial customer loads which are—

(i)  served by the Administrator, and

(ii)  located within or adjacent to the geographic service boundaries of such public bodies and cooperatives;

(B)  public body, cooperative, and Federal agency customers were served, during such five-year period, with Federal base system resources not obligated to other entities under contracts existing as of December 5, 1980, (during the remaining term of such contracts) excluding obligations to direct service industrial customer loads included in subparagraph (A) of this paragraph;

(C)  no purchases or sales by the Administrator as provided in section 839c(c) of this title were made during such five-year period;

(D) all resources that would have been required, during such five-year period, to meet remaining general requirements of the public body, cooperative and Federal agency customers (other than requirements met by the available Federal base system resources determined under subparagraph (B) of this paragraph) were—

    (i) purchased from such customers by the Administrator pursuant to section 839d of this title, or

    (ii) not committed to load pursuant to section 839c(b) of this title,

and were the least expensive resources owned or purchased by public bodies or cooperatives; and any additional needed resources were obtained at the average cost of all other new resources acquired by the Administrator; and

(E) the quantifiable monetary savings, during such five-year period, to public body, cooperative and Federal agency customers resulting from—

    (i) reduced public body and cooperative financing costs as applied to the total amount of resources, other than Federal base system resources, identified under subparagraph (D) of this paragraph, and

    (ii) reserve benefits as a result of the Administrator's actions under this chapter

were not achieved.

(3) Any amounts not charged to public body, cooperative, and Federal agency customers by reason of paragraph (2) of this subsection shall be recovered through supplemental rate charges for all other power sold by the Administrator to all customers. Rates charged public body, cooperative, or Federal agency customers pursuant to this subsection shall not include any costs or benefits of a net revenue surplus or deficiency occurring for the period ending June 30, 1985, to the extent such surplus or deficiency is caused by—

(A)     a difference between actual power deliveries and power deliveries projected for the purpose of establishing rates to direct service industrial customers under subsection (c) (1) of this subsection, and

(B)     an overrecovery or underrecovery of the net costs incurred by the Administrator under section 839c(c) of this title as a result of such difference.

Any such revenue surplus or deficiency incurred shall be recovered from, or repaid to, customers over a reasonable period of time after July 1, 1985, through a supplemental rate charge or credit applied proportionately for all other power sold by the Administrator at rates established under other subsections of this section prior to July 1, 1985.

(4)     The term "general requirements" as used in this section means the public body, cooperative or Federal agency customer's electric power purchased from the Administrator under section 839c(b) of this title, exclusive of any new large single load.

(c)     Rates applicable to direct service industrial customers

(1)     The rate or rates applicable to direct service industrial customers shall be established—

(A)     for the period prior to July 1, 1985, at a level which the Administrator estimates will be sufficient to recover the cost of resources the Administrator determines are required to serve such customers' load and the net costs incurred by the Administrator pursuant to section 839c(c) of this title, based upon the Administrator's projected ability to make power available to such customers pursuant to their contracts, to the extent that such costs are not recovered through rates applicable to other customers; and

(B)     for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.

(2)    The determination under paragraph (1) (B) of this subsection shall be based upon the Administrator's applicable wholesale rates to such public body and cooperative customers and the typical margins included by such public body and cooperative customers in their retail industrial rates but shall take into account—

    (A)    the comparative size and character of the loads served,

    (B)    the relative costs of electric capacity, energy, transmission, and related delivery facilities provided and other service provisions, and

    (C)    direct and indirect overhead costs,

    all as related to the delivery of power to industrial customers, except that the Administrator's rates during such period shall in no event be less than the rates in effect for the contract year ending on June 30, 1985.

(3)    The Administrator shall adjust such rates to take into account the value of power system reserves made available to the Administrator through his rights to interrupt or curtail service to such direct service industrial customers.

(d)    Discount rates; special rates

(1)    In order to avoid adverse impacts on retail rates of the Administrator's customers with low system densities, the Administrator shall, to the extent appropriate, apply discounts to the rate or rates for such customers.

(2)    In order to avoid adverse impacts of increased rates pursuant to this chapter on any direct service industrial customer using raw minerals indigenous to the region as its primary resource, the Administrator, upon request of such customer showing such impacts and after considering the effect of such request on his other obligations under this chapter, is authorized, if the Administrator determines that such impacts will be significant, to establish a special rate applicable to such customer if all power sold to such customer may be interrupted, curtailed, or withdrawn to meet firm loads in the region. Such rate shall be established in accordance with this section and shall include

– SA-15 –

such terms and conditions as the Administrator deems appropriate.

(e)    Uniform rates; rates for sale of peaking capacity; time-of-day, seasonal, and other rates

Nothing in this chapter prohibits the Administrator from establishing, in rate schedules of general application, a uniform rate or rates for sale of peaking capacity or from establishing time-of-day, seasonal rates, or other rate forms.

(f)    Basis for rates

Rates for all other firm power sold by the Administrator for use in the Pacific Northwest shall be based upon the cost of the portions of Federal base system resources, purchases of power under section 839c(c) of this title and additional resources which, in the determination of the Administrator, are applicable to such sales.

(g)    Allocation of costs and benefits

Except to the extent that the allocation of costs and benefits is governed by provisions of law in effect on December 5, 1980, or by other provisions of this section, the Administrator shall equitably allocate to power rates, in accordance with generally accepted ratemaking principles and the provisions of this chapter, all costs and benefits not otherwise allocated under this section, including, but not limited to, conservation, fish and wildlife measures, uncontrollable events, reserves, the excess costs of experimental resources acquired under section 839d of this title, the cost of credits granted pursuant to section 839d of this title, operating services, and the sale of or inability to sell excess electric power.

(h)    Surcharges

Notwithstanding any other provision of this section (except the provisions of subsection (a) of this section), the Administrator shall adjust power rates to include any surcharges arising under section 839b(f) of this title, and shall allocate any revenues from such charges in such manner as the Administrator determines will help achieve the purposes of section 839b(f) of this title.

(i)    Procedures

In establishing rates under this section, the Administrator shall use the following procedures:

(1)    Notice of the proposed rates shall be published in the Federal Register with a statement of the justification and reasons supporting such rates. Such notice shall include a date for a hearing in accordance with paragraph (2) of this subsection.

(2)    One or more hearings shall be conducted as expeditiously as practicable by a hearing officer to develop a full and complete record and to receive public comment in the form of written and oral presentation of views, data, questions, and argument related to such proposed rates. In any such hearing—

    (A)    any person shall be provided an adequate opportunity by the hearing officer to offer refutation or rebuttal of any material submitted by any other person or the Administrator, and

    (B)    the hearing officer, in his discretion, shall allow a reasonable opportunity for cross examination, which, as determined by the hearing officer, is not dilatory, in order to develop information and material relevant to any such proposed rate.

(3)    In addition to the opportunity to submit oral and written material at the hearings, any written views, data, questions, and arguments submitted by persons prior to, or before the close of, hearings shall be made a part of the administrative record.

(4)    After such a hearing, the Administrator may propose revised rates, publish such proposed rates in the Federal Register, and conduct additional hearings in accordance with this subsection.

(5)    The Administrator shall make a final decision establishing a rate or rates based on the record which shall include the hearing transcript, together with exhibits, and such other materials and information as may have been submitted to, or developed by, the Administrator. The decision shall include a full and complete justification of the final rates pursuant to this section.

(6)    The final decision of the Administrator shall become effective on confirmation and approval of such rates by the Federal Energy Regulatory Commission pursuant to subsection (a) (2) of this section. The Commission shall have the authority, in accordance with such procedures, if any, as the Commission shall promptly establish and

– SA-17 –

make effective within one year after December 5, 1980, to approve the final rate submitted by the Administrator on an interim basis, pending the Commission's final decision in accordance with such subsection. Pending the establishment of such procedures by the Commission, if such procedures are required, the Secretary is authorized to approve such interim rates during such one-year period in accordance with the applicable procedures followed by the Secretary prior to December 5, 1980. Such interim rates, at the discretion of the Secretary, shall continue in effect until July 1, 1982.

(j)    Cost figures to be indicated on rate schedules and power billings

All rate schedules adopted, and all power billings rendered, by the Administrator pursuant to this section shall indicate—

(1)    the approximate cost contribution of different resource categories to the Administrator's rates for the sale of energy and capacity, and

(2)    the cost of resources acquired to meet load growth within the region and the relation of such cost to the average cost of resources available to the Administrator.

(k)    Statutory basis for procedures used in establishing rates or rate schedules

Notwithstanding any other provision of this chapter, all rates or rate schedules for the sale of nonfirm electric power within the United States, but outside the region, shall be established after December 5, 1980, by the Administrator in accordance with the procedures of subsection (i) of this section (other than the first sentence of paragraph (6) thereof) and in accordance with the Bonneville Project Act [16 U.S.C. §§ 832 et seq.], the Flood Control Act of 1944, and the Federal Columbia River Transmission System Act [16 U.S.C. §§ 838 et seq.]. Notwithstanding section 201(f) of the Federal Power Act [16 U.S.C. § 824(f)], such rates or rate schedules shall become effective after review by the Federal Energy Regulatory Commission for conformance with the requirements of such Acts and after approval thereof by the Commission. Such review shall be based on the record of proceedings established under subsection (i) of this section. The parties to such proceedings under subsection (i) of this section shall be afforded an opportunity by the Commission for an additional hearing in accordance with the procedures established for rate-making by the Commission pursuant to the Federal Power Act [16 U.S.C. §§ 791a et seq.].

(l)     Rates for sales outside United States; negotiations

In order to further the purposes of this chapter and to protect the consumers of the region, the Administrator may negotiate, or establish, rates for electric power sold by the Administrator to any entity not located in the United States which shall be equitable in relation to rates for all electric power which is, or may be, purchased by the Administrator or the Administrator's customers from entities outside the United States. In establishing rates other than by negotiation, the provisions of subsection (i) of this section shall apply. In the case of any negotiation with an entity not located in the United States, the Administrator shall provide public notice of any proposal to negotiate such rates. Such negotiated rates shall be not less than the rates established under this chapter for nonfirm power sold within the United States but outside the region. The Administrator shall also afford notice of any rates negotiated pursuant to this subsection.

(m)    Impact aid payments; formula

(1)     Beginning the first fiscal year after the plan and program required by section 839b(d) and (h) of this title are finally adopted, the Administrator may, subject to the provisions of this section, make annual impact aid payments to the appropriate local governments within the region with respect to major transmission facilities of the Administrator, as defined in section 3(c) of the Federal Columbia River Transmission Act [16 U.S.C. § 838a(c)]—

(A)     which are located within the jurisdictional boundaries of such governments,

(B)     which are determined by the Administrator to have a substantial impact on such governments, and

(C)     where the construction of such facilities, or any modification thereof, is completed after December 5, 1980, and, in the case of a modification of an existing facility, such modification substantially increases the capacity of such existing transmission facility.

(2)     Payments made under this subsection for any fiscal year shall be determined by the Administrator pursuant to a regionwide, uniform formula to be established by rule in accordance with the procedures set forth in subsection (i) of this section. Such rule shall become

effective on its approval, after considering its effect on rates established pursuant to this section, by the Federal Energy Regulatory Commission. In developing such formula, the Administrator shall identify, and take into account, the local governmental services provided to the Administrator concerning such facilities and the associated costs to such governments as the result of such facilities.

(3)    Payments made pursuant to this subsection shall be made solely from the fund established by section 11 of the Federal Columbia River Transmission System Act [16 U.S.C. § 838i]. The provisions of section 13 of such Act [16 U.S.C. § 838k], and any appropriations provided to the Administrator under any law, shall not be available for such payments. The authorization of payments under this subsection shall not be construed as an obligation of the United States.

(4)    No payment may be made under this subsection with respect to any land or interests in land owned by the United States within the region and administered by any Federal agency (other than the Administrator), without regard to how the United States obtained ownership thereof, including lands or interests therein acquired or withdrawn by a Federal agency for purposes of such agency and subsequently made available to the Administrator for such facilities.

(n)    Limiting the inclusion of costs of protection of, mitigation of damage to, and enhancement of fish and wildlife, within rates charged by the Bonneville Power Administration, to the rate period in which the costs are incurred

Notwithstanding any other provision of this section, rates established by the Administrator, under this section shall recover costs for protection, mitigation and enhancement of fish and wildlife, whether under this chapter or any other Act, not to exceed such amounts the Administrator forecasts will be expended during the fiscal year 2002-2006 rate period, while preserving the Administrator's ability to establish appropriate reserves and maintain a high Treasury payment probability for the subsequent rate period.

**16 U.S.C. § 839f   Administrative provisions**

(a)   Contract authority

Subject to the provisions of this chapter, the Administrator is authorized to contract in accordance with section 2(f) of the Bonneville Project Act of 1937 (16 U.S.C. § 832a(f)). Other provisions of law applicable to such contracts on December 5, 1980, shall continue to be applicable.

(b)   Executive and administrative functions of Administrator of Bonneville Power Administration; sound and businesslike implementation of chapter

The Administrator shall discharge the executive and administrative functions of his office in accordance with the policy established by the Bonneville Project Act of 1937 (16 U.S.C. § 832 and following), section 7152(a) (2) and (3) of Title 42, and this chapter. The Secretary of Energy, the Council, and the Administrator shall take such steps as are necessary to assure the timely implementation of this chapter in a sound and businesslike manner. Nothing in this chapter shall be construed by the Secretary, the Administrator, or any other official of the Department of Energy to modify, alter, or otherwise affect the requirements and directives expressed by the Congress in section 7152(a) (2) and (3) of Title 42 or the operations of such officials as they existed prior to December 5, 1980.

(c)   Limitations and conditions on contracts for sale or exchange of electric power for use outside Pacific Northwest

Any contract of the Administrator for the sale or exchange of electric power for use outside the Pacific Northwest shall be subject to limitations and conditions corresponding to those provided in sections 2 and 3 of the Act of August 31, 1964 (16 U.S.C. §§ 837a and 837b) for any contract for the sale, delivery, or exchange of hydroelectric energy or peaking capacity generated within the Pacific Northwest for use outside the Pacific Northwest. In applying such sections for the purposes of this subsection, the term "surplus energy" shall mean electric energy for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy, and the term "surplus peaking capacity" shall mean electric peaking capacity for which there is no demand in the Pacific Northwest at the rate established for the disposition of such capacity. The authority granted, and duties imposed upon, the Secretary by sections 5 and 7 of such Act (16 U.S.C. §§ 837e and 837f) [16 U.S.C. §§ 837d and 837f] shall also apply to the Administrator in connection with resources acquired by the Administrator pursuant to this chapter. The Administrator shall, in making any determination, under any

– SA-21 –

contract executed pursuant to section 839c of this title, of the electric power requirements of any Pacific Northwest customer, which is a non-Federal entity having its own generation, exclude, in addition to hydroelectric generated energy excluded from such requirements pursuant to section 3(d) of such Act (16 U.S.C. § 837b(d)), any amount of energy included in the resources of such customer for service to firm loads in the region if (1) such amount was disposed of by such customer outside the region, and (2) as a result of such disposition, the firm energy requirements of such customer or other customers of the Administrator are increased. Such amount of energy shall not be excluded, if the Administrator determines that through reasonable measures such amount of energy could not be conserved or otherwise retained for service to regional loads. The Administrator may sell as replacement for any amount of energy so excluded only energy that would otherwise be surplus.

(d)     Disposition of power which does not increase amount of firm power Administrator is obligated to provide to any customer

No restrictions contained in subsection (c) of this section shall limit or interfere with the sale, exchange or other disposition of any power by any utility or group thereof from any existing or new non-Federal resource if such sale, exchange or disposition does not increase the amount of firm power the Administrator would be obligated to provide to any customer. In addition to the directives contained in subsections (i) (1) (B) and (i) (3) of this section and subject to:

    (1)     any contractual obligations of the Administrator,

    (2)     any other obligations under existing law, and

    (3)     the availability of capacity in the Federal transmission system,

the Administrator shall provide transmission access, load factoring, storage and other services normally attendant thereto to such utilities and shall not discriminate against any utility or group thereof on the basis of independent development of such resource in providing such services.

(e)     Judicial review; suits

    (1)     For purposes of sections 701 through 706 of Title 5, the following actions shall be final actions subject to judicial review—

(A)   adoption of the plan or amendments thereto by the Council under section 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b(h) of this title;

(B)   sales, exchanges, and purchases of electric power under section 839c of this title;

(C)   the Administrator's acquisition of resources under section 839d of this title;

(D)   implementation of conservation measures under section 839d of this title;

(E)   execution of contracts for assistance to sponsors under section 839d(f) of this title;

(F)   granting of credits under section 839d(h) of this title;

(G)   final rate determinations under section 839e of this title; and

(H)   any rule prescribed by the Administrator under section 839e(m)(2) of this title.

(2)   The record upon review of such final actions shall be limited to the administrative record compiled in accordance with this chapter. The scope of review of such actions without a hearing or after a hearing shall be governed by section 706 of Title 5, except that final determinations regarding rates under section 839e of this title shall be supported by substantial evidence in the rulemaking record required by section 839e(i) of this title considered as a whole. The scope of review of an action under section 839d(c) of this title shall be governed by section 706 of Title 5. Nothing in this section shall be construed to require a hearing pursuant to section 554, 556, or 557 of Title 5.

(3) Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator.

(4) For purposes of this subsection—

    (A) major resources shall be deemed to be acquired upon publication in the Federal Register pursuant to section 839d(c) (4) (B) of this title;

    (B) resources, other than major resources, shall be deemed to be acquired upon execution of the contract therefor;

    (C) conservation measures shall be deemed to be implemented upon execution of the contract or grant therefor; and

    (D) rate determinations pursuant to section 839e of this title shall be deemed final upon confirmation and approval by the Federal Energy Regulatory Commission.

(5) Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. §§ 832 et seq.], the Act of August 31, 1964 (16 U.S.C. §§ 837-837h), or the Federal Columbia River Transmission System Act (16 U.S.C. §§ 838 and following), shall be filed in the United States court of appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred. In the case of a challenge of the plan or programs or amendments thereto, such suit shall be filed within sixty days after publication of a notice of such final action in the Federal Register. Such court shall have jurisdiction to hear and determine any suit brought as provided in this section. The plan and program, as finally adopted or portions thereof, or amendments thereto, shall not thereafter be reviewable as a part of any other action under this chapter or any other law. Suits challenging any other actions under this chapter shall be filed in the appropriate court.

(f) Tax treatment of interest on governmental obligations

    For purposes of enabling the Administrator to acquire resources necessary to meet the firm load of public bodies, cooperatives, and Federal agencies from a

– SA-24 –

governmental unit at a cost no greater than the cost which would be applicable in the absence of such acquisition, the exemption from gross income of interest on certain governmental obligations provided in section 103(a) (1) of Title 26 shall not be affected by the Administrator's acquisition of such resources if—

(1) the Administrator, prior to contracting for such acquisition, certifies to his reasonable belief, that the persons for whom the Administrator is acquiring such resources for sale pursuant to section 839c of this title are public bodies, cooperatives, and Federal agencies, unless the Administrator also certifies that he is unable to acquire such resources without selling a portion thereof to persons who are not exempt persons (as defined in section 103(b) of Title 26), and

(2) based upon such certification, the Secretary of the Treasury determines in accordance with applicable regulations that less than a major portion of the resource is to be furnished to persons who are not exempt persons (as defined in section 103(b) of Title 26).

The certification under paragraph (1) shall be made in accordance with this subsection and a procedure and methodology approved by the Secretary of the Treasury. For purposes of this subsection, the term "major portion" shall have the meaning provided by regulations issued by the Secretary of the Treasury.

(g) Review of rates for sale of power to Administrator by investor-owned utility customers

When reviewing rates for the sale of power to the Administrator by an investor-owned utility customer under section 839c(c) or 839d of this title, the Federal Energy Regulatory Commission shall, in accordance with section 824h of this title—

(1) convene a joint State board, and

(2) invest such board with such duties and authority as will assist the Commission in its review of such rates.

(h) Companies which own or operate facilities for the generation of electricity primarily for sale to Administrator

(1) No "company" (as defined in section 79b(a) (2) of Title 15), which owns or operates facilities for the generation of electricity (together

– SA-25 –

with associated transmission and other facilities) primarily for sale to the Administrator under section 839d of this title shall be deemed an "electric utility company" (as defined in section 79b(a) (3) of Title 15), within the meaning of any provision or provisions of chapter 2C of Title 15, if at least 90 per centum of the electricity generated by such company is sold to the Administrator under section 839d of this title, and if—

(A)   the organization of such company is consistent with the policies of section 79a(b) and (c) of Title 15, as determined by the Securities and Exchange Commission, with the concurrence of the Administrator, at the time of such organization; and

(B)   participation in any facilities of such "company" has been offered to public bodies and cooperatives in the region pursuant to section 839d(m) of this title.

(2)   The Administrator shall include in any contract for the acquisition of a major resource from such "company" provisions limiting the amount of equity investment, if any, in such "company" to that which the Administrator determines will be consistent with achieving the lowest attainable power costs attributable to such major resource.

(3)   In the case of any "company" which meets the requirements of paragraph (1), the Administrator, with the concurrence of such Commission, shall approve all significant contracts entered into by, and between, such "company" and any sponsor company or any subsidiary of such sponsor company which are determined to be consistent with the policies of section 79a(b) and (c) of Title 15 at the time such contracts are entered into. The Administrator and the Securities and Exchange Commission shall exercise such approval authority within sixty days after receipt of such contracts. Such contracts shall not be effective without such approval.

(4)   Paragraph (1) of this subsection shall continue to apply to any such "company" unless the Administrator or the Securities and Exchange Commission, or both, through periodic review, (A) determine at any time that the "company" no longer operates in a manner consistent with the policies of section 79a(b) and (c) of Title 15 and in accordance with this subsection, and (B) notify the "company" in

– SA-26 –

writing of such preliminary determination. This subsection shall cease to apply to such "company" thirty days after receipt of notification of a final determination thereof. A final determination shall be made only after public notice of the preliminary determination and after a hearing completed not later than sixty days from the date of publication of such notice. Such final determination shall be made within thirty days after the date of completion of such hearing.

(i) Electric power acquisition or disposition

(1) At the request and expense of any customer or group of customers of the Administrator within the Pacific Northwest, the Administrator shall, to the extent practicable—

(A) acquire any electric power required by (i) any customer or group of customers to enable them to replace resources determined to serve firm load under section 839c(b) of this title, or (ii) direct service industrial customers to replace electric power that is or may be curtailed or interrupted by the Administrator (other than power the Administrator is obligated to replace), with the cost of such replacement power to be distributed among the direct service industrial customers requesting such power; and

(B) dispose of, or assist in the disposal of, any electric power that a customer or group of customers proposes to sell within or without the region at rates and upon terms specified by such customer or group of customers, if such disposition is not in conflict with the Administrator's other marketing obligations and the policies of this chapter and other applicable laws.

(2) In implementing the provisions of subparagraphs (A) and (B) of paragraph (1), the Administrator may prescribe policies and conditions for the independent acquisition or disposition of electric power by any direct service industrial customer or group of such customers for the purpose of assuring each direct service industrial customer an opportunity to participate in such acquisition or disposition.

(3) The Administrator shall furnish services including transmission, storage, and load factoring unless he determines such services cannot

– SA-27 –

be furnished without substantial interference with his power marketing program, applicable operating limitations or existing contractual obligations. The Administrator shall, to the extent practicable, give priority in making such services available for the marketing, within and without the Pacific Northwest, of capability from projects under construction on December 5, 1980, if such capability has been offered for sale at cost, including a reasonable rate of return, to the Administrator pursuant to this chapter and such offer is not accepted within one year.

(j)  Retail rate designs which encourage conservation and efficient use of electric energy, installation of consumer-owned renewable resources, and rate research and development

  (1)  The Council, as soon as practicable after December 5, 1980, shall prepare, in consultation with the Administrator, the customers, appropriate State regulatory bodies, and the public, a report and shall make recommendations with respect to the various retail rate designs which will encourage conservation and efficient use of electric energy and the installation of consumer-owned renewable resources on a cost-effective basis, as well as areas for research and development for possible application to retail utility rates within the region. Studies undertaken pursuant to this subsection shall not affect the responsibilities of any customer or the Administrator which may exist under the Public Utility Regulatory Policies Act of 1978.

  (2)  Upon request, and solely on behalf of customers so requesting, the Administrator is authorized to (A) provide assistance in analyzing and developing retail rate structures that will encourage cost-effective conservation and the installation of cost-effective consumer-owned renewable resources; (B) provide estimates of the probable power savings and the probable amount of billing credits under section 839d(h) of this title that might be realized by such customers as a result of adopting and implementing such retail rate structures; and (C) solicit additional information and analytical assistance from appropriate State regulatory bodies and the Administrator's other customers.

(k)     Executive position for conservation and renewable resources

There is hereby established within the administration an executive position for conservation and renewable resources. Such executive shall be appointed by the Administrator and shall be assigned responsibility for conservation and direct-application renewable resource programs (including the administration of financial assistance for such programs). Such position is hereby established in the senior executive service in addition to the number of such positions heretofore established in accordance with other provisions of law applicable to such positions.

**Certificate of Service**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 19, 2009.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participant:

David Hill
Department of Energy
1000 Independence Avenue, SW
Washington, D.C. 20585

_____/s/ Jason T. Kuzma_____

Jason T. Kuzma

07772-0414/LEGAL16657100.6