IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133, 08-75161, 08-75165

---

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *ET AL.,*

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

---

ON PETITION FOR REVIEW UNDER THE
NORTHWEST POWER ACT

---

**OPENING BRIEF OF PETITIONERS
PUBLIC UTILITY DISTRICT NO. 1 OF COWLITZ COUNTY,
PUBLIC POWER COUNCIL, NORTHWEST REQUIREMENTS
UTILITIES, AND PACIFIC NORTHWEST GENERATING
COOPERATIVE**

Paul M. Murphy
James L. Buchal
MURPHY & BUCHAL, LLP
2000 SW First Ave., Suite 420
August 19, 2009          Portland, Oregon  97201
Tel:  (503) 227-1011
*Attorneys for Cowlitz PUD*

Addition Counsel Listed on Back of Cover

Mark R. Thompson
825 NE Multnomah Street, Ste. 1225
Portland, Oregon 97232
*Attorney for Public Power Council*


Susan K. Ackerman
9883 NW Nottage Dr.
Portland, Oregon 97229
*Attorney for Northwest Requirements Utilities*


R. Erick Johnson
R. Erick Johnson PC
5285 SW Meadows Road, Suite 230
Lake Oswego, Oregon 97035
*Attorney for Pacific Northwest Generating Cooperative*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioners provide the following information:

1. Petitioner Public Utility District No. 1 of Cowlitz County, Washington is a government public utility organized under the laws of the State of Washington, and has no parent corporation and is not owned in whole or part by any publicly held corporation;

2. Public Power Council is a non-profit corporation, duly incorporated and organized under the laws of the State of Washington, with its principal office in Portland, Oregon. Public Power Council has no stock and no parent corporation;

3. Northwest Requirements Utilities (NRU) is a non-profit corporation organized under the laws of the state of Oregon to represent the interests of its 51 public preference utility members. Neither NRU nor its members have parent corporations or stock; and

4. Pacific Northwest Generating Cooperative (PNGC Power) is a cooperative corporation organized under the laws of the State of Oregon. PNGC Power also has no parent corporation and no publicly owned corporation owns 10% or more of its stock.

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .................................................. i

Table of Authorities .................................................................................. v

COMMON NAMES, ACRONYMS AND TECHNICAL TERMS
USED IN THIS BRIEF.......................................................................... ix

Jurisdictional Statement ......................................................................... 1

Statement of the Issues Presented....................................................... 3

Statement of the Case ........................................................................... 4

Statement of Facts.................................................................................. 7

Summary of Argument ......................................................................... 10

Argument ............................................................................................... 10

I.     THE TEXT, LEGISLATIVE HISTORY AND STRUCTURE
OF THE ACT ALL DEMONSTRATE THAT CONGRESS
INTENDED TO PROVIDE A SPECIFIC, OBJECTIVE
METHOD FOR PROTECTING PREFERENCE CUSTOMERS
FROM HIGHER RATES DUE TO THE COSTS OF THE
EXCHANGE PROGRAM .................................................. 14

    A.    Standard of Review .................................................. 14

    B.    The Origins and Purposes of the Act ...................................... 16

    C.    The Origin and Purpose of the "Rate Ceiling" ........................ 20

    D.    The Detailed Language and Structure of § 7(b) Confirms
Congress' Specific, Objective Protection for Preference
Customers....................................................................... 22

II.    BPA ADOPTED IMPROPER ASSUMPTIONS NOT CONTAINED IN § 7(b)(2) THAT ARE CONTRARY TO LAW AND DIMINISH THE RATE PROTECTION REQUIRED BY CONGRESS ............. 28

    A.    BPA Must Adhere to the Five Statutory Assumptions, and Cannot Introduce Additional Assumptions Undermining the Five Assumptions ................................................................. 28

    B.    BPA Unlawfully Increased the General Requirements of Preference Customers in the 7(b)(2) Case ............................... 32

        1.    Adding non-existent load to Preference Customers' "general requirements" is contrary to law ..................... 32

        2.    BPA's rationales for adding non-existent load are meritless ........................................................................... 35

        3.    BPA's arguments conflict with the text of the Act........ 37

        4.    The legislative history confirms that BPA's conservation arguments are spurious ................................................... 41

        5.    BPA is incorrect when it argues that Preference Customers claim conservation should be free ............... 43

        6.    BPA's unauthorized treatment of conservation undermines the § 7(b)(2) rate protections...................... 44

    C.    Without Statutory or Logical Basis, BPA Exaggerated Federal Base System Costs in the 7(b)(2) Case ................................... 47

    D.    On Remand, BPA Improperly Rewrote Its Interpretation of Section 7(b)(2), Thereby Substantially Diluting The Protection Provided to Preference Customers By The § 7(b)(2) Rate Ceiling ............................................................................... 49

        1.    BPA's New Interpretation of § 7(b)(2)(D) is Unreasonable ................................................................ 53

iii

2.     BPA's Development and Application of A Revised
       Interpretation of § 7(b)(2)(D) and Its New Restrictions on
       Non-Federal Resources Constitutes Impermissible
       Retroactive Rulemaking ................................................. 57

E.     The Legislative History Confirms that, with the Departure of
       DSI Load and Non-Achievement of Significant Act Financing
       Benefits, the § 7(b)(2) Rate Ceiling Should Eliminate or
       Drastically Reduce the Exchange Program.............................. 58

Conclusion ........................................................................................ 61

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE WITH RULE 32

STATUTORY ADDENDUM- Cited Sections of the
Pacific Northwest Electric Power Planning and Conservation
Act §§ 16 U.S.C. § 839 *et seq.*

iv

# TABLE OF AUTHORITIES

**Cases**

*ALCOA v. Central Lincoln Peoples' Utility District,*
467 U.S. 380 (1984) ...................................................... *passim*

*Azarte v. Ashcroft,*
394 F.3d 1278 (9th Cir. 2005) ......................................... 15

*Bowen v. Georgetown University Hospital,*
488 U.S. 204 (1988) ...................................................... 57

*Boudette v. Barnette,*
923 F.2d 754 (9th Cir. 1991) .......................................... 31

*Burns v. U.S. R.R. Retirement Bd.,*
701 F.2d 193 (D.C. Cir. 1983) ......................................... 36

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
476 U.S. 837 (1984) ................................................... 15, 58

*Golden Northwest Aluminum, Inc. v. BPA,*
501 F.3d 1037 (9th Cir. 2007) ....................................... *passim*

*Health Ins. Ass'n of America, Inc. v. Shalala,*
23 F.3d 412 (D.C. Cir. 1994) .......................................... 57

*King v. St. Vincent's Hospital,* 502 U.S. 215 (1991) .................................... 40

*Longview Fibre Co. v. Rasmussen,*
980 F.2d 1307 (9th Cir. 1992) ......................................... 31

*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,*
513 U.S. 251 (1995) ...................................................... 49

*Maislin Industries, Inc. Primary Steel, Inc.,*
497 U.S. 116 (1990) ...................................................... 60

*M-S-R Pub. Power Agency v. BPA,*
    297 F.3d 833 (9th Cir. 2002)........................................................ 14, 31

*PacifiCorp v. BPA,*
    795 F.2d 810 (9th Cir. 1986)........................................................... 19

*PacifiCorp v. F.E.R.C,*
    795 F2.d 816 (9th Cir. 1986)........................................................ 4, 25

*Pacific Northwest Generating Cooperative v. Dep't of Energy,*
    2009 WL 2386294, *14 (9th Cir. Aug. 5, 2009)................................ 56

*Portland General Electric Co. v. BPA,*
    501 F.3d 1009 (9th Cir. 2007)...................................................... *passim*

*Public Utility Dist. No. 1 of Snohomish County, Wash. v.*
*Bonneville Power Admin.,*
    506 F.3d 1145 (9th Cir. 2007)......................................................... 14

*Silvers v. Sony Pictures Entertainment, Inc.,*
    402 F.3d 881 (9th Cir. 2005)............................................................ 31

*Tennessee Valley Authority v. Hill,*
    437 U.S. 153 (1978) ........................................................................ 29

*United States v. Gamboa-Cardenas,*
    508 F.3d 491 (9th Cir. 2007)............................................................ 31

*Wilderness Society v. U.S. Fish and Wildlife Service,*
    316 F.3d 913 (9th Cir. 2003)............................................................ 58

**Statues**

**Pacific Northwest Electric Power Planning and Conservation Act, §§ 16 U.S.C. § 839 *et seq.***

§ 3(3)        16 U.S.C. § 839a(3) ........................................................ 39

§ 3(7)        16 U.S.C. § 839a(7) ........................................................ 55

§ 3(9)        16 U.S.C. § 839a(9) ........................................................ 33

§ 3(19)       16 U.S.C. § 839a(19) .................................................. 40, 53

§ 4(e)(1)     16 U.S.C. § 839b(e)(1)..................................................... 44

§ 5(a)        16 U.S.C. § 839c(a) ..................................................... 2, 16

§ 5(b)        16 U.S.C. § 839c(b) ................................................... *passim*

§ 5(c)        16 U.S.C. § 839c(c) ................................................... *passim*

§ 5(d)(1)     16 U.S.C. § 839c(d)(1).................................................... 18

§ 6(a)        16 U.S.C. § 839d(a) .................................................. 40, 44

§ 7(b)(1)     16 U.S.C. § 839e(b)(1)............................................... 22, 23

§ 7(b)(2)     16 U.S.C. § 839e(b)(2)............................................... *passim*

§ 7(b)(3)     16 U.S.C. § 839e(b)(3)............................................... *passim*

§ 7(b)(4)     16 U.S.C. § 839e(b)(4).................................. 7, 24, 33, 34

§ 7(c)        16 U.S.C. § 839e(c) ........................................... 19, 21, 51

§ 7(f)        16 U.S.C. § 839e(f)........................................................ 19

§ 7(g)16 U.S.C. § 839e(g) ............................................................ *passim*

§ 9(e)(2)     16 U.S.C. § 839f(e)(2) ...................................................... 14

§ 9(e)(5)     16 U.S.C. § 839f(e)(5) ...................................................... 1

**Other Statutes**

5 U.S.C. § 706 ................................................................ 14, 56, 16

16 U.S.C. § 832b ................................................................ 56

16 U.S.C. § 832c(a) ................................................................ 16

**Other Authority**

H. Rep. No. 96-976, Pt. I, 96th Cong., 2d Sess. (1980)...................... 16, 17, 22

H. Rep. No. 96-976, Pt. II, 96th Cong., 2d Sess. (1980) ........................ 21, 29

S. Rep. No. 96-272, 96th Cong., 1st Sess. (1979) ................................. *passim*

125 Cong. Rec. H2060 (daily ed. April 5, 1979)......................................... 21

125 Cong. Rec. S3999 (daily ed. April 5, 1979) ......................................... 21

126 Cong. Rec. S14691 (daily ed. Nov 19, 1980)........................................ 18

viii

## COMMON NAMES, ACRONYMS AND TECHNICAL
## TERMS USED IN THIS BRIEF

Act
: The Pacific Northwest Electric Power Planning and Conservation Act of 1980, 16 U.S.C. §§ 839 *et seq.*

Appendix B
: The Numerical Analysis made part of the Senate Report as "Appendix B".

BPA
: The Bonneville Power Administration.

DSIs
: Direct-service industrial customers of BPA.

Exchange Program
: The Residential Exchange Program established under § 5(c) of the Act.

Federal Base System
: "Federal base system resources" as defined in § 3(10) of the Act.

FERC
: The Federal Energy Regulatory Commission.

general requirements
: Electric power purchased by Preference Customers from BPA as defined in § 7(b)(4) of the Act.

*GNA*
: This Court's opinion and decision in *Golden Northwest Aluminum, Inc. v. BPA*, 501 F.3d 1037 (9th Cir. 2007).

House Report, Part I
: Report of the House Commerce Committee on the bill that became the Act; H. Rep. No. 96-976, Pt. I, 96th Cong., 2d Sess. (1980).

House Report, Part II
: Report of the House Interior Committee on the bill that because the Act; H. Rep. No. 96-976, Pt. II, 96th Cong., 2d Sess. (1980).

| | |
|---|---|
| IOUs | The Investor-owned utilities entitled to participate in the Exchange Program established under § 5(c) of the Act. |
| load | That which consumes electricity, often used as the equivalent of the demand for electric power. |
| Load Reduction Agreements or LRAs | Amendments to the REP Settlement Agreements pursuant to which BPA monetized its power delivery commitments established in the REP Settlement Agreements |
| Mid-C resources | Certain low-cost, hydro-electric generating facilities located on the Columbia river and owned by various public body utilities in the Pacific Northwest. |
| *PGE* | This Court's opinion and decision in *Portland General Electric Co. v. BPA*, 501 F.3d 1009 (9th Cir. 2007). |
| Preference Customers | Public body, cooperative and federal agency customers of BPA entitled to preference and priority to Federal power under §5(a), and to rate protection under § 7(b)(2), of the Act. |
| Program Case | BPA's name for the calculation of the power costs Preference Customers would pay if there were no § 7(b)(2) rate ceiling. |
| REP Settlement Agreements | The agreements between BPA and its IOU customers under which BPA implemented its REP Settlement program, subsequently invalidated by this Court in *PGE*. |
| rate ceiling | The common name for the measure of rate protection afforded to Preference Customers by §§ 7(b)(2) and (3)  of the Act. |

| | |
|---|---|
| Senate Report | Report of the Senate Energy Committee on the bill that became the Act; S. Rep. No. 96-272, 96th Cong., 1st Sess. (1979). |
| WP-07S Case | BPA's 2007 Supplemental Wholesale Power Rate Case, the proceeding before BPA resulting in the decision now on review in these consolidated cases. |
| WP-07S ROD | BPA's Final Record of Decision in the WP-07S Case. |
| 7(b)(2) Case | BPA's name for the calculation of the power costs Preference Customers would pay using a cost calculation making the five assumptions set forth in § 7(b)(2). |
| § 7(g) Costs | Certain costs that BPA incurs that are not allocated to customers pursuant to the customer-class specific rate directives in § 7(g), § 7(c) and § 7(f) of the Act, which instead are allocated under § 7(g) of the Act to all rates based on generally accepted ratemaking principles. The § 7(g) Costs most relevant to this appeal are the costs of BPA-funded conservation programs. |

xi

**Jurisdictional Statement**

Respondent, Bonneville Power Administration ("BPA"), is a federal agency within the U.S. Department of Energy that markets wholesale electricity and provides electric transmission services to public and private utilities and some large industrial customers in the Pacific Northwest. BPA had statutory jurisdiction over the challenged determinations pursuant to the Pacific Northwest Electric Power Planning and Conservation Act of 1980 (the "Act"[1]), 16 U.S.C. § 839 *et seq.* The statutory basis of jurisdiction in this Court is § 9(e)(5) of the Act.[2]

BPA made the challenged determinations in the "Administrator's Final Record of Decision" ("WP-07S ROD") and various Final Studies issued on September 22, 2008 in BPA's 2007 Supplemental Wholesale Power Rate Case (the "WP-07S Case"). In the WP-07S ROD, BPA responded to this Court's decisions in *Portland General Electric Co. v. BPA*, 501 F.3d 1009 (9th Cir. 2007) ("*PGE*") and *Golden Northwest Aluminum, Inc. v. BPA*, 501 F.3d 1037 (9th Cir. 2007) ("*GNA*"). In *PGE*, this Court set aside certain Residential Exchange Program ("Exchange Program")

---

[1] A table of common names, acronyms and technical terms used in this brief appears after the Table of Authorities.

[2] Insofar as it has become the practice, including in BPA's WP-07S ROD, to cite the Act by its original section numbers, we adopt that practice in this brief. The Table of Authorities and Addendum provide the U.S. Code cross-references.

contracts of BPA that provided excessive financial and power benefits to investor-owned utilities ("IOUs") to pass on to their residential customers. *PGE*, 501 F. 3d at 1037. In *GNA*, this Court found BPA to have overcharged its Preference Customers for the costs associated with such Exchange Program payments in violation of § 7(b)(2) of the Act. *GNA*, 501 F. 3d at 1048. This Court remanded BPA's 2002-2006 wholesale power rates for reconsideration "in accordance with this opinion". *Id* at 1053. In its WP-07S ROD, BPA found that it had charged excessive rates to Preference Customers, and developed a "Lookback Amount," representing BPA's calculation of the overcharges to Preference Customers potentially refundable to them. [3]

Petitioners, Public Utility District No. 1 of Cowlitz County, the Public Power Council, Northwest Requirements Utilities and Pacific Northwest Generating Cooperative, are customers or associations of customers of BPA entitled to statutory preference to Federal power under § 5(a) of the Act and other authorities cited therein. (For convenience, customers entitled to such

---

[3] As explained in detail below, BPA reconsidered not only historical rates for the 2002-2006 period, but made other determinations in the same ROD for administrative convenience, given the substantial overlap in the legal issues. Some of those determinations are not yet ripe for review because they are not yet approved by the Federal Energy Regulatory Commission ("FERC"), but the central issue of BPA's historical overcharges and the refunds due Preference Customers are separate final actions not regarded by BPA as subject to FERC review, and were not submitted for such review.

2

preference will be identified as "Preference Customers.")  Petitioners were parties in the WP-07S Case, and timely filed their petitions for review on or before December 1, 2008 (Case Nos. 08-74811 and 08-74900).  This Court consolidated all of the petitions for review of the WP-07S Case by Order of January 16, 2009.  Pursuant to Circuit Rule 15-3.2(c), Petitioners are deemed to have intervened in all the consolidated cases.

### Statement of the Issues Presented

Section 7(b) of the Act provides extraordinarily detailed, objective statutory directives that BPA must follow in establishing rates for the sale of power to Preference Customers.  Section 7(b)(2), the "rate ceiling" provision, prohibits BPA from charging Preference Customers more than an amount determined in a detailed calculation based on five statutory assumptions set forth in §§ 7(b)(2)(A)-(E).  The § 7(b)(2) rate ceiling protects Preference Customers if rates based on the statutory assumptions (BPA calls this the "7(b)(2) Case") are lower than rates calculated without those assumptions (the "Program Case").  In particular,  § 7(b)(2)(C) requires BPA to assume in the 7(b)(2) Case that no Exchange Program exists, thereby protecting Preference Customers from Exchange Program costs.

3

The issue presented in this brief is whether BPA's rate ceiling calculations on remand faithfully implemented the five statutory assumptions, or, as Petitioners contend, BPA instead unlawfully adopted numerous additional and/or different assumptions not set forth in the statute, which exaggerated costs chargeable to the Preference Customers and materially diminished the rate protection the statute was supposed to provide.[4]

**Statement of the Case**

Section 5(c) of the Act created an Exchange Program by which Congress provided the residential customers of utilities, primarily IOUs, with access to the benefits of low-cost electricity generated by the Federal base system ("Federal Base System") of hydroelectric dams and other generating facilities. *See PGE*, 501 F.3d at 1014-15. The Exchange Program permits IOUs to exchange their higher-priced power for lower-priced BPA power, a "paper transaction" involving cash transfers from BPA to the IOUs. *Id.* at 1015; *PacifiCorp v. F.E.R.C*, 795 F2.d 816, 818 (9th Cir. 1986). But Preference Customers were to be protected from the costs of the

_____

[4] Last time around, this Court identified the five assumptions, recognizing that "[o]nly one of those assumptions (§ 7(b)(2)(C)) is at issue here". *PGE*, 501 F.3d at 1015 n.7. In this case, Petitioners challenge BPA's unlawful implementation of all of the five assumptions to produce the same sort of unlawful transfers from Preference Customers to IOUs that this Court admonished BPA to avoid.

4

Exchange Program to an extent very precisely specified in § 7(b)(2) (the "rate ceiling"). *See generally PGE,* 501 F.3d at 1015-16.

The facts giving rise to this case began in 2000 when BPA entered into "settlement agreements" with IOUs providing power and cash benefits, ostensibly related to statutory obligations under the Exchange Program. BPA established rates to recover the costs of such settlements from the Preference Customers without regard to the "rate ceiling" protection provided by § 7(b)(2). As noted above, this Court set aside the "settlement agreements" in *PGE,* and remanded the *GNA* case back to BPA to establish lawful rates giving effect to § 7(b)(2).

While *GNA,* which challenged BPA's 2002-2006 rates, was pending before this Court, BPA promulgated new wholesale power rates for fiscal years 2007-2009, with what BPA acknowledges was a "similarly flawed" treatment of Exchange Program costs. (ER24[5]). BPA thus determined to conduct a single supplemental proceeding, the WP-07S Case, Part I of which constituted BPA's response to the Court's rulings, by calculating the amount

---

[5] Citations in the form "ER___" refer to the Joint Excerpts of Record of Preference Customers. Citations in the form "SER___" refer to the Supplement to Joint Excerpts of Record of Preference Customers filed by Petitioners Public Utility District No. 1 of Cowlitz County, the Public Power Council, Northwest Requirements Utilities and Pacific Northwest Generating Cooperative.

5

Preference Customers had been overcharged between FY2002 and 2008.[6] (ER26; ER32.)

After remand from this Court, Petitioners reasonably expected that BPA would simply calculate the refund owed them using the § 7(b)(2) methodology BPA originally used for the 2002-08 rate periods and then provide a mechanism for prompt and assured repayment of amounts paid in excess of the § 7(b)(2) rate ceiling so calculated. But BPA did neither of these things. Instead, BPA determined not to adhere to the § 7(b)(2) rate ceiling it had initially calculated for the 2002-2006 rate period. (*See* ER84) BPA recalculated the § 7(b)(2) rate ceiling amount, changing nearly every input into the calculation, and changing longstanding policies with regard to the methods to be employed in the calculation.

In this brief, Petitioners demonstrate that BPA failed to properly ascertain the amount of rate ceiling protection to which Preference Customers were entitled because BPA's flawed interpretation of §§ 7(b)(2) and (3) conflicts with express terms of the statute, and conflicts with the specific and overall intent of Congress regarding § 7(b)(2). Petitioners also support the Opening Brief and argument of Petitioners Tillamook PUD, Snohomish PUD and the Western Public Agencies Group addressing BPA's

---

[6] Part II, describing "changes to BPA's power rates for FY 2009" (ER26) is not yet ripe for review.

unlawful treatment of certain Load Reduction Agreements and BPA's failure to provide an adequate remedy to Preference Customers for the wrongs they have suffered. Petitioners also support the arguments of the Association of Public Agency Customers on these same two subjects.

### Statement of Facts

BPA sells electric power to Preference Customers, IOUs and direct-service industries ("DSIs") at rates determined pursuant to § 7 of the Act. The rates applicable to Preference Customers are subject to a "rate ceiling" under § 7(b)(2). In *GNA*, this Court remanded rates to BPA because BPA failed to include the cost of the Exchange Program in its calculation of the rate ceiling amount. The facts relevant to this appeal are those which demonstrate that BPA again deviated from the statute, and in particular from the specific statutory assumptions set forth in §§ 7(b)(2)(A)-(E).

By way of background, calculation of the rate ceiling amount requires BPA to compute "amounts to be charged for firm power for the combined general requirements" of Preference Customers. § 7(b)(2). "General requirements" is a term specifically defined for purposes of § 7(b) in § 7(b)(4) to mean the amount of "electric power purchased from the Administrator . . ." by Preference Customers (hereafter, "general requirements"). The first of the five assumptions, in § 7(b)(2)(A), defines

the only change BPA is allowed to make to its projections of general requirements in the Program Case for purposes of the rate ceiling comparison with the 7(b)(2) Case.

The most important fact for this appeal, which alone generated nearly all the other errors addressed herein, is that BPA inflated the general requirements in the 7(b)(2) Case by assuming that many years of conservation savings had never occurred. BPA formally determined that it would use "the same General Requirements as those used in the Program Case, *except that they will not include estimates of programmatic conservation savings being acquired by BPA . . .*". (ER757 & ER449; emphasis added.)

Because BPA has funded conservation programs by Preference Customers for many years, this caused large increases, ranging from 500 to over 700 average megawatts (aMW) per year in the general requirements BPA assumed for Preference Customers in the § 7(b)(2) rate ceiling calculation. (ER483). These hundreds of megawatts of non-existent general requirements, in turn, gave rise to hundreds of millions of dollars in phantom costs to serve those non-existent requirements. (*E.g.*, SER090 (annual average of $271.1 million).) By raising the rate ceiling by hundreds of millions of dollars, BPA undermined the purpose of § 7(b)(2) and

8

unlawfully shifted the burden of the Exchange Program costs to Preference Customers.

BPA also adopted numerous assumptions artificially inflating the costs of resources in the 7(b)(2) Case substantially above the costs of the very same resources in the Program Case. Congress carefully specified the allowable changes in resource costs for purposes of § 7(b)(2). Specifically, § 7(b)(2)(E)(i) directs BPA to assume away certain "financing costs" savings achieved by reason of the Act for resources "other than Federal base system resources". But BPA nonetheless increased the costs of the Federal Base System in the 7(b)(2) Case by roughly $1.1 billion. (SER228 (FY 2002-2009 total).)

Finally, prior to this Court's remand in *GNA*, BPA had assumed that certain low-cost mid-Columbia River hydropower resources (Mid-C resources) owned by Washington Preference Customers, not part of the Federal Base System, were available to serve Preference Customers in the 7(b)(2) Case. BPA reversed its position during the remand, declaring that those low-cost resources were not available to serve Preference Customers for purposes of § 7(b)(2).

In the original rate case, prior to remand, BPA had calculated that implementation of § 7(b)(2) would permit an average of $48 million per

9

year in Exchange Program benefits from 2002-2006 and $30 million per year from 2007-2008 to be charged to Preference Customers. (*See* ER84.) Now, BPA calculated average Exchange Program benefits of $135 million per year in FY 2002-2006 and $237 million per year in FY 2007-2008. (SER097.) The dollar effects arising from BPA's unlawful assumption of non-existent general requirements and artificially-inflated Federal Base System costs, combined with BPA's reversal concerning the assumed availability of Mid-C resources in the § 7(b)(2) calculation, account for this enormous increase in Exchange Program costs borne by Preference Customers.

### Summary of Argument

Congress expected that certain financial benefits arising from the Act would provide the means to fund Exchange Program costs. Section 7(b)(2) of the Act was expressly designed to protect Preference Customers from funding Exchange Program costs if these financial benefits did not materialize or were inadequate to offset the costs of the Exchange Program. By the time this case started back in 2000, the main mechanisms expected to fund the Exchange Program had ceased to operate. Yet BPA still contends it should transfer hundreds of millions of dollars in Exchange Program

benefits to the IOUs that can only be paid for by Preference Customers, because BPA fails to follow the express terms of § 7(b)(2).

The Act was Congress' response to a serious shortage of low-cost Federal power in a political environment where the statutory preference of Preference Customers to such power would not be disturbed, and would indeed be reaffirmed. Instead of limiting the rights of Preference Customers, Congress sought to expand the supply of Federal power and to make it available for Preference Customer load growth, under carefully-specified conditions, to residential customers of IOUs through the Exchange Program, and to DSIs. But Congress did not intend that Preference Customers bear the costs of the Exchange Program; it was to be funded by other elements of the Act.

While Congress anticipated that new sources of power would be costlier than the low-cost Federal Base System, Congress also anticipated that regional financing of these new resources would provide substantial cost savings to help offset Exchange Program costs. Congress also anticipated that sales to DSIs would provide additional revenues and reserve benefits to BPA to help fund the Exchange Program.

In § 7(b)(2), Congress created special protections for Preference Customers in the event that the expected sources of funding for the

11

Exchange Program failed. The legislative history confirms that the five assumptions set forth in §§ 7(b)(2)(A)-(E) were crafted as part of a painstaking design to insure, to a precisely-specified extent, that Preference Customers would be protected from rate increases arising from the Exchange Program.

By carefully specifying the five assumptions to be made for the § 7(b)(2) rate test, Congress excluded any other cost-changing assumptions. This is clear from the legislative history as well as the rule of statutory construction *expressio unius est exclusio alterius*. Petitioners review in detail the five assumptions set forth in §§ 7(b)(2)(A)-(E), explaining how they operate together to protect the Preference Customers from Exchange Program costs.

BPA did not implement § 7(b)(2) according to its terms. Instead, BPA invented additional assumptions which frustrated the § 7(b)(2) protection. The most material of these invented assumptions—hundreds of megawatts of non-existent general requirements created by assuming away conservation—is flatly contrary to the Act and severely undermines the rate protection. BPA has attempted to justify its inflation of the 7(b)(2) Case general requirements by reference to its past practices, but past practice

12

cannot make lawful an action contrary to the plain language of the statute, so as to frustrate Congressional intent.

Petitioners also discuss additional assumptions by which BPA increased the costs of financing the Federal Base System in the 7(b)(2) Case over and above the costs used in the Program Case, notwithstanding the careful Congressional specification of the only circumstances when financing costs might be higher: the direction in § 7(b)(2)(E)(i) to assume away certain financing costs savings unrelated to the Federal Base System. A key purpose of § 7(b)(2) and the Act was to preserve for Petitioners the benefit of preference to the low-cost Federal Base System, and Congress clearly did not intend to afford BPA the discretion to greatly increase the assumed costs of those resources.

Finally, Petitioners discuss an assumption concerning the availability of certain low-cost Mid-C resources (not part of the Federal Base System) in the 7(b)(2) Case. Prior to the remand, BPA correctly assumed that such low-cost resources were available to serve public load under § 7(b)(2), dramatically reducing costs. On remand, BPA has simply reversed its position, undermining the intended protection of § 7(b)(2).

By adding to and altering the assumptions specified in § 7(b)(2), BPA denied Preference Customers the statutory protection Congress created to

13

insure them against failure of the anticipated means to fund the Exchange

Program. Instead of following §§ 7(b)(2) and (3), BPA has caused

Preference Customers to fund the Exchange Program.

**Argument**

I.    **THE TEXT, LEGISLATIVE HISTORY AND STRUCTURE OF THE ACT ALL DEMONSTRATE THAT CONGRESS INTENDED TO PROVIDE A SPECIFIC, OBJECTIVE METHOD FOR PROTECTING PREFERENCE CUSTOMERS FROM HIGHER RATES DUE TO THE COSTS OF THE EXCHANGE PROGRAM.**

A.    **Standard of Review.**

This Court's review of BPA's final actions and decisions is governed

by the Administrative Procedure Act, 5 U.S.C. § 706, as incorporated by

§ 9(e)(2) of the Act. This Court must set aside actions that are "arbitrary,

capricious, an abuse of discretion or otherwise not in accordance with law."

5 U.S.C. § 706(2)(a); *see Public Utility Dist. No. 1 of Snohomish County,*

*Wash. v. Bonneville Power Admin.*, 506 F.3d 1145, 1153 (9th Cir. 2007). In

deciding whether an action is "in accordance with law", the Court should

reject any statutory interpretation by BPA if it is inconsistent with a statutory

mandate or otherwise frustrates any policy Congress sought to implement.

*M-S-R Pub. Power Agency v. BPA*, 297 F.3d 833, 844 (9th Cir. 2002). When

"Congress has directly spoken to the precise question at issue, that is the end

of the matter; for the . . . agency must give effect to the unambiguously

14

expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 476 U.S. 837, 842-43 (1984).

As this Court has emphasized, in interpreting a statutory provision such as § 7(b)(2), one should "not look merely to a particular clause in which general words may be used, but . . . take in connection with it the whole statute . . . and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature". *Azarte v. Ashcroft*, 394 F.3d 1278, 1287 (9th Cir. 2005) (quoting *Kokoszka v. Belford*, 417 U.S. 6432, 650 (1974)). The specific language of § 7(b)(2) is best understood in the context of its history and purpose.

Accordingly, Petitioners begin with a review of the relevant structure and overarching purposes of the Act, and the very detailed legislative history explaining the rate directives of the Act, including the rate protection to Preference Customers under § 7(b)(2). The language of § 7(b)(2) and the legislative history compel the conclusion that the fundamental purpose of the § 7(b)(2) rate ceiling was to protect Preference Customers from bearing the cost of the Exchange Program, such that the Exchange Program would be funded, if at all, from financial benefits expected from the Act. The Act and its legislative history also compel the conclusion that this intended

15

protection required BPA to adhere to the detailed directives specified in §§ 7(b)(2) and (3).

**B. The Origins and Purposes of the Act.**

As the Supreme Court explained at some length in *ALCOA v. Central Lincoln Peoples' Utility District*, 467 U.S. 380, 385-86 (1984), the Act arose in the context of a growing shortage of low-cost, Federal hydropower in the Pacific Northwest. *See also PGE*, 501 F.3d at 1009, 1014. When BPA was created, cooperative and governmental utilities, such as Petitioners, were given statutory "preference and priority access" to Federal power (16 U.S.C. § 832c(a)), a policy specifically reaffirmed by § 5(a) of the Act.[7]

Section 5(a) not only reaffirmed preference, it directed that the rates for preference sales "shall be at rates established pursuant to section 7," under which Preference Customers had the most favorable rates. BPA's other two groups of customers are IOUs and DSIs, which "are 'nonpreference' customers, and BPA [historically was] allowed to contract to sell to them only power for which Preference Customers do not apply". *ALCOA*, 467 U.S. at 384.

---

[7] Congress emphasized the sanctity of the preference in the legislative history of the Act, emphasizing that the bill "does not alter in any way that Congressionally-established obligation and priority, no[r] does the Committee intend that the legislation be construed to alter or modify that obligation and priority." H. Rep. No. 96-976, Pt. I, 96th Cong., 2d Sess. 24 (1980) (hereafter "House Report, Part I") (SER152).

Under the statutes that existed prior to the Act, BPA had no authority to own, construct, or purchase the output of electric generating resources except to meet short-term deficiencies. *ALCOA*, 467 U.S. at 386 n.5. As demand rose, and with an "inevitable shortfall in Federal base resources and with no ability to add to its power", BPA felt forced to make an "administrative allocation" of the available power.[8]

In the face of "a 'regional civil war' over low cost power" (House Report, Part I, at 27 (SER)), Congress adopted the Act to address these and other issues. The Act authorized BPA "[f]or the first time . . . to acquire resources to increase the supply of federal power". *ALCOA*, 467 U.S. at 386; *PGE*, 501 F.3d at 1014. This was expected to address the growing need for power to serve DSIs and IOUs and growing Preference Customer requirements, and comprehensive planning provisions promised to achieve lower-cost power generation and conservation.

In particular, proponents of the Act argued that a very significant financial benefit would be regional financing of the new resources through BPA, rather than individual utilities. Senator Jackson, a major sponsor of the bill, declared:

---

[8] House Report, Part I, at 25 (SER153). Both the IOUs (*see* SER152) and DSIs (*see ALCOA*, 467 U.S. at 385) faced a loss of access to BPA power.

17

"The advantages of the regional power bill for the Northwest will be enormous: . . . Regional financing of resources through BPA will result in lower resource financing costs, primarily lower interest charges and reduced equity financing costs, which will save the region billions—not millions—of dollars."[9]

These expected financing benefits would figure prominently in the design of § 7(b)(2).

Section § 5(d)(1)(A) provides for BPA to offer new power contracts to DSIs, and that DSIs provide a portion of BPA's reserves for firm power sales (*ALCOA*, 467 U.S. at 387 (citing § 5(d)(1)), thereby maintaining important reserve benefits for BPA and its customers (*see also* House Report, Part I, at 61 (SER171)). As set forth below, new DSI rate directives also promised further benefits to BPA from expected above-cost sales to the DSIs, whose rates would rise sharply. *ALCOA*, 467 U.S. at 399-400.

Threatened litigation over high IOU power costs gave rise to the Exchange Program in § 5(c), which authorized BPA to sell power to the IOUs for resale to their residential customers at a rate established under § 7(b)(1), and to purchase back an equal amount of power at the IOU's Average System Cost. *PGE*, 501 F.3d at 1015. As this Court has explained, "[w]hile these agreements are called residential energy exchange agreements, there is not, in fact, any exchange of energy at all, but merely an

---

[9] 126 Cong. Rec. S14691 (daily ed. Nov 19, 1980); *see also* House Report, Part I, at 30 (SER158).

18

accounting transaction in which BPA credits a subsidy to investor-owned utilities based upon each utility's average system cost". *PacifiCorp v. BPA*, 795 F.2d 810, 812 (9th Cir. 1986); *PGE*, 501 F.3d at 1015. This Exchange Program, while providing potential benefits to the residential customers of IOUs, threatened to impose significant costs on BPA and its Preference Customers.

The Act also contained provisions promoting the national policy in favor of reducing electricity consumption through conservation, meeting loads through renewable resources, and addressing fish and wildlife concerns. The Act directed BPA to "equitably allocate [the costs of these mandates] to power rates" pursuant to § 7(g), such that these costs were not allocated to any particular customer class.

Prior to the Act, BPA had adopted a uniform rate for all firm power sales based on a single, melded generating resource cost pool. (SER211.) In the Act, Congress provided detailed rate directives assigning the costs of specific resource to specific customer classes. *See* §§ 7(b), (c) & (f). Specifically, § 7(b) directed BPA to establish rates for both Preference Customers and Exchange Program loads, and to collect through such rates the costs of the Federal Base System, then, if necessary, the cost of power purchased by BPA under the Exchange Program (purchased at "average

19

system cost"), and then, if necessary, the cost of other, typically new, high-cost generation resources.

By allocating Federal Base System and Exchange Program costs to both preference sales and Exchange Program sales, the Act threatened to dilute the value for Preference Customers of their preference to low-cost Federal power—unless other financial benefits from the Act exceeded Exchange Program costs. This problem resulted in the carefully-detailed § 7(b)(2) rate directives that are at the core of these Petitions for Review.

**C.     The Origin and Purpose of the "Rate Ceiling".**

The financial benefits to the IOUs' customers of the Exchange Program, and the benefits to the DSIs of continued access to Federal power, were fairly obvious. However, Preference Customers questioned whether the asserted financial benefits of the Act would in fact materialize and offset their potential exposure to what were expected to be large costs of the Exchange Program.

Therefore, the Public Power Council proposed several amendments to the bill that was to become the Act. As Senator Jackson, a key supporter of the Act, explained:

> "Publicly owned utilities in the region and nationally have expressed concern that the proposed regional legislation adversely affects the preference clause. Northwest Preference Customers have sought to address this issue through amendments to establish a "preference

customer rate limit" which would preserve the financial benefits of the preference clause for public agencies."[10]

Those amendments, which became §§ 7(b)(2) & (3), were designed to test whether the main expected benefits of the Act to the Preference Customers were sufficient to offset the most feared cost: the § 5(c) Exchange Program.

The legislative history makes it clear that the overarching purpose of §§ 7(b)(2) & (3), in conjunction with the § 7(c) rate directives for DSIs, was to ensure that the Preference Customers not suffer financial losses from adoption of the Exchange Program:

> "Customers of preference utilities will not suffer any adverse economic consequence as a result of this [residential] exchange since, as discussed below, the direct-service industrial customers of BPA are required to pay the costs of the exchange during its initial years while a "rate ceiling" protects the customers of preference utilities during later years."[11]

Those "later years", beginning July 1, 1985, initiated the operation of the statutory provisions now before the Court.

Section 7(b)(2) sets an upper limit on the rates BPA may charge its Preference Customers for the power they purchase from BPA to meet their

---

[10] 125 Cong. Rec. S3999 (daily ed. April 5, 1979); *see also* 125 Cong. Rec. H2060 (daily ed. April 5, 1979) (Congressman Duncan discusses the "'rate cap' amendment to insure that Preference Customers will pay *no more* (and hopefully less) under this bill than they would without it").

[11] H. Rep. No. 96-976, Pt. II, 96th Cong., 2d Sess. 35 (1980) (hereafter, "House Report, Part II") (SER192); *see also ALCOA*, 467 U.S. at 399-400 ("BPA's ability to finance the exchange program is related to the amount of power that BPA sells to DSIs . . .").

21

retail loads (exclusive of "new large single loads"). As explained in the legislative history:

> "Section 7(b)(2) establishes a 'rate ceiling' for Preference Customers that seeks to assure these customers that their rates will be no higher than they would have been had the Administrator not been required to participate in power sales or purchase transactions with non-Preference Customers under this Act. The assumption[s] to be made by the Administrator in establishing this ceiling are specifically set forth. It is through rate ceilings that this Act provides additional protection to public bodies and cooperatives' Preference Customers as to the price of the sale of power by the Administrator. In the event that this rate ceiling is triggered, then the additional needed revenues must be recovered from BPA's other rate schedules."

House Report, Part I, at 68-69 (SER178-179).

**D.    The Detailed Language and Structure of § 7(b) Confirms Congress' Specific, Objective Protection for Preference Customers.**

The § 7(b)(2) rate test involves comparing the power costs of serving Preference Customers under the Act as if § 7(b)(2) did not exist (the "Program Case") with the costs of serving such customers under assumptions carefully crafted to remove the effect of the Exchange Program and certain other effects of the Act (the "7(b)(2) Case"). If the power costs calculated in the 7(b)(2) Case are less than the power costs calculated in the Program Case, then Preference Customers' rates determined under §§ 7(b)(1) and 7(g) are to be reduced by that difference, and the costs are to

22

be recovered from other customer classes pursuant to § 7(b)(3). *See PGE*, 501 F3d at 1015.

The first sentence of § 7(b)(1) authorizes BPA to establish rates for "electric power sold to meet the general requirements" of Preference Customers and power sold under § 5(c) as part of the Exchange Program. However, § 7(b)(2) then provides a ceiling on the amount of power generation resource costs that may be recovered through power sold to meet Preference Customers' general requirements.

Pursuant to the opening clause of § 7(b)(2), certain costs, primarily conservation costs, are excluded entirely from the operation of the § 7(b)(2) rate ceiling test:

> "After July 1, 1985, the projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and federal agency customers, *exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events*, may not exceed in total, as determined by the Administrator, during any year after July 1, 1985, plus the ensuing four years, an amount equal to the power costs for the general requirements of such customers if, the Administrator assumes that—" (emphasis supplied).

As BPA explained in its formal 1984 Legal Interpretation of § 7(b)(2);

> "The phrase 'power costs for general requirements of such customers' is a direct reference back to the 'projected amounts to be charged' when calculating the costs of the Program Case. Because the two clauses are identical in all material respects, the *same power costs that were used to serve the 'general requirements' in the Program Case*

23

*should be used as the starting point to construct the revenue requirement in the 7(b)(2) Case*; that is, 'the projected amounts to be charged for firm power . . .'". (ER737; emphasis supplied).

In particular, it is clear that the "amounts charged such customers under subsection (g)" ("§ 7(g) Costs") are not to be included in the "power costs" projected in either the Program Case or the 7(b)(2) Case. Those costs are not directly associated with the Federal Base System over which Preference Customers had priority, and pursuant to § 7(g), they are allocated to all sales based on "generally accepted ratemaking principles," not the provisions of § 7(b).

*In short, the § 7(b)(2) rate ceiling test involves comparison of a subset of the costs to serve Preference Customers*. The costs to be considered in the 7(b)(2) Case are only those costs necessary to meet the general requirements of Preference Customers, defined in § 7(b)(4) to be "electric power purchased from the Administrator under section 5(b)…" by Preference Customers. Such purchases necessarily are reduced by any load reductions resulting from conservation efforts, the costs of which are not "power costs."

After the initial exclusion of § 7(g) Costs from the rate test, § 7(b)(2) goes on to prohibit BPA from charging Preference Customers any rates with a "power cost" component in excess of the amount calculated under the

24

carefully-detailed assumptions in §§ 7(b)(2)(A)-(E).  Adherence to these assumptions implements the Congressional goal of protecting Preference Customers from Exchange Program costs that exceeded other benefits specified under the Act.  A central assumption in the 7(b)(2) Case is that "no purchases or sales by the administrator as provided in § 5(c) were made" during the rate period.  (§ 7(b)(2)(C).)  This assumption removes the effect of the money-losing § 5(c) Exchange Program.  Other assumptions require that certain specific, expected benefits of the Act also be removed for purposes of the rate test.

BPA distills the directives set forth in §§ 7(b)(2)(A)-(E) into what it calls the "Five Assumptions" (ER753 & ER733).

1.	Section 7(b)(2)(A) requires BPA to assume that the 7(b)(2) Customers' general requirements in the § 7(b)(2) Case include—*i.e.,* are increased by—certain DSI loads served by BPA.  This removes from the 7(b)(2) Case any expected benefits from BPA's above-cost sales to DSIs enabled by the Act.  The above-cost portion of DSI revenues are available only in the Program Case, if at all, to help offset Exchange Program costs. *See ALCOA*, 467 U.S. at 380, 399; *PacifiCorp*, 795 F2.d 816 at 819.

2.	Section 7(b)(2)(B) requires BPA to assume that all Federal Base System resources other than those "obligated to other entities under

25

contracts existing as of December 5, 1980 (during the remaining term of such contracts)," are available to serve 7(b)(2) Customers. This provision assures Preference Customers of their statutory priority to the Federal Base System.

3. Section 7(b)(2)(C) requires BPA to assume that no Exchange Program transactions pursuant to § 5(c) occur. This assures that Preference Customers will pay Exchange Program cost only to the extent they are offset by certain benefits related to the other assumptions.

4. Section 7(b)(2)(D) requires BPA to assume that the least expensive electric power resources of Preference Customers are used to meet their "general requirements" remaining if the Federal Base System is not sufficient to meet those "general requirements." If needed, these resources replace the Exchange Program resources removed by the third assumption.

5. Section 7(b)(2)(E) requires BPA to assume that certain "quantifiable monetary savings" expected to arise from the Act were not achieved: (i) benefits of lower-cost, BPA-backed financing of resources; and, (ii) DSI reserve benefits. This assumption removes from the 7(b)(2) Case two primary expected benefits for Preference Customers under the Act;

any financing and DSI reserve benefits actually achieved would be reflected only in the Program Case to offset Exchange Program costs.

BPA correctly explains in its Legal Interpretation that the Act "assures . . . Preference Customers are charged no more for their General Requirements after July 1, 1985, than they would have been charged if the Five Assumptions [set forth in § 7(b)(2)] were to be realized."  (ER733.) Congress may have hoped and expected that the financing benefits and benefits arising from continued service to the DSIs could continue to fund the Exchange Program after July 1, 1985, *but if the anticipated benefits did not offset fully the costs of the Exchange Program, Congress specified the result in §§ 7(b)(2) & (3)*.

Under § 7(b)(3), if BPA's power costs calculated without regard to § 7(b)(2) exceed the power costs after the § 7(b)(2) rate ceiling test, the excess is to be recovered through rate surcharges for power sold for other than the general requirements of Preference Customers, including federal power "sold" under § 5(c) as part of the Exchange Program.  In the words of this Court:  "The practical effect of the rate ceiling is that once it is reached, qualifying IOUs must then pay for the cost of the additional benefits they receive, thereby reducing the overall value of their benefits."  *PGE*, 501 F.3d at 1015.

Sections 7(b)(2) and (3), properly construed, cap the Preference Customers' rates at a level no higher than they would have paid if the principal expected costs and benefits under the Act, set forth in the Five Assumptions, did not exist. This Court correctly summarized the overall purpose of § 7(b)(2) as follows:

> "[Section] 7(b)'s rate ceiling analysis provides a means of determining whether REP benefits will impact the Preference Customers' power rates and, if so, § 7(b)(3) insures that the Preference Customers power rates are unaffected by the implementation of the REP." *PGE,* 501 F.3d at 1021.

## II. BPA ADOPTED IMPROPER ASSUMPTIONS NOT CONTAINED IN § 7(b)(2) THAT ARE CONTRARY TO LAW AND DIMINISH THE RATE PROTECTION REQUIRED BY CONGRESS.

### A. BPA Must Adhere to the Five Statutory Assumptions, and Cannot Introduce Additional Assumptions Undermining the Five Assumptions.

In § 7(b)(2), Congress set out in great detail the assumptions that must be used in performing the § 7(b)(2) rate ceiling test. The legislative history confirms Congress intended § 7(b)(2) to operate on the basis of the assumptions explicitly stated in the Act. The Senate Report, which contains extraordinarily detailed treatment of § 7(b)(2), makes it clear that Congress intended to provide a specific and objective method of implementing the rate ceiling that would insure protection of Preference Customer rates.

"*The specific rate limit factors are objective in nature*. The first, the size and cost of the Federal Base System Resources, will be determinable in much the same way that BPA applies in its current ratemaking. The size and location of DSI loads with respect to preference customer service areas are also easily identified. The amount of new resources needed to meet preference customer load growth, including the applicable DSI load, may require some minor estimating. This is principally because preference customer resource construction probably will never exactly match preference customer load growth (high or low). The monetary benefits which would not be available to Preference Customers will be the hardest to determine. This analysis limits its consideration to two specific areas; lower financing costs and lower system planning and operating reserve costs."[12]

The House Report declares that § 7(b)(2) "specifies the method of calculating this [rate] ceiling, in order to *insure* such customers the cost benefits of their preference rights for sales under this subsection". [13] To "insure" is to *guarantee*. *Cf. Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978) (command to "insure that actions . . . do not jeopardize the continued existence of listed species" is "language [that] admits of no exception").

In its current Legal Interpretation of § 7(b)(2), BPA recognized the importance of preserving "the Congressionally identified drivers of the rate test—the Five Assumptions" (ER737), and correctly interpreted the Act, at least in the first instance, by declaring that § 7(b)(2) "limits the 7(b)(2) Case

---

[12] S. Rep. No. 96-272, 96th Cong., 1st Sess. at 61 (1979) (hereafter "Senate Report") (SER130, emphasis supplied).
[13] House Report, Part II, at 52 (SER201); *see also id.* at 36 (SER193).

29

to the Five Assumptions listed in § 7(b)(2) and the secondary effects of those assumptions." (ER734; *see also* SER015 (original 1984 Legal Interpretation notes that "[a]ssumptions not specified by the statute will not be considered").) BPA stated that § 7(b)(2) must be interpreted to forbid *additional* assumptions that are not "unavoidable secondary effects" (*see id.*) of the Five Assumptions to give effect to the Congressional directive in § 7(b)(2). BPA even acknowledged in the Implementation Methodology that "to the maximum extent possible, the exact structure and form of the computer model should be the same" in both the Program Case and 7(b)(2) Case. (*See* ER760-761.) BPA notes that this approach "allow[s] the 7(b)(2) Case to be modeled under the same accepted ratemaking techniques used in the Program Case" and "will also avoid the modeling of a hypothetical world that attempts to reflect in extreme detail what would have occurred if the Northwest Power Act had not been enacted". (ER734.)

In short, the language, legislative history and administrative interpretation make it clear that Congress intended the Five Assumptions, and not others, to govern the calculation of the rate ceiling. In such circumstances, the federal courts have long applied the rule of statutory interpretation *expressio unius est exclusio alterius,* that "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any

30

other mode." *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1312-13 (9th Cir. 1992) (quoting *Raleigh & Gaston Ry. Co. v. Reid*, 80 U.S. 269, 270 (1871)); *see also United States v. Gamboa-Cardenas*, 508 F.3d 491, 497 (9th Cir. 2007) (the rule "creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions"); *Silvers v. Sony Pictures Entertainment, Inc.* 402 F.3d 881, 885 (9th Cir. 2005) (same); *Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991) (same). Here Congress has established a particular mode of calculating the rate protection to be afforded Preference Customers through two alternative calculations, one with and one without the Five Assumptions. As a result, § 7(b) must be construed to forbid any differences between the Program Case and the 7(b)(2) Case other than those created by the statutorily specified assumptions.

Nevertheless, in implementing § 7(b)(2) on remand, BPA added numerous improper assumptions to the 7(b)(2) Case, and even "secondary effects" of the improper assumptions, undermining the statutory design. BPA failed to protect Preference Customers as Congress intended. Because "Congress has squarely addressed the issue" of how to perform the rate test comparison, BPA's decision to use additional, non-statutory assumptions in the rate test is not subject to any deference by this Court. *Cf. M-S-R Public*

31

*Power v. BPA*, 297 F.3d 833, 844 (9th Cir. 2002) (no deference to BPA's erroneous interpretation of the Excess Federal Power Act).

**B. BPA Unlawfully Increased the General Requirements of Preference Customers in the 7(b)(2) Case.**

The opening sentence of § 7(b)(2) makes clear the focus of the § 7(b)(2) comparison: (1) the "amounts to be charged for firm power for the combined general requirements" of Preference Customers compared with (2) the "power costs for general requirements of" Preference Customers under the Five Assumptions. BPA unlawfully exaggerated the general requirements of Preference Customers with load that did not exist because of conservation, and then assigned enormous phantom costs to serve that non-existent load, thus reducing the rate protections of § 7(b)(2).

**1. Adding non-existent load to Preference Customers' "general requirements" is contrary to law.**

As BPA explained in its Implementation Methodology, BPA develops a "load forecast [of power requirements] . . . for every BPA rate proposal independent of any requirements for implementing § 7(b)(2)". (ER756.) That load forecast "include[s] estimates of BPA programmatic conservation savings for the forecast period" (*id.*); *i.e.,* BPA's load forecast is lower than it would have been if, contrary to fact, no conservation savings were expected in the rate period.

BPA then departs from the Act, concluding that when defining the general requirements of Preference Customers in the § 7(b)(2) Case, BPA will use "the same General Requirements as those used in the Program Case, *except that they will not include estimates of programmatic conservation savings being acquired by BPA . . .*".  (ER757 & ER449; emphasis added.) The conservation savings BPA is referring to include both future savings due to past conservation programs and savings estimated from future programs. In other words, BPA adds to the statutorily-defined general requirements its estimate of the historic and forecast load reductions achieved by conservation.

Increasing the Preference Customers' general requirements by BPA's estimate of conservation savings conflicts directly with the Act because it is contrary to the definition of general requirements" in the Act.  That definition, in § 7(b)(4), specifically defines the term "general requirements" as Preference Customers' "*electric power purchased from [BPA] under § 5(b)*, exclusive of any new large single load" (emphasis added).[14]  Power *not purchased* because of conservation manifestly is *not* "power purchased".

---

[14] The Act defines "electric power" as "electric peaking capacity, electric energy, or both".  (§ 3(9))

BPA's approach is also inconsistent with the definition of "general requirements" in BPA's Legal Interpretation adopted as part of this case. In that Legal Interpretation, BPA declares that "general requirements" means:

> "The public body, cooperative and Federal agency customers' electric power assumed in the Relevant Rate Case to be purchased from BPA, exclusive of new large single loads. General requirements are limited to power purchased from BPA under section 5(b) of the Northwest Power Act . . ." (ER732.)

Section 5(b)(1) governs power sales to Preference Customers, imposing upon BPA a duty to sell "electric power to meet the firm load" of such customers. BPA has no authority under § 5(b) to sell electric power for loads that do not exist due to conservation, and BPA certainly does not sell conservation under § 5(b).[15] The reference in § 7(b)(4) to "electric power purchased from the Administrator under section 5(b)" is yet another explicit textual reference in the Act negating the notion that conservation power savings can be added to general requirements or that conservation costs have any role in the § 7(b)(2) rate test.

Congress expressly addressed the one and only change BPA should make to "general requirements" between the Program Case and 7(b)(2) Case. The only permissible difference is set forth in the First Assumption, which requires BPA to add to the general requirements only DSI loads

---

[15] Indeed, BPA typically purchases (*i.e.*, pays for) conservation *from* the Preference Customers and others; it does not sell conservation at all.

34

"served by the Administrator" and "located within or adjacent to the geographic service boundaries of such public bodies and cooperatives". (§ 7(b)(2)(A).) BPA's addition of non-existent load to Preference Customers' general requirements in the 7(b)(2) Case constitutes an additional assumption barred under the principle of *expressio unius est exclusio alterius.* Had Congress wanted load-changing assumptions in the 7(b)(2) Case other than the required addition of certain DSI loads, it would have specified them. Congress did not, and BPA had no authority to modify the § 7(b)(2) assumptions adopted by Congress so as to exaggerate Preference Customers' "general requirements".

### 2. BPA's rationales for adding non-existent load are meritless.

BPA offered several legally-incorrect arguments for increasing general requirements with phantom load in the 7(b)(2) Case. First and foremost, BPA argued that it has followed the practice of adding non-existent load since initially promulgating its original Implementation Methodology in 1984. (ER449.)

As BPA acknowledges in the ROD, "there has not been a serious debate in a BPA rate proceeding regarding the adjustment to the 7(b)(2) Case loads for conservation" since 1984. (ER482.) In large part, BPA's non-statutory increase to "general requirements" was masked and offset in

35

prior cases by assuming that the additional general requirements would be served with certain mid-Columbia hydro resources owned by Preference Customers, the costs of which were similar to, or lower than, Federal Base System costs.  In this case, BPA has now decided that general requirements will not be served by mid-Columbia resources in the 7(b)(2) Case, so the effect of exaggerating general requirements is huge.

In any event, BPA's past, and previously unchallenged, actions are no authority for perpetuating an error.  Even "longstanding practice" is not subject to deference where, as here, "that practice frustrates the congressional purpose underlying a statute".  *Burns v. U.S. R.R. Retirement Bd.*, 701 F.2d 193, 200 n.20 (D.C. Cir. 1983) (citing *Morton v. Ruiz,* 415 U.S. 199, 237 (1974)).  The statute requires BPA to assume one specific difference between the general requirements in the Program Case and the 7(b)(2) Case, and BPA is simply not permitted to make additional assumptions that  diminish the protections of the statute.  This is especially true when the overarching structure of §§ 7(b)(2) and 7(g) makes it clear that conservation costs are allocated under § 7(g), and are to play no role in the § 7(b)(2) rate ceiling test.

36

### 3. BPA's arguments conflict with the text of the Act.

In the WP-07S ROD, BPA purports to find textual support for exaggeration in "general requirements" in § 7(b)(2)(B), the statutory language governing the Second Assumption. (ER449-464.) As noted above, that language requires the Administrator to assume in the 7(b)(2) Case that Preference Customers "were served, during such five-year period, with Federal Base system resources not obligated to other entities . . .". Section 7(b)(2)(B) requires BPA to assume the Federal Base System is available to serve Preference Customers general requirements; it does not require or permit BPA to alter those general requirements. The obvious purpose of this subsection is to fully preserve Preference Customers' priority access to the Federal Base System.

BPA claims that "[b]y excluding the terms 'general requirements' and 'conservation' from subsection 7(b)(2)(B), Congress created an ambiguity whether, in the 7(b)(2) Case, conservation had already been used to meet load" of the Preference Customers. (ER459.) There is no ambiguity; the plain language of the Act provides that the loads to be assumed in § 7(b)(2) are specified by the defined term "general requirements," with the only lawful addition in the 7(b)(2) Case to such general requirements being certain DSI loads added pursuant to § 7(b)(2)(A). It would be strange

37

indeed to conclude that by not mentioning conservation in any of the Five Assumptions, Congress intended those Assumptions to mean something different than what is conveyed by the words Congress chose. All of § 7(b)(2) addresses the power cost incurred for "general requirements," defined as "electric power purchased" from BPA, not power that is *not* purchased due to conservation.

Building upon its misconstruction of § 7(b)(2)(B), BPA attempts to find textual support for adding non-existent load to the general requirements based on the use of the term "resources" in § 7(b)(2)(D). The Federal Base System resources identified in § 7(b)(2)(B) supply power to meet as much of such general requirements as they can serve. Section 7(b)(2)(D) addresses other "resources that would have been required, during such five-year period, to *meet remaining general requirements* of" the Preference Customers (emphasis added), further confirming the overarching focus on "general requirements," not conservation savings. Nonetheless, BPA argues that (1) § 7(b)(2)(D) "describes the resources the Administrator is to assume are available to 'meet remaining general requirements'"; (2) conservation is a "resource"; and therefore (3) BPA must assume that "'remaining 'general requirements' have not been affected by conservation" (ER461).

In fact, § 7(b)(2)(D) governs only BPA's selection of resources "to meet remaining general requirements of" Preference Customers "other than requirements met by the available Federal base system resources determined under subparagraph (B) of this paragraph". (*Id.*) If Preference Customers do not need to purchase some power because their "general requirements" have been reduced by conservation savings, nothing in § 7(b)(2)(D) allows BPA to assume, contrary to fact, that Preference Customers do need to purchase the power. Section 7(b)(2)(D) merely identifies the characteristics of the resources that will be used to produce power for the "remaining general requirements."

BPA simply refuses to give § 7(b)(2) its plain meaning comparing "power costs" to meet "general requirements" under specified assumptions. Instead, BPA seeks to inject the cost of conservation into the 7(b)(2) Case. BPA ignores that conservation by definition reduces the amount of power purchased by Preference Customers from BPA and thereby reduces general requirements.[16]

The language and structure of the Act do not permit conservation to be considered among the "resources" referenced in § 7(b)(2)(D). It is true

---

[16] "Conservation" is defined by the Act to mean "any reduction in electric power consumption as a result of increases in the efficiency of energy use, production or distribution". (§ 3(3))

that the general word "resource" is defined in the Act to include both "electric power" in § 3(19)(A) and "conservation" in § 3(19)(B), and both are resources purchased under § 6. But the scope of "resource" in § 7(b)(2)(D), like any statutory language, "depends on context". *Cf., e.g.,* *King v. St. Vincent's Hospital*, 502 U.S. 215, 219 (1991). By the plain terms of § 7(b)(2)(D), conservation cannot be among the resources it addresses.

Section 6 itself distinguishes between resources, such as conservation, installed under § 6(a)(1) "to reduce load," and resources acquired under § 6(a)(2) "to meet [BPA's] contractual obligations which remain after taking into account planned saving from measures provided for in paragraph (1) of this subsection". By its terms, § 7(b)(2)(D) addresses the allocation of the cost of resources "to meet remaining general requirements" of the 7(b)(2) Customers—that is, to meet BPA's contractual obligation *to supply electric power for Preference Customers to purchase* over and above the amount that can be supplied by the available Federal Base System.

Thus, in the specific context of § 7(b)(2)(D) and the overall statutory plan of § 7(b), only "electric power", not conservation, may be construed as the type of "resource" addressed in § 7(b)(2)(D). "Electric power", defined as "electric peaking capacity, electric energy, or both" (§ 3(19)(A)), is the

40

only type of resource that can "meet the remaining general requirements" of Preference Customers, that is, supply power for them to purchase.

### 4. The legislative history confirms that BPA's conservation arguments are spurious.

The plain reading of § 7(b) is confirmed by the detailed "Numerical Analysis" included as Appendix B of the Senate Report on the Act. Appendix B attempted to predict how the Act's rate directives would operate under a variety of assumptions, with "[p]articular attention . . . to the 'preference customer rate limit' which has been prepared as an amendment to section 7(b) of the proposed legislation". Senate Report, at 56 (SER125).

Congress made clear the great weight to be placed upon Appendix B. The Senate Report explains:

> "*At the request of the Committee*, the Administrator has prepared an analysis of the rate provisions of the introduced legislation with certain amendments proposed to the Committee, and it is included as Appendix B. *This analysis was widely circulated in the region and has become an important part of the common understanding of how the costs of resources would be distributed as a result of this legislation. The Committee takes notice of these understandings and the importance they played in the development of regional expectations for all classes of customers.* In full recognition that as a matter of law under this act rates shall be established pursuant to specific statutory provisions in sections 7 and 9 and that the circumstances which were assumed in preparing the analysis will change over time, the Committee has included the computer analysis and accompanying narrative in the appendix."[17]

---

[17] Senate Report, at 31-32 (SER122-123; emphasis supplied).

41

Congress referred to power resources *meeting load*, not conservation resources reducing load. [18]

Appendix B analyzed how § 7(b)(2) would operate under eighteen different scenarios of the future. No specific projections of conservation are made in connection with any of the eighteen scenarios. Instead, the loads used in Appendix B were taken directly from "two current regional load forecasts, the Pacific Northwest Conference Committee's (PNUCC) regional load forecast and the Northwest Energy Policy Project (NEPP) forecast *which could be termed a conservation load forecast*."[19] In other words, the load forecasts used in Appendix B included the projected effects of conservation on Preference Customers' general requirements.

Importantly, none of the eighteen scenarios considered in Appendix B show any variance (other than the variance required by the First Assumption relating to DSI loads) between Program Case general requirements and 7(b)(2) Case general requirements. They are the same, including in those scenarios based on the NEPP "conservation load forecast". In other words, even though avoiding load growth through conservation was the preferred

---

[18] The Appendix B discussion of non- Federal Base System resources for use in the § 7(b)(2) cost comparison is limited exclusively to coal and nuclear generating stations, and does not mention conservation. Senate Report, at 63 (SER131),

[19] Senate Report, at 57 (SER126).

strategy under the Act, and even though future conservation was assumed to exist in at least the nine scenarios based on the NEPP forecast, *no adjustment was made in any scenario to increase the general requirements in the 7(b)(2) Case to back out the effects of conservation.*[20] The general requirements in the scenarios used by Congress to illustrate § 7(b)(2) were not adjusted to remove conservation savings because § 7(b)(2) did not allow for any such adjustment.

**5.     BPA is incorrect when it argues that Preference Customers claim conservation should be free.**

In its ROD, BPA ultimately retreated to the suggestion that Petitioners' interpretation of the Act amounts to a claim that "conservation should be free in the 7(b)(2) Case". (ER483) Nothing could be further from the truth. BPA's own witnesses agreed with Petitioners' witnesses that conservation costs and applicable 7(g) costs are fully recovered from Preference Customers *no matter what happens in the 7(b)(2) Case.* (*c.f.* SER223 & SER085.) Conservation is not "free"; it is just not part of the

---

[20] Senate Report at 65-79 (SER134-149). In each case, lines four and five show the Preference Customers' loads used in the numerical analysis for that case. The Preference Customer loads for the "rate limit" case (*i.e.* the 7(b)(2) Case) are shown on lines 23 and 24 and the Preference Customer loads Regional Act case (*i.e.* Program Case) are shown on lines 37 and 38. *In all the analyses and for all years analyzed, the Preference Customers' load (exclusive of the within and adjacent DSIs) is held constant between Program Case and the 7(b)(2) Case.*

§ 7(b)(2) rate ceiling test. Section 7(b)(2) provides Preference Customers no protection whatsoever from conservation costs or any of the other applicable § 7(g) Costs, which are to be allocated to their rate through § 7(g) irrespective of the rate ceiling. Indeed, § 7(g) specifically lists conservation costs as "not otherwise allocated under ['other provisions of'] this section [7]," providing further unambiguous textual evidence of the Congressional design not to address conservation costs through §§ 7(b)(1) or (2).

By excluding conservation costs from § 7(b)(2) rate protection and requiring that conservation costs be allocated under § 7(g), including to Preference Customers, irrespective of the outcome of the § 7(b)(2) rate test, Congress assured that BPA's conservation costs would be recovered in full under all circumstances. This is consistent with the extraordinarily favored position and highest priority of conservation under the Act. (*See, e.g.,* §§ 4(e)(1) and 6(a)(1) (first priority to conservation).)

**6.      BPA's unauthorized treatment of conservation undermines the § 7(b)(2) rate protections.**

As noted above, the only time the word "conservation" appears in § 7(b)(2) is in its opening paragraph, which requires conservation costs *to be excluded entirely* from the § 7(b)(2) rate test. Under BPA's statutory construction, however, conservation costs alone wind up driving the rate test results. BPA acknowledged in the ROD that it added a very large of amount

of non-existent load to the 7(b)(2) Case, ranging from 500 to 700 aMW (ER483; *see also* SER102-103) (BPA witnesses identify a total increase of 538.2 aMW at the beginning of the FY 2009 "5 year period" , rising to 703 aMW by the end) SER093 (same)).

Adding such non-existent loads substantially reduced the rate protection provided by § 7(b)(2) by drawing into the 7(b)(2) Case the additional costs of serving these non-existent loads. BPA witnesses admitted that BPA added "an annual average of $271.1 million of conservation costs in the 7(b)(2) Case" theoretically to "serve" the non-existent loads (SER090), and admitted that the "inevitable effect" of adding such costs into the 7(b)(2) Case was to increase the 7(b)(2) rate (*see* SER101-102) and thus, to decrease the § 7(b)(2) rate protection. BPA's errors denied Preference Customers hundreds of millions of dollars worth of rate protection.

BPA's mishandling of conservation costs, contrary to the plain language, design, and purpose of § 7(b)(2), also gave rise to numerous additional assumptions beyond the Five Assumptions set forth in §§ 7(b)(2)(A)-(E). In the proceedings before BPA, Preference Customers raised numerous other issues, most of which would be solved by a proper interpretation of § 7(b)(2), which limits BPA to implementing the statutory

assumptions and adhering to the statutory definition of "general requirements".[21]

BPA's additional assumptions seem best understood as the means to manipulate the rate directives to achieve the same result this Court in *PGE* admonished BPA to eschew: providing Exchange Program benefits other than those allowed by statute. Indeed, last time around, this Court forbade BPA from utilizing § 7(g) to allocate Exchange Program costs, camouflaged as "settlement costs," to Preference Customers. *PGE*, 501 F.3d at 1021, 1028 & n.16. This time around, BPA took costs that should have been allocated pursuant to § 7(g) and allocated them to Preference Customers in the 7(b)(2) Case to offset the Exchange Program costs in the Program Case. Both approaches are equally unlawful.

Congress manifestly never intended that its "rate ceiling" be so amorphous as to allow BPA to saddle Preference Customers with Exchange Program costs by inventing assumptions not set forth in (and contrary to) the language of § 7(b)(2).

---

[21] Without the loads BPA added to general requirements, BPA would not have had to bring numerous other resources into the 7(b)(2) Case, with their high costs, to meet those phantom general requirements. In bringing in these resources, among other things, BPA assigned costs in the 7(b)(2) Case for conservation resources that had been fully paid for years before the rate period, and assigned higher costs for the very same resources in the 7(b)(2) Case than in the Program Case.

46

**C.    Without Statutory or Logical Basis, BPA Exaggerated Federal Base System Costs in the 7(b)(2) Case.**

We now turn to another non-statutory assumption which BPA made in the 7(b)(2) Case—that the cost of the Federal Base System is significantly higher than its actual cost. BPA set the Federal Base System costs $1.1 *billion* higher in the 7(b)(2) Case than the actual cost as reflected in the Program Case. (SER228; *see also* SER076-079 & SER107.) There is no lawful basis for BPA to assume, for the purposes of the 7(b)(2) Case only, that the cost of the Federal Base System is higher than it actually is. None of the § 7(b)(2) assumptions permit BPA to alter the cost of the Federal Base System in this manner.

BPA unlawfully inflated the Federal Base System costs by using a special 7(b)(2) Case "repayment study" (a financial model) in which, despite the underlying reality of BPA's debt obligations, BPA assumed that "its obligation to repay the cost of non- Federal Base System obligations simply disappears". (SER228; *see also* SER080 (BPA witnesses).) BPA bases this assumption on its prior unlawful assumption that "general requirements" must be calculated by assuming that Preference Customers have not engaged in BPA funded conservation, and that therefore, BPA must assume that it has no obligation to pay the costs of financing such conservation. (ER553.)

47

Perversely, the elimination of these real debt obligations for conservation cause the costs of financing the Federal Base System in the 7(b)(2) Case to *increase* by $1.1 billion when compared to those financing costs in the Program Case. The WP-07S ROD acknowledges that "the 7(b)(2) Case contains repayment associated with only Federal Base System resources" (ER558), in substance acknowledging that all of the conservation financing obligations of BPA disappear in the 7(b)(2) Case repayment study.[22] BPA agrees that the effect this assumption "is to substantially increase the financing costs of Federal Base System resources" in the 7(b)(2) Case. (*Id.*)

By this mechanism, BPA performed the § 7(b)(2) rate ceiling test as if the Federal Base System were $1.1 billion more expensive in the 7(b)(2) Case than in the Program Case. (SER228-229.) If BPA were permitted to alter cost inputs to § 7(b)(2), for reasons other than the specified Five Assumptions, then § 7(b)(2) would provide Preference Customers no objectively determined rate protection as Congress intended. BPA's decision to increase Federal Base System costs is simply not implementing

---

[22] It should be noted that this approach is inconsistent with BPA's preparation of the repayment study in the Program Case. There, even though BPA excludes conservation costs from Program Case costs for the § 7(b)(2) rate comparison, BPA does not run a repayment study as if BPA's obligation to pay those costs had simply disappeared. (*See* SER112)

48

the statute "in a way that is reasonable in light of the legislature's revealed design". *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995).

**D.     On Remand, BPA Improperly Rewrote Its Interpretation of Section 7(b)(2), Thereby Substantially Diluting The Protection Provided to Preference Customers By The § 7(b)(2) Rate Ceiling.**

In *PGE,* this Court made it unmistakably clear that BPA is obligated to apply its existing regulations until they are properly changed: "Until BPA adopts new regulations, FERC or this court disapprove the existing regulations, or Congress changes the law, BPA is bound by its regulations." 501 F.3d 1009, 1035.  But BPA did not follow this plain command.  Instead, on remand, it changed its interpretation of the Fourth Assumption for the § 7(b)(2) rate ceiling test.  (ER597-598.)  Not only is the new interpretation inconsistent with the Act, but BPA applied the new interpretation retroactively to calculate the refunds due to the Preference Customers from BPA's errors committed during the FY 2002-08 rate period.  (*Id.*)

Under the Second Assumption, the Act requires BPA, in calculating the § 7(b)(2) rate test ceiling, to assume  that the general requirements of Preference Customers "were served . . . with Federal base system resources."

49

§ 7(b)(2)(B).[23]  With respect to "the *remaining* general requirements of" the Preference Customers—requirements in excess of what could be served by the Federal Base System, the Fourth Assumption provides detailed instructions to BPA on how it must assume those remaining requirements are served.  Specifically, BPA is directed to assume that the "remaining general requirements"[24] of the Preference Customers are served from (1) resources BPA purchased from Preference Customers or (2) resources that are available because they have not been committed to load under § 5(b) (§§ 7(b)(2)(D)(i)-(ii)).  Moreover, these resources must be the "least expensive resources owned or purchased by public bodies or cooperatives . . .".  (§ 7(b)(2)(D)).

Soon after the passage of the Act, BPA adopted, in a Record of Decision, a legal interpretation of the Fourth Assumption in § 7(b)(2)(D)

---

[23] The only Federal Base System resources BPA can exclude under this assumption are those that were that were committed under contracts existing when the Act was passed in 1980, and those can be excluded only during the remaining term of those contracts.  *See* § 7(b)(2)(B).

[24] Congress left no doubt that this is the correct interpretation, making clear that the resources used to serve the "remaining general requirements" of the Preference Customers under the Fourth Assumption exclude the "requirements met by the available Federal base system resources determined under" § 7(b)(2)(B), the Second Assumption.

50

that BPA has followed in every rate proceeding to which § 7(b)(2) applied, until now.[25]  As stated in the 1984 Legal Interpretation:

> "Three types of additional resources are available in [calculating the] 7(b)(2) [rate ceiling].  The first type of resource is described in section 7(b)(2)(D)(i) as being resources that were 'purchased from such customers by the Administrator pursuant to section 6.'  These are resources actually acquired by [BPA] from the 7(b)(2) customers . . .. Section 7(b)(2)(D)(ii) describes the second type of resource as those 'not committed to load pursuant to section 5(b).' These are resources owned or purchased by 7(b)(2) customers that *are not dedicated to their own loads.*"  (Emphasis supplied.)  (SER025.)

Under this interpretation, low-cost resources owned by public bodies and cooperatives are assumed to serve Preference Customer loads for purposes of calculating the § 7(b)(2) rate ceiling even if they are actually sold under contract to other utilities.  The only reason public bodies' and cooperatives' resources are excluded in § 7(b)(2)(D)(ii) is if they are already being used to serve Preference Customers' loads.  This exclusion makes sense because, if Preference Customers are using their own generation to serve their own load, they have no need for BPA to serve those same "general requirements."  BPA's 1984 interpretation was affirmed by the Administrator in the 1996 Wholesale Power Rate Proceeding Final Record of Decision, which stated:

---

[25] Prior to 1985, the § 7(b)(2) rate ceiling test did not apply because Congress specified a different method to pay Residential Exchange costs that protected Preference Customers without relying on the§ 7(b)(2) rate ceiling. *See* § 7(c)(1)(A), which assigns most such costs to DSIs.

51

Congress provided that the resources owned by preference customers but not dedicated to their loads should be included in the 7(b)(2) Case resource stack *regardless of whether sales are made from such resources*. (SER008, emphasis supplied.)

After this Court's remands in *GNA* and *PGE,* BPA abandoned its long-standing and well-reasoned interpretations of the Fourth Assumption, and adopted an interpretation of the Fourth Assumption that was contrary to its earlier interpretation. Under its new interpretation, BPA decided that it must, as a matter of law, exclude all resources owned by public bodies and cooperatives if the output from those resources were sold to any regional utility customer of BPA (including IOUs). (*See* ER612) BPA then applied its new interpretation, as well as a number of additional assumptions, in its "recalculation" of the § 7(b)(2) rate protections during the past, FY 2002-08 rate periods (*i.e.* its calculation of the Lookback Amount).

The result of BPA's policy about-face and the new interpretation was the exclusion of inexpensive non-federal resources (the "Mid-C resources") BPA had previously assumed were available to serve Preference Customers when it calculated the § 7(b)(2) rate ceiling. BPA's reversal caused a substantial *decrease* in the rate protection that BPA afforded Preference Customers for the FY 2002-08 periods, and a substantial *increase* in the illegal Exchange Program Settlement monies the IOUs were allowed to retain.

52

### 1. BPA's New Interpretation of § 7(b)(2)(D) is Unreasonable.

BPA's post-remand reversal of its interpretation of the Fourth Assumption cannot be harmonized with the language and structure of the Act. Under § 7(b)(2)(D), "resources owned or purchased by public bodies or cooperatives . . ." are available in the 7(b)(2) Case if they are "not committed to load pursuant to section 5(b)". The Act defines "resources" as "electric power, including the actual or planned electric power *capability* of generating facilities." § 3(19) (emphasis added). This makes a generator's capability a "resource" for purposes of § 7(b)(2)(D). Under § 5(b)(1)(A), a generator's *capability* can only be committed to serve the load of the generator's owner (*i.e.,* "the capability of such entity's firm . . . resources used . . . to serve its firm load in the region".). § 5(b)(1)(A).

Under these statutory provisions, the capability of non-federal resources, including the capability of certain low-cost resources on the Columbia River owned by Preference Customers ("Mid-C resources"), cannot be "committed to load pursuant to section 5(b)" unless they their capability is committed to the load of the resource owner. In other words, even if the owner of a Mid-C resource makes a sale of energy based on the output of the generator to a third party, that sale is not the sale of the resource's *capability*, and the use of energy by the purchaser to serve its load

53

does not constitute a commitment of such *capability* under § 5(b) even if the purchaser has a § 5(b) contract.

BPA's 1984 Legal Interpretation recognized the connection between the definition of "resource" and § 5(b)(1) by excluding from the 7(b)(2) Case only Preference Customers' non-federal resources whose *capability has been committed to the owner's own loads* under § 5(b). (SER024.) On remand, however, BPA abandoned its long-standing interpretation and instead determined that Preference Customers' resources (such as the Mid-C resources) were not available in the 7(b)(2) Case if the energy produced by the resources was under contract to regional IOUs. (*See* ER612.) In essence, BPA determined that the only generating capability owned by public bodies that could be available in the 7(b)(2) Case would be capability sitting idle (none is), or generators with their output exported from the region.

BPA went even further in eliminating inexpensive non-federal resources owned by public bodies from the § 7(b)(2) rate ceiling calculation by requiring, for the first time, that a non-federal, § 7(b)(2)(D)(ii) resource must be owned by a public body or cooperative *customer with a contract with BPA pursuant to § 5(b)*, and if its output were sold to a utility for resale

54

to retail consumers, then the output *must be sold to a utility without such a contract*. (ER579-587.)

No such restriction appears in the Act. Subsection (ii) of the Fourth Assumption requires only that the resources not be "committed to load pursuant to section 5(b)" (§ 7(b)(2)(D)(ii)) and that the resource be "owned or purchased by public bodies or cooperatives . . ." (§ 7(b)(2)(D)). But BPA interprets the statute as if it read that the resource must be "owned or purchased by public body or cooperative *customers*." The Act defines "customer" as "anyone who purchases power from [BPA] pursuant to this Act." § 3(7). BPA's adding the word "customer" is significant because many of the inexpensive Mid-C resources are owned by public bodies without § 5(b) contracts with BPA; they are not "customers".

BPA cannot add language to the statute. The first reference in § 7(b)(2)(D) to public body and cooperatives expressly includes the qualifier "customers," and subsection (i) also refers to resources purchased by BPA from "such customers." However, the second reference in § 7(b)(2)(D) to public bodies and cooperatives *does not refer to "customers"*. It must be presumed that, when Congress chose to use different language to describe certain entities, the difference was intentional and the entities are different.

55

*See Pacific Northwest Generating Cooperative v. Dep't of Energy*, 2009 WL 2386294, *14 (9th Cir. Aug. 5, 2009).

Under § 7(b)(2)(D), non-federal resources must be "the least expensive resources owned or purchased by *public bodies or cooperatives*" to qualify for use in the 7(b)(2) Case. The term "public body" is defined in the BPA Project Act to mean "states, public power districts, counties and municipalities, including agencies or subdivisions thereof." "Cooperative" is defined as "any form of nonprofit-making organization or organizations of citizens supplying, or which may be created to supply, members with any kind of goods, commodities, or services, as nearly as possible at cost." 16 U.S.C. § 832b. There is no statutory requirement that a consumer-owned utility have a § 5(b) contract to be a public body or cooperative. Similarly, § 7(b)(2)(D) is silent regarding the required contract status of any purchaser of output from any non-federal resource. It does not imply, let alone require, that the purchaser of non-federal resource output not have a § 5(b) contract in order for such resource capability to be available in the 7(b)(2) Case. BPA has misconstrued the Act and unlawfully denied Preference Customers of the low-cost Mid-C resources owned by public bodies in the region.

### 2. BPA's Development and Application of A Revised Interpretation of § 7(b)(2)(D) and Its New Restrictions on Non-Federal Resources Constitutes Impermissible Retroactive Rulemaking.

Even if, contrary to fact, it were possible to reconcile BPA's new interpretation of § 7(b)(2)(D) with its language, BPA may not apply the new interpretation to the FY 2002-2008 periods to which BPA previously applied its 1984 Legal Interpretation. BPA's application of its new Legal Interpretation to calculate retroactively the Lookback Amount violates the general prohibition against an agency revising a rule and applying the revised rule backwards in time, at least in a context where the outcome is not required by law.

As Supreme Court explained in *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208 (1988), agencies only have the authority to promulgate rules on a retroactive basis where that power "is conveyed by Congress in express terms". And "interpretive rules, no less than legislative rules, are subject to *Georgetown Hospital's* ban on retroactivity". *Health Ins. Ass'n of America, Inc. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994). If BPA's retroactive rulemaking is left uncorrected, Petitioners will have prevailed in their claim in *GNA* that the rate ceiling protections apply, only to again be deprived of them through BPA's redefinition of what those protections are.

57

BPA has argued that its original determination with respect to the Mid-C resources was contrary to law. But BPA's 1984 Legal Interpretation had been in place since 1984, and was the product of a formal rulemaking. It is entitled to a high degree of deference under *Chevron*. *See Wilderness Society v. U.S. Fish and Wildlife Service*, 316 F.3d 913 (9th Cir. 2003). Applying such deference, only if the Court concludes the 1984 Legal Interpretation cannot be reconciled with the Act and its purposes, could the Court conclude that the original interpretation was contrary to law. Where, as here, BPA's newly-minted interpretation is at best an alternative reading of the provision, BPA cannot lawfully apply its new rule in these proceedings to shrink rate protection for the Preference Customers.

**E.     The Legislative History Confirms that, with the Departure of DSI Load and Non-Achievement of Significant Act Financing Benefits, the § 7(b)(2) Rate Ceiling Should Eliminate or Drastically Reduce the Exchange Program.**

While the legislative history does not identify impermissible additional assumptions for the 7(b)(2) Case (and would not be expected to), it does confirm the intended results under the circumstances that prevailed during the rate periods reassessed by BPA on remand. Before BPA, Petitioners analyzed the Appendix B scenarios in detail to "see how § 7(b)(2) was expected to operate to provide Preference Customers the intended rate ceiling protection, how this protection was expected to affect

58

the REP benefits . . . and how it affected other rates". (SER215.) That analysis confirmed that "the balance between two main drivers dominates whether and how much § 7(b)(2) triggers" to provide rate protection: (1) the net cost of the Exchange Program and (2) the benefits of DSI load as perceived when the Act was adopted. (*Id.*)[26]

The analysis concluded that if the net cost of the Exchange Program was less than or equal to the value of benefits from DSI service ("the amount of revenues in excess of the embedded cost of serving the DSIs . . . plus the value of the uncompensated reserve benefits provided by DSIs in the Program Case"), the rate protections provided under § 7(b)(2) will generally not trigger, or will trigger by a very small amount. (SER215-216.) By contrast, if the net cost of the Exchange Program exceeded the value of DSI benefits, "then §7(b)(2) will trigger by approximately the amount of such excess." (*Id.*)

The WP-02 rate case (2002-2006) involved "less than 33% of the DSI loads assumed for the Appendix B Numerical Analysis."[27] The WP-07 (2007-2009) had no sales to DSIs at all. More importantly, the industrial

---

[26] Appendix B assumed only limited financing benefits of about twenty-five basis points (*see* Senate Report at 62 (SER131); here, BPA assumed even less benefits of only eighteen basis points.

[27] Actual loads for FY 2002-2006 were only "about 10% of BPA's assumed DSI loads for WP-02". (SER219.)

59

margin on DSI sales was many times smaller than assumed in Appendix B and "BPA has not obtained power system reserves from the DSIs at any time frame included in this supplemental case". (SER219.) In short, for all practical purposes, DSI benefits had ceased to exist for the fiscal years covered by this case.

Thus, in the years covered by the two historic rate periods now before the Court, had BPA implemented § 7(b) as contemplated by Congress and illustrated in Appendix B, "§ 7(b)(2) should [have] trigger[ed] by the preliminary REP benefit amount, and all of the resulting surcharge must [then have] be[en] allocated to the PF Exchange rate as the only rate available to surcharge". (SER219)

In substance, BPA may not lawfully pay any significant amount of Exchange Program benefits so long as these factual circumstances persist. The non-occurrence of expected circumstances does not permit BPA to deviate from the express terms of the Act. An administrative agency "with the authority and expertise generally to adopt new policies when faced with new developments . . . does not have the power to adopt a policy that directly conflicts with its governing statute". *See Maislin Industries, Inc. Primary Steel, Inc.,* 497 U.S. 116, 134-35 (1990). That is especially the case where, as here, Congress anticipated the possibility of changing

60

circumstances and nonetheless expected its detailed rate ceiling provisions to be carried out as written:

> In full recognition that as a matter of law *under this act rates shall be established pursuant to specific statutory provisions in sections 7 and 9* and that circumstances assumed in preparing this analysis will change overtime, the Committee has included the [Appendix B] analysis and narrative in the appendix.

Senate Report at 32 (SER123; emphasis supplied).

Deconstruction of BPA's modeling in the proceedings below confirmed that the availability of Exchange Program benefits notwithstanding the rate ceiling was not due to legitimate financing benefits, reserve benefits or DSI revenues funding the Exchange Program, as Congress intended. Rather, the Exchange Program was funded by Preference Customers through BPA's unlawful use of assumptions not contained in, and indeed foreclosed by, § 7(b)(2). Using these extra-statutory assumptions, BPA shifted hundreds of millions per year in Exchange Program costs onto the Preference Customers in contravention of the Act.

## Conclusion

For the foregoing reasons, BPA's determinations concerning the § 7(b)(2) rate ceiling should be vacated, and on the second remand, this Court should provide detailed remand instructions to prevent the continued

61

overcharging of Preference Customers. Petitioners agree with the specific request for relief contained in the "Relief Sought" in section V. of the Opening Brief of Petitioners Tillamook PUD, Snohomish PUD and the Western Public Agencies Group.

Dated: August 19, 2009.

Respectfully submitted,

*/s/ Paul M. Murphy*
Paul M. Murphy, OSB# 84125
James L. Buchal, OSB# 92161
MURPHY & BUCHAL, LLP
2000 SW First Ave., Suite 420
Portland, Oregon 97201
pmurphy@mbllp.com
jbuchal@mbllp.com

*Attorneys for Cowlitz PUD*

*/s/ Mark R. Thompson*
Mark R. Thompson, OSB #04433
825 NE Multnomah Street, Ste. 1225
Portland, Oregon 97232
Phone: (503) 595-9779
mthompson@ppcpdx.org

*Attorney for Public Power Council*

*/s/ Susan K. Ackerman*
Susan K. Ackerman, OSB #83183
9883 NW Nottage Dr.
Portland, Oregon 97229
Phone: (503) 297-2392
susan.k.ackerman@comcast.net

*Attorney for Northwest*
*Requirements Utilities*

|s/ R. Erick Johnson
R. Erick Johnson, OSB # 80062
R. Erick Johnson PC
5285 SW Meadows Road, Suite 230
Lake Oswego, Oregon 97035
Phone: (503) 684-9658
E-mail: ejohnson@rejpc.com

*Pacific Northwest Generating*
*Cooperative*

62

**STATEMENT OF RELATED CASES**

1.      *Portland General Electric Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007); *Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.*, 501 F.3d 1037 (9th Cir. 2007); and *Public Utility Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.*, 506 F.3d 1145 (9th Cir. 2007).  This appeal involves issues of whether, on remand, BPA corrected the legal errors identified in the above three decisions, all of which were heard and decided by the same panel consisting of Stephen Reinhart, W. Fletcher and Jay S. Bybee, Circuit Judges.

2.      *Idaho Public Utilities Commission v. Bonneville Power Admin.*, Consolidated Docket Nos. 08-74927, 08-74928, 08-74929, 08-74932, 08-74933, 08-74942, 08-74957.  These consolidated cases may involve whether BPA is legally authorized to correct the many errors identified in the first three related cases.

## CERTIFICATE OF COMPLIANCE WITH RULE 32

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Limitations

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,591 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.

Dated:  August 19, 2009.


Respectfully submitted,

_s/ Paul M. Murphy_
Paul M. Murphy
MURPHY & BUCHAL, LLP
2000 SW First Ave., Suite 420
Portland, Oregon  97201
Attorney for Cowlitz PUD

# STATUTORY ADDENDUM

**STATUTORY ADDENDUM**

Cited Sections of the Pacific Northwest Electric Power
Planning and Conservation Act §§ 16 U.S.C. § 839 *et seq.*

Section 3-Definitions-§ 16 U.S.C. 839a ........................................................ 1

Section 4-Planning-§ 16 U.S.C. 839b............................................................ 3

Section 5-Sale of Power-§ 16 U.S.C. 839c..................................................... 3

Section 6-Conservation and Resource Planning-§ 16 U.S.C. 839d ............... 5

Section 7-Rates-§ 16 U.S.C. 839e .................................................................. 6

Section 9e-Judicial Review-§ 16 U.S.C. 839f ............................................. 12

Add. i

Cited Sections of the Pacific Northwest Electric Power
Planning and Conservation Act §§ 16 U.S.C. § 839 *et seq.*

**Section 3 — 16 U.S.C. 839a — Definitions**
16 U.S.C. 839a

As used in this chapter, the term—

3(3)  "Conservation" means any reduction in electric power consumption as a result of increases in the efficiency of energy use, production, or distribution.

3(5)  "Consumer" means any end user of electric power.

3(7)  "Customer" means anyone who contracts for the purchase of power from the Administrator pursuant to this chapter.

3(8)  "Direct service industrial customer" means an industrial customer that contracts for the purchase of power from the Administrator for direct consumption.

3(9)  "Electric power" means electric peaking capacity, or electric energy, or both.

3(10)  "Federal base system resources" means—

    3(10)(A)    the Federal Columbia River Power System hydroelectric projects;

    3(10)(B)    resources acquired by the Administrator under long-term contracts in force on December 5, 1980; and

    3(10)(C)    resources acquired by the Administrator in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph.

3(14)  "Pacific Northwest", "region", or "regional" means—

Add. 1

3(14)(A)    the area consisting of the States of Oregon, Washington, and Idaho, the portion of the State of Montana west of the Continental Divide, and such portions of the States of Nevada, Utah, and Wyoming as are within the Columbia River drainage basin; and

3(14)(B)    any contiguous areas, not in excess of seventy-five air miles from the area referred to in subparagraph (A), which are a part of the service area of a rural electric cooperative customer served by the Administrator on December 5, 1980, which has a distribution system from which it serves both within and without such region.

3(17)  "Reserves" means the electric power needed to avert particular planning or operating shortages for the benefit of firm power customers of the Administrator and available to the Administrator

3(17)(A)    from resources or

3(17)(B)    from rights to interrupt, curtail, or otherwise withdraw, as provided by specific contract provisions, portions of the electric power supplied to customers.

3(18)  "Residential use" or "residential load" means all usual residential, apartment, seasonal dwelling and farm electrical loads or uses, but only the first four hundred horsepower during any monthly billing period of farm irrigation and pumping for any farm.

3(19)  "Resource" means—

3(19)(A)    electric power, including the actual or planned electric power capability of generating facilities, or

3(19)(B)    actual or planned load reduction resulting from direct application of a renewable energy resource by a consumer, or from a conservation measure.

Add. 2

**Section 4(e)(1) — Plan Priorities and Requisite Features; Studies**
 16 U.S.C. 839b(e)(1)

The plan shall, as provided in this paragraph, give priority to resources which the Council determines to be cost-effective. Priority shall be given: first, to conservation; second, to renewable resources; third, to generating resources utilizing waste heat or generating resources of high fuel conversion efficiency; and fourth, to all other resources.

**Section 5(a) — Preferences and priorities**
 16 U.S.C. 839c(a)

All power sales under this chapter shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 (16 U.S.C. 832 and following) and, in particular, sections 4 and 5 thereof [16 U.S.C. 832c and 832d]. Such sales shall be at rates established pursuant to section 839e of this title.

**Section 5(b)(1) — Sales to public bodies**
 16 U.S.C. 839c(b)(1)

(1)  Whenever requested, the Administrator shall offer to sell to each requesting public body and cooperative entitled to preference and priority under the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and to each requesting investor-owned utility electric power to meet the firm power load of such public body, cooperative or investor-owned utility in the Region to the extent that such firm power load exceeds—

  (A)  the capability of such entity's firm peaking and energy resources used in the year prior to December 5, 1980, to serve its firm load in the region, and

  (B)  such other resources as such entity determines, pursuant to contracts under this chapter, will be used to serve its firm load in the region.

In determining the resources which are used to serve a firm load, for purposes of subparagraphs (A) and (B), any resources used to serve a firm

Add. 3

load under such subparagraphs shall be treated as continuing to be so used, unless such use is discontinued with the consent of the Administrator, or unless such use is discontinued because of obsolescence, retirement, loss of resource, or loss of contract rights.

**Section 5(c)(1) &(2) — Purchase and exchange sales**
16 U.S.C. § 839c(c)(1) & (2)

(1)  Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.

(2)  The purchase and exchange sale referred to in paragraph (1) of this subsection with any electric utility shall be limited to an amount not in excess of 50 per centum of such utility's Regional residential load in the year beginning July 1, 1980, such 50 per centum limit increasing in equal annual increments to 100 per centum of such load in the year beginning July 1, 1985, and each year thereafter.

**Section 5(d)(1)— Sales to Existing direct Service Industrial Customers**
16 U.S.C. § 839c(d)(1)

(A)  The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers. Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region.

(B)  After December 5, 1980, the Administrator shall offer in accordance with subsection (g) of this section to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 providing for the sale of "industrial firm power."

Add. 4

**Section 5(f)— Surplus Power**
16 U.S.C. § 839c(f)

The Administrator is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to his obligations incurred pursuant to subsections (b), (c), and (d) of this section in accordance with this and other Acts applicable to the Administrator, including the Bonneville Projects Act of 1937 (16 U.S.C. 832 and following), the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), and the Act of August 31, 1964 (16 U.S.C. 837– 837h).

**Section 6(a) — Conservation Measures; Resources**
16 U.S.C. § 839d(a)

(1)  determines are consistent with the plan, or if no plan is in effect with the criteria of section 839b (e)(1) of this title and the considerations of section 839b (e)(2) of this title and, in the case of major resources, in accordance with The Administrator shall acquire such resources through conservation, implement all such conservation measures, and acquire such renewable resources which are installed by a residential or small commercial consumer to reduce load, as the Administrator subsection (c) of this section. Such conservation measures and such resources may include, but are not limited to—

    (A)  loans and grants to consumers for insulation or weatherization, increased system efficiency, and waste energy recovery by direct application,

    (B). technical and financial assistance to, and other cooperation with, the Administrator's customers and governmental authorities to encourage maximum cost-effective voluntary conservation and the attainment of any cost-effective conservation objectives adopted by individual States or subdivisions thereof,

    (C)  aiding the Administrator's customers and governmental authorities in implementing model conservation standards adopted pursuant to section 839b (f) of this title, and

(D) conducting demonstration projects to determine the cost effectiveness of conservation measures and direct application of renewable energy resources.

(2) In addition to acquiring electric power pursuant to section 839c (c) of this title, or on a short-term basis pursuant to section 11(b)(6)(i) of the Federal Columbia River Transmission System Act [16 U.S.C. 838i (b)(6)(i)], the Administrator shall acquire, in accordance with this section, sufficient resources—

(A) to meet his contractual obligations that remain after taking into account planned savings from measures provided for in paragraph (1) of this subsection, and

(B) to assist in meeting the requirements of section 839b (h) of this title.

The Administrator shall acquire such resources without considering restrictions which may apply pursuant to section 839c (b) of this title.

**Section 7(a) — Establishment; Periodic Review and Revision; Confirmation and Approval by Federal Energy Regulatory Commission**
16 U.S.C. § 839e(a)

(1) The Administrator shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power. Such rates shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law. Such rates shall be established in accordance with sections 9 and 10 of the Federal Columbia River Transmission System Act (16 U.S.C. 838) [16 U.S.C. 838g

Add. 6

and 838h], section 5 of the Flood Control Act of 1944 [16 U.S.C. 825s], and the provisions of this chapter.

(2)  Rates established under this section shall become effective only, except in the case of interim rules as provided in subsection (i)(6) of this section, upon confirmation and approval by the Federal Energy Regulatory Commission upon a finding by the Commission, that such rates—

> (A)  are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,

> (B)  are based upon the Administrator's total system costs, and

> (C)  insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.

## Section 7(b)(1) — General application of rates to meet general requirements
16 U.S.C. § 839e(b)(1)

(1)  The Administrator shall establish a rate or rates of general application for electric power sold to meet the general requirements of public body, cooperative, and Federal agency customers within the Pacific Northwest, and loads of electric utilities under section 839c (c) of this title. Such rate or rates shall recover the costs of that portion of the Federal base system resources needed to supply such loads until such sales exceed the Federal base system resources. Thereafter, such rate or rates shall recover the cost of additional electric power as needed to supply such loads, first from the electric power acquired by the Administrator under section 839c (c) of this title and then from other resources.

**Section 7(b)(2)**
      16 U.S.C. § 839e(b)(2)

(2)  After July 1, 1985, the projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and Federal agency customers, exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events, may not exceed in total, as determined by the Administrator, during any year after July 1, 1985, plus the ensuing four years, an amount equal to the power costs for general requirements of such customer if, the Administrator assumes that—

      (A)  the public body and cooperative customers' general requirements had included during such five-year period the direct service industrial customer loads which are—

            (i)  served by the Administrator, and

            (ii)  located within or adjacent to the geographic service boundaries of such public bodies and cooperatives;

      (B)  public body, cooperative, and Federal agency customers were served, during such five-year period, with Federal base system resources not obligated to other entities under contracts existing as of December 5, 1980, (during the remaining term of such contracts) excluding obligations to direct service industrial customer loads included in subparagraph (A) of this paragraph;

      (C)  no purchases or sales by the Administrator as provided in section 839c (c) of this title were made during such five-year period;

      (D)  all resources that would have been required, during such five-year period, to meet remaining general requirements of the public body, cooperative and Federal agency customers (other than

Add. 8

requirements met by the available Federal base system resources determined under subparagraph (B) of this paragraph) were—

(i) purchased from such customers by the Administrator pursuant to section 839d of this title, or

(ii) not committed to load pursuant to section 839c (b) of this title,

and were the least expensive resources owned or purchased by public bodies or cooperatives; and any additional needed resources were obtained at the average cost of all other new resources acquired by the Administrator; and

(E) the quantifiable monetary savings, during such five-year period, to public body, cooperative and Federal agency customers resulting from—

(ii) reduced public body and cooperative financing costs as applied to the total amount of resources, other than Federal base system resources, identified under subparagraph (D) of this paragraph, and

(ii) reserve benefits as a result of the Administrator's actions under this chapter [1]

were not achieved.

## Section 7(b)(3)
16 U.S.C. § 839e(b)(3)

Any amounts not charged to public body, cooperative, and Federal agency customers by reason of paragraph (2) of this subsection shall be recovered through supplemental rate charges for all other power sold by the Administrator to all customers. [The subsequent irrelevant portions of 7(b)(3) have been omitted for brevity.]

Add. 9

**Section 7(b)(4)**
      16 U.S.C. § 839e(b)(4)

The term "general requirements" as used in this section means the public body, cooperative or Federal agency customer's electric power purchased from the Administrator under section 839c (b) of this title, exclusive of any new large single load.

**Section 7(c) — Rates applicable to direct service industrial customers**
      16 U.S.C. § 839e(c)

(1)  The rate or rates applicable to direct service industrial customers shall be established—

>      (A)  for the period prior to July 1, 1985, at a level which the Administrator estimates will be sufficient to recover the cost of resources the Administrator determines are required to serve such customers' load and the net costs incurred by the Administrator pursuant to section 839c (c) of this title, based upon the Administrator's projected ability to make power available to such customers pursuant to their contracts, to the extent that such costs are not recovered through rates applicable to other customers; and

>      (B)  for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.

(2)  The determination under paragraph (1)(B) of this subsection shall be based upon the Administrator's applicable wholesale rates to such public body and cooperative customers and the typical margins included by such public body and cooperative customers in their retail industrial rates but shall take into account—

>      (A)  the comparative size and character of the loads served,

>      (B)  the relative costs of electric capacity, energy, transmission, and related delivery facilities provided and other service provisions, and

(C)  direct and indirect overhead costs.

all as related to the delivery of power to industrial customers, except that the Administrator's rates during such period shall in no event be less than the rates in effect for the contract year ending on June 30, 1985.

(3)  The Administrator shall adjust such rates to take into account the value of power system reserves made available to the Administrator through his rights to interrupt or curtail service to such direct service industrial customers.

## Section 7(f) — Basis for rates
16 U.S.C. § 839e(f)

Rates for all other firm power sold by the Administrator for use in the Pacific Northwest shall be based upon the cost of the portions of Federal base system resources, purchases of power under section 839c (c) of this title and additional resources which, in the determination of the Administrator, are applicable to such sales.

## Section 7(g) — Allocation of costs and benefits
16 U.S.C. § 839e(g)

Except to the extent that the allocation of costs and benefits is governed by provisions of law in effect on December 5, 1980, or by other provisions of this section, the Administrator shall equitably allocate to power rates, in accordance with generally accepted ratemaking principles and the provisions of this chapter, all costs and benefits not otherwise allocated under this section, including, but not limited to, conservation, fish and wildlife measures, uncontrollable events, reserves, the excess costs of experimental resources acquired under section 839d of this title, the cost of credits granted pursuant to section 839d of this title, operating services, and the sale of or inability to sell excess electric power.

Add. 11

**Section 9(e) — Judicial review; suits**
16 U.S.C. § 839f(e)

(1) For purposes of sections 701 through 706 of title 5, the following actions shall be final actions subject to judicial review—

(A) adoption of the plan or amendments thereto by the Council under section 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b (h) of this title;

(B) sales, exchanges, and purchases of electric power under section 839c of this title;

(C) the Administrator's acquisition of resources under section 839d of this title;

(D) implementation of conservation measures under section 839d of this title;

(E) execution of contracts for assistance to sponsors under section 839d (f) of this title;

(F) granting of credits under section 839d (h) of this title;

(G) final rate determinations under section 839e of this title; and

(H) any rule prescribed by the Administrator under section 839e (m)(2) of this title.

(2) The record upon review of such final actions shall be limited to the administrative record compiled in accordance with this chapter. The scope of review of such actions without a hearing or after a hearing shall be governed by section 706 of title 5, except that final determinations regarding rates under section 839e of this title shall be supported by substantial evidence in the rulemaking record required by section 839e (i) of this title considered as a whole. The scope of review of an action under section 839d (c) of this title shall be governed by section 706 of title 5. Nothing in this section shall be construed to require a hearing pursuant to section 554, 556, or 557 of title 5.

Add. 12

(3)  Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator.

(4) For purposes of this subsection—

    (A)  major resources shall be deemed to be acquired upon publication in the Federal Register pursuant to section 839d (c)(4)(B) of this title;

    (B)  resources, other than major resources, shall be deemed to be acquired upon execution of the contract therefor;

    (C)  conservation measures shall be deemed to be implemented upon execution of the contract or grant therefor; and

    (D)  rate determinations pursuant to section 839e of this title shall be deemed final upon confirmation and approval by the Federal Energy Regulatory Commission.

(5)  Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. 832 et seq.], the Act of August 31, 1964 (16 U.S.C. 837–837h), or the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), shall be filed in the United States court of appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred. In the case of a challenge of the plan or programs or amendments thereto, such suit shall be filed within sixty days after publication of a notice of such final action in the Federal Register. Such court shall have jurisdiction to hear and determine any suit brought as provided in this section. The plan and program, as finally adopted or portions thereof, or amendments thereto, shall not thereafter be reviewable as a part of any other action under this chapter or any other law. Suits challenging any other actions under this chapter shall be filed in the appropriate court.

**CERTIFICATE OF SERVICE**

I certify that, on August 19, 2009, I caused to be electronically filed the foregoing Opening Brief Of Petitioners Public Utility District No. 1 Of Cowlitz County, Public Power Council, Northwest Requirements Utilities, And Pacific Northwest Generating Cooperative.

I further certify that all participants in this case are registered CM/EFC users and will be served by the appellate CM/ECF system.

Respectfully submitted,

*s/ Paul M. Murphy*
Paul M. Murphy
MURPHY & BUCHAL, LLP
2000 SW First Ave., Suite 420
Portland, Oregon 97201
Attorney for Cowlitz PUD