IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————————————————

Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098,
08-75099, 08-75112, 08-75113, 08-75130, 08-75132,
08-75133, 08-75161, 08-75165

———————————————————————————

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *et al,*
Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,
Respondent.

———————————————————————————

ON PETITION TO REVIEW DECISIONS OF THE BONNEVILLE POWER
ADMINISTRATION

———————————————————————————

**OPENING BRIEF OF PETITIONERS TILLAMOOK PEOPLE'S
UTILITY DISTRICT, SNOHOMISH PUBLIC UTILITY DISTRICT
AND THE WESTERN PUBLIC AGENCIES GROUP**

———————————————————————————

| | | |
|---|---|---|
| Richard G. Lorenz | Eric L. Christensen | Terence L. Mundorf |
| Thomas M. Grim | Assistant General Counsel | Karl F. Hausmann |
| G. Kevin Kiely | Snohomish Public | Marsh Mundorf Pratt |
| Cable Huston Benedict | Utility District | Sullivan & McKenzie |
| Haagensen & Lloyd | 2320 California Street | 16504 9th Ave., S.E. |
| 1001 Fifth Ave., | Everett, WA 98206-1107 | Suite 203 |
| Suite 2000 | (425) 783-8649 | Mill Creek, WA 98012 |
| Portland, OR 97204-1136 | | (425) 742-4545 |
| (503) 224-3092 | | |
| | | |
| Attorneys for Tillamook | Attorneys for Snohomish | Attorneys for the |
| People's Utility District | Public District | Western Public |
| | | Agencies Group |

August 19, 2009

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Petitioners Alder Mutual Light Company, Benton Rural Electric Association; the cities of Ellensburg, Port Angeles, and the towns of Eatonville, Milton and Steilacoom, Washington; Elmhurst Mutual Power and Light Company; Lakeview Light and Power Company; Ohop Mutual Light Company; Parkland Light and Water Company; Peninsula Light Company; the Public Utility Districts Nos. 1 of Clallam, Clark, Grays Harbor, Kittitas, Lewis, Mason, Skamania and Wahkiakum Counties, Washington; the Public Utility District No. 2 of Pacific County and Public Utility District No. 3 of Mason County, Washington (together, the Western Public Agencies Group); Tillamook People's Utility District and the Public Utility District No.1 of Snohomish County, Washington, each hereby states that (a) it has no parent corporation and (b) it issues no capital stock, and, accordingly, no publicly held corporation owns a 10 percent or greater interest in it.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................VII

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUES PRESENTED FOR REVIEW ................................................... 2

STATEMENT OF THE CASE ............................................................... 4

STATEMENT OF FACTS ..................................................................... 6

    I.     The Parties To This Case ........................................................ 6

    II.    Background Facts..................................................................... 7

        a.     Congress Passed the Act to Avert a Regional Power Crisis .................................................................................... 7

        b.     BPA Replaced Exchange Program Payments With the REP Settlement .............................................................. 13

        c.     BPA's Power Delivery Obligations Under The REP Settlement Agreements Led Directly To The LRAs .... 16

        d.     Litigation Arising From the REP Settlement ............... 20

        e.     BPA Responds To This Court's Remand Orders ......... 22

SUMMARY OF THE ARGUMENT ....................................................... 24

ARGUMENT........................................................................................ 26

    I.     Standard of Review: BPA Is Not Entitled To Deference. ...... 26

    II.    BPA Must Refund The LRA Costs To Preference Customers................................................................................. 28

        a.     BPA Has Failed to Implement This Court's Remand Order by "Protecting" LRA Payments from Refund to Preference Customers. ................................................. 28

        b.     The LRAs Were An Integral Part of the REP Settlement Agreements And Are Void Under the PGE Decision. . 31

        c.     The Method Used to Collect a Cost Does Not Change the Nature of the Cost ....................................................... 36

d.    The Absence of a Challenge to an Invalid Contract Does Not Validate That Contract in a Separate Cause of Action........................................................................... 38

e.    Even If The LRAs Are Somehow Lawful, BPA Is Precluded by § 7(b)(2) from Allocating the Costs to Preference Customer Rates.......................................... 41

III.    BPA Has Failed to Take Legally Required Actions to Retrieve and to Repay Preference Customers Amounts Unlawfully Charged in BPA's Rates.......................................................... 46

a.    This Court's Decisions Require Prompt and Full Repayment of Amount Illegally Charged Preference Customers. ................................................................... 46

b    BPA Has Not Promptly Retrieved All Monies Illegally Paid To The IOUs Under the Invalid REP Settlement Agreements. ................................................................... 47

c.    BPA's Collection Scheme Will Not Retrieve All of the Unlawful REP Settlement Payments. ........................... 51

d.    BPA Has Failed to Promptly Repay the Monies Unlawfully Collected From Preference Customers....... 53

IV.    Relief Sought........................................................................ 54

CONCLUSION...................................................................................... 56

CERTIFICATE OF COMPLIANCE....................................................... 59

## COMMON ACRONYMS, NAMES AND TECHNICAL TERMS USED IN THIS BRIEF

| | |
|---|---|
| Act | The Pacific Northwest Electric Power Planning and Conservation Act of 1980, 16 U.S.C. §§ 839 *et seq.* |
| Average System Cost | The average power cost of a utility, used in the Exchange Program to determine the level of benefits by comparison to BPA's Preference Customer rate. |
| BPA | The Bonneville Power Administration. |
| DSI | Direct-service industrial customers of BPA , a group of industrial customers who purchased power directly from BPA. |
| Federal base system | "Federal base system resources" as defined in § 3(10) of the Act. |
| FERC | The Federal Energy Regulatory Commission. |
| General Requirements | Electric power purchased by Preference Customers from BPA as defined in § 7(b)(4) of the Act. |
| *GNA* | This Court's opinion and decision in *Golden Northwest Aluminum, Inc. v. BPA*, 501 F.3d 1037 (9th Cir. 2007). |
| IOUs | The Investor-owned utilities entitled to participate in the Exchange Program established under § 5(c) of the Act. |
| Load | That which consumes electricity, often used as the equivalent of the demand for electric power. |

iv

| | |
|---|---|
| Load Reduction Agreements or LRAs | Amendments to the REP Settlement Agreements pursuant to which BPA monetized its power delivery commitments established in the REP Settlement Agreements. |
| Lookback Amount | The amounts of excess Exchange Program benefits BPA paid to the IOUs that BPA proposes to recover and refund to Preference Customers. |
| *PGE* | This Court's opinion and decision in *Portland General Electric Co. v. BPA*, 501 F.3d 1009 (9th Cir. 2007). |
| Preference Customers | Public body, cooperative and federal agency customers of BPA entitled to preference and priority to Federal power under §5(a) and to rate protection under § 7(b)(2) of the Act. |
| Preference Customer Rate | The rate charged by BPA for power sold to serve the general requirements of Preference Customers. |
| Program Case | BPA's name for the calculation of the power costs Preference Customers would pay if there were no § 7(b)(2) rate ceiling. |
| Residential Exchange Program or Exchange Program | The Residential Exchange Program established under § 5(c) of the Act. |
| REP Settlement Agreements | The agreements between BPA and its IOU customers under which BPA implemented its REP Settlement program, subsequently invalidated by this Court in *PGE*. |
| *Snohomish* | This Court's opinion and decision in *Public Utility District No.1 of Snohomish County v. BPA*, 506 F.3d 1145 (9th Cir. 2007). |

WP-02 Case          BPA's 2002 Wholesale Power Rate Case, the proceeding which precipitated the appeals and decision in *GNA*.

WP-07S Case          BPA's 2007 Supplemental Wholesale Power Rate Case, the proceeding before BPA resulting in the decision now on review in these consolidated cases.

WP-07S ROD          BPA's Final Record of Decision in the WP-07S Case.

7(b)(2) Case          BPA's name for the calculation of the power costs Preference Customers would pay if the five assumptions in § 7(b)(2) were true.

# TABLE OF AUTHORITIES

**Cases**

*Aluminum Co. of America v. BPA*, 903 F.3d 585 (9th Cir. 1989) ................. 29

*Aluminum Company of North America v. Central Lincoln People's Utility District,* 467 U.S. 380 (1984) ......................................................... 8

*Banas v. American Airlines,* 969 F.2d 477 (7th Cir. 1992) ........................... 41

*Bank One v. United States,* 62 Fed. Cl. 474 (2008)...................................... 51

*Blachly-Lane Electric Cooperative Ass'n v. U.S. Dep't Energy*, 79 Fed. Appx. 975 (9th Cir. 2003)................................................................ 47

*Bull v. United States*, 295 U.S. 247 (1935).................................................. 42

*Central Lincoln People's Util. Dist. v. Johnson*, 735 F.2d 1101 (9th Cir. 1984) ...................................................................................................... 1

*Charter Limousine, Inc. v. Dade County Bd. of County Comm'rs*, 678 F.2d 586 (5th Cir. 1982)..................................................................... 29

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ......................................................................................... 28

*City of Santa Clara v. Pacific Gas & Elec. Co.*, 572 F.2d 660 (9th Cir. 1978) ................................................................................................ 35, 41

*CP Nat'l Corp. v. BPA*, 928 F.2d 905 (9th Cir. 1991)..................................... 9

*Cranson v. Goss*, 107 Mass. 439 (Mass. 1871) ........................................... 36

*DiSilvestro v. United States,* 405 F.2d 150 (2d Cir. 1968) ........................... 52

*Dunn & Black, P.S. v. U.S.,* 492 F.3d 1084 (9th Cir. 2007) .......................... 52

*Gammons v. Gulbranson*, 78 Minn. 21, 80 N.W. 779 (Minn. 1899) ........... 36

*Golden Northwest Aluminum, Inc., v. BPA,* 501 F.3d 1037 (9th Cir. 2007) ................................................................................................ passim

*Pit River Tribe v. U.S. Forest Service,* 469 F.3d 768 (9th Cir. 2006) .......... 35

*Portland General Electric Co., v. BPA,* 501 F.3d 1009 (9th Cir. 2007) passim

*Public Utility District No.1 of Snohomish County v. BPA*, 506 F.3d 1145 (9th Cir. 2007) ................................................................................ passim

*Resolution Trust Corp. v. Home Savings of America*, 946 F.2d 93 (8th Cir. 1991) ........................................................................................ 35

*Sun Oil Co. v. Wortman,* 486 U.S. 717 (1988) ............................................. 41

*U.S. v. Munsey Trust Co.*, 332 U.S. 234 (1947) ........................................... 52

*United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223 (1965) ...................................................................................... 57

*United States v. Wurts,* 303 U.S. 414 (1939)................................................ 52

**Statutes**

5 U.S.C. § 706....................................................................................... 27

16 U.S.C. § 839c(a) ............................................................................. 7,9

16 U.S.C. § 839c(b)(1)........................................................................... 10

16 U.S.C. § 839c(c) ......................................................................... 2,4,9,14

16 U.S.C. § 839e(b)(2)............................................................................. 2

16 U.S.C. § 839e(b)(3).............................................................................. 2

16 U.S.C. § 839f(e)(5) ............................................................................. 1

31 U.S.C. § 3711(a)(1)......................................................................... 42, 51

31 U.S.C. § 3716(e)(1).......................................................................... 42

**Rules**

4 C.F.R. § 102.1(a) .............................................................................. 51

**Other Authorities**

Federal Register Notice. R.A.R. 87191 (2007 Supplemental Wholesale Power Rate Adjustment Proceeding, 73 F.R. 7539 (Feb. 8, 2008))............... 1

Pacific Northwest Electric Power Planning and Conservation Act............ 1, 2

Report from the House Committee on Interior and Insular Affairs, Rept, 96-976, Part II, page 52 (Sept. 16, 1980)......................................................... 10

Report of the House Committee on Interstate and Foreign Affairs, H.R. Rep. No. 976, Part I, pages 68-69 (May 15, 1980)

**JURISDICTIONAL STATEMENT**

Tillamook People's Utility District ("Tillamook"), the Public Utility District No.1 of Snohomish County, Washington ("Snohomish") and the utilities of the Western Public Agencies Group ("WPAG") (Tillamook, Snohomish and WPAG collectively, "Utilities") challenge certain final decisions made by the Bonneville Power Administration ("BPA") in its WP-07 Supplemental rate proceeding ("WP-07S Case").[1]

Under § 9(e)(5) of the Pacific Northwest Electric Power Planning and Conservation Act, this Court has original subject matter jurisdiction over all suits challenging final actions taken, or decisions (including rate decisions) made, by BPA pursuant to the Act. 16 U.S.C. § 839f(e)(5); *See generally, Central Lincoln People's Util. Dist. v. Johnson*, 735 F.2d 1101, 1105 (9th Cir. 1984). The WP-07S Case was commenced by BPA on February 8, 2008, by publication of a Federal Register Notice. S.E.R. 18 (2007 Supplemental Wholesale Power Rate Adjustment Proceeding, 73 F.R. 7539 (Feb. 8, 2008)).[2] The Administrator's final Record of Decision in the WP-07S Case ("WP-07S ROD") was issued on September 22, 2008. The

---

[1] A Table of Common Acronyms, Names and Technical Terms Used In This Brief is included at the end of the Table of Contents to aid the reader.

[2] R.A.R. cites refer to the Respondents Administrative Record filed by BPA in this proceeding. S.E.R. cites refer to the Supplemental Excerpt of Record filed by Petitioners in this proceeding.

Utilities timely filed their petitions for review within the ninety day period allowed by the Act, 16 U.S.C. § 839f(e)(5).[3]

## ISSUES PRESENTED FOR REVIEW

The WP-07S Case was conducted in response to this Court's decisions and remand orders in *Golden Northwest Aluminum, Inc. v. BPA,* 501 F.3d 1037 (9th Cir. 2007) ("*GNA*") and *Portland Gen. Elec. Co. v. BPA,* 501 F.3d 1009 (9th Cir. 2007) ("*PGE*"). This Court found in *PGE* and *GNA* that BPA violated § 5(c) and §§ 7(b)(2) and (3) of the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §839c(c) and §§839e(b)(2) and (3) ("Act"), by entering into certain Residential Exchange Settlement Agreements ("REP Settlement Agreements") and by charging the costs of such REP Settlement Agreements to its Preference Customers. The purpose of the WP-07S Case was for BPA to determine the amount of these unlawful charges and to establish a mechanism for repayment of such unlawful charges to its Preference Customers.

In its final decision for the WP-07S Case, however, BPA decided to forego altogether the repayment of a substantial portion of the amounts that BPA unlawfully overcharged its Preference Customers, and to defer

---

[3]Although a severe snow storm caused Tillamook's petition to be received by the Court after the 90th day, this Court issued an order which deemed the filing timely.

substantially (and perhaps forever) the repayment of the balance. As explained below, each of these decisions is contrary to law and present the following issues on appeal:

1. The Load Reduction Agreements ("LRAs") between BPA and two investor-owned utilities ("IOUs") amended the form of benefits provided to those IOUs under the same REP Settlement Agreements that were invalidated by this Court in *PGE*. Are such LRAs valid notwithstanding this Court's holding in *PGE?*

2. Section 7(b)(2) of the Act establishes a "rate ceiling" applicable to Preference Customer rates. Even assuming, *arguendo,* that the LRAs are valid and binding contracts, may BPA include LRA costs in Preference Customer rates even though the LRA payments exceed the statutory § 7(b)(2) rate ceiling?

3. The *GNA* decision directed BPA to correct unlawful overcharges of Exchange Program costs. May BPA nonetheless adopt a repayment scheme that defers a substantial portion of the repayment obligation and fails to repay to Preference Customers the entire amount of the rate overcharges?

3

**STATEMENT OF THE CASE**

In *PGE,* this Court struck down BPA's substitute power sale and cash payment program, and the REP Settlement Agreements that implemented BPA's substitute program. The entire scheme unlawfully supplanted the statutory Residential Exchange Program ("Exchange Program") established by § 5(c) of the Act. 16 U.S.C. § 839c(c); *PGE*, 501 F.3d at 1028. In *GNA,* the Court further held that costs incurred by BPA under the REP Settlement Agreements were not ordinary costs of doing business, as BPA had suggested, but were Exchange Program costs subject to the § 7(b)(2) "rate ceiling test" that protects Preference Customer rates. 501 F.3d at 1047. The Court found that BPA had "unlawfully shifted onto its preference customers the costs of its settlements with the IOUs", and remanded the matter to BPA to "set rates in accordance with this opinion." *Id.* at 1048. BPA's final decisions in the WP-07S Case fail to comply with this Court's remand order in *GNA*.

Taken together, *GNA* and *PGE* direct BPA to complete two related tasks on remand. First, BPA must calculate the amount of the rate overcharges and corresponding repayment to which Preference Customers are entitled under the Act. Second, BPA is required by law to promptly and

4

fully refund to the Preference Customers the rate overcharges to which they are entitled.

BPA acted unlawfully in discharging these tasks. As described more fully below, the LRAs simply amended the REP Settlement Agreement to monetize as cash payments certain physical power deliveries required only by the REP Settlement Agreements. Despite the fact that the physical power deliveries required under the REP Settlement Agreements were later found by this Court to be unlawful, in the WP-07S Case BPA elected to treat the cash payments required by the LRAs as binding obligations. BPA further determined that the LRA payments would be "protected" against the § 7(b)(2) rate ceiling test and, ultimately, exempted from repayment to Preference Customers. BPA's refusal to include the LRA payments in the amount to be refunded to its Preference Customers is unlawful both because the LRAs were part and parcel of the REP Settlement Agreements held to be illegal and void, and because the LRA payments were charged to the Preference Customers in violation of the § 7(b)(2) rate ceiling test.

BPA also has acted unlawfully by adopting a repayment scheme that will not fully and promptly refund to Preference Customers all of the illegal charges they have borne in their BPA rates. The BPA scheme defers repayment of much of these overcharges indefinitely in order to allow BPA

5

to continue making substantial additional Exchange Program payments to the IOUs, even as the IOUs continue to hold monies unlawfully collected by BPA from the Preference Customers. Further, because BPA's repayment scheme is contingent upon a set-off against future Exchange Program benefits to which some IOUs are not even entitled, the scheme virtually guarantees that a significant portion of the illegal overcharges will never be repaid to Preference Customers.

In addition to the errors identified in this brief, the Utilities support the Opening Brief and arguments of Petitioners Public Utility No. 1 of Cowlitz County, Washington, *et al*, regarding BPA's improper use of assumptions not permitted by the Act in performing the §7(b)(2) rate ceiling test, and the improper revision of its 1984 Section 7(b)(2) Legal Interpretation.

## STATEMENT OF FACTS

### I. The Parties To This Case

BPA is the federal power marketing agency responsible for, *inter alia*, establishing wholesale rates for the sale of federal power in compliance with directives of § 7 of the Act, including the § 7(b)(2) rate ceiling. BPA also is responsible for determining and paying monetary benefits to residential and

small farm customers of Northwest utilities in accordance with § 5(c) of the Act.

The Utilities are public bodies and cooperatives that purchase power from BPA. The Utilities are among BPA's "Preference Customers" because, pursuant to § 5c(a) of the Act, 16 U.S.C. § 839c(a), they have statutory "preference" to purchase federal power marketed by BPA.

## II. Background Facts

There are two related issues in this case. The first is whether BPA, in responding to this Court's orders in *PGE* and *GNA* in the WP-07S Case, has properly calculated the amount of unlawful charges that must be repaid to Preference Customers. The second issue is whether BPA has adequately provided for the full and prompt payment of the refund amount as required by this Court's directives and applicable law. Since this appeal is grounded in part on BPA's failures to abide by the provisions of the Act in responding to the orders in *GNA* and *PGE*, the Utilities submit that a brief review of the Act's history, and the proceedings resulting in this appeal, may be helpful.

### a. Congress Passed the Act to Avert a Regional Power Crisis

In the 1970s, BPA forecasted that the federal power it was responsible for marketing would soon be insufficient to serve the loads of its Preference, IOU and direct service industrial ("DSI") customers. *See generally,*

*Aluminum Co. of North America v. Central Lincoln People's Util. Dist.,* 467 U.S. 380 (1984). In accordance with preference, BPA terminated its IOU power supply contracts, notified the DSIs that their contracts would not be renewed upon expiration and prepared to allocate its federal power supply among its Preference Customers by issuing a notice of insufficiency. This forced the IOUs to acquire expensive replacement power and resources to serve their loads, resulting in a disparity between the wholesale power costs incurred by the IOUs as compared to the cost of federal available to Preference Customers from BPA. It also prompted the DSIs to consider a legislative solution to their imminent loss of BPA power. Ultimately, BPA and its three customer groups turned to Congress to legislate a solution.

Congress addressed this crisis by allocating to each of BPA's customer groups certain federal power benefits, and by granting to BPA certain new authorities. BPA was, among other matters, authorized to augment its federal power supplies by acquiring the output of non-federal power generating resources to meet growing regional loads.

Under the Act, the IOUs got the Exchange Program, which is characterized as an exchange of high cost IOU power for lower cost federal power. In practice, as this Court has explained, the Exchange Program is a

8

"paper transaction" operating as a "cash rebate to the IOUs". *PGE*, 501 F.3d at 1015 (citing *CP Nat'l Corp. v. BPA*, 928 F.2d 905 (9th Cir. 1991)).

The Exchange Program was designed by Congress to reduce (but not necessarily eliminate) the disparity in wholesale power costs between IOUs, who did not have direct access to BPA's inexpensive federal power, and Preference Customers, who did have such direct access by virtue of the preference clause.[4] 16 U.S.C. § 839c(a). Exchange Program benefits were based on the difference between each IOU's average system cost of power ("Average System Cost") and BPA's Preference Customer rate, multiplied by the IOU's residential and small farm load. 16 U.S.C. § 839c(c). IOUs with an ASC lower than BPA's Preference Customer rate are not eligible to receive Exchange Program payments, since they have no wholesale power cost disparity to ameliorate.

The Act granted the DSIs received new 20-year power supply contracts with BPA, but at considerably higher rates. The DSI rates were intended to fund, at least in part, the Exchange Program costs.

The Preference Customers retained their statutory preference to BPA's inexpensive federal power, and received assurance in the Act that

---

[4] The exchange mechanism was chosen by Congress to provide federal power system benefits to IOUs through cash payments in order to preserve for Preference Customers their exclusive statutory priority to the inexpensive power generated by the federal power system. *PGE*, 501 F.3d at 1015-16.

their BPA rates would be based on the lowest cost federal power facilities. 16 U.S.C. § 839c(b)(1); *See also,* Report from the House Committee on Interior and Insular Affairs, Rept., 96-976, Part II, page 52 (Sept. 16, 1980) ("Section 7(b) contains the rate directives for power sold to * * * BPA's public body and cooperative customers * * *.  This will be BPA's lowest cost rate, based on BPA's lowest cost resources * * *.").

Most importantly for purposes of this appeal, Congress also established the § 7(b)(2) rate ceiling test to ensure that "preference utilities will not suffer any adverse economic consequence as a result of [the Exchange Program] since * * * the [DSIs] are required to pay the costs of the exchange during the initial years while a 'rate ceiling' protects the customers of preference utilities during later years." *Id*.  Congress intended the §7(b)(2)  rate ceiling test to protect Preference Customers from the costs of BPA's new authorities and obligations under the Act, in particular the costs of the Exchange Program.[5]  As explained in the legislative history of the Act:

[5] The § 7(b)(2) rate ceiling test provides Preference Customer cost protection by requiring a comparison in each BPA rate proceeding of two sets of power costs, one set based on the forecast costs to serve preference customers loads ("Program Case") during the relevant rate period, and the second set based on the same forecast power costs but modified to reflect the five specific and detailed assumptions set out in § 7(b)(2)  ("7(b)(2) Case"), including the direction that BPA assume there is no Exchange Program in place. The

> Section 7(b)(2) establishes a "rate ceiling" for preference customers that seeks to assure these customers that their rates will be no higher than they would have been had the Administrator not been required to participate in power sales or purchase transactions with non-preference customers under this Act. The assumptions to be made by the Administrator in establishing this ceiling are specifically set forth. It is through rate ceilings that this Act provides additional protection to public bodies and cooperatives' preference customers as to the price of the sale of power by the Administrator.

Report of the House Committee on Interstate and Foreign Affairs, H.R. Rep. No. 976, Part I, pages 68-69 (May 15, 1980).

The costs of the Exchange Program were expected to be offset (and funded) by the DSIs', both through a margin included in their rates and through inexpensive system operating reserves they provided. Exchange Program costs were also to be offset by the benefits (cost savings) achieved by financing new generating resources through BPA. So long as these benefits exceed the costs of the Exchange Program, Preference Customers will be no worse off due to the Act, and the § 7(b)(2) rate ceiling test would not "trigger" in any material amount. If the benefits under the Act do not fully fund the Exchange Program costs, however, then § 7(b)(2) directs that

---

projected amounts charged Preference Customers for firm power to serve their general requirements cannot exceed those established pursuant to the § 7(b)(2) case rate ceiling test.

11

such excess costs *must* be excluded from the Preference Customer rate. Under such circumstances, § 7(b)(3) requires that excess costs be removed from the Preference Customer and be reallocated to rates of other BPA loads, including the DSI rate and the rate used to determine the IOU Exchange Program benefits. The Act dictates that when the § 7(b)(2) rate ceiling test triggers, the costs of power to the DSIs will be increased, and the Exchange Program benefits available to the IOUs will be decreased (or completely eliminated) to provide cost protection to Preference Customers.

From the passage of the Act in 1981 until the mid 1990s, the § 7(b)2 rate ceiling test rarely triggered and the IOUs received a stream of Exchange Program subsidy payments totaling over $2.8 billion. *PGE*, 501 F.3d at 1015. By the mid 1990s, however, this situation changed due to dramatic reduction in DSI power sales. The reduction of sales to the DSIs materially decreased the DSIs' contribution to the Exchange Program costs. This, combined with the absence of the expected benefits from financing new resources through BPA, caused the Exchange Program benefits otherwise payable to the IOUs to trigger the § 7(b)(2) rate ceiling.

Under these circumstances, with virtually no BPA power sales to DSIs left, § 7(b)(3) dictated that the Exchange Program costs excluded from the Preference Customer rates by operation of §7(b)(2) must be reallocated

12

to the rates used to determine IOU Exchange Program payments. This materially reduced the Exchange Program payments to the IOUs. In short, following the demise of the DSIs in the 1990s, §§ 7(b)(2) and (3) protected Preference Customers from the costs of the Exchange Program by decreasing the Exchange Program payments that would have otherwise been paid to the IOUs, just as intended by Congress. BPA began looking for ways to provide additional Exchange Program benefits to the IOUs beyond what would otherwise be allowed by the Act.

### b. BPA Replaced Exchange Program Payments With the REP Settlement

In December of 1998, BPA issued the Subscription Strategy Record of Decision, in which it sought to substitute its own program of benefits for the Exchange Program crafted by Congress. In October of 2000, BPA issued the Residential Exchange Settlement Record of Decision, in which BPA implemented its substitute benefit program by offering the IOUs the REP Settlement Agreements.[6]

BPA's substitute program represented a material departure from the statutory Exchange Program mandated by Congress in § 5(c). 16 U.S.C.

---

[6] Although the statutory Exchange Program was available to both IOUs and Preference Customers with average power costs in excess of BPA's preference customer rate, the REP Settlement Agreements were only offered to BPA's IOU customers. *PGE*, 501 F.3d at 1019.

§ 839c(c). Under the REP Settlement Agreements, BPA agreed to provide the IOUs with cash and power deliveries equivalent in value to 1900 average megawatts ("aMW") of benefits in the 2001-2006 period, and 2200 aMW of benefits in the 2007-2011 period. The combined value of these benefits far exceeded the benefits that would have been available under the statutory Exchange Program as limited by §§ 7(b)(2) and (3). BPA estimated that the statutory Exchange Program benefits available to eligible IOUs, as permitted under §§ 7(b)(2) and (3), was $40 million per year between 2001-2006, E.R. 84, and $30 million per year between 2007-2008, S.E.R. 23, compared to the estimated benefits under the REP Settlement of $140 million per year.[7] R.A.R. 97682.

In addition to substantially increasing the amount of benefits payable to eligible IOUs, REP Settlement Agreements were even offered to IOUs that did not qualify for Exchange Program payments under the Act. The benefits available under BPA's substitute program were apportioned among all of the IOUs based on the recommendation of the public utility commissions of Oregon, Washington, Idaho and Montana, and not on the basis of the Average System Costs of the IOUs as was prescribed by law.

---

[7] Residential Exchange Program Settlement Agreements With Pacific Northwest Investor-Owned Utilities, Administrator's Record of Decision, October 2004, p.13.

*PGE*, 501 F.3d at 1020-21. Not surprisingly, all of the IOUs elected to execute REP Settlement Agreements.

The REP Settlement also altered the form of Exchange Program benefits as compared to the Act. It marked the first and only time that BPA ever agreed to meet its § 5(c) obligation by delivering to the IOUs actual power (with no power exchanged by the IOUs) instead of cash. During the 2001-2006 period, at least 1000 aMW of benefits were to be in the form of power deliveries sold at below market prices. During the 2007-2011 period, BPA intended the entire 2200 aMW benefit amount "to be comprised solely of physical power deliveries ***." *PGE*, 501 F.3d at 1020.

This shift from the long-standing practice of cash subsidy payments under the Exchange Program to physical power deliveries was made at the urging of the IOUs and state regulatory commissions. *Id.* The sale and delivery of power was viewed as less subject to manipulation and change over time by BPA than the cash subsidy payments required by the statutory Exchange Program. *Id.* The impending crisis in western energy markets would soon cause BPA to reconsider its decision to offer power, rather than cash, under the REP Settlement Agreements.

15

**c. BPA's Power Delivery Obligations Under The REP Settlement Agreements Led Directly To The LRAs**

BPA knew when it executed the REP Settlement Agreements that its commitment to deliver 1000 aMW of power to the IOUs, in combination with its other power delivery obligations, would exceed the supply of federal power that BPA is responsible for marketing. To make up the difference, BPA intended to rely on market purchases.

Before BPA had made even the first power delivery to the IOUs under the REP Settlement Agreements, California's ill-conceived wholesale power market deregulation experiment caused extreme volatility in power prices throughout the western power markets, which reached a magnitude never before seen. This imposed substantial risks on entities relying on the wholesale power market to fulfill their power needs. BPA sought ways to reduce its exposure to this market volatility and risk. One obvious answer was to amend the physical power delivery obligation of the REP Settlement Agreements and replace it with a cash payment obligation. BPA succeeded in completing such amendments to its REP Settlement Agreements with PacifiCorp and Puget Sound Energy. BPA referred to these amendments as the Load Reduction Agreements, or LRAs. BPA used the LRAs to revert back to the historical method of providing Exchange Program benefits to the IOUs: a cash subsidy.

16

To implement this change in form of benefits, BPA executed two agreements with PacifiCorp. The first agreement was entitled a "Financial Settlement Agreement." It is clear from its "Recitals" that this agreement was inextricably linked to both the Exchange Program and the REP Settlement Agreements:

> The Northwest Power Act establishes a Residential Exchange Program to provide benefits to residential and small farm consumers of Pacific Northwest utilities.

> BPA implements the Residential Exchange Program through the offer, when requested, of a Residential Purchase and Sale Agreement.

> On October 31, 2000, BPA and PacifiCorp entered into . . . the 'Settlement Agreement' . . . which provides, among other things, for BPA to provide PacifiCorp with Firm Power and Monetary Benefits to settle the Residential Exchange Program.

> The term of the Settlement Agreement continues through September 30, 2011.

> *Since the execution of the Settlement Agreement, BPA and PacifiCorp have agreed that BPA will, rather than deliver Firm Power to PacifiCorp for the first 5 years of the Settlement Agreement, make cash payments to PacifiCorp during the period that begins October 1, 2001 and ends on September 30, 2006. BPA intends to use the Firm Power not sold to PacifiCorp to meet deficits in resources necessary to meet loads of publicly owned and cooperative customers in its firm load obligations in the Pacific Northwest.*

> The cash payments in lieu of firm power deliveries under the Settlement Agreement will be as provided under this Agreement.

> *The parties will also simultaneously execute an amendment to the Settlement Agreement that removes BPA's obligation to deliver Firm Power during the first 5 years of the Settlement Agreement.*

S.E.R. 29 (Emphasis added). In short, the only "load reduction" involved monetizing the power benefits under PacifiCorp's REP Settlement Agreement. *See* Proposed Contract or Amendments to Existing Contracts With the Regional Investor-Owned Utilities, page 5 (May 25, 2004) (LRAs "amended or replaced their original REP Settlement Agreements and removed BPA's obligation to deliver 619 aMWs of firm power for the first five years of those agreements.").

In the case of Puget Sound Energy, there was a single agreement entitled "Amended Settlement Agreement." It contains the very same recitals as the PacifiCorp LRA, including a recital that:

> "Since the execution of the Settlement Agreement, BPA and Puget have agreed that BPA will, rather than deliver Firm Power to Puget for the first 5 years of the Settlement Agreement, make cash payments to Puget during the period that begins October 1, 2001 and ends on September 30, 2006. BPA intends to use the Firm Power not sold to Puget to meet deficits in resources necessary to meet loads of publicly owned and cooperative customers in its firm load obligations in the Pacific Northwest."

S.E.R. 30. It too provided for the same simple conversion of REP Settlement benefits from power into cash. S.E.R. 28.

These amendments did not change the level of benefits received by the two participating IOUs. The power that BPA was no longer committed

18

to deliver to PacifiCorp and Puget Sound Energy was valued at precisely the same level ($38/MWh) as was used to calculate monetary benefits under the REP Settlement Agreements in the WP-02 Supplemental rate case. S.E.R. 1-9. In short, the LRAs merely changed the form of REP Settlement Agreement benefits provided.[8]

BPA agrees that the LRAs converted the benefits provided to the IOUs under the REP Settlement Agreements from one form (power) to another form (money): "BPA will, rather than deliver Firm Power to [the IOUs] for the first 5 years of the Settlement Agreement, make cash payments to [the IOUs] * * *"[9]. BPA has also agreed that by changing the form in which the benefits were provided to the IOUs, the LRAs did not institute a new benefit program separate from the original REP Settlement Agreements, but that "the LRAs were a component of the overall REP settlement benefits provided to IOUs and included in [Preference Customer]

---

[8] The one difference was the "litigation penalty" that would have raised the $38/MWh figure to $45.49/MWh if the preference customers declined to settle the ongoing dispute over the lawfulness of the REP Settlement Agreements. *See Pub. Util. Dist. No.1 of Snohomish County, Wash. v. BPA,* 506 F.3d 1145, 1146 (9th Cir. 2007); S.E.R. 25 (monthly dollar amounts and aMW supporting these figures).

[9] PacifiCorp Record of Decision, S.E.R. 26; Puget Sound Energy Record of Decision, S.E.R. 27.

rates* * *."[10] And these, of course, are the same benefits that this Court found to be unlawful as being beyond BPA's authority to offer in *PGE*, 501 F.3d at 1037. *See* R.A.R. 68135 ("[T]he LRA payments are included as part of the total calculation of REP settlement benefits paid to PacifiCorp and PSE."); S.E.R. 15, ("The LRAs turned the power sale into a financial payment between BPA and PacifiCorp and between BPA and Puget Sound Energy.); S.E.R. 16 ("[U]nder BPA's proposal, for Puget Sound Energy in 2002, total REP settlement benefits were $173 million, of which $117 million were payments made under the LRA.").

### d.  <u>Litigation Arising From the REP Settlement</u>

The purpose of the REP Settlement was to provide the IOUs Exchange Program benefits in excess of those permitted under §§ 7(b)(2) and (3), and to include the costs of such benefits in Preference Customer rates by denominating them as "settlement costs."  BPA asserted that the REP Settlement costs were ordinary costs of doing business payable by all BPA customers, including its Preference Customers.  BPA therefore argued that the REP Settlement costs were not subject to the limitations of §§ 7(b)(2) and (3).  Under this reasoning, later rejected by the Court, BPA

---

[10] Testimony of Kenneth J. Marks, Raymond D. Bliven, Rodney E. Boling, Paul A. Brodie, Elizabeth A. Evans and Charles W. Forman, Jr. (Lookback Results, Recovery and Disposition) S.E.R. 16.

set its Preference Customer rates in the 2000 and 2007 rate proceedings at levels that included the costs of the REP Settlements benefits, including the LRAs.

In *PGE,* this Court determined the REP Settlements Agreements were unlawful when made. The *PGE* decision held that BPA's settlement authority under § 2(f) of the Bonneville Project Act is subject to, and constrained by, the substantive provisions of the Act. *PGE,* 501 F.3d at 1028. Based on this conclusion, the Court held that the REP Settlements violated § 5(c) and §§ 7(b)(2) and (3) of the Act, were beyond BPA's settlement authority, and were therefore illegal and void. *Id.*

*GNA,* the companion case to *PGE*, involved, *inter alia,* a challenge to BPA's decision to include REP Settlement costs in the Preference Customer rates. The Court held that BPA acted unlawfully by treating REP Settlement costs as ordinary costs of doing business rather than as Exchange Program costs, and by allocating them to Preference Customer rates in violation of the cost limitations established by the § 7(b)(2) rate ceiling test. *GNA*, 501 F.3d at 1047. The Court concluded that "[b]y burdening its preference customers with part of the cost of the REP settlement, BPA 'ignored its obligations' under sections 7(b)(2) and (3)." *Id.* at 1048. The Court remanded the matter to BPA with direction to revise its rates accordingly. *Id.* at 1053.

21

In subsequent litigation, this Court also reviewed additional amendments to the REP Settlement Agreements executed in 2004, including the so-called "litigation penalty" (the "2004 Amendments").[11] These 2004 Amendments revised how certain provisions of the REP Settlement Agreements, the LRA agreements and certain other agreements would operate in the 2007-2011 period. In *Pub. Util. Dist. No.1 of Snohomish County v. BPA*, 506 F.3d 1145 (9th Cir. 2007) ("*Snohomish*"), the Court stated that "BPA may conclude that our decisions undermined the basis for the 2000 REP Settlement Agreements and treat these 2004 Agreements as null and void." *Id*. at 1154. But because the Court could not determine from the record before it BPA's likely course of action, it remanded the 2004 Amendments "to permit BPA to determine, in the first instance, their continued validity in light of our recent opinions." *Id*.

### e. <u>BPA Responds To This Court's Remand Orders</u>

On February 8, 2008, BPA commenced the WP-07S Case to respond to this Court's orders in *GNA, PGE* and *Snohomish.* S.E.R. 19. BPA

---

[11]On May 25, 2004, BPA issued a ROD addressing additional amendments to the REP Settlement Agreements, the LRAs and certain interim agreements. Proposed Contracts or Amendments to Existing Contracts With Regional Investor-Owned Utilities Regarding the Payment of Residential and Small-Farm Consumer Benefits Under the Residential Exchange Program Settlement Agreements FY 2007-2011, Administrator's Record of Decision ("2004 Amendments ROD").

explained that the purpose of the proceeding was "to determine the amounts of REP settlement costs improperly included in the FY 2002-2008 Power Rates, * * * and to return improperly included amounts to [the Preference Customers]." *Id.* BPA proposed to do so by "reconstructing" the statutory Exchange Program benefits that the IOUs would have received had BPA complied with the Act, subtracting such reconstructed benefits from the payments actually made under the REP Settlements, and refunding the difference to its Preference Customers. S.E.R. 19. BPA refers to this refund amount as the "Lookback Amount."

According to BPA, the total amount of the REP Settlement payments included in Preference Customer rates through 2007, including payments made under the LRAs, was approximately $2.097 billion. BPA also determined that the maximum statutory Exchange Program payments to the IOUs allowed by law (including § 5(c) and §§ 7(b)(2) and (3)) would have been only about $775.0 million. Based on BPA's own methodology, and a plain reading of this Court's decisions in *PGE* and *GNA*, BPA has a refund obligation to Preference Customers of $1.322 billion for the FY 2002-2007 period.

In the WP-07S Case, however, BPA decided that it would not recover, and would not refund to Preference Customers, $648 million of the $1.322

billion in unlawful overcharges. Rather than refund the full amount unlawfully collected from its Preference Customers, BPA decided to continue treating the LRAs as binding, legal obligations, and to "protect" the $648 million in payments made under them from the § 7(b)(2) rate ceiling.

Further, in the WP-07S Case BPA decided to defer repayment of even this truncated Lookback Amount in order to maintain substantial, additional Exchange Program payments to the IOUs, requiring Preference Customers in substance, to make payments to parties that owe them money. BPA also decided in essence to forego altogether the collection of Lookback Amounts owed by IOUs that do not qualify for future statutory Exchange Program benefits.

## SUMMARY OF THE ARGUMENT

BPA has acted unlawfully in its response to this Court's rulings by deciding to continue treating the LRAs as valid and binding agreements without lawful justification, contrary to the principles of the *Snohomish* decision and despite this Court's clear decision regarding the illegality of the REP Settlement Agreements articulated in *PGE*. Because the LRAs were and are void along with the rest of the REP Settlement scheme, it is unlawful for BPA to refuse to refund to Preference Customers the LRA costs that BPA collected from the Preference Customers.

Putting aside the legality of the LRAs, BPA also acted unlawfully in the WP-07S Case by purporting to "protect" the LRA costs, which are in fact Exchange Program costs, from the operation of §§ 7(b)(2) and (3). BPA's attempt to recast Exchange Program costs under some other guise in order to exempt them from § 7(b)(2) is precisely the conduct found unlawful by this Court in *GNA*. BPA is once again burdening Preference Customers with the costs of Exchange Program, whether such benefits be lawful or unlawful, in violation of the cost limits of the § 7(b)(2) rate ceiling test, and this Court's clear directions in *GNA*.

BPA has also acted unlawfully by adopting in the WP-07S Case a repayment scheme that defers repayment of the Lookback Amounts to Preference Customers far into the future in order to allow BPA to maintain substantial and additional Exchange Program payments to the IOUs. BPA's repayment scheme also foregoes entirely the collection of Lookback Amounts owed by IOUs that do not qualify for future statutory Exchange Program benefits. R.A.R. 87522. BPA has failed to respond to this Court's order in *GNA,* and to fulfill its statutory duties to recoup and repay monies unlawfully paid to the IOUs and illegally charged Preference Customers.

25

**ARGUMENT**

**I.      Standard of Review: BPA Is Not Entitled To Deference.**

Review of BPA's final actions and decisions is governed by the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, as incorporated by § 9(e)(2) of the Act, 16 U.S.C. § 839f(e)(2).   The APA prohibits BPA actions that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a); *see Snohomish,* 506 F.3d at 1153.

Where a statute administered by an agency is clear and unambiguous, that puts an end to the matter, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  If Congress has not directly addressed the precise question at issue, however, or has by implication or omission left room within which agency discretion can operate, the question presented is whether the agency's construction of the statute "represent[s] a reasonable accommodation of conflicting policies that were committed to the agency's care by statute." *Aluminum Co. of America v. BPA*, 903 F.3d 585, 598 (9th Cir. 1989) (quoting *Chevron*, 467 U.S. at 845).

26

Challenges to agency actions or determinations on the grounds that they violate legal requirements other than the statutes administered by the agency (such as the Act in the case of BPA), or for failure to comply with a court order (such as BPA's failure to comply with the *GNA* remand order), are subject to *de novo* review by the court with no deference owed to the agency. When the agency action being reviewed presents an issue that is "one of law and does not involve the expertise of an agency, we are not bound by that agency's decision. This is particularly true when the decision of the agency is based on an interpretation of a judicial decision that in turn construes the Constitution or a statute." *Charter Limousine, Inc. v. Dade County Bd. of County Com'rs*, 678 F.2d 586 (5th Cir. 1982).

The challenges to BPA's actions presented herein involve a mixture of issues, some of which turn in part on BPA's interpretation of the ambit of §§ 7(b)(2) and (3), while the other issues involve questions of law not within BPA's special expertise, interpretation of this Court's decisions in *GNA, PGE* and *Snohomish*, as well as the meaning of this Court's remand order.

With regard to issues presented herein that deal with BPA's interpretation of § 5(c) and §§ 7(b)(2) and (3), this Court already determined in *PGE* that BPA's interpretations are not entitled to deference. *PGE,* 501 F.3d at 1032. "Because Congress has clearly spoken to the issue at hand, we

27

decline to afford BPA's construction *** *Chevron* deference.  Its position is neither consistent with the plain language of its organic acts nor with general principles of administrative law." *Id.*

With regard to challenges presented herein that involve BPA's interpretations of statutes that it does not administer and for which it has no special expertise, as well as this Court's decisions and orders in *GNA*, *PGE* and *Snohomish*, no deference to BPA's interpretations is warranted, as this Court is best positioned to interpret its own actions.

## II.    BPA Must Refund The LRA Costs To Preference Customers.

### a.  BPA Has Failed to Implement This Court's Remand Order by "Protecting" LRA Payments from Refund to Preference Customers.

As discussed above, BPA and two IOUs entered into the LRAs to amend their respective REP Settlement Agreements. These amendments "eliminated BPA's obligation to deliver virtually all power to PacifiCorp and PSE for the FY 2002-2006 period in exchange for cash payments." *Snohomish*, 506 F.3d at 1148.

The LRAs neither replaced the benefit program initiated by BPA with the REP Settlements, nor did they create separate new program to take its place.  Rather, the LRAs permitted BPA to recast (monetize) the form of benefit payment provided to these two IOUs under the REP Settlements.

28

Before the LRAs, BPA committed to provide the IOUs benefits pursuant to the REP Settlement Agreements in the form of money and delivered power. After the LRAs, BPA provided benefits to the participating IOUs in the form of money only. The form of the benefits had changed due to the LRAs, but these payments were still part and parcel of the substitute benefit program implemented by the REP Settlement Agreements. BPA does not dispute the fact that the LRAs and the payments made under them were "a component of the overall REP Settlement benefits provided to the IOUs and included in the [Preference Customer] rates." S.E.R. 16.

As noted above, *PGE* found that the payment of any Exchange Program benefits to the IOUs, except as specifically authorized by § 5(c) of the Act, was beyond BPA's authority and therefore void. *GNA* found that payments made by BPA under the REP Settlements were Exchange Program costs subject to the § 7(b)(2) rate ceiling. This Court instructed BPA in *GNA* that including any REP Settlement costs in Preference Customer rates in excess of those permitted by the § 7(b)(2) rate ceiling burdened "preference customers with part of the cost of the REP Settlement" in violation of BPA's obligations "under sections 7(b)(2) and (3)." *GNA*, 501 F.3d at 1048. This Court remanded the matter to BPA to "set rates in accordance with this opinion." *Id.* at 1053.

Under these decisions, this Court found the entire REP Settlement program illegal and void and directed BPA to remove the costs of the unlawful REP Settlement program from Preference Customer rates. BPA's duty was not limited based on the nature or validity of the contractual mechanism used to deliver such benefits to the IOUs. Under the remand order, neither the asserted validity of the LRAs, nor the form of the contract used by BPA to implement them, permitted BPA to "protect" any REP Settlement program costs from removal from Preference Customer rates.

BPA acknowledged in the WP-07S Case that the *PGE* decision found that "the 2000 REP Settlement Agreements were invalid because BPA entered into the agreements without requisite statutory authority", and that the *PGE* and *GNA* decisions were "the substantive equivalent of an instruction that BPA remedy what the Court itself describes as a 'plain violation' of the law'". E.R. 195. Nevertheless, in the WP-07S Case, BPA decided not to remove from the Preference Customer rates the REP Settlement benefits conveyed under the LRAs. Rather, BPA elected to "protect" the LRA payments from the refund obligation to Preference Customers, and from the limits imposed on Exchange Program costs that can be charged Preference Customers by operation of the the § 7(b)(2) rate ceiling.

30

BPA's decision to "protect" the REP Settlement payments made under the LRAs from the § 7(b)(2) rate ceiling, and from the corresponding refund amount owed to Preference Customers, is unlawful on two grounds: (1) as part and parcel of the REP Settlement program, the LRAs themselves are illegal and void under the *PGE* decision, requiring the refund of the payments made under them; and (2) even if the LRAs might somehow be construed as valid and legally binding, the LRAs payments were REP Settlement costs subject to exclusion from Preference Customer rates by operation of the § 7(b)(2) rate ceiling.

### b. **The LRAs Were An Integral Part of the REP Settlement Agreements And Are Void Under the PGE Decision.**

As discussed above, the LRAs amended the form of the benefits provided under the REP Settlement Agreements. As such, the LRAs were part and parcel of BPA's attempt to implement what this Court referred to as BPA's "new residential exchange benefit system" in lieu of the statutory benefit program established by § 5(c) of the Act. *PGE,* 501 F.3d at 1037. BPA was obligated under the REP Settlement Agreements to deliver power at below market prices to the IOUs, and the LRAs were merely the means by which BPA converted this promise to deliver power into a promise to pay cash. The LRAs would not have existed at all but for the invalid power delivery promise made in the REP Settlement Agreements.

31

The LRAs themselves confirm that they were merely a change in the form of settlement benefits to be paid—from power to cash: "Since the execution of the [REP] Settlement Agreement, BPA and PacifiCorp have agreed that BPA will, rather than deliver Firm Power to PacifiCorp for the first 5 years of the Settlement Agreement, make cash payments to PacifiCorp." S.E.R. 29. BPA acknowledged in the WP-07S Case that the "LRAs turned the power sale [invalidated in *PGE*] into a financial payment between BPA and PacifiCorp and BPA and Puget Sound Energy." S.E.R. 15.

BPA cannot continue to pay a monetized contractual commitment that never lawfully existed in the first place. It is settled law that "administrative actions taken in violation of statutory authorization or requirement are of no effect." *City of Santa Clara v. Pacific Gas & Elec. Co.,* 572 F.2d 660, 667 (9th Cir. 1978). *See also Pit River Tribe v. U.S. Forest Service,* 469 F.3d 768, 788 (9th Cir. 2006) (where initial lease extension void for want to NEPA compliance, subsequent extensions "must be undone;" "rest of the project approval process * * * was premised on Calpine's possession of a valid right * * * and therefore must be set aside"). As applied here, because the REP Settlements were unlawful and therefore void, BPA's commitment to deliver physical power under the REP Settlement Agreements was not

32

just discharged going forward, it never lawfully existed in the first place. Thus, the LRAs likewise were void, as they purport to monetize a contractual commitment that never lawfully existed.

It has long been the law that "one who has participated in an illegal act cannot be permitted to assert in a court of justice *any right founded upon or growing out of the illegal transaction.*" *Resolution Trust Corp. v. Home Savings of America*, 946 F.2d 93, 96 (8th Cir. 1991) (Emphasis added). This principle means that neither PacifiCorp nor Puget Sound Energy can possibly enforce the LRAs, because "[t]he law simply refuses to allow either party to invoke any aid from the court to give effect to an illegal transaction in which he has taken part." *Cranson v. Goss*, 107 Mass. 439, 442 (Mass. 1871). It also means that where, as here, "the illegality of the conduct of a party enters into the very inception of a scheme* * *a party to it cannot purge his conduct, and obtain the benefit* * *by attempting to abandon the original contract, and make a new one in furtherance of the unlawful scheme." *Gammons v. Gulbranson*, 78 Minn. 21, 23, 80 N.W. 779 (Minn. 1899).

BPA applied this very principle in the WP-07S ROD. When commenting on the BPA power sales contracts attached as exhibits to the REP Settlement Agreements, BPA noted that "the power sales that occurred

under the 2000 REP Settlement Agreements are within the scope of the Court's opinion and should be treated as invalid in BPA's Lookback analysis." S.E.R. 11. BPA also applied this principle in determining whether certain conservation payments provided "[u]nder the terms of the REP Settlement Agreements" should be treated as unlawful and be included in the refund obligation to Preference Customers. BPA concluded that the conservation payments in question "would not have existed but for the REP Settlement Agreements, and therefore should be included as settlement benefits subject to the Lookback." S.E.R. 24.

Consistent with this approach, the benefits paid under the LRAs that "would not have existed but for the REP Settlement Agreements," must be considered void as a result of the *PGE* decision, and therefore must be included in the REP Settlement benefits subject to refund to the Preference Customers.

BPA seeks to avoid the legal consequences of its own logic by arguing that the LRAs somehow are an "independent benefit or program" that have a separate existence from the REP Settlement program. In this vein, BPA suggests that "the IOUs relinquished their rights to an extremely valuable power supply," and that BPA and all its customers benefited from

34

this transaction.  E.R. 190.  But there were no rights to relinquish, for the grant of rights was illegal and void *ab initio*.

Because the REP Settlement was held in PGE to be illegal and void as beyond BPA's statutory authority, the IOUs putative "rights to an extremely valuable power supply" under the REP Settlement Agreements did not exist. The decision in PGE voided all asserted rights under the REP Settlement Agreements, including the IOUs' claimed "rights" to receive power deliveries from BPA.  As a consequence, the IOUs had no right to any BPA power deliveries to relinquish to BPA under the LRAs.

BPA also argues that it monetized its power delivery obligation under the REP Settlement Agreements to "mitigate the incremental risks brought about by the upheaval in the west costs electricity market."  S.E.R. 203. Those incremental risks were those created by BPA's own short-lived and unlawful decision to provide power by "settlement."  The Utilities do not impugn BPA's motives for entering into the LRAs.  But BPA's motives, no matter how laudable, cannot breathe legality into an agreement that is void for lack of statutory authority.

Moreover, when BPA converted the REP Settlement Agreement power delivery commitment to a cash payment commitment via the LRAs amendments, BPA used the same $38/MWh value to monetize those power

deliveries that it used to establish the REP Settlement cash payments in the WP-02 Case. This means that the value to the IOUs was the same under the REP Settlement Agreements as amended by the LRAs as it was under the original REP Settlement Agreements before such amendments. Monetizing the power delivery commitment did not change the value of the REP Settlement benefits to the IOUs or their costs to BPA.

### c. The Method Used to Collect a Cost Does Not Change the Nature of the Cost

BPA also suggests that the mechanism it used to extract the LRA costs from Preference Customers supports its assertion that the LRA amendments constitute an independent benefit or program. Specifically, BPA argues that REP Settlement costs were collected from Preference Customers by an allocation under § 7(g) to the base Preference Customer rate, while the costs under the LRAs were collected from Preference Customers through a Load Based Cost Recovery Adjustment Clause adopted in the WP-02 Case. BPA this distinction in collection method is evidence that the LRAs were a separate benefit or program. But this is a distinction that makes no difference under the law.

The mechanism used by BPA to collect unlawful REP Settlement costs incurred under the LRAs did not convert them from REP Settlement costs to power system augmentation costs, nor make them the cost of a

36

separate program. E.R. 202-04. The method BPA elects to employ to collect a particular cost is not determinative of either the nature of the cost, nor of the legality of collecting such cost through BPA's rates. The fact that BPA elected to collect the REP Settlement payments made under the LRA amendments through a cost recovery adjustment clause did not alter the nature of these payments, or in any fashion cause them to cease being REP Settlement payments that were held to be illegal and void under *PGE*.

The difference in collection mechanics is not even relevant because the REP Settlement costs collected under Preference Customer rates via a § 7(g) allocation, and the costs of the LRA amendments collected via Load Based Cost Recovery Adjustment Clause, had precisely the same affect. As described by BPA, it "allocated the costs of the 2000 REP Settlement Agreements to preference customers' [base] rates through application of section 7(g)," while the LRA payments "were recovered through a percentage adjustment to [Preference Customer] base rates." E.R. 202-03. By BPA's own admission, the end result of using these two different mechanisms was the same – the costs of the REP Settlements, including those due to the LRA amendments, were allocated to Preference Customers' base rates, and collected from BPA's Preference Customers.

37

### d. The Absence of a Challenge to an Invalid Contract Does Not Validate That Contract in a Separate Cause of Action

BPA suggests that "[b]ecause the LRAs were never challenged, BPA believes they are no longer subject to judicial review and must be regarded as valid and binding agreements." S.E.R. 10. BPA fails to recognize, however, that the LRAs are *void* notwithstanding the fact that they were not challenged, as they were entered into in violation of BPA's statutory authority. In the *City of Santa Clara* case, this Court explained that "the past sales to PG&E of so much power as Santa Clara sought and was refused exceeded the Secretary's statutory authority under the reclamation laws." *City of Santa Clara,* 572 F.2d at 667. Although Santa Clara had not challenged the sales directly, this Court held that the "past sales are *void if unlawful,* for administrative actions taken in violation of statutory authorization are of no effect." *Id.* (Emphasis supplied). Because the LRAs were void *ab initio*, they are of no legal effect whether someone challenges them or not.

BPA's position would also elevate the applicable statute of limitations to a *de facto* validation provision. But statutes of limitation are never regarded "as substantive provisions, akin to the rules governing the validity and effect of contracts, but rather as procedural restrictions fashioned by each jurisdiction for its own courts." *Sun Oil Co. v. Wortman,* 486 U.S. 717,

38

726 (1988). They are "not generally to be viewed as affecting substantive rights" at all. *Banas v. American Airlines,* 969 F.2d 477, 485 (7th Cir. 1992). Here, § 9(e)(5) of the Act cannot validate *ultra vires* contracts or create rights that are otherwise clearly prohibited by the Act. In other words, § 9(e)(5) was never intended to authorize BPA to perform contract obligations that are beyond its statutory authority—in fact prohibited by statute.

BPA cites no case pursuant to which the running of a statute of limitations somehow operates to validate an otherwise invalid contract. To the contrary, BPA recognizes in the WP-07S ROD that, even after the running of a statute of limitations, parties may still litigate the validity of contract where its validity is relevant, as in cases of setoff or recoupment. *Accord* S.E.R. 14 (noting that "the government's right to setoff a debt is generally not subject to a statute of limitation. *See also* E.R. 257; 31 U.S.C. § 3716(e)(1) (2008) (no statute of limitations operates to bar administrative offsets, removing former ten-year rule cited at S.E.R. 12-13); *see generally Bull v. United States*, 295 U.S. 247, 262 (1935) ("[R]ecoupment is in the nature of a defense arising out of some feature of the transaction upon which plaintiff's action is grounded. Such a defense is never barred by the statute of limitation so long as the main action itself is timely.").

39

BPA's argument that the validity of the LRA amendments is beyond the scope of remand from *PGE* and *GNA* also conflicts with its prior position on this topic. BPA has stated that legal challenges to the REP Settlement Agreements themselves would resolve the lawfulness of all follow-on agreements, and that challenges in other contexts were inappropriate. In the "2004 Amendments ROD," BPA expressly declared that "questions regarding the legality of the Load Reduction Agreements are the subject of pending litigation" a reference to the then-pending challenges to the 2000 REP Settlement Agreements. 2004 Amendments ROD, page 17. BPA repeated this statement in holding that any challenge to the "consistency of REP Settlement benefits with the REP" was "previously decided" by BPA and "is the subject of pending litigation"—referring to the pending challenges that ultimately produced the *PGE* opinion setting aside the 2000 REP Settlement Agreements. *Id*. at 22.

The decisions in *PGE* and *GNA* held the REP Settlement program (and the agreements implementing that program) to be illegal and void as beyond BPA's statutory authority. The LRAs were amendments to the REP Settlement Agreements, and would not have existed but for the REP Settlement Agreements. Notwithstanding BPA's efforts to find a rationale to support a different outcome, the inevitable conclusion is that this Court's

40

holding in *PGE* invalided not only the REP Settlement program, but all of the amendments and agreements that implemented that program, including the LRAs, and that the payments made thereunder must be refunded to Preference Customers.

### e. Even If The LRAs Are Somehow Lawful, BPA Is Precluded by § 7(b)(2) from Allocating the Costs to Preference Customer Rates.

Even assuming, *arguendo,* that the LRA amendments to the REP Settlement Agreements can be held to be lawful, BPA still is prohibited from recovering such costs through its Preference Customer rates.

Even lawfully incurred Exchange Program costs must be excluded from BPA's Preference Customer rates when they exceed the limits established by the §7(b)(2) rate ceiling test. *GNA,* 501 F.3d at 1053. This Court determined in *PGE* that payments under the REP Settlement are Exchange Program costs, and are therefore subject to the § 7(b)(2) rate ceiling test. 501 F.3d at 1036-37. Because BPA agrees that the payments under the "LRAs were a component of the overall REP settlement benefits provided to the IOUs,"[12] it inexorably follows that the payments under the

---

[12] Testimony of Kenneth J. Marks, Raymond D. Bliven, Rodney E. Boling, Paul A. Brodie, Elizabeth A. Evans and Charles W. Forman, Jr. (Lookback Results, Recovery and Disposition), S.E.R. 16. In addition to this statement, see section 2(c) of this brief collecting additional similar statements by BPA.

LRA amendments can only be included in Preference Customer rates if permitted by the § 7(b)(2) rate ceiling test. BPA's own testimony in the WP-07S Case acknowledged that the LRA costs exceeded what can be lawfully charged to Preference Customers under the § 7(b)(2) rate ceiling test. S.E.R. 21-23. Indeed, by protecting the LRA payments from the § 7(b)(2) rate ceiling test, BPA allowed PacifiCorp and PSE to retain $648 million more than what BPA calculated these two utilities' lawful Exchange Program benefits could be. *Id.* This amount was unlawfully collected from Preference Customers.

This Court has expressly recognized that the § 7(b)(2) rate ceiling test may require the exclusion of costs from Preference Customer rates that have been validly incurred by BPA under a legal contract. In the *Snohomish* opinion, in discussing a range of possible dispositions regarding the litigation penalty that BPA could consider on remand, the Court noted that BPA could, among other options, choose "to honor the litigation penalty provisions as amended by the 2004 amendments, *but decline to charge its preference customers the cost of paying the penalty.*" 506 F.3d at 1155 (Emphasis added). The fact that the Court recognized the validity of contractual obligations does not empower BPA to allocate costs to the Preference Customer rates if doing so violates the limits established by the

42

§ 7(b)(2) rate ceiling. Even if the LRAs can somehow be found to be legal and binding – and they should not – that does not give BPA the right or the authority to "protect" the resulting costs from the limitations established by the § 7(b)(2) rate ceiling test.

In order to avoid the straight-forward application of the directives contained in *PGE* to the LRA amendments, BPA attempts to put the genie back into the bottle by arguing that because no petitions were filed specifically challenging BPA's original rate treatment of the LRAs in the WP-02 Case, any final decision as to the legal status or rate treatment of the LRAs in the WP-07S Case is somehow exempt from judicial scrutiny. But BPA is wrong, because many parties timely challenged the original WP-02 Preference Customer rates. The petitions filed in *GNA* directly challenged BPA's "failure to establish the rates for service to the general requirements of preference customers in accordance with the statutory directives of §§ 7(b)(2) and (3)." *See* WPAG Brief in *GNA,* page 1 (Mar. 27, 2004). In fact, the primary issue presented in GNA was whether BPA might "set rates to collect from preference customers more than the maximum legal amount" as determined pursuant to the § 7(b)(2) rate ceiling test. *Id.* at 2.

Indeed, in *GNA* this Court characterized petitioners as having sought "review of the 2002-06 wholesale power rates set by BPA during its WP-02

43

rate proceeding." 501 F.3d at 1040. This Court then ruled "that BPA [unlawfully] shifted onto its preference customers the costs of settling its obligations to its IOU customers." *Id.* The opinion in *GNA* concluded that BPA "'plain[ly] violate[d]' the rule that the rates it charges preference customers must be calculated 'as if no purchases or sales were made [under the REP program].'" *Id.* at 1048 (quoting *PGE,* 501 F.3d at 1036). The *GNA* decision broadly remanded the proceeding with directions to BPA "to set rates in accordance with this opinion."[13] *Id*. at 1053. For BPA to construe such remand language so narrowly as to put some forms of REP Settlement payment beyond review is disingenuous at best.

Moreover, regardless of what was or was not appealed to this Court from the WP-02 Case, what is specifically at issue here is BPA's final decision in the WP-07S Case that LRA costs are "protected" against the application of § 7(b)(2) and are not eligible to be refunded to the Preference Customers. There is no question that petitions have been timely filed with

---

[13] This Court has also recognized that whether or not customers challenge contracts, they may still challenge the rate treatment of the costs of such contracts in the review of rates designed to recover such costs. *See Blachly-Lane Electric Cooperative Ass'n v. U.S. Dep't Energy*, 79 Fed. Appx. 975 (9th Cir. 2003) (dismissing as untimely contract claims but without prejudice to challenges to the ratemaking treatment of the costs of such contracts).

respect to final decisions made by BPA in the WP-07S Case, including the decision to impose LRA costs on Preference Customers.

BPA also offers a reprise of the argument it relied on unsuccessfully in the WP-02 Case. In particular, BPA suggests that because the payments made to the IOUs under the LRA amendments were collected under the Load Based Cost Recovery Adjustment Clause, they are no longer Exchange Program costs but instead have been transformed into augmentation costs that may be allocated to Preference Customer rates without consideration of § 7(b)(2). This echoes the argument, rejected by this Court in *PGE*, that paying monies under a settlement agreement transforms such payments from being Exchange Program costs subject to § 7(b)(2), to ordinary costs of doing business that are exempt from § 7(b)(2). Collecting costs by one mechanism versus another does not transform Exchange Program costs into augmentation costs, nor does it exempt BPA from subjecting such costs to the requirements of the § 7(b)(2) rate ceiling test.

Notwithstanding the obfuscating arguments advanced by BPA on this topic, at the end of the day the legal issue presented here is simple. The Court in *PGE* found that the payments made by BPA under the REP Settlement Agreements were Exchange Program costs subject to the limits of the § 7(b)(2) rate ceiling test. Whether valid or invalid, the payments

45

made to the IOUs pursuant to the LRA amendments were REP Settlement costs, and were subject to the § 7(b)(2) rate ceiling test. By including in the Preference Customer rate the cost of payments made under the LRA amendments, BPA set the Preference Customer rate at a level that exceeded the amount BPA could lawfully charge Preference Customers under the § 7(b)(2) rate ceiling and this Court's directives in *PGE* and *GNA*.

III. **BPA Has Failed to Take Legally Required Actions to Retrieve and to Repay Preference Customers Amounts Unlawfully Charged in BPA's Rates.**

   a. **This Court's Decisions Require Prompt and Full Repayment of Amount Illegally Charged Preference Customers.**

The Court's decisions in *PGE* and *GNA* impose on BPA certain legal duties. Specifically, BPA has the duty under the *PGE* decision to retrieve from the IOUs the monies illegally paid to them under the invalid REP Settlement. Under the *GNA* decision, BPA has the corresponding duty to promptly refund to the Preference Customers the amounts they were unlawfully overcharged in violation of the § 7(b)(2) rate ceiling.

In response, BPA decided in the WP-07S Case to retrieve only a fraction of these illegally paid monies, and to do so prospectively by reducing each IOU's future Exchange Program payments by an amount to be determined by the Administrator in subsequent BPA rate proceedings. BPA explained that its objective was to retrieve these illegally paid monies within

46

seven years. But BPA further explained that it would only do so to the extent that it does not result in the IOUs' Exchange Program payments falling below a minimum threshold, also to be determined by the Administrator in subsequent BPA rate proceedings. E.R. 282-83.

This approach is insufficient because it offers no prospect that BPA will retrieve the amounts illegally paid the IOUs under the invalid REP Settlement Agreements either promptly or fully. BPA's repayment plan does not even require BPA to retrieve that portion of the REP Settlement payments that it concedes to have been unlawfully paid. Because BPA has linked the refund of over-charges to the Preference Customers with the amounts that BPA might actually retrieve from the IOUs, BPA's repayment plan provides Preference Customers with no certainty that they will receive either prompt or full repayment of the unlawful over-charges. In the meantime, BPA proposes to make additional Exchange Program payments to the IOUs with money collected from the aggrieved Preference Customers.

### b. <u>BPA Has Not Promptly Retrieved All Monies Illegally Paid To The IOUs Under the Invalid REP Settlement Agreements.</u>

The determination in *PGE* that the REP Settlements were illegal as beyond BPA's authority means all the payments made thereunder were unlawful. Payments made by the federal government that are not legally

47

authorized violate Article I, Section 9, Clause 7 of the Constitution. *See Bank One v. United States,* 62 Fed. Cl. 474, 478 (2008).

Federal statutes and regulations impose on federal agencies, including BPA, an affirmative legal duty to retrieve funds that have been unlawfully paid. *See* 31 U.S.C. § 3711(a)(1); 4 C.F.R. § 102.1(a) ("Each federal agency shall take aggressive action, on a timely basis with effective follow-up, to collect all claims of the United States for money or property arising out of the activities of, or referred to, that agency.").

Caselaw also establishes a reciprocal obligation on recipients of such illegal payments. Here, the IOUs that received illegal payments under the now invalid REP Settlements are obligated to refund such payments to the government. "[P]arties receiving monies from the Government under a mistake of fact or law are liable *ex aequo et bono* to refund them * * *." *DiSilvestro v. United States,* 405 F.2d 150, 155 (2d Cir. 1968). In the absence of voluntary action by the receiving party to refund illegal payments, federal agencies have the authority independent of statute to bring an action to recover such funds. *United States v. Wurts,* 303 U.S. 414, 415 (1939). This includes the common law right of setoff. *U.S. v. Munsey Trust Co.*, 332 U.S. 234, 239 (1947); *Dunn & Black, P.S. v. U.S.,* 492 F.3d 1084, 1092 (9th Cir. 2007).

The scheme adopted by BPA in the WP-07S Case to retrieve the funds paid to the IOUs under the REP Settlements does not satisfy BPA's legal duty to recover these unlawful payments. With one small exception, BPA's scheme offers no certainty whatsoever that the $1.322 billion refund obligation of the IOUs will ever be retrieved. The lone exception is the $87.5 million reduction to Exchange Program benefits paid in FY 2008. S.E.R. 20. The retrieval of the remaining refund obligation is contingent upon a number of factors both within and outside of BPA's control and discretion. First, the repayment scheme presumes that the IOUs owing repayment will continue to qualify for Exchange Program benefits under the Act well into the future. Second, the repayment scheme is contingent upon the Administrator exercising his discretion so as to conclude in each subsequent BPA rate proceeding that forecasted Exchange Program benefits should be reduced. Third, the repayment scheme is contingent upon the Administrator determining the amount of any such reduction.

BPA acknowledged the uncertainties of this approach in the WP-07S Case, stating that "the level of Exchange Program benefits is likely to change in each rate proceeding," and that the "key factors impacting the future Exchange Program benefits, including IOU and BPA costs, load growth, regulatory and environmental policies and other factors cannot be

49

forecast with precision." E.R. 290. This uncertain approach extending the retrieval of these illegal payments over an indefinite period of years is not the "aggressive," or even definitive, legal action the Administrator is required to take under these circumstances.

To add insult to a very real financial injury, BPA explains that its leisurely approach is intended to achieve BPA's policy objective of maintaining substantial, additional Exchange Program payments to the IOUs in the future. "BPA's approach balances the objective of returning the Lookback Amounts to the [Preference Customers] within a reasonable time while maintaining some level of lawful REP benefits." E.R. 276. For the FY 2009, "some level of lawful REP benefits" amounted to 50 percent of the forecast statutory Exchange Program payments. As explained by BPA, its policy objective "that REP benefits go to the residential consumers of the IOUs was *paramount* in the construction of the Lookback proposal." E.R. 270. This effectively gave priority to making additional payments to the beneficiaries of BPA's unlawful actions over making refunds to the Preference Customers that were harmed by BPA's unlawful actions. BPA's scheme also permits the IOUs to retain for an indefinite period unlawful REP Settlement benefits in excess of those permitted under § 5(c) and, at the

50

same time, collect additional benefits from BPA funded by the injured Preference Customers.

Neither this Court's order in *GNA* nor other applicable law tolerates such protracted delay and substantial uncertainty in connection with BPA's retrieval of unlawful REP Settlement payments to further BPA's policy objective of continuing additional Exchange Program payments to the IOUs.

### c. **BPA's Collection Scheme Will Not Retrieve All of the Unlawful REP Settlement Payments.**

BPA's scheme of reducing future statutory Exchange Program payments will not retrieve the full amount of the illegal REP Settlement payments made to the IOUs. This is because certain IOUs that received unlawful REP Settlement payments do not now, and will not in the future, qualify for statutory REP benefit payments.

Under the REP Settlement, even IOUs that did not qualify for any benefits under the statutory Exchange Program received payments under the REP Settlement Agreements. For example, Idaho Power has a Lookback Amount obligation based on LRA payments received of $106.8 million under the REP Settlement Agreements even though it had not qualified for statutory Exchange Program payments since the 1980s. S.E.R. 21. BPA's analysis in the WP-07S Case demonstrated that Idaho Power is entitled to no REP payments in FY 2009, and that there is no reasonable prospect of it

51

receiving Exchange Program benefits for the foreseeable future due to its average system cost of power being consistently less than the Preference Customer rate.[14]  R.A.R. 87522.  Idaho Power does not even have an Exchange Program contract with BPA for the payment of any future benefits.

With no current or future Exchange Program payments to debit, BPA apparently does not intend to retrieve from Idaho Power any of the monies it was unlawfully paid under the REP Settlement Agreements. As a result, the full amount of the IOU repayment obligation will not be retrieved under the BPA approach.

In response to BPA's own forecasts in the WP-07S Case demonstrating that Idaho Power would not repay any of its REP Settlement payments within the 20-year forecast period, BPA simply speculated that under changed circumstances "Idaho Power *may at some future date* qualify for REP benefits * * *," E.R. 289, which BPA might then reduce to retrieve the unlawful rate over-charges so they could be refunded to Preference Customers.  BPA's failure to take any action to retrieve the illegal payments

---

[14] As explained above, Exchange Program benefits are determined by subtracting BPA's preference customer rate from each IOUs average system cost of power, and multiplying the positive difference by the utility's residential and small farm load.  When an IOUs average system cost of power is less than BPA's preference customer rate, it is not eligible for REP payments.

made to Idaho Power, aside from hope that circumstances change in the future, is not a legally supportable response.

### d. **BPA Has Failed to Promptly Repay the Monies Unlawfully Collected From Preference Customers.**

BPA has a legal duty to repay monies unlawfully charged to the Preference Customers at the earliest possible moment. *United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 230 (1965). There is a strong presumption in favor of retroactive recovery when it would make parties whole. *Exxon Corp. v. FERC,* 182 F.3d 30 (D.C. Cir. 2006). BPA's duty to promptly refund these unlawfully charged amounts is even more urgent where, as here, the rate over-charges paid by Preference Customers were in direct violation of § 5(c), which limits the power cost subsidy to the IOUs, and of the § 7(b)(2) rate ceiling test, which protects Preference Customers from Exchange Program costs. As this Court explained in *GNA,* the § 7(b)(2) rate ceiling test "*requires* that the IOUs' exchange benefits not come at the expense of BPA's preference customers." *GNA,* 501 F.3d at 1047 (Emphasis added).

In the WP-07S Case, BPA adopted an approach that limits the refunds to the reductions that BPA is willing to make to the IOUs' statutory Exchange Program payments, as determined by the Administrator in future rate proceedings. Since this approach permits the Administrator to "either

53

accelerate or decelerate the pace of repayment", E.R. 285, in future rate proceedings, this prospective approach provides Preference Customers little or no certainty regarding the amount and timing of the rate over-charge refunds.

BPA's lackadaisical approach to refunds to Preference Customers, which will take literally decades to complete (if ever), virtually ensures that due to the passage of time those consumers who benefited from the illegal REP Settlement payments will not repay them, and those consumers who bore the unlawful rate overcharges will not receive the refunds to which they are entitled. This is clearly not the result intended by this Court by its decisions in *GNA* and *PGE*. BPA's approach also frustrates the statutory purpose of the § 7(b)(2) rate ceiling test, which Congress clearly intended to limit the Exchange Program costs to be borne by Preference Customers. It is not a sufficient response to the *GNA* remand order for BPA to calculate the precise amounts unlawfully collected from Preference Customers, and then decline to take the steps needed to promptly repay those amounts in order to pursue policy objectives the agency deems to be more important.

## IV.   Relief Sought

BPA's failed effort to institute its own non-statutory exchange program, and the efforts of Preference Customers to obtain a refund of the

54

monies they were unlawfully charged to pay for BPA's program, has been going on for over a decade. It is now time to bring this matter to final resolution. To do so, the Utilities request that this Court enter an order that contains specific remedies to right the wrongs done so long ago. While some of BPA's legal errors can be corrected immediately based on the record in the WP-07S Case, correction of other errors will require BPA to make further findings in accordance with the Court's instructions. Petitioners therefore request that the Court order the following:

As an interim remedy:

1)      In accordance with BPAs determinations in the WP-07S Case and to the extent not already refunded, that BPA refund to Preference Customers, with interest, the full amount by which payments made to the IOUs under the REP Settlement Agreements exceeded the amount the IOUs could have lawfully been paid in accordance with §§ 5(c) and 7(b)(2) ("Excess Benefits"), including in this calculation all amounts paid pursuant to the LRAs;

2)      That BPA recover, from the IOUs that received them, the full amount of the Excess Benefits, with interest, irrespective to their entitlement to future Exchange Program benefits; and

55

3)   That such refunds and recoveries are to be completed as soon as possible, but in no event later than seven years following the last month in which the cost of Excess Benefits were included in the rates paid by Preference Customers.

As a final remedy,

4)   That BPA promptly determine the appropriate amount of Exchange Program benefits to which the IOUs were entitled during FY 2002 through FY 2008, using a § 7(b)(2) methodology corrected only for the errors of law identified in the Court's order; and

5)   That BPA recover from the IOUs and refund to Preference Customers, with interest, within the time limit stated in paragraph 3 and in addition to any amounts due to Preference Customers in accordance with paragraph 1, any amount by which the Exchange Program benefits calculated in accordance with paragraph 4 are less than the amount BPA determined to be payable to the IOUs in accordance with paragraph 1.

## CONCLUSION

Based on the foregoing, the decisions of BPA in the WP-07S Case regarding the exclusion of the payments made under the LRA amendments should be vacated, and on remand this Court should provide to BPA detailed directions as set forth above, including the direction to promptly refund to

56

Preference Customers the full amount they were unlawfully charged to fund

BPA's REP Settlement program

Respectfully submitted this 19th day of August, 2009.

| | |
|---|---|
| MARSH MUNDORF PRATT SULLIVAN & McKENZIE, PSC | CABLE, HUSTON, BENEDICT, HAAGENSEN & LLOYD, LLP |

By: /s/ Terence L. Mundorf
  Terence L. Mundorf
  Karl F. Hausmann
  16504 9th Ave. S.E., Suite 203
  Mill Creek, WA 98012
  Phone: (425) 742-4545
  Fax: (425) 745-6060

  Attorneys for the Western
  Public Agencies Group

By: /s/ Richard G. Lorenz
  Richard G. Lorenz
  Thomas M. Grim
  1001 SW Fifth Ave., Suite 2000
  Portland, OR 97204-1136
  Phone: (503) 224-3092
  Fax: (503) 224-3176

  Attorneys for Tillamook People's
  Utility District

By: /s/ Anne L. Spangler
  Anne L. Spangler
  General Counsel
  Eric Lee Christensen
  Associate General Counsel
  Jeffrey R. Kallstrom
  Senior Counsel
  Public Utility District No. 1
  of Snohomish County,
  Washington
  PO Box 1107
  2320 California Street
  Everett, WA 98206-1107
  Telephone: (425) 783-8649
  Fax: (425) 267-6071

  Attorneys for Snohomish
  County Public Utility District

57

## STATEMENT OF RELATED CASES

The following cases are related to this appeal:

1.    *Portland General Electric Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007); *Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.*, 501 F.3d 1037 (9th Cir. 2007); and *Public Utility Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.*, 506 F.3d 1145 (9th Cir. 2007).    This appeal involves issues of whether, on remand, BPA corrected the legal errors identified in the above three decisions, all of which were heard and decided by the same panel consisting of Stephen Reinhart, W. Fletcher and Jay S. Bybee, Circuit Judges.

2.    *Idaho Public Utilities Commission v. Bonneville Power Admin.*, Consolidated Docket Nos. 08-74927, 08-74928, 08-74929, 08-74932, 08-74933, 08-74942, 08-74957.  These consolidated cases may involve whether BPA is legally authorized to correct the many errors identified in the first three related cases.

<div style="margin-left:50%">

Respectfully Submitted
MARSH MUNDORF PRATT
SULLIVAN & McKENZIE, PSC

/s/ Terence L. Mundorf
Terence L. Mundorf
Karl F. Hausmann
Attorneys for the Western Public
Agencies Group

</div>

August 19th, 2009

58

## CERTIFICATE OF COMPLIANCE

**FRAP 32(A)(7)(C) AND NINTH CIRCUIT RULE 32-1 FOR CASE NOS. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133, 08-75161, 08-75165**

I certify that pursuant to FRAP 32(A)(7)(C) and Ninth Circuit Rule 32-1, the attached Opening Brief is proportionately spaced, typeface of 14 point or more, and contains 13,879 words as determined by Microsoft Word™.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 19, 2009, I caused to be electronically filed the foregoing **OPENING BRIEF OF PETITIONERS TILLAMOOK PEOPLE'S UTILITY DISTRICT, SNOHOMISH PUBLIC UTILITY DISTRICT and the WESTERN PUBLIC AGENCIES GROUP** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/EFC system.

All participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that one of the participants in the case is not registered CM/ECF users. I have mailed the foregoing document via First-Class Mail, postage prepaid to the following non-CM/ECF participant:

Erick Johnson
5285 Meadows Road
Lake Oswego, OR 97035-3397

DATED this 19th day of August, 2009.

/s/ Terence L. Mundorf
MARSH MUNDORF PRATT
SULLIVAN & McKENZIE, PSC

Attorneys for the Western Public
Agencies Group