Docket Nos. 08-74725, 08-74811, 08-74900, 08-75008,
08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130,
08-75132, 08-75133, 08-75161, 08-75165

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *et al.*,

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

---

## ON PETITION FOR REVIEW UNDER THE
## NORTHWEST POWER ACT

---

## JOINT BRIEF OF PACIFICORP AND PUGET SOUND
## ENERGY, INC. AS RESPONDENT-INTERVENORS IN
## NOS. 08-74725, 08-74811, 08-74900, 08-75008,
## 08-75091, 08-75133, and 08-75165

---

Jay T. Waldron
Sara Kobak
SCHWABE WILLIAMSON &
WYATT PC
1211 SW 5th Avenue, Suites 1500-2000
Portland, OR 97204
Telephone: (503) 222-9981

Ryan L. Flynn
PACIFICORP
825 NE Multnomah, Suite 1800
Portland, OR 97232
Telephone: (503) 813-5854

Lara L. Skidmore
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington D.C. 20004
Telephone: (503) 590-2979

**COUNSEL FOR PACIFICORP**

Donald G. Kari
Jason T. Kuzma
PERKINS COIE LLP
The PSE Building
10885 NE 4th Street, Suite 700
Bellevue, WA 98004-5579
Telephone: (425) 635-1400

Dan L. Bagatell
PERKINS COIE
BROWN & BAIN P.A.
2901 N. Central Avenue,
Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8000

**COUNSEL FOR PUGET SOUND ENERGY, INC.**

**CORPORATE DISCLOSURE STATEMENTS**

PacifiCorp is a wholly owned subsidiary of PPW Holdings, LLC, an Oregon limited liability company, which is a wholly owned subsidiary of MidAmerican Energy Holdings Company. No publicly held company owns 10 percent or more of PacifiCorp's stock.

Puget Sound Energy, Inc. is a subsidiary of Puget Energy, Inc., a Washington corporation, and is indirectly a subsidiary of Puget Equico LLC, a Washington limited liability company, Puget Intermediate Holdings Inc., a Washington corporation, and Puget Holdings LLC, a Delaware limited liability company. No publicly held corporation owns 10 percent or more of the stock of Puget Sound Energy, Inc.

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ...................................................... i

TABLE OF CONTENTS .................................................................................. ii

TABLE OF AUTHORITIES ......................................................................... iv

I.    INTRODUCTION ................................................................................. 1

II.   JURISDICTION ................................................................................... 2

III.  QUESTIONS PRESENTED BY APAC'S AND TILLAMOOK'S CHALLENGES TO BPA'S 2001 LRAS AND BPA'S RATE TREATMENT OF LRA COSTS .................................................. 5

IV.  STATEMENT OF THE CASE ........................................................... 6

V.   STATEMENT OF THE FACTS ........................................................ 7

    A.    BPA's Agreement to Make Section 5(b) Power Sales as Part of the Residential Exchange Program Settlements ................................ 7

    B.    The 2000-2001 West Coast Energy Crisis ......................................... 9

    C.    BPA's Response to the 2000-2001 West Coast Energy Crisis ........... 11

    D.    The Lack of Any Timely Challenges to the 2001 LRAs and BPA's Rate Treatment of LRA Costs .................................................. 14

    E.    Challenges to 2004 Amendments to "Reduction of Risk" Provision in the 2001 LRAs ................................................................. 16

    F.    The WP-07S Proceeding ................................................................. 18

VI.  SUMMARY OF ARGUMENT ................................................................. 18

VII. STANDARD OF REVIEW .................................................................... 19

VIII.   ARGUMENT ........................................................................................20

    A.    BPA Acted Within Its Discretion in Rejecting Untimely Challenges to the 2001 LRAs and BPA's Rate Treatment of LRA Costs ................20

        1.    The 90-Day Limitation Period Under 16 U.S.C. § 839f(e)(5) Applies to All Challenges to Final Actions by BPA, Including Challenges to BPA Contracts and BPA Rates ........................21

        2.    Even Aside from 16 U.S.C. § 839f(e)(5), BPA Did Not Abuse Its Discretion or Act Arbitrarily or Capriciously in Declining to Reopen Its Final Actions Relating to the 2001 LRAs ..........25

        3.    This Court's Decision in *Golden Northwest* Did Not Obligate BPA to Revisit Its Rate Treatment of LRA Costs ...................29

    B.    BPA Acted Within Its Discretion in Not Seeking Refunds of BPA's Load Reduction Payments to PacifiCorp and PSE .................31

        1.    PacifiCorp's and PSE's 2001 LRAs Were Valid and Binding Contracts ..................................................................32

        2.    BPA Acted Well Within Its Discretion Not to Seek Refunds ................................................................................40

    C.    BPA Acted Within Its Discretion in Declining to Revisit the Rate Treatment of Load Reduction Payments under BPA's 2001 LRAs with PacifiCorp and PSE ...................................................................43

IX.   CONCLUSION ......................................................................................44

CERTIFICATION OF COMPLIANCE WITH RULE 32(a) ...............................44

STATEMENT OF RELATED CASES ................................................................45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aluminum Co. of Am. v. Bonneville Power Admin.*,
    903 F.2d 585 (9th Cir. 1989) ........................................................26

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
    126 F.3d 1158 (9th Cir. 1997) ...................................................26

*Banas v. American Airlines*,
    969 F.2d 477 (7th Cir. 1992) ....................................................23

*Bell v. Bonneville Power Admin.*,
    340 F.3d 945 (9th Cir. 2003) ..................................2, 5, 13, 14, 24, 34, 39

*Blair v. Freeman*,
    370 F.2d 229 (D.C. Cir. 1966) ...................................................42

*CP Nat'l Corp. v. Jura*,
    876 F.2d 745 (9th Cir. 1989) ...............................................21, 22

*Cent. Mont. Elec. Power Coop. v. Bonneville Power Admin.*,
    840 F.2d 1472 (9th Cir. 1988) ...................................................21

*Consumer Fed'n of Am. v. Fed. Power Comm'n*,
    515 F.2d 347 (D.C. Cir. 1975) ..............................................41, 42

*Friends of Sierra R.R., Inc. v. Interstate Commerce Comm'n*,
    881 F.2d 663 (9th Cir. 1989) .................................................3, 24

*Golden Nw. Aluminum Co. v. Bonneville Power Admin.*,
    501 F.3d 1037 (9th Cir. 2007) .........................................4, *passim*

*Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs*,
    482 U.S. 270 (1987) ......................................................20, 24, 25

*Linn v. Ula Uranium Co.*,
    163 F. Supp. 245 (D. Utah 1958) ..........................................37, 38

*Manning v. Metal Stamping Corp.*,
    396 F. Supp. 1376 (N.D. Ill. 1975) ..................................................... 33, 37

*Nathan v. Tenna Corp.*,
    560 F.2d 761 (7th Cir. 1977) ..................................................................... 36

*Pit River Tribe v. U.S. Forest Serv.*,
    469 F.3d 768 (9th Cir. 2006) ..................................................................... 23

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
    501 F.3d 1009 (9th Cir. 2007) ....................................................... 6, *passim*

*Pub. Util. Comm'n of Cal. v. Fed. Energy Regulatory Comm'n*,
    462 F.3d 1027 (9th Cir. 2006) ................................................................... 41

*Pub. Util. Dist. No. 1 of Grays Harbor County, Wash. v. Bonneville Power*
    *Admin.*, 250 Fed. Appx. 820 (9th Cir. 2007) ............................................ 17

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.*,
    506 F.3d 1145 (9th Cir. 2007) .................................................. 6, 16, 17, 39

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.*,
    250 Fed. Appx. 817 (9th Cir. 2007) .......................................................... 17

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.*,
    250 Fed. Appx. 821 (9th Cir. 2007) .......................................................... 17

*Resolution Trust Corp. v. Home Savings of Am.*,
    946 F.2d 93 (8th Cir. 1991) ....................................................................... 33

*RSR Corp. v. Fed. Trade Comm'n,*
    656 F.2d 718, 721 (D.C. Cir. 1981) .......................................................... 20

*Sendra Corp. v. Magaw,*
    111 F.3d 162 (D.C. Cir. 1997) ................................................................... 25

*Sun Oil Co. v. Wortman,*
    486 U.S. 717 (1988) ................................................................................... 23

# FEDERAL STATUTES

5 U.S.C. § 706(2)(A) ...................................................................... 19

16 U.S.C. § 832a(f) ......................................................................... 34

16 U.S.C. § 832d(a) ........................................................................ 26

16 U.S.C. §§ 839 *et seq.* ................................................................. 2

16 U.S.C. § 839c(b) .......................................................................... 8

16 U.S.C. § 839c(c)(1) ...................................................................... 8

16 U.S.C. § 839f(e)(2) ..................................................................... 19

16 U.S.C. § 839f(b) ......................................................................... 26

16 U.S.C. § 839f(e)(5) ........................................................... 2, *passim*

# MISCELLANEOUS

15 *Corbin on Contracts* § 89.11 (J. Perillo, ed., rev. ed. 2003) ............................. 36

*Restatement (Second) of Contracts* § 183 (1981) ................................................. 36

*U.S. Dep't of Energy, Bonneville Power Admin.*,
    105 F.E.R.C. ¶ 61,068 (2003) ................................................................. 5, 14

# I.  INTRODUCTION

Respondent-intervenors PacifiCorp and Puget Sound Energy, Inc. ("PSE") concur with the Bonneville Power Administration's ("BPA") rejection of untimely challenges to the Load Reduction Agreements ("LRAs") that BPA executed with PacifiCorp and PSE in 2001 as part of BPA's Load Reduction Program.  The challenges to PacifiCorp's and PSE's 2001 LRAs came seven years after the LRAs first were executed, five years after BPA's rate treatment of LRA costs became final, and three years after the LRAs were fully performed.  Given those circumstances, BPA did not abuse its discretion or act arbitrarily and capriciously in declining to reopen its prior final actions to consider new challenges to the validity of the 2001 LRAs and to BPA's rate treatment of LRA costs.  BPA also acted properly in rejecting those belated challenges as lacking merit in any event.  Except to the extent that BPA failed to give full credit to PacifiCorp and PSE for their load reduction payments under the 2001 LRAs (an issue addressed in PacifiCorp and PSE's opening brief as petitioners), BPA's treatment of PacifiCorp's and PSE's 2001 LRAs should be affirmed.[1]

---

[1]    In addition to appearing as respondent-intervenors, PacifiCorp and PSE also are petitioners in these consolidated cases.  As petitioners, PacifiCorp and PSE filed a joint opening brief with Avista Corporation ("Avista"), Idaho Power Company, and Portland General Electric Company ("PGE") challenging certain aspects of the so-called "Lookback" approach that BPA adopted in its "WP-07S Supplemental Wholesale Power Rate Case, Administrator's Final Record of Decision" ("WP-07S ROD").  *See* Dkt. No. 75, IOU Pet. Br.  Although PacifiCorp

## II.     JURISDICTION

This Court has original and exclusive jurisdiction to review challenges to BPA's final actions and decisions under the Pacific Northwest Electric Power Planning and Conservation Act ("the Northwest Power Act"), 16 U.S.C. §§ 839 *et seq*. *See* 16 U.S.C. § 839f(e)(5). All petitions challenging BPA's final actions and decisions under the Northwest Power Act must "be filed within ninety days of the time such action or decision is deemed final … or be barred." *Id.* This Court repeatedly has instructed that compliance with the 90-day limitation period under 16 U.S.C. § 839f(e)(5) is a jurisdictional requirement for judicial review. *See, e.g., Bell v. Bonneville Power Admin.,* 340 F.3d 945, 948-49 (9th Cir. 2003).

In these consolidated cases, among other things, the Association of Public Agency Customers ("APAC")[2] and a group of consumer-owned utilities

---

and PSE file this brief separately to respond to the issues raised regarding their 2001 LRAs with BPA – an issue that does not affect the other investor-owned utilities ("IOUs") – PacifiCorp and PSE fully concur with and adopt the respondent-intervenors' brief that Avista, Idaho Power Company, and PGE have filed today regarding other issues that are common to all the IOUs. Although this response assumes the propriety of BPA's "Lookback," it does so without waiving the objections raised in the IOUs' opening brief as petitioners.

[2]     APAC is an unincorporated *ad hoc* organization comprised of a group of companies that operate industrial facilities in the Pacific Northwest and that purchase electricity from BPA's consumer-owned-utility ("COU") customers.

("Tillamook")[3] seek to challenge the validity of the LRAs that BPA executed with PacifiCorp and PSE in 2001, as well as BPA's rate treatment of the load reduction payments that BPA made under those fully-performed agreements.[4] In the WP-07S proceeding, BPA declined to reopen its prior actions to consider APAC's and Tillamook's challenges because BPA determined that those challenges were untimely and lacking in merit in any event. *See* IOUER 180-185 (R.A.R. 062496-062501.)

Because APAC and Tillamook filed timely petitions from BPA's WP-07S ROD, this Court has jurisdiction to review BPA's decision not to reopen its prior actions to consider APAC's and Tillamook's belated challenges to the validity of the 2001 LRAs and to BPA's rate treatment of its load reduction payments under the 2001 LRAs. But APAC's and Tillamook's belated challenges in the WP-07S rate proceeding do not create jurisdiction to review APAC's and Tillamook's underlying claims that the 2001 LRAs are void as outside of BPA's statutory authority or that BPA erred in its rate treatment of the load reduction payments under the LRAs. *See Friends of Sierra R.R., Inc. v. Interstate Commerce Comm'n,*

---

[3] The group of COUs challenging the 2001 LRAs includes Tillamook People's Utility District, Snohomish Public Utility District, and the Western Public Agencies Group. For ease of reference, this brief refers to those petitioners collectively as "Tillamook."

[4] For ease of reference, this brief sometimes refers to BPA's costs of load reduction payments under the 2001 LRAs as "LRA costs."

881 F.2d 663, 666 (9th Cir. 1989) ("a subsequent unsuccessful petition to an agency to reopen cannot create a new final order giving [this] court jurisdiction over an untimely petition for review"). The time for bringing those challenges passed long ago.

BPA executed the 2001 LRAs with PacifiCorp and PSE on May 23, 2001 and June 11, 2001 respectively.[5] *See* IOUER 1556-78 (R.A.R. 114125-47) (PacifiCorp's LRA); IOUER 1631-55 (R.A.R. 114264-88) (PSE's LRA). Under 16 U.S.C. § 839f(e)(5), APAC and Tillamook were required to bring any challenges to the validity of the 2001 LRAs within 90 days of those execution dates. *See Golden Nw. Aluminum Co. v. Bonneville Power Admin.,* 501 F.3d 1037, 1045 (9th Cir. 2007) ("*Golden Northwest*") ("Because power sale contracts are final agency actions, the 90-day statute of limitations begins to run from the date such contracts are executed." (internal quotation marks and citations omitted)). Because APAC's and Tillamook's challenges come many years later and well beyond the jurisdictional time limit for seeking judicial review, those challenges to

---

[5] BPA's 2001 LRA with PacifiCorp was reflected in two instruments: a letter that amended BPA's 2000 Residential Exchange Program ("REP") Settlement Agreement by removing provisions for power delivery and a separate contract that provided for load reduction payments in lieu of that power delivery. IOUER 1556-78 (R.A.R. 114125-114147). BPA's 2001 LRA with PSE (entitled "Amended Settlement Agreement") was a single instrument that both included PSE's agreement to accept load reduction payments in lieu of power delivery and superseded and replaced PSE's 2000 REP Settlement Agreement. IOUER 1631-55 (R.A.R. 114264-114288).

the validity of PacifiCorp's and PSE's 2001 LRAs are barred. *See Bell,* 340 F.3d at 948-49 (dismissing challenge to BPA's authority to enter into a different LRA in BPA's 2001 Load Reduction Program when challenge was brought six months after that LRA was executed).

APAC's and Tillamook's challenges to BPA's rate treatment of its load reduction payments under the 2001 LRAs are just as untimely. BPA's rates allocating the costs of load reduction payments under the 2001 LRAs became final on October 17, 2003. *See U.S. Dep't of Energy, Bonneville Power Admin.,* 105 FERC ¶ 61,068 (2003). Under 16 U.S.C. § 839f(e)(5), APAC and Tillamook were required to bring their rate challenges within 90 days of that date. *See Golden Northwest,* 501 F.3d at 1042-43 (challenges to rate determinations must be filed within 90 days of FERC approval). Because APAC and Tillamook did not bring their challenges until many years later, those challenges also are barred under 16 U.S.C. § 839f(e)(5).

### III. QUESTIONS PRESENTED BY APAC'S AND TILLAMOOK'S CHALLENGES TO BPA'S 2001 LRAS AND BPA'S RATE TREATMENT OF LRA COSTS

(1) Did BPA commit a clear abuse of discretion by declining to reopen its prior final actions to consider APAC's and Tillamook's challenges to the validity of the 2001 LRAs and BPA's rate treatment of LRA costs when those challenges were brought for the first time many years after the jurisdictional time limit for

seeking review of BPA's final actions and long after the 2001 LRAs had been performed fully?

(2)     To the extent that BPA should have considered the merits of APAC's and Tillamook's belated challenges, did BPA abuse its discretion or act arbitrarily, capriciously, or contrary to law in concluding that BPA's 2001 LRAs with PacifiCorp and PSE were valid and binding contracts within BPA's broader Load Reduction Program and that no refunds of load reduction payments were required?

(3)     To the extent that BPA should have considered the merits of APAC's and Tillamook's belated challenges, did BPA abuse its discretion or act arbitrarily, capriciously, or contrary to law in concluding that it was proper to recover the costs of load reduction payments under PacifiCorp's and PSE's 2001 LRAs in the same manner as BPA recovered the costs of all other LRAs in BPA's Load Reduction Program?

As shown below, the answer to each of those questions is "no."

## IV.     STATEMENT OF THE CASE

These consolidated petitions arise from BPA's WP-07S rate proceeding, which BPA conducted to respond to this Court's decisions in *Golden Northwest,* 501 F.3d 1037, *Portland Gen. Elec. Co. v. Bonneville Power Admin.,* 501 F.3d 1009 (9th Cir. 2007) ("*PGE*"), and *Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.,* 506 F.3d 1145 (9th Cir. 2007) ("*Snohomish*").

Notably, no challenges were raised in *Golden Northwest* or *PGE* to BPA's 2001 LRAs with PacifiCorp and PSE, or to BPA's rate treatment of its load reduction payments under those 2001 LRAs. In *Snohomish*, this Court considered timely challenges to 2004 amendments to a specific provision in the 2001 LRAs (the so-called "reduction of risk" or "litigation penalty" provision), but that provision is not at issue in these petitions. As in *Golden Northwest* and *PGE*, no challenges were made in *Snohomish* to the validity of the 2001 LRAs themselves or to BPA's rate treatment of its load reduction payments under those agreements. As a result, this Court never was asked to consider – and did not consider – the validity of the 2001 LRAs or BPA's rate treatment of its load reduction payments under the 2001 LRAs in *PGE*, *Golden Northwest*, or *Snohomish*. Consequently, none of those decisions required BPA to consider APAC's and Tillamook's belated challenges in the WP-07S proceeding.

## V. STATEMENT OF THE FACTS

In addition to the statement of facts contained in their opening brief as petitioners (*see* Dkt. No. 75, IOU Pet. Br. 5-27), PacifiCorp and PSE offer the following statement of facts relating to their 2001 LRAs with BPA.

### A. BPA's Agreement to Make Section 5(b) Power Sales as Part of the Residential Exchange Program Settlements

In 2000, after many years of review and negotiations, BPA attempted to settle longstanding disputes about the proper level of benefits for residential and

7

small-farm customers under the Residential Exchange Program ("REP") of section 5(c) of the Northwest Power Act. *See* 16 U.S.C. § 839c(c)(1) (prescribing REP); IOUER 822-61 (R.A.R. 097085-124) (Power Subscription Strategy ROD (Dec. 21, 1998)); IOUER 1205-404 (R.A.R. 107257-456) (2000 REP Settlement ROD (Oct. 4, 2000)). At the time of the REP settlement negotiations, BPA expected that it would have more than adequate power supplies to satisfy its regional loads for the 2002-2006 rate period. *See, e.g.,* IOUER 900 (R.A.R. 001141). As a result, in addition to monetary payments, BPA structured the REP settlements to include five-year agreements for BPA to sell and deliver approximately 1,000 average megawatts ("aMW") of power to the settling utilities at BPA's residential-load ("RL") rate pursuant to section 5(b) of the Northwest Power Act. 16 U.S.C. § 839c(b). *See, e.g.,* IOUER 1444-508 (R.A.R. 114196-260) (PSE's 2000 Firm Power Block Power Sales Agreement). The REP settlement agreements and agreements for section 5(b) power sales were expressly independent. *See* IOUER 1423 (R.A.R. 114120) (severability clause concerning PacifiCorp's section 5(b) power sales agreement); IOUER 1443 (R.A.R. 114195 (severability clause concerning PSE's section 5(b) power sales agreement).

While BPA was negotiating the REP settlement agreements and section 5(b) power sale agreements, BPA also was conducting its WP-02 rate proceeding to develop its wholesale power rates for fiscal years 2002-2006. Because the REP

8

settlement negotiations and the WP-02 rate case were proceeding simultaneously, BPA did not know whether the IOUs would accept the REP settlements while BPA was developing its rates. BPA assumed, however, that it would make no difference whether the section 5(b) power sales occurred under the REP settlements because BPA planned to sell the same amount of power to regional customers at an equivalent rate in any event. *See, e.g.,* IOUER 905 (R.A.R. 001146) ("BPA expects to make the 1,000 aMW sale to regional customers at the FPS-96 rate [a rate equivalent to the RL rate] in the Rate Design Step environment where IOUs forego the proposed settlements.").

BPA ultimately filed its proposed rates for fiscal years 2002-2006 with the Federal Energy Regulatory Commission ("FERC") on July 6, 2000. *See* BPA-SER 2068 (R.A.R. 040585). Several months later, BPA's IOU customers executed the REP settlement agreements and the agreements for section 5(b) power sales. *See* BPA-SER 387-88 (R.A.R. 071092-93). Various parties filed timely petitions for review challenging the 2000 REP settlement agreements, ultimately resulting in this Court's *PGE* decision in 2007.

**B.     The 2000-2001 West Coast Energy Crisis**

Shortly after BPA concluded its WP-02 rate case, the wholesale electric power market on the West Coast began experiencing "unprecedented volatility and a dramatic upward trend in prices." BPA-SER 00238 (R.A.R. 049532). Faced

with such unfavorable market conditions, BPA's COU customers that "had ventured into the market when it appeared market prices would stay low, came storming back to BPA during [BPA's] subscription contract offerings." BPA-SER 01904 (R.A.R. 113868). As a result of this unexpected increase in demand, it became apparent that BPA's firm load obligations might be up to 1,400 aMW higher than BPA had forecast in the WP-02 rate case. *See* BPA-SER 00241 (R.A.R. 049535). To satisfy those additional load obligations, BPA anticipated that it would have to make large purchases of power on the electric power market at a time when market prices were extremely high and volatile. *Id.*

Because of the uncertainty created by market conditions and BPA's increased load forecasts, BPA asked FERC to stay its review of BPA's WP-02 rates less than a month after BPA submitted those rates. *See* BPA-SER 00237-43 (R.A.R. 049531-37). After further evaluation, BPA projected that it likely would need to purchase a total of 3,305 aMW of electric power on the market to meet its load obligations over the five-year rate period. BPA-SER 00125 (R.A.R. 002563).

To address this dramatic change in circumstances, BPA asked FERC to extend the stay of its review of the WP-02 rates. BPA then initiated a supplemental rate hearing to make adjustments to its original WP-02 rates. BPA-SER 00126 (R.A.R. 002564). BPA published its proposed amendments on December 1, 2000, calling for a rate increase of roughly 16 percent. BPA-SER

00126-27 (R.A.R. 002564); BPA-SER 01723 (R.A.R. 111943). Almost as soon as BPA published its amended proposal, however, it became clear that BPA would not be able to recover its costs with only a 16-percent rate increase. That was so because, in addition to the volatile market conditions, the Pacific Northwest started experiencing a serious drought in the winter of 2000 to 2001, with "the volume of water in the hydro system estimated to be less than 70 percent of average[.]" BPA-SER 01723 (R.A.R. 111943). That winter ultimately became the second worst water year in all the years that BPA had been tracking water conditions. BPA-SER 01901 (R.A.R. 113865). Finally, to make matters even worse, California was experiencing rolling blackouts, and the surplus power that BPA normally purchased in winter months from California was unavailable. *Id.*

Together, these circumstances created days on which "the Northwest teetered on the brink of power shortages." *Id.* BPA spent over $50 million to purchase power over just one four-day period in January 2001. *Id.* By the end of that month, BPA predicted a 60-percent rate increase over the five-year rate period. BPA-SER 01724 (R.A.R. 111944). By April 2001, the situation had deteriorated to the point that BPA announced that the first-year rate increase could be a staggering 250 percent or more. *See* BPA-SER 01866 (R.A.R. 113304).

**C.     BPA's Response to the 2000-2001 West Coast Energy Crisis**

BPA responded to the energy crisis in two ways. On the rate side, BPA

11

adopted a proposal based on a partial settlement agreement between BPA and many of its rate case parties. Rather than reset the WP-02 base rates, the proposal included three Cost Recovery Adjustment Clauses ("CRACs") to allow BPA to increase power rates to recover costs in certain circumstances. BPA-SER 00138-41 (R.A.R. 002576-79). Because the REP settlements had mooted concerns about the level of the PF Exchange rate for REP benefits, the IOUs were among the many parties that supported BPA's adoption of the CRACs. BPA-SER 1013 (R.A.R. 096227).

One of the CRACs in BPA's proposal was the Load-Based Cost Recovery Adjustment Clause ("LB CRAC"). The LB CRAC was designed to allow BPA to recover costs arising from BPA's increased loads and the higher market prices for electric power. BPA-SER 00139 (R.A.R. 002577). Among other things, the LB CRAC allowed BPA to recover the costs of purchasing additional power to augment its supply, as well as the costs of buying down power loads to reduce demand (that is, paying customers to reduce their loads). *Id*. ("The amount of augmentation may ultimately be reduced by buying down some loads (in which case the costs of the buy-downs will be collected through the LB CRAC) or because of BPA's updating of the load forecast."). The LB CRAC expressly applied to numerous rates, including the PF Preference rate that BPA charges to its COU customers. BPA-SER 149 (R.A.R. 002765).

12

In addition to adopting the CRACs to enable recovery of its costs, BPA responded to the energy crisis by making an aggressive effort to reduce power demand through a Load Reduction Program. The Load Reduction Program sought to increase conservation by consumers, reduce power demand by utilities, and curtail loads of BPA's direct-service industrial customers ("DSIs"). *Bell,* 340 F.3d at 948. BPA ultimately negotiated 71 different load reduction agreements ("LRAs") with its customers, achieving a load reduction of 2,277 aMW. BPA-SER 1873 (R.A.R. 113525). As a result of that voluntary load reduction, BPA's projected rate increase of 250 percent was reduced to just 46 percent, a savings of approximately $4 billion. BPA-SER 1872-74 (R.A.R. 113524-26). This Court has described BPA's Load Reduction Program as "an astounding success." *Bell,* 340 F.3d at 948.

PacifiCorp and PSE were key participants in BPA's Load Reduction Program. PacifiCorp was one of the first utilities to participate. *See* BPA-SER-01875 (R.A.R. 113527). PSE followed shortly thereafter. BPA later recognized both PacifiCorp and PSE as "Golden Heroes" for their contributions in the Load Reduction Program. BPA-SER-01898 (R.A.R. 113846). As noted in BPA's brief, PacifiCorp's and PSE's load reductions under their 2001 LRAs together "amounted to approximately 620 average megawatts, or more than one-fifth of BPA's entire shortfall." BPA Br. 197 (citing BPA-SER 363 (R.A.R. 071068)). In

13

response to BPA's pleas for assistance, both PacifiCorp and PSE agreed to give up this extremely valuable power for only $20 per megawatt for the first year of their LRAs, well below the prevailing market prices of $75 to $100 per megawatt. BPA-SER 01761 (R.A.R. 111988) (PacifiCorp's LRA ROD); BPA-SER 01803 (R.A.R. 112030) (PSE's LRA ROD). As with all other LRAs in the Load Reduction Program, BPA treated the costs of its load reduction payments under the 2001 LRAs with PacifiCorp and PSE as augmentation expenses to be recovered under the LB CRAC that BPA adopted in its WP-02 Supplemental Rate Proposal. *See* IOUER 196-199 (R.A.R. 062512-15).

**D.     The Lack of Any Timely Challenges to the 2001 LRAs and BPA's Rate Treatment of LRA Costs**

BPA executed the 2001 LRAs with PacifiCorp and PSE on May 23, 2001 and June 11, 2001 respectively. *See* IOUER 1556-78 (R.A.R. 114125-47) (PacifiCorp's LRA); IOUER 1631-55 (R.A.R. 114264-88) (PSE's LRA). Shortly thereafter, BPA issued its WP-02S ROD adopting the CRACs, and FERC's approval of the adjusted WP-02 rates became final on October 17, 2003. *See U.S. Dep't of Energy, Bonneville Power Admin.,* 105 FERC ¶ 61,068 (2003).

Although other parties filed timely challenges to other load reduction agreements in BPA's Load Reduction Program, no one challenged BPA's LRAs with PacifiCorp and PSE. *See Bell,* 340 F.3d 945 (considering challenges to DSI load curtailment agreements executed as part of Load Reduction Program).

14

Similarly, although numerous parties – including APAC and Tillamook – filed timely challenges to other aspects of BPA's WP-02 rates in the *Golden Northwest* case, no party challenged BPA's adoption of the LB CRAC as a mechanism to recover its augmentation costs, including its costs for buying down loads in BPA's Load Reduction Program. *See Golden Northwest,* 501 F.3d at 1048-49 (considering challenges to WP-02 rates). No one challenged BPA's rate treatment of its load reduction payments under PacifiCorp's and PSE's LRAs as augmentation costs that were recoverable under the LB CRAC like all other load reduction payments in BPA's Load Reduction Program. *Id. See also* BPA Br. 184-94 (discussing same).

The lack of timely challenges to BPA's 2001 LRAs with PacifiCorp and PSE was unsurprising. When BPA executed those contracts, wide support existed for BPA's efforts to achieve lower rates through the Load Reduction Program. *See* IOUER 195 (R.A.R. 062511) (noting that "[t]he most likely reason no petitions were filed is that, at the time, preference customers generally supported the LRAs due to the substantial rate benefits that they received from these agreements"). Similarly, it was no surprise that no party challenged BPA's rate treatment of its load reduction payments to PacifiCorp and PSE because, at the time, broad support existed for BPA's use of the LB CRAC as a way for BPA to keep its base rates low. *See* IOUER 197 (R.A.R. 062513) (noting broad support for CRACs). Simply

15

put, APAC, Tillamook, and other COUs did not contemporaneously challenge BPA's LRAs with PacifiCorp and PSE (or BPA's rate treatment of its load reduction payments under those LRAs) because BPA's actions were benefitting them greatly.

**E.      Challenges to 2004 Amendments to "Reduction of Risk" Provision in the 2001 LRAs**

Although no one timely challenged the 2001 LRAs themselves, timely challenges were made to 2004 amendments to the 2001 LRAs.  Notably, however, none of the timely challenges to the 2004 amendments questioned either the validity of the 2001 LRAs themselves or BPA's rate treatment of load reduction payments to PacifiCorp and PSE under those LRAs.  Instead, those challenges concerned only the so-called "reduction of risk" or (more pejoratively) "litigation penalty" provision, which called for reductions in BPA's cash payments to PacifiCorp and PSE if BPA achieved a global settlement of the *PGE* case about the 2000 REP Settlement Agreements.

This Court ultimately resolved the challenges to the "reduction of risk" provision in *Snohomish*, which was issued several months after *PGE* and *Golden Northwest*.  In *Snohomish*, this Court directed BPA to revisit 2004 amendments to the "reduction of risk" provision in the 2001 LRAs in light of *PGE*.  506 F.3d at 1154-55.  The Court explained that *PGE* potentially implicated the "litigation penalty" provisions in the 2001 LRAs, as amended in 2004, because the "litigation

16

penalty" provisions were "a direct response to the litigation over the 2000 REP Settlement Agreement and not an independent benefit or program." *Id.* In remanding that issue to BPA, however, this Court did not order BPA to revisit any other aspect of the 2001 LRAs, nor did the Court make any other holdings that in any way implicated the validity of the 2001 LRAs as a whole. *See id.* at 1155.

Notably, in two unpublished memorandum decisions issued the same day as *Snohomish*, this Court dismissed other petitions as disguised attempts to raise untimely challenges to the "litigation penalty" provisions in the original 2001 LRAs. In dismissing the petition in *Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.,* 250 Fed. Appx. 817, 819-20 (9th Cir. 2007) (unpublished), this Court explained that "[p]etitioner is attempting to challenge the original 2001 Load Reduction Agreement itself under the guise of the failed 2003 ROD." Similarly, in dismissing the petition in *Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.,* 250 Fed. Appx. 821, 823 (9th Cir. 2007) (unpublished), the Court noted that "the petition does not challenge BPA's application or enforcement of a contract, but rather seeks to challenge the 2001 LRA itself."[6]

---

[6] In a third unpublished decision issued the same date, this Court also dismissed another petition challenging the "litigation penalty" provision as moot in light of the Court's decision in *Snohomish. Pub. Util. Dist. No. 1 of Grays Harbor County, Wash. v. Bonneville Power Admin.,* 250 Fed. Appx. 820 (9th Cir. 2007) (unpublished) (dismissing petition as moot).

**F.      The WP-07S Proceeding**

On remand from *Snohomish* and *Golden Northwest* and in response to *PGE*, BPA initiated the WP-07S rate proceeding in 2008.  In the WP-07S proceeding, APAC and Tillamook argued for the first time that the load reduction payments under BPA's 2001 LRAs with PacifiCorp and PSE exceeded BPA's statutory authority and should be treated as REP settlement costs for purposes of the ceiling on preference customer rates under section 7(b)(2) of the Northwest Power Act.  In rejecting APAC's and Tillamook's belated challenges to the 2001 LRAs, BPA concluded that APAC's and Tillamook's new challenges to the 2001 LRAs were barred because APAC and Tillamook failed to raise those challenges in timely petitions for review.  *See* IOUER 195 (R.A.R. 062511).  BPA also concluded that APAC's and Tillamook's claims were meritless in any event because this Court's remand order in *Snohomish* was limited to the "litigation penalty" provisions of the 2001 LRAs and this Court's decisions in *PGE* and *Golden Northwest* did not implicate the 2001 LRAs.  *See* IOUER 179 (R.A.R. 062495); IOUER 194-95 (R.A.R. 062510-11).

## VI.      SUMMARY OF ARGUMENT

This Court should affirm BPA's decision to reject APAC's and Tillamook's belated attempts to challenge the validity of PacifiCorp's and PSE's 2001 LRAs and BPA's rate treatment of its LRA costs.  No timely challenges were raised to

18

either the 2001 LRAs or BPA's treatment of its load reduction payments under the LRAs as costs recoverable under the LB CRAC.  Moreover, contrary to APAC's and Tillamook's contentions, BPA's 2001 LRAs with PacifiCorp and PSE were not mere amendments to the 2000 REP Settlement Agreements, but instead were valid and binding contracts within BPA's broader Load Reduction Program.  BPA acted well within its discretion in declining to seek refunds of BPA's load reduction payments to PacifiCorp and PSE.  BPA also acted well within its discretion in declining to revisit the rate treatment of the costs of its load reduction payments under PacifiCorp's and PSE's LRAs.  Except to the extent that BPA failed to give full credit to PacifiCorp and PSE for their load reduction payments (as discussed in PacifiCorp's and PSE's opening brief as petitioners, *see* IOU Pet. Br. 43-50), BPA's treatment of PacifiCorp's and PSE's 2001 LRAs was neither arbitrary and capricious nor an abuse of discretion.

## VII.   STANDARD OF REVIEW

The Administrative Procedures Act ("APA") governs judicial review of BPA's final actions under the Northwest Power Act.  *See* 16 U.S.C. § 839f(e)(2).  Under the APA, this Court must uphold BPA's final actions unless those actions are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  Absent a judicial order requiring reconsideration, the decision whether to reopen a final administrative action is

19

committed firmly to agency discretion and will not be reversed absent a showing of "the clearest abuse of discretion." *See Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 278 (1987) ("*ICC*") ("overturning the refusal to reopen requires a showing of the clearest abuse of discretion" (internal quotation marks and citation omitted)); *RSR Corp. v. Fed. Trade Comm'n,* 656 F.2d 718, 721 (D.C. Cir. 1981) ("administrative agencies are not to be required to reopen their final orders except in the most extraordinary circumstances" (internal quotation marks and citations omitted)).

## VIII.  ARGUMENT

### A.    BPA Acted Within Its Discretion in Rejecting Untimely Challenges to the 2001 LRAs and BPA's Rate Treatment of LRA Costs

APAC's and Tillamook's challenges to BPA's 2001 LRAs with PacifiCorp and PSE came many years after BPA's final actions and well beyond the 90-day period for seeking judicial review under 16 U.S.C. § 839f(e)(5).  Neither APAC nor Tillamook disputes that they could have raised their current challenges to the 2001 LRAs within the 90-day period under 16 U.S.C. § 839f(e)(5).  Instead, they argue that the 90-day limitation period does not apply and that this Court's remand order in *Golden Northwest* necessarily required BPA to revisit its rate treatment of 2001 LRAs.  BPA correctly rejected both arguments.

20

**1. The 90-Day Limitation Period of 16 U.S.C. § 839f(e)(5) Applies to All Challenges to Final Actions by BPA, Including Challenges to BPA Contracts and BPA Rates**

The Northwest Power Act emphasizes prompt resolution of challenges to final actions by BPA. Instead of conferring initial jurisdiction on federal district courts, the Northwest Power Act grants this Court original and exclusive jurisdiction to review BPA's final actions. *See* 16 U.S.C. § 839f(e)(5). The Northwest Power Act also imposes a very short limitation period for parties to seek judicial review of BPA's final actions, requiring petitions to be filed within 90 days of the challenged final action. *See id.* This Court repeatedly has recognized that the Northwest Power Act was structured to promote quick resolution of claims and to expedite litigation challenging BPA's final actions. *See, e.g., Cent. Mont. Elec. Power Coop. v. Bonneville Power Admin.,* 840 F.2d 1472, 1476 (9th Cir. 1988) ("one of Congress's primary objectives in providing direct review by this Court is to expedite litigation challenging BPA actions under the Northwest Power Planning Act"); *CP Nat'l Corp. v. Jura,* 876 F.2d 745, 747 (9th Cir. 1989) ("in providing for direct review by this court, Congress intended to facilitate prompt action on challenges to BPA's decisions").

The 90-day limitation period under the Northwest Power Act applied to APAC's and Tillamook's challenges to the 2001 LRAs, and no judicial decision required BPA to reopen its final actions with respect to its 2001 LRAs with

PacifiCorp and PSE. In considering APAC's and Tillamook's belated challenges, BPA determined that it would not reopen its final actions because "the 90-day jurisdictional bar would, for all intents and purposes, be eviscerated" if BPA allowed parties to challenge BPA's final actions for the first time in remand proceedings many years after BPA's final actions. *See* IOUER 195 (R.A.R. 062511). BPA also reasoned that "remand cannot be used as a vehicle for parties to resurrect arguments they should reasonably have raised, but chose not to" in earlier proceedings. *See id.*

APAC and Tillamook do not deny that they failed to make timely challenges to the 2001 LRAs. Nevertheless, APAC and Tillamook contend that BPA abused its discretion and acted arbitrarily and capriciously in treating the 2001 LRAs with PacifiCorp and PSE as valid agreements and declining to reopen its final decisions relating to those agreements. According to Tillamook, BPA always must entertain challenges to the validity of its contracts – no matter how belatedly those challenges are raised – because a different rule would "elevate the applicable statute of limitations to a *de facto* validation provision." Tillamook Br. 38. In making that argument, both APAC and Tillamook urge that the 2001 LRAs "are *void* notwithstanding the fact that they were not challenged, as they were entered into in violation of BPA's statutory authority." *See, e.g., id.* (emphasis in original).

APAC's and Tillamook's arguments fail because no determination has been

made that the 2001 LRAs are void as outside of BPA's statutory authority. Instead, BPA's statutory authority for the 2001 LRAs is the very issue that APAC and Tillamook seek to raise in this proceeding. APAC and Tillamook cannot evade the 90-day limitation period of 16 U.S.C. § 839f(e)(5) simply by assuming the merits of their position on the validity of the 2001 LRAs. The 90-day limitation period applies to *all* challenges to final actions by BPA, including challenges to BPA's contracting decisions. If APAC and Tillamook wished to challenge the 2001 LRAs as void as outside of BPA's statutory authority, they should have raised those challenges many years ago when the 2001 LRAs were executed.

APAC and Tillamook cite no authority to the contrary. Indeed, their cited authorities are inapposite and in fact are examples of courts enforcing limitation periods. *See, e.g., Banas v. American Airlines,* 969 F.2d 477, 485 (7th Cir. 1992) (declining to apply new statute of limitations at appellate stage of case); *Sun Oil Co. v. Wortman,* 486 U.S. 717, 729 (1988) (states may apply own statute of limitation in state court when applying another state's substantive law); *Pit River Tribe v. U.S. Forest Serv.,* 469 F.3d 768, 781 (9th Cir. 2006) (considering timely challenges to 1998 leasing extensions and noting that 1988 leasing decisions were not challenged because "statute of limitations has run"). Although Tillamook argues that statute of limitations are procedural – apparently in support of the

23

notion that statutes of limitations may be waived – the 90-day limitation period under 16 U.S.C. § 839f(e)(5) is not simply a procedural requirement.  Instead, compliance with the 90-day limitation period is a jurisdictional prerequisite to judicial review of all challenges to final actions by BPA.  *See, e.g., Bell,* 340 F.3d at 948-49 (dismissing untimely contract challenge for lack of subject matter jurisdiction).

APAC and Tillamook voluntarily decided not to challenge the 2001 LRAs at the time of their execution.  They presumably did so because they did not want to upset BPA's LRAs with PacifiCorp and PSE, and jeopardize the hundreds of millions of dollars in rate benefits that those LRAs provided them.  By making that decision and not filing timely challenges, APAC and Tillamook waived their current challenges, and this Court has no jurisdiction to review their claims.  APAC and Tillamook cannot circumvent the jurisdictional time limitations of 16 U.S.C. § 839f(e)(5) by making belated demands that BPA revisit the 2001 LRAs.  Because 16 U.S.C. § 839f(e)(5) is jurisdictional, "a subsequent unsuccessful petition to an agency to reopen cannot create a new final order giving [this] court jurisdiction over an untimely petition for review." *Friends of Sierra R.R., Inc.,* 881 F.2d at 666.  That is true even though BPA discussed the validity of the 2001 LRAs and its rate treatment of the costs of the LRAs in its WP-07S ROD.  *See ICC,* 482 U.S. at 280 ("It is irrelevant that the Commission's order refusing

reconsideration discussed the merits of the unions' claims at length."). As the Supreme Court has explained, "[w]here the [agency's] formal disposition is to deny reconsideration, and where it makes no alteration in the underlying order, [the Court] will not undertake an inquiry into whether reconsideration 'in fact' occurred." *Id. See also Sendra Corp. v. Magaw,* 111 F.3d 162, 167 (D.C. Cir. 1997) ("Thus, unless the agency clearly states or indicates that it has reopened the matter, its refusal of a request for reconsideration will be treated as simply that."). Instead, the only inquiry is whether BPA's refusal to reopen its previously unchallenged decisions constituted "the clearest abuse of discretion." *Id.* at 278. Given that no timely petitions for review were filed and no judicial decision directed BPA to reconsider either its authority to enter into the LRAs or its rate treatment of the load reduction payments under the LRAs, BPA did not commit "the clearest abuse of discretion" in declining to reopen its final actions to consider new challenges raised years after those contracts were executed and well after those contracts were fully performed.

2.    **Even Aside From 16 U.S.C. § 839f(e)(5), BPA Did Not Abuse Its Discretion or Act Arbitrarily or Capriciously in Declining to Reopen Its Final Actions Relating to the 2001 LRAs**

Even aside from the jurisdictional mandate of 16 U.S.C. § 839f(e)(5), it certainly was not "the clearest abuse of discretion" for BPA to decline to reopen its final actions relating to the 2001 LRAs in the circumstances of this case. Even if

25

there were no 90-day jurisdictional time limitation, BPA's ability to operate in "a sound and businesslike manner" under 16 U.S.C. § 839f(b) would be impaired significantly if parties could stand mute – or even support – BPA's final actions when taken and yet retain the right to challenge those same actions years later.

BPA is a self-financing agency that participates in the energy market in the Pacific Northwest. *See Aluminum Co. of Am. v. Bonneville Power Admin.,* 903 F.2d 585, 588 (9th Cir. 1989). By statute, BPA is required to operate in "a sound and businesslike manner" (*see* 16 U.S.C. § 839f(b)), and BPA's sales contracts are "binding in accordance with the terms thereof" (*see* 16 U.S.C. § 832d(a)). *See also Ass'n of Pub. Agency Customers v. Bonneville Power Admin.,* 126 F.3d 1158, 1171 (9th Cir. 1997) ("*APAC*") (BPA has an "unusually expansive mandate to operate with a business-oriented philosophy").

BPA's mandate to operate in "a sound and businesslike manner" informed its decision to treat the 2001 LRAs as valid and binding agreements. In its ROD, BPA stressed the importance of contracts and contract stability to BPA's ability to function as an effective market participant. IOUER 179-80 (R.A.R. 062495-96). Specifically, BPA explained:

> "Ultimately, BPA markets and purchases power through the negotiation and implementation of contracts with other utility companies and power marketers. This process is the cornerstone of BPA's power marketing business, which takes place in an environment where participants operate with the expectation that their contracts are binding and enforceable. Accordingly, BPA

26

> takes the sanctity of its contracts very seriously. In this instance, BPA does not believe that it is empowered to unilaterally declare the fully performed LRAs null and void unless presented with the most compelling reasons to take such drastic action."

IOUER 179 (R.A.R. 062495).

BPA's ability to function in a businesslike manner depends on its ability to rely on the finality of its contracts after the 90-day limitation period under 16 U.S.C. § 839f(e)(5) has expired. BPA must be able to rely on the finality of its contracts in order to make its own business decisions. As BPA explained in its ROD, "if BPA is to exercise sound business judgment as BPA is required to do, then BPA must be able to make important business decisions and move forward without fear that these decisions could be set aside years later, long after the 90-day clock has run." IOUER 180 (R.A.R. 062496). BPA's ability to function in a businesslike manner also depends on other parties being able to rely on the finality and enforceability of BPA's contracts if no timely challenges are made. IOUER 179 (R.A.R. 062495). If BPA allowed untimely challenges to contracts for the first time long after the 90-day limitation period expired, other parties would not be able to rely on the finality of their contracts with BPA and would be reluctant to contract with BPA. That is especially so in circumstances such as those here, where parties gave up valuable power resources in a time of crisis.

Allowing untimely challenges also would encourage parties to support BPA's final actions intitially, in order to obtain benefits, only to challenge those

27

same actions later in an attempt to get even greater benefits. The circumstances of BPA's 2001 LRAs with PacifiCorp and BPA illustrate that point. APAC and Tillamook enjoyed the benefits of a significantly lower rate increase during the 2001 energy crisis – only 46 percent as compared to the projected 250 percent – as a direct result of BPA's Load Reduction Program, including its 2001 LRAs with PacifiCorp and PSE. For many years after, APAC and Tillamook refrained from challenging the lawfulness of PacifiCorp's and PSE's 2001 LRAs – presumably to avoid upsetting those deals and risking sizeable rate increases. Now, after fully enjoying the lower rates resulting from the 2001 LRAs, APAC and Tillamook insist that BPA should be required to undo the fully-performed 2001 LRAs or at least refund LRA costs that were recovered from the rates of preference customers under the LB CRAC. In declining to revisit the 2001 LRAs or the rate treatment of LRA costs, BPA properly rejected APAC's and Tillamook's attempts to lie in the weeds and enjoy the benefits resulting from the 2001 LRAs and then surface with challenges after the crisis was over, when they had nothing to lose and perceived an opportunity to gain even more. Even if BPA had discretion to overlook the untimeliness of APAC's and Tillamook's challenges to the 2001 LRAs or the rate treatment of LRA costs, BPA certainly was not arbitrary or capricious and did not abuse its discretion in declining to do so.

28

### 3. This Court's Decision in *Golden Northwest* Did Not Obligate BPA to Revisit Its Rate Treatment of LRA Costs

APAC and Tillamook also claim that this Court's remand order in *Golden Northwest* obligated BPA to revisit its rate treatment of the costs of load reduction payments under the 2001 LRAs. *See, e.g.,* APAC Br. 29. But an examination of *Golden Northwest* confirms that BPA was correct in rejecting those arguments.

The costs of BPA's load reduction payments under its 2001 LRAs with PacifiCorp and PSE were costs of BPA's Load Reduction Program. Like the costs of all other load reduction payments in that program, the costs of PacifiCorp's and PSE's load reduction payments were treated as augmentation expenses subject to recovery under the LB CRAC. This Court never considered the rate treatment of load reduction payments under the 2001 LRAs in *Golden Northwest* because this Court never was asked to do so.

The petitions in *Golden Northwest* raised no challenges involving BPA's rate treatment of LRA costs. In arguing to the contrary, Tillamook points out that "many parties timely challenged the original WP-02 Preference Customer rates." Tillamook Br. 43. But the fact that parties made *other* challenges to the WP-02 rates does not mean that any party challenged BPA's recovery of load reduction payments through the LB CRAC. Indeed, as BPA points out in its brief (BPA Br. 184-89), a review of Tillamook's brief in *Golden Northwest* shows that Tillamook made *no* challenges to BPA's adoption of the LB CRAC to recover the costs of any

29

load reduction payments, including load reduction payments to PacifiCorp and PSE. *See* BPA Br., Appendix A (Tillamook Br. in *Golden Northwest*). Other preference parties expressly stated that the LB CRAC was not at issue. *See* BPA Br., Appendix B at 6 (PPC Br. in *Golden Northwest*) ("[BPA's Supplemental Proposal incorporated CRACs that are not at issue in this petition").

Because no one challenged BPA's adoption of the LB CRAC or BPA's recovery of load reduction payments, such as those to PacifiCorp and PSE, through the LB CRAC, this Court's remand order in *Golden Northwest* necessarily included no mandate relating to the collection of BPA's load reduction costs. Instead, this Court's remand order concerned only the challenges raised in *Golden Northwest* – namely, the allocation of REP settlement costs to the rates of preference customers under section 7(g) of the Northwest Power Act. *See Golden Northwest,* 501 F.3d at 1048-49 (discussing same). If Tillamook and APAC wished to challenge BPA's recovery of costs for any load reduction payments through the LB CRAC, Tillamook and APAC needed to raise those challenges many years ago in connection with their petitions in *Golden Northwest.*

As with their challenges to the validity of the 2001 LRAs, Tillamook and APAC cannot get around the 90-day limitation period under 16 U.S.C. § 839f(e)(5) simply by assuming the merits of their position that the load reduction payments under the 2001 LRAs were merely a form of REP settlement benefits. BPA's load

reduction payments to PacifiCorp and PSE were augmentation expenses recovered under the LB CRAC in the same way as BPA's other load reduction payments under the Load Reduction Program. *Golden Northwest* did not concern the rate treatment of load reduction payments under the 2001 LRAs as augmentation expenses recoverable under the LB CRAC, and BPA did not abuse its discretion or act arbitrarily and capriciously in declining to revisit its rate treatment of LRA costs in view of the lack of timely challenges.

BPA's ability to function in "a sound and businesslike manner" depends on BPA's ability to rely on the finality of its rates after 90-day limitation period under 16 U.S.C. § 839f(e)(5) is expired. Because APAC's and Tillamook's rate challenges come many years after the jurisdictional time limit of 16 U.S.C. § 839f(e)(5), BPA did not abuse its discretion or otherwise act arbitrarily or capriciously in declining to entertain those challenges at this late date.

**B.      BPA Acted Within Its Discretion in Not Seeking Refunds of BPA's Load Reduction Payments to PacifiCorp and PSE**

Even aside from the untimeliness of APAC's and Tillamook's challenges to the 2001 LRAs, BPA acted well within its discretion in not seeking refunds of load reduction payments to PacifiCorp and PSE. APAC's and Tillamook's refund arguments rest on the incorrect premise that PacifiCorp's and PSE's 2001 LRAs were mere subsets of their 2000 REP Settlement Agreements. APAC and Tillamook also incorrectly assume that BPA would be required to seek refunds in

31

any event.  As explained below, BPA properly rejected both premises and, instead, correctly concluded that PacifiCorp's and PSE's 2001 LRAs were valid contracts within BPA's Load Reduction Program and that refunds of load reduction payments were neither required nor appropriate in any event.

### 1. PacifiCorp's and PSE's 2001 LRAs Were Valid and Binding Contracts

In urging that BPA was required to seek refunds of all load reduction payments to PacifiCorp and PSE, APAC and Tillamook contend that PacifiCorp's and PSE's 2001 LRAs were simply "part and parcel" of their 2000 REP Settlement Agreements.  *See* Tillamook Br. 31; *see also* APAC Br. 25.  In support of that contention, APAC and Tillamook stress BPA's acknowledgement of "the nexus between the financial component of the LRAs and the 2000 REP Settlement Agreements."  Tillamook Br. 32, APAC Br. 25; *see also* IOUER 198 (R.A.R. 062514).  Because of that nexus, APAC and Tillamook contend that the 2001 LRAs were outside BPA's statutory authority and were void as contracts that derived from the 2000 REP Settlement Agreements.  *See* Tillamook Br. 32-33; APAC Br. 30.  But those arguments mischaracterize the 2001 LRAs and misapprehend the law governing severability of contracts.

APAC and Tillamook cite no authorities that support their position.  Both cite numerous authorities for the rule that an illegal contract is void and that "if [a] second contract grew out of, and was connected with, the first [illegal] agreement,

then the second agreement is likewise void and unenforceable." *See* APAC Br. 30 (quoting *Manning v. Metal Stamping Corp.,* 396 F. Supp. 1376, 1378 (N.D. Ill. 1975)); *see also* Tillamook Br. 33. To start, those authorities are inapposite because the enforceability of the 2001 LRAs is not at issue. The 2001 LRAs have been fully performed, and no party is seeking to enforce them. Instead, the only issue is whether BPA was required to declare *retroactively* that the already-performed 2001 LRAs were void and to demand refunds of the load reduction payments. Rather than order refunds, the authorities cited by APAC and Tillamook apply the normal rule that restitution is unavailable for illegal contracts and that courts "leave the parties in the position in which they put themselves." *Resolution Trust Corp. v. Home Savings of Am.,* 946 F.2d 93, 96 (8th Cir. 1991); *Manning,* 396 F. Supp. at 1379. BPA is leaving the parties to the LRAs in the position in which they put themselves.

The authorities cited by APAC and Tillamook also are inapposite because, contrary to APAC's and Tillamook's contentions, the 2001 LRAs were not simply continuations of the 2000 REP Settlement Agreements that this Court considered in *PGE*. Instead, PacifiCorp's and PSE's 2001 LRAs were independent contractual obligations within BPA's larger Load Reduction Program. Under the LRAs, BPA contracted to make load reduction payments at a below-market price solely for the purpose of reducing BPA's power delivery requirements during an

33

energy crisis. *See* IOUER 183 (R.A.R. 062499). To be sure, some of the "currency" used as consideration (the right to power under the section 5(b) power sale contracts) originated in connection with the REP settlements, but the fundamental nature of the LRAs was payment for load reduction. Notwithstanding their historical connection to the 2000 REP Settlement Agreements, PacifiCorp's and PSE's 2001 LRAs were lawful and enforceable.

BPA's authority to conduct the 2001 Load Reduction Program is beyond dispute. In *Bell,* 340 F.3d 945, this Court considered challenges to contract amendments that BPA executed as part of its Load Reduction Program to monetize power sales obligations with BPA's direct-service industrial ("DSI") customers. This Court first rejected the notion that the DSI contract amendments exceeded BPA's authority, noting that the administrator "has explicit statutory direction to amend contracts 'upon such terms and conditions and in such manner as he [or she] may deem necessary.'" *Id.* at 949 (quoting 16 U.S.C. § 832a(f)). Describing the Load Reduction Program as a "smashing success," this Court also rejected arguments that the DSI contract amendments were arbitrary and capricious. *Id.* Indeed, this Court concluded that BPA's decision to amend its DSI contracts to reduce power delivery obligations during the energy crisis was "eminently businesslike" in view of the fact that the original DSI contracts would have obligated BPA "to buy high and sell low." *Id.* at 948-49.

The reasoning from *Bell* applies with equal force to the 2001 LRAs that BPA entered with PacifiCorp and PSE. Under their respective LRAs, PSE and PacifiCorp gave up their then-binding contractual rights to delivery of firm power under section 5(b) in exchange for cash payments that left them vulnerable to further market swings. *See* IOUER 178 (R.A.R. 062494). PacifiCorp and PSE agreed to the load reduction payments at the urging of BPA solely for the purpose of assisting BPA "to avoid a potentially catastrophic rate increase of 250 percent." IOUER 182 (R.A.R. 062498). Unlike the costs of the 2000 REP Settlement Agreements, which were allocated to preference customers' rates through section 7(g) of the Northwest Power Act, the costs of BPA's load reduction payments under PacifiCorp's and PSE's 2001 LRAs were treated in the same way as all other load reduction agreements in BPA's Load Reduction Program and were recovered through the LB CRAC that BPA adopted in its WP-02 supplemental rate case. IOUER 196-97 (R.A.R. 062512-13). BPA aptly described PacifiCorp's and PSE's 2001 LRAs as "critical to the success of BPA's Load Reduction Program[.]" IOUER 183 (R.A.R. 062499).

The historical connection between the 2000 REP Settlement Agreements and the 2001 LRAs does not change the outcome. It is true that PacifiCorp's and PSE's original contractual rights to delivery of firm power under section 5(b) arose in connection with their then-binding 2000 REP Settlement Agreements. But, as

discussed in PacifiCorp's and PSE's opening brief as petitioners (*see* IOU Pet. Br. 37-51), the section 5(b) power sales that BPA made to the IOUs in connection with the 2000 REP Settlement Agreements were expressly independent contracts. Moreover, even assuming that BPA's section 5(b) power sales to the IOUs exceeded BPA's authority – a proposition that PacifiCorp and PSE dispute (*see* IOU Pet. Br. 37-51) – the mere existence of that connection did not render the 2001 LRAs themselves unlawful.

As a matter of law, an otherwise valid contract is not necessarily rendered unlawful merely because it is connected to a prior unenforceable agreement. As Professor Corbin has explained:

> "There are many bargains, wholly proper in themselves, that the parties would not have made except for the fact that an earlier improper transaction took place. A mere causal relation such as this, the bargain not being substantially identical with the improper transaction, and its enforcement not being the consummation of an improper purpose, is not ground for refusal of enforcement. The courts view the improper transactions in such cases as collateral or remote, and thus the later transaction is enforceable."

15 *Corbin on Contracts* § 89.11 (J. Perillo, ed., rev. ed. 2003).

In deciding whether a contract is indelibly tainted by a prior unlawful agreement, courts "look directly at the extent and seriousness of the illegal conduct and its relationship to the contract at issue." *Nathan v. Tenna Corp.,* 560 F.2d 761 (7th Cir. 1977); *see also Restatement (Second) of Contracts* § 183 (1981) (stating rule for severability of contracts). The circumstances at issue in the two cases cited

by APAC (*Manning,* 396 F. Supp. 1376, and *Linn v. Ula Uranium Co.,* 163 F. Supp. 245 (D. Utah 1958)) provide good examples of contracts fatally tainted by their relationships to illegal conduct, but they are readily distinguishable.

In *Manning,* the plaintiff sought to enforce a contract for commissions for services as a governmental representative for the defendant. 396 F. Supp. at 377-78. The plaintiff admitted that his first contract with the defendant for these services was illegal because the contract contemplated bribes to purchase the influence of a late politician. *Id.* Although the plaintiff insisted that his second contract with the defendant was not tainted by this illegal purpose, the court rejected the plaintiff's argument because the plaintiff admitted in deposition that he understood that he was expected to pay bribes to the new administration that had replaced the late politician. *Id.* at 1379. Based on this evidence, the court concluded that the new contract was simply "an outgrowth and continuation of the first contract, one which is admitted by both parties to have been illegal." *Id.*

*Linn,* 163 F. Supp. 245, involved similar circumstances. The initial contract in *Linn* was for the purpose of influencing the head of a government to make a preferential appointment of the plaintiff. *Id.* at 252. The parties later reduced their agreement to a promissory note secured by the assignment of a royalty interest. *Id.* In refusing to enforce that second contract, the Court explained that the promissory note served the same unlawful purpose and was merely a different form of the first

unlawful contract to purchase government influence. *Id.*

Unlike the contracts at issue in *Manning* and *Linn,* the load reduction payments under the 2001 LRAs were not unlawful because of their connection to the 2000 REP Settlement Agreements. As an initial matter, unlike the bribery contracts at issue in *Manning* and *Linn,* none of the contracts at issue here were inherently illegal or against public policy because of their very subject matter. In *PGE*, this Court did not hold that it was unlawful for BPA to settle its REP obligations and certainly did not hold that BPA lacked authority to sell power to the IOUs under section 5(b) of the Northwest Power Act. Instead, this Court concluded only that certain aspects of the 2000 REP Settlement Agreements exceeded BPA's statutory authority. 501 F.3d at 1032-36. Thus, when BPA entered into the 2001 LRAs with PacifiCorp and PSE, the 2000 REP Settlement Agreements were binding and enforceable contracts that BPA had a duty to honor. The 2000 REP Settlement Agreements were not *ultra vires*, and BPA had no reason to view them as inherently unlawful.

This Court's decision in *Snohomish,* 506 F.3d 1145, is also instructive. In *Snohomish,* this Court concluded that BPA was required to revisit the "litigation penalty" provisions of the 2001 LRAs, as amended in 2004, in light of this Court's *PGE* decision. *Id.* at 1154-55. In reaching that conclusion, this Court observed that the "litigation penalty" provisions were connected directly to the 2000 REP

38

Settlement Agreements because the "litigation penalty" provisions were "a direct response to the litigation over the 2000 REP Settlement Agreement and not an independent benefit or program." *Id.* Notably, however, this Court did not hold that those provisions were unlawful. *Id.* ("Again, we express no judgment on the merits of BPA's options or on the legality of the 'litigation penalty' itself."). Instead, this Court directed BPA to revisit the "litigation penalty" provisions and decide in the first instance how they should be treated. *Id.*

In this case, the 2001 LRAs were not tied directly to the 2000 REP Settlement Agreements with no other purpose or benefit. Unlike the "litigation penalty" provisions examined in *Snohomish,* the load reduction payments under 2001 LRAs were part of BPA's larger Load Reduction Program. PacifiCorp and PSE agreed to load reductions under the 2001 LRAs at BPA's urging for the sole purpose of reducing BPA's power delivery obligations during a severe energy crisis. *See* IOUER 199 (R.A.R. 062515). This Court's decision in *Bell* recognized that BPA's purpose for executing similar contracts was not only lawful, but also "eminently businesslike" and prudent. *See Bell,* 340 F.3d at 948-49.

Finally, as an undisputed factual matter, the load reduction payments under the 2001 LRAs were not viewed or treated by BPA as REP settlement benefits, but as part of BPA's Load Reduction Program. IOUER 199 (R.A.R. 062515). PacifiCorp's and PSE's 2001 LRAs were two of the 71 LRAs that BPA executed

as part of its Load Reduction Program. BPA treated its costs for load reduction payments under PacifiCorp's and PSE's 2001 LRAs in the same way that it did all other costs for load reduction payments in the program. Given the different and lawful purpose of the load reduction payments under the 2001 LRAs and the collateral nature of their relationship with the 2000 REP Settlement Agreements, BPA did not abuse its discretion or act arbitrarily and capriciously in treating PacifiCorp's and PSE's 2001 LRAs as severable from the 2000 REP Settlement Agreements.

## 2. BPA Acted Well Within Its Discretion Not to Seek Refunds

Finally, in addition to being untimely and resting on mischaracterizations of the 2001 LRAs, APAC's and Tillamook's demands for refunds are meritless because their arguments rest on the incorrect premise that refunds always are required if a BPA contract is found to exceed BPA's statutory authority. As discussed in the IOUs' opening brief as petitioners (IOU Pet. Br. 32-36), BPA had no authority to seek *any* refunds in these proceedings because BPA gave up those rights in valid limitation-of-remedies provisions in BPA's contracts with PacifiCorp and PSE. But, even if that were not so, BPA did not abuse its discretion or act arbitrarily and capriciously in refusing APAC's and Tillamook's demands for BPA to order refunds of PacifiCorp's and PSE's load reduction payments.

40

This Court long has recognized that "[a]n agency's discretion is at its zenith when it is fashioning policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives." *See Pub. Util. Comm'n of Cal. v. Fed. Energy Regulatory Comm'n,* 462 F.3d 1027, 1053 (9th Cir. 2006) (internal citations and quotation marks omitted)). In this case, BPA explained that it would not require recovery of PacifiCorp's and PSE's load reduction payments because, among other reasons, PacifiCorp and PSE gave up valuable rights to firm power for the benefit of the entire region during a severe energy crisis. IOUER 184-85 (R.A.R. 062500-501). BPA also pointed out that BPA's ability to operate as an effective market participant depends on other parties being able to rely on BPA's commitment to honoring its contracts. IOUER 179 (R.A.R. 062495).

BPA's consideration of those equities is consistent with other precedents. *Consumer Fed'n of Am. v. Fed. Power Comm'n,* 515 F.2d 347 (D.C. Cir. 1975), illustrates that point. In that case, the petitioners urged the court to order refunds in addition to setting aside the challenged agency order. In declining to do so, the court explained that "not every decision invalidating an agency order is given full retroactive effect." *Id.* at 359. Noting the "complex and difficult questions" involved with ordering refunds as a remedy, the court observed that the general rule favoring refunds for moneys wrongfully paid under invalid orders "may be

41

offset, at least in part, by the lack of a mechanism to restore the full status *quo ante*, the fact that consumers may have had the benefit of some increase in supply that would not have forthcoming … and the fact that some portion of the increased prices paid may be discerned as consistent with just and reasonable producer rates." *Id.*

*Blair v. Freeman,* 370 F.2d 229 (D.C. Cir. 1966), is another example. In that case, the court took pains to stress that its decision holding that a milk marketing order was void did not require a refund of moneys paid under the void order. *Id.* at 239-40. In stressing that point, the court observed that the unlawful payments had been distributed to thousands of dairy farmers over a period of nine years and that it would be a "formidable task" to try to recover those payments. *Id.* The court also observed that the appellants had waited eight years before bringing their challenges, compounding the difficulty of recovery. *Id.* at 240. In such circumstances, the court concluded that requiring refunds of the moneys illegally paid would not be equitable. *Id.* at 239-40.

Those same considerations apply in this case. APAC and Tillamook waited many years after the execution of the 2001 LRAs to challenge the validity of the 2001 LRAs and to demand refunds of load reduction payments made under those agreements. By waiting to assert those challenges, APAC and Tillamook enjoyed the benefits of significantly lower rates at a time when their rates were projected to

42

skyrocket.  Meanwhile, PacifiCorp and PSE did not retain any of the load reduction payments and, instead, long ago passed the benefits from the 2001 LRAs to their residential and small-farm customers as required under the settlement agreements.  In such circumstances, BPA certainly did not abuse its discretion or act arbitrarily and capriciously in refusing to demand refunds of load reduction payments under the 2001 LRAs.

**C.     BPA Acted Within Its Discretion in Declining To Revisit the Rate Treatment of Load Reduction Payments under BPA's 2001 LRAs with PacifiCorp and PSE**

Finally, BPA did not abuse its discretion or act arbitrarily or capriciously in declining to modify the rate treatment of its load reduction payments under the 2001 LRAs with PacifiCorp and PSE.  APAC and Tillamook are correct that the validity of the 2001 LRAs is distinct question from whether BPA was required to remove the costs of the load reduction payments from the rates of preference customers.  *See, e.g.,* APAC Br. 27.  But BPA's rate treatment of its load reduction payments under the 2001 LRAs was not unlawful in any way.

Nothing in this Court's remand order in *Golden Northwest* obligated BPA to revisit its rate treatment of LRA costs.  The costs of BPA's load reduction payments under its 2001 LRAs with PacifiCorp and PSE were costs of BPA's Load Reduction Program.  Like all other costs in BPA's Load Reduction Program, BPA treated the costs of load reduction payments under PacifiCorp's and PSE's

43

2001 LRAs as augmentation expenses subject to recovery under the LB CRAC. Because the petitions in *Golden Northwest* raised no challenges involving BPA's rate treatment of its load reduction payments under the 2001 LRAs and this Court's holding in *Golden Northwest* concerned only the allocation of REP settlement costs to the rates of preference customers under section 7(g), BPA did not abuse its discretion or act arbitrarily and capriciously in declining to revisit its rate treatment of the load reduction payments under the 2001 LRAs.

## IX. CONCLUSION

As discussed in the IOUs' opening brief as petitioners (*see* IOU Pet. Br. 37-51), neither the section 5(b) power sales that BPA made to the IOUs in connection with the 2000 REP Settlement Agreements nor the subsequent load reduction payments that BPA made in lieu of those power sales were contrary to the Northwest Power Act or caused any overcharges to preference customers. As a result, even if this Court upholds BPA's overall Lookback approach, this Court should remand to BPA with instructions to exclude all section 5(b) power sales, as well as all load reduction payments made in lieu of those power sales, from BPA's Lookback Amounts for all the IOUs. In all other respects, this Court should affirm BPA's treatment of its 2001 LRAs with PacifiCorp and PSE, and its rate treatment of those LRA costs. The petitions by APAC and Tillamook should be denied.

44

Respectfully submitted on February 25, 2010 by:

By: /s/ Jay T. Waldron

Jay T. Waldron
Sara Kobak
SCHWABE WILLIAMSON & WYATT PC
1211 SW 5th Avenue, Suites 1500-2000
Portland, OR 97204
Telephone: (503) 222-9981

Of Attorneys for PacifiCorp

By: /s/ Ryan L. Flynn

Ryan L. Flynn
PACIFICORP
825 NE Multnomah, Suite 1800
Portland, OR 97232
Telephone: (503) 813-5854

Of Attorneys for PacifiCorp

By: /s/ Lara L. Skidmore

Lara L. Skidmore
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington D.C. 20004
Telephone: (503) 222-9981

Of Attorneys for Petitioner PacifiCorp

By: /s/ Dan L. Bagatell

Dan L. Bagatell
PERKINS COIE BROWN & BAIN P.A.
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8000

Of Attorneys for Puget Sound Energy, Inc.

By: /s/ Donald G. Kari

Donald G. Kari
Jason T. Kuzma
PERKINS COIE LLP
The PSE Building
10885 NE 4th Street, Suite 700
Bellevue, WA 98004-5579
Telephone: (425) 635-1400

Of Attorneys for Puget Sound Energy, Inc.

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,614 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(2)(6) because this brief has been prepared in a proportionately spaced typeface in 14-point Times New Roman.

DATED this 25th day of February, 2010.

Respectfully submitted,

By: /s/ Jay T. Waldron_____
    Jay T. Waldron

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, respondent-intervenors PacifiCorp and Puget Sound Energy, Inc. state that the following cases pending in this Court are related to this case because they raise closely related issues:

*Idaho Public Utilities Commission et al. v. BPA*, Ninth Cir. Nos. 08-74927, 08-74928, 08-74929, 08-74932, 08-74933, 08-74942 & 08-47957;

*Avista Corp., et al. v. BPA*, Nos. 09-73160, 09-73021, 09-73225, 09-73228, 09-73230, 09-73247, 09-73249, 09-73251, 09-73252, 09-73254, 09-73264, 09-73269, 09-73271, 09-73274, & 09-73281.

On December 14, 2009, this Court ordered that all three sets of cases be calendared before the same merits panel.

DATED this 25th day of February, 2010.

Respectfully submitted,

By: /s/ Jay T. Waldron_____
       Jay T. Waldron

47

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF System.

Participants in the case who are registered CM/ECF users will be served by the appellate CF/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM-ECF participants:

David Hill
Department of Energy
1000 Independence Avenue, SW
Washington DC  20585

By: /s/ Jay T. Waldron_____
Jay T. Waldron