Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133, 08-75161 & 08-75165

———————————

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, et al.,

*Petitioners,*

v.

BONNEVILLE POWER ADMINISTRATION,

*Respondent.*

———————————

*On Petition for Review of the Administrator's Final Record of Decision in the Bonneville Power Administration's 2007 Supplemental Wholesale Power Rate Case, WP-07-A-05 (Sept. 22, 2008)*

---

## JOINT BRIEF OF AVISTA CORPORATION, IDAHO POWER COMPANY, AND PORTLAND GENERAL ELECTRIC COMPANY AS RESPONDENT-INTERVENORS IN NOS. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75133 & 08-75165

---

Michael G. Andrea
AVISTA CORPORATION
1411 East Mission Avenue – MSC-23
Spokane, Washington 99202
Michael.Andrea@avistacorp.com
(509) 495-2564

Counsel for Avista Corporation

R. Blair Strong
PAINE HAMBLEN LLP
717 West Sprague Avenue, Suite 1200
Spokane, Washington 99201
r.blair.strong@painehamblen.com
(509) 455-6000

Counsel for Idaho Power Company

Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, Oregon 97204
scott.seidman@tonkon.com
(503) 802-2021

Counsel for Portland General Electric Company

February 25, 2010

**Corporate Disclosure Statements**

Avista Corporation has no parent companies, and no publicly held company owns 10% or more of its stock.

Idaho Power Company is a wholly-owned subsidiary of IDACORP, a publicly traded company.

Portland General Electric Company has no parent corporations, and no publicly held company owns 10% or more of its stock.

**Table of Contents**

Table of Authorities ...............................................................................................v

Table of Abbreviations and Technical Terms ...........................................................ix

Response to APAC, Cowlitz, and Tillamook ...........................................................1

Jurisdiction .............................................................................................................1

Questions Presented ................................................................................................2

Counterstatements of the Case and Facts .................................................................3

Summary of Argument ............................................................................................3

Argument .................................................................................................................9

    I.    This Court Exercises a Deferential Standard of Review ......................9

    II.   Cowlitz and APAC's Approach to Section 7(b)(2) Is
        Fundamentally Misguided ..................................................................11

    III.  BPA Reasonably Construed Section 7(b)(2) in Determining
        How to Treat Conservation in the 7(b)(2) Case .................................16

        A.    Cowlitz and APAC's Complaints Are Irrelevant to the
               Lookback ...............................................................................16

        B.    BPA Properly Rejected Cowlitz and APAC's
               Proposal to Assume Conservation But Ignore
               Conservation Costs in the 7(b)(2) Case ...................................18

               1.    BPA Correctly Recognized that the NWPA Treats
                    Conservation as a "Resource" to Meet Power
                      Needs ...........................................................................20

               2.    BPA Reasonably Interpreted the Statutory
                    Language in Determining 7(b)(2) Case "General
                    Requirements" ..............................................................21

**Table of Contents (continued)**

C.     BPA Appropriately Modeled Repayment Costs in the 7(b)(2) Case ..................................................................28

IV.   BPA Reasonably Supplemented the WP-02 Rate Case Record and Appropriately Decided a Legal Issue that the REP Settlements Had Rendered Moot ..................................................30

A.     BPA Correctly Recognized that It Needed to Revisit WP-02 Issues in Light of This Court's 2007 Decisions ...........31

B.     BPA Did Not Violate the Mandate Rule in Resetting WP-02 Rates ...............................................................34

C.     APAC and Cowlitz's Filed Rate and Retroactivity Arguments Are Self-Defeating ...............................................36

V.    BPA Reasonably Construed the Scope of the Resource Stack of Section 7(b)(2)(D)......................................................................38

A.     BPA Appropriately Excluded Resources Already Committed to IOU Loads Pursuant to Section 5(b) .................39

B.     BPA Appropriately Excluded Resources Owned by Public Bodies that Are Not BPA Customers ............................44

VI.   BPA Reasonably Rejected APAC's Litany of Complaints About Details of BPA's Application of the Section 7(b)(2) Test and Its Calculation of Lookback Amounts .................................47

A.     APAC Has No Complaint About BPA's Treatment of Pre-Subscription Contracts in the 7(b)(2) Case........................47

B.     BPA Reasonably Forecast Its Loads for FY2002-2006 ...........48

C.     BPA Reasonably Estimated the IOUs' ASCs for FY2002-2006 .................................................................50

D.     BPA Provided Reasonable Access to Its Modeling Software .........................................................................52

**Table of Contents (continued)**

VII.  BPA Adopted Reasonable Timeframes, Interest Rates, and Procedures for Refunds to Preference Customers, Assuming That Refunds Were Legally Owed in the First Place ..........................52

    A.  APAC and Tillamook Do Not Fairly Present What BPA Has Done and Determined to Do .......................................53

    B.  BPA Properly Rejected APAC and Tillamook's Demand that BPA Accelerate Refunds by Withholding More REP Benefits.................................................55

    C.  APAC's Reliance on the "Matching Principle" Is Mistaken....................................................................................58

    D.  BPA Did Not Abuse Its Discretion in Setting Interest Rates.........................................................................................59

Conclusion and Relief Requested.............................................................................60

Statement of Related Cases.......................................................................................62

Certificate of Compliance .........................................................................................63

Addendum:  Excerpt from BPA's 1984 ASC Methodology ROD .........................A1

Certificate of Service

## Table of Authorities

**Cases** **Pages**

*Alaska Dep't of Envtl. Conservation v. EPA,*
540 U.S. 461 (2004) ..................................................................19

*Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.,*
467 U.S. 380 (1984) ....................................................................9

*Ass'n of Pub. Agency Customers, Inc. v. BPA,*
126 F.3d 1158 (9th Cir. 1997) .....................................................9

*Cal. Energy Res. Conservation & Dev. Comm'n v. BPA,*
831 F.2d 1467 (9th Cir. 1987) ...................................................56

*Cent. Lincoln Peoples' Util. Dist. v. Johnson,*
735 F.2d 1101 (9th Cir. 1984) ...................................................15

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ..............................................................9, *passim*

*Confederated Tribes of the Umatilla Indian Reservation v. BPA,*
342 F.3d 924 (9th Cir. 2003) .......................................................9

*CP Nat'l Corp. v. BPA,*
928 F.2d 905 (9th Cir. 1991) .....................................................13

*Exxon Mobil Corp. v. FERC,*
571 F.3d 1208 (D.C. Cir. 2009) .................................................10

*Farmers Exp. Co. v. United States,*
758 F.2d 733 (D.C. Cir. 1985) ...................................................60

*FTC v. Morton Salt Co.,*
334 U.S. 37 (1948) ....................................................................30

*Golden Nw. Aluminum, Inc. v. BPA,*
501 F.3d 1037 (9th Cir. 2007) .............................................10, *passim*

*INS v. Orlando Ventura,*
537 U.S. 12 (2002) ....................................................................34

*Library of Cong. v. Shaw,*
478 U.S. 310 (1986) ..................................................................59

## Table of Authorities (continued)

**Cases (continued)**                                                   **Pages**

*Mefford v. Gardner,*
383 F.2d 748 (6th Cir. 1967) .......................................................35, 36

*Mendez-Gutierrez v. Gonzales,*
444 F.3d 1168 (9th Cir. 2006) ...........................................................34

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005) ...........................................................................40

*Nat'l Treasury Employees Union v. FLRA,*
910 F.2d 964 (D.C. Cir. 1990) (en banc) ...........................................10

*New England Tel. & Tel. Co. v. Pub. Utils. Comm'n,*
376 A.2d 1041 (R.I. 1977) ..................................................................49

*Niagara Mohawk Power Corp. v. FPC,*
379 F.2d 153 (D.C. Cir. 1967) ...........................................................30

*Plaquemines Oil & Gas Co. v. FPC,*
450 F.2d 1334 (D.C. Cir. 1971) .........................................................30

*Portland Gen. Elec. Co. v. BPA,*
501 F.3d 1009 (9th Cir. 2007) .................................................10, 11, 34

*Pub. Power Council, Inc. v. BPA,*
442 F.3d 1204 (9th Cir. 2006) ...........................................................10

*Pub. Serv. Co. of Ind., Inc. v. FERC,*
575 F.2d 1204 (7th Cir. 1978) ...........................................................49

*Pub. Util. Comm'r of Or. v. BPA,*
767 F.2d 622 (9th Cir. 1985) .............................................................13

*Pub. Utils. Comm'n of Cal. v. FERC,*
988 F.2d 154 (D.C. Cir. 1993) ...........................................................10

*Resident Councils of Wash. v. Leavitt,*
500 F.3d 1025 (9th Cir. 2007) ...........................................................40

*Rust v. Sullivan,*
500 U.S. 173 (1991) ...........................................................................40

**Table of Authorities (continued)**

**Cases (continued)**                                                        **Pages**

*Sandstrom v. Principi,*
358 F.3d 1376 (Fed. Cir. 2004) ...................................................................60

*Sanford Fork & Tool Co., In re,*
160 U.S. 247 (1895) ...................................................................36

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943) ...................................................................34

*United States v. Cleveland Indians Baseball Co.,*
532 U.S. 200 (2001) ...................................................................20

*United States v. Kellington,*
217 F.3d 1084 (9th Cir. 2000) ...................................................................36

*United States v. Thrasher,*
483 F.3d 977 (9th Cir. 2007) ...................................................................36

**Statutes and Regulations**                                                 **Pages**

5 U.S.C. § 706(2)(A) ...................................................................9

16 U.S.C. § 839a(3) ...................................................................20

16 U.S.C. § 839a(19) ...................................................................20, 43

16 U.S.C. § 839c(b)(1) ...................................................................42

16 U.S.C. § 839c(c)(1) ...................................................................51

16 U.S.C. § 839d(a)(1) ...................................................................21

16 U.S.C. § 839d(a)(2) ...................................................................21

16 U.S.C. § 839d(j) ...................................................................56

16 U.S.C. § 839e(b)(2) ...................................................................11, *passim*

16 U.S.C. § 839e(b)(3) ...................................................................12

16 U.S.C. § 839e(b)(4) ...................................................................23, 45

**Table of Authorities (continued)**

**Statutes and Regulations (continued)**                                             **Pages**

16 U.S.C. § 839f(a) ...............................................................................56

16 U.S.C. § 839f(e)(2) ............................................................................9

31 U.S.C. § 3711(a) ..............................................................................57

31 C.F.R. § 900.1(c) ..............................................................................57

31 C.F.R. § 901.3 ..................................................................................57

31 C.F.R. § 902.2 ..................................................................................57

31 C.F.R. § 903.2(b) ..............................................................................57

**Other Authorities**                                             **Pages**

H.R. Rep. No. 96-976 (1980) ........................................................13, 21, 26

S. Rep. No. 96-272 (1979) ..............................................................11, 16

## Table of Abbreviations and Technical Terms

| | |
|---|---|
| aMW | average megawatts |
| APAC | the Association of Public Agency Customers, a group of wood products businesses that purchase power from BPA's preference customers, including Georgia-Pacific LLC, Grays Harbor Paper LP, JR Simplot Co., Longview Fibre Paper and Packaging, Inc., Ponderay Newsprint Company, and Weyerhauser Company |
| Appendix B | a hypothetical analysis of the effects of the NWPA conducted when the NWPA was proposed, attached as Appendix B to the Senate report on an early version of that legislation |
| ASC | average system cost |
| BPA | Bonneville Power Administration |
| Cowlitz | Public Utility District No. 1 of Cowlitz County, Washington, together with the other parties that joined in its opening brief (the Public Power Council, the Northwest Requirements Utilities, and the Pacific Northwest Generating Cooperative) |
| CRAC | Cost Recovery Adjustment Clause |
| DSIs | direct-service industrial customers of BPA |
| FBS or Federal Base System | federal Columbia River power system hydroelectric projects, certain resources acquired by BPA under long-term contracts in force as of December 1980, and certain replacement resources acquired by BPA, as defined in 16 U.S.C. § 839a(10) |
| FERC | Federal Energy Regulatory Commission |
| FY | fiscal year or years |

| | |
|---|---|
| general requirements | power that a preference customer purchases from BPA under section 5(b) of the NWPA, 16 U.S.C. § 839c(b), excluding any new large single load |
| IOU | investor-owned utility |
| IOUER | investor-owned utilities' excerpts of record (as filed with the IOUs' opening brief as petitioners) |
| IOUSER | investor-owned utilities' supplemental excerpts of record (filed with this brief) |
| Lookback | BPA's determinations of the amounts by which preference customers were overcharged for REP costs, including an assessment of "excess" REP payments that BPA had made to various IOUs pursuant to settlement agreements |
| mid-Columbia resources | electric power generated by hydroelectric facilities along the middle of the Columbia River that are owned by consumer-owned utilities (some of which power those utilities have contractually committed to IOUs) |
| NWPA or Act | the Northwest Power Act, a shorthand name for the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839 *et seq.* |
| PF Exchange rate | priority firm power rate charged by BPA for REP exchanges under section 5(c) of the NWPA |
| PF Preference rate | priority firm power rate charged by BPA for some categories of sales to preference customers under section 5(b) of the NWPA |
| preference customers | BPA power customers that are publicly owned utilities or cooperatives (sometimes called consumer-owned utilities or COUs) |
| preference petitioners | the APAC, Cowlitz, and Tillamook petitioners |

– x –

| | |
|---|---|
| Program Case | BPA's calculation of the rates that preference customers would pay absent an adjustment under sections 7(b)(2) and 7(b)(3) of the NWPA, 16 U.S.C. §§ 839e(b)(2), 839e(b)(3) |
| PSE | Puget Sound Energy, Inc. |
| REP | Residential Exchange Program |
| ROD | Record of Decision |
| section 7(g) costs | costs that section 7(g) of the NWPA, 16 U.S.C. § 839(g), requires BPA to allocate equitably across power rates, including costs of conservation |
| 7(b)(2) Case | BPA's calculation of the power costs that preference customers would pay if the five assumptions found in section 7(b)(2) of the NWPA, 16 U.S.C. § 839e(b)(2), were true |
| Tillamook | Tillamook People's Utility District and the other preference customers joining its brief (Snohomish Public Utility District, and the Western Public Agencies Group) |
| WP-02 rate case | BPA's 2002 Wholesale Power Rate Case, started in 1999 and revised in 2001, setting rates for FY2002-2006 |
| WP-07S rate case | BPA's 2007 Supplemental Wholesale Power Rate Case completed in 2008 in response to decisions by this Court in 2007, including both a Lookback component for FY2002-2008 and prospective rates for FY2009 |

**Response to APAC, Cowlitz, and Tillamook[1]**

**Jurisdiction**

As explained in the IOUs' response to BPA's motion to dismiss, this Court has jurisdiction over these petitions to the extent they relate to BPA's Lookback remedy. As the name suggests, the Lookback looked back to determine rates BPA would have adopted in the WP-02 and WP-07 rate cases and the REP benefits BPA would have awarded for FY2002-2008 if there had been no REP settlements. In addition to challenging BPA's calculations, however, the preference petitioners raise new statutory construction arguments that BPA did not face and would not have adopted in the WP-02 or WP-07 rate cases. Those issues (italicized below) are irrelevant to the Lookback and should be considered only prospectively, in conjunction with challenges to FY2009 rates and the revised statutory interpretations on which those rates were based.

---

[1] This brief responds to the opening briefs of APAC, Cowlitz, and Tillamook. The IOUs submitted a joint opening brief raising their own challenges to aspects of the Lookback and will file their reply next month. Although this response assumes the propriety of BPA's Lookback, it does so without waiving the objections raised in the IOUs' opening brief as petitioners.

Two other IOUs (PacifiCorp and PSE) are filing a separate brief addressing an issue unique to them (BPA's treatment of their Load Reduction Agreements), but they adopt all the arguments in this brief. Idaho Power subscribes only to the arguments set forth in Sections II through VII herein.

**Questions Presented**

1.      *Whether BPA reasonably rejected a construction of section 7(b)(2) of the Northwest Power Act (NWPA) under which the hypothetical 7(b)(2) Case would assume that preference customer demand was reduced by conservation, yet ignore the costs that BPA incurs to achieve that conservation.*

2.      Whether BPA reasonably supplemented its WP-02 rate case record and reassessed matters that were moot in 2001 due to the REP settlement agreements, but became relevant when BPA concluded that this Court's 2007 decisions voided those agreements.

3.      Whether BPA reasonably construed section 7(b)(2)(D) of the NWPA and excluded certain mid-Columbia River resources from the "resource stack" of that provision.  In particular:

a.      Whether BPA reasonably concluded that resources contractually reserved to IOUs can qualify as "committed to load" pursuant to section 5(b), given that section 5(b) covers both IOUs and preference customers.

b.      *Whether BPA reasonably concluded that only resources owned by public bodies with section 5(b) contracts can be considered "committed to load" pursuant to section 5(b).*

– 2 –

4. Whether BPA reasonably rejected APAC's numerous other complaints about BPA's application of the section 7(b)(2) rate test and determination of Lookback Amounts. In particular:

a. Whether BPA reasonably treated "pre-subscription contracts" in applying section 7(b)(2)(B).

b. Whether BPA reasonably forecast loads for FY2002-2006 in performing the section 7(b)(2) rate test as of 2001.

c. Whether BPA reasonably determined IOUs' average system costs for FY2002-2006 in determining REP benefits for each year.

d. Whether BPA provided reasonable access to the software model used to run the section 7(b)(2) rate test.

5. Whether BPA adopted reasonable timeframes, interest rates, and other procedures for providing refunds to preference customers (assuming refunds were owed in the first place).

## Counterstatements of the Case and Facts

The IOUs presented statements of the case and facts in their opening brief. Misstatements in the preference petitioners' opening briefs are addressed below.

## Summary of Argument

1. This Court reviews deferentially. Under the Administrative Procedures Act, BPA's actions may be overturned only if arbitrary, capricious, an

– 3 –

abuse of discretion, or otherwise contrary to law. Furthermore, the *Chevron* standard applies to BPA's interpretations of the complex statutes it applies. Courts are also deferential in reviewing remedies following a remand.

2.      Cowlitz and APAC are misguided in their approach to section 7(b)(2) of the NWPA and their effort to reduce the REP to a dead letter. They suggest that the REP was conditional on achieving other gains and is now an anachronism. But the REP was not written conditionally, and applying the section 7(b)(2) rate test involves consideration of five simultaneous and complicated assumptions. REP benefits do not turn simply on the level of DSI loads and financing savings.

3.      Cowlitz and APAC err in arguing that BPA was required to assume conservation-related savings in the 7(b)(2) Case, yet ignore the costs of achieving those savings. To begin with, this issue is irrelevant to the Lookback, which sought to determine what REP benefits BPA would have awarded for FY2002-2008 absent the REP settlements. BPA has treated conservation consistently since 1984. BPA would have not changed course and adopted Cowlitz and APAC's fundamentally different approach in 2001 or 2007 when it had no reason to do so.

If the Court reaches the merits, it should uphold BPA's longstanding construction of "general requirements." Section 7(b)(2) requires a comparison of BPA's projected charges for "general requirements" in its "Program Case" under the Act (excluding certain costs specified in section 7(g)) with the costs of serving

– 4 –

"general requirements" of preference customers under five listed assumptions (the "7(b)(2) Case"). BPA reasonably concluded that loads in the 7(b)(2) Case are not fixed and may change as BPA applies the five statutory assumptions. In particular, under Assumption D, BPA must assume that resources required to meet general requirements remaining after the Federal Base System (FBS) is exhausted are drawn in least-cost order from a stack of resources including ones BPA purchases from preference customers under section 6 of the NWPA. By statute, conservation is a resource and includable in the resource stack. BPA accordingly concluded that "general requirements" in the 7(b)(2) Case depend on how much conservation is selected under Assumption D. BPA thus starts by assuming no conservation and no conservation-related costs, and then decreases the 7(b)(2) Case load and adds in corresponding costs as conservation is drawn from the resource stack. That matched approach is reasonable. It would be *un*reasonable to assume extensive conservation at no cost, as Cowlitz urges.

Cowlitz is equally misguided in complaining about BPA's modeling of financing costs. BPA must run separate cost studies for the Program and 7(b)(2) Cases because the assumptions differ. In the Program Case, BPA must acquire and finance resources beyond the FBS; in the 7(b)(2) Case, only FBS resources are financed. Moreover, when the necessary repayments change, the scheduling of particular repayments also changes.

4. BPA acted properly in supplementing the WP-02 rate case record so it could rerun the section 7(b)(2) rate test as it would have done in 2001 without the REP settlements. BPA's original WP-02 rates were developed in 2000, before the Pacific Coast energy crisis. After the crisis erupted, BPA recognized that the assumptions underlying the rates were inaccurate and withdrew them. Rather than revising the original rates, BPA adopted Cost Recovery Adjustment Clauses (CRACs) in a supplemental rate proceeding. A key reason for doing so was that BPA's REP settlements with the IOUs had rendered the section 7(b)(2) test and PF Exchange rate moot. BPA's determination that the REP settlements were void, however, undermined the rationale for relying on CRACs. To determine what REP benefits were owed, BPA had to recalculate the PF Exchange rate.

In doing so, BPA had to reach an issue it had not decided in the WP-02 rate case: whether power from mid-Columbia River dams owned by preference customers belonged in the resource stack even though that power was committed to load of BPA's IOU customers. That issue was raised in WP-02, but it was mooted because BPA did not need to resort to the resource stack. In the Lookback, however, the FBS could not satisfy the large loads that BPA was facing due to the energy crisis. BPA thus had to decide the issue. BPA did not violate the mandate rule in doing so because there was no mandate to use the flawed PF Exchange rate from 2000: this Court merely mandated BPA to set rates in accordance with its

– 6 –

opinion. APAC and Cowlitz's reliance on the filed rate doctrine and rules against retroactive ratemaking and rulemaking is equally unavailing. If those doctrines apply, the entire Lookback was illegal and BPA could only set rates prospectively. If those doctrines do not apply, they cannot limit BPA's authority to revisit prior rates and calculate what REP benefits would have been absent the settlements.

5. BPA properly construed Assumption D. Resources "committed to load pursuant to section [5(b)]" include resources committed to IOU loads as well as preference customer loads because section 5(b) contemplates commitment of resources to both IOU and preference customer loads. BPA's construction is also practical because preference customers' remaining general requirements can be served only with available power, and power already committed to serve IOU load is unavailable for preference customers. At minimum, BPA's construction is reasonable and deserves deference.

BPA also acted reasonably in reaffirming that resources in the resource stack are limited to ones owned or purchased by BPA customers. Assumption D addresses how to serve remaining "general requirements" for actual BPA customers, and the stack is limited to resources purchased from "such customers" under section 6 or not committed to load under section 5(b). "Commitment to load" under section 5(b) is meaningful only for BPA customers that have section 5(b) contracts. BPA's construction also makes practical sense because

BPA and preference customers have no ready access to resources of public bodies that are not BPA customers.

6. BPA reasonably rejected APAC's numerous complaints about details of BPA's application of the section 7(b)(2) test and calculation of Lookback Amounts. First, APAC cannot complain about BPA's treatment of "pre-subscription" contracts because it got what it sought. Second, BPA reasonably forecast loads for FY2002-2006 in conducting the section 7(b)(2) test for the Lookback rather than using actual load data available in 2008. Section 7(b)(2) requires a forecast, and the Lookback was designed to determine what BPA would have done during the 2002 rate case absent the REP settlements. BPA would have used available data and would not have had perfect foresight. Third, in calculating REP benefits, BPA reasonably determined IOUs' actual average system costs (ASCs) for FY2002-2006 based on the historical data available. Fourth, BPA gave everyone reasonable access to its modeling software.

7. Finally, to the extent refunds to preference customers were required, BPA acted reasonably in adopting timeframes, interest rates, and procedures for those refunds. BPA's goal is to refund all past overcharges, with interest, by FY2015, matching the seven-year period during which overcharges were made. BPA has made real progress: by FY2011, half the calculated overcharges will have been returned. In developing its plan, BPA considered both sides' concerns.

– 8 –

It accelerated the repayments, but it appropriately refused to cut off 100% of REP benefits in coming years. Finally, BPA did not abuse its discretion in setting interest rates. Even if APAC had standing to complain about interest paid to others, BPA (a federal agency) was not required to pay interest. BPA volunteered to do so, but it is not this Court's role to flyspeck which rate to apply.

## Argument

### I. THIS COURT EXERCISES A DEFERENTIAL STANDARD OF REVIEW

The Administrative Procedures Act governs judicial review of BPA decisions under the NWPA. 16 U.S.C. § 839f(e)(2). BPA's actions thus must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the preference petitioners' arguments fall into two main categories: challenges to BPA's constructions of the NWPA, and challenges to BPA's efforts to remedy errors identified in this Court's 2007 decisions. As to the former, courts must defer to BPA's interpretation of the complex and potentially conflicting mandates BPA is entrusted with applying, as long as the statutes do not resolve the issue and BPA's reading is reasonable. *See, e.g., Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 389-90 (1984); *Confederated Tribes of the Umatilla Indian Reservation v. BPA*, 342 F.3d 924, 928-29 (9th Cir. 2003); *Ass'n of Pub. Agency Customers, Inc. v. BPA*, 126 F.3d 1158, 1169 (9th Cir. 1997); *see also Chevron U.S.A., Inc. v. Natural Res.*

*Def. Council, Inc.*, 467 U.S. 837, 843-45 (1984). Simply put, this Court must not substitute its view for BPA's unless BPA has contradicted the will of Congress.

Courts also recognize that agencies must exercise judgment and balance equities when selecting remedies. "When a federal court of appeals reviews an administrative agency's choice of remedies to correct a violation of a law the agency is charged with enforcing, the scope of judicial review is particularly narrow." *Nat'l Treasury Employees Union v. FLRA*, 910 F.2d 964, 966-67 (D.C. Cir. 1990) (en banc); *see also Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1216 (D.C. Cir. 2009) (deference at zenith when agency engaged in remediation); *Pub. Utils. Comm'n of Cal. v. FERC*, 988 F.2d 154, 163 (D.C. Cir. 1993) (broad deference to FERC in implementing details of remedial program on remand under the Natural Gas Act). More generally, this Court normally defers where BPA chooses among reasonable alternatives. *See Pub. Power Council, Inc. v. BPA*, 442 F.3d 1204, 1210-11 (9th Cir. 2006) (decision not to include $76 million in calculation to determine SN-CRAC trigger entitled to deference because consistent with sound business principles, even if another approach was reasonable).

The preference petitioners err in suggesting that review should be more stringent. They argue that this Court should review *de novo* because BPA deserves no deference in construing this Court's decisions, but their petitions involve different issues than this Court faced in *Portland General Electric Co. v. BPA*,

501 F.3d 1009 (9th Cir. 2007) ("*PGE*"), and *Golden Northwest Aluminum, Inc. v. BPA*, 501 F.3d 1037 (9th Cir. 2007) ("*Golden Northwest*"). Those decisions did not address, for example, how to treat conservation under section 7(b)(2) of the NWPA or how to construe the resource stack of section 7(b)(2)(D). Nor did this Court specify any remedy. *PGE* gave no specific mandate, 501 F.3d at 1037, and *Golden Northwest* merely "remand[ed] to BPA to set rates in accordance with this opinion," 501 F.3d at 1053.

## II. COWLITZ AND APAC'S APPROACH TO SECTION 7(b)(2) IS FUNDAMENTALLY MISGUIDED

Section 7(b)(2) of the NWPA defies simple characterization. Generally speaking, however, it requires BPA to compare the amounts BPA expects to charge preference customers over a five-year period under programs under the Act (the "Program Case"), excluding certain amounts charged under section 7(g), with power costs preference customers would face under five hypothetical assumptions that roughly correspond to a world without the Act (the "7(b)(2) Case"). *See* 16 U.S.C. § 839e(b)(2); S. Rep. No. 96-272, at 20 (1979) ("Senate Report") (section 7(b)(2) test ensures preference customer rates are "no greater than would occur in the absence of the regional program"); *id*. at 56 (section 7(b)(2) compares proposed preference customer rates "against the costs which these customers would have encountered in the absence of legislation"). If Program Case costs, excluding applicable section 7(g) costs, exceed 7(b)(2) Case Costs, the rate test

"triggers" and BPA allocates the difference to rates other than the PF Preference rate charged to preference customers. *See* 16 U.S.C. §§ 839e(b)(2), 839e(b)(3).

The NWPA was a compromise designed to benefit each of the competing interests. Preference customers retained their preferential supply of BPA power and benefited from BPA's ability to acquire new resources and meet their requirements more efficiently than they could themselves. DSIs received long-term access to relatively cheap BPA power. The IOUs and their residential and small-farm customers got the Residential Exchange Program (REP).

In practice, preference customers have received the lion's share of the benefits. For example, BPA projected that preference customers would receive about $2 billion in benefits from low-cost power purchases in FY2009, while the IOUs and their residential and small farm customers would receive roughly $265 million in REP benefits for FY2009 (reduced by about $87 million for the Lookback and other adjustments). IOUER750. Thus, although IOUs serve 60% of the region's residential and small farm customers, IOUSER91, those IOU customers receive only about 10% of the benefits of the Federal Columbia River Power System. The preference petitioners now seek to nullify the REP altogether, but Congress did not intend that result.

– 12 –

Congress's intent in establishing the REP was to promote wholesale rate parity so that residential consumers throughout the region would share in the benefits of low-cost federal power:

> This exchange will allow the residential and small farm consumers of the region's IOUs to share in the economic benefits of the lower-cost Federal resources marketed by BPA and will provide these consumers wholesale rate parity with residential consumers [of] preference utilities in the region.

H.R. Rep. No. 96-976, pt. II, at 35 (1980) ("House Report Part II"); *see also* H.R. Rep. No. 96-976, pt. I, at 60 (1980) ("House Report Part I") (REP "is not likely to result in parity in the retail rates being paid by consumers of preference customers and consumers of investor-owned utilities, but it should equalize the wholesale costs of the electric power with a resulting benefit [to] the investor-owned utilities' customers."). This Court has recognized Congress's goal of reducing disparity in wholesale power costs. *See, e.g.*, *Pub. Util. Comm'r of Or. v. BPA*, 767 F.2d 622, 624 (9th Cir. 1985); *CP Nat'l Corp. v. BPA*, 928 F.2d 905, 907 (9th Cir. 1991).

Cowlitz and APAC contend that Congress's intent to benefit IOUs' residential customers should be ignored because Congress dictated that preference customers would pay no costs of the REP. Cowlitz notes that one of the five assumptions in section 7(b)(2) is that the REP does not exist and suggests (at 11) that "Congress did not intend that Preference Customers bear the costs of the

– 13 –

Exchange Program." APAC similarly contends that section 7(b)(2) ensures that preference customers' rates will not be higher than if the REP did not exist.

As BPA explained, however, that analysis is unduly simplistic. IOUER405-18, 427-35. The statutory language and legislative history both make clear that the section 7(b)(2) test involves comparing the Program Case (less certain section 7(g) costs) with a hypothetical case (the 7(b)(2) Case) based on *five* simultaneous assumptions. Lack of the REP is just one of those five assumptions.

Cowlitz likewise errs in suggesting that the REP is an anachronism because sources of funds that Congress envisioned have disappeared. Cowlitz argues that BPA's profitable sales to DSIs have dwindled and that financing benefits have not materialized. The REP is not conditional, however. Nothing in the Act says that the REP shall disappear if DSI loads drop below a particular level or financing benefits are not achieved. If DSI loads fall and financing benefits are not achieved, the level of REP benefits may decline, but there is no direct link: the effects on the REP fall out of a complex statutory formula. Cowlitz insinuates that BPA starts with a level of REP benefits in mind and rigs the section 7(b)(2) test to achieve it, but that accusation is scurrilous. BPA applies the five statutory assumptions, calculates a trigger amount, and then allocates any trigger amount to rates other than the PF Preference rate. The amount of REP benefits in any year then depends

– 14 –

on three factors:  the PF Exchange rate, the exchanging utility's ASC, and the size of its residential and small farm load.  Section 7(b)(2) affects only the first factor.

Finally, Cowlitz recounts (at 58-61) its own purported "deconstruction" of BPA's ratemaking model and its own interpretation of data in Appendix B to the Senate committee report on the Act in an attempt to prove that (1) the only significant drivers of the section 7(b)(2) test are net costs of the REP in the Program Case and benefits related to DSIs, and (2) BPA must have illegally jiggered the analysis because DSI loads are now relatively small.  BPA properly rejected both arguments.  IOUER420-24.

As to Cowlitz's "deconstruction," suffice it to say that BPA debunked it below.  Although Cowlitz *claimed* it modified BPA's model to eliminate all other differences in the 7(b)(2) Case, Cowlitz did not actually do so.  Cowlitz ignored numerous other important factors reflected in the five statutory assumptions.  *See* IOUER422-24.

As to the projections in Appendix B, exactly how those projections were made is hard to tell 30 years afterward, and the numbers can support many conclusions.  For example, Appendix B suggests that Congress contemplated that annual REP costs could exceed $750 million without triggering the rate test (IOUER411), yet here the rate test triggered with annual REP benefits averaging $135 million in FY2002-2006 and $237 million in FY2007-2008 (IOUER760).

Furthermore, the legislative history recognized that "the circumstances assumed in preparing this analysis will change over time." Senate Report 32. In any event, this Court long ago recognized that reliance on Appendix B is problematic because it "was incorporated into the Senate Report with reservations." *Cent. Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1123 (9th Cir. 1984). Ultimately, as Appendix B itself recognized, IOUER421, the statutory language controls.

## III. BPA REASONABLY CONSTRUED SECTION 7(b)(2) IN DETERMINING HOW TO TREAT CONSERVATION IN THE 7(b)(2) CASE

Cowlitz and APAC challenge BPA's treatment of conservation and related costs in the section 7(b)(2) test. That statutory construction issue is irrelevant to the FY2002-2008 Lookback and should be considered only prospectively, in connection with BPA's FY2009 and future rates. If the Court nonetheless reaches the merits, BPA's construction should be affirmed under the *Chevron* standard.

### A. Cowlitz and APAC's Complaints Are Irrelevant to the Lookback

Cowlitz and APAC's arguments are premature. The petitions briefed here are limited to the Lookback aspects of the WP-07S ROD. The Lookback was designed to calculate past overcharges to preference customers by comparing the REP settlement benefits BPA paid for FY2002-2008 with the REP benefits BPA would have paid if BPA had not entered into REP settlement agreements with the IOUs. With one exception, BPA's Lookback analysis applied the 1984 Section 7(b)(2) Legal Interpretation and Implementation Methodology in effect during the

WP-02 and original WP-07 rate cases. The lone exception involved the construction of section 7(b)(2)(b)(D)(ii), an issue that was raised in WP-02 but that became moot and was left open after adoption of the REP settlement agreements. That issue resurfaced after BPA declared the REP settlement agreements void, but BPA emphasized that even there it resolved the issue as it would have done in 2001. *See*, *e.g.*, IOUER420. BPA's Lookback did ***not*** apply the revised Legal Interpretation and Implementation Methodology that BPA adopted going forward.

Although Cowlitz and APAC challenge BPA's overall approach to section 7(b)(2), they do not and cannot argue that BPA would have adopted their statutory constructions when BPA adopted rates for FY2002-2006 and FY2007-2008, which is the analysis the Lookback requires. BPA has consistently treated conservation's effects on loads and costs since it first addressed those issues in 1984. BPA would not have altered that approach in 2001 or 2007 when it had no reason to do so.[2]

To be sure, Cowlitz and APAC were entitled to raise their new statutory construction argument in their petitions to review the FY2009 rates set in WP-07S. The petitions here, however, are limited to the Lookback. Although this brief

---

[2] Cowlitz and APAC did not argue their current position in the WP-02 or original WP-07 rate cases. In WP-02, the current Cowlitz group either supported or did not oppose BPA's treatment of conservation. IOUSER18, 473. In WP-07, certain preference customers argued in a "brief on exceptions" that section 7(b)(2) did not ***require*** BPA to adjust loads for conservation, but even they recognized that BPA's treatment of conservation and related costs was "discretionary." IOUSER 104. In any event, BPA maintained its approach despite the suggestion to revisit it.

addresses the merits of the non-Lookback issues for the Court's convenience (the same panel will consider both the Lookback and FY2009 rates), the Court should take care to distinguish between the issues that affect FY2002-2008 and those that do not.

### B. BPA Properly Rejected Cowlitz and APAC's Proposal to Assume Conservation But Ignore Conservation Costs in the 7(b)(2) Case

The first paragraph of section 7(b)(2) expressly directs BPA to exclude from the Program Case conservation costs and certain other costs allocated to preference customers under section 7(g). 16 U.S.C. § 839e(b)(2). Section 7(b)(2) does not, however, direct BPA to exclude conservation costs from the 7(b)(2) Case. Moreover, section 7(b)(2) is silent about whether preference customers' "general requirements" in the 7(b)(2) Case are fixed or should be adjusted to reflect that preference customers' loads would be greater without conservation.

Since BPA first addressed these issues back in 1984, BPA has taken a consistent position. BPA initially deducts conservation costs in both the 7(b)(2) Case and the Program Case, but it adds conservation costs back into the 7(b)(2) Case to the extent that conservation is selected to serve preference customers' requirements under the hypothetical scenario of section 7(b)(2)(D) ("Assumption D"). In particular, BPA augments loads in the 7(b)(2) Case to the extent conservation does ***not*** occur under Assumption D. Thus, "general requirements" of preference customers in the 7(b)(2) Case (the loads to be served) depend on how

– 18 –

the 7(b)(2) Case assumptions are applied, and are not necessarily identical to the "general requirements" served in the Program Case. *See, e.g.*, IOUER441-54.

BPA's reaffirmation of its treatment of conservation in WP-07S pleased neither the preference petitioners nor the IOUs. Desiring to reduce costs in the 7(b)(2) Case, maximize the trigger amount, and lower the PF Preference rate, the preference petitioners contended that the loads forecast in the 7(b)(2) Case should be lowered by the same amount of conservation as in the Program Case. Nevertheless, trying to have their cake and eat it too, they also asserted that the costs of that conservation should be excluded from the 7(b)(2) Case. The IOUs, in contrast, took a principled, consistent position: conservation costs should remain in the 7(b)(2) Case, but loads in the 7(b)(2) Case should be the same as in the Program Case: reduced to reflect conservation.

Cowlitz and APAC now urge the Court to hold that their reading is the only reasonable construction of section 7(b)(2). In contrast, although the IOUs also did not prevail below, the IOUs acknowledge that section 7(b)(2) is complex and ambiguous in how it treats conservation and conservation costs and that BPA's balanced approach to that issue is both reasonable and longstanding. Under *Chevron*, this Court must defer and should affirm it. *See, e.g.*, *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 487 (2004) ("We normally accord particular deference to an agency interpretation of longstanding duration,

– 19 –

recognizing that well-reasoned views of an expert administrator rest on a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (internal quotations and citations omitted); *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 218-20 (2001) (deferring to longstanding, reasonable IRS interpretations that "wages paid" is used differently in different sections of statute).

### 1. BPA Correctly Recognized that the NWPA Treats Conservation as a "Resource" to Meet Power Needs

As the full name of the statute (the Pacific Northwest Electric Power Planning *and Conservation* Act) indicates, conservation is a basic tenet of the NWPA.  Because Congress intended BPA to rely on conservation to help meet regional demand for power, it defined "resources" as including load reduction resulting from conservation as well as electricity generated by power plants:

> "Resource" means—
>
> (A) electric power, including the actual or planned electric power capability of generating facilities, or
>
> (B) actual or planned *load reduction resulting* from direct application of a renewable energy resource by a consumer, or *from a conservation measure*.

16 U.S.C. § 839a(19) (emphasis added); *see also* 16 U.S.C. § 839a(3) (defining "conservation" in terms of a "reduction in electric power consumption").

Furthermore, section 6(a) of the NWPA directs BPA to acquire conservation resources as well as power. 16 U.S.C. § 839d(a)(1) ("The Administrator shall acquire such resources through conservation … as the Administrator determines are consistent with the plan [developed under the Act] …."). BPA thus must take conservation into account when deciding how much power to acquire to meet its remaining contractual obligations. 16 U.S.C. § 839d(a)(2)(A); *see also* House Report Part I at 64, Part II at 35 (BPA should treat conservation resources as means to meet customer load).

> **2.** **BPA Reasonably Interpreted the Statutory Language in Determining 7(b)(2) Case "General Requirements"**

Section 7(b)(2) requires BPA to compare, for the rate year plus the next four years, "the projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and Federal agency customers, exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events" with "an amount equal to the power costs for general requirements of such customers if[] the Administrator assumes" each of five assumptions. 16 U.S.C. § 839e(b)(2).

The most critical assumption here is Assumption D, under which

> all resources that would have been required, during such five-year period, to meet remaining general requirements of the public body, cooperative and Federal agency customers (other

> than requirements met by the available Federal base system resources determined under subparagraph (B) of this paragraph) were—
>
> > (i) purchased from such customers by the Administrator pursuant to section [6 of the Act], or
> >
> > (ii) not committed to load pursuant to section [5(b) of the Act],
>
> and were the least expensive resources owned or purchased by public bodies or cooperatives; and any additional needed resources were obtained at the average cost of all other new resources acquired by the Administrator ….

*Id.* § 839e(b)(2)(D). Thus, "general requirements" of preference customers that remain after exhaustion of the FBS are first met by using, in order of lowest cost, "all resources" of preference customers purchased under section 6 or not committed to load under section 5(b).

Conservation is a "resource" that BPA must acquire from preference customers (or others) under section 6. Accordingly, since 1984 BPA has included the conservation it pays preference customers to undertake among the "resources" purchased under section 6 that go into the Assumption D "resource stack." BPA assumes that conservation occurs in the hypothetical 7(b)(2) Case to the extent conservation is among the lowest-cost resources drawn from the stack, but only to that extent. At the outset of the section 7(b)(2) analysis, BPA assumes neither conservation (preference customer loads equal Program Case requirements plus the loads BPA would serve absent any conservation) nor conservation costs. If the

FBS is exhausted, BPA proceeds through the resource stack. If conservation resources are inexpensive enough to be selected, BPA reduces preference customers' "general requirements" by the amount of conservation selected, but adds the costs of the selected conservation into the 7(b)(2) Case. To the extent conservation resources are too expensive to be selected, BPA excludes the corresponding costs from the 7(b)(2) Case and leaves preference customers' "general requirements" unchanged. *See* IOUER447-77.

Cowlitz and APAC complain that BPA's approach violates section 7(b)(4), which defines "general requirements" as the amount of power that preference customers purchase from BPA under section 5(b) of the Act:

> the public body, cooperative or Federal Agency customer's electric power purchased from the Administrator under section [5(b) of the Act], exclusive of any new large single load.

16 U.S.C. § 839e(b)(4). According to Cowlitz and APAC, preference customers' "general requirements" projected in the 7(b)(2) Case must be the same amount of power those customers are projected to purchase under the Program Case unless the statute expressly states otherwise. Cowlitz and APAC accuse BPA of adding "phantom load" by augmenting "general requirements" by the amount of conservation assumed not to occur. In their view, "general requirements" in the 7(b)(2) Case may be increased only by adding certain DSI loads pursuant to Assumption A, 16 U.S.C. § 839e(b)(2)(A).

As the IOUs urged, BPA could reasonably have construed preference customers' "general requirements" in the 7(b)(2) Case to be the same as in the Program Case (reduced by conservation), if BPA also accepted the corollary that the costs of such conservation must be included in the 7(b)(2) Case. But that does not mean that BPA has acted **un**reasonably for 25 years in construing "general requirements" as a variable whose size depends on how Assumption D is applied.

BPA's construction is consistent with section 7(b)(2). The 7(b)(2) Case calculates "power costs for general requirements of such customers if[] the Administrator assumes that" the five assumptions apply. 16 U.S.C. § 839e(b)(2). The statute does not say "*such* general requirements," referring back to the same "general requirements" specified in the Program Case. It refers to "general requirements of such customers *if*" certain hypothetical circumstances exist. *Id.* (emphasis added). BPA reasonably concluded that "general requirements" of preference customers (the amount of power it needs to sell them) may change under the five assumptions—not just by adding DSI loads, but also by applying the lowest-cost-resource approach of Assumption D.

Assumption D directs BPA to use "resources" acquired under section 6 to "meet" remaining "general requirements." 16 U.S.C. § 839e(b)(2)(D). Section 6 resources include conservation, and BPA reasonably concluded that "general requirements" in the 7(b)(2) Case are the hypothetical load of preference customers

to be met in the hypothetical 7(b)(2) world.  That load is higher than in the Program Case, but there is nothing "phantom" about the difference.  The difference reflects that conservation programs and load reduction achieved under the mandates of the Act would not have occurred to the same extent without the Act.

Assumption B also supports BPA's reading.  Under Assumption B, preference customers must first be served with FBS resources not already committed under pre-NWPA contracts.  16 U.S.C. § 839e(b)(2)(B).  Assumption B does **not** tell BPA to begin serving preference customers with conservation resources, or to assume that conservation has reduced preference customers' requirements before those customers are served with FBS resources.

Cowlitz's reliance on Appendix B to an early Senate report on the NWPA is misplaced.  Although Appendix B used the shorthand "conservation load forecast" to refer to a Northwest Energy Policy Project forecast, it is unclear what conservation was assumed, whether that conservation would have occurred without the Act, and whether that conservation would have been purchased by BPA.  *See* IOUER476-77.  In any event, as noted above, Appendix B was included with reservations and is a slender reed on which to base a statutory construction.  *See also* BPA Br. 164-67 (detailing other flaws in Cowlitz's reliance on Appendix B, including conflicts with the statutory language ultimately adopted).

Contrary to Cowlitz's suggestion, BPA logically concluded that conservation purchased from preference customers is a resource capable of "meeting" requirements remaining after exhaustion of the FBS.  As BPA observed, using conservation to reduce power obligations to one customer means that more power is available for others:

> [M]eeting customer load first through conservation resources has been BPA's practice under the Act.  Conservation means that power that would otherwise have been consumed without conservation can now be available to meet load that cannot be conserved.  Fundamentally, reducing use of power (*i.e.*, load) through conservation is a means of providing power for other customer use (*i.e.*, meeting load).

IOUER438; *see also* House Report Part I at 64, Part II at 35 (discussing use of conservation to "meet" BPA's obligations to its customers).  Likewise, BPA reasonably concluded that the ***costs*** of "general requirements" in the 7(b)(2) Case should include conservation costs to the extent conservation reduces the amount of power demanded.  Conservation projects cost money just as power plants do.

In contrast, the proposed Cowlitz/APAC construction is untenable.  Cowlitz and APAC would assume vastly (500 to 700 aMW) lower loads in the 7(b)(2) Case due to conservation, yet include no conservation costs in that Case.  They claim that section 7(b)(2) expressly directs deduction of section 7(g) costs in both the Program and 7(b)(2) Cases, but the statute says no such thing.  It directs BPA to

deduct certain section 7(g) costs (including conservation costs) in the ***Program***

Case, but it does ***not*** direct BPA to deduct those costs in the ***7(b)(2)*** Case.

As the IOUs argued, the 7(b)(2) Case could assume full conservation and

lowered loads, but all conservation costs would have to be included. Or, as BPA

concluded, "general requirements" may vary in the 7(b)(2) Case and loads may be

reduced only to the extent conservation is assumed to occur, but, correspondingly,

the costs of that assumed conservation must be included. It is ***not*** reasonable to

assume extensive conservation in the 7(b)(2) Case yet ignore corresponding costs.

Cowlitz denies it is suggesting conservation is free, noting that section 7(g)

requires all classes of customers to contribute to conservation costs. But that

misses the point. The question is not who pays for conservation in the real world,

but how to treat conservation in the hypothetical 7(b)(2) Case. Congress expressly

directed BPA to deduct certain section 7(g) costs in the Program Case, but it did

***not*** direct BPA to deduct those costs in the 7(b)(2) Case. Logically, Congress must

have intended that some or all of the listed costs could remain in the 7(b)(2) Case.

BPA thus concluded that conservation costs should be included in the 7(b)(2) Case

to the extent conservation is selected—otherwise conservation ***would*** be free there.

APAC's suggestion that BPA is "penalizing" conservation is similarly

flawed. BPA's approach merely recognizes that there is no free lunch; someone

must pay for conservation. In the Program Case, conservation costs are expressly

excluded and addressed through section 7(g). In the 7(b)(2) Case, there is no such exclusion, and costs of any conservation must be reflected in the 7(b)(2) Case itself. Moreover, APAC ignores that section 7(b)(2) does not affect how much conservation occurs in the real world. Section 7(b)(2) addresses *rate levels*, and it nowhere mandates categorical exclusion of conservation and conservation costs from the 7(b)(2) Case.

### C. BPA Appropriately Modeled Repayment Costs in the 7(b)(2) Case

Cowlitz is equally mistaken in complaining that BPA exaggerated costs in the 7(b)(2) Case through its repayment studies.

BPA's cost models include repayment studies that estimate costs of repaying the debt BPA incurs to finance its resources. Cowlitz objects that BPA prepares separate repayment cost studies for the Program Case and the 7(b)(2) Case. Separate studies are appropriate, however, because the assumptions regarding the costs to be repaid vary between the two cases. In the Program Case, BPA acquires conservation and other resources under section 6 and must finance those resources. In the 7(b)(2) Case, preference customers are assumed to acquire—and bear costs of financing—any resources they need beyond the FBS. *See* 16 U.S.C. §§ 839e(b)(2)(D)(i) (resources required after FBS is exhausted are owned or purchased by preference customers), 839e(b)(2)(E)(i) (preference customers

achieve no savings in the costs of financing non-FBS resources). Thus, the only resources that BPA must finance in the 7(b)(2) Case are FBS resources.

Cowlitz protests that BPA assumes real conservation financing obligations "disappear" in the 7(b)(2) Case, but that is erroneous. Conservation financing costs still exist but, by statutory hypothesis, they (like costs of financing other non-FBS resources) are borne by others. For purposes of the repayment methodology, the relevant financing costs are those that BPA *itself* bears. The same repayment methodology produces a different result in the 7(b)(2) Case because the costs BPA finances in the two cases differ.[3]

Finally, Cowlitz dissembles in accusing BPA of setting FBS costs $1.1 billion higher in the 7(b)(2) Case than in the Program Case. BPA's repayment model optimizes the ordering and timing of BPA's debt payments. If the assumptions change for the 7(b)(2) Case, the scheduling of repayments attributable to particular resources will change as well. In particular, repayment costs attributable to the FBS in any given year will change. Contrary to Cowlitz's suggestion, BPA did not single out FBS debt repayment costs for the five years covered by the test and arbitrarily reset them $1.1 billion higher. BPA changed the

---

[3] Cowlitz suggests (at 48) that in running a separate repayment cost study, BPA alters cost inputs to the 7(b)(2) Case for reasons other than the five assumptions. In truth, the 7(b)(2) Case study merely applies those assumptions.

inputs to the model as required by section 7(b)(2), and the outputs (including the timing of particular debt payments) changed accordingly. IOUER541-42, 548.

## IV. BPA REASONABLY SUPPLEMENTED THE WP-02 RATE CASE RECORD AND APPROPRIATELY DECIDED A LEGAL ISSUE THAT THE REP SETTLEMENTS HAD RENDERED MOOT

When BPA calculated Lookback Amounts, it supplemented the WP-02 rate case record and reran the section 7(b)(2) rate test as it would have done in 2001 if the REP settlements had not occurred. That reassessment included updating price and load forecasts to reflect the Pacific Coast energy crisis of 2000-2001. BPA also addressed a legal issue—construction of "not committed to load pursuant to section [5(b) of the Act]" as used in section 7(b)(2)(D)(ii)—that arose in the WP-02 rate case but was mooted by the REP settlements.

APAC objects, contending that BPA was required to use the PF Exchange rate developed in the WP-02 rate case regardless of the validity of the assumptions that went into that rate. According to APAC, BPA violated this Court's 2007 mandates, the filed rate doctrine, and prohibitions against retroactive ratemaking and retroactive rulemaking. Cowlitz similarly argues that BPA's treatment of Assumption D(ii) constituted retroactive rulemaking.

As shown below, those arguments are wrong. Moreover, they ignore that agencies have wide discretion to fashion remedies designed to put parties in the positions they would have been in had proper procedures been followed in the first

place. *See, e.g., Plaquemines Oil & Gas Co. v. FPC*, 450 F.2d 1334, 1337 (D.C. Cir. 1971) (agency has "equitable power 'to regard as being done that which should have been done' by recreating the past, insofar as is reasonably possible, to reflect compliance with the [Natural Gas] Act"); *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967) ("the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions").

### A. BPA Correctly Recognized that It Needed to Revisit WP-02 Issues in Light of This Court's 2007 Decisions

BPA had discretion to decide whether the existing administrative record was sufficient on remand. *See, e.g., FTC v. Morton Salt Co.*, 334 U.S. 37, 55 (1948) (noting that agency could hear additional evidence and make further findings rather than relying on existing record on remand). BPA did not abuse that discretion.

Assuming BPA was legally authorized to conduct a Lookback, its only viable option was to recalculate the PF Exchange rates as though the REP settlements had not occurred. As BPA recognized, simply relying on the original WP-02 PF Exchange rate "would have been patently unreasonable" because that rate was "fatally defective." IOUER73.

BPA originally developed its WP-02 rates in mid-2000, before the Pacific Coast energy crisis. When the energy crisis erupted, BPA quickly realized that the

assumptions underlying the rates were flawed. Most notably, BPA's load forecast was "egregiously in error due to the unanticipated return of over 1,000 aMW of public agency loads": preference customers deserted BPA in favor of the open market when market prices were low, but returned to BPA in the winter of 2000 when market prices spiked from $28 to $148 per MWh. IOUER81-82.

Recognizing that the proposed WP-02 rates would not cover its costs as required by law, BPA withdrew those rates. As a fix, BPA elected to impose Cost Recovery Adjustment Clauses (CRACs) on top of the original rates, to trigger as necessary to recover BPA's costs. *See* IOUER21. BPA chose CRAC adjustments rather than reopening the entire rate case and rerunning the section 7(b)(2) test in part because of its REP settlement agreements with the IOUs, which were not affected by the PF Exchange rate. *See* IOUER79. Without the REP settlements, BPA would have rerun the section 7(b)(2) test and reset rates; otherwise the results would have been "an unjustifiable windfall to preference customers and an unjustifiable penalty to BPA's IOU customers." IOUER45-46. With CRACs rather than corrected base rates, the PF Exchange rate would have soared to $90/MWh, eliminating the REP altogether. *See* IOUER73-75. Had that happened, the IOUs would have sued—and won. *See Golden Northwest*, 501 F.3d at 1053 (BPA forecasts must be "realistic" and "accurately reflect[] the information available at the time rates [a]re set and the cost recovery mechanisms adopted");

– 32 –

IOUER96 (no serious debate that "the WP-02 rate record contained known flawed data").

Recalculating the PF Exchange rate in the Lookback required BPA to address an important legal issue that was moot in 2000 and 2001: the meaning of "not committed to load under [section 5(b)]" in Assumption D(ii). In the original WP-02 rate case, parties debated whether low-cost power from preference customer dams along the mid-Columbia River belonged in the resource stack even though that power was committed to the load of IOUs. BPA acknowledged the dispute, but deemed it moot because the FBS satisfied the modest loads it was projecting:

> *The issue of whether BPA should include Mid-Columbia resources in the 7(b)(2) Case resource stack is moot, because BPA will not use any resources from the resource stack, including Mid-C resources, to meet 7(b)(2) customers' loads.*

IOUSER31. The issue remained moot in 2001 because BPA adopted CRACs for its WP-02 rates rather than recalculating the rates.

BPA did not have that option in WP-07S, however. As discussed above, BPA could not simply use CRACs; it had to redetermine the PF Exchange rate. Moreover, due to the large return of preference customer loads by early 2001, the FBS could ***not*** satisfy preference customer requirements in the 7(b)(2) Case. BPA thus had to face the issue and decide whether power from the mid-Columbia dams was "committed to load" under Assumption D(ii). *See* IOUER553.

– 33 –

**B. BPA Did Not Violate the Mandate Rule in Resetting WP-02 Rates**

APAC all but concedes that BPA would have reopened the WP-02 rate case and confronted the mid-Columbia issue in 2001 if the REP settlements had not been in place.[4] APAC argues that this Court's mandate required BPA to use the flawed PF Exchange rate from 2000, but the Court mandated no such thing.

As APAC acknowledges (at 43), the mandate rule is limited to "situations where the scope of the remand is clear." *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006). But in *PGE*, the Court simply granted the preference customer petitions. *PGE*, 501 F.3d at 1037. It did not remand or direct BPA to take any particular action. In *Golden Northwest*, the Court "remand[ed] to BPA to set rates in accordance with this opinion," but it did not direct BPA how to do so. 501 F.3d at 1053. Consistent with its role as an appellate court, not a ratemaking agency, the Court simply identified errors and left it to BPA to exercise discretion in deciding how to remedy them. *See, e.g., INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) ("a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands"); *SEC v. Chenery Corp.*,

---

[4] APAC does quote a snippet from the WP-02 Supplemental ROD in which BPA noted that if the REP settlement agreements were challenged, the IOUs could again participate in the REP, paying the PF Exchange rate. But BPA did not address whether the IOUs would pay the PF Exchange rate as adopted in 2000, an escalated version of that rate, or a recalculated rate. IOUSER72-73. In any event, BPA explained at length why revising the fundamentally flawed WP-02 rates was the only reasonable approach.

318 U.S. 80, 88 (1943) ("an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency"). On remand, BPA put itself back into the 2001 and 2007 timeframes, resolved issues as it would have absent the REP settlement agreements, and calculated PF Exchange rates in accordance with the Court's opinions.

To the extent BPA erred, it was by engaging in a Lookback and resetting past rates rather than simply setting new rates prospectively. Assuming, however, that the mandate to "set" rates required BPA to reset past rates, it is APAC that would violate the mandate. Under APAC's approach, BPA would not have reset WP-02 (or WP-07) rates at all. BPA would merely have applied the existing PF Exchange Rate (escalated by CRACs), found no REP benefits due because that rate was too high to make any exchange worthwhile, and ordered recovery of all REP settlement amounts.

*Mefford v. Gardner*, 383 F.2d 748 (6th Cir. 1967), cited by APAC, is inapposite. The court there had decided that the claimant was disabled, so the agency erred in revisiting that question on remand. *Id.* at 756. The entire sentence clip-quoted by APAC reveals the limits of the mandate rule:

> ***"Where a reviewing court reverses a judgment with directions to render a contrary judgment and to determine a specified issue only, * * * the trial court is bound by the directions given and has*** no authority to retry any other issue, or to admit new evidence in conflict with the judgment of the reviewing court, or to enter a contrary judgment."

– 35 –

*Id.* at 758-59 (portion omitted by APAC emphasized). Here, this Court did not direct BPA to refrain from revisiting the PF Exchange rate. Instead, the Court directed BPA to "set rates in accordance with [its] opinion." *Golden Northwest*, 501 F.3d at 1053.

APAC's reliance on *United States v. Thrasher*, 483 F.3d 977 (9th Cir. 2007), is also misguided. Indeed, *Thrasher* confirms that the lower court or agency "'may consider and decide any matters left open by the mandate of this court.'" *Id*. at 981 (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255-56 (1895)). Simply put, "mandates require respect for what the higher court decided, not for what it did not decide." *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000). BPA only decided issues that this Court did not decide.

### C. APAC and Cowlitz's Filed Rate and Retroactivity Arguments Are Self-Defeating

APAC argues that the filed rate doctrine and the corollary rule against retroactive ratemaking prohibit BPA from revisiting FY2002-2006 rates to determine what REP benefits BPA would have paid absent the REP settlement agreements. According to APAC, the PF Exchange rate adopted in the WP-02 rate case and approved by FERC was final and unalterable even though this Court remanded for BPA to set rates. Cowlitz and APAC similarly argue that BPA improperly engaged in retroactive rulemaking by construing section 7(b)(2) when a legal issue that was previously moot arose during the Lookback Analysis. Both

apparently want BPA to calculate refunds due using the PF Exchange rate adopted in the WP-02 rate case, despite the recognized flaws.

That position must be rejected regardless of whether Cowlitz and APAC's arguments are right or wrong. If the doctrines they cite apply, BPA's only option was to set rates going forward, with no Lookback. Yet the refunds preference customers have demanded fundamentally depend on BPA's authority to look back and recalculate the PF Exchange rate for past periods. Doing so is the only way to know the differences between how much BPA actually paid and should have paid in REP benefits and how much preference customers were overcharged for power. If, on the other hand, the filed rate, retroactive ratemaking, and retroactive rulemaking doctrines do *not* apply, then they cannot be used to limit BPA's authority to revisit rates and recalculate what REP benefits BPA would have paid absent the REP settlement agreements. *See* IOUER35-40.

APAC tries to avoid this conundrum by suggesting that only the PF Preference rate was challenged in *Golden Northwest*, so only that rate (and not the PF Exchange rate) was subject to revision on remand. But this Court did not say that: instead, it remanded for BPA "to set rates [plural] in accordance with [its] opinion." 501 F.3d at 1053. In response, BPA conducted the Lookback with the objective of placing parties in the position they would have been in absent agency error. BPA could not determine how much it overpaid without determining the

– 37 –

REP benefits it would have paid absent the REP settlement agreements.  To do that, BPA needed to calculate the PF Exchange rates it would have adopted in 2001 and 2007.  In short, to correct for excessive PF Preference rates in the past, BPA *had* to rerun the section 7(b)(2) test and recalculate PF Exchange rates.

### V.  BPA REASONABLY CONSTRUED THE SCOPE OF THE RESOURCE STACK OF SECTION 7(b)(2)(D)

Under section 7(b)(2)(D), BPA must assume that general requirements of preference customers remaining after the FBS is exhausted are first served from resources either (i) "purchased from such customers" under section 6 or (ii) "not committed to load" pursuant to section 5(b).  16 U.S.C. § 839e(b)(2)(D).  Those resources are stacked in order of increasing cost and drawn to the extent needed.  BPA concluded that resources "committed to load" under section 5(b) include resources committed to loads of either IOUs or preference customers because BPA has section 5(b) contracts with both.  BPA also concluded that resources owned by public bodies that are *not* BPA customers and thus have no 5(b) contracts should *not* be included in the stack because those resources would not be accessible to serve preference customers' loads.  IOUER552-92.

Cowlitz challenges both statutory constructions and the resulting exclusion of certain mid-Columbia resources from the resource stack.  As a threshold matter, however, only the construction of "committed to load pursuant to section [5(b)]" is properly at issue in the Lookback petitions.  As discussed above, that issue arose in

– 38 –

WP-02, but BPA deemed it moot because FBS resources sufficed. It became ripe in the Lookback when BPA reran the section 7(b)(2) test and found that it needed to draw from the resource stack. The second issue—whether resources of public bodies that are not BPA customers belong in the resource stack—should be considered only prospectively. BPA has never included non-customer resources under section 7(b)(2)(D), and no one urged BPA to change that construction in WP-02 or the original WP-07 rate case. This is a new argument, first raised in WP-07S, and as such is irrelevant to the Lookback.

In any event, whenever considered, BPA's constructions should be upheld because they were reasonable readings of section 7(b)(2)(D).

## A. BPA Appropriately Excluded Resources Already Committed to IOU Loads Pursuant to Section 5(b)

Cowlitz notes that BPA's current reading of "committed to load pursuant to section [5(b)]" differs from BPA's original, 1984 construction of the phrase and suggests that this Court must defer to the 1984 construction. But Cowlitz recites only a selective history and misstates the proper standard of review.

BPA recounted at length the history of its construction of section 7(b)(2)(D)(ii). *See* IOUER553-61. In summary, BPA's 1984 Legal Interpretation stated, without analysis, that section 7(b)(2)(D)(ii) resources "are resources owned or purchased by the 7(b)(2) customers that are not dedicated to **their own loads**." *See* IOUER555 (emphasis added in BPA's 2008 ROD). But during development

of that 1984 interpretation, no party raised, and BPA thus did not address, whether resources committed to load of IOUs should also be deemed "committed to load" because IOUs also have section 5(b) contracts with BPA. BPA's WP-96 rate case considered power committed to IOU loads from mid-Columbia generating facilities owned by preference customers, but the issue was moot because the FBS satisfied preference customer loads in the 7(b)(2) Case. Moreover, no party to WP-96 argued that resources "committed to load pursuant to section [5(b)]" included power committed to IOUs. The issue arose in the WP-02 rate case, but it again was moot because BPA did not have to draw from the resource stack. It came up a third time in the original WP-07 proceeding, but was mooted by a partial settlement. In short, although BPA's 1984 interpretation of "committed to load" was on the books for a long time, it never mattered and BPA had not considered the alternative, plain-language construction that all resources committed to load under section 5(b) must be excluded from the stack.

Regardless of the history, however, this Court owes deference to the construction BPA chose in WP-07S, not the construction BPA adopted in 1984. In *Chevron*, the Supreme Court rejected the suggestion that it should not defer to a statutory interpretation that departed from previous constructions. 467 U.S. at 863-64. As long as an agency adequately explains its revision, its revised interpretation deserves deference because "[a]n initial interpretation is not instantly carved in

– 40 –

stone" and the agency "must consider varying interpretations and the wisdom of its policy on a continuing basis." *Id.*; *see also Rust v. Sullivan*, 500 U.S. 173, 186 (1991) (emphasizing that "[a]n agency is not required to establish rules of conduct to last forever" and upholding a revised interpretation that was consistent with the statutory language and legislative history) (internal quotations omitted); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."); *Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1036 (9th Cir. 2007) ("an agency's new position is entitled to deference so long as the agency acknowledges and explains the departure from its prior views") (internal quotations omitted).

Here, BPA explained at length why it chose to read section 7(b)(2)(D)(ii) as written: to exclude from the resource stack any resource that has been "committed to load pursuant to section [5(b)]." Contrary to Cowlitz's suggestion, BPA was not required to adopt a nonstatutory gloss and limit the exclusion to resources that preference customers have committed to ***their own*** loads under section 5(b).

The plain language of the statute supports BPA's reading. Resources used to meet remaining requirements of preference customers must "not [be] committed to load pursuant to section [5(b)]." 16 U.S.C. § 839e(b)(2)(D)(ii). The statute does not say "committed to ***preference customers'*** load." Moreover, section 5(b)

requires BPA to offer to sell power not just to preference customers, but also "to each requesting investor-owned utility" to the extent that utility's firm power load exceeds its firm peaking and energy resources as of 1980 and "such other resources as such [utility] determines, pursuant to contracts under this chapter, will be used to serve its firm load in the region." 16 U.S.C. § 839c(b)(1). BPA regularly enters into section 5(b) contracts with IOUs, and those IOUs commit resources to load pursuant to section 5(b). For example, preference customers with mid-Columbia dams have committed to supply IOUs some of the power from those dams, and the IOUs, which have section 5(b) contracts, have committed that power to their loads pursuant to section 5(b). IOUER564. Under the plain language of section 7(b)(2)(D)(ii), that power constitutes resources that are "committed to load pursuant to section [5(b)]" and cannot be included in the resource stack. *See* 16 U.S.C. § 839c(b)(1)(B) (resource committed to load if it "will be used to serve [the utility's] firm load in the region").

BPA's construction also makes practical sense. Preference customers' remaining general requirements can be served only with power available for that purpose. Power committed to serve other loads is not available to serve preference customers' general requirements. In particular, power from mid-Columbia dams that has been committed to IOU loads is unavailable to serve preference customers.

Nothing in the statute or it legislative history suggests that Congress intended BPA to assume that public agencies would breach long-term contracts with IOUs.

Cowlitz never answers these points. Nor does Cowlitz cite any legislative history supporting its view that "committed to load" must mean "committed to preference customers' load": there is none. Instead, Cowlitz argues that even though preference customers sold IOUs "energy" from mid-Columbia dams, they did not sell the "capability" of the dams and the IOUs accordingly did not commit that "capability" to load under section 5(b).

Cowlitz's distinction between "energy" and "capability" is nonsensical, as is its suggestion that a generator's capability can only be committed to the load of the generator's owner. Under the NWPA, "resources" are defined as the *electric power* that a generating facility or conservation program makes available:

> "Resource" means—
>
> (A) *electric power*, including the actual or planned electric power capability of generating facilities, or
>
> (B) actual or planned load reduction resulting from direct application of a renewable energy resource by a consumer, or from a conservation measure.

16 U.S.C. § 839a(19) (emphasis added). Electric power resources *include* the actual or potential capability of generating facilities. The mid-Columbia dam owners undeniably sold electric power and the associated capability of the dams to the IOUs, and the IOUs have committed that power to load. IOUs did not have to

– 43 –

buy shares in the dams themselves to have the power (which is the resource) committed to their load.

Cowlitz also charges that BPA's construction means that public-body-owned resources available in the 7(b)(2) Case are limited to the capability of generators sitting idle and output exported from the region. But BPA includes many preference customer resources (both conservation and output from newly built power plants) in the resource stack under section 7(b)(2)(D)(i) because they are acquired under section 6. BPA also continues to add some resources to the stack under section 7(b)(2)(D)(ii). The amount of resources "not committed to load" under section 5(b) is relatively small, but that is not surprising in the modern era and reflects preference customers' own choices. BPA was not required to ignore the plain statutory language in order to please Cowlitz.

### B. BPA Appropriately Excluded Resources Owned by Public Bodies that Are Not BPA Customers

The Court should also uphold BPA's construction that section 7(b)(2)(D)(i) and (D)(ii) resources are limited to resources owned or purchased by public bodies and cooperatives that are BPA customers. The statutory language does not directly address the issue, and BPA's longstanding construction is not only reasonable but most consistent with the structure and apparent intent of the statute.[5]

---

[5] Cowlitz suggests that BPA has newly imposed the "customer" requirement. That is incorrect. The 1984 Legal Interpretation indicated that both 7(b)(2)(D)(i)

The entire construct of section 7(b)(2)(D) (and section 7(b)(2) more generally) revolves around actual customers of BPA.  In particular, section 7(b)(2)(D) addresses how to serve remaining "general requirements" of "public body, cooperative and Federal agency customers."  16 U.S.C. § 839e(b)(2)(D).  "General requirements" exist only for actual BPA customers that purchase power under section 5(b) contracts:

> The term "general requirements" as used in this section means the public body, cooperative or Federal agency customer's electric power purchased from the Administrator under section [5(b)], exclusive of any new large single load.

16 U.S.C. § 839e(b)(4).  Furthermore, section 7(b)(2)(D)(i) resources are limited to those "purchased from *such customers* by the Administrator pursuant to section [6]."  *Id.* § 839e(b)(2)(D)(i) (emphasis added).  Likewise, section 7(b)(2)(D)(ii) resources are those "not committed to load pursuant to section [5(b)]."  *Id.* § 839e(b)(2)(D)(ii).  That concept is meaningful only for BPA customers that have section 5(b) contracts.

Cowlitz relies on the next phrase, which requires that the resources selected be "the least expensive resources owned or purchased by public bodies or cooperatives."  Cowlitz argues that Congress referred to "public bodies or cooperatives" rather than "such customers," a term used earlier in the section.  But

---

and 7(b)(2)(D)(ii) resources would be owned or purchased by "7(b)(2) customers," which BPA limited to "firm power customers of BPA."  IOUSER36, 48.

as just discussed, the previous two clauses *already* limited the selectable resources to customer-owned resources. Moreover, Congress had a reason for referring to "public bodies or cooperatives" rather "such customers" generally: "such customers" include federal agency customers. Congress did not want to include other resources of federal agency customers at this stage of the analysis.

In addition, BPA's construction makes practical sense because BPA and its preference customers lack access to resources of public bodies that are not BPA customers. Under BPA's construction, BPA first turns to the FBS, which it controls. BPA next turns to other resources readily available under the statutory scheme: resources that preference customers have sold to BPA under section 6 and resources that preference customers own or have purchased but have not committed to load under section 5(b). It would make no sense for BPA to assume that resources owned by *non*-customers would be available to meet loads of BPA's customers. As section 7(b)(2)(D)'s final sentence shows, "additional resources" from other sources are a last resort, and even those resources are non-specific and priced at the average cost of other new resources that BPA has acquired.

Finally, Cowlitz's own description of the role of Assumption D shows that BPA's reading is at least reasonable. According to Cowlitz (at 26):

> Section 7(b)(2)(D) requires BPA to assume that the least
> expensive electric power resources *of Preference Customers*
> are used to meet their 'general requirements' remaining if the

Federal Base System is not sufficient to meet those 'general requirements.'"

(Emphasis added.) Consistent with that view, BPA has limited the resources of second resort to those owned or purchased by actual preference customers.

## VI. BPA REASONABLY REJECTED APAC'S LITANY OF COMPLAINTS ABOUT DETAILS OF BPA'S APPLICATION OF THE SECTION 7(b)(2) TEST AND ITS CALCULATION OF LOOKBACK AMOUNTS

APAC argues that BPA committed various errors in applying the section 7(b)(2) test for FY2002-2006. The conservation-related issues are addressed above, and APAC's other, miscellaneous complaints are equally groundless.

### A. APAC Has No Complaint About BPA's Treatment of Pre-Subscription Contracts in the 7(b)(2) Case

APAC contends that BPA erred by serving "pre-subscription" contracts ahead of preference customer loads in the 7(b)(2) Case, but BPA did no such thing.

BPA's pre-subscription power sales are made under long-term contracts with public body customers pursuant to section 5(f) of the NWPA. The rates under these pre-subscription contracts are fixed, unlike section 5(b) sales at PF rates that adjust with every rate case. The pre-subscription contracts were adopted after enactment of the NWPA, however, so BPA had to decide how to treat those loads in light of Assumption B, 16 U.S.C. § 839e(b)(2)(B).

In WP-02, BPA decided to use FBS resources to serve pre-subscription obligations only after serving ordinary section 5(b) loads to preference customers

– 47 –

and statutorily-mandated obligations involving the Hungry Horse dam. In WP-07S, BPA did the same:

> *BPA will use FBS resources to serve preference customers' section 5(b) loads, then Hungry Horse sales, then Pre-Subscription contracts. Pre-Subscription sales to non-preference customers will be served with FBS only if the FBS is surplus to preference customers' loads.*

IOUER625 (italics original). APAC complains about a section of BPA's ***draft*** ROD, but the ***final*** WP-07S ROD gave pre-subscription sales the same (lower) priority that BPA gave in WP-02. APAC has no grievance.

## B. BPA Reasonably Forecast Its Loads for FY2002-2006

APAC next complains that BPA did not use actual load data when it performed the section 7(b)(2) test for FY2002-2006. But section 7(b)(2) expressly requires that the rate test be performed using load projections. Moreover, the Lookback was designed to determine the PF Exchange rate as BPA would have done back in the WP-02 rate case, absent the REP settlements. In the spring of 2001, BPA would have needed to revise its load forecasts based on the events of 2000-2001, but it would not have had perfect foresight about how events would transpire. That is not "cherry-picking"; it simply reflects the Lookback construct.

For example, BPA knew in ***2008*** that DSI loads had declined between 2002 and 2006. The proper question, however, was what BPA would have ***forecast*** in performing the section 7(b)(2) rate test in ***2001***, not what it now knows in perfect

hindsight. BPA appropriately used load forecasts available in the spring of 2001. *See* IOUER109-10.

Contrary to APAC's suggestion, *Public Service Co. of Indiana v. FERC*, 575 F.2d 1204 (7th Cir. 1978), supports this approach. The Seventh Circuit **upheld** the agency's estimate that a utility's expenses to purchase power in a future period would be zero based on evidence in the administrative record, even though the utility had estimated over $15 million in expenses and actual expenses were negative in that period (it earned over $2 million in sales). *Id.* at 1215-17. For its part, *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 376 A.2d 1041 (R.I. 1977), noted that the proper approach to using subsequent data depends on the circumstances and that "it is appropriate that the [agency] in general limit itself to considering data from the original time period." *Id.* at 1047. The court suggested using subsequent data only in connection with a special inflation/price-erosion allowance. *Id.* at 1046-47. Here, BPA reasonably chose to rely on the data it would have used in 2001.

APAC also complains that BPA did not properly account for price elasticity. BPA explained, however, that it would not have assumed lower loads in 2001 because doing so would have exposed BPA to unacceptable financial risks if the lower load forecast had been wrong. Moreover, BPA was already making active efforts to reduce price increases, which would have mitigated demand reduction.

– 49 –

In any event, the overall effects on the load forecast would have been minimal because most of BPA's preference customer demand (including demand of "Slice"/block and Pre-Subscription customers) was not price-elastic. IOUER95. This Court is ill-placed to second-guess that analysis.

APAC's complaint that BPA failed to produce substantiating evidence for the forecast is baseless. As BPA explained in the ROD, BPA

> maintained full records for the vast majority of the load data required to conduct the Lookback Study, and where full data records were not available, BPA used the best available data to create load forecasts. BPA fully explained the method employed in developing the Preference Customer load forecasts. Further the aggregate load data used in the Lookback study is the same as that used in the 2002 Final Rate Case.

IOUER111 (emphasis omitted).

### C. BPA Reasonably Estimated the IOUs' ASCs for FY2002-2006

APAC next complains that BPA failed to use "actual ASCs" for FY2002-2006 when calculating REP benefits due for those years. But APAC's use of the term "actual ASCs" obscures the real issues.

An ASC is the average system cost for utilities that receive REP benefits. BPA *forecasts* ASCs when setting rates in order to estimate the cost of REP benefits, but utilities receive REP benefits based on determinations of annual ASCs that reflect their *actual* costs. Between 2002 and 2007, the IOUs did not make annual ASC filings with BPA because they were receiving settlement benefits.

– 50 –

Thus, to calculate the REP benefits that would have been due without the settlements, BPA had to "backcast" actual ASCs for each year. It did so using the best available information on actual costs: from FERC Form 1 filings.

APAC complains that BPA did not use IOUs' "actual" annual ASC filings with BPA, but there were none to use. Because the REP settlement agreements specified the amounts due without reference to ASCs, the IOUs had no reason to make annual ASC filings.

APAC also suggests that BPA's use of backcast ASCs violated the NWPA, but that is not the case. The NWPA merely requires that REP benefits be determined based upon "average system cost." 16 U.S.C. § 839c(c)(1). It does not require annual filings, nor does it prohibit BPA from estimating ASCs based upon the most reliable, reasonably available information (especially in the context of a remedial proceeding).

Finally, BPA did not violate its 1984 ASC Methodology. In adopting the 1984 methodology, BPA noted that it may determine costs in other ways. *See* Addendum ("where necessary, BPA will independently determine costs").[6] Here, BPA reasonably relied on FERC Form 1 data to determine and allocate costs, as those forms are filed annually and use the same accounts described in the 1984

---

[6] Although BPA's 1984 ASC Methodology ROD is not in the administrative record, it is a public record. The Court may and should take judicial notice of it.

ASC methodology. In contrast, other potential data sources lacked the detail of FERC Form 1 data. No party, including APAC, objected below to BPA's application of the substantive requirements of the 1984 ASC methodology. *See* IOUER147, 150. Even now, APAC admits (at 41) that BPA's "proxy is acceptable for purposes of the REP benefit calculation."

### D. BPA Provided Reasonable Access to Its Modeling Software

Finally, APAC complains that it was denied due process because its expert had trouble using BPA's modeling software. BPA thoroughly refuted this objection in the ROD. IOUER693-97. The model was workable in 2000 and remained workable in 2008. BPA was not required to reprogram it anew each time APAC wanted to run alternative scenarios.

## VII. BPA ADOPTED REASONABLE TIMEFRAMES, INTEREST RATES, AND PROCEDURES FOR REFUNDS TO PREFERENCE CUSTOMERS, ASSUMING THAT REFUNDS WERE LEGALLY OWED IN THE FIRST PLACE

APAC and Tillamook attack the mechanics of BPA's plan to refund overpayments by preference customers. As explained in their opening brief, the IOUs vigorously dispute that any repayments were owed, but assuming repayments were owed, BPA has considerable discretion regarding the timing of such repayments and any rates of interest. BPA did not abuse that discretion.

– 52 –

### A.  APAC and Tillamook Do Not Fairly Present What BPA Has Done and Determined to Do

APAC and Tillamook obscure what BPA has determined to do and ignore what it has already done.

In WP-07S, BPA stated its goal to refund all past overcharges, with interest, by FY2015, to match the seven-year period over which overcharges were made. To pay for refunds, BPA committed to withhold REP payments that it would otherwise make for the benefit of the IOUs' residential customers.  For FY2009, BPA limited REP reductions to 50% of amounts otherwise due to alleviate the hardship to IOUs' residential customers.  BPA stated, however, that it might impose greater reductions later to accelerate recovery.  IOUER276-83.  BPA also decided to pay interest and recover those amounts from the IOUs as well.  BPA used the inflation rate to convert nominal Lookback Amounts into FY2009 dollars and determined that it would apply Treasury-bill rates of interest for the future, with the rate for each IOU depending on its forecast repayment period.  IOUER217-26.

BPA's words were not empty.  In WP-07S, BPA calculated Lookback Amounts of slightly over $1 billion.  BPA almost immediately refunded $256 million to preference customers, using sums due under the REP Settlement Agreements but withheld during FY2007 and FY2008.  IOUER755.  Much of this money was paid out while WP-07S was pending, under interim agreements.  In

FY2009, BPA refunded over $154 million more.  *See* IOUER753.  By FY2011, BPA will have paid back over half the original amount.  Although it is impossible to say now how close BPA will come to achieving its seven-year goal, BPA's sincerity and progress cannot be denied.

Nor can APAC and Tillamook dispute that BPA weighed equitable and practical concerns in adopting an approach that ended up displeasing everyone somewhat.  BPA expressly considered, for example, the "matching principle" and "intergenerational equity."  IOUER263-65.  BPA also addressed preference customers' concerns about the certainty of repayment, increasing the pace of repayments with the goal of returning Lookback Amounts within seven years rather than 20.  On the other hand, BPA declined to "effectively eliminate the REP for the next seven years or more," noting that the REP is a "key feature" of the NWPA and "the only means by which residential consumers of the IOUs receive a benefit from the federally owned and operated hydroelectric dams."  IOUER288.  As BPA put it:

> [BPA's] overall approach allows BPA to meet its overarching policy objectives of returning the Lookback Amounts to [preference customers] in a reasonable time, while providing some level of lawfully determined REP benefits to the residential and small farm consumers of the IOUs.

IOUER277.

BPA also considered APAC and Tillamook's request for a binding commitment to return Lookback Amounts in seven years, but rejected that as self-defeating. BPA cannot perfectly predict the levels of REP benefits it will owe in the future, and it did not want to commit to using financial reserves to repay preference customers when the cost would be recovered in preference customers' own rates. BPA further noted that preference customers remain free to challenge any different repayment approach adopted in subsequent RODs. IOUER278-79. BPA also explained why relying on future REP benefits as the source of funds was "more reasonable, practical, and effective" than suing the IOUs in court. IOUER280-82. BPA likewise described why it chose particular interest rates that were higher than the IOUs desired and lower than preference customers sought. IOUER217-26.

### B. BPA Properly Rejected APAC and Tillamook's Demand that BPA Accelerate Refunds by Withholding More REP Benefits

APAC and Tillamook suggest that BPA should accelerate its collection of Lookback Amounts by withholding more or all REP payments. They even imply that BPA should sue the IOUs for immediate recovery.

As a threshold matter, however, neither preference customers nor their customers have standing to complain about BPA's method of reclaiming overpayments from IOUs and their customers. As a BPA customer, Tillamook may complain that BPA is not repaying it fast enough, but it does not have

– 55 –

standing to insist that BPA resort to any particular source of funds, much less to demand that BPA sue third parties. APAC, a group of entities that buy power from preference customers, is even further removed. APAC's members have no contracts with BPA and no right to demand any remedy from BPA, much less the IOUs. At most, APAC members may have contingent claims against their *preference customer suppliers*, if those suppliers receive refunds from BPA.

In any event, even if APAC and Tillamook had standing, they misapprehend the governing law. BPA appropriately considered various interests—including those of IOUs and their customers—when it decided to seek reimbursement over time via reductions in REP payments instead of suing or suspending the REP.

BPA had no legal duty to sue the IOUs or to withhold 100% of REP payments until the Lookback Amounts are recovered. BPA is a self-funded agency whose operations result in no general liability to the Treasury. *See* 16 U.S.C. § 839d(j); *Cal. Energy Res. Conservation & Dev. Comm'n v. BPA*, 831 F.2d 1467, 1475 (9th Cir. 1987). Congress accordingly gave BPA wide latitude to settle or dismiss possible claims. *See* 16 U.S.C. § 839f(a). Tillamook relies on the Federal Claims Collection Act, but even if that statute superseded the NWPA, 31 U.S.C. § 3711(a) authorizes agency heads to compromise or suspend collection of claims consistent with Justice Department regulations. Those regulations allow agencies to compromise or suspend debts for a variety of reasons and to use offsets rather

than suing to collect debts, where appropriate. *See, e.g.,* 31 C.F.R. §§ 900.1(c), 901.3, 902.2, 903.2(b).[7]

Here, BPA properly recognized that the IOUs did not keep the settlement payments: as required, the IOUs passed on all benefits to their residential and small-farm customers. BPA also recognized that the IOUs' current and future residential and small-farm customers (many of whom did not benefit from past overpayments) expect to continue receiving REP benefits. BPA had to balance competing interests and equities. It was not required to ignore one set of interests entirely and withhold all REP benefits going forward. *See* IOUER286-88.

APAC and Tillamook also complain that that BPA's refund system creates a "substantial risk of non-payment," but their concern is unfounded or at least premature. BPA has already repaid a lot and intends to repay the rest with interest. APAC and Tillamook speculate that IOUs may not participate in the REP, leaving BPA with no dedicated pool of money to finance refunds. But with one exception, the IOUs *are* currently participating in the REP. BPA withheld $70 million in FY2009 and will withhold more in future years. If BPA fails to make reasonable

---

[7] Tillamook relies on "4 C.F.R. § 102.1(a)," but no such regulation exists.

progress in refunding Lookback Amounts, preference customers may petition for review then. At this point, there is no basis for this Court to step in.[8]

### C. APAC's Reliance on the "Matching Principle" Is Mistaken

APAC argues that BPA's plan to refund overcharges within seven years violates the so-called "matching principle." But the matching principle is just one of many regulatory goals, not a statutory command, and BPA took it into account. IOUER263-66.

Ironically, BPA implemented the matching principle on the preference customer side: the very preference customers that overpaid are receiving refunds, with interest. APAC's complaint seems to be that the ***customers*** of those preference customers may be different in seven years. But the customers of preference customers had no statutory right to pay any particular retail rate, and they have no legal right to any refund from BPA. Again, APAC's members at most may have state-law claims against their preference customer suppliers once those suppliers obtain refunds from BPA. In any event, if APAC's members were so concerned about prompt relief, they should have sought a stay or injunction or moved for expedited review in *PGE* and *Golden Northwest*.

---

[8] APAC and Tillamook are correct that Idaho Power is not currently participating in the REP. They ignore, however, that Idaho Power's future participation in the REP depends in part on how this Court resolves issues before it. In any event, BPA has not relieved Idaho Power of its Lookback obligation. *See* IOUER283. Any complaint is therefore premature.

In reality, the tension with the matching principle lies in the treatment of the *IOUs'* customers. If APAC and Cowlitz had their way, no current IOU customers would receive REP benefits even though many current IOU customers did not benefit from any past overpayments. The prospects of such matching problems led BPA and the IOUs to include no-refund-on-invalidity clauses in the REP settlement agreements. The IOUs contend those clauses are valid and enforceable, but even if not, BPA properly considered those equities in fashioning its remedy.

### D.     BPA Did Not Abuse Its Discretion in Setting Interest Rates

For FY2002-2008, BPA adjusted Lookback amounts based on the inflation rate (2.1% to 3.2%). Doing so added over $90 million to the Lookback Amounts. IOUER220-21. For the future, BPA is charging interest based on T-bill rates (4.21% to 5.03%). APAC complains that BPA did not impose the higher interest rates its expert suggested. According to APAC, BPA should have used a Treasury bill rate for the Lookback period and equity-based rates of return in the future. APAC's position is both self-serving (T-bill rates were high in the early 2000s, but are lower now) and groundless.

To begin with, APAC again lacks standing. The relevant debt is BPA's debt to *preference customers*. BPA owes nothing to APAC.

On the merits, BPA is a federal agency and was not required to pay preference customers *any* interest. *See Library of Cong. v. Shaw*, 478 U.S. 310,

– 59 –

311 (1986); *Sandstrom v. Principi*, 358 F.3d 1376, 1377 (Fed. Cir. 2004). When BPA elected to pay interest (IOUER217-22), it retained broad discretion to select the appropriate rate. *Farmers Exp. Co. v. United States*, 758 F.2d 733, 738 (D.C. Cir. 1985) ("the rate of interest applied to refunds by the Commission is entirely discretionary"). BPA did not abuse that discretion.

For FY2002-2008, BPA chose to adjust Lookback amounts by historical inflation rates. That was generous, as the amount owed was not a liquidated sum until BPA issued the WP-07S ROD and both BPA and the IOUs reasonably believed until 2007 that the REP settlements were valid. Going forward, BPA chose to use T-bill rates as APAC sought for the past. APAC demands an "equity-based rate of return" on the theory that preference customers are more like equity holders than debt holders. But preference customers are not stockholders in BPA. BPA is a government agency, and preference customers are not last in line for payment as equity shareholders are. *See* IOUER224-25. To the extent APAC suggests that preference customers are like *IOU* stockholders, that is equally farfetched and ignores that the relevant "debt" here is between BPA and preference customers, not between IOUs and preference customers.

### Conclusion and Relief Requested

The preference petitioners' petitions should be denied.

– 60 –

Respectfully submitted,

/s/ Michael G. Andrea

Michael G. Andrea
AVISTA CORPORATION
1411 East Mission Avenue – MSC-23
Spokane, Washington  99202

Counsel for Avista Corporation

/s/ R. Blair Strong

R. Blair Strong
PAINE HAMBLEN LLP
717 West Sprague Avenue, Suite 1200
Spokane, Washington  99201

Counsel for Idaho Power Company

/s/ Scott G. Seidman

Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, Oregon  97204

Counsel for Portland General
Electric Company

– 61 –

## Statement of Related Cases

The following cases pending in this Court are related to the consolidated cases at issue here because they involve BPA's efforts to enforce determinations that BPA made in the Record of Decision at issue here through provisions in Residential Purchase and Sale Agreements:

> *Idaho Pub. Utils. Comm'n* et al. *v. BPA*, Nos. 08-74927, 08-74928, 08-74929, 08-74932, 08-74933, 08-74942 & 0847957

The following cases pending in this Court are also related because they involve challenges to FY2009 rates established by BPA during the WP-07S proceeding at issue here:

> *Avista Corp.* et al. *v. BPA*, Nos. 09-73160, 09-73201, 09-73225, 09-73228, 09-73230, 09-73247, 09-73249, 09-73251, 09-73252, 09-73254, 09-73264, 09-73269, 09-73271, 09-73274, & 09-73281

On December 14, 2009, this Court ordered that all three sets of cases be calendared before the same merits panel.


      /s/ Scott G. Seidman
        Scott G. Seidman

## Certificate of Compliance

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit

Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of

14 points or more, and contains 13,979 words.


　　　　　　　　　　　　　　／s/ Scott G. Seidman

　　　　　　　　　　　　　　　Scott G. Seidman

**Addendum:  Excerpt from BPA's 1984 ASC Methodology ROD**

AVERAGE SYSTEM COST
METHODOLOGY

# ADMINISTRATOR'S RECORD
OF
# DECISION



BONNEVILLE POWER ADMINISTRATION
U.S. DEPARTMENT OF ENERGY

June 1984

– A1 –

energy is short-sighted since resources are not built exclusively for the production of nonfirm energy (R. 514, 516).

B.    Discussion Of Positions And Decision

BPA's proposal to exclude the costs of generating resources used for off-system sales was a necessary corollary to the uniform costing (FERC Form 1) approach to calculating ASC.  Now that BPA has decided to retain the jurisdictional costing approach instead, this issue becomes moot.  Virtually all parties submitting comments for the record believed that state regulatory commissions can be relied upon to determine what constitutes proper generating resources includable in ASC.  Therefore, special criteria for identifying how generating resource costs should be treated in the ASC calculation are no longer required.

Retail rate orders will continue to be the primary source of data on generating resources.  However, where necessary, BPA will independently determine costs (including costs of generating resources) for inclusion in ASC under the jurisdictional costing approach.  The costs of any generating resource improperly included in a utility's ASC filing will be excluded from the ASC calculation.

PAGE 66 - AVERAGE SYSTEM COST METHODOLOGY RECORD OF DECISION

**Certificate of Service**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 25, 2010.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participant:

David Hill
Department of Energy
1000 Independence Avenue, SW
Washington, D.C. 20585


/s/ Scott G. Seidman
Scott G. Seidman