Nos. 08–74725, 08–74811, 08–74900, 08–75008, 08–75091, 08–75098, 08–75099, 08–75112, 08–75113, 08–75130, 08–75132, 08–75133, 08–75161 & 08–75165

—————————————————

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

—————————————————

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, et al.,

*Petitioners,*

v.

BONNEVILLE POWER ADMINISTRATION,

*Respondent.*

—————————————————

*On Petition for Review of the Administrator's Final Record of Decision in the Bonneville Power Administration's 2007 Supplemental Wholesale Power Rate Case, WP–07–A–05 (Sept. 22, 2008)*

—————————————————

**JOINT REPLY OF THE PACIFIC NORTHWEST INVESTOR-OWNED UTILITIES (AVISTA CORPORATION, IDAHO POWER COMPANY, PACIFICORP, PORTLAND GENERAL ELECTRIC COMPANY, AND PUGET SOUND ENERGY, INC.) IN SUPPORT OF THEIR PETITIONS IN NOS. 08-75098, 08-75099, 08-75112, 08-75130, AND 08-75161**

—————————————————

Dan L. Bagatell
PERKINS COIE BROWN & BAIN P.A.
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012

DBagatell@perkinscoie.com
(602) 351–8000

Donald G. Kari
Jason T. Kuzma
PERKINS COIE LLP
10885 N.E. Fourth Street, Suite 700
Bellevue, Washington 98004
DKari@perkinscoie.com
JKuzma@perkinscoie.com
(425) 635–1400

Counsel for Puget Sound Energy, Inc.

*[counsel listing continued on inside cover]*

Michael G. Andrea
AVISTA CORPORATION
1411 East Mission Avenue – MSC–23
Spokane, Washington  99202
Michael.Andrea@avistacorp.com
(509) 495–2564

Counsel for Avista Corporation

R. Blair Strong
PAINE HAMBLEN LLP
717 West Sprague Avenue, Suite 1200
Spokane, Washington  99201
r.blair.strong@painehamblen.com
(509) 455–6000

Counsel for Idaho Power Company

Jay T. Waldron
Sara Kobak
SCHWABE, WILLIAMSON & WYATT PC
1211 SW 5th Avenue, Suites 1500-2000
Portland, Oregon  97204
JWaldron@schwabe.com
SKobak@schwabe.com
(503) 222–9981

Lara L. Skidmore
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C.  20004
Lara.Skidmore@troutmansanders.com
(503) 590–2979

Ryan L. Flynn
PACIFICORP
825 NE Multnomah Street, Suite 1800
Portland, Oregon  97232
Ryan.Flynn@PacifiCorp.com
(503) 813–5854

Counsel for PacifiCorp

Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, Oregon  97204
scott.seidman@tonkontorp.com
(503) 802–2021

Counsel for Portland General Electric Company

March 25, 2010

**Table of Contents**

Table of Authorities ................................................................................. iii

Table of Abbreviations ...............................................................................v

Overview.......................................................................................................1

Argument .....................................................................................................2

I.      The Remedy Limitations in the 2000 and 2001 Agreements
        Were Valid and Barred BPA's Demand for Refunds Through a
        Lookback ..........................................................................................2

II.     BPA's Section 5(b) Power Sales at the RL Rate and Payments
        in Lieu of Those Sales Should Have Been Excluded from the
        Lookback in Their Entirety ..............................................................6

        A.      The Power Sales Were Legitimate Section 5(b) Power
                Sales at a Proper Cost-Based Rate Under Section 7(f),
                and the Costs Were Not Allocated to Preference
                Customers Under Section 7(g)....................................................7

        B.      *PGE* and *Golden Northwest* Neither Declared the Power
                Sales Illegal Nor Undermined Their Legitimacy ....................13

        C.      Preference Customers Were Not Injured Because BPA
                Would Have Sold the Same Amount of Power at the
                Same Rate Anyway...................................................................17

        D.      The Power Sales Were Severable from the Monetary
                Aspects of the 2000 REP Settlements ......................................18

        E.      All the Power Sales and All the Load Reduction
                Payments Should Have Been Excluded from the
                Lookback..................................................................................20

        F.      BPA's Waiver Argument Ignores the Record .........................23

**Table of Contents (continued)**

III. All Payments Under the Unchallenged 2001 LRAs Should Have Been Excluded from the Lookback in Their Entirety ...............24

    A. *Snohomish* Did Not Authorize BPA to Declare the 2001 Agreements Invalid Even Though No One Challenged Them ...................................................................................25

    B. The Preference Customers' Theory that the 2001 Load Reduction Payments Measure the Benefits Conveyed in 2000 Is Both Legally and Factually Flawed.............................28

Conclusion ..................................................................................................30

Updated Statement of Related Cases........................................................32

Statutory Addendum ..................................................................................33

Certificate of Compliance..........................................................................34

Certificate of Service .................................................................................35

## Table of Authorities

**Cases**                                                                   **Pages**

*Golden Nw. Aluminum, Inc. v. BPA,*
  501 F.3d 1037 (9th Cir. 2007) ...............................................................7, *passim*

*Nw. Envtl. Defense Ctr. v. BPA,*
  117 F.3d 1520 (9th Cir. 1997) ...............................................................24

*Pac. Nw. Generating Coop. v. BPA,*
  550 F.3d 846 (9th Cir. 2008),
  *amended,* 580 F.3d 792 (2009) ..............................................................4

*Pac. Nw. Generating Coop. v. BPA,*
  580 F.3d 828 (9th Cir. 2009),
  *amended*, 2010 WL 700477 (9th Cir. Mar. 2, 2010) ............................4

*Portland Gen. Elec. Co. v. BPA,*
  501 F.3d 1009 (9th Cir. 2007) .............................................................3, *passim*

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. BPA,*
  506 F.3d 1145 (9th Cir. 2007) .............................................................1, *passim*

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. BPA,*
  250 Fed. Appx. 821 (9th Cir. 2007) ....................................................27

*Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. United States*,
  250 Fed. Appx. 817 (9th Cir. 2007) ....................................................27

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ..............................................................................28

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Defense Council,*
  435 U.S. 519 (1978) ..............................................................................24

## Table of Authorities (continued)

**Statutes**                                                                      **Pages**

Energy and Water Appropriations Act of 1996, 16 U.S.C. § 832m ........................ 8

Northwest Power Act § 5(b), 16 U.S.C. § 839c(b) .................................... 7, *passim*

Northwest Power Act § 5(c), 16 U.S.C. § 839c(c) .................................... 4, *passim*

Northwest Power Act § 5(f), 16 U.S.C. § 839c(f) ................................................... 11

Northwest Power Act § 7(b), 16 U.S.C. § 839e(b) .................................... 4, *passim*

Northwest Power Act § 7(c), 16 U.S.C. § 839e(c) ................................................. 11

Northwest Power Act § 7(f), 16 U.S.C. § 839e(f) ..................................... 7, *passim*

Northwest Power Act § 7(g), 16 U.S.C. § 839e(g) .................................... 7, *passim*

Northwest Power Act § 9(e), 16 U.S.C. § 839f(e) .................................................. 24

**Other Authorities**

H.R. Rep. No. 96-976, pt. 1 (1980) ......................................................................... 11

*Restatement (Second) of Contracts* § 183 (1981) ................................................. 20

**Table of Abbreviations**

| | |
|---|---|
| aMW | average megawatt |
| ASC | average system cost |
| BPA | Bonneville Power Administration |
| BPASER | BPA's Supplemental Excerpts of Record (filed with its response brief) |
| DSIs | direct-service industrial customers of BPA |
| FBS | Federal Base System, defined in 16 U.S.C. § 839(a)(10) to include federal Columbia River power system hydroelectric resources, resources BPA acquired under long-term contracts in force on December 5, 1980, and resources required by BPA in an amount necessary to replace reductions in capability of resources in those two categories |
| FY | fiscal year or years |
| *Golden Northwest* | *Golden Nw. Aluminum, Inc. v. BPA*, 501 F.3d 1037 (9th Cir. 2007) |
| IOU | investor-owned utility |
| IOUER | investor-owned utilities' excerpts of record (filed with opening brief) |
| IOUSSER | investor-owned utilities' second supplemental excerpts of record (filed with this brief) |
| *IPUC* | the companion cases involving BPA's RPSAs with the IOUs for FY2009-2011and FY2012-2028, Nos. 08–74927 et al. |

**Table of Abbreviations (continued)**

Lookback

BPA's determinations of the amounts by which preference customers were overcharged for REP costs, including an assessment of "excess" REP payments that BPA had made to various IOUs pursuant to settlement agreements

LRA

load reduction agreement

NR rate

"new resources" rate, one of the rates developed under section 7(f) of the NWPA for some categories of sales to preference customers and IOU customers

NWPA

the Northwest Power Act, a shorthand name for the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839 *et seq.*

PF Exchange rate

priority firm power rate charged by BPA for REP exchanges under section 5(c) of the NWPA

PF Preference rate

priority firm power rate charged by BPA for some categories of sales to preference customers under section 5(b) of the NWPA

*PGE*

*Portland Gen. Elec. Co. v. BPA*, 501 F.3d 1009 (9th Cir. 2007)

preference customers

BPA power customers that are publicly owned utilities or cooperatives (sometimes called "publics," consumer-owned utilities, or COUs)

Portland General

Portland General Electric Company

PSE

Puget Sound Energy, Inc.

R.A.R.

revised administrative record prepared by BPA

REP

Residential Exchange Program

**Table of Abbreviations (continued)**

| | |
|---|---|
| RL rate | residential load rate (RL-02) developed under section 7(f) of the NWPA and charged by BPA for certain power sales under section 5(b) of the NWPA |
| ROD | Record of Decision |
| RPSA | residential purchase and sale agreement |
| *Snohomish* | *Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. BPA*, 506 F.3d 1145 (9th Cir. 2007) |
| 2000 REP Settlement Agreements | agreements in 2000 between BPA and IOUs settling BPA's obligations under the REP for periods beginning FY2002 |
| 2001 agreements | agreements in 2001 between BPA and PacifiCorp and PSE altering (and in PSE's case replacing) their 2000 Settlement Agreements in light of BPA's requests for load reductions (also called "LRAs") |

**Overview**

The IOUs' opening brief showed that BPA's Lookback violated the limitation on remedies in BPA's contracts with the IOUs.  Moreover, even ignoring that problem, any Lookback should have excluded BPA's power deliveries and payments to avoid delivering power and BPA's payments under its 2001 LRAs with PacifiCorp and PSE.  BPA and others respond at length, but without merit.  As shown below:

1.      The limitation on remedies was valid and enforceable even if other aspects of the settlements were contrary to law, and the Court should reject BPA's attempt to use an improper, narrow construction to nullify that limitation.

2.      Even if a Lookback were permissible, BPA should have excluded the power sales to the IOUs because they were legal, severable from the monetary settlements, and did not cause any overcharges to preference customers.  The same analysis applies to BPA's payments to buy out its delivery obligations.

3.      Even if a Lookback were permissible, BPA should have excluded all payments under the 2001 LRAs because those agreements were unchallenged. *Snohomish* did not justify reconsidering those agreements, and BPA could not and did not use the 2001 LRAs to measure the value of benefits conveyed in 2000.

**Argument**

**I. THE REMEDY LIMITATIONS IN THE 2000 AND 2001 AGREEMENTS WERE VALID AND BARRED BPA'S DEMAND FOR REFUNDS THROUGH A LOOKBACK**

The IOUs' opening briefs here and in *IPUC* demonstrated that BPA's Lookback remedy violated the provisions of the 2000 REP Settlement Agreements and 2001 LRAs that limited BPA's remedies if this Court invalidated those agreements. BPA argues that this Court's 2007 decisions voided the entire agreements, including the remedy limitation. BPA also suggests that even if the limitation was not void, it was meaningless because it merely barred BPA from demanding refunds of payments that were legal to begin with. The IOUs' reply in *IPUC* refutes those arguments at length. The IOUs adopt that reply here and will only summarize their position here.

The remedy limitation was mutual and an eminently reasonable business decision for BPA given the nature of the settlements, the risk of additional claims for REP benefits absent such a limitation, and BPA's interest in halting chronic litigation over the REP. The parties agreed that even if the settlements were invalidated, they would live with their deal through the date of the Court's decision and would not look back and try to unwind the past: BPA would not seek refunds of past payments, and the IOUs would forgo claims for additional benefits for past periods. Such risk allocation provisions are routine in complex agreements, and

they made particular sense here, as the IOUs had to pass all benefits directly through to residential and small-farm customers, and implementing retroactive changes presented tremendous difficulties for both BPA and the settling IOUs. The rancor, complexity, and inequity of the Lookback later adopted confirm the prescience of that recognition. BPA plainly acted consistent with sound business principles in limiting both its and IOUs' remedies to prospective relief. In contrast, BPA acted **un**reasonably and **il**legally in unilaterally repudiating the remedy limitation in the precise circumstance where it was intended to apply.

BPA claims that this Court voided the REP Settlement Agreements in their entirety, but BPA misreads *PGE*. *PGE* held that BPA had to follow governing statutes and regulations when settling REP obligations, and that BPA failed to do so because it (a) determined settlement amounts as though it had changed its regulations when it had not and (b) treated its settlement payments as ordinary expenses chargeable to all customers. 501 F.3d 1009, 1036 (9th Cir. 2007). The Court did not hold that BPA acted entirely outside the scope of its statutory authority. To the contrary, the Court recognized BPA's authority to settle its REP obligations and to change its regulations for calculating REP benefits. Nobody challenged, and the Court did not analyze, the legality of the remedy limitation.

Indeed, the Court later made clear in *Snohomish* that some provisions of the settlement agreements could survive. 506 F.3d 1145, 1154 (9th Cir. 2007). BPA's

– 3 –

decision to abandon the settlements rather than reforming them prospectively does not excuse its disavowal of the remedy limitation. Nothing in the 2007 decisions cast doubt on the parties' agreement to allocate litigation risk.

Nor did anything in BPA's governing statutes or regulations or general legal principles preclude BPA from agreeing to forgo retrospective remedies. BPA's argument that enforcement of the no-refunds provision would violate sections 5(c) and 7(b) of the NWPA by allowing retention of more benefits than the statute allowed ignores the fundamental distinction between statutory requirements and remedies for violating them. The remedy limitations did not negate the law, nor were they an agreement to carry out an illegal bargain. They simply limited BPA and the IOUs to prospective remedies in circumstances where retrospective remedies would be inordinately complex and inevitably inequitable. Notably, in *Pacific Northwest Generating Cooperative v. BPA*, 550 F.3d 846, 881-82 (9th Cir. 2008), *amended,* 580 F.3d 792 (2009), and *Pacific Northwest Generating Cooperative v. BPA*, 580 F.3d 828, 846-47 (9th Cir. 2009), *amended*, 2010 WL 700477 (9th Cir. Mar. 2, 2010), this Court recognized that a similar waiver of remedies could be valid even though BPA's underlying contract was illegal. Indeed, BPA adopted a nearly identical limitation in a follow-on contract. BPA cannot defend the disparity.

– 4 –

No one is suggesting that BPA may evade statutory restrictions by contractually barring any remedy. Limitations on remedies must be consistent with governing statutes and regulations and must have a legitimate business purpose. But the provisions here readily satisfied that standard. Nothing in the Constitution or case-law forbade BPA from waiving its right to refunds or justified its refusal to honor its agreement.

Trying to salvage the Lookback, BPA notes that the limitation applied only "to the maximum extent permitted by law" and contends that BPA was merely precluded from seeking recovery of legal payments. But that reinterpretation would render the provision meaningless, and it conflicts with the contemporaneous record, where BPA repeatedly stated that the limitation was designed to avoid the difficulties inherent in recovering payments already passed through. BPA argues that it must demand refunds from the IOUs because it must make refunds to preference customers, but BPA presumably contemplated using another source of funds when it adopted the limitation. BPA suggests that using reserves and surplus sale revenues might indirectly raise preference customers' rates, but preference customers are not shielded from all costs remotely linked to the REP. They are shielded only to the extent section 7(b)(2) applies, and section 7(b)(2) does not apply to use of reserves or surplus sale revenues. BPA cannot disavow a bargain simply because it seems unpalatable in retrospect.

Finally, BPA's resort to equitable setoff was improper. That remedy was barred by the no-refunds clause, and it would be inequitable here, where the IOUs were merely a conduit for benefits to customers.

## II. BPA'S SECTION 5(b) POWER SALES AT THE RL RATE AND PAYMENTS IN LIEU OF THOSE SALES SHOULD HAVE BEEN EXCLUDED FROM THE LOOKBACK IN THEIR ENTIRETY

The IOUs' opening brief demonstrated that BPA erred by including its power sales to the IOUs in the Lookback because those sales were legal and did not cause any overcharges to preference customers. BPA trivializes this argument by deeming it (at 66) a mere "technical issue." But in fact the dispute is both fundamental (it addresses the essential nature of the Lookback remedy) and immensely important (IOUs' residential and small farm customers are paying hundreds of millions of dollars extra as a result).

On the merits, BPA and the preference customers spend much of their time focusing on the historical link between the power sales and the REP settlements. But that is beside the point. The Lookback was not designed to allow BPA to undo every contract somehow connected to the REP settlements. The power sales belonged in the Lookback only if they (a) were illegal *and* (b) injured preference customers. If the power sales were legal, there was nothing to remedy; and if preference customers were not injured, any remedy would provide an unwarranted windfall. As shown below, the power sales stood on proper legal footing

independent of the 2000 REP Settlement Agreements, and they did not unlawfully increase the PF Preference rate.  Moreover, they did not injure preference customers because they were at a cost-based rate and because BPA would have sold others the same amount of power at the same price even if the REP settlements had broken down.  In arguing otherwise, BPA and the preference customers distort the NWPA, misread this Court's holdings in *PGE* and *Golden Northwest*, and engage in revisionist history.

> ### A. The Power Sales Were Legitimate Section 5(b) Power Sales at a Proper Cost-Based Rate Under Section 7(f), and the Costs Were Not Allocated to Preference Customers Under Section 7(g)

Although BPA and the preference customers suggest there was something shady about the power sales, those sales were above-board, long-planned sales that BPA would have made to other customers on the same terms if the REP settlements had been withdrawn.  They complied with section 5(b) of the NWPA, their RL rate was projected to cover BPA's costs consistent with section 7(f), and none of the associated costs sales were allocated to the PF Preference rate under section 7(g).

The idea for the power sales originated in the mid-1990s, when BPA was awash in surplus power.  In its WP-96 ROD, BPA recognized that "[t]he era of BPA's dominance as the unchallenged low-cost wholesale power supplier in the Pacific Northwest [wa]s over" because "[n]ew market entrants, low gas prices, and surplus supplies of short-term capacity and energy in California and the Inland

Southwest ha[d] led to steadily falling electricity prices." IOUSSER045-46
(R.A.R.001711-12). Because BPA's rates were above wholesale market prices,
BPA was rapidly losing DSI and preference customer loads to alternative suppliers.
IOUSSER047 (R.A.R.001713). Congress even passed new legislation to make it
easier for BPA to sell surplus power. *See* 16 U.S.C. § 832m.

As recommended in a 1996 Comprehensive Review by the region's state
governors (IOUSSER136-77 (R.A.R.101431-72)), BPA decided not to compete for
short-term sales with aggressive power marketers, but instead adopted a "Power
Subscription" strategy designed to sell most of its power on long- or intermediate-
term bases (IOUER778-803 (R.A.R.097026-51). Part of BPA's 1998 Subscription
Strategy was to increase power sales to IOUs. Thus, in conjunction with its
proposal to settle long-running REP disputes, BPA sought to sell the IOUs at least
1,000 aMW of power. IOUER786-88 (R.A.R.097034-36).

By the time BPA began its WP-02 rate case in August 1999, BPA had
decided to sell that 1,000 aMW of power at a rate equivalent to the PF Preference
Rate ***regardless*** of whether it succeeded in settling its REP disputes with the IOUs.
Under one scenario, BPA assumed that the IOUs would ***not*** settle and modeled a
sale of 1,000 aMW at a Firm Power and Services (FPS) rate equal to the then-
current PF Preference rate. IOUSSER070 (R.A.R.007422). Under an alternative

scenario, BPA assumed that IOUs *would* settle and buy 1,000 aMW at an RL rate also equal to the then-current PF Preference rate. *Id.*

In the WP-02 rate case, DSIs challenged BPA's proposal to sell 1,000 aMW to the IOUs at the RL rate, but BPA reiterated that it planned to sell that power to others at an equivalent, FPS rate even if the sales to the IOUs were not completed. *See* IOUSSER078 (R.A.R.009138) (December 1999 staff testimony noting that "[t]hese [FPS sales] are not sales to IOUs at the RL rate"). BPA also concluded that such sales would not affect the PF Preference rate:

> BPA has determined that it can provide 1,000 aMW of additional power to its customers and not increase the PF Preference rate. … Because BPA has not determined the precise manner in which it would provide this additional Federal power to its regional customers, BPA has assumed that it would make sales of power under the FPS rate schedule to meet regional loads. BPA has assumed an FPS rate equal to the 1996 PF Preference rate as a reasonable price for such sales.

IOUSSER079 (R.A.R.009139).

In its WP-02 ROD, BPA confirmed it would sell the 1,000 aMW of power either to the IOUs at the RL rate or to regional customers at the equivalent FPS rate, and that that rate would cover BPA's costs consistent with section 7(f) of the NWPA. IOUER905 (R.A.R.001146), IOUER916 (R.A.R.001157). BPA again "determined that [it could] provide 1,000 aMW of additional power to its customers and not increase the PF Preference rate." IOUER919 (R.A.R.001160).

Ultimately, the IOUs agreed to purchase the 1,000 aMW power from BPA under sales agreements that were entered into in conjunction with the 2000 REP Settlement Agreements but were nevertheless independent and severable. The contracts for the five petitioners here were expressly pursuant to section 5(b) of the NWPA, not exchanges pursuant to section 5(c). *See, e.g.*, IOUER1444-511 (R.A.R.114196-263) (PSE agreement).[1]

The preference customers contend (at 10) that the power sales agreements were not legitimate section 5(b) contracts because the RL rate was lower than BPA's "new resources" (NR) rate, but that argument is unfounded. Section 5(b) authorizes BPA to sell power to IOUs, but it does not specify any rate. 16 U.S.C. § 839c(b)(1). Rates for such sales are instead governed by section 7(f), which directs BPA to determine an appropriate cost-based rate:

> Rates for all other firm power sold by the Administrator for use in the Pacific Northwest shall be based upon the cost of the portions of Federal base system resources, purchases of power under [section 5(c)] and additional resources which, in the determination of the Administrator, are applicable to such sales.

---

[1] The 2000 REP Settlement Agreements did require that "Firm Power and Monetary Benefit amounts … be passed through, in full, to each residential and small farm consumer …." *See, e.g.*, IOUER1438 (R.A.R.114190). That provision, however, did not convert the power sales into section 5(c) exchanges. Unlike section 5(b), section 5(c) requires IOUs to sell power back to BPA at their average system costs, 16 U.S.C. § 839c(c)(1), and the contracts here called for one-way sales from BPA to the IOUs.

16 U.S.C. § 839e(f).[2] Although BPA sometimes determines under section 7(f) that the costs applicable to particular sales are the costs of particular new resources, BPA explained at length in its WP-02 ROD why the costs applicable to these sales were costs of Federal Base System (FBS) resources rather than costs of acquiring new, non-FBS resources. IOUER908-27 (R.A.R.001149-68). Establishing both an RL rate and an NR rate was entirely consistent with section 7(f). *See* H.R. Rep. No. 96-976, pt. 1 at 69 (1980) (BPA may adopt "more than one rate" under section 7(f) "if circumstances make a separate rate for a separate load or demand necessary or appropriate").

Indeed, many preference customers benefited at the same time from their own equally favorable, cost-based section 7(f) rates for "pre-subscription" power sales contracts adopted in 1998. As just discussed, BPA was struggling to retain business, and it wanted to enter into long-term contracts. Various preference customers were willing to make long-term commitments, but only if they could lock in a favorable price rather than risking future PF Preference rate increases. BPA and those customers thus agreed to structure the sales as surplus sales under section 5(f). As with the sales to the IOUs, BPA had discretion to set a cost-based

---

[2] Section 7(f) governs all rates other than the PF Preference and PF Exchange rates governed by section 7(b) and rates for DSI sales governed by section 7(c).

– 11 –

rate under section 7(f), and it established that rate not at the NR rate, but at a level equivalent to the PF Preference rate. IOUER620 (R.A.R.062940).

Although the preference customers accuse BPA and the IOUs (at 13) of "creative nomenclature," the pre-subscription contracts and the power sales to the IOUs were legitimate exercises of BPA's authority under section 5. Moreover, BPA did not set an illegally low rate. Section 7(f) required BPA to set the rate to cover projected costs, and in both cases BPA reasonably concluded that the relevant costs were FBS costs, not costs of acquiring new, non-FBS resources.

Finally, because the RL rate recovered BPA's costs under section 7(f), the preference customers err in contending that they were illegally forced to subsidize the costs of BPA's power sales to the IOUs. Relying on section 7(g), 16 U.S.C. § 839e(g), BPA did allocate costs of its ***monetary*** settlements with the IOUs to the PF Preference and other rates because it viewed those costs as general expenses "not otherwise allocated" under section 7. But BPA did ***not*** do the same for the costs of the power sales. BPA fully allocated the costs of those sales to the RL rate under section 7(f). Because those costs were "otherwise allocated," BPA could not and did not charge them to other rates under section 7(g). *See* IOUSSER109 (R.A.R.016997) (7(b)(2) Rate Test Study).

**B.** ***PGE*** **and** ***Golden Northwest*** **Neither Declared the Power Sales Illegal Nor Undermined Their Legitimacy**

Although BPA and the preference customers contend that this Court declared the power sales illegal in *PGE* and *Golden Northwest*, the Court did no such thing.

*PGE* held that the 2000 REP Settlement Agreements conflicted with BPA's governing statutes and regulations, 501 F.3d at 1032-37, but the Court neither expressly nor implicitly declared the power sales invalid. The Court's holding turned on several factors, all applicable to the monetary payments and not the power sales.

The Court primarily held that BPA improperly disregarded existing regulations and did not rely on forecast average system costs (ASCs) when it determined which utilities were eligible for REP settlement benefits and what level of benefits they were eligible for. *Id.* at 1033-36. Instead of determining settlement benefits based on ASCs calculated under BPA's existing regulations, BPA factored in (1) possible challenges to the 1984 ASC Methodology, (2) potential disputes regarding calculation of the PF Exchange Rate, and (3) effects of possible fluctuations in the energy market on power acquisitions from third parties that BPA may make under section 5(c)(5) "in lieu" of purchasing power at a utility's ASC. *Id.*

But BPA's errors in disregarding its regulations did not affect the power sales. The IOUs' ASCs did not matter to the power sales, which were priced at RL

– 13 –

rates that were based on *BPA's* costs. The PF Exchange Rate was likewise immaterial because the power sales were not priced at that rate. And the effects of market volatility on section 5(c)(5) transactions were irrelevant because the power sales were at the RL rate under section 5(b) and BPA would not have engaged in section 5(c)(5) acquisitions in connection with outright sales.

The Court's other holding was that "BPA classified the costs of the REP as a 'settlement cost'" under section 7(g), which "permitted BPA to assess the cost of the REP settlement as ordinary expenses to be incorporated into BPA's general power rates." *Id.* at 1036; *see also id.* at 1028 ("BPA allocated the costs of the REP Settlement to both non-preference and preference rates pursuant to section 7(g)."). The Court held that this approach conflicted with sections 7(b)(2) and 7(b)(3). *Id.* at 1037. But BPA's treatment of REP settlement costs as ordinary expenses allocable under section 7(g) again had nothing to do with the power sales. As discussed above, the power sales were projected to cover their own costs. Power sale costs were not allocated to the PF Preference rate because section 7(g) by its terms applies only to costs "not otherwise allocated" under section 7, 16 U.S.C. § 839e(g), and the costs of the power sales were allocated to the sales themselves under section 7(f).

Tacitly recognizing that the *holdings* in *PGE* did not invalidate the power sales, BPA and the preference customers resort to the Court's description of those

– 14 –

sales in the "STATUTORY AND REGULATORY BACKGROUND" section of *PGE*. *See* 501 F.3d at 1022. BPA reads *PGE* to include a "finding" that "'the combined value of the cash and sales under the REP Settlement Agreements exceeded by nearly three times [BPA's] own estimate (in the WP-02 Rate Case) of the total expected REP obligation for the settlement period.'" BPA Br. 71 (emphasis omitted, misquotation maintained). In fact, although the Court apparently believed that BPA made such a comparison, the Court's record citation shows that BPA was acknowledging and refuting an assertion by a DSI customer, Vanalco. IOUER1256-62 (R.A.R.107308-14). In any event, whatever the panel assumed, its background discussion of the power sales was dictum. The Court's ultimate holding did not condemn BPA for paying excessive consideration, but instead for settling REP obligations "as if it had changed its regulations, which it had not" and treating the settlement costs as ordinary expenses that could be allocated to preference customers. 501 F.3d at 1036. As shown above, those holdings concerned only the monetary payments, not the power sales.

*Golden Northwest*, 501 F.3d 1037 (9th Cir. 2007), likewise did not undermine the power sales. Indeed, that decision validated BPA's logic in adopting the RL rate.

*Golden Northwest* first addressed the rate consequences of BPA's decision to sell 990 aMW to DSIs at a cost-based but below-market rate. 501 F.3d at 1043-47.

Preference customers complained that BPA had treated the costs of those sales as FBS costs, to which preference customers contribute, even though BPA acquired more power to serve the DSIs. The Court found no error, however, holding that BPA properly treated the additional power as an FBS resource because the NWPA defines FBS resources to include resources acquired to replace retired FBS resources. *Id.* at 1045-46 (further holding, at 1047, that BPA may "set a preference rate that reflects the cost of FBS replacement resources"). That holding applies equally to the IOU sales. BPA properly determined that it was serving the IOUs with FBS resources and that the appropriate costs were thus overall FBS costs rather than new resource costs. Any indirect effect on the PF Preference rate was perfectly legal. *Id.*

*Golden Northwest* next addressed the costs of the 2000 REP Settlement Agreements. Following *PGE,* the Court held that BPA could not allocate costs of the REP settlements to the PF Preference rate under section 7(g). *Id.* at 1047-48. As discussed above, however, the costs BPA allocated under section 7(g) to the PF Preference rate were the costs of its monetary payments. Costs of the power sales were not allocated to the PF Preference rate because the IOUs paid an appropriate cost-based rate calculated under section 7(f).[3]

---

[3] The third holding in *Golden Northwest* dealt with fish and wildlife costs and is immaterial here.

**C.  Preference Customers Were Not Injured Because BPA Would Have Sold the Same Amount of Power at the Same Rate Anyway**

Even if the power sales were somehow unlawful, those sales (and BPA's later payments instead of delivery) belonged in the Lookback only if they injured preference customers.  The Lookback was designed to make preference customers whole, not give them a windfall.  IOUER43 (R.A.R.062356).  The IOUs' opening brief demonstrated that preference customers could not have been injured because BPA would have sold the same 1,000 aMW of power to others at the same rate even if BPA had aborted the REP settlement process.  BPA argues that it would not have sold power to others once the energy crisis erupted, but BPA ignores that it would already have committed to sell the power by then.

As discussed above, BPA had concluded by 1999 and reconfirmed in early 2000 that it was going to sell 1,000 aMW of power even if it did not settle.  BPA had excess capacity and wanted to secure long-term commitments.  BPA now backpedals and suggests (at 73) that the 1,000 aMW sale was merely "possible," a "placeholder" because it had not lined up alternative buyers.  But BPA had firmly declared its intention and commitment to sell 1,000 aMW of power at a rate close to the PF Preference rate.  BPA's suggestion that it may not have found buyers ignores that the rate BPA had determined was below the market rate in 1999 and 2000, when BPA committed to sell the power.  If BPA or the IOUs had decided not to pursue the REP settlements in 1999 or early 2000, BPA could readily have sold

the 1,000 aMW of power through surplus sales—if not to IOUs, then to DSIs or power resellers.

Thus, by the time the energy crisis flared up in late 2000, BPA would already have committed to sell the 1,000 aMW of power.  BPA would have faced the same system augmentation costs when preference customers rushed back to BPA and demanded more power.  In fact, BPA likely would have been *worse* off because alternative customers would likely have been less solicitous than the IOUs in agreeing to forgo firm power deliveries at favorable prices.

> **D.     The Power Sales Were Severable from the Monetary Aspects of the 2000 REP Settlements**

Even if the monetary settlements were void, it does not follow that the power sales agreements were void and belonged in the Lookback.  The power sales agreements were expressly separate, independent, and severable from the settlement agreements.  *See, e.g.,* IOUER982 § 13(g) (R.A.R.113971) ("Severability" clause).  BPA tacitly acknowledges the severability clauses, but claims that "this Court found that the Firm Power Sale was a component of the REP Settlement Agreements that unlawfully 'increased the impact of the settlement agreements on preference customers' power rates.'"  BPA Br. 75 (quoting *PGE,* 501 F.3d at 1022).  But at the page cited by BPA the Court was describing the factual background, not analyzing the power sales' legality.  As discussed above, the Court's ultimate *holdings* regarding illegality appeared many pages later and

turned on ASCs and other factors that did not implicate the power sales. In reality, the power sales did ***not*** result in overcharges to preference customers: they covered their costs and, furthermore, BPA would have sold the same amount of power at the same price even if there were no REP settlements. The Court did not consider, much less reject, these points in *PGE*.

BPA further argues that severance would be improper because "[t]he Firm Power Sales were offered for the sole purpose of 'support[ing] the proposed value of the settlement of the REP with regional IOUs." BPA Br. 76 (citing BPASER1719). BPA's evidence, however, does not support its claim that the power sales' "sole purpose" was to justify the REP settlements. The cited page was the conclusion of a discussion of whether the RL rate should be capped at the lowest rate charged to preference customers. *See* IOUER1382-84 (R.A.R.107434-36). BPA decided to address the level of the RL rate in its rate case, not the power sales agreements. IOUER1384 (R.A.R.107436). In passing, while discussing the difference between "flat-block" and other power products, BPA noted that the sales involved "a specific product with a specific rate for a specific settlement" and that "[t]he rate level for the settlement sales supports the proposed value of the settlement of the REP with the regional IOUs." *Id.* Nowhere did BPA suggest that the "sole purpose" of the power sales was to support the settlement. To the contrary, the power sales were in BPA's own interest because it expected a surplus

and had decided to sell the same amount of power at the same price even if there were no settlements.

In sum, the power sales were plainly severable, and BPA erred by failing to sever them for purposes of any Lookback.  *See*, *e.g.*, *Restatement (Second) of Contracts* § 183 (1981) (provisions are severable "[i]f the parties' performance can be apportioned into corresponding pairs of part performance so that the parts of each pair are properly regarded as agreed equivalents and one pair is not offensive to public policy").

### E.     All the Power Sales and All the Load Reduction Payments Should Have Been Excluded from the Lookback

BPA excluded from the Lookback none of its payments to Avista, Idaho Power and PGE in lieu of delivering power to them, and only some of its payments to PacifiCorp and PSE under its 2001 LRAs with those two companies.  BPA's justifications do not withstand scrutiny.

According to BPA, "[l]ike the Firm Power Sale[s], the payments made to Avista, Idaho Power, and PGE were simply another means of providing REP benefits to the IOUs and were not part of an independent benefit or program." BPA Br. 77.  BPA cites no support for that *ipse dixit* conclusion, and it is incorrect. The power sales were expressly separate, independent, and severable from the settlement agreements.  Although they were entered into in conjunction with the settlements, they had their own statutory and business justification, and as cost-

– 20 –

based sales they were not a money-losing proposition for BPA. Furthermore, however *completed* sales should have been treated, BPA's payments to avoid power deliveries were made to reduce its load.

As to PacifiCorp and PSE, BPA has correctly recognized that its buyouts of delivery obligations to them involved "an independent benefit or program." BPA Br. 195-202. BPA further noted that no party timely challenged the validity of their LRAs. IOUER180 (R.A.R.062496). BPA thus decided to treat the load reduction payment aspects of the 2001 PacifiCorp and PSE agreements as legally valid. BPA admits, however, that it allowed PacifiCorp and PSE to retain only a portion of the load reduction payments.[4] BPA justifies doing so on grounds that protecting the entire load reduction payments would have increased the amounts of *non*-load-reduction payments the IOUs could retain. BPA Br. 79-80. But BPA does not explain how protecting load reduction payments would also protect non-load-reduction payments. Instead BPA simply asserts that excluding PSE's entire load reduction payments from the Lookback for FY2002 would have allowed PSE to

---

[4] As explained in the IOUs' opening brief (at 47), BPA determined Lookback Amounts for each year by subtracting from each utility's Total Benefits Received (including load reduction payments) either its load reduction payments or its Reconstructed REP Benefits, whichever was greater. Thus, PacifiCorp and PSE's load reduction payments were "protected" only to the extent they exceeded Reconstructed REP Benefits each year.

retain $56 million more in non-load-reduction payments. *Id.* (citing BPA staff testimony).

BPA's argument is illogical. According to BPA, in 2002 PSE received $56 million in payments under its original 2000 REP Settlement Agreement and $117 million in load reduction payments. BPASER482. According to BPA, PSE's "reconstructed REP benefits" for 2002 were $93 million. *Id.* BPA "protected" only $117 million (the greater of $117 million and $93 million) on the theory that PSE should be required to refund the $56 million in payments due under the original settlement. *Id.* But that shortchanges PSE and its residential and small-farm customers. According to BPA, they would have received traditional REP benefits of $93 million, yet received only $56 million in monetary payments. The correct conclusion is that PSE and its customers owed *no* refund for 2002 because they fared worse under the monetary settlements than they would have under the REP itself.

That is not to suggest that if there is a Lookback, the total Lookback Amounts for PacifiCorp and PSE would be zero. In other years, BPA calculated that its payments pursuant to the original 2000 REP settlements exceeded "reconstructed REP benefits." On net, the total Lookback Amounts for PSE and PacifiCorp would still be large and positive. But by protecting only a portion of the load reduction payments, BPA inflated PacifiCorp's and PSE's Lookback

– 22 –

amounts by hundreds of millions of dollars, resulting in substantially lower REP benefits and higher retail power bills going forward.

### F.   BPA's Waiver Argument Ignores the Record

Finally, BPA seeks to avoid review of its mistakes by arguing (at 76-77 and again at 78) that the IOUs waived their arguments that BPA failed to exclude all payments in lieu of the power sales from the Lookback.  In doing so, BPA ignores the record:  the IOUs specifically argued to BPA that any Lookback should consider only the ***monetary*** benefits that the IOUs received or would have received and should exclude the power purchases and any benefits derived therefrom.

Among other things, the IOUs pointed out in their initial brief to BPA that most of the amounts that BPA was treating as REP settlement costs that increased the PF Preference rate in fact related to the power sales.  IOUSSER127 (R.A.R.063616).  The IOUs also stressed that BPA projected no cost under-recovery from the RL sales, IOUSSER128 (R.A.R.063617), and that no one challenged the power sales agreements in this Court, IOUSSER132 (R.A.R.063621).  In later briefing taking "exceptions" to BPA's draft ROD, the IOUs noted that BPA had ignored the arguments in their initial brief and reiterated that any Lookback remedy should exclude all power purchases and benefits derived therefrom:

> The Draft ROD ignores the Pacific Northwest Investor-
> Owned Utilities' arguments in their Initial Brief that the

> RL rate applicable to sales under those agreements was a cost-based rate and recovered all or virtually all of BPA's costs for providing the power for those sales. BPA did not project any cost underrecovery in the WP-02 rate case from those sales. Accordingly, there is no rational basis for including such sales in BPA's Lookback analysis. … ***Such agreements or any benefits derived therefrom cannot be included in any Lookback analysis***.

BPASER00902 (R.A.R.092975) (emphasis added).

In short, the IOUs unequivocally argued that BPA should not include "any benefits" derived from the power sales in any Lookback analysis. Moreover, those arguments were joined by ***all*** the IOUs, not just PacifiCorp and PSE. (The only arguments limited to PacifiCorp and PSE were ones regarding the 2001 LRAs with those two companies.) BPA rejected these arguments, but the IOUs undeniably made them. This Court has rejected previous efforts by BPA to avoid the merits, and it should do so again. *Cf. Nw. Envtl. Defense Ctr. v. BPA*, 117 F.3d 1520, 1534-35 (9th Cir. 1997) (distinguishing BPA's favored authority, *Vt. Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519 (1978)).

## III. ALL PAYMENTS UNDER THE UNCHALLENGED 2001 LRAS SHOULD HAVE BEEN EXCLUDED FROM THE LOOKBACK IN THEIR ENTIRETY

BPA and the preference customers both try to justify BPA's decision to include payments under its 2001 LRAs with PacifiCorp and PSE in the Lookback even though no one challenged the validity of those agreements within the 90-day limitations period of 16 U.S.C. § 839f(e)(5). Both rationalizations are misguided.

– 24 –

**A.** ***Snohomish* Did Not Authorize BPA to Declare the 2001 Agreements Invalid Even Though No One Challenged Them**

Although BPA acknowledges that the 2001 agreements were unchallenged and thus were not reviewed by this Court, it nonetheless argues (at 203-06) that the Court in *Snohomish* directed or at least authorized BPA to declare those agreements invalid. But *Snohomish* dealt with petitions for review of 2004 amendments to the 2000 REP Settlement Agreements and to one particular, no-longer-relevant aspect of the 2001 agreements. Nowhere did the Court direct or authorize BPA to reconsider the entire 2001 LRAs.

The first section of *Snohomish* dealt with the 2004 amendments to the 2000 REP Settlement Agreements. 506 F.3d at 1153-54. The Court held that "[t]he continued validity of the 2004 Amendments depends on how BPA treats the underlying 2000 Settlement Agreement[s] in light of *PGE*." *Id.* at 1154. BPA does not suggest that this holding justified reconsideration of the 2001 agreements.

The second section of *Snohomish* dealt with "litigation penalty" provisions of the 2004 amendments, which amended both the 2001 agreements and other, 2002 agreements not at issue here. *Id.* at 1154-55. The Court "conclude[d] that the 'litigation penalty provisions of the [2001] LRAs [we]re directly related to the 2000 REP Settlement Agreements … and not part of a separate agreement." *Id.* According to Court, the litigation penalties were "not central to or directly related to the LRA," but "a direct response to the litigation over the 2000 REP Settlement

– 25 –

Agreement[s]" and "contingent on the fate of legal challenges to the 2000 REP

Settlement Agreements." *Id.* (further deeming the "litigation penalty" "a way for

BPA to gain leverage over its preference customers in an attempt to broker a

settlement to the legal challenges to its 2000 REP Settlement Agreements").

The Court thus held that the "litigation penalty" provisions, as amended, "[w]ere

sufficiently related to the 2000 REP Settlement Agreements" that "they must be

revisited in light of [its] decision in *PGE*." *Id.*

The Court specifically remanded for BPA to determine how to "treat the

2004 Amendments in light of [its] decision in *PGE*." 506 F.3d at 1155. In so

doing, the Court noted that BPA had various options, but it "express[ed] no

judgment on the merits of BPA's options or on the validity of the 'litigation

penalty' itself." *Id.* One option that the Court identified was to "determine that

[its] prior opinions undermined the entire 2001 LRAs," in which case "the 2004

Amendments modifying the LRAs [we]re also void." *Id.* "Alternatively, BPA

could determine that [the Court's] decisions invalidated the 'litigation penalty'

provisions of the LRAs, but that those decisions [we]re tangential to the main

agreement and severable." *Id.* (also noting that BPA could honor the amended

provisions but decline to charge preference customers the cost).

Contrary to BPA's suggestion, the Court did ***not*** direct BPA to reconsider the

validity of the entire 2001 LRAs. Indeed, in two simultaneous decisions the Court

made clear that the 2001 agreements themselves were not and could not properly be challenged. *Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. United States*, 250 Fed. Appx. 817, 819-20 (9th Cir. 2007) (rejecting Snohomish's "attempt[] to challenge the original 2001 Load Reduction Agreement itself in the guise of [challenging] the failed 2003 ROD"); *Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. BPA*, 250 Fed. Appx. 821 (9th Cir. 2007) (dismissing petition that technically challenged a BPA press release but in fact belatedly challenged "the 2001 LRA itself"). The Court's published *Snohomish* decision merely indicated that if BPA found that the original "litigation penalty" undermined the entire 2001 LRAs, it would logically follow that the 2004 Amendments (the agreements that were timely challenged and were actually before the Court) were likewise void.

Nowhere did the Court suggest that BPA could void other aspects of the 2001 LRAs even though no one timely challenged them. Indeed, BPA itself recognized in its ROD that "in *Snohomish*, the Court distinguished between the 'litigation penalty' provision of the LRAs and the balance of the LRAs," and that while the litigation penalty was part of the 2000 REP Settlement Agreements and had to be revisited in view of *PGE*, "the Court did not order BPA to revisit any other aspect of the LRAs. IOUER178-79 (R.A.R.062494-95). *Snohomish* provided no basis to reconsider the validity of the entire 2001 agreements.

– 27 –

**B.      The Preference Customers' Theory that the 2001 Load Reduction Payments Measure the Benefits Conveyed in 2000 Is Both Legally and Factually Flawed**

The preference customers take a different tack, arguing (at 14-18) that BPA properly included its 2001 load reduction payments to PacifiCorp and PSE in the Lookback because those payments supposedly measured the benefits of the power sales in the original 2000 REP Settlement Agreements.  This "proxy" argument fails for two reasons.

First, as the preference customers themselves observe (at 10), courts may uphold an administrative action only on grounds on which the agency itself relied. "[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  *If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis*."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (emphasis added).  Here BPA did not purport to use the load reduction payments under the 2001 agreements to measure the value of power sales agreed to a year earlier.  *See* IOUER186-87 (R.A.R.062502-03).  The Court thus may not even consider the preference customers' argument.

In any event, the argument fails on its merits. BPA's payments under the 2001 LRAs were not a fair measure of what BPA agreed to convey in 2000. The 2001 LRAs were a result of the massive disruption of the energy markets in late 2000 and early 2001 and BPA's resulting need for load reductions. The value of the power that BPA promised to deliver in 2000 skyrocketed between late 2000 and mid-2001. Responding to BPA's call for load reductions, PacifiCorp and PSE agreed to accept cash instead of power deliveries. Although doing so exposed them to market volatility, PacifiCorp and PSE agreed to accept less than the market price. IOUER1547 (R.A.R.098661), IOUER1618-19 (R.A.R.098703-04). Nevertheless, that price far exceeded the market price when the sales agreements were entered into in 2000. The IOUs contend that none of the power sales belong in the Lookback, but to the extent those sales are included, they cannot be valued as of mid-2001.

Furthermore, the preference customers' argument ignores that the 2001 agreements were not a simple monetization and change in form of benefits conferred in 2000. Most notably, PSE's 2000 power sales agreement covered only FY2002-2006, while its 2001 agreement covered FY2007-2011 as well. *Compare* IOUER1428-43 (R.A.R.114180-95) *with* IOUER1631-55 (R.A.R.114264-88).

– 29 –

In sum, BPA did not use the 2001 LRAs to measure what was conveyed in 2000, and doing so makes no sense.  If a Lookback remedy was permissible at all, BPA must exclude the LRA payments from it.

## Conclusion

The IOUs' petitions for review should be granted, and the Court should remand for BPA to adopt different remedies.

Respectfully submitted,

/s/ Michael G. Andrea

Michael G. Andrea
AVISTA CORPORATION
1411 East Mission Avenue – MSC-23
Spokane, Washington  99202

Counsel for Avista Corporation

/s/ R. Blair Strong

R. Blair Strong
PAINE HAMBLEN LLP
717 West Sprague Avenue, Suite 1200
Spokane, Washington  99201

Counsel for Idaho Power Company

/s/ Donald G. Kari

Donald G. Kari
Jason T. Kuzma
PERKINS COIE LLP
10885 N.E. Fourth Street, Suite 700
Bellevue, Washington  98004

Dan L. Bagatell
PERKINS COIE BROWN & BAIN P.A.
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona  85012

Counsel for Puget Sound Energy, Inc.

*[counsel listing continued on next page]*

– 30 –

/s/ Jay T. Waldron

Jay T. Waldron
Sara Kobak
SCHWABE, WILLIAMSON & WYATT PC
1211 SW 5th Avenue, Suites 1500-2000
Portland, Oregon  97204

Lara L. Skidmore
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C.  20004

Ryan L. Flynn
PACIFICORP
825 NE Multnomah Street, Suite 1800
Portland, Oregon  97232

Counsel for PacifiCorp

/s/ Scott G. Seidman

Scott G. Seidman
TONKON TORP LLP
888 SW 5th Avenue, Suite 1600
Portland, Oregon  97204

Counsel for Portland General
   Electric Company

**Updated Statement of Related Cases**

The following cases pending in this Court are related to the consolidated cases at issue here because they involve BPA's efforts to enforce determinations that BPA made in the Record of Decision at issue here through provisions in Residential Purchase and Sale Agreements:

> *Idaho Pub. Utils. Comm'n* et al. *v. BPA*, Nos. 08–74927, 08–74928, 08–74929, 08–74932, 08–74933, 08–74942 & 08–74957

The following cases pending in this Court are also related because they involve challenges to FY2009 rates established by BPA during the WP-07S proceeding at issue here:

> *Avista Corp.* et al. *v. BPA*, Nos. 09–73160, 09–73201, 09–73225, 09–73228, 09–73230, 09–73247, 09–73249, 09–73251, 09–73252, 09–73254, 09–73264, 09–73269, 09–73271, 09–73274 & 09–73281

On December 14, 2009, this Court ordered that all three sets of cases be calendared before the same merits panel.

_____/s/ Donald G. Kari_____

Donald G. Kari

– 32 –

## Statutory Addendum

Pertinent statutes were appended to the IOUs' opening brief.

– 33 –

**Certificate of Compliance**

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32–1, the attached reply brief is proportionately spaced, has a typeface of 14 points or more, and contains 6,923 words.

_____/s/ Dan L. Bagatell_____

Dan L. Bagatell

**Certificate of Service**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 25, 2010.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

David Hill
Department of Energy
1000 Independence Avenue, SW
Washington, D.C. 20585

D. Neil Price
Office of the Idaho Attorney General
Post Office Box 83720
Boise, Idaho 83270–0010

_____/s/ Jason T. Kuzma_____

Jason T. Kuzma

07772-0414/LEGAL17836682.6

– 35 –