# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098, 08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133, 08-75161, 08-75165

_____

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *ET AL.,*

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

_____

**REPLY BRIEF OF PETITIONERS WESTERN PUBLIC AGENCIES GROUP, PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, AND TILLAMOOK PEOPLE'S UTILITY DISTRICT**

_____

| | | |
|---|---|---|
| Terence L. Mundorf | Eric L. Christensen | Richard G. Lorenz |
| Marsh Mundorf Pratt | Public Utility District | Cable Huston Benedict |
| Sullivan & McKenzie | No.1 of Snohomish | Haagensen & Lloyd |
| 16504 9th Ave. SE | County | 1001 Fifth Avenue, |
| Suite 203 | 2320 California Street | Suite 2000 |
| Mill Creek, WA 98012 | Everett, WA 98206 | Portland, OR 97204 |
| Tel: (425) 742-4545 | Tel: (425) 783-8649 | Tel: (503) 224-3092 |
| Attorneys for the | Attorney for Snohomish | Attorneys for Tillamook |
| Western Public | Public Utility District | People's Utility District |
| Agencies Group | | |

March 25, 2010

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................... 1-6

ARGUMENT ......................................................................... 6-31

    I.   THIS COURT'S OPINIONS REQUIRE BPA TO GIVE
         PREFERENCE CUSTOMERS THE FULL SCOPE OF
         § 7(b)(2) RATE PROTECTION UPON REMAND. ................... 6-10

    II.  SUBSEQUENT CONTRACTS CANNOT DISCHARGE
         BPA FROM THE OBLIGATION TO PROTECT
         PREFERENCE CUSTOMERS FROM THE FULL COSTS
         OF UNLAWFUL REP SETTLEMENT BENEFITS ................... 10-19

         A.   Load Reduction Agreements Have No Bearing on
             BPA's Duty to Provide Full Recovery in the Lookback. ..... 11-16

         B.   The Existence Of Other Authorities Does Not
             Permit BPA To Ignore the Requirements Of §§ 5(c) and
             7(b)(2) When Calculating IOU Repayment Obligations...... 17-19

    III.  THE ABSENCE OF SPECIFIC PETITIONS FOR
         REVIEW CONCERNING THE LRAS HAS NO BEARING
         ON BPA'S DUTY TO PROVIDE § 7(B)(2) RATE
         PROTECTION. .......................................................... 19-23

    IV.  THE ABSENCE OF A SPECIFIC ATTACK ON THE
         LB CRAC HAS NO BEARING ON BPA'S DUTY TO
         PROVIDE § 7(B)(2) RATE PROTECTION .............................. 24-25

    V.   PREFERENCE CUSTOMER PARTICIPATION IN
         THE LOAD REDUCTION PROGRAM OR OTHER
         DEALINGS WITH BPA DO NOT DEPRIVE
         PREFERENCE CUSTOMERS OF THEIR STATUTORY
         REP COST PROTECTION UNDER § 7(B)(2)........................... 26-30

CONCLUSION ..................................................................... 30-32

i

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                <u>Page</u>

*Bell v. Bonneville Power Admin.*, 340 F.3d 945
(9th Cir. 2003).................................................................. 18-19

*Betty B Coal Co. v. United States Department of
Labor,* 194 F.3d 491 (4th Cir. 1999)..................................... 22

*City of Santa Clara v. Andrus*, 572 F. 2d 660
(9th Cir. 1978).................................................................. 20

*Friends of Sierra Railroad, Inc. v. Interstate Commerce
Comm'n,* 881 F.2d 663 (9th Cir. 1989).................................. 21

*Fry v. Drug Enforcement Agency*, 353 F.3d 1041
(9th Cir. 2003)................................................................. 22

*Golden Northwest Aluminum, Inc. v. Bonneville
Power Admin.,* 501 F.3d 1037 (9th Cir. 2007) ...................... 1-3, 5-6, 8-10, 13, 20, 22-23, 25-26, 29-32

*Interstate Commerce Comm'n v. Bhd. Of Locomotive Eng'rs*,
482 U.S. 270 (1987)............................................................ 22-23, 30

*M-S-R Public Power Agency v. Bonneville Power Admin.*,
297 F.3d 833 (9th Cir. 2002) ................................................ 12

*Portland General Electric Co. v. Bonneville Power Admin.*,
501 F.3d 1009 (9th Cir. 2007) .............................................. 1-3, 5-10, 17-19, 26, 28-32

*Public Utility Dist. No. 1 of Snohomish County, Wash. v.
Bonneville Power Admin.*, 506 F.3d 1145 (9th Cir. 2007) ..... 6, 9-10

*RSR Corp. v. Fed. Trade Comm'n*, 656 F.2d 718
(D.C. Cir. 1981) ................................................................ 21

*Sendra Corp. v. Magaw*, 111 F.3d 162 (D.C. Cir. 1997) ....... 22-23

| Statutes | Page |
|---|---|
| 16 U.S.C. §832f(a) | 17 |
| 16 U.S.C. § 839c(c) | 1 |
| 15 U.S.C. § 839c(d) | 12 |
| 16 U.S.C. § 839e(f) | 12 |

## **<u>INTRODUCTION</u>**

This Reply Brief is submitted by the Western Public Agencies Group, Public Utility District No. 1 of Snohomish County, Washington, and Tillamook People's Utility District, Oregon (together, "Preference Customers"). It addresses arguments made by the Bonneville Power Administration ("BPA") in its revised Answering Brief filed March 18, 2010 ("Answering Brief"), and by PacifiCorp and Puget Sound Energy, Inc., ("PSE") in their Joint Respondent-Intervenor Brief ("Joint Brief").[1]

In *Portland General Electric Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007) ("*PGE*"), and *Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.,* 501 F.3d 1037 (9th Cir. 2007) ("*GNA*"), this Court unequivocally held that the Residential Exchange Program ("REP") benefits BPA could provide to the investor owned utilities ("IOUs")[2] were limited by § 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839c(c) ("NWPA"), and that REP costs that could be charged to preference customers were limited by § 7(b)(2) of the NWPA. *Id.* at § 839e(b)(2). In this Reply, the Preference Customers demonstrate that BPA has diverged from this Court's clear directives by

---

[1] Joint Brief arguments replicating BPA's arguments will be cited, and the reply to the BPA argument also applies to those Joint Brief arguments.

[2] The IOUs are Avista, Idaho Power, Northwestern, Portland General Electric, PacifiCorp and Puget Sound Energy.

permitting PacifiCorp and PSE to retain certain payments made to them under their load reduction agreements ("LRAs"), which monetized BPA's Residential Exchange Program Settlement Agreement ("REP Settlement") power delivery obligations to them. As a result, PacifiCorp and PSE have retained REP Settlement benefits that exceed the REP benefits BPA determined they would have received absent the REP Settlements by $653 million,[3] and which amount preference customers have been charged in violation of the § 7(b)(2) rate ceiling limit.[4]

In response to *PGE* and *GNA*, BPA initiated the WP-07 Supplemental proceeding ("WP-07S") in which it conducted the Lookback analysis to determine the REP Settlement benefits unlawfully paid the IOUs, and the REP Settlement costs unlawfully charged preference customers. In the Lookback, BPA correctly determined that for Avista, Idaho Power, Northwestern and Portland General Electric ("PGE"), the amount by which the benefits conferred on them through the REP Settlement (including

---

[3] The $653 million in excess REP Settlement benefits does not include accumulated interest due as part of the refund.

[4] BPA determined the benefits the IOUs were entitled to under §§ 5(c) and 7(b)(2), and called those "reconstructed REP benefits". REP Settlement benefits in excess of reconstructed REP benefits will be referred to as "excess REP Settlement benefits" in this Reply. However, the §§ 5(c) and 7(b)(2) limits BPA calculated were themselves incorrect for the reasons explained in other preference customers' briefs, reasons with which Preference Customers agree.

2

payments to replace REP Settlement power deliveries) exceeded their reconstructed REP benefits constituted their repayment obligation, which must be refunded to preference customers.[5] By contrast and contrary to *PGE* and *GNA*, BPA wrongfully allowed PacifiCorp and PSE to retain $653 million in REP Settlement benefits in excess of what BPA determined to be their reconstructed REP benefits.

BPA asserts that PacifiCorp and PSE can retain those excess REP Settlement benefits, initially intended as power deliveries under the REP Settlement, because they were paid to PacifiCorp and PSE pursuant to their LRAs. But there is no dispute that the LRA payments reflect the costs of the power delivery portion of the REP Settlement benefits provided to PacifiCorp and PSE, and that such LRA payments would not have been made but for BPA's REP Settlement power delivery obligation. Accordingly, BPA's insistence that PacifiCorp and PSE retain payments in excess of their reconstructed REP benefits, and that the related costs be imposed on preference customers, is directly contrary to *PGE* and *GNA*.

BPA praises the LRAs as the means by which it reduced its power costs in the face of the West Coast power market melt-down in 2000-01.

---

[5] BPA's repayment method results in no repayment of Idaho Power's $101 million Lookback obligation in the foreseeable future. (R.S.E.R. 6-9; APAC Initial Br. 33.)

Even if BPA's mitigation efforts served a laudable purpose and had a beneficial effect, they have no bearing on BPA's duty to recover from PacifiCorp and PSE the full amount of the excess REP Settlement benefits conferred on them, or to refund to preference customers the full amount of the unlawful REP Settlement costs they were charged. In the context of the Lookback, the LRAs at most establish the dollar value of the excess REP Settlement benefits provided to PacifiCorp and PSE as power deliveries, and the unlawful costs borne by preference customers.

BPA's technical arguments concerning the lack of specific, independent challenges to the LRAs, or to the particular rate design BPA used to collect the LRA and other REP Settlement costs from preference customers (such as the Load Based Cost Recovery Adjustment Clause or "LB CRAC") miss the mark as they are based on a fundamental misconception of the nature of this case. This Court need not reach the validity of the LRAs to provide preference customers with the full measure of their § 7(b)(2) REP cost protection.

This is not a challenge to the LRAs *per se*, or to BPA's authority to enter into the LRAs, but an effort to recover the excess REP Settlement benefits that were monetized under the LRAs. The only relevant issue is whether the LRA payments, which were made to release BPA from its REP

4

Settlement power delivery obligations to PacifiCorp and PSE, and which would not have been made but for the REP Settlement, should be treated as REP Settlement benefits in determining the repayment obligations of PacifiCorp and PSE. Contrary to BPA's assertions, its unlawful distribution of REP Settlement benefits is not rendered lawful by entering into subsequent contracts, and the unlawful allocation of REP Settlement costs to preference customers in violation of § 7(b)(2) is not rendered lawful by BPA's particular rate design choice—the LB CRAC—to collect those excess costs.

In any event, the Lookback decisions (including the treatment of the LRA payments) made by BPA on remand in WP-07S were timely challenged, and are now properly before this Court for disposition.

Finally, BPA suggests that preference customer actions while *PGE* and *GNA* were pending justify its decision to allow PacifiCorp and PSE to retain excess REP Settlement benefits, and to forego returning to preference customers the REP Settlement costs unlawfully charged to them. (BPA Answering Br. 181-183.) BPA's argument mischaracterizes the facts and the law. BPA has not cited a single provision of the NWPA that makes the REP cost protection afforded preference customers by § 7(b)(2) contingent on how they responded to BPA's financial crisis mitigation efforts, on how

they exercised their contractual and statutory load placement rights, or on any of the other alleged "facts" posited by BPA.

## ARGUMENT

**I. THIS COURT'S OPINIONS REQUIRE BPA TO GIVE PREFERENCE CUSTOMERS THE FULL SCOPE OF § 7(b)(2) RATE PROTECTION UPON REMAND.**

BPA's decision to permit PacifiCorp and PSE to retain $653 million in excess REP Settlement benefits cannot be squared with this Court's decisions in *GNA, PGE* or *Public Utility Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.*, 506 F.3d 1145 (9th Cir. 2007) ("*Snohomish*"). BPA asserts that the LRAs were not addressed in either *PGE* or *GNA*, and were validated in *Snohomish*. (Answering Br. 195-196, 200; Joint Br. 17, 29-31.) BPA is simply wrong.

In *PGE*, this Court recognized that BPA had provided the IOUs REP Settlement benefits as cash payments and power deliveries, stating that "[i]n addition to the cash payments, BPA also included 'net requirement sales' at fixed rates to IOUs as a component of the 2000 REP Settlement Agreement." 501 F.3d at 1022. It held that the entirety of the "settlement agreements entered into between BPA and the IOUs are inconsistent with the NWPA". *Id.* at 1037.

6

Based on this clearly-articulated opinion, BPA concluded that the "Firm Power Sales were simply another means of providing the IOUs with REP Settlement benefits", and that this Court "did not differentiate between the Firm Power Sales and the financial components of the REP Settlement Agreement in finding the REP Settlement Agreements contrary to law." (Answering Br. 68-70.) As BPA correctly summarized *PGE*:

> Because the REP settlements were not based on sections 5(c) and 7(b), they were not grounded in the authority granted by Congress and BPA was without authority for them. A contract entered into by a governmental entity without the requisite constitutional or statutory authority is void and unenforceable.

(BPA IPUC Answering Br. 73.)

The LRAs with PacifiCorp and PSE "[t]urned the power sale [under the REP Settlement] into a financial payment". (R.S.E.R. 1.)[6] As a consequence, the LRAs arose out of and would not have existed but for the void REP Settlement. The inescapable result of *PGE* is that BPA could not lawfully deliver power supply benefits to PacifiCorp and PSE under the void REP Settlement. Therefore, PacifiCorp and PSE had no lawful entitlement to the REP Settlement power they sold to BPA under the LRAs. The payments made by BPA to PacifiCorp and PSE under the LRAs, reflecting

---

[6] R.S.E.R. refers to the Reply Supplemental Excerpt of Record filed by the Preference Customers contemporaneously herewith.

7

the dollar value of the unlawful REP Settlement power deliveries they replaced, fall squarely within the holding in *PGE*.

*GNA* confirms this conclusion. This Court held that BPA had "exercised its settlement authority in a manner that was contrary to the clearly expressed intent of Congress in the Bonneville Project Act and the NWPA." 501 F.3d 1048. It concluded that "BPA unlawfully shifted onto its preference customers the costs of its settlement with the IOUs", and remanded the matter to BPA "to set rates in accordance with this opinion." *Id*. at 1053. Under *GNA*, the rates set on remand must necessarily refund *all* excess REP Settlement benefits (whether provided as cash payments, power deliveries or payments to replace power deliveries) that were unlawfully charged to preference customers.

BPA acknowledges that on remand, it was to provide "remedial relief for overcharges during the FY 2002-2006 period . . . by rectifying what the Court described as a 'plain violation' of statutory requirements" – charging preference customers REP Settlement costs in excess of the § 7(b)(2) limit. (Answering Br. 47 (citations omitted).) Changing the form of the REP Settlement benefits (from power deliveries to cash payments), the agreement under which they were provided (from REP Settlement to LRA), or the mechanism used to implement the unlawful shift (from initial rates to LB

8

CRAC) does not absolve BPA of this duty, nor does it take these payments outside the scope of the remand under *GNA*.

*Snohomish* confirms this view. In *Snohomish*, this Court considered amendments to the REP Settlements and to the LRAs in light of *PGE*. The Court did not rule definitively on these amendments because it was uncertain how BPA would treat "the underlying 2000 Settlement Agreement in light of our opinion in *PGE*." *Snohomish*, 506 F.3d at 1154.

However, this Court noted that "BPA may conclude that our decisions [in *PGE* and *GNA*] undermined the basis for the 2000 REP Settlement Agreements" and that BPA could therefore "treat these 2004 agreements as null and void." *Id.* Such a conclusion by BPA would "render the provisions . . . that amend the 2000 REP Settlement Agreements void *ab initio.*" *Id.* This Court suggested that BPA could determine that "our prior opinions [PGE and GNA] undermined the entire 2001 LRAs and consequently, the 2004 Amendments modifying the LRAs are also void." *Id.* at 1155. In short, *Snohomish* put the treatment of the LRAs in light of the *PGE* decision squarely before BPA on remand.

In fact, BPA determined that this Court's opinions so undermined the REP Settlement Agreements: "In PGE, this Court invalidated the REP Settlement Agreements in their entirety, including the power sales

9

component of the Agreements." (Answering Br. 40.) Based on BPA's determination, and consistent with *Snohomish,* the LRAs are "undermined" as well, and have no continuing force and effect insofar as returning the monies to the preference customers is concerned.

Under *PGE*, *GNA* and *Snohomish*, on remand BPA must make preference customers whole for *all* REP Settlement benefit costs unlawfully borne by them, whether BPA disbursed such benefits as cash, power, or power later monetized to cash, and irrespective of the means BPA chose to impose the costs of such disbursements on the preference customers.

## II. SUBSEQUENT CONTRACTS CANNOT DISCHARGE BPA FROM THE OBLIGATION TO PROTECT PREFERENCE CUSTOMERS FROM THE FULL COSTS OF UNLAWFUL REP SETTLEMENT BENEFITS.

BPA argues that the LRAs with PacifiCorp and PSE were part of a separate program distinct from the REP Settlements. (Answering Br. 195-99; Joint Br. 33-40.) BPA asserts that it has separate statutory authority to enter into contracts, and that this Court has recognized BPA's authority to monetize power deliveries. (Answering Br. 199; Joint Br. 34-35.) BPA then bootstraps to the conclusion that the LRA payments to PacifiCorp and PSE, which monetized their REP Settlement power deliveries, need not be repaid to BPA nor refunded to preference customers. (Answering Br. 198-200; Joint Br. 40-43.) This argument lacks merit.

10

BPA's decision to execute contracts substituting cash payments for its REP Settlement power delivery obligations, in order to mitigate its losses from its exposure to a volatile power market, may have been necessary and prudent under the circumstances. However, BPA's decision to do so only establishes the measure of such losses; it does not excuse BPA from making the preference customers whole for the harm they suffered from the power sale component of the unlawful REP Settlement benefits.

### A. Load Reduction Agreements Have No Bearing on BPA's Duty to Provide Full Recovery in the Lookback.

There is no dispute that BPA substituted cash payments to the IOUs for its REP Settlement power delivery obligation in its load reduction program. BPA has characterized the load reduction program as independent of the REP Settlement, because it was aimed at reducing BPA's power delivery obligations in order to diminish BPA's reliance on the power market during a period of extremely high and volatile prices. (Answering Br. 195-99; Joint Br. 33-35.) But the need for the load reduction program arose from the discretionary power delivery commitments BPA made before the 2000-2001 power crisis, including BPA's REP Settlement power delivery obligation. (R.S.E.R. 5.)

In the late 1990s during its Subscription process, BPA decided to sell the IOUs 1,000 aMW of power at a steep rate discount as part of the REP

11

Settlement benefit package, and to sell 1,440 aMW to its direct service industrial ("DSI") customers. *Id.* BPA had no obligation to undertake these discretionary sales to non-preference customers, and BPA knew at the time it made those decisions that it lacked sufficient power in the federal system to fulfill its obligations.[7] (R.S.E.R. 12.) BPA's decision to enter into the unlawful REP Settlements was one of the *proximate causes* of its need to initiate the load reduction program.

BPA asserts that it has complied with *GNA* by permitting PacifiCorp and PSE to retain in any given year the greater of their reconstructed REP benefits or their LRA payments. (See IOUER 759; Answering Br. 65, 195-201; Joint Br. 29-31.)[8] In effect, BPA argues that LRA payments in excess of the reconstructed REP benefits were *ipso facto* part of the load reduction program, rather than the REP Settlement, and therefore can be retained by PacifiCorp and PSE without regard to the limits of § 7(b)(2). BPA does not

---

[7] BPA had no obligation to offer DSIs contracts after the expiration of the initial 20-year power contracts. See 16 U.S.C. § 839c(d); *M-S-R Public Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 838 (9th Cir. 2002). BPA is obligated to serve IOU requirements at the NR rate, but has no statutory authority to sell IOUs power at the equivalent of the preference customer rate. See 16 U.S.C. § 839e(f).

[8] The LRA payments to PacifiCorp and PSE totaled $1.019 billion, and exceeded their combined reconstructed REP benefits by $653 million (exclusive of interest).

12

cite to a single provision of the LRAs to support this novel proposition, nor does BPA explain how this approach complies with *GNA*.

In fact, the LRAs were a continuation of the REP Settlement benefits under a different contract, rather than a separate program with no connection to the REP Settlement. For example, section 5(a) of the PacifiCorp LRA states in part:

> Except as otherwise provided in this Agreement, cash payment amounts received by PacifiCorp from BPA under this Agreement shall be passed through, in full, to each residential and small farm consumer . . ."

(R.S.E.R. 24-25.)

Section 6(a) of the PSE LRA contains essentially the same language. (R.S.E.R. 28.) Significantly, these LRA provisions are virtually identical to those in the underlying REP Settlement Agreements. *See*, section 6(a), PacifiCorp and PSE Settlement Agreements (R.S.E.R. 20, 22.) The sole purpose of these sections is to continue the requirement from the original REP Settlement Agreements that all REP Settlement benefits be distributed to the designated beneficiaries of the REP – the IOU residential and small farm customer – as required by § 5c(c) of the NWPA. (BPA Answering Br. 69; Joint Br. 43 ("PacifiCorp and PSE … passed the benefits from the ... LRAs to their residential and small-farm customers as required under the

13

settlement agreements").)  These provisions demonstrate that, although the LRAs reduced BPA's REP Settlement power delivery obligation, all LRA *payments* to PacifiCorp and PSE were nothing more than a continuation of the REP Settlement benefit package, simply in a different form.

Further, BPA's argument that the existence of the load reduction program justifies PacifiCorp and PSE retaining their LRA payments is fatally undermined by BPA's correctly reasoned rejection of claims by Avista, Idaho Power, Northwestern and PGE that their excess REP Settlement benefits should be immune from refund as load reduction program payments.

The load reduction program was initiated by the Administrator's letter soliciting reductions to BPA's delivery obligations to avoid massive rate increases.[9]  All six IOUs received this letter, and all six responded by reducing BPA's REP Settlement power delivery obligation.  (See BPA Answering Br. 27.)  Each IOU did so by agreeing, in a letter agreement or amendment, to forego receipt of some or all of their REP Settlement power in return for cash payments.  (*Id*. at 67; R.S.E.R. 23-33.)  All six IOUs participated in the load reduction program in the same manner (reducing REP Settlement power deliveries), received the same benefits (cash

---

[9] Letter from Administrator Steve Wright, dated April 9, 2001. (R.S.E.R. 13-18.)

payments *in lieu* of power deliveries), and passed the benefits through to their residential and small farm customers (as required by the REP Settlement). In all material respects, all six IOUs participated in the load reduction program in the same manner. (*Id.* at 27.)

However, BPA did not allow all identically-situated IOU participants in the load reduction program to retain their full LRA payments. For Avista, Idaho Power, Northwestern and PGE, BPA correctly decided to include the full amount of their load reduction payments in their repayment obligation without adjustment or protection due to their participation in the load reduction program.[10]  (Answering Br. 68.)  As BPA explained, "the payments made to Avista, Idaho Power, and PGE were simply another means of providing REP benefits to the IOUs and were not part of an independent benefit or program". (Answering Br. 77.)

Although BPA's description is equally true of PacifiCorp's and PSE's LRA payments, BPA took a far different approach in determining their repayment obligation. BPA calculated reconstructed REP benefits of only $14 million for PacifiCorp, yet permitted PacifiCorp to retain an additional $398 million in excess REP benefits paid under its LRA. For PSE, BPA calculated reconstructed REP benefits of $483 million, and allowed PSE to

---

[10] PGE took some REP Settlement power deliveries throughout the 2002-2006 period. (Answering Br. 67.)

15

retain an additional $255 million in excess REP benefits paid under its LRA. (IOUER 759.) According to BPA, participation by PacifiCorp and PSE in the load reduction program entitled them to retain $653 million in REP Settlement power benefits paid through the LRAs in excess of BPA's calculation of their reconstructed REP benefits. (*Id.*)

BPA offers no plausible explanation for *excluding* the bulk of the load reduction payments to PacifiCorp and PSE from their REP Settlement benefit repayment obligation, given its valid reasoning for *including* all of the load reduction payments to the other IOUs in their repayment obligation. There is simply no lawful basis for permitting PacifiCorp and PSE to retain the LRA payments, which would not have been made but for the power deliveries under the unlawful REP Settlement, and which exceed their reconstructed REP benefits.

In WP-07S, BPA calculated the reconstructed REP costs preference customers were permitted to be assessed, consistent with § 7(b)(2), during the Lookback period. BPA offers no statutory support for its claim that this § 7(b)(2) rate protection could be substantially diminished by a contract to change the form of the REP Settlement benefits from power to cash, whatever reasons may have motivated the contract and whatever benefits may have accrued to BPA or its customers in the process.

16

**B.** **The Existence Of Other Authorities Does Not Permit BPA To Ignore the Requirements Of §§ 5(c) and 7(b)(2) When Calculating IOU Repayment Obligations.**

In *PGE*, this Court correctly rejected BPA's flawed legal argument that its statutory settlement authority, which was recognized as "facilitative", permitted BPA to ignore the substantive requirements of §§ 5(c) and 7(b)(2). 501 F.3d at 1030. BPA's reprise of this argument, that its "facilitative" authorities to contract and to monetize power delivery obligations empower it to ignore the substantive requirements of §§ 5(c) and 7(b)(2) on remand, must be rejected here for the same reasons that it was rejected in *PGE*.

BPA argues that the load reduction program payments made under the LRAs can be excluded from the repayment obligations of PacifiCorp and PSE because BPA entered into these contracts under authority separate from its § 5(c) REP authority, and because BPA has authority to monetize contractual power delivery obligations. (Answering Br. 199; Joint Br. 32-40.) BPA's argument is a *non sequitur*, and none of the authorities cited by BPA authorizes it to ignore the requirements of §§ 5(c) and 7(b)(2).

In *PGE*, BPA argued unsuccessfully that its authority to settle contract disputes pursuant to § 2(f) of the Bonneville Project Act, 16 U.S.C. § 832f(a), exempted the REP Settlement Agreements from the REP requirements of § 5(c), and the REP cost limitations of § 7(b)(2). 501 F.3d

17

at 1032. The only difference between BPA's argument in *PGE* and the one here is that BPA has shifted its statutory ground and now relies on its authority to contract, and its implied authority to monetize power deliveries. The result that BPA seeks in this case is the same it sought in *PGE*; permitting IOUs (in this case PacifiCorp and PSE) to retain excess REP Settlement benefits (in this case $653 million) by shielding the excess REP Settlement benefits provided to PacifiCorp and PSE under the LRAs from the requirements of §§ 5(c) and 7(b)(2). (Answering Br. 195-201; Joint Br. 18-19.)

BPA (and the Joint Brief) cite *Bell v. Bonneville Power Admin.*, 340 F.3d 945 (9th Cir. 2003) ("*Bell*") to buttress their argument that BPA's authority to monetize power delivery obligations allows it to protect, and PacifiCorp and PSE to retain, $653 million in excess REP Settlement benefits without regard to the requirements of § 7(b)(2). (Answering Br. 182, 200; Joint Br. 34-35.) This attempt is unavailing, as *Bell* is inapposite. *Bell* sustained load reduction agreements between BPA and certain DSIs as being within BPA's authority. In this case, the authority of BPA to enter into a load reduction agreement is not at issue. *See supra* at 5. Further, *Bell* did not involve, as this case does, load reduction agreements that would not have existed but for power delivery obligations contained in an unlawful

18

contract, payments that were a continuation of an unlawful benefits package, and provisions that overrode express and substantive statutory rights. *Bell* has no relevance to the issues in this case.

The REP Settlement power deliveries were an integral part of the excessive benefits BPA provided to PacifiCorp and PSE. In *PGE*, all REP Settlement costs (both cash payments and power deliveries) were found to be REP costs, as they too would not have existed but for BPA's statutory REP obligation, and to be subject to the requirements of §§ 5(c) and 7(b)(2). Likewise, the cash payments to PacifiCorp and PSE under the LRAs were REP Settlement costs as they would not have existed but for BPA's REP Settlement power delivery obligation. As such, these LRA payments were REP Settlement costs subject to the limits of § 7(b)(2).

## III. THE ABSENCE OF SPECIFIC PETITIONS FOR REVIEW CONCERNING THE LRAS HAS NO BEARING ON BPA'S DUTY TO PROVIDE § 7(B)(2) RATE PROTECTION.

BPA casts this case as an untimely challenge to its authority to enter into the LRAs, and an attack on the validity of those agreements. (Answering Br. 179-181; Joint Br. 21-25.) These arguments miss the mark. This case concerns what BPA must do on remand to make preference customers whole for rates in effect during the Lookback period, which unlawfully charged them for excess REP Settlement benefits. For this

19

reason, BPA's complaint that no separate petition was filed by preference customers challenging the LRAs within the 90 day statute of limitations is misplaced.[11] (Answering Br. 179-181; Joint Br. 20.)

Preference customers timely challenged both the REP Settlement and BPA's rates recovering REP Settlement costs as unlawful, and prevailed. Once this Court assigned to BPA the obligation on remand to set lawful rates for the Lookback period, BPA was required to exclude from such rates all unlawful REP Settlement costs. BPA concurs with this understanding: "Together with the Court's decision in PGE, BPA interprets the Court's remand in *Golden NW* as requiring BPA to remove the cost of the REP settlements from the PF Preference rate." (R.S.E.R. 35.)

BPA properly rejected the notion that the statute of limitation poses a bar to including LRA payments in the IOU repayment obligation, stating "the IOU's arguments that they were entitled to retain all benefits from the LRAs because those agreements were not timely challenged should be rejected." (Answering Br. 206.) BPA correctly determined that payments

---

[11] BPA asserts that Preference Customers' Opening Brief misstated the holding in *City of Santa Clara v. Andrus*, 572 F. 2d 660 (9th Cir. 1978). (Answering Br. 191-192.) BPA is in error. While the Court held that plaintiff's claims satisfied the statute of limitations, Preference Customers' Opening Brief cited to the portion of the decision dealing with intervenor PG&E's counterclaims, wherein it held that void contracts are of no legal effect whether challenged or not. 572 F.2d at 666, 677.

made to the IOUs (other than PacifiCorp and PSE) under the load reduction program were properly included in their repayment obligation, and in the refund to preference customers, even in the absence of independent petitions for review, because they were "simply another means of providing REP benefits to the IOUs." (Answering Br. 77.)

In support of their statute of limitations argument, BPA (and the Joint Brief) cite a number of cases holding that orders denying a request for rehearing do not commence a new statute of limitations period. *See e.g., RSR Corp. v. Fed. Trade Comm'n*, 656 F.2d 718, 720 (D.C. Cir. 1981); *Friends of Sierra Railroad, Inc. v. Interstate Commerce Comm'n,* 881 F.2d 663, 666 (9th Cir. 1989). (Answering Br. 189-90; Joint Br. 20, 24.) These decisions are not germane to this case, as they do not address the present circumstance where, on remand from this Court, the agency itself has reopened an earlier record and, after consideration, issued a new and final order.

BPA's determination on remand to use the LRAs with PacifiCorp and PSE as a pretext to forego recovery of $653 million in excess REP Settlement benefits, and to assess the preference customers such costs, are reviewable now in these timely-filed petitions. It is well-settled law that when an administrative agency reopens a proceeding for any reason, and

21

issues a new and final order after consideration, that new and final order is reviewable on its merits, even if that order merely affirms all of the prior decisions. *Interstate Commerce Comm'n v. Bhd. Of Locomotive Eng'rs*, 482 U.S. 270, 278 (1987) ("*ICC*"); *Betty B Coal Co. v. United States Department of Labor,* 194 F.3d 491, 496 (4th Cir. 1999) (New and final order – even if it merely reaffirms the rights and obligations set forth in the original order – is reviewable on its merits.) *Accord*, *Fry v. Drug Enforcement Agency*, 353 F.3d 1041(9th Cir. 2003). As this rule is generally stated:

> If for any reason the agency reopens a matter and, after reconsideration, issues a new and final order, that order is reviewable on its merits, even though the agency merely reaffirms its original decision. The new order is, in other words, final agency action and as such, a new right of actions accrues and starts the running of a new limitations period for judicial review.

*Sendra Corp. v. Magaw*, 111 F.3d 162 (D.C. Cir. 1997) ("*Sendra*").

That is precisely the situation here. BPA conducted the WP-02 rate case, and decided to collect from preference customers REP Settlement costs in excess of amounts permitted under § 7(b)(2). (Answering Br. 20.) Those decisions were challenged in the *GNA* case, and this Court determined that BPA had acted unlawfully by shifting "onto its preference customers the costs of its [REP] settlement with the IOUs." The WP-02 rates were

22

remanded to BPA to be revised in accordance with that opinion. *GNA,* 501 F.3d at 1053.

BPA responded by initiating the WP-07S proceeding and reopened the WP-02 record for supplementation. (Answering Br. 40.) In WP-07S, and in the new and final WP-07 Supplemental Record of Decision ("ROD"), BPA addressed the treatment of the payments received by PacifiCorp and PSE under the LRAs to release BPA from its REP Settlement power delivery obligation. (*Id.* at 205-06.)

Under the holdings of *ICC* and *Sendra*, BPA's treatment of the LRA payments in the WP-07S ROD is a new and final agency action to which a new right of action accrued, and for which a new statute of limitation period commenced.[12] This case challenges, among other matters, BPA's treatment in the Lookback of the LRA payments made to PacifiCorp and PSE, and it was filed within the applicable 90-day statute of limitations period. The statute of limitations therefore poses no bar to this Court considering and deciding that issue in this case.

---

[12] This conclusion is reinforced by the record in this case, which contains the entire record on appeal for the WP-02 rate proceeding. (Answering Br. at 36.)

23

## IV. THE ABSENCE OF A SPECIFIC ATTACK ON THE LB CRAC HAS NO BEARING ON BPA'S DUTY TO PROVIDE § 7(B)(2) RATE PROTECTION.

BPA argues that it collected some of the costs of unlawful REP benefits delivered to the IOUs through the LB CRAC. (Answering Br. 186; Joint Br. 29.) BPA suggests that because preference customers did not focus on the LB CRAC *per se* in their rate case briefing, this provides a basis for insulating the LRA payments to PacifiCorp and PSE from repayment to BPA, and from refund to preference customers. (Answering Br. 188-91; Joint Br. 29-31.) This argument lacks any merit.

In the first instance, the payments *in lieu* of REP Settlement power deliveries made to Avista, Idaho Power, Northwestern and PGE were all made under BPA's load reduction program, and the costs of these payments were collected from preference customers by the LB CRAC. Even in the absence of a discrete claim challenging the LB CRAC, BPA correctly determined that all of these load reduction payments were properly included in the repayment obligation of those IOUs. It is only for PacifiCorp and PSE that BPA has incorrectly raised this argument as a bar to the repayment of their excess REP Settlement benefits. BPA has offered no cogent reason why its proper disposition of this issue as applied to all of the other IOUs should be ignored for PacifiCorp and PSE. (*Id.*)

24

In WP-02 and before this Court in *GNA*, preference customers challenged BPA's decision to charge them rates in excess of those permitted by § 7(b)(2). The precise rate mechanisms employed by BPA to achieve this illegal result are immaterial to preference customers' statutory protection. The only material fact is that the totality of the REP Settlement costs included in preference customer rates exceeded the statutory limit.

BPA acknowledges that the LB CRAC was simply "one of the mechanisms BPA established in the Supplemental WP-02 rate case" to recover costs. (Answering Br. 185.) The LB CRAC was just one of many elements of BPA's rates applicable to preference customers. Preference customers were not required to challenge each and every mechanism BPA used to recover the unlawfully allocated costs, whether through increased demand charges, increased energy charges, or CRACs; the overall level of the resulting charges was unlawful because it exceeded the § 7(b)(2) rate ceiling. The suggestion that separate challenges must be made to every element of BPA's rate design to ensure full recovery for a single unlawful cost allocation based on a single error of law is unsupportable.

25

## V.    PREFERENCE CUSTOMER PARTICIPATION IN THE LOAD REDUCTION PROGRAM OR OTHER DEALINGS WITH BPA DO NOT DEPRIVE PREFERENCE CUSTOMERS OF THEIR STATUTORY REP COST PROTECTION UNDER § 7(B)(2).

BPA makes allegations which cast in an unfavorable light preference customer actions while *PGE* and *GNA* were pending, accompanied by disparaging speculation regarding the motives that prompted these actions. For example, BPA insinuates that preference customers were responsible for BPA's reliance on the power market to fulfill its power supply obligations, and are therefore culpable for BPA's financial crisis that necessitated the load reduction program.    BPA suggests that the preference customers deliberately elected not to challenge the LRAs because it "would have jeopardized the enormous rate reduction the [LRAs] had made possible", and that this was a tactic to obtain a "double benefit."  (Answering Br. 182-83; Joint Br. 28.)  These allegations are both irrelevant and false.

The conduct of preference customers has no bearing on the statutory REP cost protection provided to them by § 7(b)(2).  Preference customers may well have benefitted from BPA's decision to mitigate the damages caused in part by BPA's unlawful REP Settlement power sales to the IOUs, but that only reduced the severity of damages preference customers improperly suffered as a result of BPA's unlawful REP Settlement.  BPA's decision to mitigate such harm does not eliminate the unlawful overcharges

26

borne by preference customers, nor does it provide a basis for depriving them of a full remedy for such unlawful overcharges.

BPA's insinuations are also factually inaccurate. BPA suggests that the financial melt-down experienced by BPA during the 2000-2002 period resulted from preference customers placing loads on BPA that exceeded the levels forecast by BPA, forcing BPA to acquire power from the market power to serve them. (Answering Br. 21.) Preference customers did place more load on BPA than it had forecast, as these preference customers had a statutory and contractual right to do. However, it was the loads of non-preference IOU and DSI customers, initially amounting to about 2,440 aMW and which BPA voluntarily elected to serve, that constituted the preponderance of the approximately 3,300 aMW shortfall between BPA's federal system resources and its delivery obligations.[13] (*Id.*)

These discretionary loads, combined with BPA's faulty assumption that it could procure power from the market at prices at or near BPA's preference customer rate, were the primary factors that placed BPA in grave financial jeopardy. In any event, neither BPA's inaccurate forecast of preference customer loads, nor preference customers' exercise of their statutory and contractual rights to place load on BPA, absolve BPA from its

---

[13] See footnote 7, *supra*.

duty on remand to refund to preference customers the full amount of the excess REP Settlement benefits.

BPA suggests that preference customers supported BPA's load reduction program to obtain benefits in the form of smaller BPA rate increases, and now reverse course by challenging the load reduction program and the LRAs that provided these benefits. (Answering Br. 182-83; Joint Br. 28.) Preference customers supported BPA's efforts to reduce its delivery obligations in order to help BPA avert a financial melt-down, but did not "reverse course" and challenge the LRAs after they had run their course. BPA's implication that preference customers changed their position to maximize their benefits is unfounded.

Preference customers' opposition to the REP Settlements, and the loss of the § 7(b)(2) REP cost protection the REP Settlements entailed, began long before BPA even had an inkling that it would need a load reduction program. In early 1999, before either the REP Settlement agreements or the LRAs were even offered, preference customers filed a petition in this Court challenging the legality of the proposed REP Settlement described in the Subscription Strategy Record of Decision.[14] Further, the *PGE* case challenging the REP Settlement was pending throughout the WP-02

---

[14] Petition for Review of Benton REA, *et al* (together, Western Public Agencies Group), Docket No. 99-70320, filed March 18, 1999.

28

Supplemental rate proceeding, and both the *PGE* and *GNA* cases were pending during the term of the LRAs. *See e.g.*, *PGE*, 501 F.3d at 1023 (petitions filed within 90 days of October 31, 2000); (R.S.E.R. 26 (PacifiCorp LRA executed May 23, 2001).) In the face of these facts, it is sadly ironic that BPA now points to the efforts of its preference customers to assist BPA in its hour of extreme financial need as evidence of greedy motives and perfidious behavior.

BPA also argues that preference customers made a tactical decision not to file a separate petition challenging the LRAs to retain the rate reduction benefits they provided, and only now that those benefits are safely received challenge the LRAs. BPA speculates that if this tactic succeeds, the preference customers will receive a double benefit; a rate reduction from the load reduction program, and the return of the payments made to PacifiCorp and PSE under the LRAs that made the rate reduction possible. (Answering Br. 183; Joint Br. 28.) The facts are otherwise, and are far less Machiavellian.

Preference customers did not separately challenge the LRAs because a separate challenge was not legally necessary or useful. The LRAs were not *per se* unlawful; it was the underlying REP Settlements that conveyed excess REP benefits to the IOUs and which required BPA to recover the costs of

29

Case: 08-74811, 03/25/2010, ID: 7279185, DktEntry: 150, Page 34 of 38

those excess benefits from preference customers. If the REP Settlements and BPA's efforts to evade the limits of § 7(b)(2) were found to be unlawful in the *PGE* and *GNA* cases (which they were), remand of the WP-02 rates would necessarily include the treatment of all payments made to the IOUs arising from the REP Settlement, such as those to PacifiCorp and PSE under the LRAs to release BPA from its REP Settlement power delivery obligations.

As explained above, it is hornbook law that a new and final order in a reopened administrative proceeding is reviewable on the merits, and such order commences a new statute of limitations period. *See supra* at 21-23; *ICC*, 482 U.S. at 278. It is beyond dispute that on remand of the WP-02 rates, the treatment of the LRA costs in the preference customer rates would be subject to a new and final order, would commence a new statute of limitations period and would be subject review on its merits with no further action being taken by preference customers. In foregoing the filing of a separate petition challenging the LRAs, the preference customers were relying on these well-established principles of administrative law.

As to BPA's assertion that adhering to well-established principles of administrative law will confer a double benefit on preference customers, nothing could be further from the truth. According to BPA's own

30

calculations, the benefits available to the IOUs under the REP Settlement, in the form of cash payments, power deliveries and payments *in lieu* of such power deliveries, totaled over $2.09 billion, to be collected from preference customers through the Preference Rate. These REP Settlement benefits exceed the reconstructed REP benefits, again as determined by BPA, by over $1.32 billion. Rather than a double benefit, the LRAs in fact imposed a substantial burden on preference customers by providing BPA a pretext for not recovering $653 million of this amount, and not refunding it to preference customers. (R.S.E.R. 10.)

As a result of the LRAs, preference customers would pay $653 million in excess of the lawful rate so that PacifiCorp and PSE may retain excess REP Settlement benefits to which they were never entitled.

## CONCLUSION

In *PGE* and *GNA*, this Court gave clear and succinct guidance to BPA regarding the benefits that could be provided to the IOUs under the REP as set out in § 5(c), and the REP costs that could be charged preference customers consistent with § 7(b)(2). BPA has diverged from that guidance by permitting PacifiCorp and PSE to retain payments made to them under the LRAs to monetize their REP Settlement power deliveries that exceed their reconstructed REP benefits.

31

We do not impugn BPA's motives in reaching this decision. However, even good motives do not justify this departure from the guidance of this Court in *PGE* and *GNA*, or BPA's failure to adhere to the requirements of §§ 5(c) and 7(b)(2). PacifiCorp and PSE should be limited to the benefits permitted them by law. They should be required to return to BPA all of the excess REP Settlement benefits amounts they received, and BPA should be required to refund commensurate amounts to its preference customers.

Dated: March 25, 2010.

Respectfully submitted,

*/s/ Terence L. Mundorf*
Terence L. Mundorf, WSB 12503
Marsh Mundorf Pratt Sullivan +
McKenzie, P.S.C.
16504 9th Avenue SE, Ste 203
Mill Creek, WA 98012
Tel: 425-742-4545
E-mail: terrym@millcreeklaw.com
*Attorney for the Western Public
Agencies Group*

*/s/ Richard G. Lorenz*
Richard G. Lorenz, OSB #003086
Thomas M. Grim, OSB #882182
Cable Huston Benedict
Haagensen & Lloyd
1001 Fifth Avenue, Ste 2000
Portland, OR 97204
Tel: 503-224-3092
*Attorneys for Tillamook
Peoples' Utility District*

*/s/ Eric L. Christensen*
Eric L. Christensen, WSB #27934
Snohomish Public Utility District
2320 California Street
Everett, WA 98206
Tel: 425-783-8649
E-mail:
*Attorney for Snohomish Public Utility
District*

32

## CERTIFICATE OF COMPLIANCE WITH RULE 32

Certificate of Compliance with Type-Volume Limitation, Typeface

Requirements and Type Style Limitations

1.	This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,961 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.	This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.

Dated:  March 25, 2010.

Respectfully submitted,

*/s/ Terence L. Mundorf*
Terence L. Mundorf, WSB 12503
Marsh Mundorf Pratt Sullivan +
McKenzie, P.S.C.
16504 9th Avenue SE, Suite 203
Mill Creek, WA  98012

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Reply Brief of Petitioners with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 25, 2010.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participant:

> David Hill
> Department of Energy
> 1000 Independence Avenue SW
> Washington, D.C. 20585

*/s/Terence L. Mundorf*
Terence L. Mundorf