IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098,
08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133,
08-75161, 08-75165

_____

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *ET AL.,*

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

_____

ON PETITION FOR REVIEW UNDER THE
NORTHWEST POWER ACT

_____

**REPLY BRIEF OF PETITIONERS PUBLIC UTILITY DISTRICT
NO. 1 OF COWLITZ COUNTY, PUBLIC POWER COUNCIL,
NORTHWEST REQUIREMENTS UTILITIES, AND PACIFIC
NORTHWEST GENERATING COOPERATIVE**

Paul M. Murphy
James L. Buchal
Murphy & Buchal LLP
2000 SW First Avenue,
Suite 420
Portland, OR  97201
Tel:  (503) 227-1011

Mark R. Thompson
Public Power Council
825 NE Multnomah
Street, Suite 1225
Portland, OR  97232
Tel:  (503) 595-9779

Joel C. Merkel
1001 4th Avenue,
Suite 4050
Seattle, WA  98154
Tel:  (206) 389-8222

R. Erick Johnson
R. Erick Johnson PC
5285 SW Meadows Road,
Suite 230
Lake Oswego, OR  97035
Tel:  (503) 684-9658

March 25, 2010

# TABLE OF CONTENTS

Table of Authorities ........................................................................ ii

Introduction ..................................................................................... 1

Argument ........................................................................................ 1

I.  BPA'S IMPLEMENTATION OF § 7(b)(2) FRUSTRATES ITS FUNDAMENTAL PURPOSE .............................................................. 1

  A.  The Overriding Purpose Of § 7(b)(2) Is To Protect Preference Customers From Bearing The Costs Of The REP ...................... 2

  B.  REP Benefits Are Subordinate to Preference Customer Protection ................................................................................. 5

II.  BPA'S IMPLEMENTATION OF § 7(b)(2) IS CONTRARY TO ITS PLAIN LANGUAGE. ............................................................. 6

  A.  Congress Mandated BPA To Use Five Specific Assumptions And No Others ......................................................................... 6

  B.  Section 7(b)(2) Applies Only To The "Power Costs" Used To Supply The "General Requirements" Of Preference Customers ..................................................................................... 8

  C.  The Section 7(b)(2)(D) Reference To "Resources" Cannot Support BPA's Interpretation ...................................................... 11

  D.  Section 7(b)(2) Provides No Protection Or Limit To Conservation Costs, Which Is Why They Are Not In The Rate Ceiling Calculation At All. ............................................... 17

  E.  BPA's Special 7(b)(2) Case Repayment Study Is Contrary To Law. ..................................................................................... 19

III.    LOOKBACK CALCULATIONS MUST BE MADE IN ACCORDANCE WITH THE LAWFUL INTERPRETATION OF § 7(b)(2) WHETHER OR NOT PARTIES HISTORICALLY IDENTIFIED BPA'S ERRORS, AND IRRESPECTIVE OF BPA'S PRIOR PRACTICES ............................................................. 25

IV.    BPA CANNOT CHANGE ITS TREATMENT OF MID-COLUMBIA RESOURCES RETROACTIVELY IN THE LOOKBACK .................................................................................. 28

Conclusion ........................................................................................ 31

CERTIFICATE OF COMPLIANCE WITH RULE 32

ii

**TABLE OF AUTHORITIES**

**Cases**

*ALCOA v. Central Lincoln Peoples' Utility District*,
    467 U.S. 380 (1984) ............................................................................... 3

*Blausey v. U.S. Trustee,*
    552 F.3d 1124 (9th Cir. 2009) ............................................................. 7

*Bowen v. Georgetown University Hospital*,
    488 U.S. 204 (1988) ............................................................................ 30

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    476 U.S. 837 (1984) ................................................................. 10, 11,16

*Golden Northwest Aluminum, Inc. v. BPA*,
    501 F.3d 1037 (9th Cir. 2007) ................................................ 5, 25, 27

*McKart v. United States*,
    395 U.S. 185 (1969) ........................................................................... 27

*Portland General Electric Co. v. BPA*,
    501 F.3d 1009 (9th Cir. 2007) ............................................. 4, 5, 29, 30

*Pacific Northwest Generating Coop v. Dept. of Energy,*
    580 F.3d 792 (9th Cir. 2009) .............................................................. 7

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ............................................................................. 27

**Statutes**

Federal Columbia River Transmission System Act

§ 16 U.S.C. § 838i .................................................................... 21

Pacific Northwest Electric Power Planning and Conservation Act,
§§ 16 U.S.C. § 839 *et seq.*

§ 3(3)        16 U.S.C. § 839(3) ........................................... 15

§ 5(b)        16 U.S.C. § 839c(b) ................................... 15, 29

§ 5(c)        16 U.S.C. § 839c(c) ................................... *passim*

§ 6(a)(1)     16 U.S.C. § 839d(a)(1)...................... 13, 14, 21

§ 6(a)(2)     16 U.S.C. § 839d(a)(2)............... 13, 14, 15, 21

§ 7(b)(1)     16 U.S.C. § 839e(b)(1)...................................... 8

§ 7(b)(2)     16 U.S.C. § 839e(b)(2)............................ *passim*

§ 7(b)(3)     16 U.S.C. § 839e(b)(3).............................. 4, 25

§ 7(b)(4)     16 U.S.C. § 839e(b)(4)............................ 10, 13

§ 7(g)        16 U.S.C. § 839e(g) .......................... 9, 17, 22

**Other Authority**

H. Rep. No. 96-976, Pt. I, 96th Cong., 2d Sess. (1980)............................. 3, 7

H. Rep. No. 96-976, Pt. II, 96th Cong., 2d Sess. (1980) ............................... 3

125 Cong. Rec. S3999 (daily ed. April 5, 1979) .......................................... 21

**Introduction**

This is the Reply Brief of Petitioners Public Utility District No. 1 of Cowlitz County, Public Power Council, Northwest Requirements Utilities and Pacific Northwest Generating Cooperative (jointly "Preference Customers"). It replies to arguments of Respondent, Bonneville Power Administration ("BPA") [1] and those of Intervenor-Respondent investor-owned utilities ("IOUs") [2] that address issues raised in our Opening Brief. [3] We explain how BPA's interpretation and implementation of the § 7(b)(2) rate ceiling provision in the Pacific Northwest Electric Power Planning and Conservation Act (16 U.S.C. § 839 *et seq.*, the "NWPA") conflicts with § 7(b)(2) and frustrates its purpose to protect preference customers from the costs of the NWPA's § 5(c) Residential Exchange Program ("REP").

**Argument**

I. **BPA'S IMPLEMENTATION OF § 7(b)(2) FRUSTRATES ITS FUNDAMENTAL PURPOSE.**

As demonstrated in our Opening Brief, BPA inflated FBS costs by roughly $1.1 billion and imported into § 7(b)(2) hundreds of millions of

---

[1] The Answering Brief of Respondent BPA, filed on Jan. 25, 2010, is cited herein as "BPA Br.___"

[2] The Joint Brief of Avista Corporation, Idaho Power Company, and Portland General Electric Co., filed Feb. 25, 2010, is cited herein as "Avista Br.___"

[3] The Opening Brief of Preference Customers, filed on August 19, 2009, is cited herein as "Opening Br.___"

dollars of "conservation costs," thus stripping away much of the rate protection from REP costs that § 7(b)(2) was intended to provide. BPA and the IOUs do not dispute the magnitude of the impact of BPA's actions on § 7(b)(2) rate protection, but instead attempt to deflect attention from this result by mischaracterizing the policies Congress sought to promote.

### A. The Overriding Purpose Of § 7(b)(2) Is To Protect Preference Customers From Bearing The Costs Of The REP.

As the legislative history of the NWPA explains, § 7(b)(2) is intended to protect preference customers from bearing the costs of the REP:

> Customers of preference utilities will *not suffer any adverse economic consequence as a result of this [residential] exchange* since, . . . the direct-service industrial customers of BPA are required to pay the costs of the exchange during its initial years while *a 'rate ceiling' protects the customers of preference utilities during later years*."

(House Report, Pt. II, at 35 (SER192;[4] emphasis added).)

Section 7(b)(2) places an upper limit or "ceiling" based on a short list of assumptions "specifically set forth" in § 7(b)(2) on the "power costs" component of the rate applicable to BPA's power sales to preference customers:

> Section 7(b)(2) establishes a 'rate ceiling' for preference customers that seeks to assure these customers that their rates

---

[4] The Supplement to Joint Excerpts of Record of Preference Customers, filed on March 19, 2010, is cited herein as "SER__".

2

> will be no higher than they would have been had the
> Administrator not been required to participate in power sales or
> purchase transactions with non-preference customers under this
> Act. *The assumption[s] to be made by the Administrator in
> establishing this ceiling are specifically set forth.* It is through
> rate ceilings that this Act provides additional protection to
> public bodies and cooperatives' preference customers as to the
> price of the sale of power by the Administrator.

(House Report, Part I, at 68-69 (SER178-179; emphasis added).)

Through this rate ceiling, Congress intended to "assure that the financial

benefits of the preference clause in the Bonneville [Project] Act will accrue

to BPA preference customers." Senate Report at 61 (SER130).

Long before the NWPA, the Bonneville Project Act required BPA to

give priority to applications for power of preference customers over

competing applications from non-preference customers. *ALCOA v. Central

Lincoln Peoples' Utility District*, 467 U.S. 380, 384 (1984) (citing 16 U.S.C.

§ 832c(b)). The legislative history makes clear that the NWPA was created,

in part, because of the anticipated inadequacy of the low-cost Federal base

system ("FBS") to meet even preference customers' loads. SER153 (House

Report, Pt. I); SER183 (House Report, Pt. II); SER187 (same). With

preference, the expected shortage meant that all of the financial benefits of

the FBS would flow to preference customers; no benefits would be left over

for others.

Therefore, when Congress provided for the REP in the NWPA, it also assured through § 7(b)(2) that REP costs would be offset by new benefits from the NWPA: anticipated cost savings from BPA continuing to serve the direct service industrial loads directly and reduced costs of financing new resources. With the departure of DSI load and the small size of the financing benefits, § 7(b)(2) and (3) operate to shrink REP benefits. Although BPA argues that DSI sales and financing benefits are not the only drivers of § 7(b)(2) (BPA Br. 112), BPA does not and cannot dispute that the primary purpose of § 7(b)(2) was to provide rate protection to preference customers from the costs of the REP.

Yet under BPA's current implementation of § 7(b)(2), the preference customers *alone fund the REP* in contradiction to this Court's declaration in *Portland General Electric Co. v. BPA*, 501 F.3d 1009, 1036 (9th Cir. 2007) ("*PGE*") that the REP should "not result in an increase the preference customers' rates." BPA and the IOUs offer convoluted and textually-unsupportable assertions concerning § 7(b)(2) that eviscerate Congress' overriding intent to protect preference customers from bearing the REP costs and to preserve for them the financial benefits of preference. In short, BPA and the IOUs attempt to justify shifting the cost of the REP to preference customers, despite Congress' clear prohibition against doing so.

### B. REP Benefits Are Expressly Subordinated To Preference Customer Rate Protection.

The IOUs cite legislative history indicating Congress intended to provide benefits to residential customers of IOUs. Avista Br. 12-13. But this Court has already found that notwithstanding this goal:

> Congress made clear that [the] *primary purpose* [of the NWPA] remained to protect BPA's preference customers and that any steps BPA took to exchange power with non-preference customers could not result in an increase in the preference customers' rates.

*PGE*, 501 F.3d at 1036 (emphasis added); *Golden Northwest Aluminum, Inc. v. BPA*, 501 F.3d 1037, 1047 (9th Cir. 2007) ("The NWPA requires that the IOUs' exchange benefits not come at the expense of BPA's preference customers.")

Similarly, the IOUs complain that "preference customers have received the lion's share of the benefits" of the BPA system. Avista Br. 12; *see also* BPA Br. 146. This argument is both irrelevant (given the NWPA's protection of preference) and misleading. The IOUs argue, without record support, that preference customers "would receive $2 billion in benefits from low-cost power purchases in FY 2009" while IOUs receive only $265 million in REP Benefits (Avista Br. 12), but the IOUs are comparing apples and oranges. Apparently, the IOUs' claim is based on the difference between BPA's rates and the market price of power. *Cf.* BPA Br. 103 n.14

5

(similar calculation). REP benefits, by contrast, are based on the difference between IOU costs and BPA costs, both of which are less than market prices.

The actual goal of the REP, subject to § 7(b)(2) rate protection, is to equalize wholesale power costs to residential consumers, not to equalize some inchoate measure of "benefits" of the federal power system. And that goal is subordinate to the "primary purpose" of avoiding preference customer rate increases by reason of the REP. *PGE*, 501 F.3d at 1036. BPA argues that its implementation of section 7(b)(2), which places the onus of REP costs on preference customers, does not frustrate the purposes of § 7(b)(2) because at least some protection is provided. BPA Br. 146. But BPA cannot satisfy its statutory requirements by affording preference customers a fraction of their statutory rate protection.

## II. BPA'S IMPLEMENTATION OF § 7(b)(2) IS CONTRARY TO ITS PLAIN LANGUAGE.

### A. Congress Mandated BPA To Use Five Specific Assumptions And No Others.

Congress intended to create a "specific" and "objective" rate test and did not confer unfettered discretion on BPA to protect or not protect preference customers as it might see fit. SER130 (Senate Report emphasizes that the "specific rate limit factors are objective in nature"); *see also*

6

SER178-79 (same in House Report, Pt. I). Congress mandated that BPA use the five assumptions "specifically set forth." Because Congress specified the five assumptions, BPA is prohibited under the canon *expressio unius est exclusio alterius* (the express mention of one thing excludes others) from adding extra-statutory assumptions. *E.g., Pacific Northwest Generating Coop v. Dept. of Energy,* 580 F.3d 792, 811 (9th Cir. 2009) (applying *expressio unius* to NWPA); *Blausey v. U.S. Trustee,* 552 F.3d 1124, 1133 (9th Cir. 2009).

Neither BPA nor the IOUs challenge the conclusion that *expressio unius* applies to § 7(b)(2). Nonetheless, BPA and the IOUs assert that § 7(b)(2) authorizes BPA to make a host of extra-statutory assumptions, including: (1) general requirements are to be increased by reversing thirty years of conservation savings (Points II B, C and D *infra*); (2) BPA has no obligation to acquire and pay for conservation (Point II E *infra*); and (3) BPA has no obligation to acquire and pay for new resources to serve its obligations that are not general requirements. *Id.*

BPA and the IOUs try to justify adding new assumptions to the statutorily-mandated Five Assumptions by claiming Congress sought in § 7(b)(2) to represent "a world without the [Northwest Power] Act." Avista Br. 11; BPA Br. 161. Actual loads, resources, and costs become all but

irrelevant as such carefully defined concepts as "'general requirements' in the 7(b)(2) Case [become] the hypothetical load of preference customers to be met in the hypothetical 7(b)(2) world." Avista Br. 24-25. While Congress assuredly intended in general terms to protect preference customers against paying higher rates on account of some elements of the NWPA, § 7(b)(2) is focused on the particular goal of protecting preference customers from REP program costs by specific and carefully-crafted means.

The "no-Act world" is inconsistent with the statute. For example, § 7(b)(2)(D)(i), directs the Administrator to consider resources purchased by the Administrator *pursuant to § 6 of the NWPA*. It was only in the NWPA that Congress "for the first time" gave BPA authority in § 6 "to acquire resources to increase the supply of federal power." *ALCOA*, 467 U.S. at 386. Hence, BPA's claim that § 7(b)(2) affords it authority to create a hypothetical "no-Act world" is contrary to the plain language of the NWPA.

### B. Section 7(b)(2) Applies Only To The "Power Costs" Used To Supply The "General Requirements" Of Preference Customers.

The plain language of the first paragraph of § 7(b)(2),[5] properly

---

[5] Under § 7(b)(1), REP costs are allocated to the PF rates. BPA claims Preference Customers disputed this. BPA Br. 105-06. We did not. We noted that REP costs are allocated in the first instance to the PF rate, which creates the need for the § 7(b)(2) rate protection. Opening Br. 23.

understood, refutes all the arguments offered by BPA and the IOUs concerning § 7(b)(2):

> After July 1, 1985, the projected amounts to be charged for firm power for the combined *general requirements* of [preference customers], *exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation* . . . may not exceed in total . . . an amount equal to the *power costs* for *general requirements* of such customers if, the Administrator assumes that . . ..

BPA collects the "amounts to be charged for firm power" through rates to recover 1) the costs of generating electric power to meet the general requirements of preference customers, plus 2) conservation and other costs that BPA is directed to recover from all customers under § 7(g). By excluding § 7(g) costs, notably conservation costs, from the "amounts to be charged" (what BPA calls the "Program Case"), Congress focused upon the costs of generating electric power, and directed BPA to compare those costs with the "power costs" that result from the Five Assumptions (what BPA calls the "7(b)(2) Case").

Accordingly, § 7(b)(2) addresses only a subset of BPA's overall electric power sales (general requirements) and a subset of the costs to make such sales: the cost of obtaining electric power to supply the "general requirements" for preference customers. This is so because the "may not exceed" rate test limitation applies to "power costs," and because Congress

9

defined the "general requirements" of preference customers as "*electric power* purchased from the Administrator" by them.  § 7(b)(4) (emphasis added).

BPA's interpretation of § 7(b)(2) would typically be entitled to deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), but BPA's interpretation strays so far from Congress' express intent that *Chevron* deference cannot save it.  Because Congress expressly specified that the § 7(b)(2) rate test addressed "power costs," and not conservation costs which are excluded from the § 7(b)(2) rate test, "the intent of Congress is clear [and] that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress".  *Id.* at 843.

BPA argues that the language of the first lines of § 7(b)(2) does not expressly exclude conservation costs from the 7(b)(2) Case, so "[t]herefore conservation costs are included in the 7(b)(2) Case."  BPA Br. 155.  While the bare grammatical structure of the first lines of § 7(b)(2) may not alone expressly *forbid* any consideration of "conservation" costs as BPA proceeds to implement the Five Assumptions (BPA Br. 152; Avista Br. 26), the "power cost" context makes it clear that only an express requirement in the

10

Five Assumptions to consider conservation costs could support BPA's interpretation.

The IOUs argue that § 7(b)(2) is "silent about whether preference customers' 'general requirements' in the 7(b)(2) Case are fixed or should be adjusted to reflect that preference customers' loads would be greater without conservation". Avista Br. 18. This is wrong; "general requirements" is a defined term. Even if § 7(b)(2) were "silent," and it is not, BPA's interpretation would still fail as not "based on a permissible construction of the statute" (*Chevron*, 467 U.S. at 843), for this Court "must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n.9. BPA's and the IOUs' interpretation of § 7(b)(2) results in the preference customers bearing the cost of the REP, contrary to the expressly-stated Congressional intent.

### C. The Section 7(b)(2)(D) Reference To "Resources" Cannot Support BPA's Interpretation.

The mechanisms BPA utilizes to shift REP costs to preference customers all derive the mere existence of the word "resources" in § 7(b)(2)(D) and BPA's erroneous assumption that § 7(b)(2)(D) necessarily refers to all "resources," not just resources compatible with § 7(b)(2)(D). BPA and the IOUs sidestep the whole context and structure of the § 7(b)(2) *power cost* comparison and the statutory definition of "general

11

requirements" in favor of a simple "syllogism" that does not fit within that context: (1) "conservation" is a "resource"; (2) § 7(b)(2)(D) directs BPA to select least-cost "resources" to "meet remaining general requirements" after utilizing the FBS resources; and thus (3) BPA must be able to select "conservation resources" to supply such general requirements. BPA Br. 150.

BPA then extrapolates from its syllogism to require the extraordinary additional step of assuming away the entire effect of conservation under the NWPA—much fully paid for in prior years by preference customers and others—thus producing 500 to 700 aMW of additional load for the 7(b)(2) Case. The IOUs go so far as to claim that § 7(b)(2)(D) is the "most critical assumption" (Avista Br. 21), which embodies its own "hypothetical scenario" of no conservation except to the extent conservation is selected as a low-cost resource. Avista Br. 18.

The mere appearance of the word "resources" in the Fourth Assumption (§ 7(b)(2)(D)) can not support such a radical result. Where Congress sought to add to the "general requirements" that are to be considered in the 7(b)(2) Case, it did so expressly. In § 7(b)(2)(A), Congress directed BPA to assume that the "general requirements" included certain direct service industrial loads. *Expressio unius est exclusion alterius*.

12

While § 7(b)(2)(D) refers to identifying the costs of "all resources that would have been required . . . to meet remaining general requirements" after use of FBS resources, this language does not require or allow "conservation" to be among the resources considered in the 7(b)(2) Case. The term "general requirements" in § 7(b)(2)(D) is defined in § 7(b)(4) as "electric power purchased from the Administrator . . . under section 5(b)." Not only does use of the term "power" make it clear that conservation is not intended to be among the § 7(b)(2)(D) resources, but so too does the reference to "under section 5(b)" because BPA only sells electric *power* under § 5(b); it does not sell conservation. BPA's inclusion of conservation in the "resources" considered under § 7(b)(2)(D) is therefore contrary to the plain language of the statute.

Likewise, "power costs," the object of the § 7(b)(2) comparison, are not identical to "resource costs." The scope of "resources" in the Fourth Assumption is a function of its context; that context is comparing "power costs." BPA argues that Congress referred to resources "purchased from [preference] customers pursuant to § 6" generally, including both conservation resources described within § 6(a)(1) and power resources under § 6(a)(2). But BPA cannot dispute that only "electric power," not

13

"conservation" can "meet the remaining general requirements" of preference customers.

Section 6 itself supports our view because it distinguishes clearly between purchases of electric power to serve load, and use of conservation to reduce load. Section 6(a)(1) grants BPA authority to acquire conservation resources, while § 6(a)(2) grants BPA authority to acquire power resources "to meet his contractual obligations that remain after taking into account planned savings from measures provided for in paragraph (1)."

BPA also points to general legislative history referring to the potential for conservation to meet BPA's obligations. BPA Br. 150-51. But BPA cannot identify any legislative history suggesting that Congress viewed conservation as a "power cost" within the meaning of § 7(b)(2) or intended BPA to use conservation to meet the "general requirements" for "electric power" in the § 7(b)(2) rate test. The legislative history concerning calculation of § 7(b)(2) excludes conservation completely (addressed *infra* II D).

BPA argues that § 7(b)(2)(D) becomes "superfluous" if the pertinent "resources" are electric power resources only, because "general requirements would be limited to the amount of power available from FBS resources." BPA Br. 163. This is wrong. As discussed in Point I, the

14

NWPA was created, in part, because of the anticipated inadequacy of the FBS to meet regional loads. NWPA § 5(b) requires BPA to meet the electricity needs of any regional utility that so requests. Section 6(a)(2) obligates BPA to acquire the power resources needed to do so. If projected preference loads exceed FBS capability, § 7(b)(2)(D) operates to allocate additional costs to the 7(b)(2) Case either by use of additional *power* resources purchased from preference customers (§ 7(b)(2)(D)(i)), or by use of "other new resources acquired by the Administrator" (§ 7(b)(2)(D)).

BPA also argues that because § 7(b)(2)(B) directs the Administrator to assume that preference customers were served by FBS resources "not obligated to other entities under contracts existing as of December 5, 1980," failure to inflate loads in the 7(b)(2) Case would mean that "500 to 700 aMW of the [preference customers'] loads would be served from the start of the rate test with conservation resources." BPA Br. 158-59. This is sophistry. Under the NWPA, conservation does not "serve" loads; "conservation" is defined in § 3(3) of the NWPA as a "reduction in electric power consumption." One need not import conservation into the 7(b)(2) Case "[t]o give priority to the FBS pursuant to § 7(b)(2)(B)," as BPA

15

claims (BPA Br. 160); one need only assume that the actual projected power sales (adjusted pursuant to § 7(b)(2)(A), without additional, improper assumptions) were supplied by the FBS. If the sales are less than the size of the FBS, one need not reach § 7(b)(2)(D) at all; if they are larger than the FBS, one can utilize § 7(b)(2)(D) to select such additional electric power resources as are necessary to supply the remaining sales.

If, as BPA claims, Congress had sought to make the 7(b)(2) Case a "no-Act" case, there would be no role for the costs of BPA's conservation acquisitions which only existed by virtue of the NWPA. Yet under the interpretation pressed by BPA and the IOUs, the single most important factor driving the rate test is conservation.

Under *Chevron*, even if this Court regards § 7(b)(2) as "silent or ambiguous with respect to the specific issue[s discussed above], the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In particular, this Court "must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n.9. Because BPA's interpretations grossly inflate the 7(b)(2) Case costs, thereby permitting BPA to charge preference customers for billions in REP costs from which they were supposed to be

16

protected, BPA's statutory construction fails even if it were not refuted by the plain language of the statute.

### D. Section 7(b)(2) Provides No Protection Or Limit To Conservation Costs, Which Is Why They Are Not In The Rate Ceiling Calculation At All.

Section 7(b)(2) concerns only the "power cost" included in preference customers' rates. Preference customers have no protection from conservation costs, which are allocated to all customers, including preference customers, under § 7(g). No matter what level of rate protection arises from the difference between Program Case and 7(b)(2) Case, conservation costs are recovered in the rates paid by preference customers pursuant to § 7(g) without regard to operation of § 7(b)(2). Congress therefore directed that conservation costs be excluded from § 7(b)(2).

BPA and the IOUs falsely accuse Preference Customers of seeking conservation "for free" (BPA Br. 156) or at "no cost." Avista Br. 4; *see also* Avista Br. 19, 26-27. In fact, because all conservation costs are recovered under § 7(g), the Preference Customers must pay their share of such costs.

17

BPA's own witnesses admit that conservation costs "are fully recovered from preference customers irrespective of what happens in the 7(b)(2) Case." SER85.

BPA's and the IOUs' arguments amount to the contention that Congress intended to fund the REP at preference customers' expense by adding conservation costs into the 7(b)(2) Case without regard to actual loads and actual costs of electric power to serve those loads. Under this interpretation, rate protection for preference customers is to be attenuated (and the REP funded at their expense) to the extent of conservation costs— even conservation costs already fully paid by preference and other customers in prior rate periods.[6]

Appendix B (described in Opening Br. 41-43) further confirms that there is no lawful role for conservation in the § 7(b)(2) rate test. BPA asserts, incorrectly, that § 7(b)(2) "provides that the costs of conservation must be *removed* from the Program Case," and then argues that Appendix B is contrary to the NWPA because the "numerical analysis [in Appendix B]

_____

[6] Congress could never have intended that the § 7(b)(2) rate test operate by assuming away ancient expenditures to insulate houses, increasing utility load as if the insulation had never occurred, and then removing rate protection—*i.e.*, requiring preference customers to fund REP benefits by imagining that preference customers must in a later rate period pay (*again*) to insulate the houses.

does not show any *reduction* for conservation; it simply adds FBS costs, additional resource costs, and reserve costs." BPA Br. 166 (emphasis added). But conservation costs need not be "removed" from the Program Case; the relevant costs are defined in § 7(b)(2) to be those "exclusive of" conservation costs, precisely the set of costs Congress assembled in Appendix B by adding "FBS costs, additional resource costs, and reserve costs," and not adding any conservation costs. Appendix B did what § 7(b)(2) required and BPA refuses to do: it compared the power cost subset (exclusive of conservation costs) with and without the Five Assumptions.

It is also not surprising that Appendix B "does not identify any specific conservation amounts to be used." BPA Br. 165. The plain language of the NWPA requires that conservation costs neither be included in the "power costs" to supply the power sales under the Five Assumptions, nor be included among costs from which preference customers are protected.

### E. BPA's Special 7(b)(2) Case Repayment Study Is Contrary To Law.

By conducting a special repayment study for the 7(b)(2) Case, BPA inflated the assumed costs of financing FBS resources by over $1.1 billion for the period FY 2002-2009 and thereby reduced the § 7(b)(2) protection by

19

$125 million per year. Opening Br. 47-49 (citing SER228). Apart from erroneous claims of mischaracterization (BPA Br. 172) and dissembling (Avista Br. 29) by the Preference Customers, neither BPA nor the IOUs denies that BPA removed $1.1 billion of § 7(b)(2) rate protection by the device of a special 7(b)(2) Case repayment study.

The low-cost FBS resources are the reason for statutory preference and the primary preference benefit enjoyed by preference customers and protected by § 7(b)(2). If Congress had intended that BPA assume that FBS costs for the § 7(b)(2) rate test were higher than actual FBS costs, any such intention would have been clearly expressed in the text of § 7(b)(2). No such intention can be read or implied in § 7(b)(2) because the plain language of § 7(b)(2) precludes any such assumption.

BPA states in its brief that the "critical point" in its 7(b)(2) Case repayment study is that it contains repayment obligations associated *only with the FBS* whereas the repayment study upon which BPA bases rates includes obligations associated with *FBS resources, conservation and new resources*. BPA Br. 174. Thus, *whether BPA may lawfully use a special repayment study in the § 7(b)(2) analysis turns on whether § 7(b)(2) allows BPA to assume that BPA has no obligation to pay for the conservation and new resources that BPA must by law acquire and pay for.*

Nothing in § 7(b)(2) directs BPA to assume that any of its financial obligations do not exist so as to require a special repayment study. To the contrary, as BPA acknowledges, its ongoing financial obligations arise from the costs incurred in carrying out *all* of its statutory duties. BPA Br. 173. These duties include acquiring cost-effective conservation (§ 6(a)(1)) and additional "new resources" to provide power to meet BPA's contractual obligations (§ 6(a)(2)). 16 U.S.C. §§ 839d(a)(1) & (2). BPA, in fact, acquired conservation and new resources and incurred substantial financial obligations it must meet. 16 U.S.C. § 839e(a)(1); 16 U.S.C. § 838i.

BPA asserts that a special 7(b)(2) Case repayment study is required because FBS resources "are the only Federal resources in the 7(b)(2) Case" (BPA Br. 177), and that "[i]n the 7(b)(2) Case, the Federal government owns or has contracts for only the FBS resources, not for conservation and new resources." BPA Br. 174. If true, this would mean only that in the power cost comparison, BPA must tally up the costs of meeting general requirements of preference customers with the FBS resources and such other power resources as are necessary to meet remaining general requirements. BPA's financial obligations to meet all of its other duties under the NWPA continue, and nothing in § 7(b)(2) permits BPA to inflate FBS costs by

21

assuming that all its other financial obligations need not be paid.[7] Put another way, although the magnitude of power costs estimated for purposes of the 7(b)(2) Case is not the same as in the Program Case, both cases represent a *subset* of costs, and Congress neither allowed nor directed changes to costs outside that subset.

If BPA were supposed to ignore real-world costs outside the relevant subset of costs considered in the § 7(b)(2) test, BPA would also have had to conduct a special § 7(b)(2) repayment study for the Program Case, since § 7(b)(2) expressly excludes conservation and other § 7(g) costs from the Program Case costs. But BPA did not perform a special Program Case repayment study. BPA Br. 177-78. Instead, BPA merely made an "after-the-fact adjustment once the full costs of all resource pools are accounted for" in the repayment study. *Id.*

---

[7] The means whereby the special repayment study inflates FBS costs in the 7(b)(2) Case is a function of how BPA's annual payment obligation is calculated and the fact that the § 7(b)(2) test only looks at the rate period plus four years. BPA has a large amount of bonds associated with FBS resources coming due in a year that is after the period used in the § 7(b)(2) test. AR093964. That large payment establishes the minimum repayment for every year prior to that year. SER228. Therefore, in its special repayment study, BPA simply replaces payments actually attributable to conservation and new resources with payments BPA attributes to the FBS for § 7(b)(2) only. BPA adds one "FBS" dollar for every conservation or new resource dollar it subtracts. Thus, for the § 7(b)(2) test period, BPA creates the appearance that the FBS is more expensive than it actually is. *See* AR093908.

That is precisely what BPA must do in the 7(b)(2) Case; make the factual assessment of the full costs of resources, including financing costs, and then use the same real-world calculated costs to assemble the relevant subset of power costs for purposes of the 7(b)(2) rate test. BPA knows from its Program Case repayment study precisely what those financing costs are, and knows from its Program Case repayment study the financing costs of the FBS and other resources used to supply the general requirements in the 7(b)(2) Case.

BPA is also wrong to suggest that FBS resources "are the only Federal resources in the 7(b)(2) Case" (BPA Br. 177) and that "[i]n the 7(b)(2) Case, the Federal government owns or has contracts for only the FBS resources, not for conservation and new resources." BPA Br. 174. The plain language of § 7(b)(2)(D) is to the contrary. For example, § 7(b)(2)(D)(i) expressly refers to resources "purchased from such [preference] customers by the Administrator pursuant to section 6 [of the NWPA]." Section 7(b)(2)(D) explicitly recognizes that general requirements may be served by "any additional resources [that] were obtained at the average cost of *all* other *new resources acquired by the Administrator*" (emphasis added). This express language refutes BPA's "no-Act world" assumption that no such resource

23

acquisitions ever happened,[8] because only the NWPA authorized BPA to make the purchases and acquisitions referred to in § 7(b)(2)(D).

BPA also cites § 7(b)(2)(E), which directs BPA to assume that "the quantifiable monetary saving . . . resulting from reduced public body and cooperative financing costs as applied to the total amount of resources, other than Federal base system resources, identified in subparagraph (D) of this paragraph . . . were not achieved." In other words, BPA is to assume that the resources "purchased from such customers by the Administrator" and "all other new resources acquired by the Administrator" (both under authority granted in the NWPA) and referred to in § 7(b)(2)(D), may have a somewhat higher financing cost (*i.e.* they may not achieve certain hoped for "monetary saving").[9] But they remain, by the express language of § 7(b)(2)(D), resources either "purchased" or "acquired" by BPA and thus they remain BPA financial obligations that must be accounted for in the repayment study. This language cannot be read, as BPA suggests, to assume away repayment obligations for such resources. BPA Br. 174.

---

[8] *See* SER230-31 (which discusses new resources BPA has actually acquired).

[9] Some of BPA's new resources did not in fact achieve financing benefits. SER231.

Importantly, since § 7(b)(3) assures recovery of "any amounts not charged to [preference] customers by reason of [§ 7(b)(2)]," the operation of the § 7(b)(2) rate test does not change BPA's total revenues or repayment obligations at all. Section 7(b)(2) helps determine which customers pay which of BPA's costs; it does not determine or affect the costs BPA must pay. The goal of the repayment study, to assure timely repayment of the Federal investment, as established by the Department of Energy Order RA 61202 and otherwise (BPA Br. 173) is simply not implicated at all by operation of the § 7(b)(2) rate test.

## III. LOOKBACK CALCULATIONS MUST BE MADE IN ACCORDANCE WITH THE LAWFUL INTERPRETATION OF § 7(b)(2) WHETHER OR NOT PARTIES HISTORICALLY IDENTIFIED BPA'S ERRORS, AND IRRESPECTIVE OF BPA'S PRIOR PRACTICES.

This Court remanded this case to BPA because it charged rates "in plain violation of the Rates Adjustment Test, which guarantees preference customer rates as if 'no purchases or sales were made [under the REP]'." *GNA*, 501 F.3d at 1036. As BPA acknowledges, this "Court was clear that BPA must not only adhere to statutory requirements in the future, but rectify the harm caused by past illegality." BPA Br. 51. BPA acknowledges that in the Lookback, it "had to determine the REP benefits to which the IOUs

25

would have been entitled absent the REP settlements." BPA Br. 56; *see also id.* at 57, 59, 61, 64 (noting broad authority to correct errors on remand).[10]

The same logic requires BPA to correct its errors in interpreting § 7(b)(2) and using altered projections of FBS costs in the 7(b)(2) Case. BPA's claim that these errors are not "Lookback issues" (BPA Br. 146; *see also* Avista Br. 17-18), is therefore incorrect. BPA argues that "it simply used the 1984 Legal Interpretation and Implementation Methodology" for § 7(b)(2) (BPA Br. 147) except in a very significant case that would have provided substantial rate protection (*see infra* Point IV) and that BPA could not, as a matter of law, consider arguments concerning its legal errors that were raised in the reopened WP-07 rate case, but not the WP-02 rate case.

BPA's theory is that, because such arguments were not raised in the WP-02 rate case, "BPA could not consider the arguments in developing the WP-02 PF Exchange rate". BPA Br. 148. But the arguments *were* before BPA in the Lookback case when it re-considered and re-developed a WP-02 PF Exchange rate for the purpose of "rectify[ing] the harm caused by past illegality." BPA Br. 51. BPA and the IOUs cite no authority, and we are aware of none, which forbids an agency from "correct[ing] for known

---

[10] All of these statements are made in the context of rejecting APAC's arguments opposing BPA's reopening of the record. Whatever the merits of this APAC argument, BPA certainly cannot selectively reconsider its positions so as to create unlawful measures of REP benefits.

errors" (BPA Br. 57) brought to its attention at the time it is making a decision.

It has long been an axiom of administrative law that ". . . if [an administrative] action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law". *SEC v. Chenery Corp.,* 318 U.S. 80, 95 (1943). This Court has before it BPA's determination of the Lookback amount, which is manifestly based on the misconceptions of law discussed above and which therefore may not stand.

Preference Customers raised these issues in the agency proceedings now before this Court and BPA addressed those issues at length. Thus, the purposes of the exhaustion doctrine[11] are vindicated, for BPA has had the opportunity to consider and address the arguments presented. There is no legally-cognizable prejudice to any party from considering these arguments in the Lookback.

While petitioners did not point out the errors in the WP-02 proceedings, the REP Settlement Agreements made any such challenges moot. As is clear from this Court's decision in *GNA*, in the WP-02 case

---

[11] *See generally McKart v. United States*, 395 U.S. 185, 193-98 (1969) (agency should be given the "first chance" to apply expertise, but argument has less force in context of statutory interpretation).

27

BPA had determined the amount of REP benefits it would pay *without regard to the operation of the § 7(b)(2) rate test*. In the proceeding on review here, the issue of the proper manner to apply § 7(b)(2) is no longer moot because BPA was required to apply § 7(b)(2).

This Court already deferred to BPA in ordering remand, such that BPA "through informed discussion and analysis, help[ed the] court later determine whether its decision exceeds the leeway that the law provides". BPA Br. 63 (quoting *INS v. Ventura*, 537 U.S. 12, 17 (2002)). It is apparent that BPA's Lookback decision violated the "specific" and "objective" § 7(b)(2) rate test, and speculation about what might have happened in a hypothetical WP-02 rate case cannot prevent this Court from reviewing BPA's improper decisions.

## IV. BPA CANNOT CHANGE ITS TREATMENT OF MID-COLUMBIA RESOURCES RETROACTIVELY IN THE LOOKBACK.

Notwithstanding BPA's insistence that it could not correct errors that *increased* the costs in the 7(b)(2) Case, BPA discarded its longstanding and formally-adopted rule concerning treatment of mid-Columbia resources from one that significantly *reduced* 7(b)(2) Case costs to one that significantly *increased* them, thereby reducing the § 7(b)(2) protection to which preference customers are entitled.

28

BPA acknowledges that, under its 1984 Legal Interpretation, mid-Columbia resources were eligible to meet "remaining general requirements" of preference customers pursuant to § 7(b)(2)(D)(ii) because those resources were "not committed to load pursuant to § 5(b)" to the extent that preference customers had not dedicated such resources to their own loads. *See* BPA Br. 133-34. BPA now claims its former rule "contradicted the plain language of the Act" (BPA Br. 134), but BPA finds too much fault with its own rule.

In our Opening Brief (pp. 49-58), we explained, with respect to treatment of mid-Columbia resources, the 1984 Legal Interpretation was within BPA's zone of permissible statutory construction. BPA's 1984 Interpretation that the "not committed to load pursuant to § 5(b)" language in § 7(b)(2)(D)(ii) meant not committed to the preference customers' "own load" (BPA Br. 155), was manifestly reasonable given that §§ 5(b)(1)(A) & (B) both refer explicitly to an entity's own load. BPA and the IOUs offer no reason to deny as a matter of law that Congress directed, in the 7(b)(2) Case, that preference customers should get the benefit of low-cost resources they may actually have sold to others. Because the 1984 Legal Interpretation on this issue was permissible, in marked contrast to BPA's treatment of the issues addressed in Points I and II, BPA was bound to obey its own rules until it changed them. *PGE*, 501 F.3d at 1034-35.

29

BPA and the IOUs argue that BPA is entitled to change its rules. BPA Br. 139-40; Avista Br. 40-41. BPA may surely change its rules *prospectively* within the bounds of the NWPA, but none of the cases cited by BPA or the IOUs address the circumstances here: whether BPA may *retroactively* change from one valid statutory interpretation to another.[12] As BPA acknowledges, its cited cases address an agency's authority to change rules *prospectively* to address "changing circumstances". (*Id.*) Here there are no changed circumstances (other than BPA's attempt to settle and convey unlawful REP benefits).

Attempting to avoid this Court's holding in *PGE* that "BPA should have relied upon its 1984 [average system cost rule]" (BPA Br. 144), BPA argues that the issue was previously "moot." *See also* BPA Br. 142. But the question of mootness has no bearing on BPA's authority to engage in retroactive rulemaking contrary to the rule set out in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988). All that matters is whether the 1984 Legal Interpretation was a permissible construction of the NWPA and whether it was in effect during the past relevant period. If so, BPA was bound to apply it in the Lookback for the entire time period prior to the

---

[12] We did not argue that BPA applied its *entire* new 2008 Legal Interpretation retroactively (*cf.* BPA Br. 141); only the treatment of mid-Columbia resources.

30

effective date of its revised 2008 Legal Interpretation.  If not, it was subject to correction just like BPA's erroneous treatment of conservation and other errors of law identified above.

## Conclusion

For the foregoing reasons, this Court should grant the relief requested by Preference Customers in their Opening Brief.

Dated:  March 25, 2010.

Respectfully submitted,

*/s/ Paul M. Murphy*
Paul M. Murphy, OSB # 84125
MURPHY & BUCHAL, LLP
2000 SW First Ave., Ste. 420
Portland, Oregon  97201
E-mail:  pmurphy@mbllp.com
*Attorney for Cowlitz PUD*

*/s/ R. Erick Johnson*
R. Erick Johnson, OSB # 80062
R. Erick Johnson PC
5285 SW Meadows Road, Ste. 230
Lake Oswego, Oregon   97035
E-mail:  ejohnson@rejpc.com
*Attorney for Pacific Northwest*
*Generating Cooperative*

*/s/ Mark R. Thompson*
Mark R. Thompson, OSB # 04433
825 NE Multnomah Street,
Ste. 1225
Portland, Oregon 97232
E-mail:  mthompson@ppcpdx.org
*Attorney for Public Power Council*

*/s/ Joel C. Merkel*
Joel C. Merkel, WSB # 04556
1001 4th Avenue, Ste. 4050
Seattle, WA  98154
E-mail:  joel@merkellaw.com
*Attorney for Northwest*
*Requirements Utilities*

# CERTIFICATE OF COMPLIANCE WITH RULE 32

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Limitations

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,226 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.

Dated:  March 25, 2010.

Respectfully submitted,

*s/ Paul M. Murphy*
Paul M. Murphy
MURPHY & BUCHAL, LLP
2000 SW First Ave., Suite 420
Portland, Oregon  97201
Attorney for Cowlitz PUD

## CERTIFICATE OF SERVICE

I certify that on March 25, 2010, I caused to be electronically filed the foregoing Reply Brief Of Petitioners Public Utility District No. 1 Of Cowlitz County, Public Power Council, Northwest Requirements Utilities, And Pacific Northwest Generating Cooperative.

I further certify that all participants in this case are registered CM/EFC users and will be served by the appellate CM/ECF system.

Respectfully submitted,

*s/ Paul M. Murphy*
Paul M. Murphy
MURPHY & BUCHAL, LLP
2000 SW First Ave., Suite 420
Portland, Oregon  97201
*Attorney for Cowlitz PUD*