Docket Nos. 08-74927, 08-74928, 08-74929, 08-74932,
08-74933, 08-74942, 08-74957 (Consolidated)

---

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

IDAHO PUBLIC UTILITIES COMMISSION, *et al.*,

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION

Respondent,

---

## ON PETITION FOR REVIEW UNDER THE NORTHWEST POWER ACT

---

## JOINT REPLY BRIEF OF IDAHO PUBLIC UTILITIES COMMISSION AND IDAHO POWER COMPANY IN NOS. 08-74927 AND 08-74933

---

Lawrence G. Wasden
Idaho Attorney General
Donald L. Howell, II
Deputy Attorney General
Idaho Public Utilities Commission
472 W. Washington Street
Boise, ID 83720-00074
don.howell@puc.idaho.gov
Telephone: (208) 334-0312
Facsimile: (208) 334-3762
Counsel for Idaho Public Utilities
Commission

R. Blair Strong
Paine Hamblen LLP
717 W. Sprague Ave, Ste 1200
Spokane, WA 99201-3505
r.blair.strong@painehamblen.com
Telephone: (509) 455-6000
Facsimile: (509) 838-0007
Counsel for Idaho Power Company

# TABLE OF CONTENTS

I.     SUMMARY ................................................................................ 1

II.     ARGUMENT................................................................... 3

       A.      The Court should not grant deference to BPA's interpretation of the NWPA in requiring deemer provisions in Section 12 of the 2008 RPSA ..................... 3

       B.      BPA contends erroneously that the NWPA is ambiguous ............................................................................... 7

       C.      The NWPA does not provide for other customers to benefit when IOUs reach wholesale rate parity ........................... 13

       D.      BPA's statutory analysis disregards that the REP is implemented as a subsidy ............................................... 14

       E.      BPA's interpretation of a REP transaction as a "two way" transaction ignores the reality that BPA largely determines the economic value of both sides of the exchange transaction ....................................................................... 16

       F.      The NWPA can be implemented in a harmonious manner that does not result in IOUs bearing uncontrollable risk or render Section 5(c)(4) pointless .................................... 20

       G.      BPA mistakenly relies upon a Senate report to support support its contention that it can limit the rights of IOUs to reenter the REP after a RPSA has been terminated or suspended ............................................................... 22

       H.      BPA's approach to the REP has been sporadic and inconsistent ............................................................... 25

III.     ADOPTION OF OTHER ARGUMENTS................................. 28

IV.     RELIEF REQUESTED................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.("ALCOA"),*
    467 U.S. 380 (1984)............................................................. 7,11

*Amalgamated Sugar Co. v. Vilsack,*
    563 F.3d 822 (9th Cir. 2009)...............................................3,4,5,6,7

*Azarte v. Ashcroft,*
    394 F.3d 1278 (9th Cir. 2005) ............................................... 10

*Biodiversity Legal Found. v. Badgley,*
    309 F.3d 1166 (9th Cir. 2002)............................................... 13

*Chevron v. Nat. Res. Def. Council,*
    467 U.S. 837 (1984)............................................................. 3

*Envtl. Def. Ctr., Inc. v. EPA,*
    344 F.3d 832 (2003)............................................................. 18

*Flores v. American Seafoods Co.,*
    335 F.3d 904 (9th Cir. 2003)............................................... 19

*K-Mart Corp. v. Cartier,*
    486 U.S. 281 (1988) ............................................................. 3

*Kokoszka v. Belford,*
    417 U.S. 642 (1974) ............................................................. 10

*Machinists Local #964 v. BF Goodrich,*
    387 F.3d 1046 (9th Cir. 2004) ............................................... 10

*PacifiCorp. v. Fed. Energy Reg. Comm'n,*
    795 F.2d 816 (9th Cir. 1986)...............................................17,25

*Pacific Northwest Generating Cooperative v. Bonneville Power*
    *Admn. ("PNGC I"),* 580 F.3d 792 (9th Cir. 2009) .................. 26

*Pacific Northwest Generating Cooperative v. Bonneville
Power Admn.* ("*PNGC II*"), ___ F.3d ___,
2010 WL 700477 (9th Cir. 2010) .......................................... 12,13,18

*Portland General Electric Co. v. Bonneville Power Admn.* ("*PGE*"),
501 F.3d 1009 (9th Cir. 2007) .................................................. *passim*

**Statutes**

Administrative Procedure Act
5 U.S.C. §§ 701-706 ......................................................... 3

Administrative Procedure Act
5 U.S.C. § 706(2)(A) ......................................................... 1,3,29

Section 5(c) of the Northwest Power Act,
16 U.S.C. § 839c(c) .......................................................... *passim*

Section 5(c)(1) of the Northwest Power Act,
16 U.S.C. § 839c(c)(1) ........................................................ 1,9,14,24

Section 5(c)(4) of the Northwest Power Act,
16 U.S.C. §839c(5)(c)(4) ..................................................... 9,20,22

Section 5(c)(5) of the Northwest Power Act,
16 U.S.C. §839c(c)(5) ........................................................ 15

Section 5(c)(7) of the Northwest Power Act,
16 U.S.C. § 839c(c)(7) ........................................................ 16

Section 7 of the Northwest Power Act,
16 U.S.C. § 839e ............................................................. 16

Section 7(b) of the Northwest Power Act,
16 U.S.C. § 839e(b) .......................................................... 20,22

Section 7(b)(2) of the Northwest Power Act,
16 U.S.C. § 839e(b)(2) ....................................................... 14

Section 7(b)(3) of the Northwest Power Act,
16 U.S.C. § 839e(b)(3)............................................................... 9,22

Section 9(e)(2) of the Northwest Power Act,
16 U.S.C. § 839f(e)(2) ........................................................ 3

**Other Authorities**

126 Cong. Rec. 31434 (1980) ......................................................... 23

H.R. Report No. 96-976 (Part I) at 29,
*reprinted in* 1980 U.S.C.C.A.N. 5989, 5995 ........................... 10

H.R. Report No. 96-976 (Part I) at 32-33,
*reprinted in* 1980 U.S.C.C.A.N. 5989, 5998-99 ...................... 23

H.R. Report No. 96-976 (Part I) at 33,
*reprinted in* 1980 U.S.C.C.A.N. 5989, 5999 ........................... 24

H.R. Report No. 96-976 (Part I) at 60,
1980 WL 12944 (Leg.Hist.)................................................... 11

H.R. Report No. 96-976 (Part II) at 32,
*reprinted at* 1980 U.S.C.C.A.N. 6023, 6030 .......................... 23

H.R. Report No. 96-976 (Part II) at 35,
*reprinted in* 1980 U.S.C.C.A.N. 6023, 6033 .......................... 14

Senate Report No. 96-272 at 27,
July 30 (legislative day June 21), 1979 .................................. 23

## I. SUMMARY

In its initial brief in this case, the Idaho Public Utilities Commission ("Idaho PUC") and Idaho Power Company ("Idaho Power") have shown that Bonneville Power Administration's ("BPA") determination to include in Section 12 of the 2008 Residential Purchase and Sale Agreement ("RPSA") a provision ("deemer provision") that requires utilities participating in the RPSA to accrue certain liabilities ("deemer balance") to BPA is contrary to Section 5(c)(1) of the Northwest Power Act ("NWPA" or "Act") and is arbitrary, capricious, an abuse of discretion, and contrary to law. 5 U.S.C. § 706(2)(A). The initial brief also pointed out similar flaws in BPA's determination to include in the 2008 RPSA provisions that authorize BPA to recover deemer balances that accrued under the 1981 RPSA by withholding current and future monetary benefits under the 2008 RPSA. Also, the initial brief pointed out the legal invalidity of BPA's determination to require utilities to agree to a single long-term contract as a condition for participating in the Residential Exchange Program ("REP") and impermissible and unreasonable restriction on utilities' rights to enter and exit residential exchange transactions and make new offers for new residential exchange transactions.

In its answering brief, BPA responded with several arguments to the effect that although the NWPA was principally intended to pass to Investor-Owned Utilities ("IOUs") customers some benefits of the federal hydroelectric system, Congress intended the exchange to reflect a "two-way" flow of benefits, so that benefits could flow from IOUs to BPA. BPA also contended the NWPA permitted the enforcement of historical deemer balances under the 1981 RPSA, and these balances should be enforced against utilities under the 2008 RPSA. In this brief, Idaho Power and the Idaho PUC demonstrate that Congress did not intend the REP to result in IOUs paying benefits (or otherwise accruing liabilities) to BPA. The purpose of the REP is to share the benefits of the federal hydropower system in the form of rate relief for the more than 1.6 million eligible customers served by the regional IOUs. I.E.R. Vol. II, 136 (R.A.R. 074904); I.E.R. Vol. II, 135 (R.A.R. 064129). Therefore, BPA's determination to include the deemer provision in the 2008 RPSA should not be sustained. Additionally, BPA's determination to enforce deemer balances that supposedly arose under the 1981 RPSAs frustrates the purposes of the NWPA, and it should be voided.

## II.    ARGUMENT

**A.    The Court should not grant deference to BPA's interpretation of the NWPA in requiring deemer provisions in Section 12 of the 2008 RPSA.**

Although BPA claims to have broad contracting authority,[1] BPA's contracting authority is clearly limited by the NWPA. *Portland General Electric Co. v. Bonneville Power Admin.("PGE"),* 501 F.3d 1009, 1025 (9th Cir. 2007). Even if BPA's actions in imposing the deemer provision are not subject to enhanced scrutiny by this Court as suggested by *Amalgamated,*[2] BPA's determination to adopt the deemer provision must be overturned because it is arbitrary, capricious, and manifestly contrary to the statute. *Chevron v. Nat. Res. Def. Council,* 467 U.S. 837, 844 (1984) (citations omitted). Section 9(e)(2) of the NWPA, 16 U.S.C. § 839f(e)(2), provides that the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA") governs the scope of judicial review of BPA's actions. Under the APA, BPA's actions are upheld unless they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). BPA cannot adopt a regulation that violates the requirements of the NWPA. *K-Mart Corp. v. Cartier,* 486 U.S. 281, 294 (1988); *PGE,* 501 F.3d 1009, 1035.

---

[1]    BPA Br. 29.

[2]    *Amalgamated Sugar Co. v. Vilsack ("Amalgamated"),* 563 F.3d 822, 834-835 (9th Cir. 2009).

Additionally, "[w]here an agency interprets or administers a statute in a way that furthers its own administrative or financial interests, the agency interpretation must be subject to greater scrutiny to ensure that it is consistent with Congressional intent and the underlying purpose of the statute." *Amalgamated*, 563 F.3d at 834.

However, BPA contends that neither of the two prongs of *Amalgamated* are satisfied in this case, and therefore the deemer provision in the 2008 RPSA is not subject to enhanced scrutiny by this Court. BPA Br. 42. As to the first prong, BPA asserts that it has no self-serving interests in its 2008 RPSA contracts, particularly with respect to the deemer provision that it drafted for the RPSAs, because as a self-funded agency, it only passes through REP costs to other customers. BPA Br. 42-43. BPA's argument fails for two reasons.

First, BPA is not distinguishable from the Department of Agriculture, which was found by this Court in *Amalgamated* to have self-serving interests in administering the provisions of the Agricultural Adjustment Act. BPA admits that the enforcement of deemer balances through the RPSA contract reduces its costs. BPA Br. 42-43. How BPA covers its costs, and from what source it could receive revenues is irrelevant for purposes of applying *Amalgamated.* In that case, the Court did not even discuss the agency's revenue sources.

Second, although BPA it is a self-financed agency, it assumes the one-sided role of a party to the RPSA as though it had a financial stake in the contract

provisions that it has adopted and seeks to enforce. It is irrelevant for proposes of *Amalgamated* whether the deemer provision produces potentially valuable benefits for BPA, or, as BPA contends, for its other customers.

Under the deemer provision, the amount of money that BPA believes that it has the right to collect from an exchanging IOU, when the IOU's Average System Cost ("ASC") is lower than the BPA Priority Firm ("PF") Exchange rate, is accumulated in a deemer account. The deemer account reduces future net benefits that would otherwise be paid as a result of the utility ASC again exceeding BPA's PF Exchange rate. I.E.R. Vol. I, 053 (R.A.R. 098554). The 1981 RPSA stated that the deemer balance would never become a cash payment obligation of the utility, but "shall be carried forward to apply to any subsequent exchange." *See e.g.* I.E.R. Vol. II, 146 (R.A.R. 076595). To illustrate the effect of these provisions, Idaho Power's deemer balance under the 1981 RPSA was $1.9 million in 1984.[3] BPA calculates that Idaho Power's balance has grown to more than $245 million as of October 2007.[4] BPA would use the deemer balance that accumulates under the 1981 RPSA to reduce or delay benefits under the 2008 RPSA by hundreds of millions of dollars.

---

[3] "Deemer Account Settlement Agreement with Avista Corporation" at 6-7 (June 22, 2009) published at: http://www.bpa.gov/corporate/pubs/RODS/2009/.

[4] I.E.R. Vol. II, 141 (R.A.R. 074982).

BPA contends that the "gain" that results from BPA reducing future REP benefits through the deemer provision does not accrue to BPA, but to all the customers that pay BPA cost-based rates. BPA Br. 43. However, it is unimportant whether BPA is acting in its agency self-interest by reducing its future costs or in the interests (as BPA views them) of other customers who may ultimately pay some of BPA's costs. Following from its interpretation that the NWPA sets up a "two-way" flow of benefits,[5] BPA, in effect, places the exchanging utility and its customers on one side of a supposed two-way bargain, and interposes itself on behalf of the other customers on the other side. By imposing the deemer provisions in Section 12 of the 2008 RPSA, BPA's interpretation of the NWPA substantially advantages BPA and its other customers and disadvantages a utility whose ASC exceeds the BPA PF Exchange rate. Therefore, its interpretation is not entitled to deference by this Court. *See Amalgamated*, 563 F.3d at 834-835.

Moreover, BPA has set forth purely administrative reasons for requiring utilities to accept its offer of a RPSA with a standardized contract term, including, "to *minimize disruption* that would otherwise occur with contracts expiring at different times" and "*promoting certainty* to BPA with respect to its obligations." I.E.R. Vol. I, 075, (R.A.R. 098576) (emphasis added). However legitimate BPA's

---

[5] BPA Br. 26 (REP benefits flow to the utility when its ASC is lower than the BPA PF Exchange rate, but benefits flow to BPA when the utility's ASC is higher than the PF Exchange rate).

concerns about minimizing disruption and promoting certainty with respect to its own agency activities may be, its statutory interpretations with respect to the deemer and related provisions are tinged by its own administrative self-interest in administering contracts with IOUs. Therefore, the first prong of *Amalgamated* is easily satisfied.

The second prong of *Amalgamated* is that, "the construction advanced by the agency is arguably inconsistent with Congressional intent." *Amalgamated,* 563 F.3d at 834. The second prong is satisfied, because as discussed in the next section, BPA's interpretations of the NWPA are clearly inconsistent with Congress' intent in creating the REP. Therefore, BPA's interpretations are not entitled to deference from this Court.

### B.  BPA contends erroneously that the NWPA is ambiguous.

Section 5(c) of the NWPA [16 U.S.C. § 839c(c)] establishes the REP program. With respect to the REP Program, the Supreme Court has noted:

> Because this exchange program essentially requires BPA to trade its cheap power for more expensive power, *it is obviously a money-losing program for BPA. . .*

*Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.,* ("*ALCOA*") 467 U.S. 380, 399 (1984) (emphasis added).  BPA concedes in its RPSA ROD that "[a] Congressional presumption that REP benefits, in the main, would flow from BPA through the utilities and to the intended beneficiaries (residential and small farm

consumers) is supported by Congressional Committee Report language . . . " I.E.R. Vol. I, 061 (R.A.R. 098562).

However, BPA also contends that there is an ambiguity in the NWPA stemming from BPA's view the REP is a "two-way" transaction, and there are circumstances when an exchanging utility could be making payments to BPA, specifically when the utility's ASC "falls below" BPA's PF Exchange rate. BPA Br. 31. BPA's use of the expression, "falls below" is itself a misnomer, because as explained in Section E, below, BPA sets the rules which determine the ASC, and sets the BPA PF Exchange rate; therefore, whether the ASC is above or below the BPA PF Exchange rate is determined in large measure by BPA. It would be more accurate to describe BPA's contention as being that when it causes the utility ASC to fall below the PF Exchange rate, the NWPA authorizes BPA to collect payments from the utility.

In any event, BPA's supposed ambiguity does not arise directly from the operative words of the Act, which on their face allow the utility to extend an offer to participate in the REP only during those times that the ASC is higher than BPA's rate:

> Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount

of electric power to such utility for resale to that utility's residential users within the region.

16 U.S.C. § 839c(c)(1).

BPA finds an ambiguity in other provisions. It reasons that Congress established a termination right pursuant to NWPA Section 5(c)(4)[6] if BPA applied a surcharge to BPA's Priority Firm exchange rate pursuant to NWPA Section 7(b)(3)[7], but Congress did not expressly state what was to happen if a utility's ASC was below BPA's PF Exchange rate for other reasons.[8] BPA consequently resolves its ambiguity by erroneously concluding that there must be circumstances when it could require IOUs to make cash payments to BPA.[9]

On this assumed power to require IOUs to make cash payments, BPA constructs its deemer provision, which it believes to be reasonable, because instead of requiring IOUs to make cash payments, it substitutes a requirement that IOUs accumulate deemer balances to be used to offset and diminish REP future benefits.[10]

Additionally, BPA places a "termination right" in the 2008 RPSA, which is also based on the assumption that BPA could, if it wished, make IOUs pay when BPA reduced the utility's ASC by changing the ASC Methodology:

---

[6]    16 U.S.C. § 839c(5)(c)(4).
[7]    16 U.S.C. § 839e(b)(3).
[8]    BPA Br. 31-32.
[9]    BPA Br. 33.
[10]   BPA Br. 34.

. . . The suspension right, which will encompass the right to suspend the Agreement *in the event of changes to the ASC Methodology* that would result in a utility accumulating a deemer balance, will provide the exchanging utility with flexibility to manage the RPSA in way to maximize REP benefits in the context of a program that, *BPA finds, is structured and was intended by Congress to be a two-way bargain.*

I.E.R. Vol. I, 049 (R.A.R. 098550) (emphasis added). BPA's statutory interpretation is mistakenly narrow. Normally,

When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature.

*Azarte v. Ashcroft*, 394 F.3d 1278, 1288 (9th Cir. 2005) (quoting *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974)); *also see Machinists Local #964 v. BF Goodrich*, 387 F.3d 1046, 1051 (9th Cir. 2004) (citations omitted) ("Textual exegesis necessarily is a holistic endeavor. . .").

BPA's interpretation fails to interpret the words implementing the REP in the context of the Congressional intent respecting the NWPA. This is demonstrated in two ways.

First, it is clear that the object and policy of Section 5(c) is to provide IOU residential customers with "wholesale rate parity with residential customers of preference utilities." *See* H.R. Report No. 96-976 (Part I) at 29, *reprinted in* 1980 U.S.C.C.A.N. 5989, 5995; (*also see* Joint Initial Brief of Idaho Power Company

and Idaho Public Utilities Commission, at 24-26).  In enacting the REP, Congress stated that:

> *Section 5(c) permits power exchange and power sales whereby rate relief will be provided residential customers of investor-owned utilities.* Although all utilities are permitted to enter into such sales, its benefits are likely to be limited to utilities that are not entitled to service as a preference customer. The sale is permitted where a utility offers for sale to the administrator an amount of electric power equal to that utility's residential load. When such an offer is made the administrator shall acquire, by purchase, such power at that utility's average system cost and shall offer to sell the same amount of power back to the utility at the rate charged preference customers for their general requirements for resale to that utility's residential users within the region only. . . . *The requirement is not likely to result in parity in the retail rates being paid by consumers of preference customers and consumers of investor-owned utilities, but it should equalize the wholesale costs of the electric power with a resulting benefit [to] the investor-owned utilities' customers.*

H.R. Report No. 96-976 (Part I) at 60, 1980 WL 12944 (Leg.Hist.) (emphasis added); *see also ALCOA*, 467 U.S. at 399 ("The [residential] exchange program operates to reduce this [rate] disparity.").

Under the NWPA wholesale rate parity is automatically realized when an IOU's ASC is equal to or lower than the PF Exchange rate. In that circumstance, the IOU requires no REP subsidy, and neither BPA nor the IOU needs to do anything. However, BPA has the 2008 RPSA serve purposes not contemplated by the Act when it mandates through Section 12 of the RPSA that IOUs must accrue

deemer balances that flow benefits to BPA when wholesale rate parity has been realized and no subsidy is required.[11]

In practice, the deemer provision delays or diminishes rate relief for IOU customers when IOUs are no longer in a rate parity situation. To illustrate, a part of Avista's deemer balance ($33.516 million) was subtracted from its FY 2008 REP benefits, resulting in no net REP benefits for Avista's eligible customers in that fiscal year. I.E.R. Vol. II, 148 (R.A.R. 087518). Thus, the deemer provision clearly frustrates Congress' intent that the REP provide benefits to IOU customers to achieve wholesale rate parity, when the IOU's ASC is above BPA's rates.

Second, nary a word is to be found in the NWPA or its legislative history, and BPA does not point to any direct legislative history, indicating any Congressional intention to require IOUs to pay or accrue liabilities to BPA, or otherwise subsidize the federal hydroelectric system with hundreds of millions of dollars.[12] BPA's decision to continue to use the deemer mechanism is contrary to clear Congressional intent and obstructs the rate parity goal that Congress sought to reach through the REP. The court should not defer to BPA's deemer decision. *E.g. Pacific Northwest Generating Cooperative v. BPA* ("*PNGC II*"), ___ F.3d

---

[11] Section 12 (Payment Balancing Account) as set forth in the RPSA ROD at 15-16. I.E.R. Vol. I, 053-054 (R.A.R. 098554-55).

[12] Idaho Power's growing deemer balance as of October 2007 was estimated by BPA to exceed $245 million. I.E.R. Vol. II, 141 (R.A.R. 074982).

___, 2010 WL 700477 at *12 (9th Cir. 2010), *citing Biodiversity Legal Found. v. Badgley,* 309 F.3d 1166, 1175 (9th Cir. 2002).

**C.    The NWPA does not provide for other customers to benefit when IOUs reach wholesale rate parity.**

BPA contends that the "gain" that results from BPA setting off REP benefits through the deemer provision does not accrue to BPA, but to all the customers that pay BPA's cost-based rates. BPA Br. 43.    However, in its ROD, BPA acknowledged it had not determined how REP benefit reductions resulting from the enforcement of historic deemer balances were to be treated for purposes of setting the rates of its customers, and left this issue to separate BPA § 7(i) rate proceedings. *See* I.E.R. Vol. I, 062 (R.A.R. 098563). Therefore, even BPA apparently recognizes that the NWPA and its legislative history provide no direction as to who (if anyone) should benefit from deemer balances. The deemer balances that historically accrued under the 1981 RPSAs, and that may accrue under the 2008 RPSAs, are a creation of BPA, and the beneficiaries of these balances is left wholly to BPA to determine.

However, BPA says that nothing in the NWPA prohibits BPA from receiving the benefits of an exchange sale.[13] To the contrary, nothing in the Act or its legislative history authorizes BPA or its other customers to receive benefits amounting to hundreds of millions of dollars from IOUs through the REP. These

---

[13]    BPA Br. 32.

balances serve no purpose with respect to achieving wholesale rate parity, and BPA does not attempt to articulate such a purpose. Indeed, as quoted on page 11, herein, Congress intended that the REP provide rate relief to IOU customers, not vice versa.

Moreover, BPA fails to articulate any statutory right of other customers that is served by requiring IOUs to pay benefits to BPA. In this respect, BPA's preference utility customers are already protected from adverse economic consequences of REP exchange transactions by NWPA Section 7(b)(2). *PGE*, 501 F.3d at 1015; H.R. Report No. 96-976 (Part II) at 35, *reprinted in* 1980 U.S.C.C.A.N. 6023, 6033 (" . . . a 'rate ceiling' protects the customers of preference utilities during later years."). BPA's interpretation merely gratuitously grants to BPA, or its other customers, an opportunity to benefit when an exchange is economically adverse to an IOU in a manner that is determined by BPA in its rate cases.

**D. BPA's statutory interpretation disregards that the REP is implemented as a subsidy.**

BPA's view that the REP allows for a two-way flow of benefits[14] implies that that Section 5(c)(1)[15] imposes transaction risk upon a utility and accordingly, the IOU is on the hook, in effect, to supply power to BPA at a loss, when the

---

[14]     *See* BPA Br. 31.
[15]     16 U.S.C. § 839c(c)(1).

utility's power is less costly than the BPA's power. This implication runs contrary to BPA's implementation of the REP in practice, which BPA has treated as a numerical calculation of benefits with none of the contract risk associated with actual power deliveries:

> . . . This "exchange" is a paper transaction . . . and the NWPA requires that any exchange benefit be passed through to the utility's residential customers.

> *PGE,* 501 F.3d at 1015 (citation omitted). As implemented, BPA does not

physically accept or deliver power. BPA neither assumes risk associated with a physical delivery, nor does it depend upon the IOU to supply power; it only determines and pays benefits for IOU customers. This is recognized by a preference utility organization, which has characterized the exchange as a subsidy. *See* "Brief of Intervenor Public Power Council," dated Dec. 15, 2009 at 6, 20, and 23 n.4, *Avista et al. v. BPA,* (9th Cir. Docket Nos. 09-70265, 09-70268, 09-70292, 09-70313, 09-70316, 09-70317, 09-70640 (Consolidated)).[16]

---

[16] BPA's implementation of the REP as a calculation-based subsidy, contrasts with NWPA Section 5(c)(5) under which BPA may physically acquire and redeliver electric power to IOUs, but only if the cost of the power supplied to the IOU is less costly than the utility ASC. *See PGE* 501 F.3d at 1015 n.6; 16 U.S.C. § 839c(c)(5).

**E.     BPA's interpretation of a REP transaction as a "two-way" transaction ignores the reality that BPA largely determines the economic value of both sides of the exchange transaction.**

BPA's interpretation that the REP is a "two-way" transaction implies a fiction that BPA and an exchanging utility are driving a hard bargain in arms' length "two-way" exchanges with the IOUs. APAC even more explicitly attempts to breathe life into this fiction, contending:

> So long as a utility elects to participate in the REP program, it accepts the risk that the price for power BPA must "sell" to the IOU will be higher than the utility's ASC. This is no different than any other type of financial exchange transaction involving commodity prices.

APAC Br. at 29. Both BPA and APAC fail to acknowledge that the REP is unlike any financial exchange transaction between two more-or-less equally situated parties, because BPA can unilaterally change the "riskiness" of the exchange by changing the ASC Methodology, or its own PF Exchange rate.

Along the same vein, BPA asserts that Congress only intended that "high cost" utilities receive benefits from BPA, and Congress did not say that BPA must protect "low cost" utilities from the possibility of paying BPA. BPA Br. 38. This assertion disingenuously ignores that BPA determines both the ASC Methodology[17] and the PF Exchange rate[18], and therefore, whether the utility's ASC is high enough for benefits under the REP largely results from BPA's

---

[17]     16 U.S.C. § 839c(c)(7).
[18]     16 U.S.C. § 839e *et seq.*

determinations. Moreover, Congress did not limit the wholesale rate parity purpose of the REP to utilities whose ASCs may be significantly higher than others. The calculation of the REP benefits automatically accounts for those differences, with the higher cost utilities receiving more benefits than others.

Illustrating the power that BPA has to profoundly and negatively affect the economics of the REP is the fact that BPA exercised its power to initiate changes to the ASC Methodology after the IOUs had already executed the 1981 RPSAs. *See PacifiCorp v. Fed. Energy Reg. Comm'n*, (*"PacifiCorp"*) 795 F.2d 816 (9th Cir.1986). The revisions to the ASC Methodology were adopted by BPA, in part, to respond to the wrongful inclusion of certain costs in the average system of a utility other than Idaho Power. *Id.* at 824. BPA's changes to the ASC Methodology transformed the 1981 RPSA into an uneconomic arrangement for several utilities, including Idaho Power, under which they began to accrue large deemer balances. I.E.R. Vol. II, 137, 138 (R.A.R. 074905, 074912). Even if signatories to the 1981 RPSAs thought that they understood the risks undertaken with respect to deemer balances, they were undoubtedly surprised at the extent of BPA's authority to negatively change the economics of the REP, which was confirmed upon appeal. *PacifiCorp, supra.* As pointed out earlier, BPA's calculations show that the deemer balance attributed to Idaho Power resulting from these changes has grown to $245.36 million as of October, 2007. I.E.R. Vol. II, 141(R.A.R. 074982).

BPA's and APAC's arguments also fail to address whether the magnitude of Idaho Power's historic deemer balance, which includes ever-increasing compound interest, defeats the over-all purposes of the REP. *See PNGC II,* 2010 WL 700477 at \*13, *citing Envtl. Def. Ctr., Inc. v. EPA,* 344 F.3d 832, 858 n. 36 (2003) (holding that no deference is due an agency's conclusion where the agency, "entirely failed to consider an important aspect of the problem"). The deemer balance attributed to Idaho Power, if enforced through the deemer provision in the 2008 RPSA, will substantially reduce or delay the receipt of benefits by Idaho Power's customers, thereby defeating Congress' intent to establish a mechanism to reach wholesale rate parity. BPA's approach to historic deemer balances is purely mechanical – documents signed decades ago result in the continual accumulation of a deemer balance subject to compound interest. At no point does BPA even attempt to assess whether a historic deemer balance can reach a level at which it wholly defeats the underlying purpose of the REP.

Moreover, APAC contends that an exchanging utility under the REP, "accepts a risk that the price for power BPA must sell to the IOU will be higher than the utility's ASC." APAC Br. at 29. APAC's contention completely ignores that the major risk for exchanging IOUs and their customers is the unpredictability of BPA's future actions in administering the REP. Although the NWPA may permit BPA to change both its rates and the ASC Methodology from time to time, it is

illogical to liken that possibility to the contract risk undertaken between two more-or-less equally informed and empowered contracting parties. With respect to determining the value of the REP, BPA holds most of the chips and cards on its side of the table. BPA's promise to deliver REP benefits through the RPSA is akin to an illusory promise,[19] because, although IOUs may sign the RPSA, BPA has the power to radically change, and in history, has actually changed the economic value of the REP.

This type of "risk"-that BPA may fundamentally change the economics of the exchange-is aggravated by BPA's further requirement that IOUs execute a single long-term RPSA. BPA states that:

> Because the REP has a cost impact to BPA's base rates, 20-year contracts for all customer groups offers stability by clarifying, on a longer-term basis, the rights and obligations of BPA's customer classes and the potential cost and rate impacts that BPA must manage as a consequence.

BPA Br. 57. However, BPA does not attempt to analyze how a utility could predict or could have predicted the potential cost and rate impacts to its customers of a long-term RPSA when BPA may change the principal determinants of the economic value of the REP at any time. BPA's and APAC's interpretation would force utilities to make random guesses about when their customers might be

---

[19] "An illusory promise is one containing words 'in promissory form that promise nothing' and which 'do not purport to put any limitation on the freedom of the alleged promisor.' " *Flores v. American Seafoods Co.*, 335 F.3d 904, 912 (9th Cir. 2003) (citation omitted).

benefitted or penalized by requesting RPSAs. The NWPA simply does not contemplate that type of guess-work.

**F.      The NWPA can be implemented in a harmonious manner that does not result in IOUs bearing uncontrollable risk or render Section 5(c)(4) pointless.**

BPA and APAC contend that Section 5(c)(4) would be surplusage if the NWPA intended benefits to never flow from IOUs to BPA. BPA Br. 33, APAC Br. 31. However, their contentions are erroneous. Even if one understands the NWPA to prohibit provisions that require benefits to be delivered from IOUs to BPA, Section 5(c)(4) continues to be a vital part of the NWPA.

BPA's contention that there is an ambiguity in the statute is true only if one assumes that Congress *mandated* a "two-way" flow of benefits that *must* always be part of the REP.  If BPA adopts REP programs that avoid the "two-way" flow, then there is no ambiguity organic to the NWPA. On this point, this Court has implicitly recognized a variety of contract structures that BPA could use to pass benefits to IOU customers, other than one that imposes a long-term two-way flow of benefits. However, these are subject to rate protection for preference customers:

> . . . [W]henever BPA engages in a purchase and exchange of powers — *whether on a yearly basis, under a REP program, or pursuant to a settlement agreement*-BPA acts pursuant to its § 5(c) authority, and is thus subject to the Congressionally imposed limitations on that authority as expressed in § 5(c) and § 7(b).

*PGE,* 501 F.3d 1009 at 1032 (emphasis added).

- 20 -

Even BPA's arguments in this case do not go so far as to suggest that the NWPA leaves BPA with no choice but to impose a two-way flow of benefits, or that it is precluded from settlements or other types of contracts to implement the REP. For instance, nowhere does BPA argue that it is *required* by the Act to force IOUs into a two-way arrangement where they must pay benefits to BPA or accrue deemer balances. BPA merely states that it "*could have*" required IOUs to make cash payments. BPA Br. 33. If BPA has the latitude under the NWPA to implement the REP to avoid a "two-way" flow of benefits, then there is no inherent ambiguity that must be resolved by the imposition of deemer provisions.

In this connection, it is significant that no party claimed on appeal to this Court in litigation concerning the 2000 REP Settlement Agreements, or contends in this litigation, that BPA is required to implement the REP as though there is a "two-way" flow of benefits between the IOUs and BPA. This Court's decision dealing with the 2000 REP Settlements Agreements does not even discuss deemer balances. *See PGE,* 501 F.3d 1009.

This Court's opinions do not necessarily suggest all the possible REP arrangements that could implement the REP. However, because the NWPA permits a variety of contractual arrangements, it follows that the Act does not straitjacket IOUs into an arrangement where they must be required to flow benefits to BPA. However, all BPA contracts are subject to Congressionally imposed

- 21 -

limitations as expressed in § 5(c) and § 7(b), which protect the preference customers. *PGE,* 501 F.3d at 1032.

The 2000 REP Settlement Agreements illustrate how the REP could be implemented without resort to BPA's "two-way" interpretation. In addressing those settlements, this Court did not prohibit an arrangement whereby BPA and the exchanging utility agreed upon a fixed REP benefit for IOU customers. This Court noted that BPA, ". . . *may enter into REP settlement contracts with IOUs*, but only on terms that will protect the position of its preference customers, consistent with §§ 5(c) and 7(b)." *Id.* at 1030 (emphasis added). Therefore, there is no need to resort to the deemer provision to remedy a disharmony; the NWPA intends BPA to deliver benefits for IOU customers to achieve wholesale rate parity, not the other way around, and it allows for considerable contract flexibility in achieving Congress' objectives. But all agreements implementing the REP are subject to Section 7(b)(3) to protect the preference customers. And, if Section 7(b)(3) is triggered, then Section 5(c)(4) is also triggered to protect the IOU customers.

> **G.    BPA mistakenly relies upon a Senate report to support its contention that it can limit the rights of IOUs to reenter the REP after a RPSA has been terminated or suspended.**

BPA requires a utility that has terminated a preexisting RPSA to wait for the next rate period before it can request a new RPSA. BPA asserts that its right to insert conditions that restrict an IOU from requesting a new RPSA is based, in part,

upon a Senate committee report that purportedly requires BPA to adopt provisions governing termination and resumption of any previously-terminated exchange. BPA Br. 50, 59, *citing* Senate Report 96-272 at 27, July 30 (legislative day June 21), 1979. BPA's reliance on this report is misplaced.

The report cited by BPA accompanied S. 885, a Senate bill that proposed an early version of the NWPA that passed the Senate but did not become law. The Senate bill was amended by the House of Representatives, and the House amendment was a "complete substitute" for S. 885. 126 Cong. Rec. 31434 (1980) (remarks of Rep. Dingell). More specifically, House Bill 6677, "substantially revised the Senate-passed bill and eliminated many ambiguities identified in that bill. . . ." H.R. Report No. 96-976 (Part I) at 32-33, *reprinted at* 1980 U.S.C.C.A.N. 5989, 5998-99. Part II of the House Report, dated September 16, 1980, that accompanied the NWPA observed that Senate Bill 885 was amended by, "striking all [the text] after the enacting clause and inserting in lieu thereof the text of a substitute bill," i.e., House Bill 6677. H.R. Report No. 96-976 (Part II) at 32, *reprinted in* 1980 U.S.C.C.A.N. 6023, 6030.[20]

---

[20] The amended bill would "allow the residential and small farm consumers of the region's non-preference utilities [i.e., the IOUs] to share in the economic benefits of the Federal hydroelectric resources without impinging upon the protections provided to existing or new preference customers of BPA by the preference clause of the Bonneville Project Act. . .". *Id.* at 6030. Among the basic features of the NWPA were the "power exchange [was] designed to benefit the region's residential customers [and] preservation of the

- 23 -

The Senate agreed to the House substitution. As a consequence, BPA's reliance on the Senate report is without merit; it refers to a bill that did not become law. The House reports that accompany the amended House version of the NWPA which was ultimately enacted, do not contain statements similar to the those of the Senate.

However, BPA also contends that it is reasonable to require a utility that has exited the RPSA to wait until the next BPA rate period before requesting a new RPSA, because the two-year period of a utility's ASC and the two-year BPA rate period coincide. BPA Br. 49-50. Even assuming BPA's logic is correct in this respect, BPA fails to state any reason related to its planning or rate-setting as to why a utility desiring a new RPSA should be compelled to wait for a substantially longer time than the next rate period. More to the point, Section 5(c)(1) of the NWPA allows a utility to offer an exchange with BPA "[w]henever" the utility chooses to do so. 16 U.S.C. § 839c(c)(1).

BPA requires a utility that "suspends" its RPSA to wait for the balance of the seventeen-year term of the original RPSA before it may reenter the REP. And, BPA's requirement to offset historical deemer balances against future REP benefits would require Idaho Power to wait possibly for multiple decades (or forever) to offset deemer balances before customers are entitled to receive benefits. The

---

preference clause." H.R. Report No. 96-976 (Part I) at 33, *reprinted at* 1980 U.S.C.C.A.N. 5989, 5999.

- 24 -

certainty that BPA impliedly requires for purposes of planning or establishing rates can be satisfied by restricting utilities from reentering the REP until after the current two-year rate-making cycle. However, there is no justification for additional punitive provisions that delay customers receiving benefits of the REP for years or decades following the current rate period.

**H.     BPA's approach to the REP has been sporadic and inconsistent.**

BPA contends that it has consistently interpreted the REP over a period of 28 years with respect to requiring deemer provisions in RPSAs. BPA Br. 36-37. And, it self-righteously suggests that the Idaho Power is precluded from challenging the deemer concept now, because it failed to do so in connection with the 1981 RPSA. BPA Br. 63. BPA's contentions belie the historical record that illustrate that BPA's actual approach to deemer issues has been sporadic, inconsistent, and it has not hesitated to drastically modify the economic consequences of the 1981 RPSA by extra-contractual and post-contractual actions.

As pointed out in Section E, herein, while the REP was in its infancy (but after all the IOUs had signed the 1981 RPSAs), BPA changed the economics of the 1981 RPSA by imposing a major change in the ASC Methodology against the strenuous objections of IOUs, thus leading to the accumulation of deemer balances. *See PacifiCorp,* 795 F.2d 816; I.E.R. Vol. II, 137, 138 (R.A.R. 074905, 074912).

In the early 1990s, BPA also insisted on a more onerous compound interest rate to apply to Idaho Power's deemer balance than was applied to another utility. Rather than implementing the NWPA to benefit residential customers in the region in a uniform and predictable manner, BPA's based its imposition of a compound interest rate on the assumption that it was aggressively negotiating the terms of a mutual contract:

> *. . . Any normal business would naturally want favorable terms and conditions* when it came to negotiating the treatment of interest on an outstanding balance.

I.E.R. Vol. II, 134 (R.A.R. 062558) (emphasis added). BPA's implementation of the 1981 RPSA in this respect therefore disregarded the principle that in implementing the REP, ". . . Congress specifically directed BPA to conduct its operations in a manner that does not conform with the "sound business principles" that the agency is generally required to follow." *Pacific Northwest Generating Cooperative v. BPA* ("*PNGC I*"), 580 F.3d 792, 822 (9th Cir. 2009).

Subsequently, BPA implemented the REP by offering and signing ten-year-long 2000 REP Settlement Agreements with IOUs.[21] In these new agreements, BPA departed from its aggressive-business approach to the deemer issue, and it neither imposed new deemer provisions nor enforced preexistent deemer

---

[21]     I.E.R. Vol. II, 142 (R.A.R. 075374).

balances.[22] No party challenged this aspect of the 2000 Settlement Agreements in litigation before this Court.

BPA also cites to the 2000 RPSA as evidence of its consistent implementation of deemer provisions. In fact, the 2000 RPSA was a dead letter, and should not be relied upon for any precedent, as evidenced by BPA when it moved this Court in 2004 to dismiss appeals from the 2000 RPSA and the BPA Record of Decision that adopted the 2000 RPSA.[23] BPA based its motion upon the fact that petitioners had signed the 2000 REP Settlement Agreements, and therefore petitioners were:

> . . . *contractually prohibited*" from challenging the 2000 RPSA, and a dismissal of the appeals would be "*without prejudice* to any party's ability to file a new petition for review challenging the prototype RPSA developed in the RPSA ROD (or any contract based on such prototype RPSA) or the RPSA ROD, in the event any such RPSA is executed.[24]

This Court granted BPA's motion.[25] In actuality, the present litigation is the first opportunity that Idaho Power has had to challenge BPA's deemer provisions, in

---

[22]    I.E.R. Vol. II, 151 (R.A.R. 106553) (emphasis added).

[23]    "Unopposed Motion to Dismiss for Lack of Jurisdiction," dated March 15, 2004, at 1, filed in *Portland General Electric Company, et al. v. BPA,* (9th Cir. Docket Nos. 01-70002, 01-70008, 01-70009, 01-70014, 01-70020, 01-70041, 01-7006) (emphasis added).

[24]    *Id.* at 6-7.

[25]    "Order dismissing Appeals for Lack of Jurisdiction", dated May 26, 2004, filed in *Portland General Electric Company, et al. v. BPA,* (9th Cir. Docket Nos. 01-70002, 01-70008, 01-70009, 01-70014, 01-70020, 01-70041, 01-7006).

light of all of BPA's actions in implementing the REP since 1981. BPA's approach to the Idaho Power's deemer balance now is to mechanically and arbitrarily carry forward the historic deemer balance from the 1981 RPSA, without considering BPA's part in causing the balance after the 1981 RPSA had been signed, and without considering the effect that such balances are likely to have in obstructing participation in the REP in the future.

### III. ADOPTION OF OTHER ARGUMENTS

In the interest of brevity, the Idaho PUC and Idaho Power do not set forth in detail responses to the arguments of BPA and its allies respecting BPA's determinations of Lookback balances. The Idaho PUC and Idaho Power adopt by reference the arguments contained in the:

**A.** "Joint Reply Brief of Petitioners, Avista Corporation, PacifiCorp, Portland General Electric Company, and Puget Sound Energy" filed in this consolidated case.

**B.** "Joint Reply Brief of the Pacific Northwest Investor Owned Utilities (Avista Corporation, Idaho Power Company, PacifiCorp, Portland General Electric Company, and Puget Sound Energy, Inc.)" filed in the companion case, *Association of Public Agency Customers, et al. v. Bonneville Power Administration*, (9th Cir. Docket Nos. 08-75098, 08-75099, 08-75112, 08-75130, 08-75161).

**C.** "Reply Brief of Idaho Public Utilities Commission as Petitioner in Docket No. 08-75113," filed in the companion case, *Association of Public Agency Customers, et al. v. Bonneville Power Administration.*

## IV. RELIEF REQUESTED

For the foregoing reasons, the final determinations of BPA contained in the RPSA ROD should be declared to be arbitrary, capricious, an abuse of discretion and not in accordance with law. 5 U.S.C. § 706(2)(A). The RPSA ROD and 2008 RPSAs should be remanded to BPA with instructions to revise them in conformance with the opinion of the Court.

DATED this 25th day of March, 2010.

By: */s/ Donald L. Howell II*

Donald L. Howell, II
Deputy Attorney General
Idaho Public Utilities Commission
472 W. Washington Street
Boise, ID 83720-00074
don.howell@puc.idaho.gov
Telephone: (208) 334-0312
Facsimile: (208) 334-3762
Counsel for Idaho Public Utilities
Commission

By: */s/ R. Blair Strong*

R. Blair Strong
Paine Hamblen LLP
717 W. Sprague Ave, Ste 1200
Spokane, WA 99201-3505
r.blair.strong@painehamblen.com
Telephone: (509) 455-6000
Facsimile: (509) 838-0007
Counsel for Idaho Power Company

# CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed.R.App.P. 32(a)(7)C) and Ninth Circuit Rule 32-1, the foregoing brief, is proportionately spaced, has a typeface of 14 points or more and contains 6,851 words.

DATED this 25th day of March, 2010.


By: _/s/ R. Blair Strong_____
        R. Blair Strong

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of March, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF System.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First Class Mail, postage prepaid, to the following non-CM/ECF participants.

David Hill
Department of Energy
1000 Independence Avenue, S.W.
Washington, DC 20585

By: */s/ R. Blair Strong*
R. Blair Strong